| | |
|---|---|
| Andrew B. Zollinger, State Bar No. 24063944 | Thomas R. Califano (*pro hac vice admission pending*) |
| DLA Piper LLP (US) | DLA Piper LLP (US) |
| 1900 North Pearl Street, Suite 2200 | 1251 Avenue of the Americas |
| Dallas, Texas 75201 | New York, New York 10020-1104 |
| Telephone: (214) 743-4500 | Telephone: (212) 335-4500 |
| Facsimile: (214) 743-4545 | Facsimile: (212) 335-4501 |
| E-mail: andrew.zollinger@dlapiper.com | E-mail: thomas.califano@dlapiper.com |
| | |
| *Proposed Counsel for the Debtor* | Rachel Nanes (*pro hac vice admission pending*) |
| | DLA Piper LLP (US) |
| | 200 South Biscayne Boulevard, Suite 2500 |
| | Miami, Florida 33131 |
| | Telephone: (305) 423-8563 |
| | Facsimile: (305) 675-8206 |
| | E-mail: rachel.nanes@dlapiper.com |

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **CHAPTER 11** |
| **TARRANT COUNTY SENIOR LIVING** | § | |
| **CENTER, INC.**[1] | § | **CASE NO. 19-33756 (SGJ)** |
| | § | |
| **Debtor.** | § | |

**MOTION OF THE DEBTOR FOR INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTOR TO USE THE CASH COLLATERAL OF
UMB BANK, N.A., AS TRUSTEE; (II) PROVIDING UMB BANK, N.A., AS TRUSTEE,
ADEQUATE PROTECTION; AND (III) MODIFYING THE AUTOMATIC STAY**

The above-captioned debtor and debtor-in-possession (the "Debtor"), by and through its proposed counsel, DLA Piper LLP (US), hereby submits this motion (the "Motion"), pursuant to sections 102, 361, 362, and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 4001, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the

---

[1] The last four digits of the Debtor's federal tax identification number are 8602.

"Proposed Interim Order"), and a final order, which will be submitted in substantially the same form as the Proposed Interim Order in advance of any final hearing on this Motion (the "Proposed Final Order" and together with the Proposed Interim Order, the "Proposed Orders"), (i) authorizing the Debtor to use cash collateral (the "Cash Collateral") of the Trustee (as defined below), (ii) approving the form of adequate protection provided to the Trustee, and (iii) modifying the automatic stay. In support of this Motion, the Debtor relies upon, and incorporates by reference, (i) the *Declaration of Louis E. Robichaux IV in Support of Chapter 11 Petition and First Day Pleadings* (the "First Day Declaration"),[2] filed with the Court contemporaneously herewith, and (ii) the *Attorney Checklist Concerning Motion and Order Pertaining to Use of Cash Collateral and Post-Petition Financing* attached hereto as **Exhibit B**. In further support of this Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over the Debtor, its estate, and this chapter 11 case (the "Chapter 11 Case") pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 102, 361, 362, and 363 of the Bankruptcy Code and rules 4001, 6003, and 6004 of the Bankruptcy Rules.

---

[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

**BACKGROUND**

A.   **The Chapter 11 Case**

4.   On November 5, 2019 (the "Petition Date"), the Debtor commenced this Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.   The Debtor remains in possession of its assets and continues to operate and manage its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.   As of the date hereof, no trustee, examiner or committee of creditors has been appointed in this Chapter 11 Case.

7.   Additional information regarding the Debtor and this Chapter 11 Case, including the Debtor's business operations, capital structure, and the reasons for and objectives of this Chapter 11 Case, is set forth in the First Day Declaration.

B.   **The Debtor**

8.   Incorporated in 2006, the Debtor is a not-for-profit corporation that built a best in class senior living facility in Fort Worth, Texas (the "Facility"). In particular, the Debtor operates a continuing care retirement community (a "CCRC") that offers its senior residents (the "Residents") a continuum of care in a campus-style setting, providing living accommodations and related health care and support services to a target market of seniors aged sixty-two and older. The Debtor enables seniors to remain on the same campus as they age and their needs change by providing various levels of support and care at the same facility. In addition, the Debtor provides Residents with multiple entertainment outlets and other social benefits for all stages of their retirement living.

9.   The Facility consists of approximately 188 independent living ("IL") apartment-style residences in one-, two- and three-bedroom configurations within three towers, each of which

is eleven stories. The Facility also houses 42 residential-style assisted living ("AL") suites, 20 memory support ("MS") assisted living suites and a skilled nursing facility ("SNF") with 46 skilled nursing beds, all located on a 574,000 square foot, 2.5 acre campus. As of October 25, 2019, 176 IL units were occupied (93.6% occupancy), 42 AL units were occupied (100% occupancy), 20 MS units were occupied (100% occupancy), and 45 SNF units were occupied (97.8% occupancy).

10. The Debtor is known for its exceptional service and quality as evidenced by its five star overall rating and a five star health inspection rating by the Centers for Medicare & Medicaid Services. Additionally, the Debtor is the recipient of a Silver Achievement in Quality Award by the American Health Care Association and National Center for Assisted Living.

11. The Debtor is governed by a Board of Directors that is designated by Lifespace Communities, Inc. ("Lifespace"). Lifespace has been the sole corporate member of the Debtor since the Membership Substitution Effective Date. Lifespace is a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "IRC"), that is chartered under the laws of the State of Iowa and is authorized to do business in the State of Texas (among other states). Lifespace's mission is to create communities that celebrate the lives of seniors. Lifespace, directly or through affiliates, owns and operates fourteen (14) other communities in eight (8) states.

12. Prior to the Membership Substitution Effective Date, Stayton's sole corporate member and sponsor was SQLC, a non-profit corporation chartered under the laws of the State of Texas, a tax-exempt organization under section 501(c)(3) of the IRC, and a "supporting organization" and public charity under section 509(a)(3) of the IRC.

C.  **The Resident Contracts**

13. As is common practice in the CCRC industry, a resident interested in occupying an IL unit in the Facility must enter into a continuing care contract (a "Continuing Care Contract") with the Debtor. Unlike a pure rental retirement community, whereby a resident pays monthly fees for services (which fees may increase as the resident's needs change), the Continuing Care Contract is a life care residency contract whereby a resident pays an entrance fee (an "Entrance Fee") and fixed monthly fees for the Debtor's commitment to provide life care benefits for the duration of the resident's life, regardless of whether the resident's needs change over time which may require additional services to be provided by the Debtor. Significantly, in certain circumstances, the Debtor's commitment to provide life care benefits continues even if the resident's financial condition deteriorates and the resident is unable to continue making payments under his or her Continuing Care Contract.

14. In addition to Continuing Care Contracts, the Debtor also offers contracts for direct admission into an AL suite (the "Assisted Living Residency Agreement") and the SNF (the "SNF Residency Agreement" and collectively with Continuing Care Contracts and Assisted Living Residency Agreements, the "Residency Agreements").

D.  **The Debtor's Capital Structure**

15. As of August 31, 2019, on a net book value basis, Stayton had approximately $124.3 million in Assets consisting of approximately: (i) $11.7 million in unrestricted cash and cash equivalents; (ii) $899,000 in accounts receivable; (iii) $174,000 of deferred entrance fee receivables; (iv) $106.0 million in fixed assets; (v) $4.9 million of restricted cash; and (vi) $603,000 of other Assets, net of accumulated amortization and depreciation.

16. As of August 31, 2019, Stayton had approximately $222.7 million of liabilities, net of accumulated amortization of non-refundable entrance fees, deferred financing costs and original issue premium, which consisted of approximately: (i) $355,000 of trade accounts payable; (ii) $2.9 million of oversight fees owed to SQLC; (iii) $2.6 million of current resident refund obligations; (iv) $102.3 million in entrance fee liabilities; (v) $110.4 million of long-term municipal bond obligations; and (vi) $7.5 million of subordinated note obligations.

17. The Debtor's primary liabilities are related to the long-term municipal bonds issued for the benefit of the Debtor totaling approximately $109.7 million, inclusive of outstanding principal and interest. Specifically, Tarrant County Cultural Education Facilities Finance Corporation (the "Issuer") and UMB Bank, N.A., in its capacity as successor trustee (the "Bond Trustee"), are parties to an Indenture of Trust, dated as of October 1, 2009 (the "Bond Indenture"), pursuant to which the Issuer issued retirement facility revenue bonds in the initial principal amount of $166,575,000, consisting of (i) $100,275,000 principal amount direct note obligation, Series 2009A Bonds (the "2009A Bonds"); (ii) $10,000,000 principal amount direct note obligation, Series 2009B Bonds (the "2009B Bonds"); and (iii) $56,300,000 principal amount direct note obligation, Series 2009C Bonds (the "2009C Bonds") (the 2009A Bonds, 2009B Bonds and 2009C Bonds will hereafter be collectively referred to as, the "Bonds").

18. Pursuant to a Loan Agreement, dated as of October 1, 2009 (the "Loan Agreement"), between the Debtor and the Issuer, the Issuer loaned the proceeds of the Bonds to the Debtor for the purpose of acquiring, constructing, and equipping the Facility.

19. The Debtor and UMB Bank, N.A., in its capacity as successor master trustee (the "Master Trustee" and together with the Bond Trustee, the "Trustee"), entered into a Master Bond Indenture, Deed of Trust and Security Agreement, dated as of October 1, 2009 (as it may be further

amended from time to time in accordance with its terms, the "Master Indenture" and together with the Bond Indenture and Loan Agreement, the "Original Bond Documents"), pursuant to which the Debtor issued the Tarrant County Senior Living Center Inc. Series 2009A, Series 2009B and Series 2009C Notes (collectively, the "Notes") to provide for its loan repayment obligations under the Loan Agreement.[3]

E.       **Events Leading to Restructuring**

20.      The Debtor relies on revenue generated by existing and new residents to, among other things, maintain its day-to-day operations, service its debt obligations, and honor its resident refund obligations. This revenue is impacted, in large part, by the Debtor's ability to attract new residents, especially in its early "fill-up" stage. However, as has become common in the senior living industry and in particular among CCRCs, Stayton was hampered by ramp up delays both in construction and original move-in sales which caused a ripple effect that has threatened the Debtor's ability to honor its long-term debt obligations and maintain its operational stability. To address those issues, in July 2017, SQLC retained Seniority, Inc., which immediately implemented a number of initiatives to control operating costs and improve service quality. However, due to highly competitive market conditions in Fort Worth and surrounding areas as well as other factors, the Debtor continued to face pressure on its margins. Specific historical factors leading to the Debtor's financial issues, which were not anticipated when Stayton developed its projections in support of its bond financing, include: (a) net resident revenue approximately five percent (5%) less than initially projected; (b) a competitive labor market resulting in operating expenses being approximately twenty-five percent (25%) higher than initially projected; (c) implied monthly rent

---

[3] The 2009C Bonds and Series 2009C Note are no longer outstanding under the Original Bond Documents.

per occupant lower than initially projected; and (d) adjusted net operating income margin approximately fifty-four percent (54%) less than initially projected.

21. In light of its financial condition, the Debtor's Board of Directors decided to halt debt service payments to allow the Debtor to address its pressing need to restructure its bond debt and to ensure it maintained sufficient liquidity to meet its operational and resident obligations. As a result of these challenges, the Debtor defaulted on its Bond Obligations by, among other things, failing to (i) maintain certain financial covenants, (ii) deliver certain audited financial statements, and (iii) make payments on the Series 2009 Notes from July 1, 2018 to May 1, 2019. Consequently, prior to the filing of this Chapter 11 Case, the Trustee was entitled to exercise certain remedies against the Debtor, subject to the terms of the Second Forbearance Agreement (as defined below), which limits the exercise of those remedies for the period and upon the conditions set forth therein.

**F.     The Refinancing Transaction**

22. In order to address the Debtor's financial condition, the Debtor, SQLC, Lifespace, the Trustee, and the holders of at least sixty-seven percent (67%) of the outstanding principal amount of the Bonds issued, as applicable, negotiated and entered into that certain (i) Plan Support Agreement, dated as of May 10, 2019 (the "Plan Support Agreement"), (ii) Second Forbearance Agreement, dated as of May 10, 2019 (the "Second Forbearance Agreement"), (iii) Affiliation Agreement, dated as of May 10, 2019, and (iv) Liquidity Support Agreement, dated as of June 1, 2019 (the "Liquidity Support Agreement") that together with a refinancing of the Debtor's bond obligations, provide for the following (the "Refinancing Transaction"):

    a.    The substitution of Lifespace as the sole member of the Debtor, which occurred on June 20, 2019;

      b.      A consensual, tax-exempt refinancing of the Debtor's Bonds (the "Bond Refinancing");

      c.      An agreement by the Trustee to forbear from exercising remedies under the Original Bond Documents while the Debtor pursues the Bond Refinancing;

      d.      An agreement by Lifespace to provide liquidity support for the benefit of the Debtor prior to, during and following the Bond Refinancing; and

      e.      A pre-packaged chapter 11 bankruptcy proceeding to implement the Bond Refinancing.

23. In accordance with the Liquidity Support Agreement, Lifespace has deposited Three Million Dollars ($3,000,0000.00) with the Trustee to be held in a newly-created account known as the Liquidity Support Account through the effective date of the Plan to provide an additional source of funding to the Debtor for, among other things, operating expenses.

24. As contemplated by the Plan Support Agreement, the parties negotiated the terms of the *Debtor's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as it may be amended, modified, or supplemented, the "Plan"), filed contemporaneously herewith, pursuant to which the Debtor seeks to, among other things, (i) implement the Bond Refinancing; (ii) provide that all General Unsecured Claims of the Debtor will be paid in the ordinary course of business as if this Chapter 11 Case had not commenced; and (iii) assume all Executory Contracts and unexpired leases, including the Residency Agreements, pursuant to section 365 of the Bankruptcy Code.

**G.**      **Prepetition Solicitation**

23. Commencing on September 30, 2019, the Debtor distributed the Disclosure Statement, the Plan, and related documents to the Holders of Bond Claims (as such terms are defined in the Plan) in Class 3, which is the only Impaired class entitled to vote on the Plan, to solicit votes to accept or reject the Plan through a "prepackaged" solicitation process.

24. A voting deadline of 5:00 p.m., prevailing Central Time, on October 31, 2019 was established to cast votes on the Plan. Of the Holders of Bond Claims that voted, 94.2% in number and 99.7% in dollar amount voted in favor of the Plan.

25. Concurrently with the filing of this Motion, the Debtor has filed the *Debtor's Motion for Entry of an Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Prepackaged Plan; (II) Fixing Deadline to Object to Disclosure Statement and Prepackaged Plan; (III) Approving Prepetition Solicitation Procedures and Form and Manner of Notice of Commencement, Combined Hearing, and Objection Deadline; (IV) Conditionally Directing the United States Trustee Not To Convene Section 341(A) Meeting of Creditors; and (V) Granting Related Relief* seeking, among other relief, a combined hearing on approval of the Disclosure Statement and confirmation of the Plan.

H. **Cash Collateral**

26. The Trustee has the right to enforce the Debtor's obligation to pay the amounts borrowed from the Issuer, pursuant to its rights under the Master Indenture, and by the fact that the Issuer's rights under the Loan Agreement and the Notes (and its rights under the other Bond Documents) were assigned to the Trustee pursuant to the Bond Indenture.

27. Subject to certain exceptions, the Trustee has a security interest, lien, and mortgage on substantially all of the Debtor's assets. Specifically, pursuant to the Master Indenture, the Debtor has pledged and granted to the Trustee certain collateral, including but not limited to: (i) a first mortgage lien on the Facility and the land on which the Facility is located; (ii) a security interest in all personal property owned or hereafter acquired by the Debtor; and (iii) a security interest in all of the Gross Revenues (as defined in the Original Bond Documents) of the Debtor. In addition, all moneys and securities held by the Trustee have been pledged and assigned to the

Trustee as security for the payment amounts owed on account of the Bonds. All of the collateral described herein is referred to as the "Prepetition Collateral." The Trustee's liens on the Prepetition Collateral are referred to herein as the "Prepetition Liens."

28. In addition, pursuant to the terms of the Original Bond Documents and the Liquidity Support Agreement, certain accounts were established and are held by the Trustee, including, but not limited to the following funds, each as defined in the Original Bond Documents and Liquidity Support Agreement: the Bond Fund, the Construction Fund, the Reserve Fund, the Entrance Fee Fund, the Working Capital Fund, the Liquidity Support Account, and the Revenue Fund (collectively, the "Trustee-Held Funds"). As of the Petition Date, the Trustee-Held Funds totaled approximately $7.86 million.

I. **Agreed Use of Cash Collateral and Need for Adequate Protection**

29. Pursuant to section 362(c)(2)(A) of the Bankruptcy Code, the Trustee has consented to the Debtor's use of Cash Collateral in accordance with the terms and conditions set forth in the Proposed Orders. Without the use of Cash Collateral, the Debtor would suffer immediate and irreparable harm and would likely be required to cease operations immediately or, at a minimum, the Debtor's inability to use Cash Collateral would disrupt the Debtor as a going concern and would otherwise not be in the best interests of the Debtor or its creditors, including the holders of the Bonds and the Residents.

30. In lieu of giving the Trustee relief from the automatic stay or attempting to obtain this Court's approval for use of Cash Collateral on a non-consensual basis, the Debtor has agreed to provide adequate protection of the Prepetition Liens and other Prepetition Collateral on the terms set forth in the Proposed Orders and summarized below. The Debtor and the Trustee have

agreed to terms of the Proposed Orders as part of the Second Forbearance Agreement and Plan Support Agreement.

**J.     Summary of Key Terms of Proposed Orders**

31.     Certain of the terms of the Proposed Orders are summarized below:[4]

| Term | Brief Summary |
|---|---|
| **Use of Cash Collateral** | The Debtor is authorized to use Cash Collateral upon the terms and conditions set forth in the Proposed Orders from the Petition Date until the earlier of (i) the Debtor's ability to use Cash Collateral terminates as the result of the occurrence of a Termination Event or (ii) February 29, 2020. |
| **Adequate Protection** | The Trustee is entitled to adequate protection of its interest in the Cash Collateral. The following forms of adequate protection (collectively, the "Adequate Protection") shall be provided: |
| | (a) The Debtor shall pay to the Trustee for deposit into the Bond Fund, with respect to the immediately preceding month, amounts representing the lesser of (a) the monthly debt service payment due for such month with respect to the Series 2009 Notes as set forth in the Original Bond Documents and (b) an amount equal to 75% of any positive Forbearance Net Cash Flow for the preceding month; |
| | (b) the Trustee shall have a valid, perfected, and enforceable replacement lien and security interest (the "Replacement Lien") in (i) all assets of the Debtor existing on or after the Petition Date of the same type as the Prepetition Collateral, together with the proceeds, rents, products, and profits thereof, whether acquired or arising before or after the Petition Date, to the same extent, validity, perfection, enforceability, and priority of the liens and security interests of the Trustee as of the Petition Date (the "Postpetition Bond Collateral"); and (ii) all other assets of the Debtor of any kind or nature whatsoever within the meaning of section 541 of the Bankruptcy Code, whether acquired or arising prepetition or postpetition, together with all proceeds, rents, products, and profits thereof (the "Supplemental Collateral"; and, collectively with the Postpetition Bond Collateral, the "Collateral"); provided, however, Supplemental Collateral shall be exclusive of causes of action under Chapter 5 of the Bankruptcy Code and proceeds thereof with the exception of any causes of action pursuant to section 542 of the Bankruptcy Code). The Replacement Lien shall be subject and subordinate to only the Carve Out (as defined below) and any valid and perfected liens existing on the Petition Date that are senior to Liens of the Trustee against the Prepetition |

---

[4] The summary contained herein is only a brief summary. Capitalized terms used in the summary and not defined shall have the meanings ascribed to them in the Proposed Interim Order. The terms of the Debtor's use of Cash Collateral are set forth in detail in the Proposed Orders. In the event of any inconsistency between the above summary and the Proposed Orders, the terms of the Proposed Orders shall control.

| | |
|---|---|
| | Collateral ("Prior Liens"); |
| | (c) the Trustee shall have a superpriority administrative expense claim pursuant to section 507(b) of the Bankruptcy Code with recourse to and payable from any and all assets of the Debtor's estate, including but not limited to rights of the Debtor in, choses in action, or claims of any kind whatsoever, choate or inchoate, present or residual that for any reason cannot be made the subject of the Replacement Lien (the "Superpriority Claim"). The Superpriority Claim shall be subject only to Prior Liens and the Carve Out and shall have priority, pursuant to section 507(b) of the Bankruptcy Code, over any and all administrative expenses, diminution claims, and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (following entry of the Final Order), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtor, any successor trustee, or any creditor in this Chapter 11 Case, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment. |
| **Carve Out** | In partial consideration of the Debtor's continuing acknowledgement of the debt due and owing and the waiver of any claims under section 506(c) (following entry of the Final Order) and section 552(b) of the Bankruptcy Code, the Trustee consents to certain expenses and professional fees incurred during the pendency of this Chapter 11 Case that shall be superior in all instances to the liens and claims of the Trustee and all other parties (the "Carve Out"). For purposes hereof, the "Carve Out" means (a) the statutory fees of the United States Trustee pursuant to 28 U.S.C. § 1930 and the fees of the Clerk of this Court; and (b) for professionals retained by the Debtor or its estate and any statutory committee appointed in the Chapter 11 Case pursuant to section 1103 of the Bankruptcy Code, the fees and expenses of such professionals solely to the extent such fees and expenses (i) have actually been incurred by the corresponding professional between the Petition Date and the Termination Date, and (ii) have been allowed by the Court; provided, however, the amount of the "Carve Out" in (b) above shall be subject to a cap in the amount of $75,000 per week (with such amounts to be treated on a pro-rated basis for any partial weeks) for the period between the Petition Date and a Termination Date, minus the aggregate of (x) the amount of any retainer, deposit, or other identified funds that is available to pay such fees and expenses (including any amounts paid into any professional fee escrow), and (y) any additional amounts actually paid to such professionals (solely to the extent such payments are in addition to amounts included in the foregoing subsection (x)). The Debtor is authorized to use Cash Collateral to pay the fees, costs and expenses that constitute the Carve Out, as the same may be due and payable, either during the period this Interim Order remains in effect or thereafter, provided that no portion of the Prepetition Collateral or the Cash Collateral may be used by the Debtor, any committee or any of their professionals or any other person or entity to commence or prosecute (as opposed to analyze and investigate) any action, contest, challenge or objection with respect to the |

| | Trustee, the Bonds, the Bond Documents, or the Prepetition Collateral. Nothing herein shall constitute a waiver of any right of the Trustee to object to fees and expenses of any professionals or to challenge any assertion that any amount of the fees and expenses are not unpaid. The entry of this Interim Order shall continue to be a conclusive and binding determination on all parties that, except for the Carve Out, no costs or expenses of administration shall be imposed against the Trustee or the Prepetition Collateral or the Collateral under sections 105 , 506(c) (following entry of the Final Order) or 552(b) of the Bankruptcy Code, or otherwise. |
|---|---|

32. The Debtor believes that the adequate protection described herein and in the Proposed Orders is sufficient to protect any diminution in the value of the Trustee's interests and is fair and reasonable. The Trustee will be adequately protected and, as a result, will not be prejudiced in any way by the Debtor's use of Cash Collateral. Given these circumstances, the Court should authorize the use of Cash Collateral on the terms and conditions set forth herein and in the Proposed Orders.

## RELIEF REQUESTED

33. By this Motion, the Debtor seeks entry of the Proposed Orders, pursuant to sections 105(a), 361, 362, 363, and 364 of the Bankruptcy Code and rules 4001, 6003, and 6004 of the Bankruptcy Rules (i) authorizing the Debtor to use Cash Collateral, (ii) approving the form of adequate protection provided to the Trustee, (iii) modifying the automatic stay, and (iv) scheduling a final hearing.

## BASIS FOR RELIEF

A. **Legal Standard**

34. The Debtor's use of property of its estate is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of

business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

35. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor to use cash collateral with the consent of "each entity that has an interest in such cash collateral." 11 U.S.C. § 363(c)(2)(A) The Trustee is the only entity with an interest in the Cash Collateral and has consented to its use by the Debtor. Accordingly, the Debtor has satisfied section 363(c)(2) of the Bankruptcy Code. This Court has authorized debtors' use of cash collateral with the consent of entities with an interest in such cash collateral. *See In re Taco Bueno Restaurants, Inc., et al.*, Case No. 18-33678 (SGJ) (Bankr. N.D. Tex. Nov. 30, 2018) [Docket No. 160]; *In re Hingham Campus, LLC and Linden Ponds, Inc.*, 11-33912 (SGJ) (Bankr. N.D. Tex. August 1, 2011) [Docket No. 171].

36. Additionally, section 363(e) of the Bankruptcy Code requires a debtor to adequately protect the secured creditors' interest in property to be used by a debtor against any diminution in value of such interest resulting from the debtor's use of the property during the chapter 11 case.

37. A determination as to the adequacy of a debtor's proposed adequate protection is decided on a case-by-case basis. *See In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1019 (11th Cir. 1984); *In re Swedeland Dev. Group. Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985); *In re Columbia Gas Sys., Inc.,* 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992). By requiring adequate protection, the Bankruptcy Code seeks to shield a secured creditor from diminution in the value of its interest in its collateral during the period of use by the debtor in possession. *See Glasstream Boats*, 110 B.R. at 613; *George Ruggiere Chrysler-Plymouth*, 727

F.2d at 1019; *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.,* 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996). Adequate protection can come in various forms, including payment of adequate protection fees, payment of interest as well as granting of replacement liens and administrative claims.

B.    <u>The Trustee is Adequately Protected</u>

38.    A debtor's authority to use Cash Collateral is typically conditioned on providing "adequate protection" to secured creditors that assert an interest in such cash. "The concept of 'adequate protection' is not defined in the [Bankruptcy] Code except by the implications of the examples of adequate protection listed in [Bankruptcy Code section 361 of the Bankruptcy Code]." *In re Beker Industrial Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986). Section 361 identifies various types of adequate protection, including cash payments, additional liens, replacement liens, and such other relief that will result in the realization by the secured creditor of the "indubitable equivalent" of its interest in its collateral. *See* 11 U.S.C. § 361.

39.    The determination of adequate protection is a fact-specific inquiry that is to be made on a case-by-case basis. *See, e.g., MBank*, 808 F.2d at 1396-97 (the determination is a question of fact "which is to be decided flexibly on the proverbial 'case-by-case' basis") (citing *Martin*, 761 F.2d at 474); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) (the determination "is left to the vagaries of each case"). *See also In re Royal d'Iberville Corp.*, 10 B.R. 37, 39 (Bankr. S.D. Miss. 1981) ("Opinions as to what is adequate protection must be determined on a case-by-case basis and opinions will vary greatly from court-to-court because adequate protection is not defined in the Bankruptcy Code."). Furthermore, in determining adequate protection, "[t]he equities in each case must be weighed in striking a balance." *Stein*, 19 B.R. at 459.

40. The focus of the adequate protection requirement is to preserve the secured creditor's position at the time of the bankruptcy filing and protect the secured creditor from diminution in the value of its collateral during the reorganization process. *See Mosello*, 195 B.R. at 288; *Beker*, 58 B.R. at 736. *See also In re WorldCom, Inc.*, 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) ("The legislative history for section 361 of the Bankruptcy Code, which sets forth how adequate protection may be provided under section 363, makes clear that the purpose is to insure that the secured creditor receives the value for which the creditor bargained for prior to the debtor's bankruptcy.").

41. Here, the Adequate Protection proposed by the Debtor will fully protect the Trustee. In addition to monthly payments, the Trustee is also receiving the Replacement Lien and Superpriority Claim, subject only to the Carve Out. Furthermore, the Adequate Protection and other terms of the Debtor's use of Cash Collateral were the product of negotiations and agreement by the Trustee.

42. Based on the foregoing, the Debtor submits that the proposed Adequate Protection will fully protect the Trustee from any diminution in the value of its interest in the Cash Collateral and is fair, reasonable and sufficient to satisfy the requirements of the Bankruptcy Code. Accordingly, the Adequate Protection proposed herein and in the Proposed Orders is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

C. **The Requirements of Bankruptcy Rules 4001(c)(2) and 6003(b) Have Been Satisfied**

43. Pursuant to Bankruptcy Rule 4001(c)(2), a minimum of fifteen (15) days' notice is required before a final hearing on this Motion may take place. The same rule, however, also provides that the Court "may conduct a hearing before such 15-day period expires, but . . . may

authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(c)(2).

44. In addition, Bankruptcy Rule 6003(b) provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition," grant relief upon "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate[.]" FED. R. BANKR. P. 6003(b).

45. As set forth above, the Debtor has an immediate and urgent need to use Cash Collateral. Absent the use of Cash Collateral, the Debtor will not be able to meet its working capital and liquidity needs, and its estate, Residents, and creditors will suffer immediate and irreparable harm. Accordingly, the Debtor submits that the requirements of Bankruptcy Rules 4001(c)(2) and 6003(b) have been satisfied.

D.    **The Carve Out**

46. With the inclusion of the Carve Out, the Proposed Orders do not directly or indirectly deprive the Debtor's estate or other parties-in-interest of possible rights and powers by restricting the services for which professionals may be paid in this Chapter 11 Case. *See In re Ames Dept. Stores, Inc.,* 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). In *Ames*, the court found such "carve outs" for professional fees to be not only reasonable, but necessary to ensure that official committees and debtors' estates can retain assistance from counsel. *See id.* at 41. The Adequate Protection is expressly subject and subordinated to the Carve Out, as described above.

**E.**     **The Court Should Schedule a Final Hearing**

47.     Pursuant to Bankruptcy Rule 4001(b)(2), the Debtor requests that the Court schedule a final hearing on the Motion as soon as practicable, but in no event later than thirty (30) days following the entry of an interim order, and fix the date prior to the final hearing for the filing of objections to the Motion.

## NOTICE

48.     Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the Northern District of Texas; (b) each of the Debtor's twenty (20) largest unsecured creditors; (c) counsel to the Trustee; (d) the Internal Revenue Service; (e) the Office of the Attorneys General for Texas; (f) the State of Texas Department of Health; (g) the Texas Secretary of State, Securities Division; (h) the Banks; and (i) all parties that assert a lien on the Debtor's assets.

*[Remainder of page left intentionally blank]*

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court enter the Proposed Orders granting the relief requested herein and grant such other and further relief as the Court may deem just and appropriate.

Dated: November 5, 2019
        Dallas, Texas

**DLA PIPER LLP (US)**

By: /s/ Andrew B. Zollinger
Andrew B. Zollinger, State Bar No. 24063944
DLA Piper LLP (US)
1900 North Pearl Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 743-4500
Facsimile: (214) 743-4545
E-mail: andrew.zollinger@dlapiper.com

- and -

Thomas R. Califano (*pro hac vice admission pending*)
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
E-mail: thomas.califano@dlapiper.com

- and -

Rachel Nanes (*pro hac vice admission pending*)
DLA Piper LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Telephone: (305) 423-8563
Facsimile: (305) 675-8206
E-mail: rachel.nanes@dlapiper.com

*Proposed Counsel for the Debtor*