Andrew B. Zollinger, State Bar No. 24063944
DLA Piper LLP (US)
1900 North Pearl Street, Suite 2200
Dallas, Texas 75201
Tel: (214) 743-4500
Fax: (214) 743-4545
E-mail: andrew.zollinger@dlapiper.com

PROPOSED COUNSEL FOR THE DEBTOR

Thomas R. Califano (*pro hac vice* pending)
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Tel: (212) 335-4500
Fax: (212) 335-4501
E-mail: thomas.califano@dlapiper.com

Rachel Nanes (*pro hac vice* pending)
DLA Piper LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Tel: (305) 423-8563
Fax: (305) 675-8206
E-mail: rachel.nanes@dlapiper.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **CHAPTER 11** |
| **TARRANT COUNTY SENIOR LIVING** | § | |
| **CENTER, INC.**[1] | § | **CASE NO. 19-33756 (SGJ)** |
| | § | |
| Debtor. | § | |

## DISCLOSURE STATEMENT FOR DEBTOR'S PREPACKAGED PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

NO CHAPTER 11 CASE HAS BEEN COMMENCED AS OF THE DATE OF DISTRIBUTION OF THIS DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS DISTRIBUTED TO YOU AS PART OF A PREPETITION SOLICITATION OF YOUR VOTE ON A PREPACKAGED PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.

Dated: September 30, 2019

---

[1] The last four digits of the Debtor's federal tax identification number are 8602.

## IMPORTANT INFORMATION FOR YOU TO READ

**Tarrant County Senior Living Center, Inc. d/b/a Stayton at Museum Way (the "*Debtor*" or "*Stayton*") is providing you with the information in this *Disclosure Statement for Debtor's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, altered, revised or supplemented from time to time, the "*Disclosure Statement*") because you are a creditor entitled to vote on the *Debtor's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, altered, revised or supplemented from time to time, the "*Plan*"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan. Nothing in this Disclosure Statement may be relied upon or used by any Person for any other purpose. The Debtor is soliciting your vote to approve the Plan before the Debtor commences a voluntary reorganization under chapter 11 of the Bankruptcy Code.**

**The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Section 8 of the Plan. There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or otherwise waived.**

**If sufficient votes to obtain confirmation of the Plan are received and certain other conditions are met, the Debtor intends to commence a case under chapter 11 of the Bankruptcy Code (the "*Chapter 11 Case*") in the United States Bankruptcy Court for the Northern District of Texas (the "*Bankruptcy Court*") to implement the Plan. Because the Chapter 11 Case has not yet commenced, this Disclosure Statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of section 1125 of the Bankruptcy Code. If the Debtor commences the Chapter 11 Case, then it will promptly seek an order of the Bankruptcy Court: (i) approving this Disclosure Statement as containing "adequate information"; (ii) approving the solicitation of votes as complying with sections 1125 and 1126 of the Bankruptcy Code; and (iii) confirming the Plan.**

**The Board of Directors of the Debtor and the Debtor's sole corporate member approved the transactions contemplated by the Plan and described in this Disclosure Statement. The Debtor believes that the compromises contemplated under the Plan are fair and equitable, maximize the value of the Estate and provide the best recovery to Holders of Claims. The Debtor, therefore, strongly recommends that all Holders of Claims whose votes are being solicited submit votes to <u>accept</u> the Plan by returning their Ballots so as to be <u>actually received</u> by the Voting Agent no later than <u>October 31, 2019 at 5:00 p.m. (prevailing Central time)</u> pursuant to the instructions provided herein and on the Ballots. Pursuant to the Plan Support Agreement, the Plan is currently supported by Holders of at least sixty-seven percent (67%) of the Bond Claims.**

---

**THE DEADLINE TO VOTE ON THE PLAN IS
OCTOBER 31, 2019 AT 5:00 P.M. (PREVAILING CENTRAL TIME).**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE
<u>ACTUALLY RECEIVED</u> BY THE VOTING AGENT BEFORE THE
VOTING DEADLINE IN ACCORDANCE WITH THE
INSTRUCTIONS PROVIDED HEREIN**

## DISCLAIMER

**IF YOU ARE ENTITLED TO VOTE TO APPROVE THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THIS DISCLOSURE STATEMENT. THE DEBTOR URGES YOU TO VOTE TO ACCEPT THE PLAN.**

**EACH HOLDER OF A CLAIM AGAINST THE DEBTOR ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND BANKRUPTCY CODE SECTION 1125. NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTOR, THEIR PROPERTY OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.**

**THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. ALTHOUGH THE DEBTOR BELIEVES AND HAS MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, IT DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL. ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016 (BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS COMPLYING WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER APPLICABLE NONBANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTOR AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR.**

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN**

CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. NEITHER THIS DISCLOSURE STATEMENT NOR THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

ALL OF THE PROJECTED RECOVERIES TO CREDITORS ARE BASED UPON THE ANALYSIS PERFORMED BY THE DEBTOR AND ITS PROFESSIONALS. ALTHOUGH THE DEBTOR HAS MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN AND IN THE EXHIBITS ATTACHED HERETO, THE DEBTOR CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION.

THE DEBTOR CANNOT ASSURE YOU THAT THE DISCLOSURE STATEMENT, INCLUDING ANY EXHIBITS THERETO, THAT IS ULTIMATELY APPROVED BY THE BANKRUPTCY COURT IN THE CHAPTER 11 CASE (I) WILL CONTAIN ANY OF THE TERMS DESCRIBED IN THIS DISCLOSURE STATEMENT; OR (II) WILL NOT CONTAIN DIFFERENT, ADDITIONAL OR MATERIAL TERMS THAT DO NOT APPEAR IN THIS DISCLOSURE STATEMENT. THE DEBTOR URGES EACH HOLDER OF A CLAIM TO (I) READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT (INCLUDING THE PLAN AND THE MATTERS DESCRIBED AS "RISK FACTORS" BELOW); AND (II) TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY PRIOR TO DECIDING WHETHER TO ACCEPT OR

REJECT THE PLAN. YOU SHOULD NOT RELY ON THIS DISCLOSURE STATEMENT FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO ACCEPT OR REJECT THE PLAN.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED THE LIQUIDATION ANALYSIS DESCRIBED HEREIN. THE DEBTOR HAS NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION IN CONNECTION WITH THE PLAN OR THIS DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. THE DEBTOR MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE ANY CLAIMS AND CAUSES OF ACTION AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIED ANY SUCH CLAIMS OR OBJECTIONS TO SUCH CLAIMS. HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, SECURITIES OR TAX ADVICE AND SHOULD CONSULT THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.

THE DEBTOR RECOMMENDS THAT CREDITORS SUPPORT AND VOTE TO ACCEPT THE PLAN. IT IS THE OPINION OF THE DEBTOR THAT THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR. ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.

# TABLE OF CONTENTS

I.    EXECUTIVE SUMMARY ........................................................................... 1

    A.    Introduction........................................................................................ 1

    B.    Overview of Stayton's Recent Financial Challenges............................. 2

    C.    Proposed Refinancing Transaction ...................................................... 2

    D.    Purpose of the Disclosure Statement ................................................... 7

    E.    The Solicitation Package..................................................................... 8

    F.    The Plan............................................................................................. 8

II.    BACKGROUND INFORMATION ......................................................... 13

    A.    Overview of the Debtor's Business. .................................................. 13

    B.    Services Offered and Fees Due under Stayton's Residency
        Agreements ...................................................................................... 14

    C.    Fees Required of Residents................................................................ 17

    D.    Organizational Structure of the Debtor............................................... 18

    E.    The Debtor's Prepetition Capital Structure......................................... 19

III.    THE CHAPTER 11 PLAN ...................................................................... 21

    A.    Treatment of Claims and Interests Under the Plan. ........................... 21

    B.    Cramdown. ....................................................................................... 25

    C.    Means for Implementation of the Plan................................................ 25

    D.    Assumption of Executory Contracts and Unexpired Leases................ 31

    E.    Conditions Precedent to Confirmation and the Effective Date............ 32

    F.    Effect of Confirmation. .................................................................... 34

    G.    Modification, Revocation or Withdrawal of the Plan. ........................ 39

    H.    Retention of Jurisdiction. ................................................................. 40

    I.    Miscellaneous Provisions.................................................................. 41

IV.    RISK FACTORS IN CONNECTION WITH THE PLAN........................ 44

    A.    Bankruptcy Considerations................................................................ 45

    B.    Risks Related to the Debtor's Business and Industry .......................... 45

    C.    Additional Factors............................................................................. 50

V.    PLAN CONFIRMATION AND CONSUMMATION................................ 51

    A.    The Confirmation Hearing. ............................................................... 51

    B.    Plan Confirmation Requirements Under the Bankruptcy Code............ 52

VI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
       PLAN ........................................................................................................................ 55

       A.    Chapter 7 Liquidation. ......................................................................................... 55

       B.    Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code. ..................... 55

VII.   CERTAIN FEDERAL TAX MATTERS RELATING TO THE SERIES 2019
       BONDS ..................................................................................................................... 56

VIII.  RECOMMENDATION AND CONCLUSION ............................................................ 58

## **EXHIBITS**

Exhibit A       Debtor's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, dated September 30, 2019

Exhibit B       Plan Support Agreement

Exhibit C       2019 Bond Documents

Exhibit D       Financial Projections

Exhibit E       Liquidation Analysis

Exhibit F       Form of Opinion of Bond Counsel

## I.     EXECUTIVE SUMMARY

This Executive Summary is only a general overview of the Disclosure Statement and the material terms of, and transactions proposed by, the Plan.  This Executive Summary is qualified in its entirety by the more detailed discussions herein and the exhibits attached hereto, including the Plan.  The Debtor urges all parties to read this Executive Summary in conjunction with the Disclosure Statement and the Plan.  A copy of the Plan is attached hereto as **<u>Exhibit A</u>.**  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

### A.     Introduction

Incorporated in 2006, Stayton is a not-for-profit corporation that has built a best-in-class senior living retirement community in Fort Worth, Texas dedicated to giving its residents an enriching lifestyle.  In particular, Stayton operates a continuing care retirement community ("***CCRC***") that offers its senior residents a continuum of care in a campus-style setting, providing living accommodations and related health care and support services to a target market of seniors aged sixty-two (62) and older.

As will be discussed in greater detail herein, Stayton has recently experienced financial distress as a result of several factors.  Stayton believes that the Plan, which is the result of extensive, arm's length negotiations among (i) Stayton, (ii) Senior Quality Lifestyles Corporation, Stayton's former sole corporate member ("***SQLC***"), (iii) Lifespace Communities, Inc., Stayton's current sole corporate member ("***Lifespace***"), (iv) UMB Bank, N.A., as successor bond trustee and successor master trustee (in either capacity, as applicable, the "***Trustee***") and (v) the Holders of at least sixty-seven percent (67%) of the Bond Claims (the "***Steering Committee***") provides the Debtor with a long-term resolution of its financial distress so that it can, among other things, service its debt obligations, fulfill its charitable mission and honor its commitments to the residents of Stayton.  In particular, Stayton, SQLC, Lifespace, the Trustee and the Steering Committee, as applicable, have agreed to the terms of an Affiliation Agreement, Liquidity Support Agreement, Second Forbearance Agreement and Plan Support Agreement together with a refinancing of Stayton's bond obligations (each defined and described below) that collectively provide for the following (the "***Refinancing Transaction***"):

1. the substitution of Lifespace as the sole member of Stayton, which occurred on June 20, 2019 (the "***Membership Substitution Effective Date***");

2. a consensual, tax-exempt refinancing of Stayton's Bonds (the "***Bond Refinancing***");

3. an agreement by the Trustee to forbear from exercising remedies under the Original Bond Documents (as defined below) while Stayton pursues the Bond Refinancing;

4. an agreement by Lifespace to provide liquidity support for the benefit of Stayton prior to, during and following the Bond Refinancing; and

5. a pre-packaged chapter 11 bankruptcy proceeding (the "***Chapter 11 Case***") to implement the Bond Refinancing.

Stayton submits this Disclosure Statement in connection with Stayton's solicitation of votes on the Plan. Stayton anticipates filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court on or about November 1, 2019 in order to, among other things, implement the Bond Refinancing.

### B. Overview of Stayton's Recent Financial Challenges

As discussed in greater detail herein, Stayton relies on revenue generated by existing and new residents to, among other things, maintain its day-to-day operations, service its debt obligations and honor its resident refund obligations. However, as has become common in the senior living industry and in particular among CCRCs, Stayton has faced challenges that have threatened Stayton's ability to honor its long-term debt obligations and maintain its operational stability. To address those issues, in July 2017, SQLC retained Seniority, Inc. ("***Seniority***"), which immediately implemented a number of initiatives to control operating costs and improve service quality. However, due to highly competitive market conditions in Fort Worth and surrounding areas as well as other factors, Stayton continued to face pressure on its margins. Specific historical factors leading to the downward pressure on Stayton's margins include: Stayton's (i) net resident revenue was approximately 5% less than initially projected; (ii) among other items, a competitive labor market resulted in operating expenses being approximately 25% higher than initially projected; (iii) implied monthly rent per occupant was lower than initially projected; and (iv) adjusted net operating income margin was approximately 54% less than initially projected. As a result of these challenges, Stayton defaulted on its Bond Obligations (as defined below), the principal amount of which totals approximately $106 million, by, among other things, failing to (i) maintain certain financial covenants, (ii) deliver certain audited financial statements, and (iii) make payments on the Series 2009 Notes (as defined herein) from July 1, 2018 to May 1, 2019. Consequently, the Trustee is entitled to exercise certain remedies against Stayton, subject to the terms of the Second Forbearance Agreement, which limits the exercise of those remedies for the period and upon the conditions set forth therein.

### C. Proposed Refinancing Transaction

In order to address its financial condition, Stayton, SQLC, Lifespace and the Trustee have agreed to the terms of the Refinancing Transaction, pursuant to which: (i) Lifespace has been substituted as the sole corporate member of Stayton; (ii) Stayton, Lifespace and the Trustee will implement the transactions contemplated by the Second Forbearance Agreement, Liquidity Support Agreement and Plan Support Agreement; and (iii) Stayton will solicit votes from Holders of Bond Claims in favor of the Bond Refinancing described in the Plan and commence the Chapter 11 Case to effectuate the Bond Refinancing.

#### 1. Lifespace Substitutes as Sole Corporate Member of Stayton

As an initial step in the Refinancing Transaction, SQLC agreed to, among other things, allow Lifespace to substitute as sole corporate member of Stayton (the "***Membership Substitution***") in accordance with the terms and conditions of that certain Affiliation Agreement,

dated as of May 10, 2019, between SQLC and Lifespace (the "*Affiliation Agreement*"). The Affiliation Agreement provides, in relevant part, as follows:

a. **Separate Corporate Identity**. Stayton will maintain its corporate identity separate and apart from Lifespace and the other entities affiliated with SQLC. Stayton will retain separate ownership of its assets and will remain separately responsible for its operations and liabilities.

b. **Management**. Lifespace will become responsible for management of Stayton, including strategic, operational, financial and legal oversight from Lifespace's headquarters.

c. **Lifespace Branding**. Stayton will maintain its name but transition to the Lifespace brand, including its corporate name, symbols, logos and designs.

d. **Impact on Residents**. Lifespace will launch a resident engagement initiative and implement actions intended to improve the current state of resident relations at Stayton and other SQLC facilities. Lifespace will maintain the Residents' Council at Stayton consistent with all laws and regulations and applicable accreditation standards. Lifespace will honor the terms of the existing Continuing Care Contracts, provided that Lifespace will have the ability to amend the Continuing Care Contracts in accordance with the terms of such agreements and applicable law. However, Lifespace may create, modify, or amend Continuing Care Contracts between Stayton and any future residents who were not residents of Stayton as of the Membership Substitution Effective Date. Additionally, Lifespace will honor benevolent care commitments of Stayton to its residents existing as of the Membership Substitution Effective Date and will apply Lifespace policies for new residents entering Stayton after the Membership Substitution Effective Date.

On the Membership Substitution Effective Date, all conditions precedent to the Membership Substitution were satisfied and Lifespace became the sole corporate member of Stayton.

## 2. Second Forbearance Agreement, Liquidity Support Agreement and Plan Support Agreement

In order to effectuate the Bond Refinancing, Stayton, Lifespace, the Trustee and the Steering Committee, as applicable, have negotiated and agreed to the terms of: (i) the Second Forbearance Agreement, (ii) the Liquidity Support Agreement and (iii) the Plan Support Agreement. The salient terms of each of these agreements are discussed in greater detail below:

a. **Second Forbearance Agreement**. Pursuant to that certain Second Forbearance Agreement, dated as of May 10, 2019, between Stayton and the Trustee (the "***Second Forbearance Agreement***"), a copy of which is attached to the Plan Support Agreement as Schedule 2, the Trustee has agreed to forbear from exercising remedies under the Original Bond Documents until February 29, 2020 (the "***Forbearance Period***"), unless terminated earlier, to provide the time necessary for Lifespace to complete the Membership Substitution and for Stayton to implement the Bond Refinancing through the Chapter 11 Case.

Pursuant to the Second Forbearance Agreement, Stayton is required to acknowledge, among other things, the validity of the Original Bond Documents, the outstanding amount owed under the Original Bond Documents and the validity and priority of the Trustee's liens. Additionally, to induce the Trustee to enter into the Second Forbearance Agreement, Stayton agreed that all reasonable fees and expenses of the Trustee (including, but not limited to reasonable fees and expenses of the Trustee's attorneys and financial advisor) in connection with the Second Forbearance Agreement and the Plan Support Agreement will be paid from amounts held on deposit in certain reserve accounts.

During the Forbearance Period, Stayton is required to pay monthly debt service payments in an amount equal to the lesser of (i) existing monthly debt service and (ii) 75% of any positive Forbearance Net Cash Flow (as defined in the Second Forbearance Agreement) for the preceding month, *provided, however*, that the obligation is capped at the unrestricted cash in excess of $5,464,000 as calculated at the end of each month. If the Second Forbearance Agreement remains in effect on November 15, 2019, the amount in the Bond Fund (as defined in the Second Forbearance Agreement) shall be paid by the Trustee to the Holders of the Bonds, but no draw shall be made from amounts on deposit in the Reserve Fund (as defined in the Second Forbearance Agreement).

As a condition of the Second Forbearance Agreement, Stayton is required to meet, or cause to be met, certain milestones, including commencing the Chapter 11 Case by no later than five (5) months after the Membership Substitution Effective Date.

Finally, to induce the Trustee to enter into the Second Forbearance Agreement, Stayton is required to release and discharge the Trustee and other related parties from any and all claims, causes of actions, suits and damages arising out of or related to the Original Bond Documents.

4

b.  **Liquidity Support Agreement**.  Pursuant to the Liquidity Support Agreement, dated as of June 1, 2019 between Lifespace and the Trustee (the "*Liquidity Support Agreement*"), a copy of which is attached to the Plan Support Agreement as Schedule 3, (i) on the date of execution of the Liquidity Support Agreement, Lifespace made a deposit of Three Million Dollars ($3,000,000) (the "*Interim LSA Funding*") to be held by the Trustee, which amount is held in a newly created account (the "*Liquidity Support Account*") under the Master Indenture (as defined below); and (ii) on the Effective Date of the Plan, Lifespace will provide additional liquidity support in the form of an unfunded commitment in the amount of up to Three Million Dollars ($3,000,000) (the "*Unfunded Liquidity Support*"), which may be drawn upon in accordance with the Liquidity Support Agreement and the Master Indenture.

Under certain circumstances specified in the Liquidity Support Agreement, the Trustee will have the right to withdraw money from the Liquidity Support Account prior to the Effective Date of the Plan, or from the Unfunded Liquidity Support after the Effective Date of the Plan, to the extent necessary to pay debt service related to the Series 2019 Bonds (as defined below) or the Bonds.  Stayton will also have the right to request a draw from the Liquidity Support Account or Unfunded Liquidity Support to pay operating expenses or debt service.

Stayton is required to repay to Lifespace any amounts drawn on the Liquidity Support Account or the Unfunded Liquidity Support, with interest thereon, in accordance with the Liquidity Support Agreement and the Master Indenture.  Stayton's repayment obligation under the Liquidity Support Agreement will constitute Subordinated Indebtedness (as defined in the Master Indenture) as set forth in the Liquidity Support Agreement and Master Indenture.

c.  **Plan Support Agreement**.  Subject to the terms of that certain Plan Support Agreement, dated as of May 10, 2019 (the "*Plan Support Agreement*"), a copy of which is attached hereto as **Exhibit B**, among Stayton, the Trustee, Lifespace and the Steering Committee, Stayton agreed to commence the Chapter 11 Case in the Bankruptcy Court in order to implement the Bond Refinancing. The Plan Support Agreement contemplates that Stayton will restructure and exchange the Bonds for new bonds to be issued by the Issuer and designated "Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2019" (the "*Series 2019 Bonds*").  The Series 2019 Bonds will be issued under an Indenture of Trust (the "*Series 2019 Bond Indenture*") between

the Issuer and UMB Bank, National Association, as bond trustee, and the proceeds thereof will be loaned to Stayton pursuant to the terms of a Loan Agreement between the Issuer and Stayton (the "*Series 2019 Loan Agreement*"). The Series 2019 Bonds will be limited obligations of the Issuer and will be secured in part by the Series 2019 Note (the "*Series 2019 Note*") issued by Stayton pursuant to the Amended and Restated Master Trust Indenture, Deed of Trust and Security Agreement (the "*Amended Master Indenture*"), which will amend and restate the Master Trust Indenture, Deed of Trust and Security Agreement, dated as of October 1, 2009 (the "*Original Master Indenture*"), between Stayton and the Trustee. All references herein to the "Master Indenture" means the Original Master Indenture prior to the Effective Date and means the Amended Master Indenture on and after the Effective Date. The forms of Series 2019 Bond Indenture (including the Series 2019 Bonds), Series 2019 Loan Agreement and Amended Master Indenture (including the Series 2019 Note) (collectively, the "*2019 Bond Documents*") are attached hereto as **Exhibit C**.

Additionally, in order to provide funding for the Chapter 11 Case, the Trustee has agreed to permit Stayton to use its cash collateral in accordance with the terms and conditions set forth in a proposed Cash Collateral Order attached to the Plan Support Agreement as Schedule 5.

The Steering Committee has agreed that, subject to the terms and conditions of the Plan Support Agreement and so long as no Agreement Termination Event (as defined in the Plan Support Agreement) has occurred, they will, among other things, support confirmation of the Plan and vote to accept the Plan.

3. **The Chapter 11 Case**

As the final step in the Refinancing Transaction, and subject to receiving the requisite number of votes in favor of the Plan, Stayton will commence the Chapter 11 Case in the Bankruptcy Court to pursue the Bond Refinancing. Among other things, the Plan provides as follows:

a. Stayton shall cause the Issuer to issue new Series 2019 Bonds in an aggregate principal amount equal to $105,795,000, plus all accrued and unpaid interest on the Bonds through the Effective Date of the Plan, on the terms and conditions set forth in the 2019 Bond Documents which are described more fully in Section III.C.3 of this Disclosure Statement.

b. The Plan will provide for the following classes of Claims and Interests and treatment of such Claims and Interests:

6

| Class | Claims and Interests | Status | Entitled to Vote |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Deemed to Accept) |
| 3 | Bond Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Unimpaired | No (Deemed to Accept) |
| 5 | Preserved Intercompany Claims | Unimpaired | No (Deemed to Accept) |
| 6 | Intercompany Claims | Impaired | No (Deemed to Reject) |
| 7 | Interests in Stayton | Unimpaired | No (Deemed to Accept) |

      c.      All Executory Contracts and unexpired leases, including Continuing Care Contracts, will be assumed pursuant to section 365 of the Bankruptcy Code.

      d.      The charter, bylaws, limited liability company agreement and other organizational documents of Stayton will (i) be amended or amended and restated by Stayton consistent with section 1123(a)(6) of the Bankruptcy Code and otherwise in accordance with the Plan and the Plan Support Agreement and (ii) be in form and substance reasonably acceptable to Stayton, the Trustee, the members of the Steering Committee and Lifespace.

      e.      Stayton will release certain parties, including, without limitation, the Trustee, the Steering Committee, Lifespace and the Issuer.

Subject to receiving the necessary affirmative votes, Stayton will commence the Chapter 11 Case on or around November 1, 2019 (the "*Petition Date*"). Stayton will seek entry of orders by the Bankruptcy Court confirming the Plan and approving the Disclosure Statement so that the Plan is confirmed within forty-five (45) days of the Petition Date. In order to protect the tax-exempt status of the Bond Refinancing, it is contemplated that the Plan will become effective no earlier than six (6) months and one (1) day after the Membership Substitution Effective Date, or no earlier than December 21, 2019.

## D.      Purpose of the Disclosure Statement

Stayton submits this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code in connection with: (i) the solicitation of votes on the Plan, and (ii) a hearing to consider confirmation of the Plan. Subject to receiving the requisite number of votes in favor of the Plan, Stayton anticipates commencing the Chapter 11 Case on or about November 1, 2019.

Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement that contains information of a kind, and in sufficient detail, to permit a hypothetical reasonable investor to make an informed judgment regarding acceptance of a proposed chapter 11 plan of reorganization before soliciting acceptances of such proposed plan. Stayton provides this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to certain Holders of Claims against Stayton because Stayton is asking such Holders of Claims to vote to accept the Plan prior to the filing of Stayton's Chapter 11 Case in a manner which is intended to be binding

in the Chapter 11 Case. This Disclosure Statement sets forth certain information regarding (i) Stayton's prepetition operating and financial history; (ii) Stayton's need to file for relief under chapter 11 of the Bankruptcy Code; (iii) the terms of the Plan; (iv) the manner in which distributions will be made under the Plan; (v) certain effects of confirmation of the Plan; (vi) certain risk factors associated with the Plan; and (vii) the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted. Stayton believes that the confirmation and implementation of the Plan is in the best interests of the Debtor's Estate, Creditors and all other interested parties.

This Disclosure Statement is subject to the Bankruptcy Court's approval, as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of each of the Classes whose votes are being solicited to make an informed judgment with respect to the Plan. **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN. ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.**

The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. To the extent that the information provided in this Disclosure Statement and the Plan (including any Plan Supplements) conflict, the terms of the Plan (including any Plan Supplements) will control. Terms not otherwise specifically defined herein will have the meanings attributed to them in the Plan. Each definition in this Disclosure Statement and in the Plan includes both the singular and plural. Headings are for convenience or reference and shall not affect the meaning or interpretation of this Disclosure Statement.

### E. The Solicitation Package

Only record holders of Claims in Class 3 as of the voting record date, September 27, 2019, are entitled to vote on the Plan. Holders of Claims in Class 3 will receive a solicitation package consisting of the following materials (collectively, the "***Solicitation Materials***"):

- a form ballot (the "***Ballot***"), which shall include the voting instructions; and

- this Disclosure Statement with all exhibits, including the Plan, and any other supplements or amendments to these documents.

### F. The Plan.

### 1. Purpose and Effect of the Plan

Chapter 11 of the Bankruptcy Code allows debtors to reorganize or to liquidate and wind up their affairs for the benefit of the debtors and their creditors. Upon the commencement of a chapter 11 case, an estate is created comprised of all the legal and equitable interests of a debtor as of the date the petition is filed, which typically remain in control of the debtor as a debtor-in-possession.

Pursuant to section 362 of the Bankruptcy Code, the filing of a chapter 11 petition imposes an automatic stay of all attempts by creditors or third-parties to collect or enforce prepetition claims against a debtor or otherwise interfere with its property or business, unless relief from the automatic stay is obtained from the bankruptcy court.

The Bankruptcy Code is designed to encourage the parties-in-interest in a chapter 11 proceeding to negotiate the terms of a chapter 11 plan so that it may be confirmed.  A chapter 11 plan is the vehicle for satisfying or otherwise addressing the claims against and the interests in the debtor.  Confirmation of a chapter 11 plan makes it binding on the debtor and all of its creditors and the prior obligations owed by the debtor to such parties are compromised in exchange for the obligations specified in the plan.

### 2.    Feasibility of the Plan.

In order to establish the feasibility of the Plan for purposes of section 1129(a)(11) of the Bankruptcy Code, the Debtor and its management team and advisors, have developed financial projections (the "***Financial Projections***") that are attached hereto as __Exhibit D__.  The Financial Projections set forth the projected financial performance of the Reorganized Debtor over a defined period of time based upon a number of assumptions and factors.

### 3.    Analysis of Recoveries to Holders of Claims and Interests under the Plan and Recommendation of the Debtor

The Plan provides for a comprehensive restructuring of the Debtor's Bond Obligations. The treatment of Class 3 is the product of extensive negotiations between the Debtor, SQLC, Lifespace, the Trustee and the Steering Committee.  The Steering Committee supports the treatment of Holders of Bond Claims in Class 3.

After a careful review of its current operations and liquidity, prospects as an ongoing business, and estimated recoveries to creditors in a sale scenario, the Debtor concluded that it will maximize recoveries to its stakeholders by reorganizing as a going concern through the Refinancing Transaction embodied in the Plan.  The Debtor believes that any alternative to confirmation of the Plan, such as liquidation, a partial sale of assets, or a sale of all or substantially all of its Assets, would result in materially lower recoveries for stakeholders, significant delays, protracted litigation, and greater administrative costs.  For these reasons, the Debtor believes that its business and Assets have significant value that would not be realized in a forced sale or a liquidation, either in whole or in substantial part, and that the value of the Debtor's Estate is considerably greater as a going concern.

As set forth more fully in Section VI herein, the Debtor believes that the Plan provides the best recoveries possible for the Debtor's stakeholders and recommend that, if you are entitled to vote, you vote to accept the Plan.

### 4. Classification and Treatment of Claims Under the Plan

Certain Classes of Claims are Impaired under the Plan. The Debtor is seeking votes to accept the Plan from Holders of Bond Claims in Class 3. For a description of the Classes of Claims and their treatment under the Plan, see Sections 3 and 4 of the Plan – Classification and Treatment of Claims.

Each Class of Claims, except Administrative Expense Claims, Accrued Professional Compensation Claims and Priority Tax Claims, are placed in the following Classes and will receive the following treatment under the Plan:

*Summary of Classification and Treatment of Claims Under the Plan*

| Class | Claims and Interests | Status | Entitled to Vote |
|-------|----------------------|--------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Deemed to Accept) |
| 3 | Bond Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Unimpaired | No (Deemed to Accept) |
| 5 | Preserved Intercompany Claims | Unimpaired | No (Deemed to Accept) |
| 6 | Intercompany Claims | Impaired | No (Deemed to Reject) |
| 7 | Interests in Stayton | Unimpaired | No (Deemed to Accept) |

### 5. Summary of Voting Requirements for Plan Confirmation.

#### a. In General.

Creditors should refer only to this Disclosure Statement and the Plan to determine whether to vote to accept or reject the Plan. Under the Bankruptcy Code, only Holders of Claims that are "impaired" are entitled to vote to accept or reject the Plan. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default. An impaired class of creditors votes to accept a plan if the holders of at least two-thirds (2/3) in dollar amount, and more than one-half (1/2) in number, of those creditors that actually cast ballots vote to accept such plan. Those classes that are not impaired are not entitled to vote and are deemed to accept a plan. Those classes that are not entitled to a distribution and will not retain property under a plan are deemed to reject a plan.

A class of interest holders is deemed to accept a plan if the holders of at least two-thirds (2/3) in amount of those interest holders that actually cast ballots vote to accept such plan. A class of interest holders is impaired, not entitled to vote, and deemed to reject the plan if the plan treats such holders by providing that they will retain no property and receive no distributions under the plan.

Pursuant to the Bankruptcy Code, only creditors who actually vote on the Plan will be counted for purposes of determining whether the required number of acceptances have been obtained. Failure to deliver a *properly completed ballot* by the Voting Deadline (as defined below) will result in an abstention; consequently, the vote will neither be counted as an acceptance or rejection of the Plan.

### 6. Impaired Classes Entitled to Vote.

The Claims in Class 3 are Impaired under the Plan and Holders of such Claims in this Class are entitled to vote to accept or reject the Plan.

### 7. Unimpaired Classes Deemed to Accept the Plan.

If a Creditor holds a Claim included within a Class that is not Impaired under the Plan, under Bankruptcy Code section 1126(f), the Creditor is deemed to have accepted the Plan with respect to such Claim and its vote of such Claim will not be solicited. Classes 1, 2, 4, 5 and 7 are Unimpaired under the Plan.

### 8. Classes Deemed to Reject the Plan and Do Not Vote.

Under Bankruptcy Code section 1126(g), Class 6 will receive no distributions on account of such Claims. Thus, Class 6 is deemed to have rejected the Plan and the vote of Holders of such Claims in Class 6 will not be solicited.

### 9. Voting Deadline.

The Debtor has engaged Epiq Corporate Restructuring, LLC as its voting agent (the "***Voting Agent***") to assist in the transmission of voting materials and tabulation of votes with respect to the Plan. If a Creditor holds a Claim classified in a voting Class of Claims under the Plan, the Creditor's acceptance or rejection of the Plan is important and must be in writing and submitted on time. The record date for determining which Creditors may vote on the Plan is September 27, 2019 (the "***Voting Record Date***"). The voting deadline is October 31, 2019 at 5:00 p.m. (prevailing Central Time) (the "***Voting Deadline***").

### 10. Voting Instructions.

Section 1126(c) of the Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims in that class, counting only those claims that actually vote to accept or to reject such plan.

The Voting Deadline for the Plan is October 31, 2019 at 5:00 p.m. (prevailing Central Time). In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and timely delivered.

Most Holders of Claims related to the Bonds will submit votes by completing a Ballot and returning it to their specified bank, broker, nominee or other intermediary (a "***Nominee***"). Each Nominee may provide specific instructions to beneficial Holders of Claims related to the Bonds on how to complete and submit a Ballot. Such Holders will be instructed to return their

11

Ballot to the Nominee to enable the Nominee to complete and submit a master Ballot to the Voting Agent so that it is received by the Voting Deadline. Beneficial Holders of Claims related to the Bonds should carefully follow the instructions that accompany their Ballot to ensure that it is properly received by the Nominee with sufficient time for the Nominee to complete a master Ballot that can be delivered to the Voting Agent by the Voting Deadline. Instructions for voting are more fully described in the Ballots.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, revocation, or withdrawal of Ballots will be determined by the Debtor in its sole discretion, following consultation with the Trustee, and such determination will be final and binding unless otherwise ordered by the Bankruptcy Court. Once a party delivers a valid Ballot for the acceptance or rejection of the Plan, such party may not withdraw or revoke such acceptance or rejection without the Debtor's written consent or an order of the Bankruptcy Court. The Debtor also reserves the right to reject any and all Ballots not in proper form, if the acceptance of which would, in the opinion of the Debtor with the advice of its counsel, be unlawful.

The Debtor further reserves the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions therein) by the Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtor (or the Bankruptcy Court) determines. Neither the Debtor nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities are cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last valid Ballot timely received shall be deemed to reflect the voter's intent and shall supersede and revoke any earlier received Ballot. If you simultaneously cast inconsistent duplicate Ballots with respect to the same Claim, such Ballots shall not be counted.

## 11. Additional Information.

If you have any questions about (i) the procedure for voting on your Claim, (ii) the package of materials that you have received, or (iii) obtaining or replacing a Ballot, the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Solicitation Agent by (a) calling (866) 897-6433 (toll free) or +1 (646) 282-2500 (international) and ask for the Solicitation Group: (b) writing to Tarrant Solicitation, c/o Epiq Corporate Restructuring, LLC, 777 Third Avenue, 12th Floor, New York, NY 10017; or (c) emailing at tabulation@epiqglobal.com with a reference to "Tarrant" in the subject line.

## 12. The Confirmation Hearing

Following commencement of the Chapter 11 Case, the Debtor will request that the Bankruptcy Court schedule a combined hearing to consider, among other things, (i) approval of

the Disclosure Statement, approval of the Solicitation Materials, which shall include procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan, and (iii) confirmation of the Plan (the "***Confirmation Hearing***").  The Debtor will provide notice of the Confirmation Hearing to all necessary parties in accordance with applicable law.

The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on any master service list ordered by the Bankruptcy Court and any entities which filed objections to the Plan, without further notice to parties in interest.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  The Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

### 13.    Effect of Confirmation and Consummation of the Plan.

Following Confirmation, subject to Section 8 of the Plan, the Plan will be consummated on the Effective Date.  Among other things, on the Effective Date, certain release, injunction, exculpation and discharge provisions set forth in Section 9 of the Plan will become effective.  As such, it is important to read the provisions contained in Section 9 of the Plan very carefully so that you understand how confirmation and consummation of the Plan will affect you and any Claim you may hold against the Debtor so that you cast your vote accordingly.

Following the Effective Date, the Bonds will be cancelled, and in return, Holders of the Bonds will receive a Pro Rata share of the Series 2019 Bonds.  Additionally, following the Effective Date, the 2019 Bond Documents and the governing documents related to the Series 2019 Bonds shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtor.

## II.    BACKGROUND INFORMATION

### A.    Overview of the Debtor's Business.

Stayton operates a CCRC that offers its senior residents a continuum of care in a luxury campus-style setting, providing living accommodations and related health care and support services to a target market of seniors aged sixty-two (62) and older.  Stayton consists of approximately 188 independent living ("***IL***") apartment-style residences in one-, two- and three-bedroom configurations within three towers, each of which are eleven stories.  Stayton also houses 42 residential-style assisted living ("***AL***") suites, 20 memory support ("***MS***") assisted living suites and a skilled nursing facility ("***SNF***") with 46 skilled nursing beds, all located on a 574,000 square foot, 2.5 acre campus (the "***Facility***").  As of August 2019, 176 IL units were occupied (93.6% occupancy), 41 AL units were occupied (97.6% occupancy), 16 MS units occupied (80% occupancy), and 41 SNF units were occupied (89.1% occupancy).

As is common practice in the CCRC industry, a resident interested in occupying an IL unit in the Facility must enter into a continuing care contract (a "***Continuing Care Contract***") with Stayton.  Unlike a pure rental retirement community, whereby a resident pays monthly fees for services (which fees may increase as the resident's needs change), the Continuing Care

Contract is a life care residency contract whereby a resident will pay an Entrance Fee and fixed Monthly Fees (each as defined below) for Stayton's commitment to provide Life Care Benefits (as defined below) for the duration of the resident's life, regardless of whether the resident's needs change over time which may require additional services to be provided by Stayton. Significantly, Stayton's commitment to provide Life Care Benefits continues even if the resident's financial condition deteriorates and the resident is unable to continue to make its payments.

In addition to Continuing Care Contracts, Stayton also offers contracts for direct admission into an AL suite (the "***Assisted Living Residency Agreement***") or SNF (the "***SNF Residency Agreement***" and collectively with Continuing Care Contracts and Assisted Living Residency Agreements, the "***Residency Agreements***").  The services offered and fees due under each of Stayton's Continuing Care Contracts, Assisted Living Residency Agreements and SNF Residency Agreements are summarized below.

**B.      Services Offered and Fees Due under Stayton's Residency Agreements**

**1.      Services Provided Under Continuing Care Contracts.**

**a.      Amenities**

Occupancy is provided in an IL unit of the resident's choice, subject to availability.  Each IL unit is furnished with a refrigerator, freezer, range/oven, microwave oven, dishwasher, garbage disposal, washer, dryer, an emergency call system, fire sprinkler system and a telephone/data communications port.

Residents have use of the common areas of Stayton, which include central gathering space, multi-purpose room, living room, main dining room, club area with indoor/outdoor bar, sidewalk café/bistro, private dining room, aquatic/fitness center, business center/library, beauty salon/barber shop, card lounge/game room, creative arts center, residential storage, a mail alcove and administrative offices.  Each IL unit is assigned a garage parking space, when available.

**b.      Services**

Stayton provides residents with the following services, the cost of which is included in the Monthly Fees:

|     |     |     |
| --- | --- | --- |
| i. | <u>Housekeeping</u>. | Housekeeping of the IL unit, including vacuuming, cleaning, mopping, sweeping and changing of bed linens, occurs on a weekly scheduled basis. |
| ii. | <u>Utilities</u>. | The costs of sewer, water, waste disposal, electricity, heat, air-conditioning, and basic cable television service are included in the Monthly Fee.  The IL unit is centrally wired for cable television as well as a telephone/data communications port.  Residents are responsible for all telephone, premium cable television and internet service provider charges. |

iii.    <u>Security and Emergency Alert System</u>.  Each IL unit is equipped with smoke detectors, sprinkler system and an emergency alert system.  Stayton monitors the emergency alert systems on a twenty-four hour basis and coordinates emergency responses as appropriate.

iv.    <u>Laundry</u>.  Weekly scheduled laundry service for residents' personal bed linens is provided.

v.    <u>Mail</u>. A mailbox for each IL unit that conforms with U.S. mail postal regulations is provided in a central location.

vi.    <u>Transportation</u>.  Stayton provides local group transportation to designated shopping, medical facilities, and other local destinations on a regularly scheduled basis.

vii.    <u>Social and Recreational Programs</u>.  A full-time Lifestyle Director coordinates a variety of social, recreational, educational and cultural programs for residents.

viii.    <u>Wellness Programming</u>.  Stayton coordinates educational and screening programs promoting wellness and preventive health maintenance.

ix.    <u>Life Care Benefit</u>.  Each resident in an IL unit receives priority access to AL and/or SNF units should additional care ever be required.  In addition, IL residents receive basic assisted living or nursing care upon permanent transfer to AL or the SNF, should the need for such services arise (the "***Life Care Benefit***").

x.    <u>Optional Services</u>.  The following optional services are available on a fee-for-service basis to residents:  barber and beauty services, additional parking and additional housekeeping services.

**2.    Services Provided Under Assisted Living Residency Agreements**

Stayton also provides assisted living and memory support services for persons requiring assistance with activities of daily living and memory support but not in need of nursing care.

Residents living in AL and MS units receive the following services, the cost of which is included in the Monthly Fee:

i.    <u>Food Service</u>.  Breakfast, lunch and dinner are provided on a daily basis.

ii.      <u>Personal Care</u>. Personal care attendants are available to provide assistance with daily living, including ambulating, bathing, dressing, toileting, administration of medication, transferring and feeding.

iii.      <u>Housekeeping and Laundry</u>. Housekeeping and flat laundry services are provided as needed.

iv.      <u>Utilities</u>. The costs of sewer, water, waste disposal, electricity, heat, air conditioning, and basic cable television service are included in the Monthly Fee. The units are centrally wired for cable television and a telephone/data communications port. Residents are responsible for all telephone, premium cable television and internet service provider charges.

v.      <u>Security and Emergency Alert System</u>. Each unit is equipped with smoke detectors, sprinkler system and emergency alert system. Stayton monitors the emergency alert systems on a twenty-four hour basis and coordinates emergency responses as appropriate.

vi.      <u>Transportation</u>. Stayton provides local group transportation to designated shopping, social and cultural events, medical facilities, and other local destinations on a regularly scheduled basis.

vii.      <u>Social and Recreational Programs</u>. A full time Lifestyle Director coordinates a variety of social, recreational, educational and cultural programs for those residents wishing to participate.

**3.      Services Provided Under SNF Residency Agreements**

Stayton has a SNF for persons requiring 24-hour basic nursing care and assistance with monitoring and administration of medication. Stayton provides bed availability in the SNF to persons who are not IL or AL residents of Stayton. To the extent permitted by law, IL and AL residents of Stayton have priority over non-residents for admission to the SNF.

Stayton provides to residents, in a semi-private or private room, licensed nursing care services, including those services required by statute to be supervised or administered by a professional licensed nursing staff, e.g., medication administration, condition and behavior observation and assessment, creation and administration of a care plan, assistance with activities of daily living and communication with physicians and other care providers.

### C.      Fees Required of Residents

Stayton receives revenue from several sources, which include: (i) entrance fees ("***Entrance Fees***"), (ii) Monthly Fees for IL, AL and MS ("***Monthly Fees***"), (iii) per diem rates for SNF services, and (iv) fees for optional services.

### 1.      Entrance Fees

A one-time Entrance Fee is required for residency in an IL unit at Stayton. Ten percent (10%) of the Entrance Fee is paid when a resident reserves an IL unit at Stayton and the balance is paid upon occupancy. The amount of the Entrance Fee depends on the type of unit selected. As of January 1, 2019, the Entrance Fees range from $395,655 for the smallest one-bedroom apartment to $1,892,637 for the largest three-bedroom apartment.

The Entrance Fee is 90% refundable under a Plan A Continuing Care Contract. Refundable percentages for other plans are stated in the terms of those agreements. The refund is paid ten (10) days after receipt of sufficient proceeds to fund the refund obligation from the next re-sale(s) and occupancy of any residence(s) of Stayton.

### 2.      Monthly Fees

The Continuing Care Contract also requires residents to pay Monthly Fees to Stayton. In consideration for payment of the Entrance Fees, Monthly Fees and other fees charged by Stayton (collectively, the "***Fees***"), residents are furnished with a residence and are given access to a wide array of services. Stayton uses the Fees to fund its operations, service its debt obligations, and make capital improvements to the Facility.

> **a.      <u>IL</u>**. The amount of the Monthly Fee depends on the type of unit selected. Monthly Fees range from $3,282 for the smallest one-bedroom apartment to $7,608 for the largest three-bedroom apartment. For dual occupancy, an additional $1,373 second person fee is charged. Monthly Fees are adjusted in accordance with the Continuing Care Contract.

> **b.      <u>AL</u>**. Depending on the unit type selected, direct entrants (residents who have not executed a Continuing Care Contract and did not transfer from an IL unit) to AL are charged a Monthly Fee ranging from $7,878 to $8,466 (as of January 1, 2019), depending on the unit selected. Dual occupancy, regardless of unit type, is an additional $2,147 per month. An Entrance Fee is not required for direct entrants to AL; however a security deposit may be required.

> **c.      <u>MS</u>**. Direct entrants to MS will pay a Monthly of $8,595 Fee (as of January 1, 2019) for single occupancy of a MS studio. An Entrance Fee is not required for direct entrants to MS; however a security deposit may be required.

### 3. Per Diem

The per diem rate for the SNF is $547 per day for a private room and $366 for a semi-private room for direct entrants to the SNF. An Entrance Fee is not required for direct entrants to the SNF; however, a security deposit may be required.

### 4. Fees for Optional Services

Stayton offers its residents certain optional services, such as barber and beauty services, additional parking and additional housekeeping services, for which it charges additional fees.

### D. Organizational Structure of the Debtor.

### 1. Corporate Governance.

Stayton is governed by a Board of Directors that is elected by Lifespace. Lifespace has been the sole corporate member of Stayton since the Membership Substitution Effective Date. Lifespace is a non-profit corporation chartered under the laws of the State of Iowa, a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "*IRC*"). Lifespace's mission is to create communities that celebrate the lives of seniors. Lifespace, directly or through Affiliates, owns and operates fourteen (14) other communities in eight (8) states.

Prior to the Membership Substitution Effective Date, Stayton's sole corporate member and sponsor was SQLC. SQLC is a non-profit corporation chartered under the laws of the State of Texas, a tax-exempt organization under section 501(c)(3) of the IRC, and a "supporting organization" and public charity under section 509(a)(3) of the IRC.

### 2. Management by Seniority

Seniority is a California corporation specializing in developing, operating, and managing CCRCs. SQLC is the sole owner of Seniority. Pursuant to that Master Management Services Agreement dated as of September 7, 2017 (as amended, the "*Management Agreement*"), SQLC retained Seniority to serve as exclusive manager of the day-to-day operations of Stayton and other CCRCs affiliated with SQLC. The services provided by Seniority include: (i) determining operating policies, procedures, and standards; (ii) developing and executing a sales plan; (iii) establishing food and beverage policies; (iv) establishing all employment policies, including wage and salary terms, benefits, retirement plans, and bonuses; (v) hiring, promoting, supervising, directing, training, transferring, and discharging all of Stayton's employees; (vi) negotiating and consummating such agreements as Seniority deems necessary or advisable for furnishing all utilities, services, supplies, food, beverages, equipment, and other materials and supplies for the maintenance and operation of the Facility; and (vii) establishing advertising and public relations policies.

Pursuant to the Management Agreement, Stayton pays to Seniority a management fee of six percent (6%) of the actual monthly revenues and net Entrance Fees (the "*Management Fee*"), as defined in the Management Agreement, attributable to Stayton for general management, accounting, human resources, and sales services provided. Stayton also pays

monthly administrative fee equal to three percent (3%) of Stayton's monthly Management Fee for reimbursement of Seniority's out-of-pocket administrative expenses. In addition, Seniority provides an executive management team for Stayton, which includes an executive director and a health care administrator, the costs of which are charged to Stayton in addition to the Management Fees and monthly administrative fees.

In connection with the Membership Substitution, Lifespace has become the sole owner of Seniority and is overseeing and controlling the management services previously overseen by SQLC and outlined above. In or around January 2020, Lifespace anticipates dissolving Seniority and replacing the Management Agreement with an agreement between Lifespace and Stayton.

### 3. Regulators

The CCRC industry nationwide is regulated by various state and federal agencies. Each state has a different regulatory scheme governing CCRCs. As a Medicare-certified CCRC operating in the State of Texas, Stayton is regulated by, among others, the Centers for Medicare and Medicaid Services, the State of Texas Department of Health and the Texas Department of Insurance.

### E. The Debtor's Prepetition Capital Structure.

As of July 31, 2019, on a book value basis, Stayton had approximately $123.9 million in Assets consisting of approximately: (i) $10.5 million in cash and cash equivalents; (ii) $906,000 in accounts receivable; (iii) $657,000 of deferred entrance fee receivables; (iv) $106.3 million in fixed assets; (v) $4.8 million of restricted cash; and (vi) $730,000 of other Assets, net of accumulated amortization and depreciation.

As of July 31, 2019, Stayton had approximately $219.0 million of liabilities, net of accumulated amortization of non-refundable entrance fees, deferred financing costs and original issue premium, which consisted of approximately: (i) $518,000 of trade accounts payable; (ii) $2.9 million of oversight fees owed to SQLC; (iii) $1.1 million of current resident refund obligations; (iv) $102.9 million in entrance fee liabilities; (v) $109.7 million of long-term municipal bond obligations; and (vi) $7.5 million of subordinated note obligations.

### 1. Long-Term Municipal Bond Obligations.

On October 1, 2009, Tarrant County Cultural Education Facilities Finance Corporation (the "***Issuer***") and The Bank of New York Mellon Trust Company, National Association, as former trustee, entered into an Indenture of Trust (the "***Bond Indenture***"), pursuant to which the Issuer issued retirement facility revenue bonds in the initial principal amount of $166,575,000, consisting of (i) $100,275,000 principal amount direct note obligation, Series 2009A Bonds (the "***2009A Bonds***"); (ii) $10,000,000 principal amount direct note obligation, Series 2009B Bonds (the "***2009B Bonds***"); and (iii) $56,300,000 principal amount direct note obligation, Series 2009C Bonds (the "***2009C Bonds***") (the 2009A Bonds, 2009B Bonds and 2009C Bonds will hereafter be collectively referred to as, the "***Bonds***").

Contemporaneously with the issuance of the Bonds, the Issuer loaned the proceeds of the Bonds to Stayton, pursuant to a Loan Agreement between Stayton and the Issuer (the "***Loan***

*Agreement*"), to provide for the financing and refinancing of the acquisition, construction or installation of the Facility. Additionally, on October 1, 2009, Stayton issued the Tarrant County Senior Living Center, Inc. Series 2009A, Series 2009B and Series 2009C Notes (collectively, the "*Series 2009 Notes*") under the Original Master Indenture. The Series 2009 Notes secure the obligations of Stayton to pay the principal of and interest on the Bonds. The Bond Indenture, Loan Agreement, Original Master Indenture and Series 2009 Notes are collectively referred to herein as the "*Original Bond Documents*." As of the date hereof, the outstanding principal amount owed by Stayton under the Original Bond Documents is approximately $105,795,000 (together with interest, fees, expenses and other amounts due under the Bond Documents, the "*Bond Obligations*"). The Series 2009C Bonds and Series 2009C Note are no longer outstanding under the Original Bond Documents.

Stayton defaulted under the Original Bond Documents by, among other things, failing to (i) maintain certain financial covenants, (ii) deliver certain audited financial statements, and (iii) make payments on the Series 2009 Notes from July 1, 2018 to May 1, 2019. Consequently, pursuant to the Original Bond Documents, the Trustee is entitled to exercise certain remedies against Stayton, subject to the terms of the Second Forbearance Agreement.

Under the terms of the Original Bond Documents, certain accounts were established by Stayton and are being held by the Trustee, including, among others, the Revenue Fund, the Interest Fund, the Bond Sinking Fund, the Optional Redemption Fund, the Debt Service Reserve Fund, the Working Capital Fund, the Operating Reserve Fund, the Liquidity Support Fund, the Supplemental Liquidity Support Fund, and the Special Project Liquidity Support Fund (each as defined in the Original Bond Documents). As of July 31, 2019, the total amount of funds held by the Trustee in said accounts was approximately $4.8 million (the "*Trustee-Held Funds*"). The Trustee-Held Funds exclude the Interim LSA Funding held in the Liquidity Support Account.

## 2. Subordinated Note Obligations

### a. The Liquidity Support Funding Agreement

On October 1, 2009, SQLC LSA, LLC ("*SQLC LSA*"), a Texas limited liability company whose sole member is SQLC, Stayton and the Trustee entered into that certain Liquidity Support Agreement (the "*SQLC Support Agreement*"). Pursuant to the SQLC Support Agreement, SQLC LSA agreed to transfer $6,000,000 to the Trustee for deposit into a Liquidity Support Account established under the Original Bond Documents, with such deposit to be reduced upon the occurrence of certain events. In order to secure its obligations under the SQLC Support Agreement, Stayton provided SQLC LSA with an unsecured subordinated note dated November 12, 2009 in the amount of $6,000,000 (the "*SQLC LSA Subordinated Note*"). The SQLC LSA Subordinated Note is subordinated to the Bond Obligations. The SQLC Support Agreement has been fully drawn and the Liquidity Support Fund under the Original Bond Documents has been closed. The Plan contemplates that Stayton's obligations under the SQLC LSA Subordinated Note will be extinguished.

 **b.** **The Amended and Restated Pre-Permanent Financing Funding Agreement**

  Pursuant to that certain Amended and Restated Pre-Permanent Financing Funding Agreement dated November 5, 2009 by and between Stayton, SQLC and NSHC (the "***Pre-Permanent Financing Funding Agreement***"), NSHC agreed to transfer up to $6,400,000 to SQLC, which in turn agreed to transfer such funding to Stayton for the purpose of pursuing the development of the Facility. In order to secure its obligations under the Pre-Permanent Financing Funding Agreement, Stayton provided SQLC with an unsecured subordinated promissory note dated November 12, 2009 in the amount of $663,956.82 or such lesser sum as may become due under the Pre-Permanent Financing Funding Agreement (the "***SQLC Subordinated Promissory Note***"). The SQLC Subordinated Promissory Note is subordinated as to the Series 2009 Bonds under the Original Master Indenture. The Plan contemplates that Stayton's obligations under the SQLC Subordinated Promissory Note will be extinguished.

## III. THE CHAPTER 11 PLAN

  **THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS <u>EXHIBIT A</u>.**

  The Claims against the Debtor are divided into Classes according to their seniority and other criteria. The Classes of Claims for the Debtor and the funds and other property to be distributed under the Plan are described more fully below.

  **THE DEBTOR BELIEVES THAT THE PLAN AFFORDS CREDITORS THE POTENTIAL FOR THE GREATEST REALIZATION OF THE VALUE OF THE DEBTOR'S ASSETS. ADDITIONALLY, THE DEBTOR BELIEVES THAT THE PLAN AVOIDS SIGNIFICANT HARDSHIP TO RESIDENTS THAT WOULD OTHERWISE OCCUR AS A RESULT OF A LIQUIDATION.**

 **A.** **Treatment of Claims and Interests Under the Plan.**

  **1.** **Administrative and Priority Claims.**

   **a.** **<u>Administrative Expense Claims</u>**.

  Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code and except to the extent that a Holder of an Allowed General Administrative Claim and the Debtor before the Effective Date or the Reorganized Debtor after the Effective Date agree to less favorable treatment, each Holder of an Allowed General Administrative Claim will be paid the full unpaid amount of such Allowed General Administrative Claim in Cash: (a) if such Allowed General Administrative Claim is based on liabilities that the Debtor incurred in the ordinary course of business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Administrative Claim and without any further action by any Holder of such Allowed General Administrative Claim; (b) if such Allowed General Administrative Claim is due, on the Effective Date, or, if such Allowed General

Administrative Claim is not due as of the Effective Date, on the date that such Allowed General Administrative Claim becomes due or as soon as reasonably practicable thereafter; (c) if a General Administrative Claim is not Allowed as of the Effective Date, on the date that is no later than thirty (30) days after the date on which an order allowing such General Administrative Claim becomes a Final Order of the Bankruptcy Court or as soon as reasonably practicable thereafter; or (d) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

### b. **Administrative Expense Claims Bar Date**.

To be eligible to receive Distributions under the Plan on account of an Administrative Expense Claim that is not otherwise Allowed by the Plan, a request for payment of an Administrative Expense Claim must have been or be filed with the Bankruptcy Court on or before the Administrative Expense Claims Bar Date. Any Administrative Expense Claim that is not asserted in accordance herewith shall be deemed disallowed under the Plan and shall be forever barred against the Debtor, the Debtor's Estate, or any of the Debtor's Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

### 2. **Accrued Professional Compensation Claims.**

All Professionals seeking payment of Accrued Professional Compensation Claims shall (i) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred in the Chapter 11 Case by the date that is forty-five (45) days after the Effective Date and (ii) be paid (a) the full unpaid amount as is Allowed by the Bankruptcy Court within five (5) Business Days after the date that such Claim is Allowed by order of the Bankruptcy Court, or (b) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Accrued Professional Compensation Claim and the Debtor. Any Accrued Professional Compensation Claim that is not asserted in accordance with Section 2.2 of the Plan shall be deemed disallowed under the Plan and shall be forever barred against the Debtor, the Debtor's Estate, or any of its Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

### 3. **Priority Tax Claims.**

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by a Holder of an Allowed Priority Tax Claim and the Debtor, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Priority Tax Claim, payment in full in Cash of the Allowed amount of the Priority Tax Claim on the later of the Effective Date or as soon as practicable after the date when such Claim becomes an Allowed Claim.

### 4. **United States Trustee Statutory Fees.**

The Debtor and the Reorganized Debtor, as applicable, will pay fees payable under 28 U.S.C § 1930(a), including fees, expenses, and applicable interest payable to the United States Trustee, for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.

### 5. Classification of Claims and Interests.

Except as set forth in the Plan, all Claims against and Interests in the Debtor are placed in a particular Class.  The Debtor has not classified Administrative Expense Claims, Accrued Professional Compensation Claims, and Priority Tax Claims.

The following table classifies Claims against and Interests in the Debtor for all purposes, including voting, confirmation and Distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.  Each Class set forth below is treated hereunder as a distinct Class for voting and Distribution purposes.

Subject to all other applicable provisions of the Plan (including its Distribution provisions), classified Claims shall receive the treatment described in section 4 of the Plan.  The Plan will not provide any Distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third parties.

The following table designates the Classes of Claims against and Interests in the Debtor and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interests | Status | Entitled to Vote |
|-------|---------------------|--------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Deemed to Accept) |
| 3 | Bond Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Unimpaired | No (Deemed to Accept) |
| 5 | Preserved Intercompany Claims | Unimpaired | No (Deemed to Accept) |
| 6 | Intercompany Claims | Impaired | No (Deemed to Reject) |
| 7 | Interests in Stayton | Unimpaired | No (Deemed to Accept) |

### 6. Treatment of Claims and Interests.

#### a. Other Priority Claims (Class 1).

This Class consists of all Allowed Other Priority Claims against the Debtor that are specified as having priority in section 507(a) of the Bankruptcy Code, if any such Claims exist as of the Effective Date.  Except to the extent that a Holder of an Allowed Other Priority Claim against the Debtor has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to

such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between the Debtor and the Holder of the Allowed Other Priority Claim against the Debtor.

### b. Other Secured Claims (Class 2).

This Class consists of all Other Secured Claims against the Debtor. In full satisfaction of an Allowed Other Secured Claim, on the later of the Effective Date and the date on which the Other Secured Claim is Allowed, each Holder of an Allowed Other Secured Claim shall receive, at the sole and exclusive option of the Reorganized Debtor: (a) Cash equal to the amount of such Claim; or (b) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired, including Reinstatement.

### c. Bond Claim (Class 3).

This Class consists of the Bond Claims of the holders of the Bonds and the Trustee against the Debtor. The Bond Claims are Allowed Claims. Upon the terms and subject to the conditions set forth in the Plan, in full and final satisfaction, settlement, release, and discharge of the Bond Claims, each Holder of a Bond Claim shall receive its Pro Rata share of the Series 2019 Bonds on the Effective Date or as soon as practicable thereafter.

### d. General Unsecured Claims (Class 4).

This Class consists of all General Unsecured Claims against the Debtor. Except to the extent that a Holder of an Allowed General Unsecured Claim against the Debtor agrees to a different treatment of such Claim, on the Effective Date, (i) the Debtor or Reorganized Debtor, as applicable, will pay or treat such General Unsecured Claim, including a Claim of a Resident or under a Residency Agreement, in the ordinary course of business as if the Chapter 11 Case has not been commenced, or (ii) such Holder will receive such other treatment so as to render such General Unsecured Claim Unimpaired, in each case subject to all defenses or disputes the Debtor may assert as to the validity or amount of such Claims.

### e. Preserved Intercompany Claims (Class 5).

This Class consists of all Preserved Intercompany Claims against the Debtor. In full satisfaction of an Allowed Preserved Intercompany Claim, on the later of the Effective Date and the date on which the Preserved Intercompany Claim is Allowed, each Holder of an Allowed Preserved Intercompany Claim shall be Reinstated.

### f. Intercompany Claims (Class 6).

This Class consists of all Intercompany Claims against the Debtor. All Intercompany Claims shall be extinguished without distribution.

### g. Interests in Stayton (Class 7).

This Class consists of Interests of the Debtor. On the Effective Date, Interests of the Debtor shall be Reinstated, and holders of such Interests shall retain such Interests.

24

**B.     Cramdown.**

If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a) of the Bankruptcy Code except subsection (8) thereof, the Debtor may request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code on the bases that the Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims or Interests that is Impaired under, and has not accepted or is deemed to reject, the Plan.

**C.     Means for Implementation of the Plan.**

**1.     Refinancing Transactions.**

On the Effective Date, the Debtor, the Reorganized Debtor, or any other entities may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities under applicable law; and (d) all other actions that the Debtor or the Reorganized Debtor, as applicable, determines are necessary or appropriate.

The Confirmation Order shall and shall be deemed to, under both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

**2.     2019 Bond Documents.**

The Reorganized Debtor shall be authorized to enter into the 2019 Bond Documents on the Effective Date.  On the Effective Date, and following the consummation of the Refinancing Transaction, the 2019 Bond Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtor, enforceable in accordance with their terms.  The financial accommodations to be extended under the 2019 Bond Documents are being extended and shall be deemed to have been extended in good faith and for legitimate business purposes and are reasonable and shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the 2019 Bond Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on and security interests in the collateral granted thereunder in accordance with the terms of the 2019 Bond Documents, (c) shall be deemed automatically perfected on the Effective Date (without any further action being required by the Reorganized Debtor, the Trustee, or any of Holders of Series 2019 Bonds), having the priority set forth in the 2019 Bond Documents and subject only to such Liens and

security interests as may be permitted under the 2019 Bond Documents, and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtor, and the Entities granted such Liens and security interests are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

3. **Series 2019 Bonds.**

On the Effective Date, the Reorganized Debtor shall cause the Issuer to issue the Series 2019 Bonds, the primary economic terms of which are described below:[2]

| | |
|---|---|
| **Principal:** | $105,795,000, plus all accrued and unpaid interest on the Bonds through the Effective Date, on the terms and conditions set forth in the 2019 Bond Documents. |
| **Rate of Interest and Payment Terms:** | The Series 2019 Bonds will bear interest at a fixed rate of 5.75% per annum, mature in 2054, subject to mandatory sinking fund payments commencing after the 5th anniversary of the Effective Date of the Plan on a 35-year level debt service amortization schedule. |
| **Maturity Date:** | December 1, 2054 |
| **Call Protection:** | The Series 2019 Bonds are subject to optional redemption at 107% from the Effective Date of the Plan to the third anniversary of the Effective Date of the Plan, with the optional redemption premium declining by 1% on such anniversary and on each subsequent anniversary until the Series 2019 Bonds become redeemable at par. |
| **Collateral:** | Pursuant to Section 3.01 of the Amended Master Indenture, the Liens and security interests granted in the Original Master Indenture will continue to secure the obligations under the Amended Master Indenture including the |

---

[2]   The information set forth in the accompanying chart is solely for summary purposes.  To the extent there is any discrepancy between the information set forth in the chart and the 2019 Bond Documents, the 2019 Bond Documents, copies of which are attached hereto as Exhibit C, control.

Series 2019 Note. Pursuant to such grants, the Trustee has Liens and security interests in substantially all of Stayton's assets, including all real and personal property, including Stayton's Gross Revenues (as defined in the Amended Master Indenture).

The issuance of the Series 2019 Bonds for distribution under the Plan is authorized without the need for further corporate action, and all of the Series 2019 Bonds issued or issuable under the Plan shall be duly authorized and validly issued under the Plan. The Reorganized Debtor shall cause to be delivered customary legal opinions and other documents in connection with the issuance of the Series 2019 Bonds, in form and substance acceptable to the Trustee, including, without limitation, (i) the Opinion of Bond Counsel described in the 2019 Bond Documents, and (ii) a lender's title policy with respect to the real property securing the Reorganized Debtor's obligations under the 2019 Bond Documents, and the first mortgage position of the Trustee, subject to such exceptions as are reasonably acceptable to the Trustee.

### 4. Continued Corporate Existence.

Except as otherwise provided in the Plan, the Debtor shall continue to exist as of the Effective Date as a separate corporate Entity, with all the powers of a corporation under the applicable law in the jurisdiction where the Debtor is incorporated or formed and under the certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be under the Plan and require no further action or approval.

### 5. Vesting of Assets in the Reorganized Debtor.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, including the Liens and security interests granted under the Original Bond Documents as such Liens and security interests continue to secure the obligations related to the 2019 Bond Documents, on the Effective Date, all property in the Estate, all Causes of Action, and any property acquired by the Debtor under the Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

### 6. Cancellation of Agreements, Security Interests, and Other Interests.

On the Effective Date, except to the extent otherwise specifically provided in the Plan, including to the extent certain of the Original Bond Documents continue in existence pursuant to their amendment and restatement pursuant to the 2019 Bond Documents, all notes, instruments, certificates, and other documents evidencing the Bonds, shall be cancelled and the obligations of the Debtor or the Reorganized Debtor thereunder or in any way related thereto (including, without limitation, any guarantee obligations of any non-Debtor Affiliates with respect to the Bond Claims) shall be discharged and the agents and Trustee thereunder shall be automatically

27

and fully discharged from all duties and obligations thereunder. Except to the extent certain security interests and Liens continue in existence pursuant to the amendment and restatement of the Original Bond Documents pursuant to the 2019 Bond Documents, all existing security interests and/or Liens and/or any other Secured Claims shall also be automatically released, discharged, terminated, and of no further force and effect as of the Effective Date. Notwithstanding the foregoing, following confirmation of the Plan or the occurrence of the Effective Date, to the extent that the Original Bond Documents do not otherwise remain in effect pursuant to the 2019 Bond Documents, any credit document or agreement that governs the rights of any Holder of a Bond Claim shall continue in effect for purposes of (1) allowing Holders of such Allowed Claims to receive distributions under the Plan; (2) allowing and preserving the rights of the agents or representative of Holders of such Claims to make distributions on account of such Allowed Claims, as provided in the Plan; (3) preserving all exculpations in favor of the Trustee; (4) allowing the Trustee to enforce any rights and obligations owed to it under the Plan or the Confirmation Order; and (5) permitting the Trustee to appear and be heard in the Chapter 11 Case, or in any proceeding in the Bankruptcy Court or any other court.

### 7. Exemption from Registration Requirements; Trading of Securities.

The offering, issuance, and distribution of Series 2019 Bonds issued under the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act under section 3(a)(2) and 3(a)(4) of the Securities Act of 1933, as amended and under section 1145(a)(1) of the Bankruptcy Code. Any and all Series 2019 Bonds issued under the Plan will be freely tradable under the Securities Act by the recipients thereof.

### 8. Organizational Documents.

Subject to Section 6.1 of the Plan, the Reorganized Debtor shall enter into such agreements and amend its corporate governance documents to the extent necessary to implement the terms and provisions of the Plan. Under section 1123(a)(6) of the Bankruptcy Code, the organizational documents of the Reorganized Debtor will prohibit the issuance of non-voting Interests. After the Effective Date, the Reorganized Debtor will amend and restate its organizational documents, and the Reorganized Debtor will file its respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the state of incorporation and the organization documents of the Reorganized Debtor.

### 9. Exemption from Certain Transfer Taxes and Recording Fees.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from the Debtor to the Reorganized Debtor or to any Entity under, in contemplation of, or in connection with the Plan or under: (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtor or the Reorganized Debtor; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject

28

to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 10. Board and Officers of the Reorganized Debtor.

As of the Effective Date, the members of the board of directors and officers of the Debtor as of the Petition Date shall remain in their current capacities as director and officers of the Reorganized Debtor unless otherwise disclosed in the Plan Supplement or prior to the commencement of the Confirmation Hearing, in each case subject to the ordinary rights and powers of the board of directors to remove or replace the officers in accordance with the Reorganized Debtor's organizational documents and any applicable employment agreements that are assumed pursuant to the Plan. From and after the Effective Date, each officer of the Reorganized Debtor shall serve pursuant to the terms of the Reorganized Debtor's charters and bylaws or other formation and constituent documents, and applicable laws of the Reorganized Debtor's jurisdiction of formation.

### 11. Directors and Officers Insurance Policies.

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtor shall be deemed to have assumed all of the Debtor's D&O Liability Insurance Policies under section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtor's foregoing assumption of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtor under the Plan as to which no Proof of Claim need be Filed.

### 12. Other Insurance Policies.

On the Effective Date, the Debtor's Insurance Policies in existence as of the Effective Date shall be Reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed by the Reorganized Debtor under section 365 of the Bankruptcy Code and Section 7.1 of the Plan. Nothing in the Plan shall affect, impair, or prejudice the rights of the insurance carriers, the insureds, or the Reorganized Debtor under the Insurance Policies in any manner, and such insurance carriers, the insureds, and Reorganized Debtor shall retain all rights and defenses under such Insurance Policies. The Insurance Policies shall apply to and be enforceable by and against the insureds and the Reorganized Debtor in the same manner and according to the same terms and practices applicable to the Debtor, as existed prior to the Effective Date. Following the Effective Date, the Debtor's Insurance Policies shall comply with all applicable covenants set forth in the 2019 Bond Documents.

### 13. Preservation of Rights of Action.

In accordance with section 1123(b) of the Bankruptcy Code but subject to the releases set forth in Section 9 of the Plan, including but not limited to the release of all Causes of Action against the Trustee and the Steering Committee, all Causes of Action that the Debtor may hold against any Entity shall vest in the Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtor shall have the exclusive right, authority, and discretion to determine, initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. **Subject to the releases set forth in Section 9 of the Plan, no Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any specific Cause of Action as any indication that the Debtor or Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action. The Debtor or Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to any Cause of Action upon, after, or as a consequence of the confirmation of the Plan or the occurrence of the Effective Date**.

### 14. Corporate Action.

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of the Debtor, the Reorganized Debtor, or any other Entity, including: (1) assumption of Executory Contracts; (2) selection of the directors, managers, and officers for the Reorganized Debtor; (3) the execution of and entry into the 2019 Bond Documents; (4) the issuance and distribution of the Series 2019 Bonds as provided in the Plan; and (5) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the company structure of the Reorganized Debtor and any company action required by the Debtor or Reorganized Debtor, as applicable, in connection therewith shall be deemed to have occurred on and shall be in effect as of the Effective Date without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtor or Reorganized Debtor, as applicable.

On or prior to the Effective Date, the appropriate officers, directors, managers, or authorized persons of the Debtor or Reorganized Debtor, as applicable (including any president, vice-president, chief executive officer, treasurer, general counsel, or chief financial officer thereof), shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtor or the Reorganized Debtor, as applicable, including (1) the 2019 Bond Documents, (2) the Series 2019 Bonds and (3) any and all other agreements, documents, securities, and instruments relating to

the foregoing. The authorizations and approvals contemplated by the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 15. Effectuating Documents; Further Transactions.

Prior to, on, and after the Effective Date, the Debtor and Reorganized Debtor and the directors, managers, officers, authorized persons, and members of the boards of directors or managers and directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of the Plan, the 2019 Bond Documents, and any securities issued under the Plan in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorizations, actions, or consents except for those expressly required under the Plan. All counterparties to any documents described in this paragraph are authorized to and may execute any such documents as may be required or provided by such documents without further order of the Bankruptcy Court.

### D. Assumption of Executory Contracts and Unexpired Leases.

### 1. Assumption of Executory Contracts.

Except as otherwise provided in the Plan, each of the Executory Contracts of the Debtor, including the Residency Agreements, shall be deemed assumed as of the Effective Date, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code. The Confirmation Order may constitute an order of the Bankruptcy Court approving the assumption of each of the Executory Contracts, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date.

### 2. Inclusiveness.

Except as otherwise provided in the Plan or agreed to by the Debtor and the applicable counterparty, each Executory Contract shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract.

### 3. Cure of Defaults.

The Debtor or the Reorganized Debtor, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter, with the amount and timing of payment of any such Cure dictated by the Debtor's ordinary course of business.

### 4. Indemnification.

On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan, and the Reorganized Debtor's governance documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of and advancement of fees and expenses to the

Debtor's and the Reorganized Debtor's current and former directors, officers, employees, and agents to the fullest extent permitted by law and at least to the same extent as the certificate of incorporation, bylaws, or similar organizational documents of the Debtor as of the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed, or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted. The Reorganized Debtor shall not amend and/or restate its certificate of incorporation, bylaws, or similar organizational document before or after the Effective Date to terminate or materially adversely affect (1) the Reorganized Debtor's obligations referred to in the immediately preceding sentence or (2) the rights of such managers, directors, officers, employees, or agents referred to in the immediately preceding sentence. Notwithstanding anything to the contrary in the Plan, the Reorganized Debtor shall not be required to indemnify the Debtor's managers, directors, officers, or employees for any claims or Causes of Action for which indemnification is barred under applicable law, the Debtor's organizational documents, or applicable agreements governing the Debtor's indemnification obligations.

### 5. Full Release and Satisfaction.

Assumption of any Executory Contract pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract at any time before the effective date of the assumption.

### 6. Reservation of Rights.

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtor or the Reorganized Debtor that any such contract or lease is in fact an Executory Contract or that the Debtor or the Reorganized Debtor has any liability thereunder.

### 7. Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases under section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

### E. Conditions Precedent to Confirmation and the Effective Date.

### 1. Conditions Precedent to Confirmation.

Confirmation of the Plan shall not occur, and the Confirmation Order shall not be entered, until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of the Plan:

> a. The proposed Confirmation Order shall be in form and substance reasonably satisfactory in all respects to the Debtor, the Trustee and the Steering Committee; and

       **b.**    The Plan and the Plan Supplement, including any schedules, documents, supplements and exhibits thereto shall be, in form and substance, on the terms contemplated by the Plan Term Sheet.

### 2. Conditions Precedent to the Effective Date.

The Effective Date shall not occur until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of the Plan:

       **a.**    The Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Debtor, the Trustee, and the Steering Committee, and such Confirmation Order shall not be subject to any stay or an unresolved request for revocation under section 1144 of the Bankruptcy Code;

       **b.**    The Plan Support Agreement shall not have been terminated, and remains in full force and effect;

       **c.**    On the occurrence of the Effective Date, the conditions to effectiveness of the 2019 Bond Documents shall have been satisfied or waived and the Refinancing Transaction shall have closed pursuant to the terms of the Plan Support Agreement;

       **d.**    The Effective Date shall be no earlier than December 21, 2019.

       **e.**    All actions, documents, certificates, and agreements necessary to implement the Plan, including, without limitation, 2019 Bond Documents, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws; and

       **f.**    All requisite governmental authorities and third parties shall have approved or consented, to the extent required, to all actions, documents, certificates, and agreements necessary to implement the Plan.

### 3. Waiver of Conditions.

The conditions to confirmation and consummation of the Plan set forth therein may be waived in writing at any time by the Debtor, with the written consent of the Trustee, without notice to any other parties in interest or the Bankruptcy Court and without a hearing.

### 4. Effect of Failure of Conditions.

If consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against the Debtor; (2) prejudice in any manner the rights of the Debtor, any Holders of Claims or Interests or any other Person; or (3) constitute an

admission, acknowledgment, offer or undertaking by the Debtor, any Holders of Claims or Interests or any other Person in any respect.

**F.    Effect of Confirmation.**

**1.    General.**

Under section 1123 of the Bankruptcy Code, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved under the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that any such compromise or settlement is in the best interests of the Debtor, its Estate, and any Holders of Claims and Interests and is fair, equitable and reasonable.  Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Interests and their respective distributions (if any) and treatments hereunder, takes into account the relative priority and rights of the Claims and the Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise. As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and Interests and their respective distributions (if any) and treatments hereunder, are settled, compromised, terminated and released pursuant hereto; *provided, however*, that nothing contained in the Plan shall preclude any Person or Entity from exercising their rights under and consistent with the terms of the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan.  Notwithstanding the foregoing, any subordinated debt expressly provided for in the Plan or the 2019 Bond Documents shall remain subordinated to the extent provided for in such documents.

**2.    Releases by the Debtor.**

Pursuant to section 1123(b) of the Bankruptcy Code and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the consummation of the transactions contemplated by the Plan, as of the Effective Date, each Released Party will be deemed released and discharged by each and all of the Debtor, the Reorganized Debtor, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any cause of action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtor, the Reorganized Debtor, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor, the Reorganized Debtor, or their Estates or affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, the Debtor or other Entity, based on or relating to, or in any manner

arising from, in whole or in part, the Debtor, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the Debtor's in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Refinancing Transaction, the Plan, or any other restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan Support Agreement, or the Plan, the filing of the Chapter 11 Case, the pursuit of Confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to a Released Party's willful misconduct or intentional fraud as determined by a Final Order of the Bankruptcy Court; *provided* that any right to enforce the Plan and the Confirmation Order is not so released by Section 9.2 of the Plan.

The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released under the foregoing release. Notwithstanding the foregoing, nothing in Section 9.2 of the Plan shall or shall be deemed to prohibit the Debtor or the Reorganized Debtor from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtor or the Reorganized Debtor, unless otherwise expressly provided for in the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, under Bankruptcy Rule 9019, of foregoing release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the foregoing release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released; (iii) in the best interest of the Debtor and its Estate; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

3. **Releases by Holders of Bond Claims.**

**AS OF THE EFFECTIVE DATE, EXCEPT (I) FOR THE RIGHT TO ENFORCE THE PLAN OR ANY RIGHT OR OBLIGATION ARISING UNDER THE PLAN SUPPLEMENTS THAT REMAIN IN EFFECT OR BECOME EFFECTIVE AFTER THE EFFECTIVE DATE OR (II) AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR CONFIRMATION ORDER, INCLUDING THE 2019 BOND DOCUMENTS, IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE OBLIGATIONS OF THE DEBTOR UNDER THE PLAN AND THE CONTRIBUTIONS OF THE RELEASED PARTIES TO FACILITATE AND IMPLEMENT THE PLAN, TO**

35

THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE RELEASED PARTIES SHALL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED, AND DISCHARGED BY (A) HOLDERS OF BOND CLAIMS WHO HAVE NOT ELECTED TO OPT-OUT OF THE RELEASES PROPOSED UNDER THE PLAN AND (B) THE PARTIES TO THE PLAN SUPPORT AGREEMENT, FROM ANY AND ALL CLAIMS, INTERESTS OR CAUSES OF ACTION WHATSOEVER, WHETHER ACCRUED OR UNACCRUED, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING BEFORE THE EFFECTIVE DATE, AS OF THE EFFECTIVE DATE OR ARISING THEREAFTER, IN LAW, AT EQUITY, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF STATUTES (INCLUDING BUT NOT LIMITED TO THE FEDERAL OR STATE SECURITIES LAWS), OR OTHERWISE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTOR, THE DEBTOR'S REFINANCING AND THE TRANSACTIONS CONTEMPLATED THEREIN OR HEREIN, THE CHAPTER 11 CASE, THE NEGOTIATION, FORMULATION, PREPARATION OR CONSUMMATION OF THE PLAN, THE PLAN SUPPORT AGREEMENT, THE DEFINITIVE DOCUMENTS, OR ANY RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, PROVIDED THAT THE RELEASED PARTIES SHALL NOT BE RELEASED FROM ANY ACT OR OMISSION THAT CONSTITUTES ACTUAL FRAUD, GROSS NEGLIGENCE, WILLFUL MISCONDUCT, OR A CRIMINAL ACT AS DETERMINED BY A FINAL ORDER.

### 4.    Exculpation.

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, obligations, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss and liability for any Claim in connection with or arising out of the administration of the Chapter 11 Case, the negotiation and pursuit of the Plan Support Agreement, the Refinancing Transaction, the Plan, or the solicitation of votes for, or confirmation of, the Plan, the funding or consummation of the Plan, the occurrence of the Effective Date, the administration of the Plan or the property to be distributed under the Plan, the issuance of securities under or in connection with the Plan, or the transactions in furtherance of any of the foregoing, except for:  (a) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan; or (b) the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined to have constituted actual fraud, gross negligence, willful misconduct or a criminal act as determined by a Final Order.

5.      **Discharge of Claims and Interest.**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, effective as of the Effective Date, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims, Interests and Causes of Action of any kind or nature whatsoever against the Debtor or any of its Assets or properties, including any interest accrued on such Claims or Interests from and after the Petition Date, and regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, distributed or retained under the Plan on account of such Claims, Interests or Causes of Action. Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate shall be deemed discharged and released under and to the fullest extent provided under sections 524 and 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code. Such discharge shall void any judgment obtained against the Debtor or the Reorganized Debtor at any time, to the extent that such judgment relates to a discharged Claim.

6.      **Injunction.**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, INCLUDING BUT NOT LIMITED TO ANY RIGHT ARISING UNDER OR RELATED TO THE 2019 BOND DOCUMENTS, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED UNDER THE PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED OR DISCHARGED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED). ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASE UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.**

7. **Binding Nature of Plan.**

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTOR, THE REORGANIZED DEBTOR, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THE PLAN, EACH PERSON ACQUIRING PROPERTY UNDER THE PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS WITH THE DEBTOR AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON OR ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASE OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN, AFFIRMATIVELY VOTED TO REJECT THE PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THE PLAN.

8. **Protection Against Discriminatory Treatment.**

To the extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Persons and Entities, including Governmental Units, shall not discriminate against the Reorganized Debtor or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant, against the Reorganized Debtor, or another Person or Entity with whom the Reorganized Debtor has been associated, solely because the Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Case.

9. **Preservation of Privilege and Defenses.**

No action taken by the Debtor or Reorganized Debtor in connection with the Plan shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtor or Reorganized Debtor, as applicable, including any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral).

10. **Injunction Against Interference with Plan.**

Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests, the Debtor, and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the Debtor's, the Reorganized Debtor's and their respective affiliates', employees', advisors', officers' and directors', and agents' implementation or consummation of the Plan.

11. **Release of Liens.**

Except as otherwise provided in the Plan, the Confirmation Order, the 2019 Bond Documents, including to the extent the 2019 Bond Documents amend or restate the Original Bond Documents, or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with, and conditioned upon, the applicable Distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate shall be fully released. Except as otherwise provided in the Plan, the Confirmation Order, the 2019 Bond Documents, including to the extent the 2019 Bond Documents amend or restate the Original Bond Documents, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Debtor's Estate shall be fully released on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

G. **Modification, Revocation or Withdrawal of the Plan.**

1. **Modification and Amendments.**

The Plan or any exhibits thereto may be amended, modified, or supplemented by the Debtor with the consent of the Trustee in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, the Debtor or the Reorganized Debtor may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

2. **Effect of Confirmation on Modifications.**

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

3. **Revocation or Withdrawal of the Plan.**

The Debtor reserves the right to, consistent with its fiduciary duties, revoke or withdraw the Plan before the Effective Date. If the Debtor revokes or withdraws the Plan, or if the Confirmation Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtor or any other Person; or (iii) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Person.

**H.** **Retention of Jurisdiction.**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan, including, but not limited to, jurisdiction to:

**a.** allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount or allowance of Claims;

**b.** decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

**c.** resolve any matters related to: (i) the assumption or rejection of any Executory Contract to which the Debtor is party or with respect to which the Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, and cure Claims, pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract; (ii) any potential contractual obligation under any Executory Contract that is assumed; and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

**d.** ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

**e.** adjudicate, decide or resolve any matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

**f.** adjudicate, decide or resolve any matter involving the Reorganized Debtor;

**g.** adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

**h.** issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of the Plan;

**i.** resolve any cases, controversies, suits, disputes or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

**j.** enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

**k.** resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, any transactions or payments contemplated thereby, or any contract, instrument, release, indenture or other agreement or document relating to any of the foregoing;

**l.** adjudicate any and all disputes arising from or relating to Distributions under the Plan;

**m.** consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

**n.** hear and determine all disputes involving the existence, nature or scope of the Debtor's discharge;

**o.** enforce all orders previously entered by the Bankruptcy Court;

**p.** hear any other matter not inconsistent with the Bankruptcy Code; and

**q.** enter a final decree closing the Chapter 11 Case.

**I.     Miscellaneous Provisions.**

**1.     Section 1125(e) Good Faith Compliance.**

As of and subject to the occurrence of the Confirmation Date, the Debtor and its Related Persons shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation.

**2.     Substantial Consummation.**

On the Effective Date, the Plan shall be deemed to be substantially consummated within the meaning set forth in section 1101 and pursuant to section 1127(b) of the Bankruptcy Code.

3. **Closing of the Chapter 11 Case.**

The Reorganized Debtor shall, promptly after the full administration of the Chapter 11 Case, but by no later than March 31, 2020, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

4. **Plan Supplement.**

Any exhibits or schedules not filed with the Plan may be contained in the Plan Supplement, if any, and the Debtor hereby reserves the right to file such exhibits or schedules as a Plan Supplement.

5. **Further Assurances.**

The Debtor or the Reorganized Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtor, the Reorganized Debtor and all Holders of Claims receiving Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

6. **Exhibits Incorporated.**

All exhibits to the Plan, including the Plan Supplement, are incorporated into and are part of the Plan as if fully set forth therein.

7. **Inconsistency.**

In the event of any inconsistency among the Plan, the Disclosure Statement and any exhibit to the Disclosure Statement, the provisions of the Plan shall govern.

8. **No Admissions.**

If the Effective Date does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor, (b) prejudice in any manner the rights of the Debtor or any other party in interest, or (c) constitute an admission of any sort by the Debtor or other party in interest.

9. **Reservation of Rights.**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order and the Effective Date has occurred. None of the Plan, any statement or provision contained in the Plan or any action taken or not taken by the Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the Holders of Claims or Interests before the Effective Date.

## 10.    Successors and Assigns.

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or guardian, if any, of each Person.

## 11.    Entire Agreement.

On the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## 12.    Notices.

All notices, requests, and demands to or upon the Debtor in the Chapter 11 Case shall be in writing and, unless otherwise provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, if by facsimile transmission, when received and telephonically confirmed to the below recipients:

TARRANT COUNTY SENIOR LIVING CENTER, INC.
c/o Ankura Consulting Group LLC
Attention: Louis E. Robichaux IV
15950 Dallas Parkway
Dallas, Texas 75248
Telephone: (214) 200-3689
Facsimile: (214) 200-3686
E-mail: louis.robichaux@ankura.com

with copies to:

DLA PIPER LLP (US)
Attention:  Thomas R. Califano
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501
E-mail:  thomas.califano@dlapiper.com

- and -

DLA PIPER LLP (US)
Attention:  Rachel Nanes
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Telephone:  (305) 423-8563
Facsimile:  (305) 675-8206
E-mail:  rachel.nanes@dlapiper.com

- and -

DLA PIPER LLP (US)
Attention: Daniel B. Prieto
1900 North Pearl Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 743-4500
Facsimile: (214) 743-4545
E-mail: dan.prieto@dlapiper.com

All notices and requests to Persons holding any Claim or Interest in any Class shall be sent to them at their last known address or to the last known address of their attorney of record in the Chapter 11 Case. Any such Holder of a Claim or Interest may designate in writing any other address for purposes of this section, which designation will be effective upon receipt by the Debtor.

### 13. Severability.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 14. Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of the Plan and the transactions consummated or to be consummated in connection therewith.

### 15. Request for Confirmation.

The Debtor requests entry of the Confirmation Order under section 1129(a) of the Bankruptcy Code and, to the extent necessary, section 1129(b) of the Bankruptcy Code.

## IV. RISK FACTORS IN CONNECTION WITH THE PLAN

The Holders of Bond Claims against the Debtor should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith), before deciding whether to vote to accept or reject

the Plan.  These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A.  Bankruptcy Considerations.

Although the Debtor believes the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent set forth in section 8 of the Plan, and there can be no assurance that such conditions will be satisfied or waived.  In the event the conditions precedent described in section 8 of the Plan have not been satisfied, or waived (to the extent possible) by the Debtor or applicable parties (as provided for in the Plan) as of the Effective Date, then the Confirmation Order will be vacated, no Distributions will be made pursuant to the Plan, and the Debtor and all Holders of Claims and Interests will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtor believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class of Claims and Interests encompass Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### B.  Risks Related to the Debtor's Business and Industry

**1.   Even if the Plan is confirmed, the extent of the Debtor's remaining indebtedness may impair its financial condition and the Debtor's ability to grow and compete.**

As of the date hereof, the Debtor's total secured debt is approximately $106 million. Although the Debtor anticipates that the Plan will significantly decrease the annual debt service requirements of Stayton and, over time, increase its liquidity, it still will have a significant level of debt upon consummation of the Plan.  The Debtor's debt has important consequences for its financial condition, including:

> i.   making the Debtor vulnerable to general adverse economic, competitive and industry conditions;
>
> ii.  limiting the Debtor's ability to obtain additional financing to support its operations and make capital improvements, if necessary;

     iii.       requiring a substantial portion of the Debtor's cash flow from operations for the payment of principal and interest on its debt and reducing its ability to use its cash flow to fund working capital, capital expenditures, execution of its business strategy, acquisitions, operations and general corporate requirements; and

     iv.       limiting the Debtor's ability to receive trade credit from its vendors or otherwise placing it at a competitive disadvantage to other less leveraged competitors.

**2.     Servicing the Debtor's debt will require a significant amount of cash, and its ability to generate sufficient cash depends upon many factors, some of which are beyond its control.**

The Debtor's ability to make payments on and refinance its debt, fund planned capital expenditures and execute its business strategy depends on its ability to generate cash flow in the future. To some extent, this is subject to general economic, financial, competitive and other factors that are beyond the Debtor's control. Even if the Plan is consummated, there can be no assurance that the Debtor's business will continue to generate cash flows at or above current levels or that it will be able to meet its cash needs. If the Debtor is unable to service its debt or experiences a significant reduction in its liquidity, the Debtor could be forced to reduce or delay planned capital expenditures and other initiatives, sell assets, restructure or refinance its debt or seek additional equity capital, and the Debtor may be unable to take any of these actions on satisfactory terms or in a timely manner, or at all. Further, any of these actions may not be sufficient to allow the Debtor to service its debt obligations or may have a materially adverse effect on its results of operations and financial condition. The Debtor's failure to generate sufficient operating cash flows to pay its debts or refinance its indebtedness could have a material adverse effect on its results of operations and financial condition. If the Debtor cannot make scheduled payments on its debt, it would be in default, and as a result, holders of such debt could declare all outstanding principal and interest to be due and payable and the Debtor's existing and future lenders could, under certain circumstances, terminate their commitments to lend it money and foreclose against the assets securing its borrowings.

**3.     The Debtor may fail to maintain turnover or occupancy.**

The economic feasibility of the Facility depends upon the ability of the Facility to attract new residents and to maintain substantial occupancy of the Facility.

If the Debtor does not achieve the required levels of occupancy for the Facility, the revenues anticipated by the Facility from Monthly Fees and other charges could be adversely affected. Additionally, if a substantial number of residents live beyond the life expectancies anticipated by the Debtor, new residents will be admitted at a slower rate and the receipt of additional, potentially higher Entrance Fees will be curtailed with a consequent impairment of the Facility's cash flow. Even if the anticipated attrition levels are realized and maintained, no assurance can be given that remarketing of vacated units will take place as quickly as assumed by the Debtor.

      **4.      The Debtor may be faced with competition from other similar facilities.**

The Debtor faces competition from similar facilities operating in or near its market area, from other residential facilities for older adults and from existing facilities offering custodial, intermediate and skilled nursing care. The Debtor may face additional competition in the future as a result of the construction of new, or the renovation or expansion of existing, housing and nursing care facilities for elderly persons in the area served by the Facility as well as in the areas surrounding the area served by the Facility.

      **5.      The Plan and the related transactions, which contemplate transactions that will modify the Debtor's capital structure, are based in large part upon assumptions and analyses developed by it. If these assumptions and analyses prove to be incorrect, the Debtor's Plan may be unsuccessful in its execution of the restructuring and it may be unable to continue as a going concern.**

The Plan and the transactions related thereto, which contemplate transactions that will affect the Debtor's capital structure, are premised upon assumptions and analyses of the Debtor that are based upon the Debtor's experience and perception of historical trends, current conditions and expected future developments, as well as other factors that it considers appropriate under the circumstances. Whether actual future results and developments will be consistent with the Debtor's expectations and assumptions depend on a number of factors.

In addition, the Plan relies upon financial forecasts, including with respect to revenue growth, improved earnings before interest, taxes, depreciation and amortization, improved interest margins, and growth in cash flow. Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate. The Debtor's actual financial condition and results of operations may differ, perhaps materially, from what it anticipated. Consequently, there can be no assurance that the results or developments contemplated by the Plan will occur or, even if they do occur, that they will have the anticipated effects on the Debtor's business or operations. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of the transactions contemplated by the Plan.

      **6.      Uncertainties related to the Debtor's business may impact its ability to attract new residents.**

The Debtor's success depends on its ability to consistently, accurately and effectively provide affordable living accommodations and related healthcare and support services to middle-income seniors. Should seniors perceive that the uncertainties related to the Debtor's business have adversely affected its services, there will a decrease in new residents attracted to its Facility.

7. **Uncertainties related to the Debtor's business may create a distraction for or cause a loss of personnel and may otherwise adversely affect its ability to attract new personnel.**

The market for qualified personnel is competitive and the Debtor's future success will depend upon, among other factors, its ability to attract and retain key personnel. In addition, uncertainties about the future prospects and viability of its business is impacting and is likely to continue to impact the Debtor's ability to attract and retain key personnel, and is a distraction for existing personnel. If the Debtor loses the services of key personnel, if one or more of them decides to join a competitor or otherwise compete with it or if personnel continue to be distracted due to the uncertainties about the future prospects and viability of its business, the Debtor may not be able to effectively implement its business strategy and its business could suffer. The loss of the services of any of the Debtor's other key management personnel or the failure to attract and retain personnel could have a material adverse effect on its results of operations and financial condition due to disruptions in its leadership and the continuity of its business relationships.

8. **Third party reimbursement may be reduced or eliminated.**

The health care industry, in general, is subject to regulation by a number of governmental agencies, including those which administer the Medicare reimbursement program, and other federal, state and local governmental agencies. As a result, the Debtor is sensitive to legislative and regulatory changes in such programs and is affected by reductions in governmental spending for such programs. Congress has in the past enacted a number of provisions which affect health care providers, and additional legislative changes can be expected. Previous legislative actions have included limitation of payments to nursing homes under the Medicare program.

Future legislation, regulation or actions by the federal government are expected to continue the trend toward more restrictive limitations on reimbursement for long-term care services. At present, no determination can be made concerning whether, or in what form, such legislation would be introduced and enacted into law. Similarly, the impact of future cost control programs and future regulations upon the Debtor's financial performance cannot be determined at this time.

The Debtor may receive reimbursement from non-governmental third-party payors, such as commercial insurers, employers under self-insurance programs, health maintenance organizations, and preferred provider organizations. Most of these programs make payments at rates which are less than actual charges. Accordingly, there can be no assurance that payments made under such programs will be adequate to cover actual costs incurred.

9. **The income of the elderly may diminish.**

A large percentage of the monthly income of the residents of the Facility is fixed income derived from pensions and social security or income from investments. If, due to inflation or otherwise, substantial increases in monthly fees are required to cover increases in operating costs, wages, benefits and other expenses, residents may have difficulty paying such monthly fees. Furthermore, investment income of the residents may be adversely affected by declines in

the stock market and sustained historically low market interest rates, also resulting in payment difficulties.

### 10.    Other Possible Risk Factors.

The occurrence of any of the following events, or other unanticipated events, could adversely affect the financial condition or results of operations of the Debtor:

i.      reinstatement of or establishment of mandatory governmental wage, rent or price controls;

ii.     adoption of federal, state or local legislation or regulations having an adverse effect on the future operating or financial performance of the Debtor;

iii.    events adversely affecting the operation of the Facility, including enactment of legislation imposing ceilings on increases in health care charges, changes in Medicare or comparable regulations or attempts by third-party payors administering health care cost reimbursement plans to control or restrict the operations of certain health care facilities;

iv.     a decline in the population, a change in the age composition of the population or a decline in the economic conditions of the Debtor's market area;

v.      developments or events affecting the federal or state exemption of the Debtor's income from taxation;

vi.     suspension or revocation of or failure to renew any license, certificate or approval to operate the Facility, or any portion thereof, or any restriction on new admissions to licensed beds;

vii.    changes in key management personnel;

viii.   reductions in utilization of continuing care retirement and assisted living facilities as a result of preventive medicine, improved occupational health and safety, development and utilization of medical and scientific research and technological advances and other developments;

ix.     changes in reimbursement procedures or in contracts under public or private insurance programs;

x.      increased costs of attracting and retaining, or decreased availability of a sufficient number of, health professionals, including trained nurses vital to the Facility;

xi.      increases in costs, including costs associated with, among other things, salaries, wages and fringe benefits, supplies, technology and equipment, insurance, energy and other utilities, the attraction and retention of nurses and other personnel, compliance with or violation of environmental laws and regulations, and other costs that could result in a sizable increase in expenditures without a corresponding increase in revenues;

xii.     inability of the Debtor to obtain future governmental approvals to undertake additional projects necessary to remain competitive as to rates, charges and the quality and scope of care or any limitation on the availability of tax-exempt or other financing for future projects; and

xiii.     the occurrence of natural disasters, including floods, hurricanes, tornadoes and earthquakes, could damage the Facility, interrupt utility service or otherwise impair the operations of the Debtor and the generation of revenues from the Facility. The Facility is required to be covered by general property insurance in amounts which management of the Debtor considers to be sufficient to provide for the replacement of such Facility in the event of a natural disaster.

## C.    Additional Factors

### 1.    No Duty to Update Disclosures.

The Debtor has no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Debtor is required to do so pursuant to an order of the Bankruptcy Court. Delivery of the Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

### 2.    Representations Outside this Disclosure Statement.

This Disclosure Statement contains representations concerning or related to the Debtor and the Plan that are subject to approval by the Bankruptcy Court. Please be advised that any representations or inducements outside this Disclosure Statement and any related documents which are intended to secure your acceptance or rejection of the Plan should not be relied upon by Holders of Claims or Interests that are entitled to vote to accept or reject the Plan.

### 3.    No Admission.

The information and representations contained herein shall not be construed to constitute an admission of, or be deemed evidence of, any legal effect of the Plan on the Debtor or Holders of Claims and Interests.

4. **Tax and Other Related Considerations.**

A discussion of potential tax consequences of the Plan is provided in section VIII hereof; however, the content of this Disclosure Statement is not intended and should not be construed as tax, legal, business or other professional advice. Holders of Claims and/or Interests should seek advice from their own independent tax, legal or other professional advisors based on their own individual circumstances.

## V. PLAN CONFIRMATION AND CONSUMMATION

### A. The Confirmation Hearing.

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after appropriate notice, to hold a Confirmation Hearing. On, or as promptly as practicable after the filing of the Plan and this Disclosure Statement, the Debtor will request, pursuant to the requirements of the Bankruptcy Code and the Bankruptcy Rules, that the Bankruptcy Court schedule the Confirmation Hearing. Notice of the Confirmation Hearing (the "*Confirmation Hearing Notice*") will be provided to all known Creditors or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Pursuant to Bankruptcy Code section 1128(b), any party in interest may object to confirmation of a plan of reorganization or liquidation. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds of the objection, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon: (i) counsel for the Debtor, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, New York 10020, Attn: Thomas R. Califano (thomas.califano@dlapiper.com), DLA Piper LLP (US), 1900 North Pearl Street, Suite 2200, Dallas, Texas 75201, Attn: Dan Prieto (dan.prieto@dlapiper.com) and DLA Piper LLP (US), 200 South Biscayne Boulevard, Suite 2500, Miami, Florida 33131, Attn: Rachel Nanes (rachel.nanes@dlapiper.com); (ii) the Debtor's Chief Restructuring Officer and restructuring advisor, Ankura Consulting Group LLC, 15601 Dallas Parkway, Suite 200, Dallas, Texas 75001, Attn: Louis E. Robichaux IV (louis.robichaux@ankura.com) and Michael Morton (michael.morton@ankura.com); (iii) counsel for UMB Bank, N.A., Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn: Daniel Bleck (dbleck@mintz.com); (iv) the Office of the United States Trustee, 1100 Commerce St, Room 976, Dallas, Texas 75242-1699, Attn: Lisa Lambert; and (v) such other parties as the Bankruptcy Court may order, so as to be actually received no later than the date and time designated in the Confirmation Hearing Notice.

Bankruptcy Rule 9014 governs objections to confirmation of the Plan. UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN IS TIMELY SERVED UPON THE PARTIES LISTED ABOVE AND FILED WITH THE BANKRUPTCY COURT, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING CONFIRMATION OF THE PLAN.

**B.**    **Plan Confirmation Requirements Under the Bankruptcy Code.**

In order for the Plan to be confirmed, the Bankruptcy Code requires that the Bankruptcy Court determine that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and the Chapter 11 Case.  The Bankruptcy Code also requires that: (1) the Plan be accepted by the requisite votes of Creditors except to the extent that confirmation despite dissent is available under Bankruptcy Code section 1129(b); (2) the Plan is feasible (that is, there is a reasonable probability that the Debtor will be able to perform its obligations under the Plan without needing further financial reorganization not contemplated by the Plan); and (3) the Plan is in the "best interests" of all Creditors (that is, Creditors will receive at least as much under the Plan as they would receive in a hypothetical liquidation case under chapter 7 of the Bankruptcy Code).  To confirm the Plan, the Bankruptcy Court must find that all of the above conditions are met, unless the applicable provisions of Bankruptcy Code section 1129(b) are employed to confirm the Plan, subject to satisfying certain conditions, over the dissent or deemed rejections of Classes of Claims.

**1.**    **Best Interests of Creditors.**

The Bankruptcy Code requires that, with respect to an impaired class of claims or interests, each holder of an impaired claim or interest in such class either (i) accepts the plan or (ii) receives or retains under the plan property of a value, as of the effective date of the plan, that is not less than the amount (value) such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The Debtor, with the assistance of its professionals, has prepared the Liquidation Analysis attached hereto as **Exhibit E**.  The Liquidation Analysis is based upon a hypothetical liquidation in a chapter 7 case.  In preparing the Liquidation Analysis, the Debtor has taken into account the nature, status and underlying value of its Assets, the ultimate realizable value of its Assets, and the extent to which such Assets are subject to liens and security interests.  In addition, the Liquidation Analysis also reflects the required time and resources necessary to effectuate an orderly wind down of the Facility, which provides critical care to residents and must comply with numerous federal and state regulations.

Based upon the Liquidation Analysis, the Debtor believes that liquidation under chapter 7 would result in smaller distributions, if any, being made to Creditors than those provided for in the Plan because of: (a) the likelihood that the Debtor's Assets would have to be sold or otherwise disposed of in an orderly fashion; (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals; and (c) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtor's operations.  In the opinion of the Debtor, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford the Holders of Claims as great a realization potential as afforded to them under the Plan.

Accordingly, the Debtor believes that in a chapter 7 liquidation, Holders of Claims would receive less than such Holders would receive under the Plan.  There can be no assurance,

however, as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtor's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### 2. Feasibility of the Plan.

Pursuant to section 1129(a)(11) of the Bankruptcy Code, a debtor must demonstrate that confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor or its successor under the plan, unless such liquidation or reorganization is proposed under the plan.

In order to establish the feasibility of the Plan for purposes of section 1129(a)(11) of the Bankruptcy Code, the Debtor and its management team and advisors, have developed the Financial Projections attached hereto as **Exhibit D**. The Financial Projections set forth the projected financial performance of the Reorganized Debtor over a defined period of time based upon a number of assumptions and factors. The Financial Projections are unaudited. Impaired creditors and other interested parties should review Section VI of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtor.

The Debtor anticipates that the Financial Projections will show that the Reorganized Debtor will have a viable operation following the Chapter 11 Case and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

### 3. Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, that, except as described below, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. As a general matter under the Bankruptcy Code, a class is "impaired," unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such claim or equity interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. If no votes to accept or reject the Plan are received with respect to a Class whose votes have been solicited under the Plan (other than a Class that is deemed eliminated under the Plan), such Class shall be deemed to have voted to accept the Plan.

### 4. Additional Requirements for Nonconsensual Confirmation.

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as: (a) the plan otherwise satisfies the requirements for confirmation; (b) at least one impaired class of claims has accepted it without taking into consideration the votes of any insiders in such class; and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

### 5. No Unfair Discrimination.

The "no unfair discrimination" test requires that the plan not provide for unfair treatment with respect to classes of claims or interests that are of equal priority, but are receiving different treatment under the plan.

### 6. Fair and Equitable.

The fair and equitable requirement applies to classes of claims of different priority and status, such as secured versus unsecured. The plan satisfies the fair and equitable requirement if no class of claims receives more than 100% of the allowed amount of the claims in such class. Further, if a class of claims is considered a dissenting class ("Dissenting Class"), i.e., a Class of Claims that is deemed to reject the Plan because the required majorities in amount and number of votes is not received from the Class, the following requirements apply:

### a. Class of Secured Claims.

Each holder of an impaired secured claim either: (i) retains its liens on the subject property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim; (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof); or (iii) receives the "indubitable equivalent" of its allowed secured claim.

### b. Class of Unsecured Creditors.

Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the Dissenting Class will not receive any property under the plan.

54

c. Class of Interests.

Either (i) each interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the interests of the Dissenting Class will not receive any property under the plan.

The Debtor believes the Plan does not "discriminate unfairly" and will satisfy the "fair and equitable" requirement notwithstanding that certain Classes of Interests are deemed to reject the Plan because no Class that is junior to such Class will receive or retain any property on account of the Claims and Interests in such Class and the Plan does not provide for unfair treatment with respect to Classes of Claims or Interests that are of equal priority.

## VI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes the Plan is in the best interests of its Creditors and should accordingly be accepted and confirmed. If the Plan as proposed, however, is not confirmed, the following alternatives may be available to the Debtor: (i) a liquidation of the Debtor's Assets pursuant to chapter 7 of the Bankruptcy Code; or (ii) an alternative plan of reorganization or liquidation may be proposed and confirmed.

### A. Chapter 7 Liquidation.

If a plan pursuant to chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Debtor's Chapter 11 Case may be converted to a liquidation case under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed, pursuant to applicable provisions of chapter 7 of the Bankruptcy Code, to liquidate the Assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtor believes that such a liquidation would result in smaller distributions being made to the Debtor's Creditors than those provided for in the Plan because: (a) the likelihood that other Assets of the Debtor would have to be sold or otherwise disposed of in an orderly fashion; (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals; and (c) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtor's operations. The Debtor has found that confirmation of the Plan will provide each Holder of an Allowed Claim with a recovery that is not less than such Holder would receive pursuant to liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

### B. Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code.

If the Plan is not confirmed, the Debtor may propose a different plan, which might involve an alternative means for the reorganization or liquidation of the Debtor's Assets. However, the Debtor believes that the terms of the Plan provide for an orderly and efficient restructuring of the Debtor's obligations and will result in the realization of the most value for Holders of Claims against the Debtor's Estate.

## VII. CERTAIN FEDERAL TAX MATTERS RELATING TO THE SERIES 2019 BONDS

THE FOLLOWING IS A SUMMARY OF THE CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF HOLDING AND DISPOSING OF THE SERIES 2019 BONDS. THIS SUMMARY IS BASED UPON LAWS, REGULATIONS, RULINGS AND JUDICIAL DECISIONS NOW IN EFFECT, ALL OF WHICH ARE SUBJECT TO CHANGE (POSSIBLY ON A RETROACTIVE BASIS). THIS SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO INVESTORS IN LIGHT OF THEIR PERSONAL INVESTMENT CIRCUMSTANCES OR DESCRIBE THE TAX CONSEQUENCES TO CERTAIN TYPES OF OWNERS SUBJECT TO SPECIAL TREATMENT UNDER THE FEDERAL INCOME TAX LAWS (FOR EXAMPLE, DEALERS IN SECURITIES OR OTHER PERSONS WHO DO NOT HOLD THE SERIES 2019 BONDS AS A CAPITAL ASSET, TAX-EXEMPT ORGANIZATIONS, INDIVIDUAL RETIREMENT ACCOUNTS AND OTHER TAX DEFERRED ACCOUNTS, AND FOREIGN TAXPAYERS), AND DOES NOT DISCUSS THE CONSEQUENCES TO AN OWNER UNDER ANY STATE, LOCAL OR FOREIGN TAX LAWS. THE FORM OF BOND COUNSEL OPINION EXPECTED TO BE DELIVERED ON THE DATE OF THE EXCHANGE IS ATTACHED HERETO AS <u>EXHIBIT F</u>.

THE SUMMARY DOES NOT DEAL WITH THE TAX TREATMENT OF PERSONS WHO HOLD SERIES 2009 BONDS AND RECEIVE SERIES 2019 BONDS PURSUANT TO THE EXCHANGE DESCRIBED IN THIS DISCLOSURE STATEMENT, AND BOND COUNSEL IS NOT EXPRESSING ANY OPINION REGARDING ANY FEDERAL OR STATE INCOME TAX CONSEQUENCES TO THE HOLDER OF THE SERIES 2009 BONDS AS A RESULT OF THE EXCHANGE. PROSPECTIVE INVESTORS ARE ADVISED TO CONSULT THEIR OWN TAX ADVISORS REGARDING FEDERAL, STATE, LOCAL AND OTHER TAX CONSIDERATIONS OF HOLDING AND DISPOSING OF THE SERIES 2019 BONDS.

### A.    Opinion of Bond Counsel

In the opinion of Gilmore & Bell, P.C., the Debtor's bond counsel ("***Bond Counsel***"), under the law existing as of the issue date of the Series 2019 Bonds (1) the interest on the Series 2019 Bonds is excludable from gross income for federal income tax purposes, and (2) the interest on the Series 2019 Bonds is not an item of tax preference for purposes of computing the federal alternative minimum tax. The Series 2019 Bonds have not been designated as "qualified tax-exempt obligations" for purposes of IRC Section 265(b)(3).

Bond Counsel's opinions will be provided as of the date of the original issue of the Series 2019 Bonds on the Effective Date of the Plan, subject to the condition that the Issuer and the Borrower comply with all requirements of the IRC that must be satisfied subsequent to the issuance of the Series 2019 Bonds in order that interest thereon be, or continue to be, excludable from gross income for federal income tax purposes. The Issuer and the Borrower will covenant and agree at the time of issuance of the Series 2019 Bonds to comply with all such requirements. Failure to comply with certain of such requirements may cause the inclusion of interest on the

Series 2019 Bonds in gross income for federal income tax purposes retroactive to the Effective Date of the Plan. Bond Counsel is expressing no opinion regarding other federal, state or local tax consequences arising with respect to the Series 2019 Bonds, but has reviewed the discussion under this heading "CERTAIN FEDERAL TAX MATTERS RELATING TO THE SERIES 2019 BONDS."

**B.     Other Tax Consequences**

**1.     Sale, Exchange or Retirement of Series 2019 Bonds.**

Upon the sale, exchange or retirement (including redemption) of a Series 2019 Bond after the Effective Date of the Plan, an owner of the Series 2019 Bond generally will recognize gain or loss in an amount equal to the difference between the amount of cash and the fair market value of any property received on the sale, exchange or retirement of the Series 2019 Bond (other than in respect of accrued and unpaid interest) and such owner's adjusted tax basis in the Series 2019 Bond. To the extent a Series 2019 Bond is held as a capital asset, such gain or loss will be capital gain or loss and will be long-term capital gain or loss if the Series 2019 Bond has been held for more than twelve (12) months at the time of sale, exchange or retirement.

**2.     Reporting Requirements**.

In general, information reporting requirements will apply to certain payments of principal, interest and premium paid on the Series 2019 Bonds, and to the proceeds paid on the sale of the Series 2019 Bonds, other than certain exempt recipients (such as corporations and foreign entities). A backup withholding tax will apply to such payments if the owner fails to provide a taxpayer identification number or certification of foreign or other exempt status or fails to report in full dividend and interest income. The amount of any backup withholding from a payment to an owner will be allowed as a credit against the owner's federal income tax liability.

**3.     Collateral Federal Income Tax Consequences.**

Prospective purchasers of the Series 2019 Bonds should be aware that ownership of the Series 2019 Bonds may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, individual recipients of Social Security or Railroad Retirement benefits, certain S corporations with "excess net passive income," foreign corporations subject to the branch profits tax, life insurance companies, and taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry or have paid or incurred certain expenses allocable to the Series 2019 Bonds. Bond Counsel expresses no opinion regarding these tax consequences. Holders of Series 2009 Bonds should consult their tax advisors as to federal, state, and local tax consequences of the exchange of Series 2009 Bonds for Series 2019 Bonds on the Effective Date of the Plan, the applicability of the collateral federal income tax consequences referenced in this paragraph, and other federal income tax consequences of the exchange of Series 2009 Bonds for Series 2019 Bonds, and the purchase, ownership and disposition of the Series 2019 Bonds, including the possible application of state, local, foreign and other tax laws.

## VIII. RECOMMENDATION AND CONCLUSION

The Debtor believes the Plan is in the best interests of its Estate, Creditors and other interested parties and urge the Holders of Impaired Claims entitled to vote to accept the Plan and to evidence such acceptance by properly voting and timely returning their ballots.

Dated: September 30, 2019

Respectfully submitted,

TARRANT COUNTY SENIOR LIVING CENTER, INC.

By: */s/ Louis E. Robichaux IV*
      Name: Louis E. Robichaux IV
      Title: Chief Restructuring Officer

58

# **EXHIBIT A**

Debtor's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, dated September 30, 2019

Daniel B. Prieto, State Bar No. 24048744
DLA Piper LLP (US)
1900 North Pearl Street, Suite 2200
Dallas, Texas 75201
Tel: (214) 743-4500
Fax: (214) 743-4545
E-mail: dan.prieto@dlapiper.com

PROPOSED COUNSEL FOR THE
DEBTOR

Thomas R. Califano (*pro hac vice* pending)
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Tel: (212) 335-4500
Fax: (212) 335-4501
E-mail: thomas.califano@dlapiper.com

Rachel Nanes (*pro hac vice* pending)
DLA Piper LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Tel: (305) 423-8563
Fax: (305) 675-8206
E-mail: rachel.nanes@dlapiper.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **CHAPTER 11** |
| **TARRANT COUNTY SENIOR LIVING** | § | |
| **CENTER, INC.**[1] | § | **CASE NO. 19-[_____]** |
| | § | |
| **Debtor.** | § | |

## DEBTOR'S PREPACKAGED PLAN OF REORGANIZATION
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

> **THIS CHAPTER 11 PLAN OF REORGANIZATION IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTOR'S FILING OF A CHAPTER 11 CASE.**

Dated: September 30, 2019

---

[1] The last four digits of the Debtor's federal tax identification number are 8602. The mailing address for the Debtor is 2501 Museum Way, Fort Worth, TX 76107.

# TABLE OF CONTENTS

**SECTION 1.**  **DEFINITIONS AND INTERPRETATION** ............................................................. **4**

    1.1    Definitions ........................................................................................................... 4

    1.2    Interpretation, Application of Definitions and Rules of Construction.............................. 13

    1.3    Computation of Time....................................................................................... 13

    1.4    Controlling Document .................................................................................... 14

    1.5    Plan Support Agreement ................................................................................. 14

**SECTION 2.**  **ADMINISTRATIVE AND PRIORITY CLAIMS**.......................................... **14**

    2.1    Administrative Expense Claims ...................................................................... 14

    2.2    Accrued Professional Compensation Claims .................................................. 15

    2.3    Priority Tax Claims ........................................................................................ 15

    2.4    United States Trustee Statutory Fees .............................................................. 15

**SECTION 3.**  **CLASSIFICATION OF CLAIMS AND INTERESTS** ................................. **15**

**SECTION 4.**  **TREATMENT OF CLAIMS AND INTERESTS** .......................................... **16**

    4.1    Other Priority Claims (Class 1)....................................................................... 16

    4.2    Other Secured Claims (Class 2)...................................................................... 16

    4.3    Bond Claim (Class 3)...................................................................................... 16

    4.4    General Unsecured Claims (Class 4) ............................................................... 17

    4.5    Preserved Intercompany Claims (Class 5)....................................................... 17

    4.6    Intercompany Claims (Class 6)....................................................................... 17

    4.7    Interests in Stayton (Class 7) ......................................................................... 17

**SECTION 5.**  **CRAMDOWN.**.............................................................................................. **17**

**SECTION 6.**  **MEANS FOR IMPLEMENTATION OF THIS PLAN** ................................. **17**

    6.1    Refinancing Transaction ................................................................................. 17

    6.2    2019 Bond Documents..................................................................................... 18

    6.3    Series 2019 Bonds .......................................................................................... 18

    6.4    Continued Corporate Existence ...................................................................... 19

    6.5    Vesting of Assets in the Reorganized Debtor ................................................. 19

    6.6    Cancellation of Agreements, Security Interests, and Other Interests................ 20

    6.7    Exemption from Registration Requirements; Trading of Securities.................. 20

    6.8    Organizational Documents............................................................................... 20

    6.9    Exemption from Certain Transfer Taxes and Recording Fees.......................... 20

    6.10   Board and Officers of the Reorganized Debtor ............................................... 21

    6.11   Directors and Officers Insurance Policies....................................................... 21

    6.12   Other Insurance Policies ................................................................................. 21

    6.13   Preservation of Rights of Action..................................................................... 22

| | | |
|---|---|---|
| 6.14 | Corporate Action | 22 |
| 6.15 | Effectuating Documents; Further Transactions | 23 |
| **SECTION 7.** | **ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** | **23** |
| 7.1 | Assumption of Executory Contracts | 23 |
| 7.2 | Inclusiveness | 23 |
| 7.3 | Indemnification | 23 |
| 7.4 | Full Release and Satisfaction | 24 |
| 7.5 | Reservation of Rights | 24 |
| 7.6 | Nonoccurrence of Effective Date | 24 |
| **SECTION 8.** | **CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE** | **24** |
| 8.1 | Conditions Precedent to Confirmation | 24 |
| 8.2 | Conditions Precedent to the Effective Date | 24 |
| 8.3 | Waiver of Conditions | 25 |
| 8.4 | Effect of Failure of Conditions | 25 |
| **SECTION 9.** | **EFFECT OF CONFIRMATION** | **25** |
| 9.1 | General | 25 |
| 9.2 | Releases by the Debtor | 26 |
| 9.3 | Releases by Holders of Claims | 27 |
| 9.4 | Exculpation | 28 |
| 9.5 | Discharge of Claims and Interest | 28 |
| 9.6 | Injunction | 28 |
| 9.7 | Binding Nature of Plan | 29 |
| 9.8 | Protection Against Discriminatory Treatment | 29 |
| 9.9 | Preservation of Privilege and Defenses | 29 |
| 9.10 | Injunction Against Interference with Plan | 30 |
| 9.11 | Release of Liens | 30 |
| **SECTION 10.** | **MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS PLAN** | **30** |
| 10.1 | Modification and Amendments | 30 |
| 10.2 | Effect of Confirmation on Modifications | 30 |
| 10.3 | Revocation or Withdrawal of this Plan | 30 |
| **SECTION 11.** | **RETENTION OF JURISDICTION** | **31** |
| **SECTION 12.** | **MISCELLANEOUS PROVISIONS** | **32** |
| 12.1 | Section 1125(e) Good Faith Compliance | 32 |
| 12.2 | Substantial Consummation | 32 |
| 12.3 | Closing of the Chapter 11 Case | 32 |

12.4 Plan Supplement ...................................................................................................... 33

12.5 Further Assurances ................................................................................................... 33

12.6 Exhibits Incorporated ............................................................................................... 33

12.7 Inconsistency ........................................................................................................... 33

12.8 No Admissions .......................................................................................................... 33

12.9 Reservation of Rights ............................................................................................... 33

12.10 Successors and Assigns ........................................................................................... 33

12.11 Entire Agreement ..................................................................................................... 33

12.12 Notices ..................................................................................................................... 33

12.13 Severability .............................................................................................................. 34

12.14 Governing Law ......................................................................................................... 35

12.15 Request for Confirmation ......................................................................................... 35

## INTRODUCTION

Tarrant County Senior Living Center, Inc. d/b/a The Stayton at Museum Way (the "***Debtor***") proposes this prepackaged chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code for the resolution of outstanding claims against, and interest in, the Debtor.

Reference is made to the *Disclosure Statement for Debtor's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* for a discussion of the Debtor's history and assets, a summary and analysis of this Plan, and certain related matters, including the distributions to be made under this Plan and the risk factors relating to consummation of this Plan. Capitalized terms used but not defined herein have the meanings ascribed to them in Section 1 of this Plan.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## SECTION 1. DEFINITIONS AND INTERPRETATION

### 1.1 *Definitions*.

The following terms used herein shall have the respective meanings below:

"***2019 Bond Documents***" means the Indenture of Trust, the Loan Agreement, Amended Master Indenture (including Supplemental Master Trust Indenture No. 3 and the Series 2019 Note (as defined in the Disclosure Statement)), substantially in the forms attached to the Disclosure Statement as **Exhibit C**.

"***Accrued Professional Compensation Claim***" means, at any date, all accrued fees and reimbursable expenses for services rendered by a retained Professional in the Chapter 11 Case through and including such date, to the extent such fees and expenses have not been previously paid whether under a retention order with respect to such Retained Professional or otherwise. To the extent that there is a Final Order denying some or all of a Retained Professional's fees or expenses, such denied amounts shall no longer be considered an Accrued Professional Compensation Claim.

"***Administrative Expense Claim***" means any Claim for costs and expenses of administration pursuant to sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Debtor's Estate and operating the business of the Debtor; (b) all fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930; (c) Claims for the value of any goods received by the Debtor within twenty (20) days before the Petition Date allowed in accordance with section 503(b)(9) of the Bankruptcy Code; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Case pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code.

"***Administrative Expense Claims Bar Date***" means the first Business Day that is thirty (30) days after the Effective Date or such other date ordered by the Bankruptcy Court.

4

***"Affiliate"*** means, with respect to any Entity, an "affiliate" as defined in section 101(2) of the Bankruptcy Code as if such entity were a debtor.

***"Allowed"*** means, with reference to any Claim against the Debtor, a Claim (i) as to which no objection or request for estimation has been filed on or before any deadline therefor set by the Bankruptcy Court or the expiration of such other applicable period fixed by the Bankruptcy Court or this Plan; (ii) as to which any objection has been settled, waived, withdrawn or denied by a Final Order or in accordance with this Plan; or (iii) that is allowed (a) by a Final Order, (b) by an agreement between the Holder of such Claim and the Debtor or (c) pursuant to the terms of this Plan. An "Allowed Claim" shall be net of any valid setoff exercised with respect to such Claim pursuant to the provisions of the Bankruptcy Code and applicable law. Moreover, any portion of a Claim that is satisfied, released, or waived during the Chapter 11 Case is not an Allowed Claim. Unless otherwise specified in this Plan, in section 506(b) of the Bankruptcy Code or by Final Order of the Bankruptcy Court, the term "Allowed Claim" shall not, for purposes of Distributions under this Plan, include interest, fees (including attorneys' fees), costs or charges on such Claim from and after the Petition Date.

***"Amended Master Indenture"*** means the Amended and Restated Master Trust Indenture, Deed of Trust and Security Agreement, including Supplemental Master Trust Indenture No. 3, substantially in the forms attached as Schedule 4 to the Plan Support Agreement.

***"Assets"*** means all assets of the Debtor of any nature whatsoever, including, without limitation, all property of the Debtor's Estate pursuant to section 541 of the Bankruptcy Code, Cash, Avoidance Actions, Causes of Action, equipment, inventory, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and proceeds of any of the foregoing.

***"Avoidance Actions"*** means any and all avoidance, recovery, subordination or other actions or remedies that may be brought on behalf of the Debtor or the Estate under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code and under similar state or federal statutes and common law, including, without limitation, fraudulent transfer laws, whether or not litigation is commenced to prosecute such actions or remedies.

***"Ballot"*** means the ballots upon which Holders of Impaired Claims entitled to vote on this Plan have indicated their acceptance or rejection of this Plan in accordance with the instructions regarding voting.

***"Bankruptcy Code"*** means title 11 of the United States Code, as now in effect or hereafter applicable to this Chapter 11 Case.

***"Bankruptcy Court"*** means the United States Bankruptcy Court for the Northern District of Texas having jurisdiction over the Chapter 11 Case.

***"Bankruptcy Rules"*** means the Federal Rules of Bankruptcy Procedure, as amended, and the local rules of the Bankruptcy Court, as applicable to the Chapter 11 Case.

***"Bond Claims"*** means any Claim arising from, or related to, the Original Bond Documents and the Bonds, including any and all outstanding principal, which is owed in the

5

amount $105,795,000.00, plus any and all accrued interest, fees (including, without limitation, professional fees), expenses, costs and other charges payable with respect to the Bonds, which Claims are Allowed pursuant to the Cash Collateral Order.

***"Bond Indenture"*** means that certain Indenture of Trust, dated as of October 1, 2009, between the Tarrant County Cultural Education Facilities Finance Corporation and The Bank of New York Mellon Trust Company, N.A., as predecessor to the Trustee.

***"Bonds"*** means, collectively, the Series 2009A Bonds, the Series 2009B Bonds and the Series 2009C Bonds. The Series 2009C Bonds are no longer outstanding under the Original Bond Documents.

***"Business Day"*** means any day of the calendar week, except Saturday, Sunday, a "legal holiday," as defined in Bankruptcy Rule 9006(a), or any day on which commercial banks are authorized or required by law to close in Dallas, Texas.

***"Cash"*** means cash and cash equivalents including, without limitation, checks and wire transfers.

***"Cash Collateral Order"*** means any order, whether interim or final, authorizing the use by the Debtor during the Chapter 11 Case of the cash collateral of the Trustee.

***"Causes of Action"*** means any claim, cause of action, controversy, demand, agreement, right (including to legal or equitable remedies), action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law, asserted or which may be asserted by or on behalf of the Debtor and/or the Estate, including: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Avoidance Action; and (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

***"Chapter 11 Case"*** means the Debtor's chapter 11 case pending in the Bankruptcy Court under case number 19-_____-___11.

***"Claim"*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

***"Class"*** means a class or category of Claims or Interests as classified and described in Section 3 of this Plan.

***"Collateral"*** means any property or interest in property of the Estate subject to a Lien, charge or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or other applicable law.

*"**Confirmation Date**"* means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the Bankruptcy Court's docket in the Chapter 11 Case.

*"**Confirmation Hearing**"* means the hearing(s) before the Bankruptcy Court on confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

*"**Confirmation Order**"* means the order entered by the Bankruptcy Court confirming this Plan in accordance with chapter 11 of the Bankruptcy Code and approving the Disclosure Statement and the other solicitation materials in respect of this Plan.

*"**Creditor**"* means a Holder of a Claim.

*"**Cure**"* or *"**Cure Claim**"* means a Claim (unless waived or modified by the applicable counterparty) based upon the Debtor's defaults under an Executory Contract assumed by the Debtor under sections 365 and 1123 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

*"**Debtor**"* means Stayton as debtor and debtor in possession, and includes the Estate.

*"**Debtor in Possession**"* means the Debtor in its capacity as debtor in possession in the Chapter 11 Case pursuant to sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

*"**Deficiency Claim**"* means a General Unsecured Claim for the difference between (a) the aggregate amount of an Allowed Claim and (b) the value received on account of the portion of such Allowed Claim that is a Secured Claim.

*"**Definitive Documents**"* means the definitive documents and agreements governing this Plan and the transactions contemplated thereunder (including any related orders, agreements, instruments, schedules, or exhibits) that are contemplated by and referenced in this Plan (as amended, modified, or supplemented from time to time), including: (i) the motion seeking authority to use cash collateral and grant adequate protection and the Cash Collateral Orders to be entered by the Bankruptcy Court approving such motion and all security documents and other loan documents in connection therewith; (ii) this Plan (including all exhibits and supplements thereto); (iii) the Disclosure Statement and the other solicitation materials in respect of this Plan; (iv) the Confirmation Order and pleadings in support of entry of the Confirmation Order; (v) the 2019 Bond Documents and related documentation, any other exit financing contemplated by the Plan Term Sheet, and all security documents and other related loan documents; (vi) those motions and proposed court orders that the Debtor file on or after the Petition Date and seek to have heard on an expedited basis at the "first day hearing"; (vii) the documents or agreements for the governance of the Reorganized Debtor, including any membership agreements and certificates of incorporation; (viii) all management or consulting agreements of the Reorganized Debtor; (ix) all agreements relating to Interests in the Reorganized Debtor, if applicable; and (x) such other documents, pleadings, agreements or supplements as may be reasonably necessary or advisable to implement the Refinancing, and in the case of all such documents described in clauses (i) through (x) consistent in all respects with all other terms and provision of the Plan Term Sheet, and, except

as otherwise set forth herein, acceptable in form and substance to the Trustee, Lifespace, and the Debtor.

*"Disallowed Claim"* means any Claim or portion thereof which has been disallowed by a Final Order and includes any Claim which is not an Allowed Claim for any other reason.

*"Disclosure Statement"* means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to this Plan, as such disclosure statement may be altered, supplemented, modified, or amended from time to time, including all exhibits and schedules thereto, to be approved by the Confirmation Order.

*"Distribution"* means Cash, property, interests in property or other value distributed to Holders of Allowed Claims, or their designated agents, under this Plan.

*"Effective Date"* means the first Business Day selected by the Debtor on which (a) the conditions specified in Section 8 of this Plan have been either satisfied or waived in accordance with the terms of Section 8, and (b) no stay of the Confirmation Order is in effect.

*"Estate"* means the estate created in the Chapter 11 Case containing all property and other interests of the Debtor pursuant to section 541 of the Bankruptcy Code.

*"Exculpated Party"* means, collectively, in each case in its capacity as such: (a) the Debtor; (b) the Reorganized Debtor; (c) the Trustee; (d) the Steering Committee; (e) Lifespace, and (f) with respect to each of the foregoing entities in clauses (a) and (e), such Entity and its current and former predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, and all of their respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals.

*"Executory Contract"* means all contracts and leases to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

*"Facility"* means the continuing care retirement community owned and operated by Stayton, known as "The Stayton at Museum Way."

*"Final Order"* means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, that has been entered on the docket in the Chapter 11 Case or the docket of any other court of competent jurisdiction, and, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that the possibility

8

that a motion under Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rule 9024, may be filed relating to such order shall not cause such order to not be a Final Order.

*"General Administrative Claim"* means any Administrative Expense Claim, other than an Accrued Professional Compensation Claim and claims for fees and expenses under 28 U.S.C § 1930(a).

*"General Unsecured Claim"* means any Claim, including, without limitation, any Deficiency Claim, asserted against the Debtor that is not (a) a Secured Claim, (b) a Claim entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court, (c) a Bond Claim, (d) an Intercompany Claim or (e) a Preserved Intercompany Claim.

*"Governmental Unit"* has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

*"Holder"* means the legal or beneficial holder of a Claim or Interest.

*"Impaired"* means, with respect to a Claim or Interest, that such Class of Claims or Interests is impaired within the meaning of section 1124 of the Bankruptcy Code.

*"Indemnification Provisions"* means the Debtor's indemnification provisions in effect as of the Petition Date, whether in the Debtor's bylaws, certificates of incorporation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise providing a basis for any obligation of the Debtor to indemnify, defend, reimburse, or limit the liability of, or to advances fees and expenses to, any of the Debtor's current and former directors, officers, equity holders, managers, members, employees, accountants, investment bankers, attorneys, other professionals, and professionals of the Debtor, and such current and former directors', officers', and managers' respective Affiliates, each of the foregoing solely in their capacity as such.

*"Insurance Policies"* means, collectively, all of the Debtor's insurance policies.

*"Intercompany Claim"* means any Claim against the Debtor held by an Affiliate that is not a Preserved Intercompany Claim.

*"Interest"* means the interest of any Holder in an equity security of the Debtor within the meaning of section 101(16) of the Bankruptcy Code represented by any issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership or membership interest in the Debtor, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, including a partnership, limited liability company or similar interest in the Debtor.

*"Issuer"* means the Tarrant County Cultural Education Facilities Finance Corporation.

*"Lien"* has the meaning set forth in section 101(37) of the Bankruptcy Code.

*"Lifespace"* means Lifespace Communities, Inc.

9

"*Loan Agreement*" means that Loan Agreement, dated as of October 1, 2009 between Stayton and the Issuer.

"*Master Indenture*" means the Original Master Indenture prior to the Effective Date and on and after the Effective Date the Amended Master Indenture.

"*Original Bond Documents*" means, collectively, the Bond Indenture, the Original Master Indenture, the Loan Agreement, and any other documents entered into in connection with the Bonds.

"*Original Master Indenture*" means that Master Trust Indenture, Deed of Trust and Security Agreement, dated as of October 1, 2009, between Stayton and the Trustee, as amended by the Supplement Indenture Number 1, dated as of October 1, 2009, and the Supplemental Indenture No. 2, effective as of June 20, 2019.

"*Other Priority Claim*" means any Claim entitled to priority under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

"*Other Secured Claim*" means a Secured Claim other than the Bond Claim.

"*Person*" means an individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, estate, unincorporated organization, governmental unit, government (or agency or political subdivision thereof), or other entity, including, without limitation, the Debtor.

"*Petition Date*" means the date on which the Debtor commences the Chapter 11 Case.

"*Plan*" means this prepackaged chapter 11 plan of reorganization, including all appendices, exhibits, schedules and supplements hereto (including any appendices, exhibits, schedules and supplements to this Plan that are contained in the Plan Supplement), as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and the Plan Support Agreement.

"*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to this Plan, in each case subject to the terms and provisions of the Plan Support Agreement, to be filed no later than ten (10) days prior to the Confirmation Hearing, as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, the Bankruptcy Rules and the Plan Support Agreement.

"*Plan Support Agreement*" means that certain Plan Support Agreement entered into on May 10, 2019 by and among the Debtor, the Trustee, the Steering Committee and Lifespace, and any subsequent Entity that becomes a party thereto pursuant to the terms thereof, attached as **Exhibit B** to the Disclosure Statement.

"*Plan Term Sheet*" means that certain term sheet describing the key terms of a plan of reorganization for Stayton, attached as <u>Schedule 1</u> to the Plan Support Agreement.

"*Preserved Intercompany Claims*" means, collectively, (i) each Intercompany Claim arising on or after June 20, 2019 under (a) management agreements or (b) any administration or operational agreements pursuant to which an affiliate of Lifespace or Senior Quality Lifestyles Corporation pays costs incurred on Stayton's behalf to third parties and allocates to, and receives reimbursement of such costs, from Stayton; and (ii) the Intercompany Claim, if any, arising from any draws prior to the Effective Date on the Liquidity Support Agreement (as defined in the Disclosure Statement) provided by Lifespace.

"*Priority Claim*" means any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim, Accrued Professional Compensation Claim or Priority Tax Claims.

"*Priority Tax Claim*" means any Claim of a Governmental Unit of a kind entitled to priority under section 507(a)(8) of the Bankruptcy Code.

"*Pro Rata*" shall mean the proportion that the amount of a Claim in a particular Class or Classes bears to the aggregate amount of all Claims in such Class or Classes, unless this Plan otherwise provides.

"*Professionals*" means all professionals employed in the Chapter 11 Case pursuant to sections 327, 363 and 1103 of the Bankruptcy Code.

"*Proof of Claim*" means a proof of Claim filed against the Debtor in the Chapter 11 Case.

"*Refinancing*" means the refinancing of existing debt and certain other obligations of Stayton to be implemented through this Plan and for which the principal terms are set forth in the Plan Term Sheet.

"*Refinancing Transaction*" shall have the meaning ascribed to it in the Disclosure Statement.

"*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claims or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

"*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns and present and former affiliates (whether by operation of law or otherwise) and each of their respective members, partners, equity holders, certificate holders, officers, directors, employees, representatives, advisors, attorneys, auditors, agents, and professionals, in each case acting in such capacity on or any time prior to or after the Petition Date, and any Person claiming by or through any of them.

"*Released Parties*" means (i) the Debtor; (ii) the Reorganized Debtor; (iii) the Trustee; (iv) the Steering Committee; (v) Lifespace, (vi) the Issuer, and (vii) with respect to each of the foregoing entities in clauses (i) and (vi), such entity and its current and former predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, and all of their respective current and former officers, directors, principals, shareholders, members, partners,

11

employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals.

*"Releasing Parties"* means all Persons who have held, hold or may hold Claims or Interests that have been released, discharged or are subject to exculpation pursuant to this Plan.

*"Reorganized Debtor"* means the Debtor, as reorganized pursuant to and under this Plan on or after the Effective Date, and its successors.

*"Retained Professional"* and collectively, *"Retained Professionals"* means any Entity: (a) employed in the Chapter 11 Case under a Final Order in accordance with section 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, under sections 327, 328, 329, 330, or 331 of the Bankruptcy Code (other than an ordinary course professional retained under an order of the Bankruptcy Court); or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court under section 503(b)(4) of the Bankruptcy Code.

*"Residency Agreements"* means all Continuing Care Contracts, Assisted Living Residency Agreements, SNF Residency Agreements (each as defined in the Disclosure Statement) and any additional documents related thereto.

*"Residents"* shall mean all persons that reside at the Facility and are parties to Residency Agreements.

*"Secured Claim"* means any Claim of a Creditor that is secured by property of the Estate, to the extent of the value of the Creditor's interest in the Estate's interest in such property, as provided in section 506(a) of the Bankruptcy Code. Secured Claim also means a Claim of a Creditor that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the amount subject to setoff, as provided in section 506(a) of the Bankruptcy Code. To the extent the value of any property securing such Claim is less than the amount of such Claim, the difference between such value and such Claim is a *"Deficiency Claim"* unless the holder of such Claim validly elects under section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

*"Series 2009A Bonds"* means those certain Series 2009A Retirement Facility Revenue Bonds (The Stayton At Museum Way Project), issued by the Issuer pursuant to the Bond Indenture.

*"Series 2009B Bonds"* means those certain Series 2009B Retirement Facility Revenue Bonds (The Stayton At Museum Way Project), issued by the Issuer pursuant to the Bond Indenture.

*"Series 2009C Bonds"* means those certain Series 2009C Retirement Facility Revenue Bonds (The Stayton At Museum Way Project), issued by the Issuer pursuant to the Bond Indenture.

"*Series 2019 Bonds*" means those certain Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2019, to be issued by the Issuer pursuant to the 2019 Bond Documents in accordance with the terms and conditions set forth in this Plan.

"*Steering Committee*" means, collectively, each (a) member of an informal steering committee comprised of holders of Bonds holding, collectively, at least sixty-seven (67%) of the outstanding aggregate principal amount of all Bonds issued that are parties to the Plan Support Agreement and (b) holder of the Bonds that executes a joinder to the Plan Support Agreement pursuant to its terms.

"*Stayton*" means the Debtor.

"*Trustee*" means (i) UMB Bank, N.A., in its capacity as successor trustee under the Bond Indenture, (ii) UMB Bank, N.A., in its capacity as successor master trustee under the Master Indenture, and (iii) any successor trustee in either capacity.

"*Unimpaired*" means, with respect to a Claim or Interest, a Class of Claims or Interests that is "unimpaired" within the meaning of section 1124 of the Bankruptcy Code.

"*United States Trustee*" means the Office of the United States Trustee for the Northern District of Texas.

"*Voting Agent*" means Epiq Corporate Restructuring, LLC.

"*Voting Record Date*" shall have the meaning ascribed to such term in the Disclosure Statement.

      1.2    *Interpretation, Application of Definitions and Rules of Construction.* Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan, as the same may be amended, supplemented, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein. A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to this Plan. The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Unless otherwise provided, any reference in this Plan to an existing document, exhibit or schedule means such document, exhibit or schedule as it may have been amended, restated, revised, supplemented or otherwise modified. If a time or date is specified for any payments or other Distribution under this Plan, it shall mean on or as soon as reasonably practicable thereafter. Further, where appropriate from a contextual reading of a term, each term includes the singular and plural form of the term regardless of how the term is stated and each stated pronoun is gender neutral. In the event of any ambiguity or conflict between this Plan and the Disclosure Statement, the provisions of this Plan shall govern.

      1.3    *Computation of Time*. Bankruptcy Rule 9006 shall apply to all computations of time periods prescribed or allowed by this Plan unless otherwise set forth herein

or provided by the Bankruptcy Court. Any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter unless otherwise specified herein

1.4 *Controlling Document.* In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects. In the event of an inconsistency between this Plan and the Plan Supplement, this Plan shall control. In the event of an inconsistency between this Plan and the Confirmation Order, the Confirmation Order shall control.

1.5 *Plan Support Agreement.* Notwithstanding anything to the contrary in this Plan, the Plan Supplement, the Confirmation Order, or the Disclosure Statement, any and all consent rights in the Plan Support Agreement with respect to the form and substance of this Plan, the Plan Supplement, the Definitive Documents and any other documents relating to the Refinancing, including, without limitation, any amendments, restatements, supplements, or other modifications to such documents and any consents, waivers, or other deviations under or from any such documents, shall be incorporated by reference herein and fully enforceable as if stated in full herein. Solely with respect to any consent or consultation rights in this Plan, in the event of an inconsistency between this Plan, the Plan Supplement, the Disclosure Statement, the Definitive Documents and the Plan Support Agreement, the Plan Support Agreement shall control.

## SECTION 2. ADMINISTRATIVE AND PRIORITY CLAIMS

2.1 *Administrative Expense Claims*. Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code and except to the extent that a Holder of an Allowed General Administrative Claim and the Debtor before the Effective Date or the Reorganized Debtor after the Effective Date agree to less favorable treatment, each Holder of an Allowed General Administrative Claim will be paid the full unpaid amount of such Allowed General Administrative Claim in Cash: (a) if such Allowed General Administrative Claim is based on liabilities that the Debtor incurred in the ordinary course of business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Administrative Claim and without any further action by any Holder of such Allowed General Administrative Claim; (b) if such Allowed General Administrative Claim is due, on the Effective Date, or, if such Allowed General Administrative Claim is not due as of the Effective Date, on the date that such Allowed General Administrative Claim becomes due or as soon as reasonably practicable thereafter; (c) if a General Administrative Claim is not Allowed as of the Effective Date, on the date that is no later than thirty (30) days after the date on which an order allowing such General Administrative Claim becomes a Final Order of the Bankruptcy Court or as soon as reasonably practicable thereafter; or (d) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

To be eligible to receive Distributions under this Plan on account of an Administrative Expense Claim that is not otherwise Allowed by this Plan, a request for payment of an Administrative Expense Claim must have been or be filed with the Bankruptcy Court on or before the Administrative Expense Claims Bar Date. Any Administrative Expense Claim that is not asserted in accordance herewith shall be deemed disallowed under this Plan and shall be forever barred against the Debtor, the Debtor's Estate, or any of the Debtor's Assets or property,

and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

2.2 ***Accrued Professional Compensation Claims***. All Professionals seeking payment of Accrued Professional Compensation Claims shall (i) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred in the Chapter 11 Case by the date that is forty-five (45) days after the Effective Date and (ii) be paid (a) the full unpaid amount as is Allowed by the Bankruptcy Court within five (5) Business Days after the date that such Claim is Allowed by order of the Bankruptcy Court, or (b) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Accrued Professional Compensation Claim and the Debtor. Any Accrued Professional Compensation Claim that is not asserted in accordance with this Section 2.2 shall be deemed disallowed under this Plan and shall be forever barred against the Debtor, the Debtor's Estate, or any of its Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

2.3 ***Priority Tax Claims***. Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by a Holder of an Allowed Priority Tax Claim and the Debtor, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Priority Tax Claim, payment in full in Cash of the Allowed amount of the Priority Tax Claim on the later of the Effective Date or as soon as practicable after the date when such Claim becomes an Allowed Claim.

2.4 ***United States Trustee Statutory Fees***. The Debtor and the Reorganized Debtor, as applicable, will pay fees payable under 28 U.S.C § 1930(a), including fees, expenses, and applicable interest payable to the United States Trustee, for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.

## SECTION 3. CLASSIFICATION OF CLAIMS AND INTERESTS

3.1 Except as set forth herein, all Claims against and Interests in the Debtor are placed in a particular Class. The Debtor has not classified Administrative Expense Claims, Accrued Professional Compensation Claims, and Priority Tax Claims.

The following table classifies Claims against and Interests in the Debtor for all purposes, including voting, confirmation and Distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. This Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. Each Class set forth below is treated hereunder as a distinct Class for voting and Distribution purposes.

Subject to all other applicable provisions of this Plan (including its Distribution provisions), classified Claims shall receive the treatment described in section 4 herein. This Plan will not provide any Distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third parties.

The following table designates the Classes of Claims against and Interests in the Debtor and specifies which of those Classes are (i) Impaired or Unimpaired by this Plan, (ii) entitled to vote to accept this Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject this Plan, or (iv) deemed to accept this Plan.

| Class | Claims and Interests | Status | Entitled to Vote |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Deemed to Accept) |
| 3 | Bond Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Unimpaired | No (Deemed to Accept) |
| 5 | Preserved Intercompany Claims | Unimpaired | No (Deemed to Accept) |
| 6 | Intercompany Claims | Impaired | No (Deemed to Reject) |
| 7 | Interests in Stayton | Unimpaired | No (Deemed to Accept) |

## SECTION 4.  TREATMENT OF CLAIMS AND INTERESTS

4.1     ***Other Priority Claims (Class 1)***.  This Class consists of all Allowed Other Priority Claims against the Debtor that are specified as having priority in section 507(a) of the Bankruptcy Code, if any such Claims exist as of the Effective Date.  Except to the extent that a Holder of an Allowed Other Priority Claim against the Debtor has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between the Debtor and the Holder of the Allowed Other Priority Claim against the Debtor.

4.2     ***Other Secured Claims (Class 2)***.  This Class consists of all Other Secured Claims against the Debtor.  In full satisfaction of an Allowed Other Secured Claim, on the later of the Effective Date and the date on which the Other Secured Claim is Allowed, each Holder of an Allowed Other Secured Claim shall receive, at the sole and exclusive option of the Reorganized Debtor:  (a) Cash equal to the amount of such Claim; or (b) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired, including Reinstatement.

4.3     ***Bond Claim (Class 3)***.  This Class consists of the Bond Claims of the holders of the Bonds and the Trustee against the Debtor.  The Bond Claims are Allowed Claims. Upon the terms and subject to the conditions set forth in this Plan, in full and final satisfaction, settlement, release, and discharge of the Bond Claims, each Holder of a Bond Claim shall receive its Pro Rata share of the Series 2019 Bonds on the Effective Date or as soon as practicable thereafter.

16

4.4     ***General Unsecured Claims (Class 4)***.  This Class consists of all General Unsecured Claims against the Debtor.  Except to the extent that a Holder of an Allowed General Unsecured Claim against the Debtor agrees to a different treatment of such Claim, on the Effective Date, (i) the Debtor or Reorganized Debtor, as applicable, will pay or treat such General Unsecured Claim, including a Claim of a Resident or under a Residency Agreement, in the ordinary course of business as if the Chapter 11 Case has not been commenced, or (ii) such Holder will receive such other treatment so as to render such General Unsecured Claim Unimpaired, in each case subject to all defenses or disputes the Debtor may assert as to the validity or amount of such Claims.

4.5     ***Preserved Intercompany Claims (Class 5)***.  This Class consists of all Preserved Intercompany Claims against the Debtor.  In full satisfaction of an Allowed Preserved Intercompany Claim, on the later of the Effective Date and the date on which the Preserved Intercompany Claim is Allowed, each Holder of an Allowed Preserved Intercompany Claim shall be Reinstated.

4.6     ***Intercompany Claims (Class 6)***.  This Class consists of all Intercompany Claims against the Debtor.  All Intercompany Claims shall be extinguished without distribution.

4.7     ***Interests in Stayton (Class 7)***.  This Class consists of Interests of the Debtor. On the Effective Date, Interests of the Debtor shall be Reinstated, and holders of such Interests shall retain such Interests.

## SECTION 5.  CRAMDOWN.

If all applicable requirements for confirmation of this Plan are met as set forth in section 1129(a) of the Bankruptcy Code except subsection (8) thereof, the Debtor may request that the Bankruptcy Court confirm this Plan in accordance with section 1129(b) of the Bankruptcy Code on the bases that this Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims or Interests that is Impaired under, and has not accepted or is deemed to reject, this Plan.

## SECTION 6.  MEANS FOR IMPLEMENTATION OF THIS PLAN

6.1     ***Refinancing Transaction***.  On the Effective Date, the Debtor, the Reorganized Debtor, or any other entities may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of this Plan; (c) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities under applicable law; and (d) all other actions that the Debtor or the Reorganized Debtor, as applicable, determines are necessary or appropriate.

The Confirmation Order shall and shall be deemed to, under both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary

or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan.

6.2 ***2019 Bond Documents***. The Reorganized Debtor shall be authorized to enter into the 2019 Bond Documents on the Effective Date. On the Effective Date, and following the consummation of the Refinancing Transaction, the 2019 Bond Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtor, enforceable in accordance with their terms. The financial accommodations to be extended under the 2019 Bond Documents are being extended and shall be deemed to have been extended in good faith and for legitimate business purposes and are reasonable and shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in accordance with the 2019 Bond Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on and security interests in the collateral granted thereunder in accordance with the terms of the 2019 Bond Documents, (c) shall be deemed automatically perfected on the Effective Date (without any further action being required by the Reorganized Debtor, the Trustee, or any of Holders of Series 2019 Bonds), having the priority set forth in the 2019 Bond Documents and subject only to such Liens and security interests as may be permitted under the 2019 Bond Documents, and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtor, and the Entities granted such Liens and security interests are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

6.3 ***Series 2019 Bonds***. On the Effective Date, the Reorganized Debtor shall cause the Issuer to issue the Series 2019 Bonds, the primary economic terms of which are described below:[2]

| | |
|---|---|
| **Principal:** | $105,795,000, plus all accrued and unpaid interest on the Bonds through the Effective Date, on the terms and conditions set forth in the 2019 Bond Documents. |

---

[2] The information set forth in the accompanying chart is solely for summary purposes. To the extent there is any discrepancy between the information set forth in the chart and the 2019 Bond Documents, the 2019 Bond Documents, copies of which are attached to the Disclosure Statement as <u>Exhibit C</u>, control.

| **Rate of Interest and Payment Terms:** | The Series 2019 Bonds will bear interest at a fixed rate of 5.75% per annum, mature in 2054, subject to mandatory sinking fund payments commencing after the 5th anniversary of the Effective Date of this Plan on a 35-year level debt service amortization schedule. |
| --- | --- |
| **Maturity Date:** | December 1, 2054 |
| **Call Protection:** | The Series 2019 Bonds are subject to optional redemption at 107% from the Effective Date of this Plan to the third anniversary of the Effective Date of this Plan, with the optional redemption premium declining by 1% on such anniversary and on each subsequent anniversary until the Series 2019 Bonds become redeemable at par. |
| **Collateral:** | Pursuant to Section 3.01 of the Amended Master Indenture, the Liens and security interests granted in the Original Master Indenture will continue to secure the obligations under the Amended Master Indenture including the Series 2019 Note. Pursuant to such grants, the Trustee has Liens and security interests in substantially all of Stayton's assets, including all real and personal property, including Stayton's Gross Revenues (as defined in the Amended Master Indenture). |

The issuance of the Series 2019 Bonds for distribution under this Plan is authorized without the need for further corporate action, and all of the Series 2019 Bonds issued or issuable under this Plan shall be duly authorized and validly issued under this Plan. The Reorganized Debtor shall cause to be delivered customary legal opinions and other documents in connection with the issuance of the Series 2019 Bonds, in form and substance acceptable to the Trustee, including, without limitation, (i) the Opinion of Bond Counsel described in the 2019 Bond Documents, and (ii) a lender's title policy with respect to the real property securing the Reorganized Debtor's obligations under the 2019 Bond Documents, and the first mortgage position of the Trustee, subject to such exceptions as are reasonably acceptable to the Trustee.

6.4     ***Continued Corporate Existence***. Except as otherwise provided in this Plan, the Debtor shall continue to exist as of the Effective Date as a separate corporate Entity, with all the powers of a corporation under the applicable law in the jurisdiction where the Debtor is incorporated or formed and under the certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by this Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be under this Plan and require no further action or approval.

6.5     ***Vesting of Assets in the Reorganized Debtor***. Except as otherwise provided in this Plan or any agreement, instrument, or other document incorporated herein, including the Liens and security interests granted under the Original Bond Documents as such Liens and security interests continue to secure the obligations related to the 2019 Bond Documents, on the Effective Date, all property in the Estate, all Causes of Action, and any property acquired by the Debtor under this Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in this Plan,

the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

6.6 ***Cancellation of Agreements, Security Interests, and Other Interests***.  On the Effective Date, except to the extent otherwise specifically provided herein, including to the extent certain of the Original Bond Documents continue in existence pursuant to their amendment and restatement pursuant to the 2019 Bond Documents, all notes, instruments, certificates, and other documents evidencing the Bonds, shall be cancelled and the obligations of the Debtor or the Reorganized Debtor thereunder or in any way related thereto (including, without limitation, any guarantee obligations of any non-Debtor Affiliates with respect to the Bond Claims) shall be discharged and the agents and Trustee thereunder shall be automatically and fully discharged from all duties and obligations thereunder.  Except to the extent certain security interests and Liens continue in existence pursuant to the amendment and restatement of the Original Bond Documents pursuant to the 2019 Bond Documents, all existing security interests and/or Liens and/or any other Secured Claims shall also be automatically released, discharged, terminated, and of no further force and effect as of the Effective Date.  Notwithstanding the foregoing, following confirmation of the Plan or the occurrence of the Effective Date, to the extent that the Original Bond Documents do not otherwise remain in effect pursuant to the 2019 Bond Documents, any credit document or agreement that governs the rights of any Holder of a Bond Claim shall continue in effect for purposes of (1) allowing Holders of such Allowed Claims to receive distributions under this Plan; (2) allowing and preserving the rights of the agents or representative of Holders of such Claims to make distributions on account of such Allowed Claims, as provided herein; (3) preserving all exculpations in favor of the Trustee; (4) allowing the Trustee to enforce any rights and obligations owed to it under this Plan or the Confirmation Order; and (5) permitting the Trustee to appear and be heard in the Chapter 11 Case, or in any proceeding in the Bankruptcy Court or any other court.

6.7 ***Exemption from Registration Requirements; Trading of Securities***.  The offering, issuance, and distribution of Series 2019 Bonds issued under this Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act under section 3(a)(2) and 3(a)(4) of the Securities Act of 1933, as amended and under section 1145(a)(1) of the Bankruptcy Code.  Any and all Series 2019 Bonds issued under this Plan will be freely tradable under the Securities Act by the recipients thereof.

6.8 ***Organizational Documents***.  Subject to Section 6.1 of this Plan, the Reorganized Debtor shall enter into such agreements and amend its corporate governance documents to the extent necessary to implement the terms and provisions of this Plan.  Under section 1123(a)(6) of the Bankruptcy Code, the organizational documents of the Reorganized Debtor will prohibit the issuance of non-voting Interests.  After the Effective Date, the Reorganized Debtor will amend and restate its organizational documents, and the Reorganized Debtor will file its respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the state of incorporation and the organization documents of the Reorganized Debtor.

6.9 ***Exemption from Certain Transfer Taxes and Recording Fees***.  To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from the Debtor

to the Reorganized Debtor or to any Entity under, in contemplation of, or in connection with this Plan or under: (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtor or the Reorganized Debtor; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

6.10 ***Board and Officers of the Reorganized Debtor.*** As of the Effective Date, the members of the board of directors and officers of the Debtor as of the Petition Date shall remain in their current capacities as director and officers of the Reorganized Debtor unless otherwise disclosed in the Plan Supplement or prior to the commencement of the Confirmation Hearing, in each case subject to the ordinary rights and powers of the board of directors to remove or replace the officers in accordance with the Reorganized Debtor's organizational documents and any applicable employment agreements that are assumed pursuant to this Plan. From and after the Effective Date, each officer of the Reorganized Debtor shall serve pursuant to the terms of the Reorganized Debtor's charters and bylaws or other formation and constituent documents, and applicable laws of the Reorganized Debtor's jurisdiction of formation.

6.11 ***Directors and Officers Insurance Policies***. Notwithstanding anything in this Plan to the contrary, the Reorganized Debtor shall be deemed to have assumed all of the Debtor's D&O Liability Insurance Policies under section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtor's foregoing assumption of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in this Plan, Confirmation of this Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtor under this Plan as to which no Proof of Claim need be Filed.

6.12 ***Other Insurance Policies***. On the Effective Date, the Debtor's Insurance Policies in existence as of the Effective Date shall be Reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed by the Reorganized Debtor under section 365 of the Bankruptcy Code and Section 7.1 hereof. Nothing in this Plan shall affect, impair, or prejudice the rights of the insurance carriers, the insureds, or the Reorganized Debtor under the Insurance Policies in any manner, and such insurance carriers, the insureds, and Reorganized Debtor shall retain all rights and defenses under such Insurance Policies. The Insurance Policies shall apply to and be enforceable by and against the insureds and the Reorganized Debtor in the same manner and according to the same terms and practices applicable

to the Debtor, as existed prior to the Effective Date. Following the Effective Date, the Debtor's Insurance Policies shall comply with all applicable covenants set forth in the 2019 Bond Documents.

6.13 *Preservation of Rights of Action*. In accordance with section 1123(b) of the Bankruptcy Code but subject to the releases set forth in Section 9 herein, including but not limited to the release of all Causes of Action against the Trustee and the Steering Committee, all Causes of Action that the Debtor may hold against any Entity shall vest in the Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtor shall have the exclusive right, authority, and discretion to determine, initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. **Subject to the releases set forth in Section 9 herein, no Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any specific Cause of Action as any indication that the Debtor or Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action. The Debtor or Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in this Plan, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to any Cause of Action upon, after, or as a consequence of the confirmation of the Plan or the occurrence of the Effective Date**.

6.14 *Corporate Action*. Upon the Effective Date, all actions contemplated by this Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of the Debtor, the Reorganized Debtor, or any other Entity, including: (1) assumption of Executory Contracts; (2) selection of the directors, managers, and officers for the Reorganized Debtor; (3) the execution of and entry into the 2019 Bond Documents; (4) the issuance and distribution of the Series 2019 Bonds as provided herein; and (5) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the transactions contemplated by this Plan (whether to occur before, on, or after the Effective Date). All matters provided for in this Plan involving the company structure of the Reorganized Debtor and any company action required by the Debtor or Reorganized Debtor, as applicable, in connection therewith shall be deemed to have occurred on and shall be in effect as of the Effective Date without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtor or Reorganized Debtor, as applicable.

On or prior to the Effective Date, the appropriate officers, directors, managers, or authorized persons of the Debtor or Reorganized Debtor, as applicable (including any president, vice-president, chief executive officer, treasurer, general counsel, or chief financial officer thereof), shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by this Plan (or necessary or desirable to effect the transactions contemplated by this Plan) in the name of and on behalf of the Debtor or the Reorganized Debtor, as applicable, including (1) the 2019 Bond Documents, (2) the Series 2019 Bonds and (3) any and

all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

6.15 ***Effectuating Documents; Further Transactions***. Prior to, on, and after the Effective Date, the Debtor and Reorganized Debtor and the directors, managers, officers, authorized persons, and members of the boards of directors or managers and directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of this Plan, the 2019 Bond Documents, and any securities issued under this Plan in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorizations, actions, or consents except for those expressly required under this Plan. All counterparties to any documents described in this paragraph are authorized to and may execute any such documents as may be required or provided by such documents without further order of the Bankruptcy Court.

## SECTION 7. ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1 ***Assumption of Executory Contracts***. Except as otherwise provided in this Plan, each of the Executory Contracts of the Debtor, including the Residency Agreements, shall be deemed assumed as of the Effective Date, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code. The Confirmation Order may constitute an order of the Bankruptcy Court approving the assumption of each of the Executory Contracts, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date.

7.2 ***Inclusiveness***. Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each Executory Contract shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract.

7.3 ***Indemnification***. On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of this Plan, and the Reorganized Debtor's governance documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of and advancement of fees and expenses to the Debtor's and the Reorganized Debtor's current and former directors, officers, employees, and agents to the fullest extent permitted by law and at least to the same extent as the certificate of incorporation, bylaws, or similar organizational documents of the Debtor as of the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed, or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted. The Reorganized Debtor shall not amend and/or restate its certificate of incorporation, bylaws, or similar organizational document before or after the Effective Date to terminate or materially adversely affect (1) the Reorganized Debtor's obligations referred to in the immediately preceding sentence or (2) the rights of such managers, directors, officers, employees, or agents referred to in the immediately preceding sentence. Notwithstanding

23

anything to the contrary herein, the Reorganized Debtor shall not be required to indemnify the Debtor's managers, directors, officers, or employees for any claims or Causes of Action for which indemnification is barred under applicable law, the Debtor's organizational documents, or applicable agreements governing the Debtor's indemnification obligations.

7.4 **Full Release and Satisfaction**. Assumption of any Executory Contract pursuant to this Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract at any time before the effective date of the assumption.

7.5 **Reservation of Rights**. Nothing contained in this Plan or the Plan Supplement shall constitute an admission by the Debtor or the Reorganized Debtor that any such contract or lease is in fact an Executory Contract or that the Debtor or the Reorganized Debtor has any liability thereunder.

7.6 **Nonoccurrence of Effective Date**. In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases under section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

## SECTION 8. CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

8.1 **Conditions Precedent to Confirmation**. Confirmation of this Plan shall not occur, and the Confirmation Order shall not be entered, until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of this Plan:

(a) The proposed Confirmation Order shall be in form and substance reasonably satisfactory in all respects to the Debtor, the Trustee and the Steering Committee; and

(b) This Plan and the Plan Supplement, including any schedules, documents, supplements and exhibits thereto shall be, in form and substance, on the terms contemplated by the Plan Term Sheet.

8.2 **Conditions Precedent to the Effective Date**. The Effective Date shall not occur until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of this Plan:

(a) The Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Debtor, the Trustee, and the Steering Committee, and such Confirmation Order shall not be subject to any stay or an unresolved request for revocation under section 1144 of the Bankruptcy Code;

(b) The Plan Support Agreement shall not have been terminated, and remains in full force and effect;

24

(c)     On the occurrence of the Effective Date, the conditions to effectiveness of the 2019 Bond Documents shall have been satisfied or waived and the Refinancing Transaction shall have closed pursuant to the terms of the Plan Support Agreement;

(d)     The Effective Date shall be no earlier than December 21, 2019.

(e)     All actions, documents, certificates, and agreements necessary to implement this Plan, including, without limitation, 2019 Bond Documents, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws; and

(f)     All requisite governmental authorities and third parties shall have approved or consented, to the extent required, to all actions, documents, certificates, and agreements necessary to implement this Plan.

8.3     ***Waiver of Conditions***.  The conditions to confirmation and consummation of this Plan set forth herein may be waived in writing at any time by the Debtor, with the written consent of the Trustee, without notice to any other parties in interest or the Bankruptcy Court and without a hearing.

8.4     ***Effect of Failure of Conditions***.  If consummation of this Plan does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any claims by or Claims against the Debtor; (2) prejudice in any manner the rights of the Debtor, any Holders of Claims or Interests or any other Person; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any Holders of Claims or Interests or any other Person in any respect.

## SECTION 9.  EFFECT OF CONFIRMATION

9.1     ***General.***  Under section 1123 of the Bankruptcy Code, and in consideration for the classification, distributions, releases and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved under this Plan.   The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that any such compromise or settlement is in the best interests of the Debtor, its Estate, and any Holders of Claims and Interests and is fair, equitable and reasonable.   Notwithstanding anything contained herein to the contrary, the allowance, classification and treatment of all Allowed Claims and Interests and their respective distributions (if any) and treatments hereunder, takes into account the relative priority and rights of the Claims and the Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise.   As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the

Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and Interests and their respective distributions (if any) and treatments hereunder, are settled, compromised, terminated and released pursuant hereto; *provided, however*, that nothing contained herein shall preclude any Person or Entity from exercising their rights under and consistent with the terms of this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan. Notwithstanding the foregoing, any subordinated debt expressly provided for in this Plan or the 2019 Bond Documents shall remain subordinated to the extent provided for in such documents.

9.2 ***Releases by the Debtor.*** Pursuant to section 1123(b) of the Bankruptcy Code and except as otherwise specifically provided in this Plan or the Plan Supplement, for good and valuable consideration, including the consummation of the transactions contemplated by this Plan, as of the Effective Date, each Released Party will be deemed released and discharged by each and all of the Debtor, the Reorganized Debtor, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any cause of action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtor, the Reorganized Debtor, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor, the Reorganized Debtor, or their Estates or affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, the Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between the Debtor and any Released Party, the Debtor's in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Refinancing Transaction, this Plan, or any other restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan Support Agreement, or this Plan, the filing of the Chapter 11 Case, the pursuit of Confirmation of this Plan, the pursuit of consummation of this Plan, the administration and implementation of this Plan, including the issuance or distribution of securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to a Released Party's willful misconduct or intentional fraud as determined by a Final Order of the Bankruptcy Court; *provided* that any right to enforce this Plan and the Confirmation Order is not so released by this Section 9.2.

The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released under the foregoing release. Notwithstanding

the foregoing, nothing in this Section 9.2 shall or shall be deemed to prohibit the Debtor or the Reorganized Debtor from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtor or the Reorganized Debtor, unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, under Bankruptcy Rule 9019, of foregoing release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the foregoing release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released; (iii) in the best interest of the Debtor and its Estate; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

9.3 ***Releases by Holders of Claims***. **AS OF THE EFFECTIVE DATE, EXCEPT (I) FOR THE RIGHT TO ENFORCE THIS PLAN OR ANY RIGHT OR OBLIGATION ARISING UNDER THE PLAN SUPPLEMENTS THAT REMAIN IN EFFECT OR BECOME EFFECTIVE AFTER THE EFFECTIVE DATE OR (II) AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN OR CONFIRMATION ORDER, INCLUDING THE 2019 BOND DOCUMENTS, IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE OBLIGATIONS OF THE DEBTOR UNDER THIS PLAN AND THE CONTRIBUTIONS OF THE RELEASED PARTIES TO FACILITATE AND IMPLEMENT THIS PLAN, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE RELEASED PARTIES SHALL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED, AND DISCHARGED BY (A) HOLDERS OF BOND CLAIMS WHO HAVE NOT ELECTED TO OPT-OUT OF THE RELEASES PROPOSED UNDER THIS PLAN AND (B) THE PARTIES TO THE PLAN SUPPORT AGREEMENT, FROM ANY AND ALL CLAIMS, INTERESTS OR CAUSES OF ACTION WHATSOEVER, WHETHER ACCRUED OR UNACCRUED, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING BEFORE THE EFFECTIVE DATE, AS OF THE EFFECTIVE DATE OR ARISING THEREAFTER, IN LAW, AT EQUITY, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF STATUTES (INCLUDING BUT NOT LIMITED TO THE FEDERAL OR STATE SECURITIES LAWS), OR OTHERWISE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTOR, THE DEBTOR'S REFINANCING AND THE TRANSACTIONS CONTEMPLATED THEREIN OR HEREIN, THE CHAPTER 11 CASE, THE NEGOTIATION, FORMULATION, PREPARATION OR CONSUMMATION OF THIS PLAN, THE PLAN SUPPORT AGREEMENT, THE DEFINITIVE DOCUMENTS, OR ANY RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS OR THE SOLICITATION OF VOTES WITH RESPECT TO THIS PLAN, PROVIDED THAT THE RELEASED PARTIES SHALL NOT BE RELEASED FROM ANY ACT OR OMISSION**

**THAT CONSTITUTES ACTUAL FRAUD, GROSS NEGLIGENCE, WILLFUL MISCONDUCT, OR A CRIMINAL ACT AS DETERMINED BY A FINAL ORDER.**

9.4 ***Exculpation***. To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, obligations, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss and liability for any Claim in connection with or arising out of the administration of the Chapter 11 Case, the negotiation and pursuit of the Plan Support Agreement, the Refinancing Transaction, this Plan, or the solicitation of votes for, or confirmation of, this Plan, the funding or consummation of this Plan, the occurrence of the Effective Date, the administration of this Plan or the property to be distributed under this Plan, the issuance of securities under or in connection with this Plan, or the transactions in furtherance of any of the foregoing, except for: (a) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under this Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with this Plan; or (b) the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined to have constituted actual fraud, gross negligence, willful misconduct or a criminal act as determined by a Final Order.

9.5 ***Discharge of Claims and Interest.*** To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, effective as of the Effective Date, all consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims, Interests and Causes of Action of any kind or nature whatsoever against the Debtor or any of its Assets or properties, including any interest accrued on such Claims or Interests from and after the Petition Date, and regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, distributed or retained under this Plan on account of such Claims, Interests or Causes of Action. Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate shall be deemed discharged and released under and to the fullest extent provided under sections 524 and 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code. Such discharge shall void any judgment obtained against the Debtor or the Reorganized Debtor at any time, to the extent that such judgment relates to a discharged Claim.

9.6 ***Injunction***. **EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN OR THE CONFIRMATION ORDER, INCLUDING BUT NOT LIMITED TO ANY RIGHT ARISING UNDER OR RELATED TO THE 2019 BOND DOCUMENTS, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR**

28

ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED UNDER THIS PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED OR DISCHARGED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED). ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASE UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

9.7 *Binding Nature of Plan*. ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THIS PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTOR, THE REORGANIZED DEBTOR, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THIS PLAN, EACH PERSON ACQUIRING PROPERTY UNDER THIS PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS WITH THE DEBTOR AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON OR ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THIS PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASE OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THIS PLAN, AFFIRMATIVELY VOTED TO REJECT THIS PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THIS PLAN.

9.8 *Protection Against Discriminatory Treatment*. To the extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Persons and Entities, including Governmental Units, shall not discriminate against the Reorganized Debtor or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant, against the Reorganized Debtor, or another Person or Entity with whom the Reorganized Debtor has been associated, solely because the Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Case.

9.9 *Preservation of Privilege and Defenses*. No action taken by the Debtor or Reorganized Debtor in connection with this Plan shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtor or Reorganized Debtor, as applicable, including any attorney-

client privilege or work-product privilege attaching to any documents or communications (whether written or oral).

9.10 **Injunction Against Interference with Plan**. Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests, the Debtor, and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the Debtor's, the Reorganized Debtor's and their respective affiliates', employees', advisors', officers' and directors', and agents' implementation or consummation of this Plan.

9.11 **Release of Liens**. Except as otherwise provided in this Plan, the Confirmation Order, the 2019 Bond Documents, including to the extent the 2019 Bond Documents amend or restate the Original Bond Documents, or in any contract, instrument, release or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with, and conditioned upon, the applicable Distributions made pursuant to this Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate shall be fully released. Except as otherwise provided in this Plan, the Confirmation Order, the 2019 Bond Documents, including to the extent the 2019 Bond Documents amend or restate the Original Bond Documents, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Debtor's Estate shall be fully released on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

## SECTION 10. MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS PLAN

10.1 **Modification and Amendments**. This Plan or any exhibits thereto may be amended, modified, or supplemented by the Debtor with the consent of the Trustee in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, the Debtor or the Reorganized Debtor may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of this Plan.

10.2 **Effect of Confirmation on Modifications**. Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

10.3 **Revocation or Withdrawal of this Plan**. The Debtor reserves the right to, consistent with its fiduciary duties, revoke or withdraw this Plan before the Effective Date. If the Debtor revokes or withdraws this Plan, or if the Confirmation Date does not occur, then: (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts effected by this Plan, and any

30

document or agreement executed pursuant to this Plan, shall be deemed null and void; and (c) nothing contained in this Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtor or any other Person; or (iii) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Person.

## SECTION 11.  RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the  Chapter 11 Case and this Plan, including, but not limited to, jurisdiction to:

(a) allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount or allowance of Claims;

(b) decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or this Plan;

(c) resolve any matters related to:  (i) the assumption or rejection of any Executory Contract to which the Debtor is party or with respect to which the Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, and cure Claims, pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract; (ii) any potential contractual obligation under any Executory Contract that is assumed; and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

(d) ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

(e) adjudicate, decide or resolve any matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

(f) adjudicate, decide or resolve any matter involving the Reorganized Debtor;

(g) adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(h) issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of this Plan;

(i)      resolve any cases, controversies, suits, disputes or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in this Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

(j)      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(k)      resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, any transactions or payments contemplated thereby, or any contract, instrument, release, indenture or other agreement or document relating to any of the foregoing;

(l)      adjudicate any and all disputes arising from or relating to Distributions under this Plan;

(m)      consider any modifications of this Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(n)      hear and determine all disputes involving the existence, nature or scope of the Debtor's discharge;

(o)      enforce all orders previously entered by the Bankruptcy Court;

(p)      hear any other matter not inconsistent with the Bankruptcy Code; and

(q)      enter a final decree closing the Chapter 11 Case.

## SECTION 12.  MISCELLANEOUS PROVISIONS

12.1      ***Section 1125(e) Good Faith Compliance***.  As of and subject to the occurrence of the Confirmation Date, the Debtor and its Related Persons shall be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation.

12.2      ***Substantial Consummation***.  On the Effective Date, this Plan shall be deemed to be substantially consummated within the meaning set forth in section 1101 and pursuant to section 1127(b) of the Bankruptcy Code.

12.3      ***Closing of the Chapter 11 Case***.  The Reorganized Debtor shall, promptly after the full administration of the Chapter 11 Case, but by no later than March 31, 2020, file with

32

the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

12.4 **Plan Supplement**. Any exhibits or schedules not filed with this Plan may be contained in the Plan Supplement, if any, and the Debtor hereby reserves the right to file such exhibits or schedules as a Plan Supplement.

12.5 **Further Assurances**. The Debtor or the Reorganized Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan. The Debtor, the Reorganized Debtor and all Holders of Claims receiving Distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

12.6 **Exhibits Incorporated**. All exhibits to this Plan, including the Plan Supplement, are incorporated into and are part of this Plan as if fully set forth herein.

12.7 **Inconsistency**. In the event of any inconsistency among this Plan, the Disclosure Statement and any exhibit to the Disclosure Statement, the provisions of this Plan shall govern.

12.8 **No Admissions**. If the Effective Date does not occur, this Plan shall be null and void in all respects, and nothing contained in this Plan shall (a) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor, (b) prejudice in any manner the rights of the Debtor or any other party in interest, or (c) constitute an admission of any sort by the Debtor or other party in interest.

12.9 **Reservation of Rights**. Except as expressly set forth herein, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order and the Effective Date has occurred. None of this Plan, any statement or provision contained in this Plan or any action taken or not taken by the Debtor with respect to this Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the Holders of Claims or Interests before the Effective Date.

12.10 **Successors and Assigns**. The rights, benefits and obligations of any Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or guardian, if any, of each Person.

12.11 **Entire Agreement**. On the Effective Date, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

12.12 **Notices**. All notices, requests, and demands to or upon the Debtor in the Chapter 11 Case shall be in writing and, unless otherwise provided herein, shall be deemed to have been duly given or made when actually delivered or, if by facsimile transmission, when received and telephonically confirmed to the below recipients:

TARRANT COUNTY SENIOR LIVING CENTER, INC.
c/o Ankura Consulting Group LLC
Attention: Louis E. Robichaux IV
15950 Dallas Parkway
Dallas, Texas 75248
Telephone: (214) 200-3689
Facsimile: (214) 200-3686
E-mail: louis.robichaux@ankura.com

with copies to:

DLA PIPER LLP (US)
Attention: Thomas R. Califano
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
E-mail: thomas.califano@dlapiper.com

- and -

DLA PIPER LLP (US)
Attention: Rachel Nanes
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Telephone: (305) 423-8563
Facsimile: (305) 675-8206
E-mail: rachel.nanes@dlapiper.com

- and -

DLA PIPER LLP (US)
Attention: Daniel B. Prieto
1900 North Pearl Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 743-4500
Facsimile: (214) 743-4545
E-mail: dan.prieto@dlapiper.com

All notices and requests to Persons holding any Claim or Interest in any Class shall be sent to them at their last known address or to the last known address of their attorney of record in the Chapter 11 Case. Any such Holder of a Claim or Interest may designate in writing any other address for purposes of this section, which designation will be effective upon receipt by the Debtor.

12.13 **Severability**. If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it

valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

12.14 ***Governing Law***. Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of this Plan and the transactions consummated or to be consummated in connection therewith.

12.15 ***Request for Confirmation***. The Debtor requests entry of the Confirmation Order under section 1129(a) of the Bankruptcy Code and, to the extent necessary, section 1129(b) of the Bankruptcy Code.

Dated:  September 30, 2019

Respectfully submitted,

TARRANT COUNTY SENIOR LIVING CENTER, INC.

By:     */s/ Louis E. Robichaux IV*
         Name: Louis E. Robichaux IV
         Title: Chief Restructuring Officer

35

# **EXHIBIT B**

Plan Support Agreement

# PLAN SUPPORT AGREEMENT

This Plan Support Agreement (including all schedules and exhibits, as amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof, the "**Plan Support Agreement**"), dated as of May 10, 2019, is entered into by and among (i) Tarrant County Senior Living Center, Inc. ("**Stayton**"), (ii) UMB Bank, N.A., as successor to The Bank of New York Mellon Trust Company, National Association, as trustee (the "**Bond Trustee**") and as master trustee (the "**Master Trustee**"; and together with the Bond Trustee, the "**Trustee**"), (iii) each (a) member of an informal steering committee comprised of holders of Bonds (as defined below) currently holding, collectively, at least sixty-seven percent (67%) of the outstanding aggregate principal amount of all Bonds issued and (b) holder of Bonds that executes a Joinder to this Plan Support Agreement pursuant to section 6(b) hereof (each referred to herein as a "**Steering Committee Member**" and, collectively, as the "**Steering Committee**"), and (iv) Lifespace Communities, Inc. ("**Lifespace**"). Stayton, the Trustee and Master Trustee, the Steering Committee and Lifespace are referred herein as the "**Parties**" and individually as a "**Party**." Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the term sheet describing the key terms of an anticipated chapter 11 plan of reorganization for Stayton (the "**Plan Term Sheet**") attached hereto as Schedule 1.

## PRELIMINARY STATEMENTS

A.    The Issuer and the Bond Trustee are parties to an Indenture of Trust, dated as of October 1, 2009 (the "**Bond Indenture**"), pursuant to which the Tarrant County Cultural Education Facilities Finance Corporation (the "**Issuer**") issued its Retirement Facility Revenue Bonds (The Stayton At Museum Way Project), Series 2009A, Series 2009B and Series 2009C (collectively, the "**Bonds**") in the initial principal amount of $166,575,000.

B.    The Issuer loaned the proceeds of the Bonds to Stayton pursuant to a Loan Agreement, dated as of October 1, 2009 (the "**Loan Agreement**").

C.    Stayton and the Master Trustee entered into a Master Bond Indenture, Deed of Trust and Security Agreement, dated as of October 1, 2009 (as amended by the Supplemental Indentures defined below and as it may be further amended from time to time in accordance with its terms, the "**Master Indenture**"), pursuant to which Stayton issued the Tarrant County Senior Living Center Inc. Series 2009A, Series 2009B and Series 2009C Notes (collectively, the "**Notes**") to provide for its loan repayment obligations under the Loan Agreement.

D.    Stayton and the Master Trustee entered into a Supplemental Indenture Number 1, dated as of October 1, 2009 (the "**First Supplemental Indenture**"), pursuant to which the terms and conditions upon which the Notes were authenticated, issued and delivered were clarified, a Supplemental Indenture No. 2, effective as of the Membership Substitution Effective Date (as defined below), pursuant to which provisions relating to draws on the Liquidity Support Agreement (defined below) were added (the "**Second Supplemental Indenture**") a Supplemental Indenture No. 3, effective as of the Plan Effective Date (as defined below) (the "**Third Supplemental Indenture**," and together with the First Supplemental Indenture and the Second Supplemental Indenture, the "**Supplemental Indentures**") pursuant to which Stayton will issue a note securing its obligations relating to the Series 2019 Bonds.

1

E.    As of the date hereof, Stayton acknowledges that it owes unpaid principal in the amount of $105,795,000 plus any unpaid interest and fees pursuant to the Master Indenture and the Loan Agreement.

F.    As of the date hereof, Stayton acknowledges that it is in default of certain of its obligations under the Master Indenture and the Loan Agreement.

G.    Contemporaneously with entry into this Plan Support Agreement Stayton, Lifespace, and Senior Quality Lifestyles Corporation ("**SQLC**"), the sole member of Stayton, and certain other SQLC entities, are entering into an "**Affiliation Agreement**," pursuant to which, among other things, Lifespace will become the sole member of SQLC (the "**Membership Substitution**") on the terms set forth in the Affiliation Agreement (the actual date of such Membership Substitution, the "**Membership Substitution Effective Date**").

H.    Contemporaneously with entry into this Plan Support Agreement, the Trustee and Stayton are entering into the "**Second Forbearance Agreement**" attached hereto as Schedule 2.

I.    Contemporaneously with consummation of the Membership Substitution, Lifespace and the Master Trustee will enter into the "**Liquidity Support Agreement**" attached hereto as Schedule 3.

J.    The Parties have agreed to implement a refinancing of the Bonds in accordance with, and subject to the terms and conditions set forth in this Plan Support Agreement and the Schedules hereto (the "**Refinancing Transaction**").

K.    As set forth herein, Stayton will (a) solicit approval from holders of Bonds for a plan of reorganization reflecting the terms set forth in the Plan Term Sheet (including all exhibits, schedules, supplements, appendices, annexes and attachments thereto, the "**Plan**"), (b) subject to receiving the requisite votes in favor of the Plan, commence a prepackaged bankruptcy reorganization case (the "**Anticipated Bankruptcy Proceeding**") by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "**Bankruptcy Court**") to obtain Bankruptcy Court approval of the Plan, and (c) take all actions necessary to consummate the Plan and the Refinancing Transaction.

## STATEMENT OF AGREEMENT

After good faith, arms' length negotiations, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    Definitions. As used herein, the following terms shall have the meanings given to them below.

A.    "**Bankruptcy Code**" means title 11 of the United States Code.

2

B.    "**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in New York, New York.

C.    "**Person**" means any individual, partnership, joint venture, limited liability company, corporation, trust, unincorporated organization, or any other legal entity or association.

D.    "**Petition Date**" means the date on which Stayton files a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2.    Schedules and Preliminary Statements. The Schedules attached hereto and Preliminary Statement set forth above are incorporated herein and form an integrated part of this Plan Support Agreement, subject to such modifications and amendments as may be permitted by Section 24 hereof.

3.    Effectiveness of Agreement. Upon the execution of this Plan Support Agreement by the Parties set forth as signatories hereto, this Plan Support Agreement will constitute the legally binding and enforceable agreement of the Parties, effective as of the date first written above (the "**Agreement Date**").

4.    Agreement of the Parties. Subject to the terms and conditions hereof, and for so long as this Plan Support Agreement has not been terminated in accordance with the terms hereof by or as to a Party, each Party agrees to the following:

(a)    Plan Term Sheet. Each Party hereby represents and agrees that the terms and conditions set forth in the Plan Term Sheet, substantially in the form attached hereto, are acceptable in all respects.

(b)    2019 Bond Documents. Each Party hereby represents and agrees that the terms and conditions set forth in the Trust Indenture and all related documents necessary for the issuance of the Series 2019 Bonds (the "**2019 Bond Documents**"), substantially in the forms attached hereto as Schedule 4, are acceptable in all respects.

(c)    Cash Collateral. Each Party hereby represents and agrees that the terms and conditions set forth in the proposed cash collateral order attached hereto as Schedule 5 regarding the use of cash collateral (as defined in section 363(a) of the Bankruptcy Code) by Stayton in the Anticipated Bankruptcy Proceeding (the "**Cash Collateral Agreement**", and, together with the Plan Term Sheet, the Plan, the 2019 Bond Documents, the Liquidity Support Agreement, and the Second Forbearance Agreement, the "**Refinancing Documents**") are acceptable in all respects. The Trustee hereby consents, at the direction of each Steering Committee Member, to the use by Stayton of cash collateral in the Anticipated Bankruptcy Proceeding, subject to the terms and conditions of the Cash Collateral Agreement.

5.    Mutual Obligations of the Parties.

(a)    So long as no Agreement Termination Event has occurred and not been waived in accordance herewith, each Party agrees that it will not, and, as with respect to each Steering Committee Member, it will not direct the Trustee to:

3

(i) support or encourage, directly or indirectly, any financial restructuring or sale of assets concerning either Stayton or its assets other than the Refinancing Transaction;

(ii) take any action inconsistent with the Refinancing Transaction or the Plan Term Sheet, the transactions contemplated hereby, or the timing of confirmation and consummation of such transactions as described herein;

(iii) support or encourage any Person to (a) vote to reject the Plan (or direct any other Person to vote to reject the Plan), (b) "opt out" of, or object to, any releases or exculpations provided under the Plan that are contemplated by the Plan Term Sheet, (c) otherwise commence any proceeding to oppose the Plan or object to confirmation thereof, or (d) otherwise agree to, consent to, or provide any support to any other chapter 11 plan or other restructuring or sale or liquidation of assets concerning either Stayton or its assets other than the Refinancing Transaction; and

(iv) object to or otherwise commence any proceeding to oppose the Plan or alter the Plan (in each case, with respect to provisions that are contemplated by the Plan Term Sheet) or any of the terms of the Refinancing Transaction (or any other document filed in furtherance of the Refinancing Transaction which is consistent with the Refinancing Transaction) or take any other action that is inconsistent with consummation of the Plan on terms that are contemplated by the Plan Term Sheet and the Refinancing Transaction.

6.     Steering Committee Member Obligations.

(a)     Voting on the Plan. Each Steering Committee Member agrees that, subject to the terms and conditions of this Plan Support Agreement and so long as no Agreement Termination Event (as defined below) has occurred and not been waived in accordance herewith, it will:

(i) support, and not interfere or support interference with, Stayton's use of cash collateral pursuant to the Cash Collateral Agreement;

(ii) take all steps necessary to support confirmation of the Plan on terms that are contemplated by the Plan Term Sheet;

(iii) vote, or cause to be voted, all Claims and all other claims, rights or interests arising under the Bond Indenture that it holds or as to which it has voting authority to accept the Plan on terms that are contemplated by the Plan Term Sheet by the deadlines set forth in the disclosure statement related to the Plan (the **"Disclosure Statement"**) by delivering a duly executed and completed ballot or ballots, as applicable, accepting the Plan;

(iv) not "opt out" of, or object to, any releases or exculpations provided under the Plan that are contemplated by the Plan Term Sheet (and, to the extent required by the ballot, affirmatively "opt in" to such releases and exculpations); and

(v) not change, withdraw or revoke such vote (or cause or direct such vote to be changed, withdrawn or revoked).

(b) <u>Restrictions on Transfers</u>. Each Steering Committee Member agrees that until this Plan Support Agreement has terminated in accordance with the terms hereof, it (the term "it" with respect to Steering Committee Members applies to any Steering Committee Member regardless of gender, to the extent applicable) shall not sell, transfer or assign any of its Bonds or Claims (as defined below) or any option thereon or any right or interest (voting or otherwise) therein unless and until the transferee thereof enters into a joinder in the form annexed as <u>Exhibit A</u> hereto (a "**Joinder**"), and such Joinder is provided to the Notice parties set forth in section 37 and (ii) any purported sale, transfer or assignment shall be deemed null and void if a Joinder has not been provided to the Notice parties within five Business Days of such sale, transfer or assignment.

(c) <u>Adequate Information; Compliance with Section 1125(g) of the Bankruptcy Code</u>. Each Steering Committee Member agrees that it has obtained, or will receive prior to its vote on the Plan, adequate information regarding the Plan and Refinancing Transaction and that Stayton has provided all material, relevant information that each Steering Committee Member has requested in advance of executing this Plan Support Agreement. Additionally, each Steering Committee Member agrees that, for purposes of this Plan Support Agreement, the solicitation of its support of the Plan in accordance with the terms and conditions hereof complies with the requirements of the Bankruptcy Code and that each Steering Committee Member was solicited in a manner complying with the requirements of the Bankruptcy Code.

(d) <u>Direction to Trustee</u>. So long as this Plan Support Agreement is in effect, and the Plan has been confirmed, the Steering Committee agrees to direct the Trustee prior to the closing of the Refinancing Transaction to take all actions commercially reasonably necessary to execute and deliver the 2019 Bond Documents and all other Refinancing Documents and consummate the Refinancing Transaction. Each of Stayton and Lifespace agree that to the extent they receive or otherwise come into possession of any information regarding the respective holdings of the Bonds, as a result of directions provided by the Steering Committee or otherwise, such information shall be kept confidential and such information shall not be disclosed to any person other than to Stayton or Lifespace, and their respective advisors under the condition that such advisors shall adhere to such confidentiality restrictions; <u>provided, however</u>, Stayton shall be permitted to disclose in connection with the Bankruptcy Documents, the Plan, and Disclosure Statement the following information: (i) the identity of the members of the Steering Committee; and (ii) the aggregate principal amount of, and aggregate percentage of, Bonds held by the Steering Committee.

7. <u>Representations and Warranties of the Steering Committee</u>. Each Steering Committee Member represents and warrants that the following statements are true, correct and complete as of the date hereof:

(a) it represents and warrants that, as of the date hereof, such Steering Committee Member either (i) is the sole legal or beneficial owner of a principal amount of the Bonds, and all related claims, rights, powers and causes of action arising out of or in connection with or otherwise relating to such Bonds (collectively, the "**Claims**") or (ii) has the power and

authority to bind the legal and beneficial owner(s) of such Bonds and Claims to the terms of this Plan Support Agreement and, in either case, such Steering Committee Member has full power and authority to vote on and consent to such matters concerning such Bond and Claims and to exchange, assign and transfer such Bonds and Claims.

(b)     it has all requisite corporate, partnership, limited liability company or similar authority to enter into this Plan Support Agreement and perform its obligations contemplated hereunder, and the execution and delivery of this Plan Support Agreement and the performance of each such Steering Committee Member's obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership or other similar action on its part;

(c)     the execution, delivery and performance by such Steering Committee Member of this Plan Support Agreement does not and shall not violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

(d)     the execution, delivery and performance by such Steering Committee Member of this Plan Support Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body; and

(e)     this Plan Support Agreement is the legally valid and binding obligation of such Steering Committee Member, enforceable in accordance with its terms.

8.     <u>Stayton Obligations.</u> Stayton agrees that, consistent with the exercise of its fiduciary duties, it will:

(a)     Provide the Trustee with drafts of the Plan and accompanying Disclosure Statement by no later than three months after the Membership Substitution Effective Date, which Plan and Disclosure Statement shall be reasonably satisfactory in form and substance to the Trustee;

(b)     support and take all commercially reasonable steps to commence solicitation of the requisite acceptances for the Plan by no later than four months after the Membership Substitution Effective Date (the "**Solicitation Date**");

(c)     subject to obtaining the requisite acceptances of the Plan, support and take all commercially reasonable steps to commence the Anticipated Bankruptcy Proceeding, including filing each of the Bankruptcy Documents (as defined below), which shall each be in form and substance reasonably satisfactory to the Trustee, by no later than five months after the Membership Substitution Effective Date (the "**Petition Date**");

(d)     support and take all reasonably necessary steps in seeking to obtain from the Bankruptcy Court an order confirming the Plan by no later than the date that is 45 days following the Petition Date (the "**Confirmation Date**");

(e)     take all reasonable efforts to provide drafts of the following documents (collectively, the **"Bankruptcy Documents"**) which shall be in form and substance reasonably satisfactory to the Steering Committee and the Trustee no later than 10 business days prior to the proposed Petition Date:

(i)      Petition with all required documents;

(ii)     Declaration in Support of First Day Pleadings;

(iii)    Motion to Approve Disclosure Statement and Pre-Petition Solicitation Procedures and proposed Order;

(iv)    Proposed Order Confirming the Plan;

(v)     Motion Authorizing Use of Cash Collateral;

(vi)    Motion Authorizing Debtor to Escrow Certain Entrance Fees and Refund Certain Escrow Fees;[1] and

(vii)   Motion to Utilize Existing Cash Management System.

(f)     take all reasonable steps so that the effective date of the Plan (the **"Plan Effective Date"**) shall occur not sooner than six months plus one day and not later than seven months after the Membership Substitution Effective Date.

(g)     support and take all commercially reasonable steps that are necessary to obtain any requisite regulatory or third-party approval for the Plan and Refinancing Transaction as expeditiously as is reasonably practicable under applicable law;

(h)     in the event it proposes a plan that does not comply with this Plan Support Agreement or that constitutes an Agreement Termination Event, not assert that Lifespace or the Steering Committee Members have expressly or impliedly supported, endorsed or otherwise agreed to any financial information, including any projections or liquidation analysis, included in the Refinancing Documents;

(i)     remain in material compliance with its covenants and obligations under the Second Forbearance Agreement, and, except as expressly set forth in the Second Forbearance Agreement while the Second Forbearance Agreement remains in effect, the Master Indenture and Loan Agreement;

(j)     not transfer any assets other than in the ordinary course of its business or as authorized by the Bankruptcy Court;

---

[1]      Parties to discuss prior to Petition Date if filing is necessary.

(k)     use commercially reasonable efforts to respond to written requests for information from the Parties and promptly as reasonably practicable (subject to any confidentiality restrictions or considerations);

(l)     use its best efforts to obtain approval of the release, injunction and exculpatory provisions as contemplated by the Plan Term Sheet for all Parties to the Refinancing Transaction to the extent available under applicable law, and, if applicable, under the Plan, which by way of example only shall include opposing any effort by any person or entity to eliminate or reduce the scope of such release, injunction and exculpation provisions; and

(m)     Use its best efforts to have the Membership Substitution Effective Date occur no later than July 31, 2019.

9.     Fiduciary Out. Nothing herein shall prevent a determination by Stayton, made in good faith and following consultation with external counsel, subsequent to the date hereof that its compliance with the agreements in Section 8 herein or any other covenant, obligation or agreement contained in this Plan Support Agreement or the Plan Term Sheet is no longer consistent with its fiduciary duties under applicable law, in light of, among other fiduciary considerations, the requirement that a materially better transaction for the benefit of creditors must take into account the Liquidated Damages (as defined below) by giving notice thereof to the other Parties, in which event this Plan Support Agreement shall, notwithstanding anything herein to the contrary, be deemed automatically terminated 14 business days after such notice is provided to the Parties (a "**Fiduciary Termination**"); provided, however, that in the event of a Fiduciary Termination prior to the Membership Substitution Effective Date, Lifespace shall be entitled to liquidated money damages (the "**Liquidated Damages**") calculated as $500,000, plus any reasonable third-party professional expenses incurred by Lifespace in pursuing the Refinancing Transaction up to a cap of $2,000,000; provided, further, that nothing herein shall prejudice any Party from challenging such subsequent exercise of Stayton's fiduciary duties, including without limitation, seeking a determination from a court of competent jurisdiction that the actions or inactions by Stayton described in this Section constitute an unlawful exercise of its fiduciary duties.

10.     Representations and Warranties of Stayton. Stayton represents and warrants that the following statements are true, correct and complete as of the date hereof:

(a)     it has all requisite corporate, partnership, limited liability company or similar authority to enter into this Plan Support Agreement and, subject to any necessary Bankruptcy Court approval with respect to the Refinancing Documents, carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Plan Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership or other similar action on its part;

(b)     the execution, delivery, and, subject to any necessary Bankruptcy Court approval with respect to the Refinancing Documents, performance by Stayton of this Plan Support Agreement does not and shall not violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

(c)     the execution, delivery, and performance by Stayton of this Plan Support Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body;

(d)     the information it has provided in connection with the Refinancing Transaction and this Plan Support Agreement did not and does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading; and

(e)     this Plan Support Agreement is the legally valid and binding obligation of Stayton, enforceable in accordance with its terms.

11.     <u>Lifespace Obligations</u>. Lifespace agrees that it will:

(a)     Use its best efforts to have the Membership Substitution Effective Date occur no later than July 31, 2019;

(b)     remain in material compliance with its covenants and obligations under the Affiliation Agreement; and

(c)     upon consummation of the Membership Substitution, enter into the Liquidity Support Agreement and comply with the requirements thereunder, including issuing the funded and the unfunded liquidity support, in each case subject to and in accordance with the terms of such Liquidity Support Agreement.

12.     <u>Representations and Warranties of Lifespace</u>. Lifespace represents and warrants that the following statements are true, correct and complete as of the date hereof:

(a)     it has all requisite corporate authority to enter into this Plan Support Agreement and, subject to any necessary Bankruptcy Court approval with respect to the Refinancing Documents, carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Plan Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, action on its part;

(b)     the execution, delivery, and, subject to any necessary Bankruptcy Court approval with respect to the Refinancing Documents, performance by Lifespace of this Plan Support Agreement does not and shall not violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

(c)     the execution, delivery, and performance by Lifespace of this Plan Support Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body;

(d) the information it has provided in connection with the Refinancing Transaction and this Plan Support Agreement did not and does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading; and

(e) this Plan Support Agreement is the legally valid and binding obligation of Lifespace, enforceable in accordance with its terms.

13. <u>Termination of Support Agreement</u>. In the event that this Plan Support Agreement shall be deemed terminated as a result of any of the events set forth in the following Sections 14, 15, and 16 (each, an "**Agreement Termination Event**"), all Parties shall be immediately relieved of any obligations hereunder. If the Anticipated Bankruptcy Proceeding has been filed prior to such occurrence, such notice may be provided as part of a motion for relief from the automatic stay; <u>provided</u>, <u>however</u>, that nothing herein shall be deemed to require a motion for relief from the automatic stay to effect such termination. Notwithstanding the above or anything else in this Plan Support Agreement to the contrary, upon termination of this Plan Support Agreement, any Steering Committee Member shall be entitled as of right to change or withdraw its vote in favor of the Plan and be relieved from all obligations of a Steering Committee Member under this Plan Support Agreement, with prior written notice thereof to Stayton and, if applicable, compliance with Rule 3018 of the Federal Rules of Bankruptcy Procedure (a "**Withdrawal**").

14. <u>Automatic Termination</u>. This Plan Support Agreement shall be deemed automatically terminated as to all Parties upon the occurrence of any of the following Agreement Termination Events, without any further notice or action required:

(a) Occurrence of the Plan Effective Date;

(b) Execution of a mutual written agreement to terminate this Plan Support Agreement by each of Stayton, Lifespace, and greater than a two-thirds majority in amount of the Bonds held collectively by the Steering Committee (a "**Steering Committee Supermajority**") who are signatory hereto;

(c) Unless waived by all of a Steering Committee Supermajority, Lifespace, and the Trustee, termination of the Affiliation Agreement prior to the Membership Substitution Effective Date;

(d) Unless waived by all of a Steering Committee Supermajority, Lifespace, and the Trustee, termination of the Second Forbearance Agreement;

(e) Unless waived by all of a Steering Committee Supermajority, Lifespace, and the Trustee, termination of the Liquidity Support Agreement; and

(f) If, following the Petition Date, the Bankruptcy Court enters an order dismissing the Anticipated Bankruptcy Proceeding or an order pursuant to section 1112 of the Bankruptcy Code converting the Anticipated Bankruptcy Proceeding to a case under chapter 7 of the Bankruptcy Code.

15. <u>Termination Upon Notice</u>. This agreement shall be deemed automatically terminated as to all Parties upon the occurrence of any of the following Agreement Termination Events and provision of notice by the specified Party or Parties:

(a) By the Trustee, if the Membership Substitution Effective Date has not occurred by July 31, 2019;

(b) By the Trustee, if by the Membership Substitution Effective Date the Master Trustee has entered into the Liquidity Support Agreement and (i) the Sponsor has not entered into such agreement or (ii) any portion of the liquidity support to be provided under such agreement is not provided in accordance with the terms of such Liquidity Support Agreement;

(c) By the Trustee, if Stayton files a motion seeking to modify or amend the order approving the Cash Collateral Agreement, unless such modification or amendment is acceptable in form and substance to the Trustee;

(d) By the Trustee or Lifespace, in the event Stayton files or supports confirmation of, or fails to actively oppose confirmation of, a plan of reorganization that is inconsistent with the filing or consummation of the Plan or that requests or would result in a modification or amendment of the Plan in a way that materially adversely affects the Party electing termination; <u>provided</u>, <u>however</u>, that, following the Membership Substitution Effective Date, Lifespace shall not be eligible to provide notice of such Agreement Termination Event if occurrence of such event was within Lifespace's control;

(e) By the Trustee or a Steering Committee Member that is negatively and directly impacted by the following events, in the event Stayton files a motion, complaint, application, or other request seeking to disallow, subordinate, or limit in any way the Bonds held by any member of the Steering Committee, Claims or the liens of any member of the Steering Committee or the Trustee, or seeking entry of an order by the Bankruptcy Court disallowing, subordinating, or limiting in any way the Bonds, Claims or liens of any member of the Steering Committee or the Trustee, or asserting a claim against the Bond Trustee, the Master Trustee or any Steering Committee Member to avoid any transfer or obligation, or seeking any other monetary or equitable relief from or against the Bond Trustee, the Master Trustee or any Steering Committee Member;

(f) By the Trustee or Lifespace, in the event Stayton files a motion, objection, lawsuit, administrative or adversary proceeding, or otherwise assists in any of the foregoing, which would result in a modification or amendment of the Plan (including in the case of document which is an interim order, by replacement with a final order) that materially adversely affects the party seeking termination, or is otherwise inconsistent with the terms of the Refinancing Transaction in a manner that materially adversely affects the party seeking termination; <u>provided</u>, <u>however</u>, that, following the Membership Substitution Effective Date, Lifespace shall not be eligible to provide notice of such Agreement Termination Event if occurrence of such event was within Lifespace's control; and

(g) By any Party if following the Petition Date, the Bankruptcy Court:

(i)     enters an order denying confirmation of the Plan, unless waived by Stayton, Lifespace and a Steering Committee Supermajority;

(ii)     enters an order pursuant to section 1104 of the Bankruptcy Code appointing a trustee or appointing an examiner with powers beyond the duty to investigate and report (as set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), including, without limitation, to operate and manage Stayton's business, unless waived by Lifespace and a Steering Committee Supermajority; or

(iii)     enters an order terminating, whether in whole or in part, Stayton's exclusive right to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code.

16.    <u>Termination Upon Five Days' Notice</u>. This agreement shall be deemed automatically terminated as to all Parties upon the occurrence of any of the following Agreement Termination Events, following five days' notice by the specified Party or Parties and the expiration of any applicable cure period:

(a)     By the Trustee or Lifespace, if Stayton fails to meet any of the deadlines set forth in Section 8(a)-(m); <u>provided</u>, <u>however</u>, that, following the Membership Substitution Effective Date, Lifespace shall not be eligible to provide notice of such Agreement Termination Event if achievement of the applicable deadline was within Lifespace's control;

(b)     By the Trustee, if a cash collateral order substantially in the form as the Cash Collateral Agreement, and in form and substance acceptable to the Trustee, is not entered within 30 days of the Petition Date;

(c)     By any Party, if the class comprised of members of the Steering Committee has not voted to accept the Plan by the deadline set forth in the Disclosure Statement, or such vote is no longer effective;

(d)     By the Trustee or Lifespace, if Stayton fails to obtain an order confirming the Plan by seven month following the Membership Substitution Effective Date;

(e)     By the Trustee or Lifespace if the Plan Effective Date has not occurred by February 29, 2020; <u>provided</u>, <u>however</u>, that, following the Membership Substitution Effective Date, Lifespace shall not be eligible to provide notice of such Agreement Termination Event if such delay was within Lifespace's control;

(f)     By any Party, if any governmental authority, including any regulatory authority or bankruptcy court of competent jurisdiction, issues any ruling or order denying any requisite approval of, or enjoining, the consummation of any portion of the Refinancing Transaction;

(g)     By any Party, if an injunction, judgment, order, decree, ruling or charge has been entered that prevents consummation of the Refinancing Transaction;

(h) By any Party, if there is an unequivocal rejection of consent, by a third party or such third party's governing entity, whose consent is required to effectuate the Refinancing Transaction;

(i) By either Lifespace or the Trustee, if Stayton fails to comply with any of its obligations under (i) this Plan Support Agreement, (ii) the Second Forbearance Agreement, or (iii) the Liquidity Support Agreement; provided, however, the Trustee shall not take action to terminate under this provision unless it has provided the Steering Committee Members notice of Stayton's asserted failure to comply with its obligations, at least seven days have passed, and the Trustee has not been directed to issue a default notice to Stayton by a Steering Committee Supermajority; provided, further, that, following the Membership Substitution Effective Date, Lifespace shall not be eligible to provide notice of such Agreement Termination Event if the applicable failure to comply was within Lifespace's control;

(j) By either Stayton or Lifespace if any Steering Committee Member fails to comply with any of its obligations under this Plan Support Agreement in any material respect, and such failure could materially delay, or is reasonably likely to prevent, entry of the Confirmation Order or closing of the Refinancing Transaction; or

(k) By the Trustee or, prior to the Membership Substitution Effective Date, Stayton in the event Lifespace fails to comply with any of its obligations under the Liquidity Support Agreement, and such failure could materially delay, or is reasonably likely to prevent, entry of the Confirmation Order or closing of the Refinancing Transaction; provided, however, the Trustee shall not take action to terminate under this provision if directed not to do so by a Steering Committee Supermajority.

For the avoidance of doubt and without limitation, an action or failure to act by Stayton after the Membership Substitution Effective Date shall be deemed "within Lifespace's control" for purposes of any termination right under this Agreement if under Stayton's governing documents and applicable board resolutions, following the Membership Substitution Effective Date Lifespace, directly or indirectly, has the authority to remove and/or appoint a sufficient number of members of Stayton's board of directors such that, if such authority were exercised, there would be a sufficient number of members of the board of directors of Stayton to require that the applicable action not be taken or, in the case of a failure to act, that the applicable action be taken, assuming in either case that any continuing members of Stayton's board of directors who previously voted in favor of the applicable action or against the applicable action, as the case may be, continued to vote in the same manner.

17. Notices of Termination. Notwithstanding any provision in this Plan Support Agreement to the contrary, the right to provide any notice(s) of an Agreement Termination Event (a "**Termination Notice**") shall not be available to any Party whose breach of, or failure to fulfill any material obligation under, this Plan Support Agreement has been the cause of, or resulted in, the occurrence of an Agreement Termination Event. Any Termination Notice shall be sent to all Parties.

18. Rights to Dispute Termination or Withdrawal. All Parties reserve all rights to argue that any alleged Agreement Termination Event did not occur or a Termination Notice or

Withdrawal was not permitted under this Plan Support Agreement by serving on the Parties hereto a notice of its intention to object setting forth with specificity the grounds for any such objection no later than on or before 14 days prior to the hearing on confirmation of any plan, including but not limited to the Plan. Nothing herein shall be deemed in any way to prejudice any Parties' right to respond to or otherwise oppose such a notice of intention to object or any related document or pleading including by seeking an expedited or emergency hearing thereon or seeking to continue any scheduled confirmation hearing. Notwithstanding anything contained in this Plan Support Agreement, including without limitation a termination pursuant to Sections 14 - 16, all obligations of the Parties hereunder shall be reinstated in the event of a judicial determination that the applicable Agreement Termination Event or Withdrawal was improper or not effective and such Agreement Termination Event or Withdrawal shall be deemed to be null and void *ab initio*. In the event the Bankruptcy Court finds that an Agreement Termination Event has occurred as provided for in this Plan Support Agreement, then any Withdrawal based on such Agreement Termination Event shall be deemed to have been in good faith for purposes of section 1126(e) of the Bankruptcy Code; it being expressly agreed that nothing herein shall prohibit Stayton from asserting that the applicable Withdrawal was not in good faith on any other basis.

19.   Effect of Termination. Subject to Section 28 of this Plan Support Agreement, upon termination of this Plan Support Agreement, all obligations hereunder, shall terminate and shall be of no force and effect, provided that any claim or causes of action for breach of this Plan Support Agreement shall survive termination and all rights and remedies of the non-breaching Party with respect to such claims or causes of actions shall be fully preserved and not be prejudiced in any way, and provided further that the breach of this Plan Support Agreement by one or more Parties shall not create any rights or remedies against the non-breaching Party.

20.   No Administrative Expense Claim Created. Notwithstanding anything contained in this Plan Support Agreement to the contrary, in the event this Plan Support Agreement is terminated or breached subsequent to assumption thereof, no administrative expense claim shall be created or deemed to arise or exist in favor of any Steering Committee Member except as necessary to offset any claim by Stayton against such Steering Committee Member, the Steering Committee or the Trustee hereunder.

21.   Appearing in the Bankruptcy Court. Notwithstanding any provision in this Plan Support Agreement, nothing in this Plan Support Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Bankruptcy Court so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Plan Support Agreement and the Refinancing Transaction and are not for the purpose of hindering, delaying or preventing the consummation of the Refinancing Transaction.

22.   Cooperation; Further Assurances. The Parties shall cooperate with each other and one another's advisors and shall coordinate their activities (to the extent practicable) in respect of all actions commercially reasonably necessary to consummate the Refinancing Transaction consistent with the terms and provisions of the Plan Term Sheet. The Parties further agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be commercially reasonably appropriate or necessary, from time to time, to effectuate the Refinancing Transaction.

23. <u>Additional Claims.</u> Nothing herein should be construed to restrict any Steering Committee Member's right to acquire additional Claims against Stayton. To the extent any Steering Committee Member acquires additional Claims, each such Steering Committee Member agrees that it shall promptly notify Stayton regarding any such acquisition and that such Claims shall automatically be subject to this Plan Support Agreement.

24. <u>Amendments.</u> This Plan Support Agreement may not be modified, amended or supplemented except in a writing signed by the Parties, provided, however, that any of the deadlines set forth in Section 8(a)-(m) may be waived or extended by written agreement of Stayton, Lifespace, and a Steering Committee Supermajority.

25. <u>GOVERNING LAW; JURISDICTION.</u> THIS PLAN SUPPORT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS PLAN SUPPORT AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER, OR ARISING OUT OF OR IN CONNECTION WITH, THIS PLAN SUPPORT AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, SHALL BE BROUGHT IN ANY FEDERAL OR STATE COURT IN TEXAS HAVING JURISDICTION, AND BY EXECUTION AND DELIVERY OF THIS PLAN SUPPORT AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING; PROVIDED, THAT AFTER THE PETITION DATE THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY ISSUES RELATING TO THIS PLAN SUPPORT AGREEMENT PROVIDED THAT THE BANKRUPTCY COURT SHALL FOLLOW APPLICABLE CHOICE OF LAW RULES.

26. <u>WAIVER OF TRIAL BY JURY.</u> EACH PARTY TO THIS PLAN SUPPORT AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING SOLELY OUT OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR FUTURE MODIFICATION THEREOF, WHETHER SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF ANY RIGHT THEY MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

27. <u>Specific Performance. Damages.</u> It is understood and agreed by the Parties that the exact nature and extent of damages resulting from a breach of this Plan Support Agreement are uncertain at the time of entering into this Plan Support Agreement and that breach of this Plan Support Agreement would result in damages that would be difficult to determine with certainty. It

is understood that, other than damages specified in Section 9, money damages would not be a sufficient remedy for any breach of this Plan Support Agreement, and the Parties shall each be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach without the requirement of having to post a bond in connection therewith. Except for the Steering Committee Members, against which specific performance and designation of bankruptcy plan voting rights shall be the exclusive remedies, specific performance shall not be deemed to be the exclusive remedy for breach of this Plan Support Agreement by any Party or its representatives, but shall be in addition to all other remedies available at law or in equity.

28. <u>Survival.</u> Notwithstanding (i) any sale of the Bonds or Claims in accordance with <u>Section 6(b)</u> or (ii) the termination of this Plan Support Agreement pursuant to <u>Sections 14 -16</u>, the agreements and obligations in <u>Sections 7, 9, 10, 12, 18-21, 23- 27, 29-43</u> shall survive such sale and/or termination and shall continue in full force and effect for the benefit of the Steering Committee in accordance with the terms hereof.

29. <u>Headings.</u> The headings of the Sections, paragraphs and subsections of this Plan Support Agreement are inserted for convenience only, and shall not affect the interpretation hereof.

30. <u>Successors and Assigns; Severability; Several Obligations.</u> This Plan Support Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives. The invalidity or unenforceability at any time of any provision hereof shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof. The agreements, representations and obligations of the Steering Committee under this Plan Support Agreement are, in all respects, several and not joint.

31. <u>No Third-Party Beneficiaries.</u> Unless expressly stated herein, this Plan Support Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third party beneficiary hereof.

32. <u>Consideration.</u> It is hereby acknowledged by the Parties that no consideration shall be due or paid to the Steering Committee for their agreement to support the Refinancing Transaction and vote in favor of the Plan in accordance with the terms and conditions of this Plan Support Agreement, other than Stayton's agreement to pursue the Refinancing Transaction and file, pursue confirmation of, and implement the Plan in accordance with the terms and conditions of this Plan Support Agreement, which the Parties acknowledge is fair and sufficient consideration to support the Parties' respective agreements hereunder.

33. <u>Prior Negotiations; Entire Agreement.</u> This Plan Support Agreement and incorporated Refinancing Documents constitute the entire agreement of the Parties related to the Refinancing Transaction, and supersedes all other prior negotiations with respect to the subject matter hereof.

34. <u>Counterparts.</u> This Plan Support Agreement and any amendments, joinders, consents or supplements hereto, may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement.

Facsimile or scanned signatures on this Plan Support Agreement shall be treated as originals for all purposes.

35. <u>Construction</u>. This Plan Support Agreement shall be deemed to have been negotiated and prepared at the joint request, direction and construction of the Parties, at arm's length and be interpreted without favor to any Party.

36. <u>Time of the Essence</u>. Time shall be of the essence with respect to each and every of the various undertakings and obligations set forth in this Plan Support Agreement.

37. <u>Notices</u>. All notices, demands, requests, consents, approvals and other communications ("**Notice**" or "**Notices**") hereunder shall be in writing and delivered by (i) courier or messenger service, (ii) express or overnight mail, (iii) electronic mail (with a contemporaneous telephone message at the phone number(s) listed below), or (iv) by registered or certified mail, return receipt requested and postage prepaid, addressed to the respective parties as follows:

    (a)    If to Stayton:

> Tarrant County Senior Living Center, Inc.
> c/o Ankura Consulting
> Attn: Louis Robichaux
> 15950 Dallas Parkway
> Dallas, TX 75248
> Phone: (214) 200-3689
> E-mail: Louis.Robichaux@ankura.com

    with a copy to:

> DLA Piper LLP (US)
> Attn: Thomas R. Califano
> 1251 Avenue of the Americas
> New York, NY 10020-1104
> Phone: (212) 335-4990
> E-mail: thomas.califano@dlapiper.com

    (b)    If to UMB Bank, N.A., as Trustee and as Master Trustee:

> UMB Bank, N.A.
> Attn: Virginia A. Housum
> Senior Vice President
> 120 Sixth Street South, Suite 1400
> Minneapolis, MN 55403
> E-mail: Virginia.housum@umb.com

with a copy to:

> Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
> Attn: Daniel S. Bleck
> One Financial Center
> Boston, MA 02111
> Phone: (617) 348-4498
> E-mail: DSBleck@mintz.com

(c)     If to the Steering Committee:

> Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
> Attn: Daniel S. Bleck
> One Financial Center
> Boston, MA 02111
> Phone: (617) 348-4498
> E-mail: DSBleck@mintz.com

(d)     If to the Lifespace Communities, Inc.:

> Ropes & Gray LLP
> Attn: John Chesley
> Three Embarcadero Center
> San Francisco, CA 94111
> Phone: (415) 315-6394
> E-mail: John.Chesley@ropesgray.com

or to such other addresses either party may hereafter designate. Notice by courier or messenger service or by express or overnight mail, shall be effective upon receipt. Notice by electronic mail shall be effective upon delivery by the sender of a confirming telephone message. Notice by mail, shall be complete at the time of deposit in the U.S. mail system, but any right or duty to do any act or make any response within any prescribed period or on a date certain after the service of such Notice given by mail shall be, without further action by any party, automatically extended three (3) days.

38.     Reservation of Rights. Except as expressly provided in this Plan Support Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each Steering Committee Member to protect and preserve its rights, remedies and interests, including its Claims against Stayton. Nothing herein shall be deemed an admission of any kind. If the transactions contemplated herein or otherwise stated in the Refinancing Documents are not consummated, or this Plan Support Agreement is terminated for any reason, the Parties hereto fully reserve any and all of their rights. Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Plan Support Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

39.   Fees and Expenses. Should any Party commit a material breach of this Plan Support Agreement, such breaching Party shall pay all fees, charges and expenses, including reasonable attorneys, accountants and financial advisors fees, and all other costs and expenses which may be incurred by other Parties in the enforcement of this Plan Support Agreement, whether or not any action or proceedings is actually commenced against the breaching Party or prosecuted to judgment.

40.   Nature of the Obligations of Each Steering Committee Member. The obligations of each Steering Committee Member hereunder shall be several, and not joint with the obligations of any other Steering Committee Member herein, and no Steering Committee Member shall be responsible in any way for the performance of the obligations of any other Steering Committee Member hereunder. Nothing herein or in any other agreement or document, and no action taken by any Steering Committee Member pursuant hereto or thereto, shall be deemed to constitute the Steering Committee as a group, a partnership, an association, a joint venture or any other kind of entity or create a presumption that the Steering Committee are in any way acting in concert or as a group with respect to such obligations or the transaction contemplated by this Plan Support Agreement. Each Steering Committee Member shall be entitled to protect and enforce its rights, including the rights arising out of this Plan Support Agreement, and it shall not be necessary for any other Steering Committee Member to be joined as an additional party in the proceeding for such purpose.

41.   Press Releases and Third Party Communications. Except as expressly contemplated herein, without the prior written consent of the Parties hereto, no Party will (or will permit any of its subsidiaries, affiliates, agents or representatives to) show this Plan Support Agreement or the schedules attached hereto (or otherwise disclose the existence or all or a portion of the contents hereof) to any third party (other than to the Parties, the Issuer, Lifespace, the Trustee and the respective officers, directors, employees, accountants, attorneys and financial advisors of each the Parties, the Issuer, Lifespace and the Trustee); provided, that Stayton shall be permitted to issue any press release with respect to this Plan Support Agreement with the consent of the other Parties hereto, which consent shall not be unreasonably withheld, and to discuss the content of such press releases and the transactions described in this Plan Support Agreement with the residents of Stayton following either (i) issuance of such press releases or (ii) 5:00 p.m. eastern on the day immediately prior to the date that the EMMA notice referenced at the end of this paragraph is anticipated to be posted; and provided further, that each Party hereto shall be permitted to issue a press release, make a public statement or disclose the contents of the Plan Support Agreement as may be required by law, regulation or court or administrative order, in which case the Party making the disclosure shall use all reasonable efforts to consult with, and provide a copy of all proposed written disclosure to, the other Parties hereto prior to such disclosure. Notwithstanding the foregoing, the Parties acknowledge that the Trustee has certain notice obligations under the Bond Indenture and the Master Trustee has certain notice obligations under the Master Indenture and nothing herein is intended to prohibit the Trustee or the Master Trustee, as applicable, from providing any notices as the Trustee or Master Trustee deems necessary therein. It is agreed by the parties that a notice or notices shall be posted on the MSRB Electronic Municipal Market Access (EMMA) website promptly upon execution of this Plan Support Agreement that, at a minimum, will disclose the material terms of this Plan Support Agreement, the Second Forbearance Agreement, the Liquidity Support Agreement, and the Plan Term Sheet, including without limitation the anticipated Membership Substitution and the material terms of the Refinancing

Transaction, including the bond exchange associated therewith, as well as the approximate aggregate percentage of the principal amount of the Bonds held by the Steering Committee Members.

42. <u>Automatic Stay</u>. Stayton acknowledges that after the commencement of the Anticipated Bankruptcy Proceeding, the giving of notice of termination by any Party pursuant to this Plan Support Agreement or a Withdrawal shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code.

43. <u>Agreement Not a Plan</u>. This Plan Support Agreement does not constitute a plan of reorganization or confirmation thereof under the Bankruptcy Code. The Plan will not become effective unless and until the Bankruptcy Court enters an order confirming the Plan and the Plan becomes effective in accordance with its terms. This Plan Support Agreement is not intended to constitute a solicitation or acceptance of the Plan.

**[Signature Pages Follow]**

IN WITNESS WHEREOF, the Parties hereto have executed this Plan Support Agreement or caused the same to be executed by their respective duly authorized officers as of the date first set forth above.

**Stayton**:


By: _____
Name: Louis E. Robichaux IV
Title:   Chief Restructuring Officer

IN WITNESS WHEREOF, the Parties hereto have executed this Plan Support Agreement or caused the same to be executed by their respective duly authorized officers as of the date first set forth above.

UMB Bank, N.A., as Trustee and as Master Trustee:


By: _Virginia Anne Housum_

Name: _VIRGINIA ANNE HOUSUM_

Title: _Senior Vice President_

DocuSign Envelope ID: CD85E1E4-9D43-46B9-863E-96324282B889

IN WITNESS WHEREOF, the Parties hereto have executed this Plan Support Agreement or caused the same to be executed by their respective duly authorized officers as of the date first set forth above.

**Lifespace Communities, Inc.:**

By: _LaVerne Epp_____

Name: __E. LaVerne Epp_____

Title: ___Director and Authorized Agent____

### Exhibit A - Form of Joinder

This Joinder to the Plan Support Agreement (including all schedules and exhibits, as amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof, the **"Plan Support Agreement"**), dated as of [May] [●], 2019, is entered into by and among (i) Tarrant County Senior Living Center, Inc., (ii) UMB Bank, N.A., as successor to The Bank of New York Mellon Trust Company, National Association, as trustee and as master trustee, (iii) each (a) member of an informal steering committee signatory thereto and (b) holder of Bonds that executes this form of Joinder, and (iv) Lifespace Communities, Inc. is executed and delivered by [_____] (the **"Joining Supporting Creditor"**).

Each capitalized term used herein but not defined herein shall have the meaning set forth in the Plan Support Agreement.

     1. Agreement to be Bound. The Joining Supporting Creditor hereby agrees to be bound by all of the terms of the Plan Support Agreement. The Joining Supporting Creditor shall hereafter be deemed to be a **"Steering Committee Member"** and a Party for all purposes under the Plan Support Agreement.

     2. Representations and Warranties. With respect to the aggregate principal amount of Bonds held by the Joining Supporting Creditor upon consummation of the Transfer of such Bonds to the Joining Supporting Creditor, the Joining Supporting Creditor hereby makes, as of the date hereof, the representations and warranties of the Steering Committee Members set forth in sections [----] of the Plan Support Agreement to each of the other Parties to the Restructuring Support Agreement.

     3. Governing Law. Sections __ and __ of the Plan Support Agreement is incorporated by reference as if set forth fully herein, except that any references to "Plan Support Agreement" shall be replaced with references to "Joinder".

* * * *

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Joining Supporting Creditor has caused this Joinder to be executed as of the date first written above.

_____

Entity Name of Joining Supporting Creditor

Authorized Signatory:

By: _____

Name:

Title:

Address:

Principal amount of Bonds beneficially owned by Joining Supporting Creditor, or beneficially owned by accounts for which Joining Supporting Creditor has investment management responsibility:

$_____

**Schedule 1 - Plan Term Sheet**

TARRANT COUNTY SENIOR LIVING CENTER, INC.

PLAN TERM SHEET

**May 10, 2019**

THIS TERM SHEET IS ATTACHED AS <u>SCHEDULE 1</u> TO THE RESTRUCTURING, LOCKUP, AND PLAN SUPPORT AGREEMENT, DATED AS OF MAY 10, 2019, (THE "<u>PLAN SUPPORT AGREEMENT</u>"), BY AND AMONG (I) TARRANT COUNTY SENIOR LIVING CENTER, INC. (THE "<u>STAYTON</u>"), (II) UMB BANK, N.A., AS SUCCESSOR TO THE BANK OF NEW YORK MELLON TRUST COMPANY, NATIONAL ASSOCIATION, AS TRUSTEE (THE "<u>BOND TRUSTEE</u>") AND AS MASTER TRUSTEE (THE "<u>MASTER TRUSTEE</u>"; AND TOGETHER WITH THE BOND TRUSTEE, THE "<u>TRUSTEE</u>"), (III) EACH MEMBER OF AN INFORMAL STEERING COMMITTEE COMPRISED OF HOLDERS OF BONDS CURRENTLY HOLDING AT LEAST SIXTY-SEVEN PERCENT (67%) OF THE OUTSTANDING AGGREGATE PRINCIPAL AMOUNT OF ALL BONDS ISSUED (EACH REFERRED TO HEREIN AS A "<u>STEERING COMMITTEE MEMBER</u>" AND, COLLECTIVELY, AS THE "<u>STEERING COMMITTEE</u>"), AND (IV) LIFESPACE COMMUNITIES, INC. ("<u>LIFESPACE</u>"). CAPITALIZED TERMS USED IN THIS TERM SHEET THAT ARE NOT DEFINED HEREIN SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN SUPPORT AGREEMENT.

THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

THIS TERM SHEET DOES NOT ADDRESS ALL MATERIAL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL RESTRUCTURING. THE TRANSACTIONS CONTEMPLATED BY THIS TERM SHEET ARE SUBJECT TO NEGOTIATION AND EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET AND OTHERWISE SATISFACTORY TO STAYTON, THE STEERING COMMITTEE, THE TRUSTEE AND LIFESPACE.

THIS TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER APPLICABLE STATUTES AND DOCTRINES PROHIBITING THE DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS. NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, SOLELY FOR SETTLEMENT PURPOSES, WITH A FULL RESERVATION AS TO ALL RIGHTS, REMEDIES AND DEFENSES OF STAYTON, THE TRUSTEE, THE STEERING COMMITTEE, AND ALL OTHER PARTIES. THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN ARE STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY WITHOUT THE PRIOR WRITTEN CONSENT OF STAYTON.

This plan term sheet (this "**Term Sheet**") sets forth the principal terms of a refinancing (the "**Refinancing**") of existing debt and certain other obligations of Stayton to be implemented through a chapter 11 plan (including any supplement thereto, together with any exhibits, schedules, attachments or appendices thereto, in each case as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Plan Support Agreement, the "**Plan**"). The Refinancing contemplates solicitation of acceptances of the Plan from holders of Bond Claims through a prepackaged

solicitation and the commencement of a reorganization case (the "**Chapter 11 Case**") by Stayton in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "**Bankruptcy Court**") to obtain Bankruptcy Court approval of, and to effectuate, the Refinancing Transaction through the Plan.

| Chapter 11 Debtor | "**Debtor**" means Tarrant County Senior Living Center, Inc.<br><br>"**Reorganized Debtor**" means the Debtor reorganized pursuant to the Plan, from and after the Effective Date. |
|---|---|
| Implementation | The Debtor will commence the prepackaged Chapter 11 Case and implement the Refinancing pursuant to the Plan as provided in the Plan Support Agreement. |
| Use of Cash Collateral | The Steering Committee Members have committed to direct the Trustee to authorize the Debtor to use cash collateral (as defined in section 363(a) of the Bankruptcy Code), subject to the terms and conditions set forth in the Plan Support Agreement. |
| Debt to Be Restructured | Bonds issued in the initial principal amount of $166,575,000 by the Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility (The Stayton At Museum Way Project), Series 2009A, Series 2009B and Series 2009C (collectively, the "**Original Bonds**"). |
| New 2019 Bonds | On the Effective Date, the Reorganized Debtor shall cause the Issuer to issue new Series 2019 Bonds (the "**2019 Bonds**") in an aggregate principal amount equal to $105,795,000, plus all accrued and unpaid interest on the Original Bonds through the Effective Date, on the terms and conditions set forth in the 2019 Bond Documents. The Reorganized Debtor shall cause to be delivered customary legal opinions and other documents in connection with the issuance of newly issued secured tax-exempt bonds in form and substance acceptable to the Trustee for the Series 2019 Bonds, including without limitation: (i) the Opinion of Bond Counsel described in the 2019 Bond Documents; and (ii) a lender's title policy with respect to the real property securing the Reorganized Debtor's obligations under the 2019 Bond Documents, and the first mortgage position of the Trustee, subject to such exceptions as are reasonable acceptable to the Trustee. |
| **Treatment of Claims and Interests under the Plan** | |
| On the Effective Date, each holder of an allowed Claim or Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's allowed Claim or Interest, except to the extent different treatment is agreed to by the Debtor or Reorganized Debtor, as applicable, and the applicable Holder. | |
| Administrative Claims | Except with respect to Administrative Claims that are Professional Fee Claims, each holder of an Allowed Administrative Claim shall be paid in full in cash either (i) as soon as practicable after the Effective Date or (ii) if the Administrative Claim is not allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim; provided, however, that Allowed Administrative Claims that arise in the ordinary course of the Debtor's business, including Administrative Claims arising from or with respect to the sale of goods or services on or after the Petition Date and the |

| | Debtor's executory contracts and unexpired leases, shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions, without further action by the holders of such Administrative Claims or further approval by the Bankruptcy Court. |
|---|---|
| **Professional Fee Claims** | All final requests for payment of Professional Fee Claims and requests for reimbursement of expenses of members of any statutory committee must be filed no later than 45 days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Fee Claims, as determined by the Bankruptcy Court, shall be payable in full, in cash, on the date of allowance of such Professional Fee Claims. Notwithstanding the foregoing, Professional Fee Claims may be payable on an interim basis in accordance with an interim compensation order entered by the Bankruptcy Court. |
| **Priority Tax Claims** | Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Priority Tax Claim, payment in full of the allowed amount of the Priority Tax Claim on the later of the Effective Date or as soon as practicable after the date when such claim becomes an Allowed Claim. |
| **Priority Claims** | **Unimpaired; Deemed to Accept.** On the Effective Date, each holder of an Allowed Priority Claim shall receive cash in an amount equal to such Allowed Claim unless the holder of such Claim agrees to less favorable treatment. |
| **Other Secured Claims** | **Unimpaired; Deemed to Accept.** Each holder of an Other Secured Claim shall, in the sole discretion of the Reorganized Debtor, receive on the Effective Date (or as promptly thereafter as reasonably practicable): (a) payment in full in Cash, including the payment of any interest Allowed and payable under section 506(b) of the Bankruptcy Code; or (b) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired, including Reinstatement. |
| **Bond Claims** | **Impaired; Voting.** On the Effective Date, holders of Allowed Bond Claims shall receive, in full satisfaction of their Allowed Bond Claims, their pro rata share of the 2019 Bonds. On the Effective Date, the Bonds will be cancelled without further action by or order of the Bankruptcy Court. |
| **General Unsecured Claims** | **Unimpaired; Deemed to Accept.** Except to the extent that a holder of a General Unsecured Claim agrees to a different treatment, (i) the Debtor or Reorganized Debtor, as applicable, will continue to pay or treat such General Unsecured Claim, including a resident claim under a resident agreement or otherwise, in the ordinary course of business as if the Chapter 11 Case has not been commenced, or (ii) such holder will receive such other treatment so as to render such General Unsecured Claim Unimpaired, in each case subject to all defenses or disputes the Debtor may assert as to the validity or amount of such Claims. |
| **Intercompany Claims (Unimpaired)** | **Unimpaired; Deemed to Accept.** Each Intercompany Claim arising after the Membership Substitution from (a) management agreements or (b) any administration and operational agreements pursuant to which an affiliate of Lifespace or SQLC pays costs incurred on Stayton's behalf to third parties and |

3

| | allocates to, and receives reimbursement of such costs shall (collectively, "Preserved Intercompany Claims"), at the option of the Reorganized Debtor, be either (i) Reinstated or (ii) released without any distribution on account of such Claim. |
|---|---|
| **Intercompany Claims (Impaired)** | **Impaired; Voting.** Each holder of an Intercompany Claim that is not a Preserved Intercompany Claim shall receive, on the Effective Date, release of any and all of its outstanding obligations owing to Stayton, and each Intercompany Claim shall be extinguished without any further distribution on account of such Claim. |
| **Interests in Stayton** | **Unimpaired; Deemed to Accept.** On the Effective Date, Interests of the Debtor shall be Reinstated, and holders of such Interests shall retain such Interests. |
| **General Plan Provisions** | |
| **Executory Contracts** | All executory contracts and unexpired leases, including resident contracts, will be deemed assumed pursuant to section 365 of the Bankruptcy Code. |
| **Charter; Bylaws** | The charter, bylaws, limited liability company agreement and other organizational documents of the Reorganized Debtor will (i) be amended or amended and restated by the Reorganized Debtor consistent with section 1123(a)(6) of the Bankruptcy Code and otherwise in accordance with the Plan and the Plan Support Agreement and (ii) be in form and substance reasonably acceptable to the Debtor, the Trustee, the Steering Committee Members and Lifespace. |
| **Vesting of Assets** | On the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all assets of the Debtor's Estate will vest in the Reorganized Debtor free and clear of all Claims, liens, encumbrances, charges and other interests, except as otherwise provided in the Plan, which Plan shall expressly provide that the obligations related to the 2019 Bonds are secured by a first priority lien against all of the Reorganized Debtor's assets as evidenced by the Series 2019 Note. |
| **Survival of Indemnification Obligations and D&O Insurance** | Any obligations of Stayton pursuant to its corporate charters, bylaws, limited liability company agreement, or other organizational documents to indemnify current and former offices, directors, agents, and/or employees with respect to all present and future actions, suits, and proceedings against Stayton or such directors, officers, agents and/or employees, based upon any act or omission for or on behalf of Stayton will not be discharged or impaired by confirmation of the Plan or the occurrence of the Effective Date. All such obligations will be deemed and treated as executory contracts to be assumed by Stayton under the Plan and will continue as obligations of the Reorganized Debtor. |
| **Released Parties** | "Released Party" means, collectively, in each case in its capacity as such: (a) the Debtor; (b) the Reorganized Debtor; (c) the Bond Trustee; (d) the Master Trustee; (e) the Steering Committee; (f) Lifespace, (g) the Issuer, and (h) with respect to each of the foregoing entities in clauses (a) and (g), such entity and its current and former predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, and all of their respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, |

| | |
|---|---|
| | investment bankers, consultants, representatives, management companies, fund advisors and other professionals. |
| **Debtor Releases** | As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, each Released Party will be deemed forever released and discharged, to the maximum extent permitted by law, by the Debtor, the Reorganized Debtor, the Estate, and any and all other entities who may purport to assert any cause of action, directly or derivatively, by or on behalf of the Debtor, the Reorganized Debtor, the Estate, from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtor, the Reorganized Debtor, or the Estate, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor, the Reorganized Debtor, or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtor or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the purchase, sale, or rescission of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtor's in- or out-of-court restructuring efforts, intercompany transactions, the Refinancing, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Refinancing Transaction, the Plan, or any other restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan Support Agreement, or the Plan, the filing of the Chapter 11 Case, the pursuit of confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to a Released Party's willful misconduct or intentional fraud as determined by a Final Order. |
| **Releases by Holders of Bond Claim** | As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective on or after the Effective Date or (ii) as otherwise expressly provided in the Plan or confirmation order for the Plan, in exchange for good and valuable consideration, including the obligations of the Debtor under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by (a) holders of Bond Claims who have not elected to opt-out of the releases proposed under the Plan and (b) the parties to the Plan Support Agreement, from any and all Claims, Interests or causes of action whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based in whole or in part upon any act or omission, |

| | |
|---|---|
| | transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor, the Debtor's Refinancing and the transactions contemplated therein or herein, the Chapter 11 Case, the negotiation, formulation, preparation or consummation of the Plan, the Plan Support Agreement, the Definitive Documents, or any related agreements, instruments, or other documents or the solicitation of votes with respect to the Plan, *provided* that the Released Parties shall not be released from any act or omission that constitutes actual fraud, gross negligence, willful misconduct, or a criminal act as determined by a Final Order. |
| **Injunction** | The Plan will provide for an injunction solely with respect to any Claim extinguished, discharged, or released pursuant to the Plan, with language substantially to the effect of the following: <br><br> (a) Upon entry of the confirmation order, all holders of Claims and Interests and other parties in interests, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relations to any Claim extinguished, discharged, or released pursuant to the Plan. <br><br> (b) Except as expressly provided in the Plan, the confirmation order or a separate order of the Bankruptcy Court, as of the Effective Date, all entities that have held, currently hold or may hold a Claim or other debt or liability (whether proof of such Claims has been filed or not and whether or not such entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) that will be extinguished, discharged or released pursuant to the terms of the Plan shall be permanently enjoined from taking any of the following actions on account of any such discharged Claim, debt or liability:  (i) commencing or continuing in any manner any action or other proceeding against the Released Parties, or any of their property, other than to enforce any right to a distribution pursuant to the Plan; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Released Parties, or any of their property, other than as permitted pursuant to (i) above; (iii) creating, perfecting or enforcing any lien or encumbrance against the Released Parties, or any of their property; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Released Parties; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan. |
| **Exculpation** | The Plan will provide that "**Exculpated Parties**" will have the same meaning as Released Parties. <br><br> The Plan will contain exculpation provisions with language substantially to the effect of the following: <br><br> To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, obligations suit, judgment, damage, demand, debt, right, cause of action, remedy, loss and liability for any Claim in connection with or arising out of the administration of the Chapter 11 Case, the negotiation and pursuit of the Plan Support Agreement, the Refinancing Transaction, the Plan, or the |

6

|  | solicitation of votes for, or confirmation of, the Plan, the funding or consummation of the Plan, the occurrence of the Effective Date, the administration of the Plan or the property to be distributed under the Plan, the issuance of securities under or in connection with the Plan, or the transactions in furtherance of any of the foregoing, except for: (a) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan; or (b) the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct. |
|---|---|
| **Conditions to Effective Date** | Unless waived in writing by the Debtor, on the one hand, and the Trustee, on the other hand, the occurrence of the Effective Date shall be subject to usual and customary conditions that are reasonably satisfactory to Stayton, the Trustee and the Steering Committee, including the following:<br>• the Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order shall be a Final Order;<br>• the Plan Support Agreement will not have been terminated, and will be in full force and effect;<br>• on the occurrence of the Effective Date, the conditions to effectiveness of the 2019 Bond Documents shall have been satisfied or waived and the Refinancing transactions shall have closed pursuant to the terms of the Plan Support Agreement;<br>• the Effective Date shall be no earlier than six months after the Membership Substitution;<br>• negotiation, execution, and delivery of Definitive Documents; and<br>• all requisite governmental authorities and third parties shall have approved or consented to the Refinancing, to the extent required. |
| **Retention of Jurisdiction** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (a) resolution of disputed Claims, if any, (b) allowance of compensation and expenses for pre-Effective Date services, (c) resolution of motions, adversary proceedings or other contested matters, (d) entering such orders as necessary to implement or consummate the Plan and any related documents or agreements and (e) other purposes. |
| **Definitive Documents** | This Term Sheet is indicative, and any final agreement will be subject to the Definitive Documents. The Definitive Documents will contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein consistent with the terms of this Term Sheet, and in accordance with the Plan Support Agreement. |
| **Tax Structure:** | To the extent possible, the Refinancing contemplated by this Term Sheet will be structured so as to obtain the most beneficial structure for the Debtor and holders of Interests in Stayton, as determined by the Debtor, the Trustee and Lifespace, and will also be structured in a manner that best preserves the tax attributes of the Debtor in a manner satisfactory to the Debtor, the Trustee and Lifespace. |

**Annex 1**

**Definitions**

"**Administrative Claim**" means a Claim for costs and expenses of administration allowed under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the businesses of the Debtor (such as wages, salaries, commissions for services and payments for leased equipment and premises); (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 330(a), 331 or 503 of the Bankruptcy Code, including Professional Fee Claims; and (c) all fees and charges assessed against the Estate under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930

"**Bonds**" means Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton At Museum Way Project), Series 2009A, Series 2009B and Series 2009C, issued pursuant to the Bond Indenture.

"**Bond Indenture**" means that certain Indenture of Trust dated as of October 1, 2009 the Issuer and the Bond Trustee.

"**Claim**" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against the Debtor or the Debtor's Estate.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"**Bond Claims**" means claims (inclusive of any unsecured deficiency claims) arising under the Bonds.

"**Definitive Documents**" means the definitive documents and agreements governing the Plan and the transactions contemplated thereunder (including any related orders, agreements, instruments, schedules, or exhibits) that are contemplated by and referenced in the Plan (as amended, modified, or supplemented from time to time), including: (i) the motion seeking authority to use cash collateral and grant adequate protection and the interim and final orders to be entered by the Bankruptcy Court approving such motion and all security documents and other loan documents in connection therewith; (ii) the Plan (including all exhibits and supplements thereto); (iii) the Disclosure Statement and the other solicitation materials in respect of the Plan; (iv) the Confirmation Order and pleadings in support of entry of the Confirmation Order; (v) all the 2019 Bond Documents and related documentation, any other exit financing contemplated by this Term Sheet, and all security documents and other related loan documents; (vi) those motions and proposed court orders that the Debtor file on or after the Petition Date and seek to have heard on an expedited basis at the "first day hearing"; (vii) the documents or agreements for the governance of the reorganized Debtor, including any membership agreements and certificates of incorporation; (viii) all management or consulting agreements of the Reorganized Debtor; (ix) all agreements relating to warrants or other interests exercisable in to shares of the reorganized Debtor, if applicable; and (x) such other documents, pleadings, agreements or supplements as may be reasonably necessary or advisable to implement the Refinancing, and in the case of all such documents described in clauses (i) through (x) consistent in all respects with all other terms and provision of this Plan Term Sheet, and, except as otherwise set forth herein, acceptable in form and substance to the Trustee, Lifespace, and the Debtor.

"**Disclosure Statement**" means the written disclosure statement that relates to the Plan, including the exhibits thereto, as such disclosure statement may be amended, modified, or supplemented from time to time.

"**Cash Collateral Order**" means the interim and/or final order, as applicable, of the Bankruptcy Court approving the Debtor's use of cash collateral, as such term is defined in section 363 of the Bankruptcy Code.

"**Effective Date**" means the date that is the first business day after the date the Court confirms the Plan on which (a) the conditions to the occurrence of the Effective Date under the Plan have been satisfied or

1

waived pursuant to the terms thereof, (b) no stay of the order confirming the Plan is in effect, and (c) the Debtor declare the Plan effective.

"**Estate**" means the estate created for that Debtor in the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

"**General Unsecured Claims**" means a deficiency Claim and any Claim that is not a cure claim, Administrative Claim, Priority Tax Claim, Priority Claim, Other Secured Claim, Bond Claim or Intercompany Claim.

"**Holder**" means an entity holding a Claim against, or Interest in, the Debtor.

"**Intercompany Claim**" means any Claim held by an affiliate of the Debtor against the Debtor arising before the Petition Date.

"**Interest**" means any equity security, as such term is used within in section 101(16) of the Bankruptcy Code, of the Debtor.

"**Other Priority Claim**" means a Claim under section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim or Priority Tax Claim.

"**Other Secured Claim**" means any Claim, other than the Bond Claims, secured by a Lien on collateral in which the Estate has an interest, to the extent of the value of such collateral (a) as agreed to by the Holder of such Claim and the Debtor or (b) as determined pursuant to a Final Order of the Bankruptcy Court in accordance with section 506(a) of the Bankruptcy Code or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

"**Priority Tax Claim**" means any Claim of a governmental unit of the kind against the Debtor entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"**Professional**" means any person retained by the Debtor or a statutory committee, if any, pursuant to a Final Order of the Bankruptcy Court entered pursuant to sections 327, 328 or 1103 of the Bankruptcy Code.

"**Professional Fee Claim**" means any Claim of a Professional for allowance of compensation and/or reimbursement of costs and expenses incurred in the Chapter 11 Case on or before the Effective Date.

"**Reinstate**," "**Reinstated**," or "**Reinstatement**" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim or Interest entitles the holder of such Claim or Interest, or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim or Interest as such maturity existed before such default; (iii) compensating the holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate under a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the holder of such Claim or Interest (other than the Debtor or an insider of the Debtor) for any actual pecuniary loss incurred by such Holder as the result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim or Interest entitles the Holder thereof.

"**Reorganized Debtor**" means Stayton, or any successor or assign thereto, by merger, amalgamation, consolidation, or otherwise, on or after the Effective Date.

2

**Schedule 2 - Second Forbearance Agreement**

## SECOND FORBEARANCE AGREEMENT

This Second Forbearance Agreement (this "Forbearance Agreement") dated as of this 10th day of May, 2019 (the "Effective Date") is by and among **TARRANT COUNTY SENIOR LIVING CENTER, INC.** (the "Borrower"), **UMB BANK, N.A.,** in its capacity as successor trustee (the "Bond Trustee") under the Indenture of Trust dated as of October 1, 2009 (the "Bond Indenture") between Tarrant County Cultural Education Facilities Finance Corporation (the "Issuer") and The Bank of New York Mellon Trust Company, N.A., as the prior trustee and **UMB BANK, N.A.,** in its capacity as successor master trustee (the "Master Trustee" and together with the Bond Trustee, the "Trustee") under the Master Trust Indenture, Deed of Trust and Security Agreement dated as of October 1, 2009 (the "Master Indenture") between the Borrower and The Bank of New York Mellon Trust Company, N.A., as prior master trustee. Capitalized terms used and not defined in this document have the meanings given such terms in the Bond Indenture or the Master Indenture. This Forbearance Agreement shall be effective during the Forbearance Period (as defined in Section V below).

## RECITALS

A.     At the request of the Borrower, the Issuer issued its Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton At Museum Way Project), Series 2009A, Series 2009B and Series 2009C in the aggregate principal amount of $166,575,000 (the "Bonds") pursuant to the Bond Indenture.

B.     Pursuant to the Loan Agreement dated as of October 1, 2009 (the "Loan Agreement") between the Borrower and the Issuer, the Issuer loaned the proceeds of the Bonds to the Borrower for the purpose of acquiring, constructing and equipping a continuing care retirement community known as "Stayton at Museum Way" located in Fort Worth, Texas (the "Project").

C.     The rights of the Issuer under the Loan Agreement were assigned to the Bond Trustee pursuant to the Bond Indenture as security for the Bonds. In addition, as security for its obligations with respect to the Bonds, the Borrower entered into the Master Indenture pursuant to which the Borrower granted the Master Trustee a security interest against substantially all of the Borrower's assets (all such collateral so granted under the Bond Documents, the "Collateral").

D.     The Bond Indenture, the Loan Agreement, the Master Indenture, the Liquidity Support Agreement, and any other document or agreement delivered as security for, or in respect to, the Bonds or the Borrower's obligations under any of such documents are collectively referred to herein as the "Bond Documents."

E.     Events of Default have occurred and are continuing pursuant to the Master Indenture as result of the Borrower's failure (i) to maintain a Historical Debt Service Coverage Ratio of at least 1.0x as of the Fiscal Year ended December 31, 2017 and December 31, 2018, (ii) to deliver the audited financial statements for the Fiscal Year ended December 31, 2017 by May 30, 2018, (iii) to make payments on the Series 2009 Notes from July 1, 2018 to May 1, 2019, and (iv) to provide and post on the MSRB Electronic Municipal Market Access (EMMA) website certain monthly and quarterly financial statements and operating data at the times required by the Master Indenture (collectively, the "Specified Defaults").

F.     The Borrower and the Trustee entered into two initial forbearance agreements, the second of which expired by its terms on September 20, 2018, pursuant to which the Trustee agreed to forbear from exercising remedies against the Borrower due to certain specified defaults.

G.     The Borrower anticipates additional Events of Default will occur as a result of its failure to make the required monthly debt service payments on the Series 2009 Notes during the Forbearance Period (the "Anticipated Defaults" and together with Specified Defaults, the "Known Defaults").

H.     Senior Quality Lifestyles Corporation ("SQLC"), as sole member of the Borrower, entered into a letter of intent with Lifespace Communities, Inc. ("Lifespace") with respect to a potential transaction that involves, among other entities, the Borrower and Lifespace.

I.     The Borrower, SQLC, Lifespace and the Trustee have agreed to the terms of the Plan Support Agreement, effective as of the date hereof, attached hereto as **Exhibit A** (the "Plan Support Agreement"), which contemplates, among other things, a substitution of Lifespace as the sole member of the Borrower or SQLC (as described more fully in the Plan Support Agreement, the "Membership Substitution"), followed by filing of a chapter 11 proceeding of the Borrower (the "Anticipated Bankruptcy Proceeding") before the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") seeking approval and consummation of a plan of reorganization (the "Plan") containing terms consistent with those set forth in the Plan Support Agreement, supported by the members of an informal steering committee comprised of bondholders that are signatories to the Plan Support Agreement holding at least 67% of the outstanding aggregate principal amount of Bonds (the "Steering Committee").

J.     The Borrower has requested that each of the Trustees forbear from exercising their respective remedies under the Bond Documents as a result of the Known Defaults while the Borrower moves forward with the Membership Substitution and Anticipated Bankruptcy Proceeding, and the Trustee, at the direction of the holders of a majority of the principal amount of the Bonds (the "Directing Bondholders" and together with the Trustee, the "Creditor Parties"), has agreed to forbear subject to and upon the conditions set forth herein and in reliance upon the truth of the foregoing recitals, and of the promises, conditions and covenants herein contained.

NOW THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

I.     ACKNOWLEDGEMENTS.

(a)     Affirmation of Recitals. The Borrower hereby confirms, represents and warrants to the Creditor Parties that the Recitals set forth at the beginning of this Forbearance Agreement are true and accurate in all respects, and the Borrower acknowledges that the Trustee is relying upon such truth and accuracy in entering into this Forbearance Agreement and the Directing Bondholders have so relied in directing the Trustee to enter into this Forbearance Agreement.

(b)     Agreement of Trustee Pursuant to Trustee Direction. All references in this Forbearance Agreement to the Trustee's agreeing with or agreement to, consenting to or consent to, acknowledging or acknowledgement of, or any like action by the Trustee, shall refer to such entity having been directed so to agree, consent, acknowledge or take like action pursuant to a direction from the Directing Bondholders.

(c)     Acknowledgements Respecting Status and Borrower Representations. The Borrower hereby acknowledges and represents to the Trustee, upon which representations the Trustee has relied in entering into this Forbearance Agreement and the Directing Bondholders have relied in directing the Trustee to enter into this Forbearance Agreement, that: (i) the Bond Documents to which the Borrower is a party constitute the valid and binding obligations of the Borrower; (ii) the outstanding principal amount owed on Bonds is $105,795,000; (iii) to the best of the Borrower's knowledge, all of the real and personal property owned by the Borrower constituting the Collateral is subject to the lien granted under the Master Indenture and the Trustee holds a valid, first priority lien on all of the Collateral, subject to the Permitted Encumbrances; (iv) all representations and warranties of the Borrower in this Forbearance Agreement are true and correct as of the date hereof, and shall survive the execution of this Forbearance Agreement; (v) the Borrower is authorized to enter into this Forbearance Agreement; (vi) the Borrower has no right of defense, set off, reduction, claim or counterclaim against the Creditor Parties or the Trust Estate, whether at law or in equity, with respect to the indebtedness or other obligations evidenced and/or secured by any of the Bond Documents; and (vii) upon execution and delivery hereof, this Forbearance Agreement will be a legal and binding obligation of the Borrower.

(d)     No Waiver. The Borrower hereby acknowledges that nothing in this Forbearance Agreement is intended to serve as a waiver of any payment or other obligation of the Borrower under any of the Bond Documents, and each of such obligations shall continue in full force and effect, subject to the terms and conditions of this Forbearance Agreement as more specifically set forth herein. The Borrower hereby acknowledges that the Creditor Parties reserve all of their respective rights to take action with respect to the Known Defaults and any other defaults, potential defaults and Events of Default now or hereafter existing under the Bond Documents, including, without limitation, the Known Defaults, upon the occurrence of a Forbearance Termination Event (as defined in Section V below). The parties acknowledge that, subject to the terms of this Forbearance Agreement and the Creditor Parties' agreement to forbear as more particularly set forth herein, all terms of the Bond Documents remain in full force and effect.

(e)     Known Defaults. The Borrower represents and warrants that, and the Trustee represents and warrants that to its knowledge, as of the date hereof, there is no other default or Event of Default, or any event which, with notice or lapse of time or both, would constitute a default or an Event of Default under any of the Bond Documents, other than the Known Defaults.

(f)     Ratification of Security Interest. The Borrower hereby ratifies and confirms its grant of a first priority security interest in the Collateral, subject to the Permitted Encumbrances, in favor of the Trustee to secure the Bonds and amounts owing under the Bond Documents. The Borrower hereby warrants that, to its knowledge, there are no other

3

liens existing as of the date hereof with respect to the Collateral other than the Permitted Encumbrances.

II.     <u>COVENANTS AND AGREEMENTS OF THE BORROWER</u>.

To further induce the Trustee to enter into this Forbearance Agreement and to forbear, and the Directing Bondholders to direct the Trustee to enter into this Forbearance Agreement, as and to the extent provided in this Forbearance Agreement, the Borrower further covenants and agrees, and represents and warrants to the Creditor Parties as follows:

(a)     <u>Fees and Expenses</u>. During the term of this Forbearance Agreement, the Borrower agrees that all reasonable fees and expenses of the Trustee (including, but not limited to, reasonable fees and expenses of its attorneys and Financial Advisor) in connection with the negotiation, execution and enforcement of this Forbearance Agreement, the other transactions contemplated by this Forbearance Agreement and the Plan Support Agreement, and any foregoing fees and expenses upon presentment thereof shall be paid solely from amounts on deposit in the Bond Fund and the Reserve Fund; provided, however, that nothing herein modifies, alters or amends the Trustee's respective rights under the Bond Documents to receive payment of its fees and expenses from the Trust Estate.

(b)     <u>Financial Advisor</u>. The Trustee has retained RBC Capital Markets, as financial advisor to the Trustee (the "<u>Financial Advisor</u>"). The Borrower agrees that the Trustee and the Financial Advisor may directly contact and have discussions with the Borrower's management, consultants and advisors, and those of Lifespace. The Borrower further agrees to provide such information as reasonably requested by the Financial Advisor.

(c)     <u>Debt Service Payments</u>. Commencing on the 10th day of each month after the commencement of the Forbearance Period, the Borrower shall pay to the Bond Trustee for deposit to the Bond Fund with respect to the immediately preceding month starting with the month of April 2019, amounts representing the lesser of (i) the monthly debt service payment due for such month with respect to the Series 2009 Notes as set forth in the Bond Documents and (ii) an amount equal to 75% of any positive Forbearance Net Cash Flow (as defined below) for the preceding month, provided, however, that such lesser amount shall not exceed the amount of unrestricted cash and investments cash (as calculated in the entry for "Ending Book Balance-Operating" in the Budget attached hereto) of the Borrower on the last day of the preceding month in excess of $5,464,000. Up to fifty percent (50%) of the interest payable to the holders of the Bonds on May 15, 2019 shall be paid by the Bond Trustee to the holders of the Bonds from amounts on deposit in the Reserve Fund together, if practicable, with any amounts in the Bond Fund as of such date, provided, however, that the total amount of payments under this subsection (c) shall not exceed the amount of interest payable to the holders of the Bonds, and shall be applied toward interest due on account of the Bonds. If this Forbearance Agreement remains in effect on November 15, 2019, the amount then in the Bond Fund shall be paid by the Bond Trustee to the holders of the Bonds and applied toward interest due on account of the Bonds, but no draw shall be made from amounts on deposit in the Reserve Fund. Nothing herein constitutes a waiver of the amounts due with respect to the Series 2009 Notes and amounts due on the Series 2009 Notes and not paid as a result of the deferral in the preceding sentence shall become immediately due and

payable at the end of the Forbearance Period. For the purposes of this Section II(c), "Forbearance Net Cash Flow" shall mean Net Cash Flow, as such term is calculated in the Budget, including Net Entrance Fees, as such term is calculated in the Budget. If Net Cash Flow as calculated under the Budget is less than or equal to zero for a given month, Forbearance Net Cash Flow for the purposes of this Section II(c) shall be equal to zero.

(d)     Initial Approved Budget. Attached hereto as **Exhibit B** is a cash budget through February 29, 2020 (the "Initial Budget") prepared by the Borrower, which Initial Budget sets forth a good faith projection of all cash receipts and disbursements relating to the Project during such period. During the portion of the Forbearance Period prior to the date of the initial funding of the Liquidity Support Agreement (the "Initial Testing Period"), for each four-week period, the Borrower's aggregate expenses ("Actual Expenses") shall not exceed 112.5% of the budgeted expenses set forth in the Budget (the "Initial Budgeted Expenses") for the applicable four-week period, provided however, that entrance fee refunds shall not be counted against Actual Expenses or Budgeted Expenses. During the Initial Testing Period, on Wednesday of each fourth week, commencing with the Wednesday that is five full weeks after the execution hereof, the Borrower shall provide to the Trustee and the Directing Bondholders a report showing the Actual Expenses and the Budgeted Expenses for the four-week period ending on the Friday preceding such Wednesday.

(e)     Updated Budget. In the event the Interim LSA Funding (as defined below) is fully drawn from the LSA Account (as defined below), upon such date (the "LSA Depletion Date") Stayton and the Trustee will negotiate in good faith an updated weekly budget (the "Updated Budget") that sets forth a good faith projection of all cash receipts and disbursements relating to the Project during the period from the LSA Depletion Date through February 29, 2020 (the "Updated Testing Period"). During the Updated Testing Period, for each four-week period, Actual Expenses shall not exceed 112.5% of the budgeted expenses set forth in the Updated Budget (the "Updated Budgeted Expenses") for the applicable four-week period, provided however, that entrance fee refunds shall not be counted against Actual Expenses or Updated Budgeted Expenses. During the Updated Testing Period, on Wednesday of each fourth week, commencing with the Wednesday that is five full weeks after the LSA Depletion Date, the Borrower shall provide to the Trustee and the Directing Bondholders a report showing the cumulative Actual Expenses and the cumulative Updated Budgeted Expenses, for the four-week period ending on the Friday preceding such Wednesday.

(f)     Notwithstanding the 12.5% variance otherwise permitted, during the Forbearance Period, (i) no amounts in excess of the applicable Budgeted Expenses shall be paid by Borrower to any affiliate of Lifespace or SQLC other than amounts payable under Stayton's (a) management agreements, subject to the limitations set forth in Section II(h)(4) hereof, or (b) any administration and operational agreements pursuant to which an affiliate of Lifespace or SQLC pays costs incurred on Stayton's behalf to third parties and allocates to, and receives reimbursement of such costs from, Stayton, and (ii) other than expenses incurred in connection with the restructuring transactions contemplated by the Plan Support Agreement, Stayton shall incur expenses and pay disbursements only in the ordinary course.

(g)      Material Transaction Covenant. During the Forbearance Period, except for the transactions contemplated by the Plan Support Agreement, the Borrower shall not enter into any material transaction or agreement relating to or involving (i) an affiliation, merger or sale of substantially all of the Borrower's assets, (ii) the grant of a material lien, mortgage or security interest in any of its property or material encumbrance of any assets, other than Permitted Encumbrances, or (iii) any partnership, joint venture or monetization with respect to the assets of the Borrower, unless approved in advance by the Directing Bondholders.

(h)      Milestones. The Borrower agrees it will meet, or cause to be met, the following milestones (each a "Milestone" and collectively the "Milestones"):

(1)      The Borrower shall request regulatory approval from the Texas Department of Insurance to effectuate the Membership Substitution by not later than seven business days after the execution of this Forbearance Agreement;

(2)      The Borrower shall ensure that Lifespace has issued the LSA (as defined in the Plan Support Agreement) to the Master Trustee, in form and substance acceptable to the Master Trustee, and has deposited $3,000,000 in funding (the "Interim LSA Funding") in the Liquidity Support Account (as defined in the LSA) with the Master Trustee pursuant to the terms thereof, by not later than the date the Membership Substitution occurs;

(3)      The Borrower and Lifespace shall have completed the Membership Substitution by not later than July 31, 2019;

(4)      As of the date of the Membership Substitution, the Borrower shall have completed the transition of day to day management to an entity under the control of Lifespace, which may include Seniority, Inc. ("Seniority"). The amount payable by the Borrower under any management agreement by the Borrower for the applicable management services ("Management Agreement"), together with the amount of any home office or similar fee paid by the Borrower to Lifespace or any affiliate of Lifespace, shall not exceed the compensation payable to Seniority (calculated in a similar manner) under the management agreement between the Borrower and Seniority, which is attached hereto as **Exhibit C**, provided, however, for the avoidance of doubt, Section 3.1(i) of the Master Management Services Agreement shall be deemed amended to read as follows:

In accordance with each Addendum, Owner shall pay or cause its Affiliate to pay to Manager a monthly Management Fee of six percent (6%) of the Actual Monthly Revenues attributable to the Community on the dates specified in subsection (iii) below.

(5)      The Borrower shall have provided drafts of the Plan, the disclosure statement to the Plan, and any other principal documents associated with the Anticipated Bankruptcy Proceeding (the "Proposed Bankruptcy Documents") by not later than three months after the date of the Membership Substitution;

(6)     The Borrower and the Trustee shall have agreed to the form of the Proposed Bankruptcy Documents by not later than four months after the date of the Membership Substitution;

(7)     The Borrower shall have commenced the Anticipated Bankruptcy Proceeding by not later than five months after the date of the Membership Substitution; and

(8)     The Plan shall have become effective on a date that is not sooner than six months plus one day and not later than seven months after the Membership Substitution.

(i)     <u>Reporting and Conference Calls</u>.

(1)     The Borrower shall notify the Trustee immediately of any notices of default, or event that with the passage of time would become a default, from any other counterparty, including any material correspondence from potential creditors or Lifespace.

(2)     The Borrower shall notify the Trustee immediately of any potential defaults, or events that with the passage of time would become a default, under the Bond Documents, except for the Known Defaults.

(3)     The Borrower shall notify the Trustee immediately of any material notices from, or communications with, any governmental authority or agency with regulatory oversight of the Project and immediately provide copies of any such notices or communications.

(4)     The Borrower shall host a monthly call with the Creditor Parties and the Borrower's professional advisors, to discuss the monthly financials of the Borrower, sales and reservations for the prior month, progress with the transactions referenced in this Forbearance Agreement including but not limited to the Membership Substitution, the Plan Support Agreement, and Anticipated Bankruptcy Proceeding, and any other information reasonably requested by the Creditor Parties.

## III.     CONDITIONS TO EFFECTIVENESS OF FORBEARANCE AGREEMENT.

This Forbearance Agreement shall not become effective (such date being defined as the "Effective Date") until receipt by the Trustee of each of the following:

(a)     a fully executed original of this Forbearance Agreement;

(b)     the execution of the Plan Support Agreement by all parties thereto; and

(c)     the Budget.

## IV.     COVENANT OF THE TRUSTEE.

Trustee covenants and agrees that, provided that no Forbearance Termination Event has occurred, the Trustee shall not pay more than fifty percent (50%) of the interest payable to the holders of the Bonds on May 15, 2019 from the Reserve Fund under the Bond Indenture.

## V. FORBEARANCE TERMINATION EVENTS; REMEDIES.

Forbearance Termination Events. The period of this forbearance (the "Forbearance Period") shall commence on the Effective Date and shall continue until the earlier of (i) a Forbearance Termination Event; or (ii) February 29, 2020. A "Forbearance Termination Event" shall be the occurrence of any one of the following, unless the Trustee expressly and in writing notifies the Borrower that it waives such Forbearance Termination Event, it being acknowledged by the Borrower that the Trustee shall have no duty whatsoever to provide any such notice:

(1) The occurrence of any default or Event of Default other than a Known Default, or any event which, with the passage of time or giving of notice or both, would constitute a default or Event of Default under any of the Bond Documents other than a Known Default;,

(2) The termination of the Plan Support Agreement or the LSA, pursuant to the terms thereof;

(3) The filing of a bankruptcy or other insolvency proceeding by or against the Borrower, SQLC, Seniority (but only so long as Seniority is the manager of the Project), or Lifespace, except as contemplated under the Plan Support Agreement;

(4) The commencement of any proceedings or actions against the Borrower, SQLC, or Seniority (but only so long as Seniority is the manager of the Project),to appoint a receiver or to foreclose any mortgage lien on or security interest in the Project;

(5) A violation of any of the covenants and obligations set forth herein, including failure to meet a Milestone;

(6) Any change in the ownership or membership of SQLC or any merger, affiliation, or sale of all or substantially of the assets of SQLC, including without limitation, its interests in Seniority, other than as contemplated under the Plan Support Agreement and the Membership Substitution;

(7) If any of the representations or warranties made hereunder by or on behalf of the Borrower (including the Recitals hereto) shall not have been true, accurate or complete in any material respect when made; or

(8) If, in derogation of the acknowledgements given pursuant to Section I, the Borrower asserts the existence of any defense, set off, reduction, claim or counterclaim against the Creditor Parties, whether at law or in equity, with respect to the indebtedness or other obligations evidenced and/or secured by this Forbearance Agreement or any of the Bond Documents.

8

(b)     Remedies Upon Termination. Upon the occurrence of a Forbearance Termination Event, the forbearance granted under Section VI shall immediately and automatically terminate, and the Trustee shall have available to it all rights and remedies specified under any of the Bond Documents or under applicable law.

VI.     AGREEMENT TO FORBEAR.

During the Forbearance Period, the Creditor Parties hereby agree to forbear from exercising remedies under the Bond Documents arising by reason of the Known Defaults. The foregoing agreement by the Creditor Parties (i) is not intended by the parties and shall not be construed as a waiver of any existing and continuing defaults under the Bond Documents, it being acknowledged and agreed that no such waiver shall be effected hereby, and (ii) is only an agreement to forbear from exercising, or directing the exercise of, rights and remedies available under the Bond Documents as such rights relate to the Known Defaults and is in no way intended to limit any rights or remedies the Creditor Parties may have with respect to any default or Event of Default heretofore, now, or hereafter arising other than the Known Defaults. Upon the termination of the Forbearance Period, all forbearances, deferrals and indulgences granted by the Creditor Parties pursuant to this Forbearance Agreement shall automatically terminate, and the Creditor Parties shall thereupon have, and shall be entitled to exercise, any and all of their respective rights and remedies under the Bond Documents or otherwise.

The Borrower acknowledges that the aforesaid agreement by the Creditor Parties is given at the request of the Borrower and the Borrower warrants to and for the benefit of the Creditor Parties that such agreement shall not have the effect of releasing any person or entity from liability for repayment of the indebtedness or performance of the obligations evidenced and/or secured by the Indenture or any of the other Bond Documents. The Borrower hereby waives all notices of default and rights to cure as provided in the Bond Documents or otherwise with respect to the Known Defaults. The Borrower also reaffirms the Trustee's right to payment of its fees and expenses as Trustee from the amounts on deposit in the Bond Fund and the Reserve Fund and to the lien securing the same, all as set forth in the Bond Documents. The Borrower acknowledges and agrees that nothing in this Forbearance Agreement shall act in derogation of such right to payment or such lien.

VII.     VOLUNTARY ACTION.

The Borrower hereby acknowledges and agrees that it (i) has read and understands the contents of this Forbearance Agreement, (ii) has had the opportunity to consult with counsel of its choice throughout all of the negotiations that preceded the execution of this Forbearance Agreement, and (iii) has acted voluntarily and without duress in connection with the execution and delivery of this Forbearance Agreement after reviewing and understanding each provision of this Forbearance Agreement and without reliance upon any promise or representation of any person or persons acting for or on behalf of the Creditor Parties.

VIII.     RELEASE OF THE CREDITOR PARTIES.

IN ORDER TO INDUCE THE TRUSTEE TO ENTER INTO THIS AGREEMENT, AND THE DIRECTING BONDHOLDERS TO DIRECT THE TRUSTEE, THE BORROWER,

FOREVER RELEASES AND DISCHARGES THE CREDITOR PARTIES AND EACH OF THEIR RESPECTIVE OFFICERS, DIRECTORS AND EMPLOYEES (COLLECTIVELY, THE "RELEASED PARTIES") FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, SUITS AND DAMAGES (INCLUDING CLAIMS FOR ATTORNEYS' FEES AND COSTS) WHICH THEY EVER HAD OR MAY NOW HAVE AS OF THE DATE HEREOF AGAINST ANY OF THE RELEASED PARTIES FOR ANY CLAIMS ARISING OUT OF OR RELATED TO THE BOND DOCUMENTS OR THE ADMINISTRATION THEREOF, WHETHER KNOWN OR UNKNOWN, INCLUDING, BUT NOT LIMITED TO, ANY AND ALL CLAIMS BASED UPON OR RELYING ON ANY ALLEGATIONS OR ASSERTIONS OF DURESS, ILLEGALITY, , BREACH OF CONTRACT, REGULATORY VIOLATIONS, NEGLIGENCE, MISCONDUCT, OR ANY OTHER TORT, CONTRACT OR REGULATORY CLAIM OF ANY KIND OR NATURE. THIS RELEASE IS INTENDED TO BE FINAL AND IRREVOCABLE AND IS NOT SUBJECT TO THE SATISFACTION OF ANY CONDITIONS OF ANY KIND.

The provisions, waivers and releases set forth in this Section VIII are binding upon the Borrower and its assigns and successors in interest. The provisions, waivers and releases of this Section VIII shall inure to the benefit of each of the Released Parties.

The Borrower represents and warrants that it is the sole and lawful owner of all right, title and interest in and to all of the claims released hereby and it has not heretofore voluntarily, by operation of law or otherwise, assigned or transferred or purported to assign or transfer to any person any such claim or any portion thereof.

The provisions of this Section VIII shall survive payment in full of the amounts owed by the Borrower under the Bond Documents, full performance of all the terms of this Forbearance Agreement, and any exercise of remedial actions under the Bond Documents or otherwise.

IX.     INDENTURE HELD FUNDS.

The Borrower hereby acknowledges and agrees that all amounts on deposit in the Bond Fund and the Reserve Fund are held in trust by the Trustee for the benefit of the owners of the Bonds.

X.     FURTHER ASSURANCES.

The Borrower will take such other reasonable actions as the Creditor Parties may reasonably request from time to time to perfect or continue the Trustee's first priority security interests in the Collateral (subject to the Permitted Encumbrances) and to accomplish the objectives of this Forbearance Agreement.

XI.     MISCELLANEOUS.

(a)     Notices. All notices, demands, requests and other communications required pursuant to the provisions of this Forbearance Agreement shall be transmitted via electronic message to the addresses below:

To the Trustee:                    With A Copy To:

UMB BANK, N.A.
Corporate Trust Services
Attn: Virginia Housum
120 Sixth Street South, Suite 1400
Minneapolis, MN 55402
Email: *VIRGINIA.HOUSUM@UMB.COM*

MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
Attn: Daniel Bleck
One Financial Center
Boston, MA 02111
FAX: (617) 542-2241
Email: DSBleck@mintz.com

To the Borrower:

With A Copy To:

TARRANT COUNTY SENIOR LIVING
CENTER, INC..
Louis E. Robichaux IV
15950 Dallas Parkway, Suite 750,
Dallas, TX 75248
E-mail: Louis.Robichaux@ankura.com

DLA Piper LLP (US)
Attn: Thomas R. Califano, Esq.
1251 Avenue of the Americas
New York, New York 10020-1104
E-mail: thomas.califano@dlapiper.com

To Lifespace:

With A Copy To:

Lifespace Communities, Inc.
Attn: Jodi Hirsch
4201 Corporate Drive
West Des Moines, IA 50266
E-mail:
Jodi.Hirsch@lifespacecommunities.com

Ropes & Gray
Attn: John Chesley
Three Embarcadero Center
San Francisco, CA 94111
E-mail: John.Chesley@ropesgray.com

(b)     Severability. If any covenant, condition, or provision herein contained is held to be invalid by final judgment of any court of competent jurisdiction, the invalidity of such covenant, condition, or provision shall not in any way affect any other covenant, condition or provision herein contained.

(c)     No Modification or Waiver. None of the terms or provisions of any of the Bond Documents or of this Forbearance Agreement may be changed, waived, modified, discharged or terminated except by a written instrument executed by the parties or party against whom or which enforcement of the change, waiver, modification, discharge or termination is asserted. None of the terms or provisions of the Bond Documents or this Forbearance Agreement shall be deemed to have been abrogated or waived by reason of any failure or failures to enforce the same.

(d)     Counterparts. This Forbearance Agreement may be executed in any number of counterparts, each of which shall be considered an original for all purposes, provided, however, that all such counterparts shall together constitute one and the same instrument. A pdf signature hereon shall be deemed an original for all purposes.

(e)     Time is of the Essence. Time shall be of the essence with respect to each and every of the various undertakings and obligations set forth in this Forbearance Agreement.

(f)     Successors and Assigns. The provisions of this Forbearance Agreement shall be binding upon, and shall inure to the benefit of, the respective successors and assigns of the Creditor Parties, and the respective legal representatives, successors and assigns of the Borrower; provided, however, nothing herein shall be intended as a consent to an assignment not specifically permitted by the Bond Documents.

(g)     Entire Agreement. The various Bond Documents, as confirmed and affected by this Forbearance Agreement, constitute the entire agreement between the Creditor Parties, the Borrower and the other parties to the Bond Documents and this Forbearance Agreement relating to or connected with the Bonds. Any other agreements or understandings related to or connected with the Bonds not expressly set forth in the Bond Documents, as confirmed or affected hereby, are null and void and superseded in their entirety.

(h)     No Third-Party Beneficiaries. This Forbearance Agreement shall be solely for the benefit of the parties to this Forbearance Agreement and the other Creditor Parties and no other person or entity shall be a third party beneficiary hereof.

(i)     Applicable Law. This Forbearance Agreement is executed and delivered under seal and shall be construed in accordance with and governed by the laws of, the State of Texas without giving effect to the choice of laws principles thereof.

(j)     Captions. The captions and headings in this Forbearance Agreement are for convenience only and in no way define or describe the scope or content of any provision of this Forbearance Agreement.

IN WITNESS WHEREOF, the parties have executed this Forbearance Agreement as a sealed instrument as of the date first above written.

TARRANT COUNTY SENIOR LIVING CENTER, INC.

Name: Louis E. Robichaux IV
Title: Chief Restructuring Officer

UMB BANK, N.A., as Trustee

Name:
Title:

13

IN WITNESS WHEREOF, the parties have executed this Forbearance Agreement as a sealed instrument as of the date first above written.

TARRANT COUNTY SENIOR LIVING CENTER, INC.

Name: _____

Title:

UMB BANK, N.A., as Trustee

*Virginia Anne Horium*

Name: VIRGINIA ANNE HOUIUM

Title: Senior Vice President

13

# Exhibit A

# **Exhibit B**

TARRANT COUNTY SENIOR LIVING CENTER, INC. - THE STAYTON AT MUSEUM WAY
A. DRAFT Weekly Cash Flow Projection
Report Date: May 6, 2019

$ in Thousands

Confidential
FRE 408 Settlement Material
Draft - Subject to Material Change

TARRANT COUNTY SENIOR LIVING CENTER, INC. - THE STAYTON
13 DRAFT Weekly Cash Flow Projection
Report Date: May 6, 2019

$ in Thousands

| | 9/27 Fcst | 10/4 Fcst | 10/11 Fcst | 10/18 Fcst | 10/25 Fcst | 11/1 Fcst | 11/8 Fcst | 11/15 Fcst | 11/22 Fcst | 11/29 Fcst | 12/6 Fcst | 12/13 Fcst | 12/20 Fcst | 12/27 Fcst | 1/3 Fcst | 1/10 Fcst | 1/17 Fcst | 1/24 Fcst | 1/31 Fcst | 2/7 Fcst | 2/14 Fcst | 2/21 Fcst | 2/28 Fcst | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Entrance Fee Obligation Roll Forwards** | | | | | | | | | | | | | | | | | | | | | | | | |
| Entrance Fee Escrow (Asset) | | | | | | | | | | | | | | | | | | | | | | | | |
| Beginning | 3,173 | 3,173 | 3,173 | 3,173 | 3,173 | 3,460 | 3,460 | 3,460 | 3,460 | 3,460 | 3,460 | 3,460 | 3,460 | 3,460 | 3,460 | 3,460 | 3,460 | 4,239 | 4,239 | 4,239 | 4,239 | 5,018 | 3,173 | |
| (+) Move-In Fee Receipts to Escrow | | | | | 757 | | | | | | | | | | | | | 779 | | | | 779 | | 6,657 |
| (-) Transfers from Entrance Fee Escrow | | | | | (470) | | | | | | | | | | | | | | | | | | (1,004) | 35,973 |
| Ending | 3,173 | 3,173 | 3,173 | 3,173 | 3,460 | 3,460 | 3,460 | 3,460 | 3,460 | 3,460 | 3,460 | 3,460 | 3,460 | 3,460 | 3,460 | 3,460 | 4,239 | 4,239 | 4,239 | 4,239 | 5,018 | 3,514 | | |
| Deferred Entrance Fees Receivable | | | | | | | | | | | | | | | | | | | | | | | | |
| Beginning | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | |
| (+) Entrance Fee Refund | | | | | | | | | | | | | | | | | | | | | | | | |
| (-) Entrance Fee Revenue | | | | | | | | | | | | | | | | | | | | | | | | |
| Ending | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | |
| Entrance Fee Refund Owner - Pre-petition | | | | | | | | | | | | | | | | | | | | | | | | |
| Beginning | | | | | | | | | | | | | | | | | | | | | | | | 781 |
| (+) Entrance Fee Refund Triggered - Move-Outs | | | | | 472 | | | | | | | | | | | | | | | | | | | 3,990 |
| (-) Entrance Fee Refunds Paid - Queue | | | | | (670) | | | | | | | | | | | | | | | | | | | (4,771) |
| Ending | | | | | | | | | | | | | | | | | | | | | | | | |
| Entrance Fee Refund Queue - Post-petition | | | | | | | | | | | | | | | | | | | | | | | | |
| Beginning | | | | | | | | 470 | 470 | 470 | 470 | 470 | 940 | 940 | 940 | 940 | 940 | 1,422 | 1,422 | 1,422 | 1,422 | 1,422 | 1,504 | |
| (+) Entrance Fee Refund Triggered - Move Outs | | | | | | | | 470 | | | | 470 | | | | 482 | | | 482 | | | | 482 | 1,504 |
| (-) Entrance Fee Refunds Paid - Queue | | | | | | | | | | | | | | | | | | | | | | | (2,004) | (1,956) |
| Ending | | | | | | | | 470 | 470 | 470 | 470 | 940 | 940 | 940 | 940 | 940 | 1,422 | 1,422 | 1,422 | 1,422 | 1,504 | | | |
| **Other Accounts Roll Forwards** | | | | | | | | | | | | | | | | | | | | | | | | |
| Debt Service Reserve Funds | | | | | | | | | | | | | | | | | | | | | | | | |
| Beginning | 4,242 | 4,242 | 4,184 | 4,184 | 4,184 | 4,184 | 4,184 | 4,112 | 4,112 | 4,112 | 4,112 | 4,054 | 4,054 | 4,054 | 4,054 | 3,996 | 3,996 | 3,996 | 3,996 | 3,996 | 3,923 | 3,923 | 3,923 | 4,395 |
| (+) Additions to Account | | | | | | | | | | | | | | | | | | | | | | | | |
| (-) Payments From Account | | (58) | | | | | (73) | | | | | (58) | | | | (58) | | | | (72) | | | (344) | (1,167) |
| (-) Trustee Professional Fees | | | | | | | | | | | | | | | | | | | | | | | | (1,167) |
| Ending | 4,242 | 4,184 | 4,184 | 4,184 | 4,184 | 4,184 | 4,112 | 4,112 | 4,112 | 4,112 | 4,054 | 4,054 | 4,054 | 4,054 | 3,996 | 3,996 | 3,996 | 3,996 | 3,996 | 3,923 | 3,923 | 3,923 | 3,560 | 3,880 |
| Accounts Payable - Prepetition | | | | | | | | | | | | | | | | | | | | | | | | |
| Beginning | 316 | 392 | 317 | 393 | 387 | 393 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | 165 |
| (+) Expense | 167 | 167 | 167 | 167 | 167 | 167 | | | | | | | | | | | | | | | | | | 5,010 |
| (-) Cash Payment | (90) | (243) | (90) | (223) | (113) | (243) | | | | | | | | | | | | | | | | | | (4,870) |
| (-) Cash Settlement | | | | | | | | | | | | | | | | | | | | | | | (317) | (317) |
| Ending | 392 | 317 | 393 | 337 | 393 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | 317 | | 0 |
| Accounts Payable - Postpetition | | | | | | | | | | | | | | | | | | | | | | | | |
| Beginning | | | | | | | 91 | 256 | 367 | 367 | 367 | 187 | 187 | 187 | 187 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | |
| (+) Expense | | | | | | 91 | 223 | 111 | 111 | 468 | 91 | 263 | 91 | 313 | 92 | 223 | 113 | 92 | 242 | 91 | 243 | 92 | 2,265 |
| (-) Cash Payment | | | | | | | (56) | (92) | (111) | (468) | (91) | (263) | (91) | (313) | (91) | (223) | (113) | (91) | (243) | (91) | (243) | (92) | (758) | (2,965) |
| Ending | | | | | | 91 | 256 | 367 | 367 | 367 | 187 | 187 | 187 | 187 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | | |
| Sponsored Professional Fee Account | | | | | | | | | | | | | | | | | | | | | | | | |
| Beginning | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | 832 |
| (+) Transfers from Operating | 94 | 129 | 155 | 129 | 134 | 139 | 75 | 50 | 45 | 74 | 47 | 47 | 52 | 52 | 47 | 52 | 52 | 50 | 48 | 53 | 56 | 223 | #NAME? | |
| (-) Payments to Professionals | (84) | (109) | (159) | (129) | (134) | (139) | | | | (58) | | | (287) | | | (178) | | | | | | (383) | (2,567) | |
| (-) Transfers to Operating | | | | | #NAME? | | | | | | | | | | | | | | | | | | #NAME? | #NAME? |
| Ending | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | #NAME? | |

# Exhibit C

*Execution document*

## MASTER MANAGEMENT SERVICES AGREEMENT

This MASTER MANAGEMENT SERVICES AGREEMENT (the "Agreement") is entered into this 7th day of September, 2017, by and between Seniority, Inc., a California corporation (the "Manager"), and Senior Quality Lifestyles Corporation, a Texas nonprofit corporation (the "Owner"). Each of the Manager and Owner is a "Party" and together they may be referred to as the "Parties". Capitalized terms are defined in Section XII.

## RECITALS

WHEREAS, Owner, through its Affiliates, owns certain lifecare senior living communities, each generally consisting of the following: Independent Living Apartments, Assisted Living Units, Memory Care Units, and Health Care Centers, each of which comprises a "Community" and collectively comprise the "Communities";

WHEREAS, Owner, through its Affiliates, intends to develop and/or own additional Communities;

WHEREAS, Manager has expertise in developing, operating, and managing facilities similar to the Communities;

WHEREAS, Owner desires to create a consistency of its brand as a premier provider of Class A (hereinafter defined) lifecare senior living communities by utilizing uniform management services;

WHEREAS, Affiliates that enter into an Addendum (hereinafter defined) with Manager will have the benefit of certain economies of scale and standardization of programs and services, as well as the negotiated terms and conditions of this Agreement;

WHEREAS, Owner desires to engage or use its best efforts to cause Affiliate to engage Manager and Manager is willing to accept such engagement to develop, manage, and operate the Communities as further described in the Addenda included in Exhibit B, attached hereto and incorporated herein, as may be amended from time to time; and

WHEREAS, as the sole member of each Affiliate, Owner shall take any reasonable action necessary to ensure that any Affiliate entering into an Addendum under this Agreement fulfills all of its obligations thereunder;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

#5507692

*Execution document*

# AGREEMENT

## SECTION 1. APPOINTMENT OF MANAGER.

In consideration for the economies of scale, efficiencies, and standardization of services described herein, Owner will use its best efforts to cause each of its Affiliates to appoint Manager as the sole and exclusive manager of the Communities and to delegate to Manager general day-to-day operational responsibility for the Communities. Affiliate's appointment of Manager will be evidenced by the execution of the Addenda between Affiliate and Manager. Owner hereby appoints Manager to perform the duties for Owner set forth in this Agreement. Manager hereby accepts such appointment and assumes such responsibility.

## SECTION 2. TERMS OF THE AGREEMENT.

The specific terms as shall apply to each Affiliate and Community shall be captured in the addendum for said Community included in Exhibit B (each an "Addendum"). Each Addendum shall be on a form attached hereto as Exhibit A.

## SECTION 3. COMPENSATION.

3.1 Management Fee. In accordance with each Addendum, Owner shall pay or cause its Affiliate to pay to Manager a Management Fee for general management, accounting, human resources, and sales services provided to the Community, as may be further described in each Addendum. For clarity, items identified herein as being paid "at Owner's expense" are paid outside of the Management Fee.

(i) In accordance with each Addendum, Owner shall pay or cause its Affiliate to pay to Manager a monthly Management Fee of eight percent (8%) of the Actual Monthly Revenues attributable to the Community on the dates specified in subsection (iii) below.

(ii) In addition to the Management Fee, Manager shall be reimbursed all of its reasonable travel and other reasonable out-of-pocket expenses incurred in fulfilling its obligation under this Agreement and pursuant to the Owner's expense and travel reimbursement policy in effect as of the date of this Agreement, except as provided for in subsection (iv) below. Notwithstanding anything herein to the contrary, to the extent required by Section 409A of the Internal Revenue Code of 1986, as amended: (1) all reimbursements under this Agreement and any Addendum shall be paid no later than the last day of the calendar year following the calendar year in which the expense was incurred, (2) the amount of expenses eligible for reimbursement or in-kind benefits provided under this Agreement during a calendar year will not affect the expenses eligible for reimbursement or in-kind benefits provided in any other calendar year, and (3) the right to reimbursement or in-kind benefits provided under this Agreement shall not be subject to liquidation or exchange for another benefit.

(iii) Unless otherwise described in each Addendum, the first month's Management Fee shall be due and payable on the Commencement Date; thereafter, the Management Fee for each calendar month shall be due and payable on or before the first day of such calendar month in

2

accordance with the Budget. In accordance with each Addendum, Owner shall pay or shall cause its Affiliate to pay Manager interest on any Management Fee or other payments that have not been made within fifteen (15) days after the date due, unless the payment delay was caused in whole or in part by Manager. Interest shall be computed from the date the payment is due at the lesser of (i) the highest lawful rate, and (ii) a rate of nine percent (9%) per annum. Notwithstanding anything herein to the contrary, all Management Fees (inclusive of the interest accrued thereon) accrued during the term of this Agreement shall be due and payable in full no later than June 1 of the calendar year immediately following the calendar year of the original due date of the payment. In the event there is a dispute between Owner or the Affiliate and Manager regarding any payment due to Manager, interest on a late payment will be computed only from the date the dispute is settled and payment is approved.

(iv) In addition to the Management Fee, as provided in each Addendum, Owner shall pay or shall cause its Affiliate to pay a monthly administrative fee equal to three percent (3%) of a Community's monthly Management Fee (the "Administrative Fee") for reimbursement of Manager's general out-of-pocket administrative expenses reasonably related to Manager's duties under this Agreement, including, but not limited to, long distance telephone calls, copying, postage and express mail, and delivery charges. The Administrative Fee for each month shall be paid at the same time as the Management Fee for such month, as set forth in Section 3.1(iii) above.

(v) On an quarterly basis, the parties shall compare the Actual Monthly Revenues to the budgeted Actual Monthly Revenues in order to reconcile the Management Fee and the Administrative Fee, using unaudited Actual Monthly Revenues for the first, second and third quarters and using audited Actual Monthly Revenues for the fourth quarter. If the total amount of the Management Fee and Administrative Fee paid to Manager exceeds the amount due over the applicable quarter, then Manager shall credit or reimburse Owner or its Affiliate for the overpayment. If the total amount of the Management Fee and Administrative Fee paid to Manager is less than the amount due for the applicable quarter, Owner shall pay Manager the balance no later than 45 days following the end of the quarter for which such reconciliation was computed in the case of the first, second and third quarters, and for the fourth quarter/annual reconciliation, no later than June 1 of the calendar year immediately following the calendar year of the reconciliation.

3.2    Development Fee. If any Addendum includes development services, then, as provided in the Addendum, Owner shall also pay or cause its Affiliate to pay Manager a reasonable, periodic, fixed Development Fee as provided for in said Addendum, under the terms described in Section 3.1(iii) above.

3.3    Ancillary Fees. Owner, independently or through its Affiliate, and Manager may agree to reasonable fees for other services to be provided by Manager outside the scope of the Management Fee, Administrative Fee or Development Fee. Any such ancillary fees shall be described in the relevant Addendum.

3

*Execution document*

## SECTION 4.   DUTIES OF MANAGER.

As may be further provided or detailed herein or in the respective Addendum, Manager shall perform the following duties:

4.1     Duties. Manager shall assume any pre-opening duties, as applicable, and all general day-to-day operational responsibilities for the Community in all respects, as more fully set forth herein and in the Addendum. Ordinary duties of Manager shall involve exclusively operating and managing each Community identified in Exhibit B during the term identified in each respective Addendum, with full control and discretion in the operation, direction, management, and supervision of the Community, subject only to the limitations described in this Agreement and the Addendum. Manager is expressly authorized to do the following with respect to each Community and in accordance with approved Annual Budgets and the terms of this Agreement and the Addendum: (i) determine operating policies, procedures, and standards (subject to the Class-A requirement described herein); (ii) develop and execute a sales plan; (iii) establish food and beverage policies; (iv) establish all employment policies, including wage and salary terms, benefits, retirement plans, and bonuses; (v) hire, promote, supervise, direct, train, transfer, and discharge all Community employees; (vi) negotiate and consummate such agreements as Manager may deem necessary or advisable for furnishing all utilities, services, supplies, food, beverages, equipment, and other materials and supplies for the maintenance and operation of the Community; (vii) establish advertising and public relations policies; (viii) obtain and maintain in Owner's or Owner's Affiliate's name all licenses, permits, and accreditations and surety or fidelity bond requirements required in connection with management and operation of the Community; (ix) establish such bank accounts as are required for the operation and maintenance of the Community according to GAAP; (x) manage and oversee Owner's investment portfolio through an investment advisor selected by Owner and compensated directly by each Affiliate; and (xi) manage and oversee Owner's back-office and administrative services (at no additional charge, unless the Parties agree that such management and oversight warrants its own Addendum, in which case an appropriate fee will be designated thereunder).

4.2     Management Standard. Manager shall manage each Community through the delivery and supervision of superior resident care and by creating and maintaining a premium senior living community, including a congenial and attractive environment for all residents consistent with Class-A senior living standards.

4.3     Operational Standard. Manager shall operate each Community in accordance with the (i) terms of this Agreement, (ii) in accordance with the highest standards of retirement facility care consistent with both the Class-A resident program, as described in Section 4.2 above, and premium services being offered in the Community, (iii) the resident fee structure, and (iv) the approved Annual Budget and Annual Business Plan in a careful and proper manner and in full compliance with all applicable restrictive covenants running with the land, statutes, ordinances, orders, rules, and regulations of governmental authorities having jurisdiction over the Community or the Owner or its Affiliate. Manager shall promptly remedy any violation of any such statute, ordinance, order, rule, regulation, or restrictive covenant running with the land that comes to Manager's attention.

4

*Execution document*

4.5    Permits and Licenses. At the expense of and in full cooperation with Owner and the respective Affiliate and in Owner's or the respective Affiliate's name, Manager shall obtain and/or maintain all licenses, permits, and approvals necessary for the operation of each Community. Manager shall supply necessary technical assistance and professional consultation to help Owner and/or its Affiliate meet all local, state, and federal requirements applicable to such licenses, permits, and approvals.

4.6    Intellectual Property. Manager shall supply management and supervision of operational services for the Community through Manager's recommended manuals, forms, financial assessment tools, and systems (the "Manager's Intellectual Property"). Owner agrees (i) to use or take any reasonable action necessary to cause its Affiliate to use the manuals, forms, and systems provided by Manager for the benefit of operating the Community and (ii) to not disclose or otherwise reproduce, disseminate, or allow the reproduction of these documents to any third party.

4.7    Service Contracts. At the expense and in the name of Owner or its Affiliate, Manager shall contract for utilities, insurance, and other operation and maintenance services that Manager deems advisable, including consulting contracts (the "Service Contracts"); provided, however that Manager shall obtain prior written approval of Owner or Affiliate before entering into or renewing any Service Contract with a term of more than one year or under which total fees payable to the service provider for any single Community may exceed fifty thousand dollars ($50,000) for any single year; although, the Parties may agree in writing to a higher dollar threshold without amending this Agreement. Owner may waive this approval obligation if the Service Contract is approved as part of the adoption of a Community's Annual Budget. As a condition to obtaining such consent, Manager shall supply Owner or Affiliate with a copy of the proposed contract and shall state to Owner or Affiliate the relationship, if any, between Manager (or the person or persons in control of Manager) and the party proposed to supply such goods or services, or both. Any Service Contract with an affiliate of Manager requires Owner or Affiliate's prior written consent. Unless waived by Owner in writing, all Service Contracts will be at arms-length and in no event will they exceed market rates. All Service Contracts shall: (a) be in the name of Owner or its Affiliate, (b) be assignable, at Owner's or Affiliate's option, to Owner's or Affiliate's nominee, (c) if possible, include a provision for cancellation thereof by Owner or Affiliate or Manager at no cost upon not less than thirty (30) days written notice, and (d) if applicable, require that all contractors provide evidence of sufficient insurance. Owner acknowledges that Manager may endeavor to bundle certain Service Contracts for all or multiple Communities in order to create efficiencies and economies of scale; Owner agrees to take reasonably necessary actions to coordinate multiple approvals of such Service Contracts by the relevant Affiliates.

4.8    Capital Improvements. At the expense and in the name of Owner or its Affiliate and in accordance with each approved Annual Budget, which budget shall include a capital improvements reserve account, Manager shall make or cause to be made such capital improvements as may be provided under such Annual Budget and such ordinary repairs and alterations as Manager may deem advisable or necessary; provided, however, that Manager will not expend more than ten thousand dollars ($10,000) on any single non-budgeted item for any single Community without Owner's or Affiliate's prior written approval, as the case may be, except in the case of emergency repairs necessary in the reasonable opinion of Manager to protect

5

a Community from damage or to maintain services to residents as called for in their residency agreements. Capital improvement projects exceeding fifty thousand dollars ($50,000) per improvement must be subject to a competitive bid process. Owner shall, from time to time, at Affiliate's sole cost and expense, take any reasonable action necessary to cause its Affiliate to make major Community capital expenditures which are (i) reasonably necessary to maintain the Community as a Class-A senior living community; (ii) set forth in the approved Annual Budget; (iii) jointly approved by Affiliate and Manager; or (iv) reasonably necessary in connection with any safety reason. If Affiliate and Manager disagree as to whether any major capital expenditure is reasonably necessary for a Community for any of this purposes described in this section, Manager shall either (i) accept Affiliate's position, or (ii) terminate the respective Addendum upon sixty (60) days' written notice to Owner and the Affiliate.

4.9     Furniture, Fixtures, and Equipment. At the expense and in the name of Owner or its Affiliate and in accordance with approved Annual Budgets, Manager shall purchase and keep each Community furnished with all necessary furnishings, fixtures, equipment, and supplies, utilizing Manager's purchasing programs and systems of inventory control to provide low costs for such items consistent with maintaining the operation of the Communities in a Class-A manner; provided, however, that Manager shall not expend more than ten thousand dollars ($10,000) on any non-budgeted item, without Owner's or its Affiliate's prior written approval, as the case may be. Furniture, fixtures, and equipment means all furniture, furnishings, wall coverings, fixtures, equipment and systems located at or used in connection with a Community, together with all replacements therefor and additions thereto including: all vehicles; machinery; equipment and systems required for grounds keeping functions and maintenance of the facility; equipment and systems for the operation of the kitchens; office equipment; dining carts; material handling equipment, cleaning, and engineering equipment; telephone systems; computer systems; and all other furnishings, fixtures, and equipment of whatever nature necessary or appropriate to maintain and repair the Community.

4.10    Manager Employees.

(i)     Manager shall provide for each Community qualified executive management, at Affiliate's expense, to include an Executive Director, and such executive management may also include, as determined in Manager's discretion, an Associate Executive Director, a Director of Operations, and/or a Health Care Administrator, each of whom shall, unless otherwise stated in the relevant Addendum, be employees of Manager.

(ii)    Each Executive Director shall assume the responsibility for the daily operations of the relevant Community, and shall be responsible for all recruiting, hiring training, and discharge if necessary, at Affiliate's expense and as Affiliate's employees, of all other personnel necessary to maintain and operate the Community. Manager shall present its recommendation for an Executive Director to Owner and/or its respective Affiliate, introduce its recommended Executive Director to Owner and/or its respective Affiliate, and obtain Owner's and the respective Affiliate's approval of each Executive Director, as well obtain Owner's and the respective Affiliate's approval for the compensation, including salary, relocation packages, bonuses and benefits of the Executive Director. Manager shall evaluate the Executive Director on an annual basis and present the written evaluation to Owner and/or its respective Affiliate. If an Executive Director position

6

becomes vacant, Manager will supplement the on-site staff to ensure the Community continues to operate effectively during such vacancy.

4.11   Supervision of Employees.  Manager shall, through each Community's Executive Director, supply supervision of operational services for the Communities delivered through the Owner's or its Affiliate's employees. Each Executive Director shall establish compensation, consistent with comparability data, and salary scales and guidelines under the Community's approved Annual Budget for employees; provided, however, that the compensation of the Executive Director and any Associate Executive Director, Director of Operations, and/or Health Care Administrator, along with such other executive team members for a Community employed directly by Affiliate, including any Director of Nursing, Director of Sales and Marketing, and any other employee of the Affiliate whose total compensation is in excess of one hundred fifty thousand dollars ($150,000) (provided, the Parties may agree in writing to a higher dollar threshold without amending this Agreement) must be approved in writing and memorialized consistent with Internal Revenue Service guidelines by the respective Affiliate in accordance with the Affiliate's conflict of interest policy.

4.12   Accounting.  Manager shall provide appropriate accounting systems and software for each Community, to be site licensed for use on Owner's and Affiliate's computer equipment, if applicable, to include complete accounting, bookkeeping, and record keeping services for the Community, specifically including, but not limited to: (i) resident billings, (ii) accounts payable, (iii) accounts receivable, (iv) general ledger records, (v) inventory records, and (vi) demographic information on residents. Software maintenance and update charges will be expenses of Owner or its Affiliate, as applicable. Payroll processing may be delegated to a third party, the cost of which will be the responsibility of Owner or its Affiliate, as applicable. Books and records for each Community shall be maintained with the Manager, but are the property of Owner and the Affiliate and available to Owner and the Affiliate upon request. Owner's Board shall engage a certified public accountant to conduct annual audits of the books, records and accounting procedures of each Community.

4.13   Revenues.  Manager shall collect revenues for each Community and shall maintain segregated accounts for each Community. Manager shall have the right to deposit and withdraw funds from such accounts to pay expenses and liabilities of the Community, including all operating expenses as provided for in the approved Annual Budget and any non-budgeted item paid or approved for payment by Owner or its Affiliate in accordance with the provisions of this Agreement; provided, however, that Manager shall not withdraw funds to pay any fees payable to Manager for which Manager has received written notice from Owner or Affiliate disputing the amount owed to Manager. Sums due to Manager which were not included in the approved Annual Budget shall be paid directly by Affiliate, or by Manager upon prior written approval by Affiliate. Revenues from one Community shall not be comingled with revenues from another Community.

4.14   Collections.  Manager shall collect all rents, late charges, and other charges that may become due at any time from any resident or from others for services provided in connection with or for the use of a Community or any portion thereof. Manager shall collect and identify any income due to Affiliate from miscellaneous services provided to residents or the public including, but not limited to, resident storage and coin operation machines of all types (i.e., vending machines,

7

*Execution document*

pay telephones, etc.). In accordance with each approved Annual Budget and with Owner or Affiliate's prior written approval, Manager may engage counsel and cause such legal proceedings as may be necessary to enforce payment of charges by residents or compliance with other terms of residency agreements, or to dispossess residents of a Community; provided, however, that Manager shall provide Owner and Affiliate fifteen (15) days' written notice before terminating any resident agreement. .

4.15    Taxes and Other Expenses.

(i)    At expense of Affiliate, Manager shall pay all real property taxes and assessments on each Community and all insurance premiums of Affiliate with respect to each Community, and shall establish all reserves as the approved Annual Budget may direct.

(ii)    Manager shall not take any tax position that is inconsistent with its role as a service provider hereunder.    Specifically, Manager will not claim any depreciation or amortization deduction, tax credits, or deduction for any payment as rent with respect to any Community.

(iii)    All of Manager's general administrative expenses reasonably related to Manager's duties under this Agreement, including long distance telephone calls, copying, postage and express mail, and delivery charges, shall be included in the Administrative Fee described in Section 3.1(iv) above.

(iv)    Manager shall cause to be prepared and filed 1099 Forms with the Internal Revenue Service reporting payments to professionals and contractors employed at a Community as is required in accordance with applicable laws and regulations.

(v)    Manager shall cause to be prepared and filed all applicable employment tax forms with the Internal Revenue Service reporting payments to employees of a Community and shall cause to be prepared and provided all applicable Form W-2s to employees of a Community, all as is appropriate in accordance with applicable laws and regulations.

4.16    Fidelity Bonds.    At Manager's expense, the Executive Directors, and all other employees of Manager who handle or are responsible for Owner or Affiliate's funds, shall each be bonded by a fidelity bond in an amount not less than five hundred thousand dollars ($500,000). Manager shall procure, out of Owner's or its Affiliate's funds, a similar fidelity bond for employees of Owner and its Affiliate who handle or are responsible for funds related to the operation of a Community. Losses in excess of the fidelity bond due to theft or other fraudulent activity of Manager's employees shall be borne by Manager. Losses in excess of the fidelity bond due to theft or other fraudulent activity of Owner or Affiliate's employees shall be borne by Owner, either directly or through its Affiliate.

4.17    Prohibited Acts. Notwithstanding any provision in this Agreement to the contrary, Manager shall not without the prior approval of Owner or Affiliate, as the case may be:

(i)    convey or otherwise transfer or pledge or encumber the Community or any other property or asset of Owner or Affiliate;

8

#5507692

*Execution document*

(b) institute or defend lawsuits (except as otherwise provided herein) or other legal proceedings on behalf of Owner or Affiliate;

(c) pledge the credit of Owner or Affiliate (except for purchases made in the ordinary course of operating the Community or as otherwise contemplated pursuant to this Agreement); or

(d) borrow money or execute any promissory note or deed of trust, security agreement, guaranty or other encumbrance in the name of or on behalf of Owner or Affiliate.

## SECTION 5. DUTIES OF OWNER

5.1 <u>Operating Costs</u>. Owner agrees to maintain, or take action reasonably necessary to cause its Affiliate to maintain, a level of rates and charges sufficient to assure the operation of the Community in a Class-A, premium senior living facility manner taking into account the approved Annual Business Plan and Annual Budget and the market area in which each Community is located and to provide for the payment of all costs of operation of each Community, including Management Fees and other Manager-related fees. In the event actual or projected disbursements are ever in excess of the revenues collected for any Community, Affiliate shall pay the excess promptly, and in no event after the tenth (10th) business day after receipt of written notification of a deficit or shortfall by Manager. Manager shall strive to notify Owner and the respective Affiliate in advance that such a request for funds will be required. Manager shall have no obligation to expend its own funds to cover operating shortfalls of a Community.

Owner agrees take any reasonably required action to cause Affiliate to pay the following operating costs (computed on a cash basis) in connection with operating each Community under an Addendum: (i) employee expenses and taxes, including without limitation salaries, wages, bonuses, benefits, expenses, and other compensation of all Community employees; (ii) routine repairs, maintenance and alterations; (iii) administrative and general expenses; (iv) fees for attorneys, accountants, and other third parties performing services permitted hereunder; (v) insurance premiums and applicable deductibles; (vi) food service; (vii) laundry service; (viii) inventories; (ix) fixed asset supplies; (x) license fees; (xi) marketing, promotion, and publicity; (xii) computer operating costs and communications lines and infrastructure; (xiii) special events; and (xiv) any and all other expenses which are necessary and proper for operating a Community under the standard described in this Agreement. No part of Manager's central office overhead shall be deemed an operating cost, except to the extent such overhead is otherwise provided for in this Agreement.

5.2 <u>Employees</u>. Except for the Executive Directors, Associate Executive Directors, Directors of Operation, and Health Care Administrators, all persons employed in the operation of the Communities shall be employees of an Affiliate, and shall not be deemed or construed to be employees of Manager. From Affiliate's funds and on Affiliate's behalf, Manager shall make disbursements and deposits for all employee compensation and other amounts payable with respect to persons who are so employed by Affiliate in the operation of each Community, including, but not limited to: unemployment insurance, social security, worker's compensation, health and life insurance, and other charges imposed or required by any governmental authority or provided for

9

*Execution document*

in any collective bargaining agreement. Manager shall maintain or cause to be maintained complete payroll records for each Community.

5.3    Approvals. Unless otherwise stated herein, in any case in which Owner's or its Affiliate's written approval is required for any proposed action of Manager, Manager shall provide a written request for Owner's or its Affiliate's approval directed respectively to either the President and CEO of the Owner or the Chairman of the Affiliate. Owner agrees to provide or take reasonable action required to cause its Affiliate to provide written approval or disapproval within five (5) business days of Manager's request; provided, however that, for extraordinary actions which reasonably require additional time for review and approval, to wit: (i) approval of certain Service Contracts; (ii) approval of compensation of certain highly-paid employees; (iii) approval of legal proceedings; and (iv) approval of high-cost non-budgeted items for which Owner or Affiliate may desire to solicit competitive bids, Owner or its Affiliate, as the case may be, shall have up to thirty (30) days to provide written approval or disapproval of Manager's request.

## SECTION 6.    REPORTING AND BUDGETING REQUIREMENTS

6.1    Monthly Financial Statements. Manager shall cause to be prepared interim monthly financial statements of operations of each Community, to include (i) an income statement; (ii) a balance sheet; (iii) aging accounts receivable, including resident late and non-payments; and (iv) aging accounts payable, to be submitted to Owner and its respective Affiliate as to its Community within fifteen (15) business days after the end of each month, together with all supporting documentation requested by Owner or its Affiliate from time to time. For the twelve (12) months immediately following the effective date of this Agreement, Manager shall have thirty (30) business days after the end of each month to provide the interim monthly financial statements.

6.2    Annual Business Plan and Annual Budget. Manager shall prepare and submit to Owner and each respective Affiliate for Owner's or the respective Affiliate's approval, at least sixty (60) days prior to the commencement of each Fiscal Year, (i) the Annual Business Plan and (ii) Annual Budget for each Community, such budget to cover all projected revenues and expenses of the Community, broken out to include Independent Living Apartments, Assisted Living Units, Memory Support Units and the Health Center, including any capital improvements (each an "Annual Budget"). Each Annual Budget shall also include Manager's recommendations and suggestions for (i) monthly service fees, per diem rates, entrance fees, ancillary service fees, and other costs and charges to the residents of the Community; (ii) the salaries and benefits of all groups of employees; (iii) renewal or engagement of Service Contracts; (iv) major purchase contracts for consumable supplies; (v) capital improvements; (vi) reserves (equal to three percent (3%) of gross revenues for a Community); and (vii) repair and replacement estimates for furniture, fixtures, and equipment.

6.3    Budget Process. Manager shall submit final, recommended Annual Budgets to Owner and each respective Affiliate for review and approval under Section 5.3 above; provided, that Manager shall be authorized to proceed with operations on the basis provided in the prior Fiscal Year's Annual Budget if the proposed Annual Budget is not approved prior to the commencement of the Fiscal Year for which such proposed Annual Budget is applicable.

10

6.4 Reports and Data.

(i) Manager shall provide all necessary statistical operating reports (including, but not limited to payroll, sales, use and occupancy tax, etc.) and all necessary operating data to meet local, state, and federal regulatory requirements. Additionally, Manager shall acquire, at Affiliate's expense, reasonably required actuarial reports for the sound operation of the respective Community.

(ii) Manager shall cause to be prepared any monthly, quarterly, annual, and other continuing disclosure reports required to be submitted by any Affiliate pursuant to a master trust indenture and/or continuing disclosure agreements applicable to any tax-exempt bond issue outstanding for such Affiliate (the "Continuing Disclosure Reports"). Manager shall cause such Continuing Disclosure Reports to be provided to the relevant master trustee and to the MSRB, as applicable, in the time and manner set forth in the relevant master trust indenture or continuing disclosure agreement. Manager shall cause to be provided each Continuing Disclosure Report to the respective Affiliate for approval at least three (3) business days prior to the applicable due date for such Continuing Disclosure Report. Manager shall promptly notify Affiliate if Manager is not able to cause to be prepared a Continuing Disclose Report at least three (3) business days prior to its applicable due date. Manager shall promptly notify Affiliate if Manager does not cause to be provided a Continuing Disclosure Report to the master trustee or the MSRB, as applicable, on or before the applicable due date. Continuing Disclosure Reports required to be provided to the MSRB shall be posted to EMMA (emma.msrb.org) under the applicable CUSIP number(s) for the bond issue(s) to which such Continuing Disclosure Reports relate. Manager's President or Chief Financial Officer (or a designee approved by Owner) shall participate on continuing disclosure investor calls related to the Continuing Disclosure Reports.

(iii) All books, records, and reports maintained or prepared by Manager for or in connection with the operation of the Community shall be the Owner or its respective Affiliate's property, provided that Manager may maintain copies of or extracts therefrom for its own business use.

6.5 Annual Audit. Owner's Board shall engage a certified public accountant to annually audit the books, records, and accounting procedures for each Community.

6.6 Quarterly Meetings. Manager and its Executive Directors shall meet with Owner's Board, or a designated Owner Board committee and each Affiliate's Board, or a designated Affiliate Board committee on a quarterly basis (i) to review the financial results of operations and performance of each Community as compared to the applicable Annual Budget and Annual Business Plan, (ii) to review the quality of care delivered to residents at each Community, (iii) to apprise the Owner and the respective Affiliate of the status of each Community, and (iv) to discuss other pertinent Community and industry related issues.

SECTION VII. INSURANCE

7.1 Owner's Insurance. Manager, working with Owner and/or its Affiliate and Owner's or its Affiliate's insurance consultant, shall procure and maintain in Owner's or

11

Affiliate's name and at Owner's or Affiliate's sole cost and expense, as the case may be, during the term of this Agreement with companies authorized to do business in the state where the Community is located the following insurance policies:

(i)    fire and extended coverage (including vandalism and malicious mischief) in an amount adequate to cover the full replacement value of the improvements, fixtures, equipment, and contents in the Community;

(ii)    business interruption or loss of rents coverage in an amount satisfactory to Manager;

(iii)    comprehensive professional and general liability insurance on an occurrence basis or claims made basis with minimum limits of liability in the amount of One Million Dollars ($1,000,000) per occurrence and Three Million Dollars ($3,000,000) in the aggregate for bodily injury, personal injury or death to one or more persons, and One Hundred Thousand Dollars ($100,000) for property damages or such other minimum limits of liability in such amounts as are deemed by mutual agreement of the Owner, the respective Affiliate, and Manager to be appropriate for the risks associated with the Community, together with a contractual liability endorsement covering Owner's and its Affiliate's indemnity obligations contained herein; if insurance is provided on a claims made basis, Owner or Affiliate will be required to provide tail coverage which is acceptable to Manager;

(iv)    employment practices liability insurance;

(v)    worker's compensation and employer liability in the minimum amounts required under the law of the state where the Community is located, covering all of Owner's or its Affiliate's and Manager's employees working in, at and around the Community;

(vi)    comprehensive automobile liability covering all vehicles owned by Owner or its Affiliate; and

(vii)    such other insurance as Manager and Owner or its Affiliate reasonably determine to be necessary or desirable for the protection of the interests of Manager and Owner or its Affiliate or, with respect to Owner's or its Affiliate's insurance, as may be required by any lender.

7.2    <u>Manager's Insurance</u>.  Manager shall procure and maintain during the term of this Agreement at the sole cost and expense of Manager, except for the payment of the premium for workers' compensation insurance for the Executive Director, and any other staff directly employed by Manager, which shall be a reimbursable cost of Manager paid by Owner or its respective Affiliate, the following insurance coverages:

(i)    Comprehensive general liability insurance written on an occurrence basis with minimum limits of liability in the amount of five million dollars ($5,000,000) in the aggregate and two million dollars ($2,000,000) per occurrence;

12

#5507692

*Execution document*

(ii)     Liability insurance sufficient to protect Manager from claims of Manager's employees under workers' compensation and other employee benefit acts; and

(iii)     comprehensive automobile liability insurance covering all vehicles owned by Manager.

7.3     Insurance Policies. All insurance policies required to be carried by a Party under this Section will be carried with companies with an A.M. Best rating of "A", or better, in the name of said Party as named insured, or may be provided on a self-insurance basis. All self-insurance and deductibles shall be subject to the reasonable approval of the other Party. Additional insureds are entitled to thirty (30) days' written notice of cancellation of any insurance policies. Each Party will deliver to the other Party a cancellation of any insurance policy. Proceeds shall be payable to the Party that suffered the loss. Any insurance coverage required to be obtained and maintained by either Party may be provided under the other Party's umbrella policies, so long as the coverage available to each Community is equal to or exceeds the limits set forth in Addendum.

7.4     Additional Insureds. In each such policy of insurance procured and/or maintained pursuant to Sections 7.1 (iii), (iv), (v), and (vii), Manager shall be listed as an additional insured and such policies shall be endorsed to provide that such insurance is primary to any insurance purchased directly by Manager for its own account and is not excess or contributing insurance.

7.5     Inability to Obtain Insurance. In the event the insurance required under Sections 7.1 (iii), (iv), (v), (vi), or (vii) cannot be procured for the account of Owner or Affiliate in such amounts and with such companies as are deemed by mutual agreement of Owner, Affiliate and Manager necessary to cover the risks associated with the Community, either Party may terminate this Agreement upon written notice to the other.


SECTION VIII. INDEMNIFICATION

8.1     Owner's Indemnification of Manager. Owner shall indemnify, defend, and hold harmless Manager and its employees, representatives, officers, and agents (each, a "Manager Party" and collectively, the "Manager Parties") from and against any and all liability, including reasonable attorneys' fees, arising incident to Manager's performance of its duties hereunder, INCLUDING MANAGER'S OR A MANAGER PARTY'S OWN NEGLIGENCE, except for such liability as results from: (i) the gross negligence of a Manager Party, (ii) the willful misconduct or illegal misconduct of a Manager Party, (iii) the breach by Manager of any material obligation hereunder, or (iv) any act of a Manager Party which is beyond the authority granted to Manager under this Agreement or other authorization from Owner. Owner shall also indemnify and hold Manager harmless against any and all losses, costs, or expenses incurred by Manager by reason of, arising out of, or in any way related to noncompliance by the Community with all applicable state, federal, and local laws, ordinances, rules, and regulations relating to the physical condition of the property of any Community; provided, that Manager notified Owner promptly of such noncompliance and that the noncompliance is not the result of the breach by Manager of any material obligation hereunder.

13

*Execution document*

8.2     Manager's Indemnification of Owner.  Manager shall indemnify, defend, and hold harmless Owner and its employees, representatives, officers, and agents from and against any and all liability, including reasonable attorneys' fees, arising incident to Manager's performance of its duties hereunder resulting from: (i) the gross negligence of a Manager Party, (ii) the willful misconduct or illegal misconduct of a Manager Party, (iii) the breach by Manager of any material obligation hereunder, including willful misconduct or gross negligence of Manager in failing to comply with any law or regulation applicable to any Community, or (iv) any act of a Manager Party which is beyond the authority granted to Manager under this Agreement or other authorization from Owner.

## SECTION IX.  CONFIDENTIALITY

9.1     Resident Information.  Manager shall and shall instruct all personnel to comply with state and federal privacy laws with regard to resident and patient information obtained or encountered through work with or access to information of any Community.

9.2     Owner's Information.  Manager shall keep confidential all financial, statistical, personal, personnel information obtained or encountered under this Agreement relating to Owner. However, Manager shall not be required to keep confidential any data that is publicly available, is obtained by Manager from third parties, or is required by law or regulatory or judicial process to be released, provided, however that, in the case of disclosure required by law or regulatory or judicial process, Manager shall, to the extent feasible, provide prior written notice to Owner of the obligation to disclose confidential information and a copy or description of the information Manager intends to disclose and shall allow Owner sufficient opportunity to review the information and submit any objections to the person requesting disclosure of the confidential information.

9.3     Manager Confidential Information.  Owner recognizes and acknowledges that Manager possesses certain confidential and proprietary documents and information that Manager has created ("Manager Confidential Information"), which Manager uses in the course of providing management services for its clients and which Manager may disclose to Owner in the course of performance of this Agreement. Owner shall not use any Manager Confidential Information except as reasonably necessary in connection with the management of the Community. During the term of this Agreement and after termination of this Agreement for any reason, Owner shall keep and shall cause its Affiliate to keep confidential all Manager Confidential Information except as reasonably necessary in connection with the management Community and except as required by law or regulatory or judicial process. This Section 9.3 shall not apply to information that is: (i) generally available to the public other than as a result of a disclosure by Owner or Affiliate, or (ii) available to Owner on a non-confidential basis prior to Owner's receipt of the information from Manager.

## SECTION X.  TERM AND TERMINATION

10.1     Term.  The term of this Agreement shall be for ten (10) years and shall renew for an additional ten (10) years unless a termination notice is provided by either Party at least one hundred and eighty (180) days prior to the end of the initial term. The term for management

14

#5507692

services for any specific Community shall be identified in that Community's Addendum.

10.2  Termination for Cause. This Agreement may be terminated by either Party upon thirty (30) days' written notice to the other Party, should the other Party fail to perform any of its obligations with the terms hereof and fail to cure the same within the notice period, or if the cure cannot be achieved in thirty (30) days, begin to cure the same within such thirty (30) day period and achieve such cure within ninety (90) days of the provision of notice of termination by the other Party. Owner may terminate this Agreement immediately in the event of fraud or intentional misconduct by Manager; provided, Owner provides written notice to Manager setting forth Owner's specific reason(s) for asserting fraud or intentional misconduct and such reason or reasons include (i) systemic bad acts by Manager, as a company, in the performance of its duties under this Agreement; or (ii) intentional bad act(s) by one or more members of Manager's executive leadership team in performing under this Agreement.

10.3  Bankruptcy This Agreement may be terminated by either Party should the other Party or its owner or manager file a petition in bankruptcy, make a general assignment for the benefit of creditors to take advantage of an insolvency act, or should a petition in bankruptcy be filed against the other Party or its owner or manager, which remains undismissed after forty-five (45) days.

10.4  Change in Senior Management. Owner may terminate this Agreement in the event Manager substantially changes its senior management team so that Manager no longer provides service of the quality and content contemplated in Section 4.3 of this Agreement and fails to cure such lack of quality, content and service within one hundred twenty (120) days after written notice thereof from Owner to Manager setting forth Owner's specific reasons for asserting Manager's failure to meet the standard of performance.

10.5  Termination of Addendums. Unless otherwise expressly stated in the notice of termination provided to the other Party, termination of this Agreement in accordance with this Section 10 will also terminate each Addendum entered into between Manager and an Affiliate as of the same date the termination of this Agreement becomes effective.

10.6  Earned Fees. Upon termination of this Agreement, Owner shall promptly, but in no event later than thirty (30) days after termination, pay or take reasonably required action to cause its Affiliate to pay all earned Management Fees, as well as all reimbursable costs and expenses payable to or incurred by Manager hereunder, except any amounts which are reasonably disputed by Owner or Affiliate.

10.7  Cooperation. Upon any termination of this Agreement, for any reason and under any circumstances, Manager shall reasonably cooperate with and assist Owner, its Affiliate, and agents of Owner or its Affiliate in an orderly transition of the management of the Community from Manager to Owner or its Affiliate. As of the date of termination of this Agreement, Manager shall:

(i)  Deliver to Owner or its Affiliate all funds collected and held for the account of Owner or its Affiliate, as the case may be;

15

#5507692

*Execution document*

(ii)     Deliver to Owner or its Affiliate all property and documents, all records, reports, files and similar materials relating to the Community;

(iii)     Assign to Owner, or its Affiliate or its designee, all contracts not otherwise in the name of Owner or its Affiliate (but in the name of Manager) relating to the operation of the Community and assign, to the extent transferable, to Owner, or its Affiliate or its designee, all applicable licenses and permits in the name of Manager necessary to operate the Community;

(iv)     Deliver to Owner or its Affiliate a complete list of all contracts, agreements and obligations pertaining to the Community in Manager's possession;

(v)     Deliver to Owner or its Affiliate copies of all contracts, manuals, and forms used in connection with the operation of the Community; and

(vi)     Turn over to Owner or its Affiliate any and all information and documents related to the Community in the possession of Manager.

Notwithstanding anything in the foregoing to the contrary, Manager shall not be required to deliver to Owner or its Affiliate copies of any of the Manager's Intellectual Property or proprietary manuals or other materials of Manager used by Manager in connection with the provision of management services to owners of senior housing projects generally and Owner or its Affiliate shall not be entitled to retain any of such manuals or materials. However, all manuals and materials developed by Manager specifically for use at the Community shall constitute the Owner's or its Affiliate's property, and Owner or its Affiliate shall be entitled to use those manuals and materials, without restriction.

## SECTION XI. MISCELLANEOUS.

11.1     <u>No Partnership</u>. It is expressly understood and agreed that Manager shall act as an independent contractor in its performance under this Agreement. No provision hereof shall be determined or construed to create a partnership or joint venture between Owner, its Affiliate and Manager with respect to any Community or otherwise. Further, none of the Manager, nor its officers, shareholders (other than Owner), or employees shall be voting members of the Owner's Board, or any Affiliate's Board.

11.2     <u>Binding Effect</u>. This Agreement binds and benefits the Parties and their respective successors and permitted assigns; provided, however, that this Agreement may not be assigned by any Party without the written consent of the other, except to a corporate affiliate, or, in the case of Manager, a related corporation or entity formed, or to be formed, to carry out Manager's duties hereunder, provided such entity has financial resources and qualified personnel equal in all respects to Manager's and assumes in writing Manager's obligations hereunder, and provided further that such entity is controlled by Manager.

11.3     <u>Reserved</u>.

11.4     <u>Severability; Complete Agreement</u>.  In the event any provision of this Agreement

16

#5507692

*Execution document*

shall be held to be invalid, the same shall not affect in any respect whatsoever the validity of the remainder of this Agreement. This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof, and can only be amended by written instrument executed by the Parties.

11.5    Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of Texas, except any conflicts of law principles of Texas that may direct the interpretation or enforcement of this Agreement to the laws of any other jurisdiction. The Parties agree that any legal action relating to or arising out of this Agreement or the transactions contemplated hereby shall be brought in the courts situated in Dallas County, Texas, and that such courts shall be the sole venue such actions, and the Parties waive any defense that Dallas County, Texas is an inconvenient or improper venue.

11.6    Limitation of Liability. Neither Party shall look beyond the corporate assets of the other in satisfaction of any claims against the other.

11.7    Time. Time is of the essence of this Agreement.

11.8    Headings. The headings used in this Agreement are for convenience and will not enlarge or diminish the effect of the provisions of this Agreement.

11.9    Construction. When the context requires, any gender includes any other gender, the singular includes the plural, and the plural includes the singular. When the words "including", "include" or "includes" are used in this Agreement, those should be interpreted in a non-exclusive manner as though the words "without limitation" immediately follow the same. Except as otherwise indicated, all Section and exhibit references in this Agreement will be deemed to refer to the Sections in and exhibits to this Agreement.

11.10    Counterparts. This Agreement and all other copies of it are considered one Agreement. This Agreement may be executed concurrently in one or more counterparts, each of which will be considered an original, but all of which together constitute one instrument.

11.11    Delays or Omissions. No delay or omission by either Party in exercising any right, power, or remedy upon any breach by any other Party shall be construed to be a waiver of or acquiescence in any such breach or any similar or subsequent breach. To be effective, any waiver, permit, consent, or approval of any kind on the part of any Party of any breach of this Agreement, or any waiver of any provisions or conditions of this Agreement, must be in writing. Unless otherwise specified herein, all remedies of a Party for a breach of this Agreement are cumulative.

11.12    Third Party Beneficiaries. Nothing in this Agreement, express or implied, is intended to confer upon any Party, other than the Parties hereto and their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

#5507692

*Execution document*

11.13  Tax-Exempt Bonds Compliance. Manager understands that Owner and/or its Affiliates may finance the Communities with proceeds of bonds, the interest of which is excludable from "gross income" for federal income tax purposes. In such event, this Agreement has to comply with the management contract's safe-harbor guidelines of Rev. Proc. 2017-13, I.R.B. 2017-6, as amended and superseded ("Guidelines"). Owner and Manager represent that compensation provided to Manager under this Agreement for Manager's services is reasonable, and it is consistent with industry standards. Manager agrees that it is not entitled to and will not take any tax position that is inconsistent with being a service provider to Owner and/or its Affiliates with respect to the Communities. In furtherance thereof, Manager agrees not to claim any depreciation or amortization deduction, investment tax credit, or deduction that an owner would otherwise be allowed with respect to the Communities. Owner and/or its Affiliate bear the risk of loss upon damage or destruction of the Community (for example, due to force majeure). Owner and Manager agree to ensure that throughout the Term: (i) no more than 20 percent (20%) of the voting power of the governing body of Owner and/or its Affiliate is vested in the directors, officers, shareholders, partners, members, and employees of Manager, in the aggregate; (ii) the governing body of Owner and/or its Affiliate does not include the chief executive officer (or a person with equivalent management responsibilities) of Manager or the chairperson (or equivalent executive) of Manger's governing body; and (iii) the chief executive officer of Manager is not the chief executive officer of Owner, its Affiliate or any of their related parties (within the meaning of section 1.150-1(b) of the Treasury Regulations). Manager and Owner (on its own behalf and on behalf of its Affiliates) agree to make a good-faith effort to amend this Agreement, to the extent necessary to ensure compliance with the Guidelines.

11.14  Dispute Resolution. In the event of a dispute under this Agreement, the Parties agree as follows. First, to attempt to resolve the dispute by conducting a meeting of the Owner's Chairman of the Board and/or President and CEO, the respective Affiliate's Chairman of the Board, and Manager's chief executive officer within fifteen (15) days' notice of such dispute by either Manager or Owner. If resolution of the dispute is not achieved in such meeting, the Parties may agree to a second meeting or may agree to pursue mediation within thirty (30) days from the date of such meeting, by a mutually selected mediator. If the mediation does not resolve the dispute, the Parties may pursue all rights and remedies available under the law.

11.15.  Waiver of Jury Trial. TO THE FULLEST EXTENT PERMITTED BY LAW, EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION, COUNTERCLAIM OR JUDICIAL PROCEEDING BROUGHT BY ANY PARTY INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR IN CONNECTION WITH THIS AGREEMENT AND ANY ACTS OR OMISSIONS OF ANY PARTY IN CONNECTION HEREWITH.

11.16  Reserved.

11.17  Notices. Any notice required or permitted to be delivered in connection with this Agreement must be in writing and may be given by certified or registered mail, facsimile, hand delivery or by overnight courier and shall be deemed to be received (a) if given by certified or registered mail, three (3) days after deposit in the United States mail, postage prepaid, certified mail, return receipt requested, or (b) if given by facsimile or hand delivery, when such notice is

18

#5507692

*Execution document*

received by the Party to whom it is addressed, or (c) if given by an overnight courier or delivery service, one (1) day after deposit with such courier. Notices shall be sent to Manager or Owner at the address or telecopy number set forth below:

Notices to Manager shall be addressed to:

Seniority, Inc.
15601 Dallas Parkway, Suite 200
Addison, TX 75001
Phone: 469-916-8958
Fax: 214-602-1236
Attention: President

Notices to Owner shall be addressed to:

Senior Quality Lifestyles Corporation
15601 Dallas Parkway, Suite 200
Addison, TX 75001
Phone: 469-916-8958
Fax: 214-602-1236
Attention: President and CEO

With a copy to:

Thompson & Knight LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Phone: 214-969-1508
Fax: 214-880-3191
Attention: David M. Rosenberg

11.18   Limitation of Liability.   It is understood and agreed that, in connection with the duties, obligations and liabilities of Owner arising under this Agreement, Manager hereby recognizes that Owner is a nonprofit charitable corporation and agrees that it will look solely to the corporate assets of Owner in satisfaction of any claims Manager may have against Owner, hereby waiving, relinquishing and releasing any and all claims against all past, present and future officers, directors, employees or agents of Owner and the personal assets of said officers, directors, employees or agents. The Parties shall be liable to each other only for any actual or direct costs, damages, or expenses which are finally judicially determined to have resulted from the willful misconduct, gross negligence, or breach of contract by the Party in performing its services under this Agreement. The Parties' liability to each other shall not include any damages which are special, incidental, direct, consequential, exemplary, or punitive. Manager shall not be liable to Owner for any costs, damages, or expenses which result from acts taken or omissions made by Owner or its agents or representatives prior to the commencement of this Agreement.

19

*Execution document*

11.19 <u>Force Majeure</u>. Neither Party shall be liable or deemed to be in default for any delay or failure in performance under this Agreement or other interruption of services deemed to result from, directly or indirectly, from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, failure of transportation systems, strikes or other work interruptions by either Party's employees, terrorist activity, or any other similar cause beyond the reasonable control of either Party unless such delay or failure in performance is expressly addressed somewhere else in this Agreement.

## SECTION XII. DEFINITIONS

"<u>Actual Monthly Revenues</u>" shall mean the actual monthly amounts received by a Community in Revenues.

"<u>Addendum</u>" means the supplemental agreement to this Master Management Services Agreement for each Community.

"<u>Administrative Fee</u>" has the meaning ascribed to it in Section 3.1(iv).

"<u>Affiliate</u>" means, with regard to Owner, any such entity owning a Community for which Owner is the sole member and for which an addendum has been executed pursuant to this Agreement.

"<u>Agreement</u>" means this Master Management Services Agreement by and between Owner and Manager.

"<u>Annual Budget</u>" means the budget prepared by Manager and approved by the Owner's Board, and the relevant Affiliate's Board relating to each Community. The Annual Budget shall conform to the Fiscal Year.

"<u>Annual Business Plan</u>" means the plan prepared by Manager and approved by the Owner's Board and the relevant Affiliate's Board relating to each Community. The Annual Business Plan shall, at a minimum, address physical, service, operations, and management levels for the upcoming fiscal year based on standards for quality mutually agreed upon by Owner and Manager.

"<u>Assisted Living Units</u>" means those units identified for each Community as the "Assisted Living Units".

"<u>Associate Executive Director</u>" means the Associate Executive Director for any Community, a direct employee of Manager, unless otherwise provided for in the Addendum.

"<u>Board</u>" means the Board of Directors of the Owner or the Board of Directors of an Affiliate, as applicable.

"<u>Class-A</u>" means, for each Community, the premier physical, service, operations, and management levels agreed to by the Manager and Affiliate in the Annual Business Plan and Annual Budget and based on standards for quality mutually agreed upon by Owner and Manager.

#5507692

"Commencement Date" shall have the meaning ascribed to it in the Addendum for any Community.

"Community" or "Communities" means the "Community" owned by Owner directly or through an Affiliate as identified in the Addendum.

"Development Fee" has the meaning ascribed to it in Section 3.2 and as further described in any relevant addendum.

"Director of Operations" means the Director of Operations for any Community, a direct employee of Manager, unless otherwise provided for in the Addendum.

"Executive Director" means the Executive Director for any Community, a direct employee of Manager, unless otherwise provided for in the Addendum.

"Fiscal Year" means the Owner or Affiliate's Fiscal Year: beginning January 1 and ending December 31.

"GAAP" means generally accepted accounting principles.

"Healthcare Administrator" means the Healthcare Administrator for any Community, a direct employee of Manager, unless otherwise provided for in the Addendum.

"Health Care Center" (or "Health Care") means the nursing care beds identified for each Community.

"Independent Living Apartments" (or "Apartments") means those units identified for each Community as the "Independent Living Apartments" or the "Apartments".

"Management Fee" shall mean the compensation due to Manager for its management services for any Community under the term of the relevant Addendum. The Management Fee shall not include any share of net profits of a Community.

"Manager" means Seniority, Inc., a California corporation.

"Manager Parties" has the meaning ascribed to it in Section 7.1.

"Manager's Intellectual Property" shall have the meaning ascribed to it in Section 4.6.

"Memory Care Units" means those units identified for each Community as the "Memory Care Assisted Living Units".

"MSRB" means the Municipal Securities Rulemaking Board, or any successor thereto, established pursuant to Section 15B(b)(1) of the Securities Exchange Act of 1934.

"Owner" means Senior Quality Lifestyles Corporation, a Texas nonprofit corporation.

"Revenues" means, for any period *the sum of* (i) net patient service revenues and resident service revenues *plus* (ii) other operating revenues *plus* (iii) entrance fees (other than initial entrance fees) received *plus* (iv) estimated costs of unreimbursed services provided to benevolent care residents *minus* (A) entrance fees amortized during such fiscal year and (B) entrance fees refunded to residents; *but excluding* (i) any realized or unrealized gain or loss resulting from changes in the valuation of investment securities or realized or unrealized changes in the value of derivative investments, (ii) any gains on the sale or other disposition of fixed or capital assets not in the ordinary course, (iii) earnings resulting from any reappraisal, revaluation or write up of fixed or capital assets, (iv) any revenues recognized from deferred revenues related to entrance fees, and (v) insurance (other than business interruption) and condemnation proceeds. For the sake of clarity, "net patient service revenues and resident service revenues" means gross patient service revenues and gross resident service revenues less (x) contractual adjustments and allowances, (y) allowances for bad debt, and (z) other marketing incentive credits offered to residents which reduce monthly service fees or entrance fees.

*[Signature Page to Follow]*

22

*Execution document*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

MANAGER:

SENIORITY, INC., a California corporation

By: _____
Name: STAN WATERHOUSE
Title: PRESIDENT & CEO

OWNER:

SENIOR QUALITY LIFESTYLES
CORPORATION, a Texas nonprofit corporation

By: _____
Name: Joe Anderson
Title: President and CEO

*[Signature Page to Master Management Services Agreement]*

## ADDENDUM

This Addendum (the "Agreement") is entered into by and between Seniority, Inc., a California corporation (the "Manager"), and Tarrant County Senior Living Center, Inc., a Texas nonprofit corporation (the "Affiliate"), the sole member of which is Senior Quality Lifestyles Corporation, a Texas nonprofit corporation (the "Owner"), and is attached to and made part of that certain Master Management Services Agreement (the "MSA"), dated as of September 7, 2017, by and between Manager and Owner. Each of the Manager and Affiliate is a "Party" and together they may be referred to herein as the "Parties". All capitalized terms not defined herein have the meaning ascribed to such terms in the MSA.

## RECITALS

WHEREAS, Affiliate owns The Stayton at Museum Way, located in Fort Worth, Texas, a life care senior living facility currently comprised of 188 Independent Living Apartments, 42 Assisted Living Units, 20 Memory Care Units, and a Health Care Center comprised of 46 skilled nursing beds (the "Community");

WHEREAS, Manager has expertise in developing, operating, and managing facilities similar to the Community;

WHEREAS, Affiliate desires to participate in the economies of scale, efficiencies, and standardization of programs and services provided under the MSA; and

WHEREAS, Affiliate desires to engage Manager and Manager is willing to accept such engagement to develop, manage, and operate the Community as set forth in this Agreement and under the terms of the MSA.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## AGREEMENT

### SECTION 1.  APPOINTMENT OF MANAGER.

Affiliate hereby appoints Manager as the sole and exclusive manager of the Community and delegates to Manager general day-to-day operational responsibility for the Community. Manager hereby accepts such appointment and assumes such responsibility. The Parties agree to meet quarterly as provided in Section 6.6 of the MSA.

### SECTION 2.  COMPENSATION.

**2.1.    Management Fee.**    Affiliate shall pay to Manager a management fee ("Management Fee") as set forth in Section 3.1(i) and (iii) of the MSA for general management, accounting, human resources, and sales services provided to the Community.

A-1

**2.2.   Administrative Fee.**   Affiliate shall pay to Manager an administrative fee ("Administrative Fee") as set forth in Section 3.1(iv) of the MSA for Manager's administrative expenses.

**2.3.   Reimbursements.**   Affiliate shall reimburse Manager for its reasonable travel and other out-of-pocket expenses incurred in fulfilling its obligations under this Agreement. Reimbursements shall be paid as set forth in Section 3.1(ii) of the MSA and pursuant to the Owner's expense and travel reimbursement policy as referenced therein.

### SECTION 3.   DUTIES OF MANAGER.

**3.1.   Duties.**   Manager shall perform all general day-to-day operational responsibilities for the Community in all respects in accordance with the provisions of the MSA and this Agreement. Ordinary duties of Manager shall involve exclusively operating and managing the Community, with full control and discretion in the operation, direction, management, and supervision of the Community, subject only to the limitations described in this Agreement and the MSA, Manager is expressly authorized to do the following in accordance with the approved Annual Business Plan and Annual Budget for the Community, which Manager shall prepare and provide as required in the MSA, and subject the management and operational standards and limitations provided in the MSA and this Agreement:

(i)   determine operating policies, procedures, and standards (subject to the Class-A requirement described in the MSA);

(ii)   develop and execute a sales plan;

(iii)   establish food and beverage policies;

(iv)   establish all employment policies, including wage and salary terms, benefits, retirement plans, and bonuses;

(v)   hire, promote, supervise, direct, train, transfer, and discharge all Community employees;

(vi)   negotiate and consummate such agreements as Manager may deem necessary or advisable for furnishing all utilities, services, supplies, food, beverages, equipment, and other materials and supplies for the maintenance and operation of the Community, subject to the terms of Section 4.7, Section 4.8 and Section 4.9 of the MSA;

(vii)   establish advertising and public relations policies;

(viii)   obtain and maintain in Affiliate's name all licenses, permits, and accreditations and surety or fidelity bond requirements required in connection with management and operation of the Community;

(ix)   establish such bank accounts as are required for the operation and maintenance of the Community according to GAAP;

A-2

(x)     develop an Annual Business Plan and an Annual Budget for Affiliate's approval in accordance with the terms and conditions of the MSA, including Sections 6.2 and 6.3 therein, specifically including provisions for (a) capital improvements; (b) furniture, fixtures, and equipment; (c) employee compensation and taxes; (d) Community operating costs and administrative expenses; (e) taxes, insurance, bonds, and other expenses; (f) revenues; and (g) Manager's recommendations for fees, rates, and other costs and charges to residents;

(xi)     provide all reports and data required under Section 6.4 of the MSA; and

(xii)     manage and oversee Affiliate's investment portfolio through an investment advisor selected by Owner and Affiliate.

Manager and Affiliate agree that, to the extent not modified by this Agreement, Section 4 of the MSA is hereby incorporated into this Agreement such as the duties of Manager specified in Section 4 are owed directly to Affiliate and shall be performed by Manager subject to the limitations and conditions specified therein

**3.2.     Intellectual Property**. Manager shall supply management and supervision of operational services for the Community through Manager's recommended manuals, forms, financial assessment tools, and systems (the "Manager's Intellectual Property"). Affiliate agrees (i) to use the manuals, forms, and systems provided by Manager for the benefit of operating the Community and (ii) to not disclose or otherwise reproduce, disseminate, or allow the reproduction of these documents to any third party.

**3.3.     Manager's Employees.** Manager shall provide, for the Community, a qualified Executive Director, at Affiliate's expense, who shall be an employee of Manager. The Executive Director of the Community shall assume the responsibility for the daily operations of the Community and shall be responsible for all recruiting, hiring, firing, and training, at Affiliate's expense and as Affiliate's employees, all other personnel necessary to maintain and operate the Community. Prior to appointing or hiring the Executive Director, Manager shall present its recommendation for an Executive Director to Affiliate, introduce its recommended Executive Director to Affiliate, and obtain Affiliate's approval of the Executive Director, as well as obtain Affiliate's approval for the   compensation, including salary, bonuses and benefits, of the Executive Director as provided for in the MSA.    Manager shall evaluate the Executive Director on an annual basis and present the written evaluation to Owner and Affiliate.

**3.4.     Supervision of Employees**. Manager shall, through the Executive Director, supply supervision of operational services for the Community delivered through Affiliate's employees.

**3.5.     Accounting**. Manager shall provide appropriate accounting systems, payroll processes, record keeping, and software, pursuant to Section 4.12 of the MSA. Manager shall provide monthly financial statements pursuant to Section 6.1 of the MSA.

**3.6.     Revenues**. Manager shall collect revenues for the Community as provided for in Sections 4.13 and 4.14 of the MSA. Sums due to Manager which were not included in the

A-3

approved Annual Budget shall be paid directly by Affiliate, unless otherwise agreed to in writing by the Parties.

**3.7.** **Taxes and Other Expenses.** At expense of Affiliate, Manager shall pay all taxes and other expenses, and not take any position that is inconsistent with its role as a service provider, as described in Section 4.15 of the MSA and the approved Annual Budget.

**3.8.** **Fidelity Bonds.** At Manager's expense, the Executive Director, and all other employees of Manager who handle or are responsible for Affiliate's funds, shall be bonded by a fidelity bonds in an amount not less than five hundred thousand dollars ($500,000.00). Manager shall procure, out of Affiliate's funds, a similar fidelity bond for employees of Affiliate who handle or are responsible for Affiliate's funds.

**3.10.** **Insurance.** Manager agrees to provide insurance as required under Section 7.2 of the MSA, under the terms and conditions outlined in Section 7.

## SECTION 4. DUTIES OF AFFILIATE.

**4.1.** **Operating Costs.** Affiliate shall maintain a level of rates and charges sufficient to assure the operation of the Community in a Class-A, premium senior living facility manner (taking into account the approved Annual Business Plan, approved Annual Budget, and the market area in which the Community is located) and to provide for the payment of all costs of operation of the Community, including Management Fees and other Manager-related fees as generally described in Section 5.1 of the MSA. Pursuant to the terms of Section 5.1 of the MSA and in the event actual or projected disbursements are ever in excess of the revenues collected for any Community, Affiliate shall pay the excess promptly, and in no event after the tenth (10th) business day after receipt of written notification of a deficit or shortfall by Manager. Manager shall strive to notify Affiliate in advance that such a request for funds will be required. Manager shall have no obligation to expend its own funds to cover operating shortfalls of a Community.

**4.2.** **Employees.** Except for the Executive Director, all persons employed in the operation of the Community shall be employees of Affiliate, and shall not be deemed or construed to be employees of Manager.

**4.3.** **Insurance.** Unless otherwise provided by Owner, Affiliate agrees to provide all insurance required under Section 7.1 of the MSA under the terms and conditions outlined in Section 7.

## SECTION 5. INDEMNIFICATION.

**5.1.** **Affiliate's Indemnification of Manager.** Affiliate shall indemnify, defend, and hold harmless Manager and its employees, representatives, officers, and agents, (each, a "Manager Party" and collectively, the "Manager Parties") from and against any and all liability, up to the total value of the Management and Administrative Fees (a) paid through the date of the indemnification claim and (b) payable for the remaining number of months in term of this Agreement following the date of the indemnification claim, assuming the monthly fees for the remaining months in the term are equal to the average of the monthly Management and

A-4

Administrative Fees paid for the six months prior to the month in which the indemnification claim is made, including reasonable attorneys' fees, arising incident to Manager's performance of its duties hereunder, INCLUDING MANAGER OR MANAGER PARTY'S OWN NEGLIGENCE, except for such liability as results from: (i) the gross negligence of a Manager Party, (ii) the willful misconduct or illegal misconduct of a Manager Party, (iii) the breach by Manager of any material obligation hereunder, or (iv) any act of a Manager Party which is beyond the authority granted to Manager under this Agreement or other authorization from Affiliate. Affiliate shall also indemnify and hold Manager harmless against any and all losses, costs, or expenses incurred by Manager by reason of, arising out of, or in any way related to noncompliance by the Community with all applicable state, federal, and local laws, ordinances, rules, and regulations relating to the physical condition of the property of the Community; provided, Manager notified Affiliate promptly of such noncompliance and that the noncompliance is not the result of the breach by Manager of any material obligation hereunder.

**5.2.** **Manager's Indemnification of Affiliate**. Manager shall indemnify, defend, and hold harmless Affiliate and its employees, representatives, officers, and agents, from and against any and all liability, up to the total value of the Management and Administrative Fees (a) paid through the date of the indemnification claim and (b) payable for the remaining number of months in term of this Agreement following the date of the indemnification claim, assuming the monthly fees for the remaining months in the term are equal to the average of the monthly Management and Administrative Fees paid for the six months prior to the month in which the indemnification claim is made, including reasonable attorneys' fees, arising incident to Manager's performance of its duties hereunder resulting from: (i) the gross negligence of a Manager Party, (ii) the willful misconduct or illegal misconduct of a Manager Party, (iii) the breach by Manager of any material obligation hereunder, including willful misconduct or gross negligence of Manager in failing to comply with any law or regulation applicable to any Community, or (iv) any act of a Manager Party which is beyond the authority granted to Manager under this Agreement or other authorization from Affiliate. With regard to insurance coverage required of Manager in Section 7.1 of the MSA, Affiliate shall be listed as an additional insured and such policies shall be endorsed to provide that such insurance is primary to any insurance purchased directly by Affiliate for its own account and Manager's indemnification obligations hereunder, and is not excess or contributing insurance.

## SECTION 6. CONFIDENTIALITY.

**6.1.** **Affiliate's Information**. Manager shall keep confidential all financial, statistical, personal, personnel information obtained or encountered under this Agreement relating to Affiliate. However, Manager shall not be required to keep confidential any data that is publicly available, or is obtained by Manager from third parties, or is required by law or contract to be released; provided, however that, in the case of disclosure required by law or regulatory or judicial process, Manager shall, to the extent feasible, provide prior written notice to Affiliate of the obligation to disclose confidential information and a copy of or description of the information Manager intends to disclose and shall allow Affiliate sufficient opportunity to review the information and submit any objections to the person requesting disclosure of the confidential information.

A-5

**6.2.** **Manager Confidential Information**. Affiliate recognizes and acknowledges that Manager possesses certain confidential and proprietary documents and information that Manager has created ("Manager Confidential Information"), which Manager uses in the course of providing management services for its clients and which Manager may disclose to Affiliate in the course of performance of this Agreement. Affiliate shall not use any Manager Confidential Information except as reasonably necessary in connection with the management of the Community. During the term of this Agreement and after termination of this Agreement for any reason, Affiliate shall keep confidential all Manager Confidential Information except as reasonably necessary in connection with the management of the Community and except as required by law or regulatory or judicial process. This Section 6.2 shall not apply to information that is: (i) generally available to the public other than as a result of a disclosure by Affiliate, or (ii) available to Affiliate on a non-confidential basis prior to Affiliate's receipt of the information from Manager.

## SECTION 7. TERM AND TERMINATION.

**7.1.** **Term**. The term of this Agreement shall be for ten (10) years and shall renew for an additional ten (10) years unless a termination notice is provided by either Party one hundred and eighty (180) days prior to the end of the initial term. The Parties agree that the term of this Agreement, including all renewal options, shall not exceed the lesser of thirty (30) years or eighty percent (80%) of the weighted average economic life of the Community, as determined under Section 147(b) of the Internal Revenue Code as of the beginning of this Agreement.

**7.2.** **Termination for Cause**. This Agreement may be terminated by either Party upon thirty (30) days' written notice to the other Party, should the other Party fail to perform any of its obligations with the terms hereof and fail to cure the same within the notice period, or if the cure cannot be achieved in thirty (30) days, begin to cure the same within such thirty (30) day period and achieve such cure within ninety (90) days of the provision of notice of termination by the other Party. Notwithstanding the forgoing, Affiliate may terminate this Agreement immediately in the event of fraud or intentional misconduct by Manager, provided Affiliate provides written notice to Manager setting forth Affiliate's specific reason(s) for asserting fraud or intentional misconduct and such reason or reasons include (i) systemic bad acts by Manager, as a company, in performance of its duties under this Agreement or (ii) intentional bad act(s) by one or more members of Manager's executive leadership team in performing under this Agreement.

**7.3.** **Bankruptcy**. This Agreement may be terminated by either Party should the other Party or its owner or manager file a petition in bankruptcy, make a general assignment for the benefit of creditors to take advantage of an insolvency act, or should a petition in bankruptcy be filed against the other Party or its owner or manager, which remains undismissed after forty-five (45) days.

**7.4.** **Change in Senior Management**. Affiliate may terminate this Agreement in the event Manager substantially changes its senior management team so that Manager no longer provides service of the quality and content contemplated in Section 4.3 of the MSA and fails to cure such lack of quality, content, and service within one hundred twenty (120) days after written

A-6

notice thereof from Affiliate to Manager setting forth Affiliate's specific reasons for asserting Manager's failure to meet the standard of performance.

**7.5.** **Change in Control of Community**. This Agreement may be terminated by Affiliate in the event (each a "Change in Control Event") of (i) a sale of the Community to an unrelated third party or (ii) an affiliation of Affiliate with an unrelated third party that results in a change in control of the governing body of the Affiliate to persons selected by the unrelated third party or a change in membership of the Affiliate such that an unrelated third party maintains a majority membership interest in Affiliate, or (iii) any other transaction in which effective control of the Community or the Affiliate is transferred to an unrelated third party. Affiliate must provide at least ninety (90) days' written notice to Manager of termination due to a Change in Control Event. Affiliate may provide termination notice to Manager in advance of the occurrence of a Change in Control Event and at any time after Affiliate enters into a letter of intent, purchase agreement, affiliation agreement, or other agreement outlining the terms of the Change in Control Event and prior to the closing of the Change in Control Event, provided termination may not occur until ninety (90) days after such closing. In the event of termination due to a Change in Control Event, Manager shall be paid for the unexpired term of this Agreement and compensated for the added value Manager established for the Community as follows: an amount equal to the average monthly fees, to include the Management Fees and Administrative Fees, and any Development Fees or Ancillary Fees, due to Manager under Section 2 of this Agreement for the six (6) months preceding the month the Change in Control Event notice occurs times the lesser of (i) twenty-four (24) months or (ii) the number of months remaining in the term.

**7.6.** **Earned Fees**. Upon termination of this Agreement, Affiliate shall promptly, but in no event later than thirty (30) days after termination, pay all earned Management Fees, as well as all reimbursable costs and expenses payable to or incurred by Manager hereunder along with any other payments due to Manager, except any amounts which are reasonably disputed by Affiliate.

**7.7.** **Cooperation**. Upon any termination of this Agreement, for any reason and under any circumstances, Manager shall reasonably cooperate with and assist Affiliate in an orderly transition of the management of the Community from Manager to Affiliate or its agent. As of the date of termination of this Agreement, Manager shall:

(i) Deliver to Affiliate all funds collected and held for the account of Affiliate;

(ii) Deliver to Affiliate all property and documents, all records, reports, files, and similar materials relating to the Community;

(iii) Assign to Affiliate, or its designee, all contracts not otherwise in the name of Affiliate (but in the name of Manager) relating to the operation of the Community and assign, to the extent transferable, to Affiliate or Owner or its designee, all applicable licenses and permits in the name of Manager necessary to operate the Community;

A-7

      (iv)    Deliver to Affiliate a complete list of all contracts, agreements and obligations pertaining to the Community in Manager's possession;

      (v)    Deliver to Affiliate copies of all contracts, manuals, and forms used in connection with the operation of the Community; and

      (vi)    Turn over to Affiliate any and all information and documents related to the Community in the possession of Manager.

Notwithstanding anything in the foregoing to the contrary, Manager shall not be required to deliver to Affiliate or Owner copies of any of the Manager's Intellectual Property or proprietary manuals or other materials of Manager used by Manager in connection with the provision of management services to owners of senior housing projects generally, and Affiliate shall not be entitled to retain any of such manuals or materials. However, all manuals and materials developed by Manager specifically for use at the Community shall constitute Affiliate's property, and Affiliate shall be entitled to use those manuals and materials, without restriction.

## SECTION 8.  MISCELLANEOUS.

**8.1.**  **No Partnership**. It is expressly understood and agreed that Manager shall act as an independent contractor in its performance under this Agreement. No provision hereof shall be determined or construed to create a partnership or joint venture between Affiliate and Manager with respect to the Community. Further, none of the Manager, nor its officers, shareholders (other than Owner or Owner's directors), partners, members, or employees shall be voting members of the Affiliate's Board.

**8.2.**  **Binding Effect**. This Agreement binds and benefits the Parties and their respective successors and assigns; provided, however, that this Agreement may not be assigned by any Party without the written consent of the other, except to a corporate affiliate, or, in the case of Manager, a related corporation or entity formed, or to be formed, by Manager to carry out Manager's duties hereunder, provided such entity has financial resources and qualified personnel equal in all respects to Manager's and assumes in writing Manager's obligations hereunder, and provided further that such entity is controlled by Manager.

**8.3.**  **Tax-Exempt Bonds Compliance**. Manager understands that Affiliate may finance the Community with proceeds of bonds, the interest of which is excludable from "gross income" for federal income tax purposes. In such event, this Agreement has to comply with the management contract's safe-harbor guidelines of Rev. Proc. 2017-13, I.R.B. 2017-6, as amended and superseded ("Guidelines"). Affiliate and Manager represent that compensation provided to Manager under this Agreement for Manager's services is reasonable, and it is consistent with industry standards. Manager agrees that it is not entitled to and will not take any tax position that is inconsistent with being a service provider to Affiliate with respect to the Community. In furtherance thereof, Manager agrees not to claim any depreciation or amortization deduction, investment tax credit, or deduction that an owner would otherwise be allowed with respect to the Community. Affiliate will continue to bear the risk of loss upon damage or destruction of the Community (for example, due to force majeure). Affiliate and Manager agree to ensure that throughout the Term: (i) no more than 20 percent (20%) of the voting power of the governing

A-8

body of Affiliate is vested in the directors, officers, shareholders, partners, members, and employees of Manager, in the aggregate; (ii) the governing body of Affiliate does not include the chief executive officer (or a person with equivalent management responsibilities) of Manager or the chairperson (or equivalent executive) of Manager's governing body; and (iii) the chief executive officer of Manager is not the chief executive officer of Affiliate or any of Affiliate's related parties (within the meaning of section 1.150-1(b) of the Treasury Regulations). Manager and Affiliate agree to make a good-faith effort to amend this Agreement, to the extent necessary to ensure compliance with the Guidelines.

**8.4.** **Severability; Complete Agreement; Control.** In the event any provision of this Agreement shall be held to be invalid, the same shall not affect in any respect whatsoever the validity of the remainder of this Agreement. This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof, and can only be amended by written instrument executed by the Parties. In the event of a conflict between the provisions of this Agreement and the MSA, the provisions of this Agreement shall control with respect to the management of the Community.

**8.5.** **Governing Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of Texas, except any conflicts of law principles of Texas that may direct the interpretation or enforcement of this Agreement to the laws of any other jurisdiction. The Parties agree that any legal action relating to or arising out of this Agreement or the transactions contemplated hereby shall be brought in the courts situated in Dallas County, Texas, and that such courts shall be the sole venue such actions, and the Parties waive any defense that Dallas County, Texas is an inconvenient or improper, venue.

**8.6.** **Limitation of Liability.** Neither Party shall look beyond the corporate assets of the other in satisfaction of any claims against the other.

**8.7.** **Time.** Time is of the essence for this Agreement.

**8.8.** **Headings.** The headings used in this Agreement are for convenience and will not enlarge or diminish the effect of the provisions of this Agreement.

**8.9.** **Construction.** When the context requires, any gender includes any other gender, the singular includes the plural, and the plural includes the singular. When the words "including", "include" or "includes" are used in this Agreement, those should be interpreted in a non-exclusive manner as though the words "without limitation" immediately follow the same. Except as otherwise indicated, all Section and exhibit references in this Agreement will be deemed to refer to the Sections in and exhibits to this Agreement.

**8.10.** **Counterparts.** This Agreement and all other copies of it are considered one Agreement. This Agreement may be executed concurrently in one or more counterparts, each of which will be considered an original, but all of which together constitute one instrument.

**8.11.** **Delays or Omissions.** No delay or omission by either Party in exercising any right, power, or remedy upon any breach by any other Party shall be construed to be a waiver of or acquiescence in any such breach or any similar or subsequent breach. To be

A-9

effective, any waiver, permit, consent, or approval of any kind on the part of any Party of any breach of this Agreement, or any waiver of any provisions or conditions of this Agreement, must be in writing. Unless otherwise specified herein, all remedies of a Party for a breach of this Agreement are cumulative.

**8.12. Third Party Beneficiaries.** Nothing in this Agreement, express or implied, is intended to confer upon any Party, other than the Parties hereto and their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

**8.13. Waiver of Jury Trial.** TO THE FULLEST EXTENT PERMITTED BY LAW, EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION, COUNTERCLAIM OR JUDICIAL PROCEEDING BROUGHT BY ANY PARTY INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR IN CONNECTION WITH THIS AGREEMENT AND ANY ACTS OR OMISSIONS OF ANY PARTY IN CONNECTION HEREWITH.

**8.14. Dispute Resolution.** In the event of a dispute under this Agreement, the Parties agree as follows. First, to attempt to resolve the dispute by conducting a meeting of Affiliate's Chairman of the Board or President (if any), Owner's Chairman of the Board and/or President and CEO, and Manager's chief executive officer within fifteen (15) days' notice of such dispute by either Manager or Affiliate. If resolution of the dispute is not achieved in such meeting, the Parties may agree to a second meeting or may agree to pursue mediation within thirty (30) days from the date of such meeting, by a mutually selected mediator. If the mediation does not resolve the dispute, the Parties may pursue all rights and remedies available under the law.

**8.15. Notices.** Any notice required or permitted to be delivered in connection with this Agreement must be in writing and may be given by certified or registered mail, facsimile, hand delivery or by overnight courier and shall be deemed to be received (a) if given by certified or registered mail, three (3) days after deposit in the United States mail, postage prepaid, certified mail, return receipt requested, or (b) if given by facsimile or hand delivery, when such notice is received by the party to whom it is addressed, or (c) if given by an overnight courier or delivery service, one (1) day after deposit with such courier. Notices shall be sent to Manager or Affiliate at the address or telecopy number set forth below:

Notices to Manager shall be addressed to:

Seniority, Inc.
15601 Dallas Parkway, Suite 200
Addison, TX 75001
Phone: 469-916-8958
Fax: 214-602-1236

#5581139

Notices to Affiliate shall be addressed to:

Tarrant County Senior Living Center, Inc.
15601 Dallas Parkway, Suite 200
Addison, TX 75001
Phone: 469-916-8958
Fax: 214-602-1236
Attention: Chairman

With a copy to:

Thompson & Knight LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Phone: 214-969-1508
Fax: 214-880-3191
Attention: David M. Rosenberg

**8.16.** **Limitation of Liability**. It is understood and agreed that, in connection with the duties, obligations and liabilities of Affiliate arising under this Agreement, Manager hereby recognizes that Affiliate is a nonprofit charitable corporation and agrees that it will look solely to the corporate assets of Affiliate in satisfaction of any claims Manager may have against Affiliate, hereby waiving, relinquishing and releasing any and all claims against all past, present, and future officers, directors, employees or agents of Affiliate and the personal assets of said officers, directors, employees, or agents. The Parties shall be liable to each other only for any actual or direct costs, damages, or expenses which are finally judicially determined to have resulted from the willful misconduct, gross negligence, or breach of contract by the Party in performing its services under this Agreement. The Parties' liability to each other shall not include any damages which are special, incidental, direct, consequential, exemplary, or punitive. Manager shall not be liable to Affiliate for any costs, damages, or expenses which result from acts taken or omissions made by Affiliate or its agents or representatives prior to the commencement of this Agreement.

**8.17.** **Force Majeure**. Neither Party shall be liable or deemed to be in default for any delay or failure in performance under this Agreement or other interruption of services deemed to result from, directly or indirectly, from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, failure of transportation systems, strikes or other work interruptions by either Party's employees, terrorist activity, or any other similar cause beyond the reasonable control of either Party unless such delay or failure in performance is expressly addressed somewhere else in this Agreement.

*[Signature Page to Follow]*

A-11

#5581139

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

MANAGER:

SENIORITY, INC., a California corporation

By: _____
Name: _____
Title: _____

AFFILIATE:

TARRANT COUNTY SENIOR LIVING
CENTER, INC., a Texas nonprofit corporation

By: _____
Name: _____JOSEPH E ANDERSON_____
Title: _____PRESIDENT & CEO_____

**Schedule 3 - Liquidity Support Agreement**

LIQUIDITY SUPPORT AGREEMENT

among

LIFESPACE COMMUNITIES, INC.

TARRANT COUNTY SENIOR LIVING CENTER INC.,
As the Initial Obligated Group Member

and

UMB BANK, NATIONAL ASSOCIATION,
as Master Trustee

Dated as of _____, 2019

# TABLE OF CONTENTS

Page

ARTICLE I          DEFINITIONS ................................................................................................2

ARTICLE II         REPRESENTATIONS AND WARRANTIES OF THE LIQUIDITY
                   PROVIDER...........................................................................................2

    Section 2.1.          Representations and Warranties of the Liquidity Provider.....................2
    Section 2.2.          Representations and Warranties of the Borrower ...................................3

ARTICLE III        DEBT SERVICE SUPPORT ...............................................................3

    Section 3.1.          Funded Liquidity Support ..........................................................3
    Section 3.2.          Unfunded Liquidity Support ......................................................4
    Section 3.3.          Entry into the Obligated Group...................................................5
    Section 3.4.          Moneys to be Held in Trust........................................................5
    Section 3.5.          Investment of Moneys...............................................................6
    Section 3.6.          Security Interest in Liquidity Support Account ...........................6

ARTICLE IV         OTHER COVENANTS AND AGREEMENTS.......................................6

    Section 4.1.          Obligations Absolute and Unconditional .....................................6
    Section 4.2.          No Setoff, Counterclaim or Defense............................................7
    Section 4.3.          Waiver of Notice; Payment of Charges .......................................7
    Section 4.4.          Amendments and Waivers .........................................................8

ARTICLE V          TERM AND TERMINATION ............................................................8

ARTICLE VI         MISCELLANEOUS ...........................................................................9

    Section 6.1.          Delay or Omission Not a Waiver ................................................9
    Section 6.2.          Entire Agreement; Execution in Counterparts .............................9
    Section 6.3.          Governing Law........................................................................9
    Section 6.4.          Parties Interested Herein; Successors and Assigns .......................9
    Section 6.5.          Notices...................................................................................9
    Section 6.6.          Assignment............................................................................11

## LIQUIDITY SUPPORT AGREEMENT

THIS AGREEMENT dated as of ____, 2019 (this "Agreement"), is among **TARRANT COUNTY SENIOR LIVING CENTER INC.**, a Texas nonprofit corporation, as the obligor and the initial Obligated Group Member (the "Borrower"), **LIFESPACE COMMUNITIES, INC.**, an Iowa nonprofit corporation, (the "Liquidity Provider"); and **UMB BANK, NATIONAL ASSOCIATION**, a national banking association duly organized and existing under the laws of the United States of America, as Master Trustee, as defined below.

### BACKGROUND

A.      UMB Bank, National Association, currently serves as (i) successor trustee (the "Series 2009 Bond Trustee") under the Indenture of Trust dated as of October 1, 2009 (the "Series 2009 Bond Indenture") between Tarrant County Cultural Education Facilities Finance Corporation (the "Issuer") and The Bank of New York Mellon Trust Company, National Association, as the prior trustee and (ii) successor master trustee (the "Master Trustee") under the Master Trust Indenture, Deed of Trust and Security Agreement dated as of October 1, 2009 (as amended and supplemented, including by the supplement dated as of _____, 2019, the "Master Indenture") between the Borrower and The Bank of New York Mellon Trust Company, N. A., as prior master trustee.

B.      The Series 2009 Bond Trustee and the Master Trustee have entered into a Plan Support Agreement ("PSA") with the Borrower, the Liquidity Provider, the Master Trustee, the Series 2009 Bond Trustee, and the Steering Committee Members named therein (the "Directing Holders"), obligating the Series 2009 Bond Trustee, the Master Trustee and the Directing Holders, as the holders of at least ___% of the bonds issued and outstanding under the Series 2009 Bond Indenture (the "Series 2009 Bonds"), to support a pre-negotiated plan of reorganization (the "Plan of Reorganization") to be filed in a proceeding (the "Anticipated Bankruptcy Proceeding") under Chapter 11 of Title 11 of the United State Code (the "Bankruptcy Code").

C.      On the date of execution and delivery of this Agreement (the "LSA Delivery Date") the Liquidity Provider has been substituted for Senior Quality Lifestyles Corporation ("SQLC") as the sole member of the Borrower (the "Membership Substitution") and the Master Trustee, the Series 2009 Bond Trustee, and the Borrower have executed a Second Forbearance Agreement (the "Second Forbearance Agreement").

D.      The PSA contemplates that the Borrower shall restructure and exchange (the "Bond Exchange") the Series 2009 Bonds for new bonds to be issued by the Issuer and designated "Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2019" (all bonds from time to time outstanding under the terms of the Series 2019 Bond Indenture (as defined below) being hereinafter referred to as the "Series 2019 Bonds").

E.      The Series 2019 Bonds will be issued under an Indenture of Trust (the "Series 2019 Bond Indenture") between the Issuer and UMB Bank, National Association, as bond trustee (the "Series 2019 Bond Trustee"), and the proceeds thereof will be loaned to the Borrower pursuant to

the terms of a Loan Agreement between the Issuer and the Borrower (the "Series 2019 Loan Agreement").

F. The Series 2019 Bonds will be limited obligations of the Issuer and will be secured in part by the Series 2019 Note (the "Series 2019 Note") issued by the Borrower pursuant to the Amended and Restated Master Trust Indenture, Deed of Trust and Security Agreement (the "Amended Master Indenture") between the Borrower and the Master Trustee, as supplemented by the [Series 2019 Supplemental Indenture] between the Borrower and the Master Trustee, each substantially in the form included in the PSA.

G. The Liquidity Provider has agreed to provide the following liquidity support: (i) on the LSA Delivery Date, the Liquidity Provider shall make a deposit of $3,000,000 to be held by the Master Trustee, which amount shall be deposited in a newly-created account known as the Liquidity Support Account; and (ii) on the effective date of the Plan of Reorganization (the "Effective Date"), the Liquidity Provider shall provide additional liquidity support in the form of an unfunded commitment in an amount of up to $3,000,000, supported by the full faith and credit of the Liquidity Provider, which amount may be drawn upon in accordance with the terms hereof and of the Amended Master Indenture.

In consideration of the premises and in order to enhance the marketability of the Series 2019 Bonds, the Liquidity Provider, Borrower and the Master Trustee do hereby covenant and agree as follows:

## ARTICLE I

## DEFINITIONS

Capitalized terms not defined in this Agreement have the meanings set forth in the Master Indenture or Amended Master Indenture, as applicable. All accounting terms not otherwise defined in the form of Amended Master Indenture or herein have the meanings assigned to them in accordance with generally accepted accounting principles in the United States consistently applied unless the context indicates otherwise.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF THE LIQUIDITY PROVIDER

*Section 2.1.* Representations and Warranties of the Liquidity Provider. The Liquidity Provider represents and warrants that it is a nonprofit corporation, organized under the laws of the state of Iowa, and in good standing under the laws of Iowa, is not in material violation of any provision of its organizational documents by executing and delivering this Agreement, has the power to enter into this Agreement, has duly authorized the execution and delivery of this Agreement by proper corporate action and neither this Agreement nor the agreements herein contained contravene or constitute a default under any material agreement, instrument or indenture to which it is a party or by which it or its property is bound (except for any such breaches for which Borrower has obtained a waiver or a required consent) or any provision of its organizational documents or a violation of any other material requirement of law.

*Section 2.2.* Representations and Warranties of the Borrower. The Borrower represents and warrants that it is a not-for-profit corporation duly incorporated, validly existing and in good standing under the laws of the State of Texas, is not in material violation of any provision of its organizational documents by executing and delivering this Agreement, has the power to enter into this Agreement, has duly authorized the execution and delivery of this Agreement by proper corporate action and neither this Agreement nor the agreements herein contained contravene or constitute a default under any material agreement, instrument or indenture to which it is a party or by which it or its property is bound (except for any such breaches for which Borrower has obtained a waiver or a required consent) or any provision of its organizational documents or a violation of any other material requirement of law.

## ARTICLE III

## LIQUDITY SUPPORT

*Section 3.1.* Funded Liquidity Support.

(a) On the LSA Delivery Date, the Liquidity Provider has deposited $3,000,000 with the Master Trustee to be deposited in the Liquidity Support Account established under Section 3.03 of the Master Indenture, as amended on the date hereof.

(b) The Master Trustee may, upon request of the Series 2019 Bond Trustee in the form attached as **Exhibit A** (a "Series 2019 Bond Trustee Funded LSA Request"), withdraw moneys from the Liquidity Support Account to the extent necessary to pay debt service related to the Series 2019 Bonds, upon certification by the Series 2019 Bond Trustee to the Master Trustee that no other funds (other than funds in the Reserve Fund established under the Series 2019 Bond Indenture) are available to the Series 2019 Bond Trustee for such purpose.

(c) Following an Event of Default under the Series 2009 Bond Indenture and the termination of (i) the PSA other than as a result of a PSA Breach (as defined in subsection (g) below) or (ii) the Second Forbearance Agreement, other than as a result of a breach by the Bond Trustee or the Master Trustee at the direction of the Directing Holders, the Master Trustee may, upon request of the Series 2009 Bond Trustee in the form attached as **Exhibit B** (a "Series 2009 Bond Trustee Funded LSA Request"), withdraw moneys from the Liquidity Support Account to the extent necessary to pay debt service related to the Series 2009 Bonds, upon, and only upon, (i) certification by the Series 2009 Bond Trustee to the Master Trustee that no other funds (other than funds in the Reserve Fund established under the Series 2009 Bond Indenture) are available to the Series 2009 Bond Trustee for such purpose, and (ii) determination by the Master Trustee that the PSA has terminated solely as a result of a PSA Breach.

(d) The Borrower may request draws from the Liquidity Support Account by delivering to the Master Trustee a written request in the form attached as **Exhibit C** (a "Borrower Funded LSA Request") solely for payment of operating expenses of the Borrower or payment of debt service on the Series 2019 Bonds, which Borrower Funded LSA Request shall specify the proposed use of such funds, and shall certify that the

Borrower shall use the requested disbursement solely for such purposes no later than ten (10) days following receipt of funds. Any draws for operating expenses pursuant to a Borrower Funded LSA Request shall be deposited by the Borrower into its Operating Account held at _____. Any draws for debt service pursuant to a Borrower Funded LSA Request shall be transferred by the Master Trustee to the Series 2019 Bond Trustee for deposit to the Bond Fund established under the Series 2019 Bond Indenture. Without limiting subsection (e) above, the Borrower is not, in any circumstance, permitted or obligated to draw on the Liquidity Support Account to fund debt service on the Series 2009 Bonds.

(e)     On the Effective Date, the Liquidity Provider shall provide an amount to the Master Trustee sufficient to bring the funds in the Liquidity Support Account to $3,000,000, which amount shall be promptly deposited by the Master Trustee into the Liquidity Support Account. Any amounts deposited in the Liquidity Support Account pursuant to this Section 3.1(e) shall reduce the Unfunded Liquidity Support obligation of the Liquidity Provider by a corresponding dollar amount.

(f)     From and after the Effective Date, the Master Trustee shall not expend or disburse amounts in the Liquidity Support Account at any time that funds remain available under the Unfunded Liquidity Support, unless, in the case of the Unfunded Liquidity Support, the Master Trustee has requested such funds under Section 3.2(b) of this Agreement and the Liquidity Provider has not provided such funds by the date and time required thereunder. If any amount is expended or disbursed from the Liquidity Support Account following the Liquidity Provider's failure to provide such funds by the date and time required under Section 3.2(b) of this Agreement, any amount subsequently received from the Liquidity Provider with respect to the applicable request from the Unfunded Liquidity Support shall be deposited in the Liquidity Support Account.

(g)     If there is a breach of the PSA by a Directing Holder or the Series 2009 Bond Trustee or the Master Trustee at the direction of the Directing Holders that prevents the closing of the Bond Exchange (a "PSA Breach"), any remaining amounts in the Liquidity Support Account shall, upon written request to the Master Trustee by the Liquidity Provider, be returned to the Liquidity Provider. Unless (i) there is a PSA Breach, or (ii) the Liquidity Provider becomes entitled to a return of funds pursuant to Section 5.1 hereof, all funds in the Liquidity Support Account are and shall be non-refundable to the Liquidity Provider. To the extent the Liquidity Provider becomes entitled to a return of funds hereunder, the Liquidity Provider shall be only entitled to funds held by the Master Trustee in the Liquidity Support Account.

*Section 3.2.*     Unfunded Liquidity Support.

(a)     As of and only upon the Effective Date, the Liquidity Provider shall be required to provide, and hereby commits to provide, additional liquidity support to the Borrower from time to time in the form of an unfunded commitment in the aggregate amount of $3,000,000 less any amounts provided by the Liquidity Provider pursuant to Section 3.1(d) hereof, supported by the full faith and credit of the Liquidity Provider (the "Unfunded Liquidity Support").

(b)  The Master Trustee may, upon request of the Series 2019 Bond Trustee, draw upon the Unfunded Liquidity Support to the extent necessary to pay debt service on the Series 2019 Bonds, upon certification by the Series 2019 Bond Trustee to the Master Trustee in the form attached as **Exhibit D** (a "Series 2019 Bond Trustee Unfunded LSA Request") that no other funds (other than funds in the Reserve Fund established under the Series 2019 Bond Indenture or in the Liquidity Support Account) are available to the Series 2019 Bond Trustee for such purpose. The Liquidity Provider shall provide such funds to the Master Trustee no later than three (3) business days following receipt of a Series 2019 Bond Trustee Unfunded LSA Request. Draws pursuant to a Series 2019 Bond Trustee Unfunded LSA Request shall be deposited by the Master Trustee into the Liquidity Support Account established under Section 3.3 of the Amended Master Indenture and transferred to the Series 2019 Bond Trustee for deposit to the Bond Fund established under the Series 2019 Bond Indenture.

(c)  The Borrower may request draws from the Unfunded Liquidity Support by providing written request to the Liquidity Provider in the form attached as **Exhibit E** (a "Borrower Unfunded LSA Request") and simultaneously providing a copy of such Borrower Unfunded LSA Request to the Master Trustee, solely for payment of operating expenses of the Borrower, which Borrower Unfunded LSA Request shall specify the proposed use of such funds, and shall certify that the Borrower shall use the requested disbursement solely for such purposes no later than ten (10) days following receipt of funds. The Liquidity Provider shall provide such funds to the Borrower no later than three (3) business days following receipt of a Borrower Unfunded LSA Request. Draws pursuant to a Borrower Unfunded LSA Request shall be deposited by the Borrower into its Operating Account.

(d)  Any amounts funded by the Liquidity Provider pursuant to Section 3.2(b) or (c) hereof shall reduce the Unfunded Liquidity Support obligation of the Liquidity Provider by a corresponding dollar amount. The maximum amount of the Unfunded Liquidity Support obligation, including all amounts advanced pursuant to Sections 3.1(e), 3.2(b) or 3.2(c), is $3,000,000.

*Section 3.3.*  Notices to Liquidity Provider. Each Series 2019 Bond Trustee Funded LSA Request, Series 2009 Bond Trustee Funded LSA Request, Borrower Funded LSA Request, Series 2019 Bond Trustee Unfunded LSA Request, and Borrower Unfunded LSA Request shall be provided to the Liquidity Provider no less than four (4) days prior to the proposed withdrawal of funds from the Liquidity Support Account or draw on the Unfunded Liquidity Support, and applicable. The Master Trustee shall not withdraw any monies from the Liquidity Support Fund pursuant to this Agreement, the Master Indenture, or the Amended Master Indenture without confirmation from the Series 2009 Bond Trustee, the Series 2019 Bond Trustee, or the Borrower, as applicable, that the notice to the Liquidity Provider has been given in accordance with this Section 3.3. .

*Section 3.4.*  Moneys to be Held in Trust. All moneys drawn upon by, deposited with, or paid to the Master Trustee pursuant to this Article III shall be held by the Master Trustee in trust subject to the terms of the Master Indenture or Amended Master Indenture, as applicable, and, until used or applied as herein provided, shall be subject to the lien, terms and provisions thereof

and shall not be commingled with any other funds of the Issuer, the Borrower or the Liquidity Provider. All earnings on investments in the Liquidity Support Account shall be paid to the Liquidity Provider by the Master Trustee no less frequently than quarterly.

*Section 3.5.* Investment of Moneys. All moneys drawn upon by, deposited with, or paid to the Master Trustee pursuant to this Article III shall be invested by the Master Trustee as permitted under Section 3.06 of the Master Indenture or Amended Master Indenture, as applicable, at the direction of the Liquidity Provider.

*Section 3.6.* Security Interest in Liquidity Support Account. To secure the Series 2019 Bonds and the Borrower's obligations with respect thereto, the Liquidity Provider and the Borrower hereby each grant a security interest in, pledge, assign and transfer in trust to the Master Trustee, upon the terms set forth in this Agreement, a security interest in the Liquidity Support Account (including any right to draw upon the Unfunded Liquidity Support), and all moneys and investments held therein. This Agreement shall be self-operative with respect to such property, but each of the Borrower and the Liquidity Provider agrees to execute and deliver on demand such security agreements, deposit control agreements, financing statements, continuation statements and other documents, authorizes the Master Trustee to prepare and file such financing statements, continuation statements and other documents as the Master Trustee considers necessary or appropriate to perfect a security interest in such property or continue the lien and security interest hereof in any such property, and irrevocably appoints the Master Trustee as its attorney in fact with the authority in its name, place and stead so to do. Unless and until the conditions described in Section 3.1(c) have occurred, (i) in no event shall this Agreement, the Liquidity Support Account, the Unfunded Liquidity Support, or any other obligations of the Liquidity Provider hereunder be or serve as collateral or security for any obligations of the Borrower with respect to the Series 2009 Bonds, and (ii) in no event may the Series 2009 Bond Trustee or the Borrower make any draws on the Liquidity Support Account to fund, pay or reimburse any costs related to or debt service on the Series 2009 Bonds.

*Section 3.7.* Default under PSA. Upon any PSA Breach, all monies in the Liquidity Support Account shall be immediately paid by the Master Trustee to the Liquidity Provider.

## ARTICLE IV

## OTHER COVENANTS AND AGREEMENTS

*Section 4.1.* Obligations Absolute and Unconditional. Subject to the limitations set forth herein, the obligations of the Liquidity Provider under this Agreement shall be absolute and unconditional, except for those conditions contained in this Agreement, and shall remain in full force and effect until the termination of this Agreement, and such obligations shall not be affected, modified or impaired upon the happening from time to time of any event, including, without limitation, any of the following:

(a) the occurrence of the Anticipated Bankruptcy Proceeding, confirmation of the Plan of Reorganization and/or the issuance of the Series 2019 Bonds; or

(b)  the compromise, settlement, release or termination of any or all of the obligations, covenants or agreements of the Issuer or the Borrower under the Series 2009 Bond Indenture, the Series 2019 Bond Indenture, the Master Indenture, the Amended Master Indenture or any other agreement entered into in connection with or securing the Series 2009 Bonds or the Series 2019 Bonds (collectively, the "Bond Documents"); or

(c)  the failure to give notice to the Liquidity Provider or the Borrower of the occurrence of a default or an event of default under the terms of any of the Bond Documents; or

(d)  the waiver of the payment, performance or observance by the Liquidity Provider, the Borrower or any future Member of the Obligated Group of any of the obligations, covenants or agreements of any of them contained in the Bond Documents; or

(e)  the modification or amendment (whether material or otherwise) of any obligation, covenant or agreement set forth in the Bond Documents, so long as the Liquidity Provider shall have consented in writing to any modification or amendment of this Agreement; or

(f)  the taking of or the failure to take the actions under or referred to in the Bond Documents, including, the failure of the Series 2009 Bond Trustee, the Series 2019 Bond Trustee or the Master Trustee (collectively, the "Trustee") to give any required notice; or

(g)  any failure, omission, delay or lack on the part of the Trustee to enforce, assert or exercise any right, power or remedy conferred on the Trustee in the Bond Documents, or any other act or acts on the part of the Trustee; or

(h)  the release or discharge of the Borrower, the Trustee or the Issuer from the performance or observance of any obligation, covenant or agreement contained in the Bond Documents; or

(i)  the default or failure of the Liquidity Provider fully to perform any of its obligations set forth in this Agreement or of the Borrower fully to perform any of its obligations in the Bond Documents; or

(j)  the invalidity, in whole or in part, of the Bond Documents.

*Section 4.2.*  No Setoff, Counterclaim or Defense. No setoff, counterclaim, reduction or diminution of an obligation or any defense of any kind or nature that either the Liquidity Provider or the Borrower has or may have against the other, the Series 2009 Bond Trustee, the Series 2019 Bond Trustee or the Master Trustee shall be available hereunder to the Liquidity Provider or the Borrower against the other, the Series 2009 Bond Trustee, the Series 2019 Bond Trustee or the Master Trustee.

*Section 4.3.*  Waiver of Notice; Payment of Charges. The Liquidity Provider and the Borrower expressly waive notice from the Trustee of their acceptance and reliance on this Agreement. To the extent permitted by applicable law, the Borrower agrees to pay all charges,

advances, costs, expenses and fees, including all reasonable attorneys' fees, that may be incurred by the Trustee in collecting or attempting to collect the amounts due hereunder following any default on the part of the Borrower or Liquidity Provider hereunder, whether this Agreement shall be enforced by suit or otherwise and all such amounts relating to such enforcement shall not reduce the amount owed by the Borrower or the Liquidity Provider.

*Section 4.4.* Amendments and Waivers. This Agreement may only be amended or modified by written amendment signed by each of the parties hereto.

# ARTICLE V

# TERM AND TERMINATION

Section 5.1. Termination. This Agreement shall terminate upon the first to occur of any of the following:

(i) after the Effective Date, the date the Unfunded Liquidity Support has been reduced to zero and no amounts remain in the Liquidity Support Account; or

(ii) the date all Series 2019 Bonds are paid in full or defeased, in each case in accordance with the Series 2019 Bond Indenture; or

(iii) a PSA Breach has occurred; or

(iv) the date on which all of the following conditions are satisfied: (a) the Borrower has maintained not less than 150 Days Cash on Hand for two consecutive Fiscal Years (excluding any amounts in the Liquidity Support Account and the Unfunded Liquidity Support), (b) there is no Event of Default under the Amended Master Indenture, (c) the Borrower is in compliance with all obligations under the Amended Master Indenture, and (d) the Reserve Fund for the Series 2019 Bonds is fully funded, or

(v) the date on which the Series 2019 Bonds receive a rating from any Rating Agency of not less than "BBB-" or equivalent; or

Section 5.2. Effect of Termination. Upon any termination of this Agreement in accordance with Section 5.1, (i) any remaining amounts in the Liquidity Support Account shall be paid by the Master Trustee to the Liquidity Provider, (ii) any remaining Unfunded Liquidity Support shall be cancelled, and (ii) all obligations of the Liquidity Provider under this Agreement shall be cancelled and of no further force or effect.

## ARTICLE VI

## MISCELLANEOUS

*Section 6.1.* Delay or Omission Not a Waiver. No delay or omission to exercise any right or power accruing upon any default, omission or failure of performance hereunder shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient. In the event any provision contained in this Agreement should be breached by the Liquidity Provider and thereafter duly waived by the Master Trustee, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder. No waiver, amendment, release or modification of this Agreement shall be established by conduct, custom, or course of dealing, but solely by an instrument in writing duly executed in accordance with the provisions of this Agreement.

*Section 6.2.* Entire Agreement; Execution in Counterparts. This Agreement constitutes the entire agreement, and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof. This Agreement may be executed simultaneously in several counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

*Section 6.3.* Governing Law. This Agreement shall be governed exclusively by the applicable laws of the State of Texas.

*Section 6.4.* Parties Interested Herein; Successors and Assigns. This Agreement is made for the sole benefit of the Borrower, the Liquidity Provider, the Issuer, the Series 2009 Bond Trustee, the Series 2019 Bond Trustee, the Master Trustee, and the holders of the Series 2009 Bonds and the Series 2019 Bonds, and their respective successors and assigns. On and after the Effective Date and the issuance of the Series 2019 Bonds, all rights of the Series 2009 Bond Trustee hereunder shall expire. The Master Trustee may take action to enforce any of the provisions of this Agreement, and shall do so upon the direction of the Series 2009 Bond Trustee or the Series 2019 Bond Trustee. Except for the Borrower, the Liquidity Provider, the Issuer, the Series 2009 Bond Trustee, the the Series 2019 Bond Trustee, the Master Trustee, and the holders of the Series 2009 Bonds and the Series 2019 Bonds, and their respective successors and assigns, no other person or persons shall have any benefits, rights or remedies under or by reason of this Agreement. With the exception of rights herein expressly conferred, nothing herein expressed or mentioned in or to be implied from this Agreement is intended or shall be construed to give any person other than the Borrower, the Liquidity Provider, the Issuer, the Series 2009 Bond Trustee, t the Series 2019 Bond Trustee, the Master Trustee, the holders of the Series 2009 Bonds and the Series 2019 Bonds, and their respective successors and assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement.

*Section 6.5.* Notices. All notices required hereunder, including written demands described in this Agreement, shall be in writing, sent via Federal Express or other overnight courier, or delivered by messenger or telecopy (with hard copy also sent by overnight courier or messenger) to the following addresses or to such other address as such parties shall from time to time designate by notice in writing to the others:

The Borrower:

Tarrant County Senior Living Center, Inc.
c/o Lifespace Communities, Inc.
Attn: Chief Financial Officer
4201 Corporate Drive
West Des Moines, Iowa 50266
Fax: _____
Email: larry.smith@lifespace communities.

with a copy to:

Lifespace Communities, Inc.
Attn: General Counsel
4201 Corporate Drive
West Des Moines, Iowa 50266
Fax: _____
Email: jodi.hirsch@lifespacecommunities.com

The Series 2009 Bond Trustee, the Series 2019 Trustee and
the Master Trustee:

UMB Bank, National Association
Corporate Trust Services
Attn: Virginia Housum
120 Sixth Street South, Suite 1400
Minneapolis, MN 55402
Email: Virginia.housum@umb.com

with a copy to:

Mintz, Levin, Cohn, Ferris
Glovsky and Popeo, P.C.
Attn: Daniel Bleck
One Financial Center
Boston, MA 02111
Fax: 617-542-2241
Email: DSBleck@mintz.com

The Liquidity Provider:

Lifespace Communities, Inc.
Attn: Chief Financial Officer
4201 Corporate Drive
West Des Moines, Iowa 50266
Fax: _____
Email: larry.smith@lifespacecommunities.com

with a copy to:

Lifespace Communities, Inc.
Attn: General Counsel
4201 Corporate Drive
West Des Moines, Iowa 50266
Fax: _____
Email: jodi.hirsch@lifespace communities.com

Whenever any notice in writing is required to be given hereunder, such notice shall be deemed given and such requirement satisfied if such notice is mailed by first-class mail, postage prepaid, addressed as provided above.

*Section 6.6.*     Assignment. This Agreement may not be assigned by any party, except to any successor master trustee under the Master Indenture.

## ARTICLE VII

## BORROWER REPAYMENT OBLIGATION

*Section 7.1.*     Borrower Repayment Obligation.

(a)     The Borrower will repay to the Liquidity Provider any amounts drawn on the Liquidity Support Account or the Unfunded Liquidity Support obligation (the "Borrower's Repayment Obligation") as soon as and when permitted to do so by this Agreement and Section 427 of the Amended Master Indenture, with interest thereon at the rate of ____% per annum computed from the date of each draw on the Liquidity Support Account or the Unfunded Liquidity Support on the amount drawn.

(b)     The Borrower's Repayment Obligation will constitute Subordinated Indebtedness of the Borrower, as defined in the Master Indenture, and as such the Borrower's Repayment Obligation is subject to the following provisions. The Liquidity Provider, as the holder of the Borrower's Repayment Obligation, now or at any time in the future, accepts and agrees to be bound by the subordination provisions and payment conditions associated with Subordinated Indebtedness set forth in the Amended Master Indenture.

(c)     The Borrower's Repayment Obligation shall, to the extent and in the manner hereinafter set forth, be subordinated and subject in right to the prior payment in full of Superior Indebtedness as defined in this Section. For all purposes of this Section, the term "Superior Indebtedness" shall mean all Master Notes now or hereafter issued and secured under the Amended Master Indenture, as from time to time supplemented and modified.

(d)     The Liquidity Provider may not accelerate the payment of the Borrower's Repayment Obligation.

(e)     No present or future Owner of Superior Indebtedness shall be prejudiced in its right to enforce subordination of the Borrower's Repayment Obligation by any act or failure to act on the part of any Member or anyone in custody of its assets or property.

(f)     The foregoing subordination provisions shall be for the benefit of the Owners of Superior Indebtedness and may be enforced by the Master Trustee against the Liquidity Provider; provided, however: (i) that the foregoing provisions are solely for the purpose of defining the relative rights of the Owners of Superior Indebtedness on the one hand and the Liquidity Provider on the other hand, and that nothing herein shall impair, as between the Borrower and the Liquidity Provider, the obligation of the Borrower, which is unconditional and absolute, to pay to the Liquidity Provider in accordance with the terms of this Agreement, nor shall anything herein

prevent the Liquidity Provider from exercising all remedies otherwise permitted by applicable law or hereunder upon default hereunder, subject to the rights set forth above of the Owners of Superior Indebtedness to receive cash, property or securities otherwise payable or deliverable to the Liquidity Provider, and (ii) that the Liquidity Provider shall not be charged with knowledge of the existence of any facts which would prohibit the making of any payment of moneys to the Liquidity Provider, unless and until the Liquidity Provider, shall have received written notice thereof from any Member or from one or more Owners of Superior Indebtedness, or from the Master Trustee.

*Section 7.2.*    Additional Repayment Conditions.  In addition to the foregoing and in accordance with Section 3.09 of the Master Indenture, the Borrower will not make payments on the Borrower's Repayment Obligation unless the Borrower delivers an Officer's Certificate to the Master Trustee prior to any payment on the Borrower's Repayment Obligation that contains the certifications required by Section 3.09 of the Amended Master Indenture.

*Section 7.3.*    Survival.  The provisions of this Article VII shall survive termination of this Agreement.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in their respective corporate names by their respective officers thereunto duly authorized as of the date first above written.

TARRANT COUNTY SENIOR LIVING CENTER, INC.

By: _____
       Title:

LIFESPACE COMMUNITIES, INC.

By: _____
       Title:

UMB BANK, NATIONAL ASSOCIATION, as Master Trustee and Bond Trustee for the Series 2009 Bonds and the Series 2019 Bonds

By: _____
       Title:

**[Signature Page to Liquidity Support Agreement]**

EXHIBIT A

Form of Series 2019 Bond Trustee Funded LSA Request

**[Signature Page to Liquidity Support Agreement]**

EXHIBIT B

Form of Series 2009 Bond Trustee Funded LSA Request

**[Signature Page to Liquidity Support Agreement]**

EXHIBIT C

Form of Borrower Funded LSA Request

**[Signature Page to Liquidity Support Agreement]**

EXHIBIT D

Form of Series 2019 Bond Trustee Unfunded LSA Request

**[Signature Page to Liquidity Support Agreement]**

EXHIBIT E

Form of Borrower Unfunded LSA Request

**[Signature Page to Liquidity Support Agreement]**

**Schedule 4 - 2019 Bond Documents**

AMENDED AND RESTATED MASTER TRUST INDENTURE,
DEED OF TRUST AND SECURITY AGREEMENT

between

TARRANT COUNTY SENIOR LIVING CENTER INC.,
as the Initial Obligated Group Member

and

UMB BANK, NATIONAL ASSOCIATION
as successor Master Trustee

Amended and Restated as of
[November 1], 2019

TABLE OF CONTENTS

Page

ARTICLE I      DEFINITION OF TERMS, CONSTRUCTION AND CERTAIN
GENERAL PROVISIONS ................................................................5

    Section 1.01     Definition of Terms.........................................................5
    Section 1.02     Compliance Certificates and Reports.................................27
    Section 1.03     Form of Documents Delivered to Master Trustee ..............28
    Section 1.04     Acts of Holders of Obligations .......................................29
    Section 1.05     Notices, etc., to Master Trustee and Obligated Group Members.........30
    Section 1.06     Notices to Holders of Obligations; Waiver........................30
    Section 1.07     [Reserved.]..................................................................31
    Section 1.08     Effect of Headings and Table of Contents.........................31
    Section 1.09     Successors and Assigns..................................................31
    Section 1.10     Separability Clause .......................................................31

ARTICLE II     THE OBLIGATIONS .........................................................31

    Section 2.01     Series and Amount of Obligations....................................31
    Section 2.02     Appointment of Obligated Group Representative ...............32
    Section 2.03     Execution and Authentication of Obligations.....................32
    Section 2.04     Supplement Creating Obligations.....................................32
    Section 2.05     Conditions to Issuance of Obligations Hereunder ..............33
    Section 2.06     List of Holders of Obligations ........................................33
    Section 2.07     Optional and Mandatory Redemption................................34
    Section 2.08     Mutilated, Destroyed, Lost and Stolen Obligations.............34
    Section 2.09     Cancellation ................................................................34

ARTICLE III    FUNDS AND ACCOUNTS ....................................................35

    Section 3.01     [Reserved.]..................................................................35
    Section 3.02     [Reserved.]..................................................................35
    Section 3.03     Liquidity Support Account .............................................35
    Section 3.04     [Reserved.]..................................................................36
    Section 3.05     Revenue Fund .............................................................36
    Section 3.06     Investment of Funds......................................................37
    Section 3.07     Allocation and Transfers of Investment Income..................37
    Section 3.08     Master Trustee Relieved From Responsibility ...................37
    Section 3.09     Payments on Subordinated Indebtedness...........................37

ARTICLE IV    REPRESENTATIONS AND COVENANTS OF THE OBLIGATED
GROUP MEMBERS ..........................................................38

    Section 4.01     Title to Mortgaged Trust Estate and Lien of this Instrument..............38
    Section 4.02     Further Assurances.......................................................38
    Section 4.03     Recording and Filing.....................................................38
    Section 4.04     Payment of Principal, Premium and Interest ......................39
    Section 4.05     Payment of Taxes and Other Claims .................................39
    Section 4.06     Maintenance of Properties ..............................................40

Section 4.07    Corporate Existence; Status of Obligor ...............................................40
Section 4.08    Preservation of Qualifications.............................................................41
Section 4.09    Additions to Facilities.........................................................................41
Section 4.10    Insurance............................................................................................41
Section 4.11    Rates and Charges..............................................................................45
Section 4.12    Damage or Destruction ......................................................................46
Section 4.13    Condemnation.....................................................................................48
Section 4.14    Other Provisions with Respect to Net Proceeds ................................48
Section 4.15    Financial Statements, Bondholder Calls, Etc.....................................49
Section 4.16    Permitted Additional Indebtedness.....................................................52
Section 4.17    Calculation of Debt Service and Debt Service Coverage ...................57
Section 4.18    Sale or Lease of Property ...................................................................59
Section 4.19    Liens on Property...............................................................................60
Section 4.20    Liquidity Covenant ............................................................................60
Section 4.21    [Reserved.].........................................................................................61
Section 4.22    Occupancy Covenant .........................................................................61
Section 4.23    [Reserved].........................................................................................62
Section 4.24    Deposits on Effective Date .................................................................62
Section 4.25    Reserve Fund for Series 2019 Bonds.................................................64
Section 4.26    Rating Application ..............................................................................64
Section 4.27    Management Agreements; Oversight Fees .........................................64
Section 4.28    [Reserved.].........................................................................................65
Section 4.29    Actuarial Study ..................................................................................65

ARTICLE V     CONSOLIDATION, MERGER, CONVEYANCE AND TRANSFER .........65

Section 5.01    Merger, Consolidation, Sale or Conveyance .....................................65

ARTICLE VI    MEMBERSHIP IN THE OBLIGATED GROUP .........................................67

Section 6.01    Admission of Obligated Group Members............................................67
Section 6.02    Obligated Group Members .................................................................68
Section 6.03    Withdrawal of Obligated Group Members .........................................68
Section 6.04    Successor Obligated Group Representative.........................................69

ARTICLE VII   REMEDIES OF THE MASTER TRUSTEE AND HOLDERS OF
                SECURED OBLIGATIONS IN EVENT OF DEFAULT.............................70

Section 7.01    Events of Default ...............................................................................70
Section 7.02    Acceleration of Maturity; Rescission and Annulment.......................71
Section 7.03    Entry...................................................................................................71
Section 7.04    Powers of Sale, Transfer, Assignment, Lease, and Other
                Dispositions; Suits for Enforcement ..................................................72
Section 7.05    Incidents of Sale.................................................................................74
Section 7.06    Collection of Indebtedness and Suits for Enforcement by
                Master Trustee ...................................................................................75
Section 7.07    Master Trustee May File Proofs of Claim ..........................................76
Section 7.08    Master Trustee May Enforce Claims Without Possession of
                Obligations.........................................................................................77
Section 7.09    Application of Money Collected.........................................................77

Section 7.10 Limitation on Suits.................................................................77
Section 7.11 Unconditional Right of Holders of Obligations to Receive
 Principal, Premium and Interest.......................................78
Section 7.12 Restoration of Rights and Remedies.........................................78
Section 7.13 Rights and Remedies Cumulative.............................................78
Section 7.14 Delay or Omission Not Waiver.................................................78
Section 7.15 Control by Holders of Obligations............................................79
Section 7.16 Waiver of Past Defaults............................................................79
Section 7.17 Undertaking for Costs...............................................................79
Section 7.18 Waiver of Stay or Extension Laws ...........................................79
Section 7.19 Inapplicability of Finance Code................................................80

ARTICLE VIII CONCERNING THE MASTER TRUSTEE...................................80

Section 8.01 Duties and Liabilities of Master Trustee..................................80
Section 8.02 Notice of Defaults.....................................................................81
Section 8.03 Certain Rights of Master Trustee .............................................81
Section 8.04 Not Responsible For Recitals or Issuance of Obligations .........83
Section 8.05 Master Trustee or Registrar May Own Obligations..................83
Section 8.06 Money to Be Held in Trust .......................................................83
Section 8.07 Compensation and Expenses of Master Trustee .......................83
Section 8.08 Corporate Master Trustee Required; Eligibility ......................84
Section 8.09 Resignation and Removal; Appointment of Successor.............84
Section 8.10 Acceptance of Appointment by Successor .................................85
Section 8.11 Merger or Consolidation ...........................................................86
Section 8.12 Master Trustee as Related Bond Trustee ..................................86

ARTICLE IX SUPPLEMENTS AND AMENDMENTS........................................86

Section 9.01 Supplements Without Consent of Holders of Obligations.........86
Section 9.02 Supplements With Consent of Holders of Obligations..............87
Section 9.03 Execution of Supplements ........................................................87
Section 9.04 Effect of Supplement ................................................................88
Section 9.05 Obligations May Bear Notation of Changes.............................88
Section 9.06 Substitution of Lifespace Master Notes ...................................88

ARTICLE X SATISFACTION AND DISCHARGE OF INDENTURE;
 UNCLAIMED MONEYS...............................................91

Section 10.01 Satisfaction and Discharge of Indenture .................................91
Section 10.02 Obligations Deemed Paid........................................................91
Section 10.03 Application of Trust Money......................................................92
Section 10.04 Payment of Related Bonds........................................................92

ARTICLE XI MISCELLANEOUS PROVISIONS...............................................92

Section 11.01 No Personal Liability ...............................................................92
Section 11.02 Texas Contract ........................................................................92
Section 11.03 Legal Holidays .........................................................................92
Section 11.04 Benefits of Provisions of Indenture and Obligations...............93
Section 11.05 Execution in Counterparts; Electronic Transactions................93

iii

Section 11.06    UCC Financing Statements.................................................................93

AMENDED AND RESTATED MASTER TRUST INDENTURE,
DEED OF TRUST AND SECURITY AGREEMENT

THIS AMENDED AND RESTATED MASTER TRUST INDENTURE, DEED OF TRUST AND SECURITY AGREEMENT, dated as of [November 1], 2019 (this "Indenture" or this "Master Indenture"), between TARRANT COUNTY SENIOR LIVING CENTER INC., a Texas nonprofit corporation, as the obligor and the initial Obligated Group Member (the "Obligor"), and UMB BANK, NATIONAL ASSOCIATION, as successor Master Trustee, amends and restates the Master Trust Indenture, Deed of Trust and Security Agreement dated as of October 1, 2009 (as previously amended, the "Original Master Indenture"), between the Obligor and The Bank of New York Mellon Trust Company, National Association as initial Master Trustee.

WITNESSETH:

WHEREAS, the Obligor was authorized and deemed it necessary and desirable to enter into the Original Master Indenture for the purpose of providing for the issuance from time to time by the Obligor or other Persons electing to become Obligated Group Members (as defined herein) of Obligations (as defined herein) to finance or refinance the acquisition or betterment of health care facilities or other facilities, or for other lawful and proper purposes; and

WHEREAS, UMB Bank, National Association is the successor to The Bank of New York Mellon Trust Company, National Association as Master Trustee under the Original Master Indenture; and

WHEREAS, the Obligor is authorized and deems it necessary and desirable to amend and restate the Original Master Indenture into this Indenture to reflect amendments thereto agree upon by the Obligor and the Master Trustee; and

WHEREAS, the Obligor has filed a voluntary plan of reorganization (the "Plan") under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"), which Plan was supported and approved by the holders of approximately ___ % of the Obligations Outstanding under the Original Master Indenture; and

WHEREAS, the Plan contemplates, among other matters, the amendment and restatement of the Original Master Indenture by this Amended and Restated Master Indenture as of the effective date (the "Effective Date") of the Plan, and the Bankruptcy Court has entered its order (the "Bankruptcy Court Order") approving the Plan and, among other things, approving the amendment and restatement of the Original Master Indenture by this Amended and Restated Master Trust Indenture, which Bankruptcy Court Order supersedes, with respect to the amendment effected by this Amended and Restated Master Trust Indenture, anything in Section 9.02 of the Original Master Indenture limiting in any respect the ability of the Holders of the Obligations to amend the Original Master Indenture; and

WHEREAS, all acts and things necessary to constitute this Indenture as amended and restated on and as of the Effective Date a valid indenture and agreement according to its terms have been done and performed, the Obligor has duly authorized the execution and delivery of this

amended and restated Indenture, and the Obligor, in the exercise of the legal right and power invested in it, executes this amended and restated Indenture and proposes to make, execute, issue and deliver Obligations hereunder; and

WHEREAS, the Master Trustee has agreed to, and agrees to, accept and administer the trusts created hereby,

## GRANTING CLAUSES

NOW, THEREFORE, THIS INDENTURE WITNESSETH, that, to secure the payment of the principal of (and premium, if any) and interest on the Outstanding Obligations (hereinafter defined) and the performance of the covenants therein and herein contained and to declare the terms and conditions on which the Outstanding Obligations are secured, and in consideration of the premises, of the purchase of the Obligations by the Holders thereof, and of the sum of One Dollar ($1.00) to the Obligated Group Members in hand paid by the Master Trustee at or before the execution and delivery hereof the receipt and sufficiency of which are hereby acknowledged, the Obligated Group Members in the Original Master Indenture have granted, bargained, sold, aliened, remised, released, conveyed, assigned, transferred, mortgaged, hypothecated, pledged, set over, and confirmed, and by these presents do hereby grant, bargain, sell, alien, remise, release, convey, assign, transfer, mortgage, hypothecate, pledge, set over, and confirm, to the Master Trustee, forever, all and singular the following described properties, and grant a security interest therein for the purposes herein expressed, to wit:

## GRANTING CLAUSE FIRST

All real and personal property of the Obligated Group, including without limitation all property of the Obligated Group Members described in the other granting clauses herein; and

## GRANTING CLAUSE SECOND

The land described on Exhibit "A" hereto (the "Premises") and incorporated herein for all purposes, including, without limitation, all buildings, structures, fixtures, additions, enlargements, extensions, improvements, modifications or repairs now or hereafter located thereon or therein and with the tenements, hereditaments, servitudes, appurtenances, rights, privileges and immunities thereunto belonging or appertaining which may from time to time be owned by the Obligated Group Members, and all claims or expectancy, of, in and to the Premises, it being the intention of the parties hereto that, so far as may be permitted by law, all property of the character hereinabove described, which is now owned or is hereafter acquired by the Obligated Group Members, and is affixed or attached or annexed to the Premises, shall be and remain or become and constitute a portion of the Premises, and the security covered by and subject to the lien of this Indenture; and

## GRANTING CLAUSE THIRD

All of the rights, titles, interests and estates, now owned or hereafter acquired by the Obligated Group Members in and to any and all accounts, chattel paper, goods, documents, instruments, general intangibles, deposit accounts, investment property, equipment, inventory, fixtures, and any and all other personal property of any kind or character defined in and subject to the provisions of the Texas Business and Commerce Code, including the supporting obligations

2

thereof, proceeds and products of and from any and all of such personal property used in connection with or arising out of the operation and use of the improvements located on the Premises and any substitutions or replacements therefor; including the following, all whether now owned or hereafter acquired or arising and wherever located; without limitation, such grant, pledge and assignment includes: (i) accounts (including health-care-insurance receivables, credit card receivables and rights to receive payment from third-party payors such as Medicare and Medicaid) and Gross Revenues; (ii) securities entitlements, securities accounts, commodity accounts, commodity contracts and investment property; (iii) deposit accounts; (iv) instruments (including promissory notes); (v) documents (including warehouse receipts); (vi) chattel paper (including electronic chattel paper and tangible chattel paper); (vii) inventory, including raw materials, work in process, or materials used or consumed in the business of the Obligated Group Members, items held for sale or lease or furnished or to be furnished under contracts of service, sale or lease, goods that are returned, reclaimed or repossessed; (viii) goods of every nature, including stock-in-trade, goods on consignment, standing timber that is to be cut and removed under a conveyance or contract for sale, the unborn young of animals, crops grown, growing, or to be grown, manufactured homes, computer programs embedded in such goods and farm products; (ix) equipment, including machinery, vehicles and furniture; (x) fixtures; (xi) agricultural liens; (xii) as-extracted collateral; (xiii) letter of credit rights; (xiv) general intangibles, of every kind and description, including payment intangibles, software, computer information, source codes, object codes, records and data, all existing and future customer lists, choses in action, claims (including claims for indemnification or breach of warranty), books, records, patents and patent applications, copyrights, trademarks, tradenames, tradestyles, trademark applications, goodwill, blueprints, drawings, designs and plans, trade secrets, contracts, licenses, license agreements, formulae, tax and any other types of refunds, returned and unearned insurance premiums, rights and claims under insurance policies; (xv) all supporting obligations of all of the foregoing property; (xvi) all property of the Obligated Group Members now or hereafter in the Master Trustee's possession or in transit to or from, or under the custody or control of, the Master Trustee or any affiliate thereof; (xvii) all cash and cash equivalents thereof; and (xviii) all cash and noncash proceeds (including insurance proceeds) of all of the foregoing property, all products thereof and all additions and accessions thereto, substitutions therefor and replacements thereof; and

### GRANTING CLAUSE FOURTH

Any amounts on deposit from time to time in any fund or account created hereunder, subject to the provisions of this Master Indenture permitting the application thereof for the purposes and on the terms and conditions set forth herein; and

### GRANTING CLAUSE FIFTH

Any and all property that may, from time to time hereinafter, by delivery or by writing of any kind, be subjected to the lien and security interest hereof by the Obligated Group Members or by anyone in its behalf (and the Master Trustee is hereby authorized to receive the same at any time as additional security hereunder), which subject to the lien and security interest hereof of any such property as additional security may be made subject to any reservations, limitations, or conditions which shall be set forth in a written instrument executed by the grantor or the person so acting in its behalf or by the Master Trustee respecting the use and disposition of such property or the proceeds thereof;

TO HAVE AND TO HOLD, IN TRUST, WITH THE POWER OF SALE, all said property, rights, privileges, and franchises of every kind and description, real, personal, or mixed, hereby and hereafter (by supplemental instrument or otherwise) granted, bargained, sold, aliened, remised, released, conveyed, assigned, transferred, mortgaged, hypothecated, pledged, set over, or confirmed as aforesaid, or intended, agreed, or covenanted so to be, together with all the appurtenances thereto appertaining (said properties, rights, privileges, leasehold, and franchises including any cash and securities hereafter deposited or required to be deposited with the Master Trustee (other than any such cash which is specifically stated herein not to be deemed part of the Trust Estate) being herein collectively referred to as the "Trust Estate") unto the Master Trustee and its successors and assigns forever;

SUBJECT, HOWEVER, to the Liens (as defined herein) described in Exhibit B hereto and to any and all mortgages, liens, charges, encumbrances, pledges, and security interests granted, created, assumed, incurred, or existing pursuant to the provisions of Section 4.19 hereof;

BUT IN TRUST, NEVERTHELESS, for the equal and ,proportionate benefit and security of the Holders from time to time of all the Outstanding Obligations without any priority of any such Obligations over any other such Obligations except as herein otherwise expressly provided;

UPON CONDITION that, if the Obligated Group Members or their successors or assigns shall well and truly pay, or cause to be paid, the principal of (and premium, if any) and interest on the Outstanding Obligations according to the true intent and meaning thereof, or there shall be deposited with the Master Trustee such amounts in such form in order that none of the Obligations shall remain Outstanding as herein defined and provided, and shall pay or cause to be paid to the Master Trustee all sums of money due or to become due to it in accordance with the terms and provisions hereof, then upon the full and final payment of all such sums and amounts secured hereby or upon such deposit, the rights, titles, liens, security interests, and assignments herein granted shall cease, determine, and be void and this grant shall be released by the Master Trustee in due form at the expense of the Obligated Group Members, except only as herein provided; otherwise this grant to be and shall remain in full force and effect;

UPON FURTHER CONDITION as to any property included in the Trust Estate that, upon Request of the Obligated Group Representative accompanied by an Officer's Certificate and an Opinion of Counsel to the effect that the conditions precedent for the disposition of such property set forth in Section 4.18 hereof (other than the condition precedent set forth in Section 4.18(d) hereof) have been satisfied, the rights, title, liens, security interests and assignments herein granted shall cease, determine and be void as to such property only and this grant shall be released by the Master Trustee as to such property in due form at the expense of the Obligated Group Members;

ALL THINGS NECESSARY to make this Indenture a valid agreement and contract for the security of the Obligations in accordance with the terms of such Obligations and this Indenture have been done;

IT IS HEREBY COVENANTED AND DECLARED that the Trust Estate is to be held and applied by the Master Trustee, subject to the further covenants, conditions, and trusts hereinafter set forth, and the Obligated Group Members do hereby covenant and agree to and with the Master

Trustee, for the equal and proportionate benefit of all Holders of the Obligations except as herein otherwise expressly provided; and

THIS INDENTURE FURTHER WITNESSETH and it is expressly declared that all Obligations issued and secured hereunder are to be issued, authenticated and delivered and all said rights hereby pledged and assigned are to be dealt with and disposed of under, upon and subject to the terms, conditions, stipulations, covenants, agreements, trusts, uses and purposes as hereinafter expressed and the Obligated Group Members have agreed and covenanted, and do hereby agree and covenant, with the Master Trustee for the equal and proportionate benefit of the respective holders from time to time of the Obligations as follows:

## ARTICLE I
## DEFINITION OF TERMS, CONSTRUCTION AND CERTAIN GENERAL PROVISIONS

Section 1.01    Definition of Terms.  For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

(1)    "this Indenture" or "this Master Indenture" means this instrument as originally executed or as it may from time to time be supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof;

(2)    all references in this instrument designated "Articles," "Sections," and other subdivisions are to the designated Articles, Sections and other subdivisions of this instrument as originally executed.  The words "herein," "hereof," and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section, or other subdivision;

(3)    the terms defined in this Article have the meanings assigned to them in this Article, and include the plural as well as the singular number; and

(4)    all accounting terms not otherwise defined herein have the meanings assigned to them, in accordance with generally accepted accounting principles applied in accordance with Section 1.02 of this Indenture.

"Act" when used with respect to any Holder of Obligations has the meaning specified in Section 1.04.

"Additional Indebtedness" means Indebtedness incurred by any Member subsequent to the issuance of the Series 2019 Note.

"Additional Obligation" means any evidence of Indebtedness or evidence of any repayment obligation under any Interest Rate Agreement issued after the issuance of the Series 2019 Note, which is authorized to be issued by a Member pursuant to this Master Indenture which has been authenticated by the Master Trustee pursuant to Section 2.03 hereof.

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.

For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the policies of such Person, directly or indirectly, whether through the power to appoint and remove its directors, the ownership of voting securities, by contract, or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Authorized Denomination" means $5,000 or any integral multiple thereof or such other denomination for a series of Obligations as may be set forth in a Supplemental Indenture.

"Authorized Representative" shall mean, with respect to the Obligated Group Representative and each Obligated Group Member, its respective chairman of the board, chief executive officer, president, chief financial officer, chief reorganization officer, any vice president, or any other person or persons designated an Authorized Representative thereof by an Officer's Certificate of the Obligated Group Representative or the Obligated Group Member, signed by an Authorized Representative and delivered to the Master Trustee.

"Balloon Indebtedness" means Funded Indebtedness, 25% or more of the original principal of which matures during any consecutive 12 month period, if such maturing principal amount is not required to be amortized below such percentage by mandatory redemption or prepayment prior to such 12 month period. Balloon Indebtedness does not include Indebtedness which otherwise would be classified hereunder as Put Indebtedness.

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas.

"Bankruptcy Court Order" means the order of the Bankruptcy Court approving the Plan, including the amendment and restatement of the Original Master Indenture by this Amended and Restated Master Trust Indenture.

"Board Resolution" of any specified Person means a copy of a resolution certified by the Person responsible for maintaining the records of the Governing Body of such Person to have been duly adopted by the Governing Body of such Person and to be in full force and effect on the date of such certification, and delivered to the Master Trustee.

"Bond Indenture" means the Indenture of Trust dated as of [November 1], 2019, between the Issuer and the Series 2019 Bond Trustee relating to the Series 2019 Bonds.

"Book Value," when used with respect to Property of a Member, means the value of such Property, net of accumulated depreciation and amortization, as reflected in the most recent audited financial statements of such Member that have been prepared in accordance with generally accepted accounting principles, and when used with respect to Property of all Members, means the aggregate of the values of such Property, net of accumulated depreciation and amortization, as reflected in the most recent audited combined financial statements of the Obligated Group prepared in accordance with generally accepted accounting principles, provided that such aggregate shall be calculated in such a manner that no portion of the value of any Property of any Member is included more than once.

"Budget" means the Obligated Group's annual operating and capital budget for the applicable year, broken down by month and approved by a Consultant, as amended from time to time with the approval of a Consultant.

"Business Day" means any day other than (i) a Saturday, a Sunday or, in the City of New York, New York, or in Minneapolis, Minnesota (or, if different, in the city in which the designated corporate trust office of the Related Bond Trustee is located), a day on which banking institutions are authorized or required by law or executive order to close, or (ii) a day on which the New York Stock Exchange is closed.

"Capitalized Lease" means any lease of real or personal property which, in accordance with generally accepted accounting principles as in effect for the Obligated Group from time to time is treated as a "capital leases" or a "finance lease", but does not include operating leases.

"Capitalized Rentals" means, as of the date of determination, the amount at which the aggregate Net Rentals due and to become due under a Capitalized Lease under which a Person is a lessee would be reflected as a liability on a balance sheet of such Person.

"Cash and Investments" means (i) the sum of cash, cash equivalents, and the Current Value of marketable securities of the Obligated Group Members, including without limitation board-designated assets, including amounts, if any, on deposit in the Operating Account and the Liquidity Support Account, but excluding (a) trustee-held funds other than those described above in this definition, (b) donor-restricted funds not available to pay debt service on the Obligations, and (c) any funds pledged or otherwise subject to a Lien, other than a Lien solely in favor of the Master Trustee plus (ii) unless otherwise expressly stated, the undrawn amount available under the Liquidity Support Agreement (i.e. disregarding amounts funded into the Liquidity Support Account) as of the applicable calculation date. For the purposes of calculations hereunder, an Unrestricted Contribution from an Affiliate made after the applicable calculation date shall be treated as being made on the applicable calculation date so long as the Unrestricted Contribution is made prior to the date the applicable certificate is required to be delivered with respect to such calculation and is irrevocably designated by the Obligated Group as to be deemed for all purposes hereunder as made on the applicable calculation date.

"Code" means the Internal Revenue Code of 1986, as amended from time to time and the corresponding provisions, if any, of any successor internal revenue laws of the United States.

"Commitment Indebtedness" means the obligation of any Member to repay amounts disbursed pursuant to a commitment from a financial institution to refinance or purchase when due, when tendered or when required to be purchased (a) other Indebtedness of such Member, or (b) Indebtedness of a Person who is not a Member, which Indebtedness is guaranteed by a Guaranty of such Member or secured by or payable from amounts paid on Indebtedness of such Member, in either case which Indebtedness or Guaranty of such Member was incurred in accordance with the provisions of Section 4.16 hereof, and the obligation of any Member to pay interest payable on amounts disbursed for such purposes, plus any fees, costs or expenses payable to such financial institution for, under or in connection with such commitment, in the event of disbursement pursuant to such commitment or in connection with enforcement thereof, including without limitation any penalties payable in the event of such enforcement.

"Completion Funded Indebtedness" means any Funded Indebtedness for borrowed money: (a) incurred for the purpose of financing the completion of the acquisition, construction, remodeling, renovation or equipping of Facilities or marketing or other pre-opening expenses of Facilities with respect to which Funded Indebtedness has been incurred in accordance with the provisions hereof; and (b) with a principal amount not in excess of the amount which is required to provide completed and equipped Facilities of substantially the same type and scope contemplated at the time such prior Funded Indebtedness was originally incurred, to provide for Funded Interest during the period of construction, to provide any reserve fund relating to such Completion Funded Indebtedness and to pay the costs and expenses of issuing such Completion Funded Indebtedness.

"Consent," "Order," and "Request" of any specified Person mean, respectively, a written consent, order, or request signed in the name of an Authorized Representative of the Obligated Group Representative or in the name of any other Person by the Chairman of the Governing Body, the President, a Vice President, the Treasurer, an Assistant Treasurer or the Chief Financial Officer of such Person or any other person or persons designated by an Officers Certificate and delivered to the Master Trustee.

"Construction Index" means the most recent issue of the "Dodge Construction Index for U.S. and Canadian Cities" with reference to the city in which the subject property is located (or, if such Index is not available for such city, with reference to the city located closest geographically to the city in which the subject property is located), or, if such Index is no longer published or used by the federal government in measuring costs under Medicare or Medicaid programs, such other index which is certified to be comparable and appropriate by the Obligated Group Representative in an Officer's Certificate delivered to the Master Trustee and which other index is acceptable to the Master Trustee.

"Consultant" means a professional consulting, accounting, investment banking or commercial banking firm or individual selected by the Obligated Group Representative having the skill and experience necessary to render the particular report required and having a favorable reputation for such skill and experience, which firm or individual (i) does not control any Member of the Obligated Group or any Affiliate thereof and is not controlled by or under common control with any Member of the Obligated Group or an Affiliate thereof and (ii) if selected to perform the services required under Section 4.11, 4.20 or 4.22, has received Noteholder Consent, provided that for such purpose Noteholder Consent shall be deemed granted if (a) the Obligated Group has caused to be posted on the EMMA website for the CUSIP numbers of the Related Bonds a notice stating that the Obligated Group is required to retain a Consultant under the applicable Section of the Master Indenture, identifying the Consultant proposed to be retained by the Obligated Group and stating that, pursuant to this Master Indenture, Noteholder Consent to such Consultant is required but will be deemed granted unless the beneficial owners of at least one-third in principal amount of all Related Bonds have notified the Master Trustee of their objection to such Consultant on or before the date that is 30 days following the date of such posting of such notice on the EMMA website and (b) within 30 days following the date of such posting of such notice on the EMMA website, the Master Trustee shall not have received written communication from the beneficial owners of at least one-third in principal amount of all Related Bonds objecting to the retention of the applicable Consultant (for such purpose, the Master Trustee may conclusively rely upon a

certification by the Person submitting the applicable objection of the principal amount of Related Bonds beneficially owned by such Person).

"Contributions" means the aggregate amount of all contributions, grants, gifts, bequests and devises actually received in cash or marketable securities by any Person in the applicable fiscal year of such Person and any such contributions, grants, gifts, bequests and devises originally received in a form other than cash or marketable securities by any Person which are converted in such fiscal year to cash or marketable securities.

"Control Agreement" means an agreement among a depository institution, the Obligor and the Master Trustee with respect to a depository account established by the Obligor, which agreement, to the Master Trustee's satisfaction, confers "control", within the meaning of the Uniform Commercial Code, over the applicable account to the Master Trustee.

"Credit Facility" means any Liquidity Facility, letter of credit, bond insurance policy, standby purchase agreement, guaranty, line of credit, surety bond or similar credit or liquidity facility securing any Indebtedness of any Obligated Group Member.

"Current Value" means (i) with respect to Property, Plant and Equipment: (a) the aggregate fair market value of such Property, Plant and Equipment as reflected in the most recent written report of an appraiser selected by the Obligated Group Representative and, in the case of real property, who is a member of the American Institute of Real Estate Appraisers (MAI), delivered to the Master Trustee (which report shall be dated not more than 12 months prior to the date as of which Current Value is to be calculated) increased or decreased by a percentage equal to the aggregate percentage increase or decrease in the Construction Index from the date of such report to the date as of which Current Value is to be calculated, minus the fair market value (as reflected in such most recent appraiser's report) of any Property, Plant and. Equipment included in such report but disposed of since the last such report increased or decreased by a percentage equal to the aggregate percentage increase or decrease in the Construction Index from the date of such report to the date as of which Current Value is to be calculated; plus (b) the Book Value of any Property, Plant and Equipment acquired since the last such report increased or decreased by a percentage equal to the aggregate percentage increase or decrease in the Construction Index from the date of such acquisition to the date as of which Current Value is to be calculated, minus (c) the Book Value of any such Property, Plant and Equipment acquired since the last such report but disposed of; and (ii) with respect to any other Property, the fair market value of such Property.

"Days Cash on Hand" means, as of the date of calculation, the amount determined by dividing (a) the amount of Cash and Investments on such date by (b) the quotient obtained by dividing Expenses (including interest on Indebtedness but excluding provisions for bad debt amortization, depreciation or any other non-cash expenses) as shown on the most recent annual audited financial statements of the Obligated Group (or, with respect to any calculation of Days Cash on Hand as of any quarter end that is not the end of a Fiscal Year, as reflected in the unaudited trailing twelve month financial statements for the period ending on such quarter end, as derived from the quarterly financial statements delivered pursuant to Section 4.15(b)(ii) hereof), by 365.

"Debt Service Requirements" means, with respect to the period of time for which calculated, the aggregate of the payments required to be made during such period in respect of

principal (whether at maturity, as a result of mandatory sinking fund redemption, mandatory prepayment or otherwise) and interest on outstanding Funded Indebtedness of each Person or a group of Persons with respect to which calculated; provided that: (a) the amount of such payments for a future period shall be calculated in accordance with the assumptions contained in Sections 4.16 and 4.17 hereof; (b) interest shall be excluded from the determination of the Debt Service Requirements to the extent that Funded Interest is available to pay such interest; (c) principal of Indebtedness shall be excluded from the determination of Debt Service Requirements to the extent that amounts are on deposit in an irrevocable escrow for the applicable Indebtedness and such amounts (including, where appropriate, the earnings or other increment to accrue thereon) are required to be applied to pay such principal and such amounts so required to be applied are sufficient to pay such principal; (d) principal of Indebtedness due in its final year shall be excluded from the determination of Debt Service Requirements to the extent moneys were initially deposited and are on deposit as of the date of calculation in a debt service reserve fund which required that moneys on deposit in the debt service reserve fund be used to pay a principal payment in the final year of such Indebtedness, and except for the payment to be received from such debt service reserve fund, the Indebtedness would have had approximately level debt service.

"Defeasance Obligations" means:

(1)     Direct obligations of the United States of America or obligations to the full and prompt payment of which the full faith and credit of the United States of America is pledged or evidences of ownership of proportionate interests in future interest and principal payments on such obligations held by a bank or trust company as custodian, under which the owner of the investment is the real party in interest and has the right to proceed directly and individually against the obligor on such obligations, and which underlying obligations are not available to satisfy any claim of the custodian or any Person claiming through the custodian or to whom the custodian may be obligated, provided that in each case the obligations are not subject to prepayment; and

(2)     Obligations described in Section 103(a) of the Code rated AAA or Aaa by Moody's or S&P, provision for the payment of the principal of (and premium, if any) and interest on which shall have been made by the irrevocable deposit at least 123 days preceding the date of determination with a bank or trust company acting as a trustee or escrow agent for holders of such obligations of money, or obligations described in clause (1) above, the maturing principal of and interest on which, when due and payable, without reinvestment will provide money, sufficient to pay when due the principal of (and premium, if any) and interest on such obligations, and which money, or obligations described in clause (1) above, are not available to satisfy any other claim, including any claim of the trustee or escrow agent or any claim of any Person claiming through the trustee or escrow agent or any claim of any Person to whom the Person on whose behalf such irrevocable deposit was made, the trustee, or the escrow agent may be obligated, whether arising out of the insolvency of the Person on whose

behalf such irrevocable deposit was made, the trustee or escrow agent or otherwise.

"Effective Date" means _____, 2019, the date set forth in the Bankruptcy Court Order for the effective date of the Plan.

"Entrance Fees" means fees, other than security deposits, monthly rentals or monthly service charges, paid to a Member by residents of Independent Living Units for the purpose of obtaining the right to reside in those units including any refundable resident deposits described in any lease or similar Residency Agreements with respect to those Independent Living Units, but shall not include any such amounts held in escrow or otherwise set aside pursuant to the requirements of any such agreement prior to the occupancy of the unit covered by such Residency Agreement or pursuant to Chapter 246, Texas Health and Safety Code (which amounts shall be included if and when occupancy occurs and such set-aside is no longer required).

"Event of Default" has the meaning set forth in Article VII hereof.

"Expenses" means, for any period, the aggregate of all expenses calculated under generally accepted accounting principles, including without limitation any accrual for taxes, assessments and insurance, incurred by the Person or group of Persons involved during such period, but excluding (a) interest expense on Funded Indebtedness, (b) depreciation and amortization, (c) extraordinary expenses, losses on the sale of assets other than in the ordinary course of business and losses on the extinguishment of debt or termination of pension plans or Interest Rate Agreements, (d) losses resulting from any reappraisal, revaluation or write down of assets or Interest Rate Agreements, other than bad debts, (e) other non-cash expenses or losses, other than write down of bad debts that have been included in Revenues, and (f) any development or marketing fees that constitute Subordinated Indebtedness. If such calculation of Expenses is being made with respect to the Obligated Group, any such expenses attributable to transactions between any Member and any other Member shall be excluded.

"Facilities" means all land, leasehold interests and buildings and all fixtures and equipment (as defined in the Uniform Commercial Code or equivalent statute in effect in the state where such fixtures or equipment are located) of a Person.

"Fiscal Year" means any 12 month period beginning on January 1 of any calendar year and ending on December 31 of such calendar year, or such other consecutive 12 month period selected by the Obligated Group Representative as the fiscal year for the Members for good faith reasons unrelated to circumvention of covenants and requirements of this Indenture.

"Fitch" means Fitch Inc., a corporation organized and existing under the laws of the State of Delaware, its successors and assigns, and if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "Fitch" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Obligated Group, with written notice to the Master Trustee.

"Funded Indebtedness" means, with respect to any Person, (a) all Indebtedness of such Person incurred or assumed for money borrowed or credit extended, which is not Short Term; (b) all Short Term Indebtedness incurred by the Person which is of the type described in Section

11

4.16(d) hereof; (c) the Person's Guaranties of Indebtedness which are not Short Term (but including Guaranties of Short Term Indebtedness described in Section 4.16(d) hereof); and (d) Capitalized Rentals under Capitalized Leases entered into by the Person; provided, however, that Indebtedness that could be described by more than one of the foregoing categories shall not in any case be considered more than once for the purpose of any calculation made pursuant to this Master Indenture.

"Funded Interest" means amounts irrevocably deposited in an escrow or other trust account (other than a debt service reserve fund held under a Related Bond Indenture or ordinary course debt service payments paid into a debt service fund held under a Related Bond Indenture) to pay interest on Funded Indebtedness or Related Bonds and interest earned on such amounts to the extent such interest earned is required to be applied to pay interest on Funded Indebtedness or Related Bonds.

"Governing Body" means, with respect to a Member, the board of directors, the board of trustees or similar group in which the right to exercise the powers of corporate directors or trustees is vested.

"Government Obligations" means direct obligations of the United States of America or obligations the full and timely payment of the principal of and interest on which is unconditionally guaranteed by the United States of America.

"Gross Revenues" means all receipts, revenues, rentals, income, insurance proceeds (including, without limitation, all Medicaid, Medicare and other third party payments), condemnation awards, Entrance Fees and other moneys received by or on behalf of any Obligated Group Member, including (without limitation) revenues derived from (a) the ownership, operation or leasing of any portion of the Facilities (including, without limitation, fees payable by or on behalf of residents of the Facilities) and all rights to receive the same (other than the right to directly receive Medicaid and Medicare payments, to the extent prohibited by law), whether in the form of accounts, general intangibles or other rights, and the proceeds of such accounts, general intangibles and other rights, whether now existing or hereafter coming into existence or whether now owned or held or hereafter acquired, and (b) gifts, grants, bequests, donations and contributions heretofore or hereafter made that are legally available to meet the obligations of the Obligated Group Member to pay Obligations issued under this Master Indenture; provided, however, that there shall be excluded from Gross Revenues (i) any amounts received by an Obligated Group Member as a billing agent for another entity, except for fees received for serving as billing agent, (ii) for the avoidance of doubt, gifts, grants, bequests, donations and contributions to an Obligated Group Member heretofore or hereafter made, and the income and gains derived therefrom, which are specifically restricted by the donor or grantor to a particular purpose which is inconsistent with their use to pay Obligations issued under this Master Indenture, (iii) any moneys received by any Obligated Group Member from prospective residents or commercial tenants in order to pay for customized improvements to those Independent Living Units, Rental Units or other areas of the Facilities to be occupied or leased to such residents or tenants, and (iv) all deposits made pursuant to Residency Agreements that pursuant to the terms of such Residency Agreements are required to be held in escrow until construction of particular Facilities is completed, a certificate of occupancy has been issued and appropriate licenses, if required, have been issued.

"Guaranty" means all obligations of a Person guaranteeing, or in effect guaranteeing, any Indebtedness, dividend or other obligation of any Primary Obligor in any manner, whether directly or indirectly, including but not limited to obligations incurred through an agreement, contingent or otherwise, by such Person: (a) to purchase such Indebtedness or obligation or any Property constituting security therefor; (b) to advance or supply funds: (i) for the purchase or payment of such Indebtedness or obligation, or (ii) to maintain working capital or a balance sheet condition; (c) to purchase securities or other Property or services primarily for the purpose of assuring the owner of such Indebtedness or obligation of the ability of the Primary Obligor to make payment of the Indebtedness or obligation; or (d) otherwise to assure the owner of such Indebtedness or obligation against loss in respect thereof.

"Historical Debt Service Coverage Ratio" means, for any period of time, the ratio consisting of a numerator equal to the amount determined by dividing Income Available for Debt Service for that period by the Debt Service Requirements for such period and a denominator of one; provided, however, that in calculating the Debt Service Requirements for such period, the principal amount of any Funded Indebtedness included in such calculation which is paid during such period shall be excluded to the extent such principal amount is paid from the proceeds of other Funded Indebtedness incurred in accordance with the provisions of this Master Indenture; and provided further, to the extent an Interest Rate Agreement has been entered into in connection with any particular Funded Indebtedness, the actual debt service paid after the effect of payments made to or received from the provider of the Interest Rate Agreement shall be used in the calculation.

"Historical Pro Forma Debt Service Coverage Ratio" means, for any period of time, the ratio consisting, of a numerator equal to the amount determined by dividing Income Available for Debt Service for that period by the Maximum Annual Debt Service Requirement for the Funded Indebtedness then outstanding (other than any Funded Indebtedness being refunded with the Funded Indebtedness then proposed to be issued) and any Funded Indebtedness then proposed to be issued and a denominator of one.

"Holder" means a bearer of any Obligation issued in bearer form, and the registered owner of any Obligation issued in registered form.

"Income Available for Debt Service" means for any period, the excess of Revenues over Expenses of the Person or group of Persons involved.

"Indebtedness" means all debt or obligations of any Member for the repayment of borrowed money (including Capitalized Leases and installment purchase contracts) shown as liabilities on the balance sheet of such Member or which are properly capitalized on the balance sheet of such Member in accordance with generally accepted accounting principles, and all Guaranties; provided that Indebtedness shall not include:

    (a)    obligations of any Member to another Member or Guaranties or assumptions by a Member, directly or indirectly, of Indebtedness of another Member;

    (b)    any portion of any Indebtedness or any portion of Related Bonds payable from such Indebtedness, for which cash or Government Obligations are irrevocably on deposit in

an escrow or trust account with the Master Trustee, the Related Bond Trustee or a third party escrow agent, which cash and Government Obligations (including, where appropriate, the earnings or other increments to accrue thereon) are irrevocably required to be used to pay, and are sufficient to pay, the applicable portion of such Indebtedness or the corresponding portion of Related Bonds payable from such Indebtedness;

        (c)     rentals payable under leases which are not Capitalized Leases;

        (d)     Indebtedness of any entity that is not a Member (even though such entity may be a subsidiary of or controlled by or under common control with a Member) except to the extent of any Guaranty by any Member of such Indebtedness or to the extent that Member is otherwise obligated with respect to that Indebtedness;

        (e)     any other obligations that do not constitute debt under generally accepted accounting principles;

        (f)     liabilities to residents of senior living or similar facilities to refund Entrance Fees or other fees paid by those residents;

        (g)     any Interest Rate Agreement or any Obligation issued to evidence or secure obligations thereunder; and

        (h)     Subordinated Indebtedness to an Affiliate.

"Independent Counsel" means an attorney, other than attorney who is an employee or officer of a Member or an Affiliate of a Member, duly admitted to practice law before the highest court of any state, or a firm with which such an attorney is affiliated, and, without limitation, may include independent legal counsel for any Member, the Master Trustee or any Related Bond Trustee.

"Independent Living Units" means the independent living units that are part of the Project and are offered for occupancy on an Entrance Fee basis, and does not include Rental Units.

"Insurance Consultant" means a person or firm who in the case of an individual is not an employee or officer of any Member or of an Affiliate of any Member and which, in the case of a firm, does not control any Member of the Obligated Group or any Affiliate thereof and is not controlled by or under common control with any Member of the Obligated Group or an Affiliate thereof, appointed by the Obligated Group Representative, qualified to survey risks and to recommend insurance coverage for nursing homes or health care facilities and services of the type involved, and having a favorable reputation for skill and experience in such surveys and such recommendations, and which may include a broker or agent with whom any Member transacts business, provided in all events that such person or firm is not unacceptable to the Master Trustee.

"Interest Payment Date" means the Stated Maturity of an installment of interest on the Obligations.

"Interest Rate Agreement" means an interest rate exchange, hedge or similar agreement, expressly identified in an Officer's Certificate of the Obligated Group Representative delivered to

the Master Trustee as being entered into in order to hedge the interest payable on all or a portion of any Indebtedness, which agreement may include, without limitation, an interest rate swap, a forward or futures contract or an option (e.g. a call, put, cap, floor or collar) and which agreement does not constitute an obligation to repay money borrowed, credit extended or the equivalent thereof.

"Investment Grade Condition" means that at least one Rating Agency shall have rated the Series 2019 Bonds BBB- or Baa3 or higher (or such other rating deemed to be "investment grade" by the applicable Rating Agency) and that each Rating Agency rating the Series 2019 Bonds shall have rated the Series 2019 Bonds BBB- or Baa3 or higher (or such other rating deemed to be "investment grade" by the applicable Rating Agency.)

"Lien" means any mortgage or pledge of, security interest in or lien on, charge or encumbrance on or lease of any Property of the Person involved in favor of or to, or which secures any obligation to, any Person other than any Member.

"Lifespace" means Lifespace Communities, Inc., an Iowa nonprofit corporation, and its successors and permitted assigns under the Lifespace Master Indenture.

"Lifespace Master Indenture" means the Master Trust Indenture dated as of November 1, 2010, as supplemented and amended from time to time in accordance with its terms, among Lifespace, such other Personas as hereafter become members of the obligated group in accordance with the Lifespace Master Indenture, and the Lifespace Master Trustee.

"Lifespace Master Trustee" means U.S. Bank National Association, as master trustee under the Lifespace Master Indenture, or any successor master trustee in accordance with the terms thereof.

"Lifespace Obligated Group" means the members from time to time of the obligated group under the Lifespace Master Indenture. As of the date hereof, Lifespace is the sole member of the obligated group under the Lifespace Master Indenture.

"Liquidity Facility" means a written commitment to provide money to purchase or retire any Indebtedness if (i) on the date of delivery of such Liquidity Facility, the unsecured Funded Indebtedness or claims paying ability of the provider of such Liquidity Facility or its parent holding company or other controlling entity is rated at least "A" by a least one of the Rating Agencies and (ii) as of any particular date of determination, no amount funded under such Liquidity Facility for the payment of the principal or the purchase or redemption price of such Indebtedness (exclusive of amounts realized for the payment of accrued interest on such Indebtedness) shall be required to be repaid by the obligor on such Funded Indebtedness for a period of at least one year.

"Liquidity Provider" means Lifespace.

"Liquidity Requirement" has the meaning given such term in Section 4.20 hereof

"Liquidity Support Account" means the account by that name established by the Liquidity Provider with the Master Trustee pursuant to the Liquidity Support Agreement and Section 3.03 of this Master Indenture.

"Liquidity Support Agreement" means the Liquidity Support Agreement dated as of [April __], 2019, among the Obligor, the Liquidity Provider, and the Master Trustee.

"Master Trustee" means UMB Bank, National Association, a national banking association with trust powers, as trustee hereunder, and any successor in trust appointed pursuant to Article VIII hereof.

"Maturity" when used with respect to any Indebtedness means the date on which the principal of such Indebtedness or any installment thereof becomes due and payable as therein provided, whether at the Stated Maturity thereof or by declaration of acceleration, call for redemption, or otherwise.

"Maximum Annual Debt Service Requirement" means the largest total Debt Service Requirements for the current or any succeeding Fiscal Year; provided, however, that with respect to any calculation of the Historical Pro Forma Debt Service Coverage Ratio for purposes of Section 4.11 with respect to a Testing Date for a trailing 12-month period that occurs before or includes [the first May 1 or November 1 that is 5 years after the Effective Date], "Maximum Annual Debt Service Requirement" means $[_____], representing as of the date hereof the largest total Debt Service Requirements for the current or any succeeding Fiscal Year in the period that ends with the Fiscal Year that includes [the first May 1 or November 1 that is 5 years after the Effective Date] .

"Moody's" means Moody's Investors Service, a corporation organized and existing under the laws of the State of Delaware, its successors and assigns, and, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "Moody's" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Obligated Group, with written notice to the Master Trustee.

"Mortgaged Property" means the real property and personal property of the Members which is subject to the Lien and security interest of this Master Indenture.

"Net Proceeds" means, when used with respect to any insurance (other than the proceeds of business interruption insurance) or condemnation award or sale consummated under threat of condemnation, the gross proceeds from the insurance or condemnation award or sale with respect to which that term is used, less all expenses (including attorney's fees, adjuster's fees and any expenses of the Obligated Group or the Master Trustee) incurred in the collection of such gross proceeds.

"Net Rentals" means all fixed rents (including as such all payments which the lessee is obligated to make to the lessor on termination of the lease or surrender of the Property other than upon termination of the lease for a default thereunder) payable under a lease or sublease of real or personal Property, excluding any amounts required to be paid by the lessee (whether or not designated as rents or additional rents) on account of maintenance, repairs, insurance, taxes and similar charges. Net Rentals for any future period under any so called "percentage lease" shall be computed on the basis of the amount reasonably estimated to be payable thereunder for such period, but in any event not less than the amount paid or payable thereunder during the immediately preceding period of the same duration as such future period; provided that the amount estimated

to be payable under any such percentage lease shall in all cases recognize any change in the applicable percentage called for by the terms of such lease.

"Non Recourse Indebtedness" means any Indebtedness the liability for which is effectively limited to the proceeds of rights exercised against the personal property financed by such Indebtedness, with no recourse, directly or indirectly, to any other Property of any Member.

"Noteholder Consent" means the written consent of the Holders of a majority in aggregate principal amount of the total amount of Obligations then Outstanding.

"Obligated Group" means, collectively, all of the Obligated Group Members.

"Obligated Group Member" or "Member" means the Obligor and any other Person who has satisfied the requirements set forth in this Indenture for becoming an Obligated Group Member and its successors until any such Person or a successor or transferee Person satisfies the requirements set forth in this Indenture for ceasing to be an Obligated Group Member.

"Obligated Group Representative" means the Obligor, or any successor Obligated Group Representative appointed pursuant to Section 6.04 hereof.

"Obligation" means any promissory note, guaranty, lease, contractual agreement to pay money or other obligation of any Obligated Group Member which is authenticated and delivered pursuant to this Indenture and which is entitled to the benefits of this Indenture.

"Obligation Register" means the register of ownership of the Obligations to be maintained pursuant to this Indenture.

"Obligor" means Tarrant County Senior Living Center Inc., a Texas nonprofit corporation, and any and all successors thereto in accordance with this Indenture.

"Occupied" means an Independent Living Unit for which a Residency Agreement has been executed, all related Entrance Fees have been paid in accordance with such Residency Agreement, and the occupant of such Independent Living Unit continues to permanently reside therein. For purposes of this definition, combined Independent Living Units are counted as the number of original units so combined.

"Officer's Certificate" means a certificate signed, in the case of a certificate delivered by a Member of the Obligated Group, by the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the President, any Vice President, Director of Finance or any other Authorized Representative of any Member of the Obligated Group or, in the case of a certificate delivered by any other corporation, by the President, any Vice President, Director of Finance or any other officer or agent authorized to sign by resolution of the Governing Body of such corporation or, in the case of a certificate delivered by any other Person, the chief executive or chief financial officer of such other Person, in either case whose authority to execute such certificate shall be evidenced to the satisfaction of the Master Trustee.

"Operating Account" shall mean the deposit account established by the Obligor at _____, or any successor deposit account established by the Obligor with a financial institution.

"Opinion of Counsel" means a written opinion of counsel who may (except as otherwise expressly provided herein) be counsel to any Obligated Group Member and shall be reasonably acceptable to the Master Trustee.

"Organizational Documents" of any corporation means the articles of incorporation, certificate of incorporation, corporate charter or other document pursuant to which such corporation was organized, and its bylaws, each as amended from time to time, and as to any other Person, means the instruments pursuant to which it was created and which govern its powers and the authority of its representatives to act on its behalf.

"Outstanding" when used with respect to Obligations means, as of the date of determination, all Obligations theretofore authenticated and delivered under this Indenture, except:

(1)     Obligations theretofore cancelled and delivered to the Master Trustee or delivered to the Master Trustee for cancellation;

(2)     Obligations for whose payment or redemption money (or Defeasance Obligations to the extent permitted by Section 10.02 of this Indenture) shall have theretofore been deposited with the Master Trustee or any Paying Agent for such Obligations in trust for the Holders of such Obligations pursuant to this Indenture; provided, that, if such Obligations are to be redeemed, notice of such redemption has been duly given or waived pursuant to this Indenture or irrevocable provision for the giving of such notice satisfactory to the Master Trustee has been made pursuant to this Indenture; and

(3)     Obligations upon transfer of or in exchange for or in lieu of which other Obligations have been authenticated and delivered pursuant to this Indenture;

provided, however, that in determining whether the Holders of the requisite principal amount of Outstanding Obligations have given any request, demand, authorization, direction, notice, consent, or waiver hereunder, Obligations owned by any Obligated Group Member or any Affiliate of any Obligated Group Member shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Master Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent, or waiver, only Obligations that the Master Trustee knows to be so owned shall be so disregarded. Obligations so owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Master Trustee the pledgee's right so to act with respect to such Obligations and that the pledgee is not an Obligated Group Member or an Affiliate of any Obligated Group Member.

"Paying Agent" means any Person authorized by the Obligated Group Representative to pay the principal of (and premium, if any) or interest on any Obligations on behalf of the Obligated Group.

"Permitted Encumbrances" means, as of any particular date:

(a) Liens arising by reason of good faith deposits with a Member in connection with leases of real estate, bids or contracts (other than contracts for the payment of money), deposits by any Member to secure public or statutory obligations, or to secure, or in lieu of, surety, stay or appeal bonds (other than in connection with proceedings or litigation relating to collection of Indebtedness), and deposits as security for the payment of taxes or assessments or other similar charges; any Lien arising by reason of deposits with, or the giving of any form of security to, any governmental agency or any body created or approved by law or governmental regulation for any purpose at any time as required by law or governmental regulation as a condition to the transaction of any business or the exercise of any privilege or license, or to enable any Member to maintain self-insurance or to participate in any funds established to cover any insurance risks or in connection with workers' compensation, unemployment insurance, pensions or profit sharing plans or other social security plans or programs, or to share in the privileges or benefits required for corporations participating in such arrangements;

(b) any Lien described in Exhibit B which is existing on the date of execution of this Indenture provided that no such Lien may be extended, renewed or modified to apply to any Property of a Member of the Obligated Group not subject to such Lien on such date, unless such Lien as so extended, renewed or modified otherwise qualifies as a Permitted Encumbrance;

(c) any Lien on the Property of any Member granted in favor of or securing Indebtedness to any other Member, with Noteholder Consent;

(d) this Master Indenture, and any other Lien on Property if such Lien equally and ratably secures all of the Obligations and only the Obligations;

(e) leases which relate to Property of the Obligated Group which is of a type that is customarily the subject of such leases, such as office space for physicians and educational institutions, food service facilities, gift shops, commercial, beauty shop, banking, radiology, other similar specialty services, pharmacy and similar departments or employee rental apartments; and any leases, licenses or similar rights to use Property whereunder a Member is lessee, licensee or the equivalent thereof upon fair and reasonable terms no less favorable to the lessee or licensee than would obtain in a comparable arm's length transaction;

(f) Liens for taxes and special assessments which are not then delinquent, or if then delinquent are being contested in accordance with Section 4.05 hereof;

(g) utility, access and other easements and rights of way, restrictions, encumbrances and exceptions which do not materially interfere with or materially impair the operation of the Property affected thereby (or, if such Property is not being then operated, the operation for which it was designed or last modified);

(h) any mechanic's, laborer's, materialman's, broker's, appraiser's, supplier's or vendor's Lien or right in respect thereof if payment is not yet due under the contract in question or has been due for less than 30 days, or if such Lien is being contested in accordance with the provisions of the Master Indenture;

(i) such Liens, defects, irregularities of title and encroachments on adjoining property as normally exist with respect to property similar in character to the Property involved

and which do not materially adversely affect the value of, or materially impair, the Property affected thereby for the purpose for which it was acquired or is held by the owner thereof;

(j) zoning laws and similar restrictions which are not violated by the Property affected thereby;

(k) statutory rights under Section 291, Title 42 of the United States Code, as a result of what are commonly known as Hill Burton grants, and similar rights under other federal statutes or statutes of the state in which the Property involved is located;

(l) all right, title and interest of the state where the Property involved is located, municipalities and the public in and to tunnels, bridges and passageways over, under or upon a public way;

(m) Liens on or in Property given, granted, bequeathed or devised by the owner thereof existing at the time of such gift, grant, bequest or devise, provided that such Liens consist solely of restrictions on the use thereof or the income therefrom;

(n) Liens (other than Liens on cash or securities deposited with or subject to a control agreement for the benefit of a creditor or agent of a creditor or a surety for a creditor) resulting from any judgment or award, the time for the appeal or petition for rehearing of which shall not have expired, or in respect of which any Member shall at any time in good faith be prosecuting an appeal or proceeding for a review and in respect of which a stay of execution pending such appeal or proceeding for review shall be in existence, provided that such Liens are junior to the Lien of this Indenture;

(o) Liens by the depositor on moneys deposited by patients or others with a Member as security for or as prepayment of the cost of patient care or any rights of residents of life care, elderly housing or similar facilities to endowment, prepayment or similar funds deposited by or on behalf of such residents;

(p) Liens on Property due to rights of third party payors for recoupment of excess reimbursement paid;

(q) any security interest in a rebate fund, conventionally sized debt service or interest reserve, debt service, construction fund or any similar fund established pursuant to the terms of any Supplement, Related Bond Indenture or Related Loan Agreement in favor of the Master Trustee, a Related Bond Trustee or the holder of the Indebtedness issued pursuant to such Supplement, Related Bond Indenture or Related Loan Agreement or the holder of any related Commitment Indebtedness;

(r) any Lien on any Related Bond or any evidence of Indebtedness of any Member acquired by or on behalf of any Member which secures Commitment Indebtedness and only Commitment Indebtedness;

(s) any Lien on tangible personal Property acquired by a Member which Lien secures a Capitalized Lease, Non-Recourse Indebtedness or other Indebtedness issued, incurred or assumed by any Member in connection with and to effect such acquisition or existing

20

Indebtedness which will remain outstanding after such acquisition, if in any such case the aggregate principal amount of such Indebtedness does not exceed the fair market value subject to such Lien as determined in good faith by the Governing Body of the Member;

(t)     [reserved];

(u)     such Liens, covenants, conditions and restrictions, if any, on tangible property which do not secure Indebtedness and which are other than those of the type referred to above, and which (i) in the case of Property owned by the Obligated Group on the date of execution of the Master Indenture, do not and will not, so far as can reasonably be foreseen, materially adversely affect the value of the Property currently affected thereby or materially impair the same, and (ii) in the case of any other Property, do not materially impair or materially interfere with the operation or usefulness thereof for the purpose for which such Property was acquired or is held by a Member;

(v)     such Liens as are required to be granted by Section 246.111 of the Texas Health and Safety Code, as amended; and

(w)     any other Lien with Noteholder Consent.

"Permitted Investments" means:

(a)     Government Obligations;

(b)     debt obligations which are (i) issued by any state or political subdivision thereof or any agency or instrumentality of such state or political subdivision, and (ii) at the time of purchase, rated in one of the two highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by any Rating Agency;

(c)     any bond, debenture, note, participation certificate or other similar obligation issued by a government sponsored agency (such as the Federal National Mortgage Association, the Federal Home Loan Bank System, the Federal Home Loan Mortgage Corporation, the Federal Farm Credit Bank or the Student Loan Marketing Association) which is either (i) rated in the highest rating category by any Rating Agency, or (ii) backed by the full faith and credit of the United States of America;

(d)     U.S. denominated deposit account, certificates of deposit and banker's acceptances of any bank, trust company, or savings and loan association, including the Master Trustee or Bond Trustee or their affiliates, which have a rating on their short-term certificates of deposit on the date of purchase in one of the two highest short-term rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by any Rating Agency, and which mature not more than 360 days after the date of purchase;

(e)     commercial paper which is rated at the time of purchase in one of the two highest short-term rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by any Rating Agency, and which matures not more than 270 days after the date of purchase;

(f)    bonds, notes, debentures or other evidences of debt issued or guaranteed by a corporation which are, at the time of purchase, rated by any Rating Agency in any of the three highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise);

(g)    investment agreements with banks that at the time the agreement is executed are rated in one of the two highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by any Rating Agency or investment agreements with non-bank financial institutions, provided that (1) all of the unsecured, direct long-term debt of either the non-bank financial institution or the related guarantor of such non-bank financial institution is rated by any Rating Agency at the time the agreement is executed in one of the two highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) for obligations of that nature; or (2) if the non-bank financial institution and any related guarantor have no outstanding long-term debt that is rated, all of the short-term debt of either the non-bank financial institution or the related guarantor of the non-bank financial institution is rated by any Rating Agency in one of the two highest rating categories (without regard to any refinement or gradation of the rating category by numerical modifier or otherwise) assigned to short-term debt by any Rating Agency. If such non-bank financial institution and any guarantor do not have any short-term or long-term debt, but do have a rating in one of the two highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise), then investment agreements with the non-bank financial institution will be permitted. Any investment agreement pursuant to this clause (g) shall provide that if at any time after purchase the provider of the investment agreement drops below the two highest rating categories assigned by the applicable Rating Agency, (a) within 30 days, the provider will either (1) cause its obligations under the agreement to be assumed by another provider rated in one of the two highest rating categories or (2) secure the agreement with Government Obligations which are represented to be free and clear of third-party claims, are required to be valued no less frequently than weekly, monthly, are required to maintain a fair market value in relation to the amount owed under the investment agreement, including principal and interest, equal to at least 103%, and are held in the custody of the Master Trustee or the Master Trustee's custodial agent, and (b) any failure of the provide to comply with clause (a)(1) or (2) shall constitute an event of default under the agreement;

(h)    repurchase agreements with respect to and secured by Government Obligations or by obligations described in clause (b) and (c) above, which agreements may be entered into with a bank (including the Master Trustee, the Bond Trustee or their affiliates), a trust company, financial services firm or a broker dealer which is a member of the Securities Investors Protection Corporation, provided that (i) the Bond Trustee or a custodial agent of the Bond Trustee has possession of the collateral and that the collateral is free and clear of third-party claims, (ii) a master repurchase agreement or specific written repurchase agreement governs the transaction, (iii) the collateral securities are valued no less frequently than monthly, and (iv) the fair market value of the collateral securities in relation to the amount of the repurchase obligation, including principal and interest, is equal to at least 103%, and (v) the collateral securities are held in the custody of the Bond Trustee or the Bond Trustee's agent;

(i)     investments in a money market fund, including funds of the Bond Trustee, the Master Trustee or their affiliates, rated (at the time of purchase) in the highest rating category for this type of investment by any Rating Agency; and

(j)     shares in any investment company, money market mutual fund, fixed income mutual fund, exchange-traded fund or other collective investment fund registered under the federal Investment Company Act of 1940, whose shares are registered under the Securities Act of 1933, and whose investments consist solely of Permitted Investments as defined in paragraphs (a) through (i) above, including money market mutual funds from which the Bond Trustee, the Master Trustee or their affiliates derive a fee for investment advisory or other services to the fund.

The Master Trustee shall be entitled to assume that any investment which at the time of purchase is a Permitted Investment remains a Permitted Investment thereafter, absent receipt of written notice or information to the contrary. To the extent such investment is no longer a Permitted Investment, the Obligated Group Representative shall promptly provide the Master Trustee written notice of such status and the Master Trustee shall proceed to liquidate such investment.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof or any other entity.

"Place of Payment" for a series of Obligations means a city or political subdivision designated as such pursuant to this Indenture or a Supplement.

"Plan" means the plan of reorganization filed by the Obligor in the Bankruptcy Court on _____, 2019, as amended.

"Premises" means the real property described in Exhibit A hereto, as it may be amended from time to time.

"Primary Obligor" means the Person who is primarily obligated on an obligation which is guaranteed by another Person.

"Project" means The Stayton at Museum Way, a continuing care retirement community consisting of (a) the Premises, (b) Independent Living Units, Rental Units, assisted living units, a health center including nursing beds, and related common areas, (c) necessary or useful furnishings, equipment and machinery, and (d) such interests in land as may be necessary or suitable for the foregoing, including roads and rights of access, utilities and other necessary site preparation facilities.

"Projected Debt Service Coverage Ratio" means, for any future period, the ratio consisting of a numerator equal to the amount determined by dividing the projected Income Available for Debt Service for that period by the Maximum Annual Debt Service Requirement for the Funded Indebtedness expected to be outstanding during such period and a denominator of one.

"Projected Rate" means the projected yield at par of an obligation as set forth in the report of a Consultant, or if a contemporaneous Funded Indebtedness issue is offered by the Obligor that

is not subject to any credit enhancement, the yield on the Funded Indebtedness for a comparable term over which Put Indebtedness or Balloon Indebtedness is to be computed in accordance with Section 4.17. Such report shall state that in determining the Projected Rate such Consultant reviewed the yield evaluations at par of not less than three obligations (or such lesser number as the Consultant shall deem appropriate, but in no event less than one) selected by such Consultant, the interest on which is entitled to the exemption from federal income tax afforded by Section 103(a) of the Code or any successor thereto (or, if it is not expected that it will be reasonably possible to issue such tax exempt obligations, or if the interest on the Indebtedness for which the Projected Rate is being calculated is not entitled to such exemption, then obligations the interest on which is subject to federal income taxation) which obligations such Consultant states in its report are reasonable comparators for utilizing in developing such Projected Rate and which obligations: (i) were outstanding on a date selected by the Consultant which date so selected occurred during the 90 day period preceding the date of the calculation utilizing the Projected Rate in question, (ii) to the extent practicable, are obligations of Persons engaged in operations similar to those of the Obligated Group and having a credit rating similar to that of the Obligated Group, (iii) are not entitled to the benefits of any credit enhancement (including without limitation any letter or line of credit or insurance policy) if the obligation for which the Projected Rate is being determined is not benefited by any credit enhancement, and (iv) to the extent practicable, have a remaining term and amortization schedule substantially the same as the obligation with respect to which such Projected Rate is being developed.

"Property" means any and all rights, titles and interests in and to any and all property, whether real or personal, tangible (including cash) or intangible, wherever situated and whether now owned or hereafter acquired by a Person.

"Property, Plant and Equipment" means all Property of each Member which is classified as property, plant and equipment under generally accepted accounting principles.

"Put Date" means (a) any date on which an owner of Put Indebtedness may elect to have such Put Indebtedness paid, purchased or redeemed by or on behalf of the underlying obligor prior to its stated maturity date or (b) any date on which Put Indebtedness is required to be paid, purchased or redeemed from the owner by or on behalf of the underlying obligor (other than at the option of the owner) prior to its stated maturity date, other than pursuant to any mandatory sinking fund or other similar fund or other than by reason of acceleration upon the occurrence of an event of default.

"Put Indebtedness" means Indebtedness which is (a) payable or required to be purchased or redeemed by or on behalf of the underlying obligor, at the option of the owner thereof, prior to its stated maturity date or (b) payable or required to be purchased or redeemed from the owner by or on behalf of the underlying obligor (other than at the option of the owner) prior to its stated maturity date, other than pursuant to any mandatory sinking fund or other similar fund or other than by reason of acceleration upon the occurrence of an event of default.

"Rating Agency" means Moody's, Standard & Poor's or Fitch.

"Related Bond Indenture" means any indenture, bond resolution or other comparable instrument pursuant to which a series of Related Bonds is issued, or, in the case of Related Bonds not issued by a governmental issuer, means the Related Loan Agreement.

"Related Bond Trustee" means the trustee and its successor in the trust created under any Related Bond Indenture, or, in the case of Related Bonds not issued by a governmental issuer, means the lender or, in the case of multiple lenders, lender agent or representative designated under the Related Loan Agreement.

"Related Bonds" means the revenue bonds or other obligations issued by any state, territory or possession of the United States or any municipal corporation or political subdivision formed under the laws thereof or any constituted authority or agency or instrumentality of any of the foregoing empowered to issue obligations on behalf thereof ("governmental issuer"), pursuant to a single Related Bond Indenture, the proceeds of which are loaned or otherwise made available to any Obligated Group Member in consideration of the execution, authentication and delivery of an Obligation to or for the order of such governmental issuer, or, in the case of a loan or other extension of credit made by a lender or group of lenders other than a governmental issuer and secured by an Obligation, means the applicable loan or credit facility.

"Related Loan Agreement" means any loan agreement, financing agreement, credit agreement or other comparable instrument entered into in connection with a series of Related Bonds.

"Rental Units" means units that are offered for occupancy on a rental basis with no Entrance Fee payable in connection with occupancy.

"Required Information Recipient" means the Master Trustee, each Related Bond Trustee, the Municipal Securities Rulemaking Board's EMMA information repository (in the form required for posting thereon), and all beneficial owners of Related Bonds who hold $500,000 or more of Related Bonds and request such reports in writing (which written request shall include a certification as to such ownership).

"Residency Agreement" means each and every contract, including without limitation any "Reservation Agreement" or "Residency Agreement", as amended from time to time, between an Obligated Group Member and a resident of the Project giving the resident rights of occupancy in the Project, including, without limitation, the Independent Living Units, Rental Units, assisted living units, skilled nursing beds or specialty care (dementia) beds and providing for services to such resident.

"Responsible Officer" when used with respect to the Master Trustee means the officer in the corporate trust department or comparable department of the Master Trustee having direct responsibility for administration of this Master Indenture.

"Revenue Fund" means the Revenue Fund created by Section 3.05 hereof.

"Revenues" means, for any period, (a) in the case of any Person providing health care services and/or senior living services, the sum of (i) net patient service revenues and resident service revenues plus (ii) other operating revenues, plus (iii) non operating revenues (other than

any revenues recognized from deferred revenues related to Entrance Fees, Contributions, income derived from the sale of assets not in the ordinary course of business, any gain from the extinguishment of debt or other extraordinary item, earnings which constitute Funded Interest or earnings on amounts which are irrevocably deposited in escrow to pay the principal of or interest on Indebtedness, but including investment income), plus (iv) Unrestricted Contributions, plus or minus, as applicable, (v) Entrance Fees received minus Entrance Fees refunded to residents, and (b) in the case of any other Person, gross revenues less sale discounts and sale returns and allowances, as determined in accordance with generally accepted accounting principles; but excluding in either case (i) any unrealized gain or loss resulting from changes in the valuation of investment securities or unrealized changes in the value of derivative investments, (ii) any gains on the sale or other disposition of fixed or capital assets not in the ordinary course, (iii) earnings resulting from any reappraisal, revaluation or write up of fixed or capital assets, and (iv) insurance (other than business interruption) and condemnation proceeds; provided, however, that if such calculation is being made with respect to the Obligated Group, such calculation shall be made in such a manner so as to exclude any revenues attributable to transactions between any Member and any other Member. For the avoidance of doubt, for purposes of this definition, the net cash amount of Entrance Fees received minus Entrance Fees refunded during the applicable calculation period is treated as an addition to Revenues (if positive) or subtraction from Revenues (if negative), and any deferred recognition of Entrance Fees in other periods for GAAP purposes is disregarded.

"Series 2019 Bond Trustee" means UMB Bank, National Association, as bond trustee under the Bond Indenture.

"Series 2019 Bonds" means the Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Series 2019.

"Series 2019 Note" means the Series 2019 Note issued by the Obligated Group Representative pursuant to and described in the Series 2019 Supplemental Indenture.

"Series 2019 Supplemental Indenture" means the Supplemental Master Trust Indenture No. 3 dated as of [November 1], 2019 between the Obligated Group Representative and the Master Trustee.

"Short Term," when used in connection with Indebtedness, means having an original maturity less than or equal to one year and not renewable at the option of the debtor for a term greater than one year beyond the date of original issuance or subject to a Put within one year of the incurrence of such Indebtedness (unless such Put is unconditionally payable from other Indebtedness in effect at the time of incurrence that is not Short Term.)

"Standard & Poor's" means Standard & Poor's, a division of The McGraw Hill Companies, Inc., a corporation organized and existing under the laws of the State of New York, its successors and assigns, and, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "Standard & Poor's" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Obligated Group Representative, with written notice to the Master Trustee.

"Stated Maturity" when used with respect to any Indebtedness or any installment of interest thereon means any date specified in the instrument evidencing such Indebtedness or such installment of interest as a fixed date on which the principal of such Indebtedness or any installment thereof (including any sinking fund installment) or the fixed date on which such installment of interest is due and payable.

"Subordinated Indebtedness" means any promissory note, guaranty, lease, contractual agreement to pay money or other obligation the terms of the documents providing for the issuance of which expressly provide that no payments shall be made on such Subordinated Indebtedness at any time that any Obligations, whether currently Outstanding or subsequently issued, are Outstanding, unless such payments are permitted under Section 3.09 of this Master Indenture and that the Master Trustee is an intended third party beneficiary of such subordination provision.

"Supplement" means an indenture supplemental to, and authorized and executed pursuant to the terms of, this Indenture.

"Target Coverage Ratio" means, for the first two Testing Dates, 1.10:1.00, and for each subsequent Testing Date, 1.20:1.00.

"Tax Exempt Organization" means a Person organized under the laws of the United States of America or any state thereof that is exempt from federal income taxes under Section 501(a) of the Code as an organization described in Section 501(c)(3) of the Code, or corresponding provisions of federal income tax laws from time to time in effect.

"Testing Date" means each June 30 and December 31, commencing with the first such date that is at least 12 months after the Effective Date.

"Threshold Amount" means $1,000,000.

"Trust Estate" has the meaning given such term in the Granting Clauses hereof.

"Unrestricted Contributions" means Contributions which are not restricted in any way that would prevent their application to the payment of debt service on Indebtedness of the Person receiving such Contributions.

Section 1.02    Compliance Certificates and Reports.  Whenever the amount or date of any of the following is a condition to the taking of any action permitted hereby,

(a)     Estimated Revenues, Expenses, Cash and Investments and Income Available for Debt Service of any Person for any future Fiscal Year shall be established by a certificate or report of a Consultant stating the amount of such estimated item based upon assumptions provided by such Person and stating that such assumptions are, in the opinion of the Consultant, reasonable.

(b)     any of:

(1)     Revenues, Expenses, Cash and Investments and Income Available for Debt Service of any Person for any prior Fiscal Year or period,

27

(2)     Maximum Annual Debt Service of any Person, and

(3)     principal of and interest on any Indebtedness shall be established by an Officer's Certificate of the Obligated Group Representative stating the amount of such item and that such amounts have been derived from either the most recent financial statements of the Obligated Group delivered to the Master Trustee pursuant to Section 4.15 hereof or, for any period other than a prior Fiscal Year, from the internally prepared financial statements of the Obligated Group for such period;

(c)     the anticipated date of completion of any construction project of any Person shall be established by an Officer's Certificate of the Obligated Group Representative; and

(d)     securities shall include any amounts invested in marketable securities, whether classified as short term or long term assets.

All calculations required to be made hereunder with respect to the Obligated Group shall be made-after elimination of intercompany items on a combined basis. The character or amount of any asset, liability or item of income or expense required to be determined or any consolidation, combination or other accounting computation required to be made for the purposes hereof, shall be determined or made in accordance with generally accepted accounting principles in effect on the date hereof, or at the option of the Obligated Group Representative, at the time in effect (provided that such generally accepted accounting principles are applied consistently with the requirements existing either on the date hereof or at the time in effect) except that assets, liabilities, items of income and expenses of Affiliates which are not included in the Obligated Group shall not be taken into account, and except where such principles are inconsistent with the requirements of this Indenture; provided, however, that there shall not be included in any calculation of any item otherwise required to be included in such calculation with respect to any Person which has withdrawn or is withdrawing from the Obligated Group.

Section 1.03     Form of Documents Delivered to Master Trustee. In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents. Any certificate or opinion of any officer of a Person may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any such certificate or Opinion of Counsel may be based, in so far as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of a specified Person stating that the information with respect to such factual matters is in the possession of such Person, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

28

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Section 1.04 <u>Acts of Holders of Obligations</u>. (a) Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders of Obligations may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders of Obligations in person or by agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Master Trustee, and, where it is hereby expressly required, to the Obligated Group Representative. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Holders of Obligations signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent, or of the holding by any Person of unregistered Obligations, shall be sufficient for any purpose of this Indenture and conclusive in favor of the Master Trustee and the Obligated Group Members, if made in the manner provided in this Section.

(b) The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by the certificate of any notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof. Where such execution is by an officer of a corporation or a member of a partnership, on behalf of such corporation or partnership, such certificate or affidavit shall also constitute sufficient proof of his authority.

(c) The amount of Obligations held in bearer form held by any Person executing any such instrument or writing as a Holder of Obligations, the numbers of such Obligations, and the date of his holding the same, may be proved by the production of such Obligations or by a certificate executed, as depositary, by any trust company, bank, banker or member of a national securities exchange (wherever situated), if such certificate is in form satisfactory to the Master Trustee, showing that at the date therein mentioned such Person had on deposit with such depositary, or exhibited to it, the Obligations held in bearer form therein described; or such facts may be proved by the certificate or affidavit of the Person executing such instrument or writing as a Holder of Obligations, if such certificate or affidavit is in form satisfactory to the Master Trustee. The Master Trustee and the Obligated Group Members may assume that such ownership of any Obligation held in bearer form continues until (1) another certificate bearing a later date issued in respect of the same Obligation is produced, or (2) such Obligation is produced by some other Person, or (3) such Obligation is registered as to principal or is surrendered in exchange for an Obligation in registered form, or (4) such Obligation is no longer Outstanding.

(d) The fact and date of execution of any such instrument or writing and the amount and numbers of Obligations held in bearer form held by the Person so executing such instrument or writing may also be proved in any other manner which the Master Trustee deems sufficient; and the Master Trustee may in any instance require further proof with respect to any of the matters referred to in this Section.

(e)     The ownership of Obligations in registered form shall be proved by the Obligation Register.

(f)     Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Obligation shall bind every future Holder of the same Obligation and the Holder of every Obligation issued upon the transfer thereof or in exchange therefor or in lieu thereof, in respect of anything done or suffered to be done by the Master Trustee or the Obligated Group Members in reliance thereon, whether or not notation of such action is made upon such Obligation.

Section 1.05   Notices, etc., to Master Trustee and Obligated Group Members.   Any request, demand, authorization, direction, notice, consent, waiver or Act of Holders of Obligations or other document provided or permitted by this Indenture to be made upon, given or furnished to, or filed with,

(1)     the Master Trustee by any Holder of Obligations or by any specified Person shall be sufficient for every purpose hereunder if actually received by the Master Trustee at UMB Bank, National Association, 120 Sixth Street South, Suite 1400, Minneapolis, MN 55402, Attention:   Corporate Trust Department;

(2)     the Obligated Group Members by the Master Trustee or by any Holder of Obligations shall be sufficient for every purpose hereunder if in writing and mailed, first class postage prepaid, to the Obligated Group Representative addressed to it at Tarrant County Senior Living Center Inc., c/o Lifespace Communities, Inc., 4201 Corporate Drive, West Des Moines, Iowa 50266, Attention:   Chief Financial Officer or at any other address previously furnished in writing to the Master Trustee by the Obligated Group Representative, with a copy to Lifespace Communities, Inc., 4201 Corporate Drive, West Des Moines, Iowa 50266, Attention:  Jodi Hirsch, Senior Vice President and General Counsel; or

(3)     any Obligated Group Member by the Master Trustee or by any Holder of Obligations shall be sufficient for every purpose hereunder if in writing and mailed, registered or certified first class postage prepaid, to the Obligated Group Member addressed to it at the address specified in the Supplement executed by such Obligated Group Member or at any other address previously furnished in writing to the Master Trustee by such Obligated Group Member.

Section 1.06   Notices to Holders of Obligations; Waiver.   Where this Indenture provides for notice to Holders of Obligations of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, to each Holder of such Obligations, at his address as it appears on the Obligation Register, not later than the latest date, and not earlier than the earliest date, prescribed for the transmission of such notice. Where this Indenture provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be

the equivalent of such notice. Waivers of notice by Holders of Obligations shall be filed with the Master Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

Section 1.07 [Reserved.]

Section 1.08 Effect of Headings and Table of Contents. The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 1.09 Successors and Assigns. All covenants and agreements in this Indenture by the Obligated Group Members shall bind their respective successors and assigns, whether so expressed or not.

Section 1.10 Separability Clause. In case any provision in this Indenture or in the Obligations shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

ARTICLE II
THE OBLIGATIONS

Section 2.01 Series and Amount of Obligations. (a) Obligations shall be issued under this Indenture in series created by Supplements permitted hereunder. No Obligations may be issued hereunder to evidence or secure Non Recourse Indebtedness or Subordinated Indebtedness. Each series shall be designated to differentiate the Obligations of such series from the Obligations of any other series. No Obligation issued hereunder shall be secured on a basis senior to other Obligations; provided, however, that the provision of an Interest Rate Agreement, letter or line of credit, standby bond purchase agreement, bond insurance policy or other similar instrument or obligation issued by a financial institution or municipal bond insurer or the establishment of a debt service reserve fund or account for the benefit of the Holders of certain Obligations, shall not be considered as the providing of security for such Obligations for purposes of the above preclusion on an Obligation being secured on a basis senior to other Obligations. The number of series of Obligations that may be created under this Indenture is not limited. The aggregate principal amount of Obligations of each series that may be created under this Indenture is not limited except as restricted by Supplement and the provisions of Article IV of this Indenture.

(b) Any Obligated Group Member proposing to incur Indebtedness, other than the Series 2019 Note, whether evidenced by Obligations issued pursuant to a Supplement or by evidences of Indebtedness issued pursuant to documents other than this Master Indenture, shall give written notice of its intention to incur such Indebtedness, including in such notice the amount of Indebtedness to be incurred, to the Obligated Group Representative and the other Obligated Group Members. The Obligated Group Representative shall provide the Master Trustee with a copy of any such notice it receives prior to the date such Indebtedness is to be incurred. Any such Obligated Group Member, other than the Obligated Group Representative, proposing to incur such Indebtedness other than the Series 2019 Note, shall obtain the written consent of the Obligated Group Representative, which consent shall be evidenced by an Officer's Certificate of the Obligated Group Representative filed with the Master Trustee or an endorsement to such

31

Indebtedness signed by the Obligated Group Representative. The Series 2019 Note is issued simultaneously with the execution and delivery hereof.

Section 2.02  Appointment of Obligated Group Representative. Each Obligated Group Member, by becoming an Obligated Group Member, irrevocably appoints the Obligated Group Representative as its agent and true and lawful attorney in fact and grants to the Obligated Group Representative (a) full and exclusive power to execute Supplements authorizing the issuance of Obligations or series of Obligations, (b) full and exclusive power to execute Obligations for and on behalf of the Obligated Group and each Obligated Group Member, (c) full and exclusive power to execute Supplements on behalf of the Obligated Group and each Obligated Group Member pursuant to Sections 9.01 and 9.02 hereof, and (d) full power to prepare, or authorize the preparation of, any and all documents, certificates or disclosure materials reasonably and ordinarily prepared in connection with the issuance of Obligations hereunder, or Related Bonds associated therewith, and to execute and deliver such items to the appropriate parties in connection therewith.

Section 2.03  Execution and Authentication of Obligations. All Obligations shall be executed for and on behalf of the Obligated Group and the Obligated Group Members by an Authorized Representative of the Obligated Group Representative. The signature of any such Authorized Representative may be manual or may be mechanically or photographically reproduced on the Obligation. If any Authorized Representative whose signature appears on any Obligation ceases to be such Authorized Representative before delivery thereof, such signature shall remain valid and sufficient for all purposes as if such Authorized Representative had remained in office until such delivery. Each Obligation shall be manually authenticated by an authorized officer of the Master Trustee, without which authentication no Obligation shall be entitled to the benefits hereof.

The Master Trustee's authentication certificate shall be substantially in the following form:

MASTER TRUSTEE'S AUTHENTICATION CERTIFICATE

This [Obligation] is one of the Obligations referred to in the aforementioned Master Indenture.

Date of Authentication: _____          Master Trustee: _____

By: Authorized Signatory

Section 2.04  Supplement Creating Obligations. The Obligated Group Representative (on behalf of the Obligated Group Members) and the Master Trustee may from time to time enter into a Supplement in order to create Obligations hereunder. Each Supplement authorizing the issuance of Obligations shall specify and determine the date of the Obligations, the principal amount thereof, the purposes for which such Obligations are being issued, the form, title, designation, and the manner of numbering or denominations, if applicable, of such Obligations, the date or dates of maturity of such Obligations, the rate or rates of interest (or method of determining the rate or rates of interest) and premium, if any, borne by such Obligations, the arrangement for place and medium of payment, and any other provisions deemed advisable or necessary. Each Obligation shall be issuable, shall be transferable and exchangeable and shall be subject to redemption as specified in

this Master Indenture and in the Supplement. Any Obligation to be held by a Related Bond Trustee in connection with the issuance of Related Bonds shall be in the principal amount equal to the aggregate principal amount of such Related Bonds and shall be registered in the name of the Related Bond Trustee as assignee of the issuer of the Related Bonds. Unless an Obligation has been registered under the Securities Act of 1933, as amended (or similar legislation subsequently enacted), each such Obligation shall be endorsed with a legend which shall read substantially as follows: "This [describe Obligation] has not been registered under the Securities Act of 1933 or any state securities law (or any such similar subsequent legislation);" provided, however, such legend shall not be required if the Master Trustee is provided with an Opinion of Counsel to the effect that such legend is not required.

A Supplement and the Obligations issued thereunder may contain, as applicable, provisions relating to bond insurance or other forms of credit enhancement, as well as any and all compatible provisions necessary in order to make the Obligations meet the requirements of an issuer of any credit enhancement. Similarly, a Supplement may provide for Obligations to be issued in fixed or variable rate forms, as the case may be, with such tender and redemption provisions as may be deemed necessary for the issuance thereof and provide for the execution of required documents necessary for such purposes, and may specifically subordinate payment, remedies and any other provisions of the Obligations issued thereunder to the provisions of any other Obligations.

Section 2.05    Conditions to Issuance of Obligations Hereunder.    With respect to Obligations created hereunder, simultaneously with or prior to the execution, authentication and delivery of Obligations pursuant to this Master Indenture:

(a)    The Obligated Group Representative (on behalf of the Obligated Group Members) and the Master Trustee shall have entered into a Supplement as provided in Section 2.04 hereof, and all requirements and conditions to the issuance of such Obligations set forth in the Supplement and in this Master Indenture, including, without limitation, the provisions of Section 4.16 hereof (provided that such provisions shall not be applicable to the Series 2019 Note), shall have been complied with and satisfied, as provided in an Officer's Certificate of the Obligated Group Representative, a copy of which shall be delivered to the Master Trustee; and

(b)    The Obligated Group Representative shall have delivered to the Master Trustee an Opinion of Counsel to the effect that (1) registration of such Obligations under the Securities Act of 1933, as amended, and qualification of this Master Indenture or the Supplement under the Trust Indenture Act of 1939, as amended, is not required, or, if such registration or qualification is required, that all applicable registration and qualification provisions of said acts have been complied with, and (2) the Master Indenture and the Obligations are valid, binding and enforceable obligations of each of the Obligated Group Members in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance and other laws affecting creditors' rights generally, usual equity principles and other customary exclusions.

Section 2.06    List of Holders of Obligations.  The Master Trustee shall keep on file at its office the Obligation Register which shall consist of a list of the names and addresses of the Holders of all Obligations.  At reasonable times and under reasonable regulations established by the Master Trustee, the Obligation Register may be inspected and copied by any Obligated Group

Member, the Holder of any Obligation or the authorized representative thereof, provided that the ownership by such Holder and the authority of any such designated representative shall be evidenced to the satisfaction of the Master Trustee.

Section 2.07 <u>Optional and Mandatory Redemption</u>. Obligations of each series shall be subject to optional and mandatory redemption in whole or in part and may be redeemed prior to maturity, as provided in the Supplement creating such series, but not otherwise.

Section 2.08 <u>Mutilated, Destroyed, Lost and Stolen Obligations</u>. If (i) any mutilated Obligation is surrendered to the Master Trustee, or the Master Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Obligation, and (ii) there is delivered to the Master Trustee such security or indemnity as may be required by the Master Trustee to save it and the Obligated Group Representative harmless, then, in the absence of notice to the Obligated Group Representative or the Master Trustee that such Obligation has been acquired by a bona fide purchaser, the Obligated Group Representative shall execute and upon its request the Master Trustee shall authenticate and deliver in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Obligation, a new Obligation of like tenor, series, interest rate and principal amount, bearing a number not contemporaneously outstanding.

In case any such mutilated, destroyed, lost or stolen Obligation has become or is about to become due and payable, the Obligated Group Representative in its discretion may, instead of issuing a new Obligation, pay such Obligation.

Upon the issuance of any new Obligation under this Section, the Obligated Group Representative and the Master Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Master Trustee) connected therewith.

Every new Obligation issued pursuant to this Section in lieu of any destroyed, lost or stolen Obligation shall constitute an original additional contractual obligation of the maker thereof, whether or not the destroyed, lost or stolen Obligation shall be at any time enforceable by anyone, and shall be entitled to all the benefits and security of this Indenture equally and proportionately with any and all other Obligations duly issued hereunder.

The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Obligations.

Section 2.09 <u>Cancellation</u>. All Obligations surrendered for payment, redemption, transfer or exchange shall, if delivered to any Person other than the Master Trustee, be delivered to the Master Trustee and, if not already canceled or required to be otherwise delivered by the terms of the Supplement authorizing the series of Obligations of which such Obligation is a part, shall be promptly canceled by it. The Obligated Group Representative may at any time deliver to the Master Trustee for cancellation any Obligations previously authenticated and delivered hereunder, which the Obligated Group Representative may have acquired in any manner whatsoever, and all Obligations so delivered shall be promptly canceled by the Master Trustee. No Obligations shall be authenticated in lieu of or in exchange for any Obligations canceled as

provided in this Section, except as expressly permitted by this Indenture. All canceled Obligations held by the Master Trustee shall be treated by the Master Trustee in accordance with its current document retention policies.

## ARTICLE III
## FUNDS AND ACCOUNTS

Section 3.01   [Reserved.]

Section 3.02   [Reserved.]

Section 3.03   Liquidity Support Account.

*[note: we anticipate amendment of the existing MTI at the time the Liquidity Support Agreement is executed to provide substantially similar language with respect to the funded $3,000,000.]*

(a)   The Master Trustee has previously established the Liquidity Support Account under the Original Master Indenture. The Liquidity Support Account continues in effect under this Master Indenture. On the Effective Date, pursuant to the terms of the Liquidity Support Agreement, the Master Trustee shall receive from the Liquidity Provider, and upon receipt shall deposit to the Liquidity Support Account, the amount, if any, as together with other amounts then on deposit in the Liquidity Support Account shall equal $3,000,000. The money deposited in the Liquidity Support Account, together with all investments thereof and investment income therefrom, shall be held in trust and applied solely as provided in this Section and the Liquidity Support Agreement. Pending disbursements of the amounts on deposit in the Liquidity Support Account, the Master Trustee shall promptly invest and reinvest such amounts in accordance with the Liquidity Support Agreement.

(b)   The Bond Trustee or the Obligor may from time to time request the Master Trustee to request deposits by the Liquidity Provider from the Unfunded Liquidity Support (as defined in the Liquidity Support Agreement) to the Liquidity Support Account in accordance with and subject to the limits under the Liquidity Support Agreement. All amounts received by the Master Trustee from the Liquidity Provider following such a request shall be deposited in the Liquidity Support Account.

(c)   The Bond Trustee or the Obligor may from time to time direct the Master Trustee to withdraw moneys from the Liquidity Support Account (including without limitation moneys deposited therein pursuant to subsection (b)) for operating expenses of the Project in accordance with the Liquidity Support Agreement or, if no other funds are available therefor (other than funds in a debt service reserve fund), to pay amounts due but unpaid on any Obligations upon submission of a disbursement request in accordance with the Liquidity Support Agreement. The Master Trustee shall fund any such withdrawals from amounts deposited in the Liquidity Support Account pursuant to subsection (b) or, if no such moneys are available for deposit or such moneys are not deposited on a timely basis by the Liquidity Provider, from available amounts described in subsection (a).

(d)     If the conditions for such release under the terms of the Liquidity Support Agreement are satisfied, the Master Trustee shall transfer any remaining funds in the Liquidity Support Account to the Liquidity Provider in accordance with the Liquidity Support Agreement.

Section 3.04    [Reserved.]

Section 3.05    <u>Revenue Fund</u>. On the fifth Business Day preceding the end of each month following the occurrence of an Event of Default, the Master Trustee shall withdraw and pay or deposit from the amounts on deposit in the Revenue Fund the following amounts in the order indicated:

<u>First</u>:           To the payment of all amounts due the Master Trustee under this Indenture;

<u>Second</u>:       To the payment of the amounts then due and unpaid upon the Obligations, first, for interest, ratably, without preference or priority of any kind, according to the amounts due and payable on such Obligations for interest and second, for principal (and premium, if any) ratably, without preference or priority of any kind, according to the amounts due and payable on such Obligations for principal (and premium, if any), provided that if the Obligations shall have been accelerated pursuant to Section 7.02, payments shall; be made according to the amounts due and payable on such Obligations for interest and principal (and premium, if any) ratably, without preference or priority of any kind for interest, principal or premium, according to the amounts due and payable on such Obligations;

<u>Third</u>:         To the Operating Account, on the first Business Day of each month, the amount certified by the Obligated Group Representative to be needed to pay operating expenses of the Project required to be paid in such month, which amount shall not exceed 110% of the amount set forth for such month in the Budget; and

<u>Fourth</u>:       Such other amounts as the Obligated Group Representative may request for such purposes as shall be specified in a written request to the Master Trustee, but only if the Master Trustee has received Notcholder Consent to such payments or transfers.

If the Master Trustee has received Notcholder Consent to such reprioritization, all or any portion of amounts described in paragraphs Third or Fourth of this subsection (c), as specified in the applicable Noteholder Consent, may be paid out at a higher level of priority (e.g., ahead of Second), as so specified, during such period as is so specified.

The money deposited to the Revenue Fund, together with all investments thereof and investment income therefrom, shall be held in trust and applied solely as provided in this Section and in Section 7.09 hereof. Pending disbursements of the amounts on deposit in the Revenue Fund, the Master Trustee shall promptly invest and reinvest such amounts in accordance with Section 3.06 hereof.

Section 3.06 Investment of Funds. Any moneys held by the Master Trustee hereunder as part of any fund or account established under this Indenture shall be invested or reinvested by the Master Trustee in Permitted Investments upon the receipt of an Obligated Group Representative Request (upon which the Master Trustee is entitled to rely). Any such investments shall be held by or under the control of the Master Trustee and shall mature, or be redeemable at the option of the Master Trustee at such times as it is anticipated that moneys from the particular fund will be required for the purposes of this Indenture. For the purpose of any investment or reinvestment under this Section, investments shall be deemed to mature at the earliest date on which the obligor is, on demand, obligated to pay a fixed sum in discharge of the whole of such obligation. Any Permitted Investments may be purchased from or sold to the Master Trustee or any of its respective affiliates.

Section 3.07 Allocation and Transfers of Investment Income. Any investments in any fund or account shall be held by or under the control of the Master Trustee and shall be deemed at all times a part of the fund or account from which the investment was made. Any loss resulting from such investments shall be charged to such fund or account; provided that investment earnings on the Liquidity Support Account shall be paid to Lifespace in accordance with the terms of the Liquidity Support Agreement.

Section 3.08 Master Trustee Relieved From Responsibility. The Master Trustee shall be fully protected in relying upon any Obligated Group Representative Request relating to investments in any fund, and shall not be liable for any losses or prepayment penalties as a result of complying with any such Obligated Group Representative Request, and shall not be required to ascertain any facts with respect to such Request.

Section 3.09 Payments on Subordinated Indebtedness. A Member will not make payments on Subordinated Indebtedness unless the Obligated Group Representative delivers an Officer's Certificate to the Master Trustee prior to the applicable payment on Subordinated Indebtedness certifying that the following conditions are satisfied:

(a) If the proposed payment on the Subordinated Indebtedness is to be made to an Affiliate, had the payment occurred as of the last day of the most recent fiscal quarter for which financial statements have been delivered under Section 4.15, the Obligated Group would have had Days Cash on Hand of not less than 150 after that payment;

(b) If the proposed payment on the Subordinated Indebtedness is to be made to a Person that is not an Affiliate, (i) had the payment occurred as of the last day of the most recent fiscal quarter for which financial statements have been delivered under Section 4.15, the Obligated Group would have had Days Cash on Hand of not less than 120 after that payment, and (ii) had the payment occurred during the most recent Fiscal Year for which audited financial statements of the Obligated Group are available, the Historical Debt Service Coverage Ratio for that Fiscal Year, deducting the amount of the proposed payment from Income Available for Debt Service, would have been not less than 1.30; and

(c) Whether the payment is to an Affiliate or to a Person that is not an Affiliate, there is no event existing that constitutes, or with the giving of notice or the passing of time or both would constitute, and the proposed payment on Subordinated Indebtedness will not cause an

event that with the giving of notice or the passing of time or both would constitute, an Event of Default under this Master Indenture.

## ARTICLE IV
## REPRESENTATIONS AND COVENANTS OF THE OBLIGATED GROUP MEMBERS

Section 4.01   Title to Mortgaged Trust Estate and Lien of this Instrument.   The Obligor represents that it has good and indefeasible title to the Trust Estate, and any other Obligated Group Member will represent by its admission to the Obligated Group that it has good and indefeasible title to its portion of the Trust Estate, free and clear of any liens, charges, encumbrances, security interests and adverse claims whatsoever except the encumbrances permitted by Section 4.19 hereof. The Obligor represents, and any other Obligated Group Member will represent by its admission to the Obligated Group, that it has the right to mortgage the Trust Estate (or in the case of an Obligated Group Member other than the Obligor, its portion of the Trust Estate) and will warrant and defend to Master Trustee, the title and the lien of this Indenture as a valid and enforceable mortgage thereon, subject to Permitted Encumbrances. This Indenture constitutes a valid and subsisting lien on the Trust Estate, all in accordance with the terms hereof, subject to Permitted Encumbrances.

The Obligated Group Representative covenants that the Operating Account shall at all times be and remain subject to a Control Agreement.

Section 4.02   Further Assurances.   The Obligor, upon the request of Trustee, will execute, acknowledge, deliver and record and/or file such further instruments and do such further acts as may be necessary, desirable or proper to carry out more effectively the purpose of this Indenture and to subject the Trust Estate to the liens and security interests hereof.

Section 4.03   Recording and Filing.   The Obligor shall cause this Master Indenture and all amendments and supplements thereto and substitutions therefor to be recorded, filed, re-recorded and refiled in such manner and in such places as are necessary to protect the lien on the Trust Estate and will pay all such recording, filing, re-recording and refiling taxes, fees and other charges. Additionally, the Obligor hereby authorizes the Master Trustee at any time and from time to time to file any initial financing statements, amendments thereto and continuation statements with or without the signature of the Obligor as authorized by applicable law, as applicable to all or part of the Property. For purposes of such filings, the Obligor agrees to furnish any information requested by the Master Trustee promptly upon request by the Master Trustee. The Obligor also ratifies its authorization for the Master Trustee to have filed any like initial financing statements, amendments thereto and continuation statements, if filed prior to the date of this Master Indenture. The Obligor hereby irrevocably constitutes and appoints the Master Trustee and any officer or agent of the Master Trustee, with full power of substitution, as its true and lawful attorneys in fact with full irrevocable power and authority in the place and stead of the Obligor or in the Obligor's own name to execute in the Obligor's name any documents and otherwise to carry out the purposes of this Section 4.03, to the extent that the Obligor's authorization above is not sufficient. To the extent permitted by law, the Obligor hereby ratifies all acts said attorneys in fact have lawfully done in the past or shall lawfully do or cause to be done in the future by virtue hereof. This power of attorney is coupled with an interest and shall be irrevocable. Furthermore, this Master Indenture shall also constitute a "fixture filing" for the purpose of Article 9 of the Texas Business and

Commerce Code against all of the Trust Estate which is or to become fixtures. Information concerning the security interest herein granted may be obtained at the addresses of the Obligor and the Master Trustee as set forth in Section 1.05 of this Master Indenture. The Obligor's identification number assigned by its state of incorporation is correctly set forth in Section 4.07 of this Master Indenture. The Obligor shall promptly notify the Master Trustee of any change in its organizational identification number.

Section 4.04   Payment of Principal, Premium and Interest.   The Obligated Group Representative will duly and punctually pay the principal of (and premium, if any) and interest on the Obligations in accordance with the terms of the Obligations and this Indenture.

Each Obligated Group Member hereby jointly and severally unconditionally guarantees the full and timely payment of the principal of, and premium, if any, and interest on all Outstanding Obligations which such Person has not created or otherwise made (and on which such Person is not otherwise primarily liable) in accordance with the terms thereof, whether at Stated Maturity, declaration of acceleration, call for-redemption or otherwise. Such guaranty shall not be affected, modified or impaired upon the happening from time to time of any event, other than the payment of such Obligations (or provision therefor), including, without limitation, any of the following, whether or not with notice to, or the consent of, the guarantor:

(a)   the waiver, compromise, settlement, release or termination by any Person of the obligations evidenced by such Obligations or any covenant or security in support thereof;

(b)   the failure to give notice to the guarantor of the occurrence of an event of default under the terms and provisions of this Indenture or any agreement under which such Obligations are created, assumed, guaranteed or secured;

(c)   any failure, omission, or delay on the part of the Master Trustee or the Holder of such Obligations to enforce, assert or exercise any right, power or remedy conferred on the Master Trustee or such Holder in this Indenture or any other agreement under which such Obligations are created, assumed, guaranteed or secured;

(d)   the voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all the assets, marshaling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization or arrangement under bankruptcy or similar laws, composition with creditors or readjustment of, or other similar proceedings affecting any such guarantor or any other obligor on Obligations;

(e)   the invalidity, irregularity, illegality, unenforceability, or lack of value of, or any defect in any of the Obligations so guaranteed or any collateral security therefor; or

(f)   to the extent permitted by law, any event or action that would, in the absence of this Section, result in the release or discharge by operation of laws of such guarantor from the performance or observance of any obligation, covenant, or agreement contained in this Indenture.

Section 4.05   Payment of Taxes and Other Claims.   Each Obligated Group Member will pay or discharge or cause to be paid or discharged before the same shall become delinquent, (1) all taxes, assessments, and other governmental charges lawfully levied or assessed or imposed

upon it or upon its income, profits, or property, and (2) all lawful claims for labor, materials, and supplies which, if unpaid, might by law become a lien upon its property; provided, however, that no such Person shall be required to pay and discharge or cause to be paid and discharged any such tax, assessment, governmental charge, or claim to the extent that the amount, applicability, or validity thereof shall currently be contested in good faith by appropriate proceedings and the property of the Obligated Group, or any portion thereof, shall not be subject to sale, foreclosure, transfer, loss or forfeiture as a result of or during the pendency of such contest. Each Obligated Group Member shall establish and shall maintain adequate reserves on its books for the payment of the contested amount plus any accruing interest and/or penalties thereon. Solely for purposes of Section 3.09 and 4.18(f) of this Master Indenture, following any initial administrative or judicial determination adverse to the Obligated Group Member, during the remaining period of any such contest, the contested amount plus any accruing interest and/or penalties thereon shall be treated as an Expense in calculation of Days Cash on Hand.

Section 4.06    Maintenance of Properties. Each Obligated Group Member will cause all its properties used or useful in the conduct of its business to be maintained and kept in good condition, repair, and working order and supplied with all necessary equipment, ordinary wear and tear, casualty, condemnation, and acts of God excepted. Each Obligated Group Member will cause to be made all necessary repairs, renewals, replacements, betterments, and improvements thereof, all as in the reasonable judgment of the Obligated Group Representative may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times; provided, however, that nothing in this Section shall prevent any such Person from discontinuing the operation and maintenance of any of its properties if such discontinuance is, in the reasonable judgment of such Person (and in the opinion of the Governing Body of such Person if the property involved is any substantial part of the properties of such Person taken in the aggregate), desirable in the conduct of its business and not disadvantageous in any material respect to the Holders of the Obligations.

Section 4.07    Corporate Existence; Status of Obligor. (a) Subject to Section 5.01, each Obligated Group Member will do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence, rights (charter and statutory), and franchises; provided, however, that no Person shall be required to preserve any right or franchise if the Governing Body of such Person shall reasonably determine that the preservation thereof is no longer desirable in the conduct of its business and that the loss thereof is not disadvantageous in any material respect to the Holders of the Obligations.

(b)    The Obligor's exact legal name is correctly set forth at the beginning of this Master Indenture, and the Obligor is an organization of the type specified in the first paragraph of this Master Indenture. The Obligor is formed or incorporated in or organized under the laws of the State of Texas, and has an organizational identification number of 800725819 assigned by the Secretary of State of the State of Texas. Neither the Obligor nor any other Obligated Group Member will cause or permit any change to be made in its name or identity unless the it shall have first notified the Master Trustee in writing of such change at least 30 days prior to the effective date of such change, and shall have first taken all action, including any action required by the Master Trustee, required for the purpose of perfecting or protecting the lien and security interest of the Master Trustee. The place where the Obligor keeps its books and records, including recorded data of any kind or nature, regardless of the medium or recording, including software,

writings, plans, specifications and schematics, has been for the preceding two months and will continue to be the address of the Obligor set forth in Section 1.05 hereof (unless the Obligor notifies the Master Trustee in writing at least 30 days prior to the date of such change). No other Obligated Group Member will change the place where it keeps its books and records, including recorded data of any kind or nature, regardless of the medium or recording, including software, writings, plans, specifications and schematics, unless it notifies the Master Trustee in writing at least 30 days prior to the date of such change.

(c)     The Obligor and any other Obligated Group Member that is an organization described in Section 501(c)(3) of the Code at the time it becomes and Obligated Group Member covenants and agrees to take all action necessary to preserve its status as an organization described in Section 501(c)(3) of the Code.

Section 4.08     Preservation of Qualifications.  Each Obligated Group Member will not allow any permit, right, license, franchise or privilege necessary for the ownership or operation of the Trust Estate as a continuing care retirement community to lapse or be forfeited.  If an Obligated Group Member becomes a provider of services under and a participant in the Medicare program or any successor program thereto or any program by a federal, state or local government providing for payment or reimbursement for services rendered for health care, such Obligated Group Member shall use its commercially reasonable efforts to remain fully qualified as a provider of services and a participant in such program; provided, however, that no Obligated Group Member shall be required to maintain any such qualification if (i) the Governing Board of such Person shall determine that the maintenance of such qualification is not in the best economic interest of such Person and (ii) at least 30 days prior to the discontinuance of such qualification, such Person shall notify the Required Information Recipient of such proposed discontinuance and shall provide the Required Information Recipient with a written explanation of the basis for such determination.

Section 4.09     Additions to Facilities.  Any additions, improvements and extensions to the Facilities and repairs, renewals and replacements thereof, including (without limitation) any capital improvements, shall upon their acquisition become part of the Facilities.  Each Obligated Group Member shall provide written notice to the Master Trustee at the time it acquires any real estate and shall add a legal description of such real estate to Exhibit A, record such revised version of Exhibit A and take sure other action as is required to subject such additional real estate to the Lien hereof.

Section 4.10     Insurance.

(a)     Required Coverage.  The Obligated Group shall maintain, or cause to be maintained, insurance under policies issued on an occurrence basis and otherwise of such type and in such amounts or in excess of such amounts as are customarily carried by, and insure against such risks as are customarily insured against by, businesses of like size and character to the Obligated Group Members; provided that in no case is such insurance coverage to be in an amount less than that specified below:

(i)     "All Risk" or "Special form" insurance against loss and/or damage to the Facilities under a policy or policies covering such risks as are ordinarily insured against with respect to similar facilities, including without limiting the generality of the foregoing, fire,

lightning, windstorm, hail, flood (if required under subparagraph (ix) below), earthquake, explosion, riot, riot attending a strike, civil commotion, damage from aircraft, vehicle, or smoke and uniform standard extended coverage and vandalism, malicious mischief, and ordinance law endorsements including boiler coverages and machinery coverage. Such insurance shall be in an amount not less than the full insurable replacement value of the Facilities, with a deductible amount of not more than $100,000. No policy of insurance shall be so written that the proceeds thereof will produce less than the minimum coverage required by the preceding sentence, by reason of co-insurance provisions or otherwise, without the prior written consent of the Master Trustee. The term "full insurable replacement value" means the actual replacement cost of the Facilities, including demolition that is required to rebuild and increased cost of construction endorsements. During construction, this coverage may be provided as part of the builder's all risk coverage required under subparagraph (viii) below.

(ii)     Use and occupancy (or business interruption) insurance, covering interruption of the Obligated Group's operations in whole or in part by reason of the total or partial suspension of, or interruption in, the operation of the Facilities, including its construction or rental of buildings, caused by the damage to or destruction of any part of the Facilities caused by any of the perils described in subparagraph (i) above, with such exceptions as are customarily imposed by insurers, in an amount sufficient to pay the interest component of debt service, taxes (or payments in lieu of taxes), and other fixed charges and other necessary continuing expenses for a period of at least twelve (12) months.

(iii)     Commercial general public liability insurance (excluding professional liability coverage as provided in subparagraph (viii) below), including blanket contractual liability and bodily injury liability and automobile liability insurance, in an occurrence form, protecting the Obligated Group against liability for injuries to persons and property with a combined single limit of liability coverage not less than $1,000,000 per occurrence and $1,500,000 annual aggregate with a deductible not to exceed $100,000.

(iv)     Automobile liability insurance, including hired and non-owned coverage, in an occurrence form, in the minimum amount of $1,000,000 bodily injury and property damage combined single limit and aggregate where applicable, with a deductible not to exceed $100,000.

(v)     Excess liability coverage in the amount of at least either straight excess or umbrella excess, covering excess of subparagraphs (iii), (iv), and (x) of this subsection to be maintained in force so that the total coverage available under each of the aforementioned subsections, including this subsection, is not less than $5,000,000 per occurrence and in the aggregate, where applicable, as excess of employer's liability, general liability, professional liability and automobile liability coverage, provided that the Obligated Group need not maintain such coverage if an Insurance Consultant states in writing that such coverage is not available, not available at reasonable rates, or is unfeasible for some other reason, but states that the insurance the Obligated Group is maintaining is customary in the case of corporations engaged in the same or similar activities and similarly situated and is adequate to protect the Obligated Group's Property and operations.

(vi)     Workers' compensation insurance or qualification as a self-insurer under applicable state law respecting all employees of the Obligated Group and all persons engaged in work on the Facilities, in such amount as is customarily carried by like organizations engaged in like activities of comparable size and liability exposure.

(vii)     [reserved]

(viii)     Commencing on the date of execution of a construction contract with respect to any additions to or restorations, replacements or modifications of the Facilities, until the completion date of such other construction, carry, or cause the contractor to carry, builder's all risk completed value insurance to the extent of the full replacement value of such portions of the Facilities, in non-reporting form for and with extended coverage endorsement then in use in the state in which the construction occurs, and covering all physical loss or damage, including by vandalism and malicious mischief for the following: soft costs, delayed completion, loss of earnings/rents and physical damage for "all risks of physical loss" affecting the building or structure; materials and supplies owned by the insured with a full installation floater; foundations; temporary structures (scaffolding, construction forms, etc.); fixtures, materials and equipment to service the building or intended to become a permanent part of the building.

(ix)     Either (A) flood insurance in the lesser amount of (1) the aggregate outstanding principal amount of the Obligations and (2) the maximum amount of flood insurance available, or (B) a certification from the Insurance Consultant that no portion of the Facilities is located in an area having "Special Flood Hazards" as that term is used in the Flood Disaster Protection Act of 1973, as amended.

(x)     Professional liability insurance with limits of liability not less than $1,000,000 annually per occurrence and $3,000,000 annual aggregate, and with a deductible not to exceed $100,000.

(b)     Carriers. All policies of insurance shall be issued by responsible insurance companies or associations selected by the Obligated Group rated at least "A-" by A.M. Best or a comparable rating agency.

(c)     Policies. All policies of insurance shall provide that they may not be canceled nor the coverages reduced, the deductibles increased or otherwise modified adversely to the interests of the Holders without at least thirty (30) days' prior written notice to the Master Trustee.   The insurance required by subparagraphs (iii), (iv), and (v) of subsection (a) of this Section shall name the Master Trustee as an additional insured, as its interests may appear.   The insurance required by subparagraphs (i), (ii), (vii), (viii), and (ix) of subsection (a) of this Section shall name the Master Trustee as an "additional insured" in accordance with the so-called "standard mortgagee subparagraph" and/or "loss payable clause" and require that all insurance proceeds resulting from any claim be paid to the Master Trustee for the benefit of the Holders. All policies of property insurance required hereunder, by naming the Master Trustee as mortgagee, shall contain an endorsement or agreement by the insurer that any loss will be payable in accordance with the terms of said policy, notwithstanding any act of the owner of the property that might otherwise result in forfeiture of said insurance.

43

(d)    <u>Certificates</u>. Originals or certified copies of the original policies, including all endorsements of all such policies, shall be deposited with the Master Trustee, provided that in lieu of such policies there may be deposited with the Master Trustee an original certificate or certificates of the respective insurers originally executed by the authorized agent(s) attesting the fact that the insurance required by this Section is in full force and effect and clearly reflecting all coverages, amounts and deductibles. At least five (5) days prior to the expiration of any such policy, the Obligated Group shall furnish the Master Trustee evidence satisfactory to the Master Trustee that the policy has been renewed or replaced or is no longer required hereby.

(e)    <u>Blanket Policies</u>. In lieu of separate policies, the Obligated Group may maintain blanket or umbrella policies if such policies provide the same coverage required by this Section with protection against each risk and meeting all the other requirements stated herein and the Obligated Group deposits with the Master Trustee a certificate or certificates of the respective insurers evidencing such coverage and otherwise meeting the requirements stated herein.

(f)    <u>Unexpired Policies</u>. To the extent so provided in any unexpired insurance policy applicable to the Facilities, the Obligated Group's rights, if any, to all unexpired insurance policies, including any right to unearned premiums applicable to the Facilities and all proceeds thereof, shall inure to the benefit of, and pass to the purchaser of, the Facilities at any foreclosure or trustee's sale conducted pursuant to the terms of this Master Indenture.

(g)    <u>Substitute Coverage</u>. If any insurance required by this Section (other than insurance described in clause (a)(i) or (a)(ii)) shall be commercially unavailable at a reasonable cost, as evidenced by a certificate of the Insurance Consultant to the Master Trustee to the effect that (i) that such insurance is unavailable or that the cost of such insurance is in an amount or range specified in such certificate and that such cost is not reasonable for the scope of coverage, and (ii) due to the circumstances described in (i), similarly situated continuing care retirement communities are not at such time purchasing the applicable type of insurance or the applicable amount of insurance coverage, the Master Trustee shall accept such substitute coverage or other modification as shall be recommended by the Insurance Consultant. The failure to maintain any coverage required by this Section (other than insurance described in clause (a)(i) or (a)(ii)) with respect to any period for which such a certificate of an Insurance Consultant has been delivered to the Master Trustee shall not constitute a default hereunder provided that the Obligated Group complies with the recommended substitute coverage or other modification.

(h)    <u>Insurance Consultant Review</u>. The Obligated Group Representative shall annually review the insurance each Obligated Group Member maintains as to whether such insurance is customary and adequate. In addition, the Obligated Group Representative shall, at least once every two Fiscal Years (commencing with its Fiscal Year ending December 31, 2020), and, if any substitute coverage is in effect pursuant to subsection (g) above, at least once every Fiscal Year, cause a certificate of an Insurance Consultant or Insurance Consultants to be delivered to the Master Trustee within 120 days of the applicable Fiscal Year which indicates that the insurance then being maintained by the Members meets the standards described above. The Obligated Group Representative shall cause copies of its review, or the certificates of the Insurance Consultant or Insurance Consultants, as the case may be, to be delivered promptly to the Master Trustee.

44

(i) <u>Master Trustee as Insured</u>. Naming of the Master Trustee as an insured or additional insured under any insurance policy, or the furnishing to the Master Trustee of information relating thereto, shall not impose upon the Master Trustee any responsibility or duty to approve the form of such policy, the qualifications of the company issuing same or any other matters relating thereto.

Section 4.11 <u>Rates and Charges</u>. (a) Each Member covenants and agrees to operate all of its Facilities on a revenue producing basis and to charge such fees and rates for its Facilities and services and to exercise such skill and diligence, including obtaining payment for services provided, as to provide income from its Property together with other available funds sufficient to pay promptly all payments of principal and interest on its Indebtedness, all expenses of operation, maintenance and repair of its Property and all other payments required to be made by it hereunder to the extent permitted by law. Each Member further covenants and agrees that it will from time to time as often as necessary and to the extent permitted by law, revise its rates, fees and charges in such manner as may be necessary or proper to comply with the provisions of this Section.

(b) The Members covenant and agree that the Obligated Group Representative will calculate the Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group for the 12 month period ending on each Testing Date, and will deliver a copy of such calculation to the Required Information Recipient no later than 45 days following the applicable Testing Date, provided that a copy of the calculation for the December 31 Testing Date shall be redelivered with the audited financial statements for the applicable Fiscal Year based on the data in such audited financial statements.

(c) If the Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group is less than the Target Coverage Ratio for two consecutive Testing Dates, the Obligated Group Representative, shall, within 30 days following the delivery of the calculation described herein deliver to the Master Trustee an Officer's Certificate setting forth in reasonable detail the reasons for such failure to achieve the applicable Target Coverage Ratios and the measures undertaken by the Obligated Group in order to generate an Historical Pro Forma Debt Service Coverage Ratio of at least 1.20:1 as of the following Testing Date.

(d) If the Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group is less than the Target Coverage Ratio for three consecutive Testing Dates, the Obligated Group Representative, at the Obligated Group's expense, shall select a Consultant within 30 days following the delivery of the calculation described herein to make recommendations with respect to the rates, fees and charges of the Obligated Group and the Obligated Group's methods of operation and other factors affecting its financial condition in order to increase such Historical Pro Forma Debt Service Coverage Ratio to at least 1.20:1 as of the following Testing Date.

(e) Within 60 days of the engagement of any such Consultant, the Obligated Group Representative shall cause a summary of the Consultant's report and recommendations, if any, to be filed with each Member and each Required Information Recipient, and shall simultaneously cause a copy of the Consultant's report and recommendations, if any, to be filed in a password-protected data room (other than one provided by Intralinks or BOX) that may be accessed by beneficial owners of Related Bonds and potential purchasers of Related Bonds. Each Member shall follow each recommendation of the Consultant applicable to it to the extent feasible

(as determined in the reasonable judgment of the Governing Body of the Obligated Group Representative) and permitted by law. This Section shall not be construed to prohibit any Member from serving indigent residents to the extent required for such Member to continue its qualification as a Tax Exempt Organization or from serving any other class or classes of residents without charge or at reduced rates so long as such service does not prevent the Obligated Group from satisfying the other requirements of this Section.

(f)     If the Obligated Group fails to achieve a Historical Pro Forma Debt Service Coverage Ratio at least equal to the Target Coverage Ratio for two or more Testing Dates, such failure shall not constitute an Event of Default under the Master Indenture if the Obligated Group takes all action necessary to comply with the procedures set forth above for preparing a report and adopting a plan and follows each recommendation contained in such report to the extent feasible (as determined in the reasonable judgment of the Governing Body of the Obligated Group Representative) and permitted by law.   Notwithstanding the preceding sentence, if the Obligated Group fails to achieve a Historical Pro Forma Debt Service Coverage Ratio of at least 1.00:1 as of any Testing Date, such failure shall constitute an Event of Default under this Master Indenture.

Section 4.12   Damage or Destruction.  Each Member agrees to notify the Master Trustee immediately in the case of the destruction of its Facilities or any portion thereof as a result of fire or other casualty, or any damage to such Facilities or portion thereof as a result of fire or other casualty, the Net Proceeds of which are estimated to exceed the Threshold Amount.  If such Net Proceeds do not exceed the Threshold Amount, such Net Proceeds may be paid directly to the Member suffering such casualty or loss.  The Members covenant that they will expend or contract to expend an amount not less than the amount of any such Net Proceeds within 24 months after receipt thereof to (i) repair, replace or restore the damaged or destroyed facilities, (ii) acquire or construct additional capital assets for any one or more Members, or (iii) repay, or irrevocably escrow the applicable Net Proceeds for the repayment of, the principal portion of any Indebtedness incurred by any one or more Members of the Obligated Group to acquire or construct capital assets or refinance Indebtedness incurred for such purpose.

In the event such Net Proceeds exceed the Threshold Amount, the Member suffering such casualty or loss shall deposit such Net Proceeds upon receipt with the Master Trustee (and thereupon the Master Trustee shall establish a Restoration Fund hereunder and deposit such Net Proceeds therein) and, within 12 months after the date on which the aggregate Net Proceeds are finally determined, elect by written notice to the Master Trustee one of the following three options:

(a)     Option A Repair and Restoration.  Such Member may elect to replace, repair, reconstruct, restore or improve any of the Facilities of the Obligated Group or acquire additional Facilities for the Obligated Group or repay Indebtedness incurred for any such purpose pending the receipt of such Net Proceeds provided that the Obligated Group Representative notifies the Master Trustee of such election and provides to the Master Trustee, if the Net Proceeds deposited or expected to be deposited with the Master Trustee exceed $10,000,000 and unless expressly and specifically waived by the Master Trustee, prior to the application of any such Net Proceeds to such replacement, repair, reconstruction, restoration or improvement (1) a copy of a fully executed construction contract entered into by the Member with respect to such replacement, repair, reconstruction, restoration  or improvement work, with a guaranteed maximum price, together with a collateral assignment of such contract to the Master Trustee exercisable by the

46

Master Trustee upon an Event of Default hereunder, (2) (2) evidence of the effectiveness of builders' risk insurance fully insuring the Obligated Group and the Master Trustee, as their interests may appear, for risks customarily covered by builders' risk insurance, (3) a disbursement agreement between such Member and the Master Trustee, in form and substance satisfactory to the Master Trustee (the "Disbursement Agreement"), containing disbursement procedures, including requisition approvals by a construction monitor or consultant retained by the Master Trustee at the Obligated Group's expense, forms of disbursement requisitions, certifications with each requisition as to sufficiency of funds to complete the contracted work at the remaining contract price, lien waiver requirements, retention requirements, and change order approvals by the applicable construction monitor or consultant, (4) evidence satisfactory to the Master Trustee that the Obligated Group will remain financially viable and debt service on the Obligations will be paid during the period of such replacement, repair, reconstruction, restoration or improvement and thereafter, and (5) the Net Proceeds and any other amounts as are required, in combination with such Net Proceeds, to pay (A) the guaranteed maximum price of the applicable construction contract and (B) any debt service coming due on Obligations during the period of expenditure of the Net Proceeds, to the extent such amount is in excess of amounts projected to be available from Revenues during such period. Provided that the Master Trustee has received the above-listed items, unless an Event of Default has occurred and is continuing hereunder, any Net Proceeds of insurance relating to such damage or destruction received by the Master Trustee shall be released from time to time by the Master Trustee to such Member upon:

> (i)     the receipt by the Master Trustee of: a written requisition by the Member to the Master Trustee in the form set forth in the Disbursement Agreement, together with the approvals of such requisition required under the Disbursement Agreement; and

> (ii)    satisfaction of such other disbursement conditions as may be set forth in the Disbursement Agreement.

It is further understood and agreed that in the event such Member shall elect this Option A, such Member shall complete the replacement, repair, reconstruction, restoration, improvement and acquisition of the Facilities, whether or not the Net Proceeds of insurance received for such purposes are sufficient to pay for the same.

(b)     Option B Prepayment of Obligations.  Such Member may elect (and shall be deemed to have so elected if no other election has been made in accordance with this Section 4.12 within 12 months after the date on which the aggregate Net Proceeds are finally determined), to have all of the Net Proceeds payable as a result of such damage or destruction applied to the prepayment of the Obligations.  In such event such Member shall, in its notice of election to the Master Trustee, direct the Master Trustee to apply such Net Proceeds, when and as received, to the prepayment of Obligations on a pro rata basis among all Obligations Outstanding.  In the event any Related Bonds secured by an Obligation are not redeemable or prepayable at the time of such prepayment, the applicable pro rata portion of such Net Proceeds shall be irrevocably escrowed with the applicable Related Bond Trustee until the earlier of the date on which such Related Bonds are subject to redemption or prepayment or the date of acceleration of the Related Bonds.

(c)     Option C Partial Restoration and Partial Prepayment of Obligations.  Such Member may elect to have a portion of such Net Proceeds applied to the replacement, repair,

reconstruction, restoration and improvement of the Facilities of the Obligated Group or the acquisition of additional Facilities for the Obligated Group or the repayment of Indebtedness incurred for any such purpose pending the receipt of such Net Proceeds with the remainder of such Net Proceeds to be applied to prepay Obligations on a pro rata basis among all Obligations Outstanding, in which event such Net Proceeds to be used for replacement, repair, reconstruction, restoration, improvement and acquisition shall be applied as set forth in subparagraph (a) of this Section 4.12 (subject to the conditions on such election) and such Net Proceeds to be used for prepayment of the Obligations shall be applied as set forth in subparagraph (b) of this Section.

Notwithstanding the foregoing, the proceeds of business interruption insurance are not subject to the above provisions of this Section.

At any time that an Event of Default shall have occurred and be continuing, (i) the Master Trustee shall be entitled to settle any insurance claim arising from the destruction of its Facilities or any portion thereof, and each Obligated Group Member hereby grants the Master Trustee power of attorney to effect such settlement on its behalf and (ii) notwithstanding the foregoing, any Net Proceeds obtained by the Master Trustee shall, unless otherwise directed by the Holders of a majority in principal amount of the Outstanding Obligations, apply such Net Proceeds as provided in Section 3.05 hereof.

Section 4.13   Condemnation.   Each Member agrees to notify the Master Trustee immediately if it receives notice of any prospective or pending condemnation proceedings with respect to the Facilities or any part thereof. The Master Trustee and the Members shall cooperate fully with each other in the handling and conduct of any prospective or pending condemnation proceedings with respect to their Facilities or any part thereof. Each Member hereby irrevocably assigns to the Master Trustee, as its interests may appear, all right, title and interest of such Member in and to any Net Proceeds of any award, compensation or damages payable in connection with any such condemnation or taking, or payment received in a sale transaction consummated under threat of condemnation (any such award, compensation, damages or payment being hereinafter referred to as an "award"), which exceeds the Threshold Amount. Such Net Proceeds shall be initially paid to the Master Trustee for disbursement or use as hereinafter provided. If such Net Proceeds do not exceed the Threshold Amount, such Net Proceeds may be paid to the Member in question. The Members covenant that they will expend or contract to expend an amount not less than the amount of any such Net Proceeds within 24 months of the receipt thereof to (i) restore, replace or repair the condemned Facilities, (ii) acquire or construct additional capital assets, or (iii) repay the principal portion of Indebtedness incurred by one or more Members of the Obligated Group to acquire or construct capital assets or to refinance Indebtedness incurred for such purpose.

In the event such Net Proceeds exceed the Threshold Amount, the Member in question shall deposit such Net Proceeds upon receipt with the Master Trustee (and thereupon the Master Trustee shall establish a Restoration Fund hereunder and deposit such Net Proceeds therein). Thereupon, such Net Proceeds shall be subject in all respects to Section 4.12 as though such Net Proceeds were proceeds of insurance and such condemnation constituted damage to the applicable Facilities.

Section 4.14   Other Provisions with Respect to Net Proceeds.   Amounts received by the Master Trustee in respect of any awards shall, at the Request of the Obligated Group

Representative, be invested or reinvested by the Master Trustee as directed in writing by the Obligated Group Representative in Permitted Investments.

Section 4.15  Financial Statements, Bondholder Calls, Etc.  (a) The Members covenant that they will keep or cause to be kept proper books of records and accounts in which full, true and correct entries will be made of all dealings or transactions of or in relation to the business and affairs of the Obligated Group in accordance with generally accepted principles of accounting consistently applied except as may be disclosed in the notes to the audited financial statements referred to in subparagraph (b) below.  To the extent that generally accepted accounting principles would require consolidation of certain financial information of entities which are not Members of the Obligated Group with financial information of one or more Members, consolidated financial statements prepared in accordance with generally accepted accounting principles which include information with respect to entities which are not Members of the Obligated Group may be delivered in satisfaction of the requirements of this Section 4.15 so long as:  (i) supplemental information in sufficient detail to separately identify the information with respect to the Members of the Obligated Group is delivered to the Master Trustee with the audited financial statements; (ii) such supplemental information has been subjected to the auditing procedures applied in the audit of the consolidated financial statements delivered to the Master Trustee and, in the opinion of the accountant, is fairly stated in all material respects in relation to the consolidated financial statements taken as a whole; and (iii) such supplemental information is used for the purposes hereof or for any agreement, document or certificate executed and delivered in connection or pursuant to this Master Indenture.

(b)     The Obligated Group Representative will furnish or cause to be furnished to each Required Information Recipient, the following:

(i)     A monthly statement of the Obligated Group as soon as practicable after the information is available but in no event more than 45 days after the completion of such month, including (I) a calculation of the marketing levels for the Project as of the end of such month, including the number of Independent Living Units that have been sold or cancelled during that month and on an aggregate basis; (II) occupancy levels of the Project as of the end of such month including the number of Independent Living Units that were occupied and vacated during that month and on an aggregate basis; (III) an unaudited statement of revenues and expenses and statement of cash flows of the Obligated Group for such month compared to the approved budget for that month and an unaudited balance sheet of the Obligated Group as of the end of such month; and (IV) statements of the balances for each fund and account required to be established hereunder or under the Liquidity Support Agreement or under any Related Bond Indenture as of the end of such month (obtained from the applicable trustee), all in reasonable detail and certified by an officer of the Obligated Group Representative.  The Obligated Group Representative does not need to deliver any monthly statement of the Obligated Group described in this subsection (i) at any time that the Historical Pro Forma Debt Service Coverage Ratio for the most recent Fiscal Year was at least 1.30:1.

(ii)     Quarterly unaudited financial statements of the Obligated Group as soon as practicable after they are available but in no event more than 45 days after the completion of such fiscal quarter, including a combined or combining statement of revenues and expenses and statement of cash flows of the Obligated Group during such period, a combined or combining

49

balance sheet as of the end of each such fiscal quarter, and a calculation of the occupancy, Days Cash on Hand, and Historical Pro Forma Debt Service Coverage Ratio for such fiscal quarter if required to be calculated by Sections 4.11, 4.20, 4.21, 4.22 and 4.23 hereof, all prepared in reasonable detail and certified, subject to year-end adjustment, by an officer of the Obligated Group Representative. Such financial statements and calculations shall be accompanied by a comparison to the annual budget provided pursuant to subsection (iv) below.

(iii) Within 150 days of the end of each Fiscal Year, an annual audited financial report of the Obligated Group prepared by a firm of certified public accountants, including, if there is more than one Obligated Group Member, a combined and an unaudited combining balance sheet as of the end of such Fiscal Year and a combined and an unaudited combining statement of cash flows for such Fiscal Year and a combined and an unaudited combining statement of revenues and expenses for such Fiscal Year, showing in each case in comparative form the financial figures for the preceding Fiscal Year together with a separate written statement of the accountants preparing such report containing calculations of the Obligated Group's Historical Debt Service Coverage Ratio for said Fiscal Year and Days Cash on Hand as of the end of such Fiscal Year and a statement that such accountants have no knowledge of any default under this Master Indenture insofar as they related to accounting matters, or if such accountants shall have obtained knowledge of any such default or defaults, they shall disclose in such statement the default or defaults and the nature thereof.

(iv) On or before the date of delivery of the financial reports referred -to in subsection (iii) above, an Officer's Certificate of the Obligated Group Representative (A) stating that the Obligated Group is in compliance with all of the terms, provisions and conditions of this Master Indenture or, if not, specifying all such defaults and the nature thereof, (B) calculating and certifying the marketing, occupancy, Days Cash on Hand, and Historical Pro Forma Debt Service Coverage Ratio, if required to be calculated for such Fiscal Year by Sections 4.11, 4.20, 4.21, 4.22 and 4.23 hereof, as of the end of such month or Fiscal Year, as appropriate, and (C) attaching a summary and copy of the Obligated Group's annual operating and capital budget for the coming year.

(v) On or before the date of delivery of the financial reports referred to in subsections (ii) and (iii) above, a management's discussion and analysis of results for the applicable fiscal period.

(vi) Copies of (A) any board approved revisions to the summary of the annual budget provided pursuant to subsection (iv) above, or (B) any correspondence to or from the Internal Revenue Service concerning the status of the Obligor as an organization described in Section 501(c)(3) of the Code or with respect to the tax exempt status of the Series 2019 Bonds, promptly upon receipt.

(vii) Such additional information as the Master Trustee or any Related Bond Trustee may reasonably request concerning any Member in order to enable the Master Trustee or such Related Bond Trustee to determine whether the covenants, terms and provisions of this Master Indenture have been complied with by the Members and for that purpose all pertinent books, documents and vouchers relating to the business, affairs and Property (other than patient, donor and personnel records) of the Members shall, to the extent permitted by law, at all times

during regular business hours be open to the inspection of such accountant or other agent (who may make copies of all or any part thereof) as shall from time to time be designated by the Master Trustee or such Related Bond Trustee.

(c)     The Members also agree that, within 10 days after its receipt thereof, the Obligated Group Representative will file with the Required Information Recipient a copy of each Consultant's report (or summary thereof) or counsel's opinion required to be prepared under the terms of this Master Indenture.

(d)     The Obligated Group Representative shall give prompt written notice of a change of accountants by the Obligated Group to the Master Trustee and each Related Bond Trustee. The notice shall state (i) the effective date of such change; (ii) whether there were any unresolved disagreements with the former accountants on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which the accountants claimed would have caused them to refer to the disagreement in a report on the disputed matter, if it was not resolved to their satisfaction; and (iii) such additional information relating thereto as such Related Bond Trustee or the Master Trustee may reasonably request.

(e)     Within 15 days after the delivery of the monthly (if applicable), quarterly and annual information required under subsections (b)(i), (ii) and (iii) hereof, the Obligated Group shall host a telephone call with Holders and beneficial owners and prospective beneficial owners of Related Bonds, during which the chief financial officer and the chief operating officer of the Obligor and, if different, the Obligated Group Representative shall provide a presentation regarding such information and respond to questions from Holders and beneficial owners and prospective beneficial owners of Related Bonds. The Obligated Group Representative shall provide, in writing, the date and time of each such call and details as to how to participate in such call to the Required Information Recipient at least 7 days prior to the applicable call.

(f)     Without limiting the foregoing, each Member will permit, upon reasonable notice, the Master Trustee or any such Related Bond Trustee (or such persons as they may designate) to visit and inspect, at the expense of such Person, its Property and to discuss the affairs, finances and accounts of the Obligated Group with its officers and independent accountants, all at such reasonable times and locations and as often as the Master Trustee or such Related Bond Trustee may reasonably request.

(g)     The Obligated Group Representative may designate a different Fiscal Year for the Members of the Obligated Group by delivering a notice to the Master Trustee designating the first and last day of such new Fiscal Year and whether or not there will be any interim fiscal period (the "Interim Period") of a duration of greater than or less than 12 months preceding such new Fiscal Year, provided that such redesignation shall not be permitted if the effect thereof is to avoid an Event of Default that would have occurred but for such redesignation or to permit a transaction that would not be permitted under this Master Indenture but for such redesignaqtion. The Members covenant that they will furnish to the Master Trustee and each Related Bond Trustee, as soon as practicable after they are available, but in no event more than 150 days after the last day of such Interim Period, a financial report for such Interim Period certified by a firm of nationally or regionally recognized independent certified public accountants selected by the Obligated Group Representative covering the operations of the Obligated Group for such Interim Period and

containing a combined balance sheet as of the end of such Interim Period and a combined statement of changes in fund balances and changes in financial position for such Interim Period and a combined statement of revenues and expenses for such Interim Period, showing in each case in comparative form the financial figures for the comparable period in the preceding Fiscal Year, together with a separate written statement of the accountants preparing such report containing a calculation of the Obligated Group's Historical Pro Forma Debt Service Coverage Ratio for the Interim Period and Days Cash on Hand as of the end of such Fiscal Year and a statement that such accountants have obtained no knowledge of any default by any Member in the fulfillment of any of the terms, covenants, provisions or conditions of this Master Indenture insofar as they relate to accounting matters, or if such accountants shall have obtained knowledge of any such default or defaults, they shall disclose in such statement the default or defaults and the nature thereof (but such accountants shall not be liable directly or indirectly to anyone for failure to obtain knowledge of any default).

(h)    Delivery of such reports, information and documents described in this Section 4.15 to the Master Trustee is for informational purposes only, and the Master Trustee's receipt thereof shall not constitute notice to it of any information contained therein or determinable from information contained therein, including compliance by the Obligated Group or the Members with any of its or their covenants hereunder, as to which the Master Trustee is entitled to rely exclusively on Officer's Certificates.

Section 4.16    Permitted Additional Indebtedness.    So long as any Obligations are outstanding, the Obligated Group will not incur any Additional Indebtedness (whether or not incurred through the issuance of Additional Obligations) other than:

(a)    Funded Indebtedness, if prior to incurrence thereof or, if such Funded Indebtedness was incurred in accordance with another subsection of this Section 4.16 and any Member wishes to have such Indebtedness classified as having been issued under this subsection (a), prior to such classification, there is delivered to the Master Trustee:

(i)    (A) an Officer's Certificate to the effect that for the most recent Fiscal Year for which audited financial statements have been filed with the Master Trustee as required by this Indenture, the Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group was not less than 1.20:1; or

(ii)    (A) an Officer's Certificate to the effect that for the most recent Fiscal Year for which audited financial statements have been filed with the Master Trustee as required by this Indenture, the Historical Debt Service Coverage Ratio of the Obligated Group was not less than 1.20:1; and (B) a written report of a Consultant (prepared in accordance with industry standards) to the effect that the estimated Projected Debt Service Coverage Ratio of the Obligated Group will be not less 1.25:1 for each of the first two full Fiscal Years following the later of (1) the estimated completion of the development, marketing, acquisition, construction, renovation or replacement being paid for with the proceeds of such additional Funded Indebtedness or (2) the first full Fiscal Year following the maximum level of occupancy in the case of construction, renovation or replacement of elderly housing facilities being financed with the proceeds of such additional Funded Indebtedness, provided that the maximum level of occupancy is projected to occur no later than during the fourth full Fiscal Year following the incurrence of such Funded

52

Indebtedness, or (3) following the incurrence of Funded Indebtedness for other purposes; provided that such report shall include forecast balance sheets, statements of revenues and expenses and statements of changes in financial position for such Fiscal Year and a statement of the relevant assumptions upon which such forecasted statements are based, which financial statements must indicate that sufficient revenues and cash flow could be generated to pay the operating expenses of the Obligated Group's proposed and existing facilities and the debt service on all of the Obligated Group's Indebtedness during each Fiscal Year, including the Fiscal Year in which such Indebtedness is incurred, until the applicable first two full Fiscal Years.

(b) Subject to the proviso following subsection (j) below, Completion Funded Indebtedness in an amount of no more than 10% of the Funded Indebtedness originally incurred to finance the construction of the applicable Facilities, if there is delivered to the Master Trustee: (i) an Officer's Certificate of the Member for whose benefit such Indebtedness is being issued stating that at the time the original Funded Indebtedness for the Facilities to be completed was incurred, such Member had reason to believe that the proceeds of such Funded Indebtedness together with other moneys then expected to be available would provide sufficient moneys for the completion of such Facilities, (ii) a statement of an independent architect or an expert setting forth the amount estimated to be needed to complete the Facilities, and (iii) an Officer's Certificate of such Member stating that the proceeds of such Completion Funded Indebtedness to be applied to the completion of the Facilities, together with a reasonable estimate of investment income to be earned on such proceeds and available to pay such costs, the amount of moneys, if any, committed to such completion from available cash or marketable securities and reasonably estimated earnings thereon, enumerated loans from Affiliates or bank loans (including letters or lines of credit) and federal or state grants reasonably expected to be available, will be in an amount not less than the amount set forth in the statement of an independent architect or other expert, as the case may be, referred to in (ii).

(c) Funded Indebtedness for the purpose of refunding any outstanding Funded Indebtedness if prior to the incurrence thereof an Officer's Certificate of a Member is delivered to the Master Trustee stating that, taking into account the issuance of the proposed Funded Indebtedness and the application of the proceeds thereof and any other funds available to be applied to such refunding, the Annual Debt Service Requirement of the Obligated Group will not be increased in any year during which Obligations Outstanding at the time such Funded Indebtedness is incurred (other than Obligations that will cease to be Outstanding upon the incurrence of such Funded Indebtedness) remain Outstanding.

(d) Subject to the proviso following subsection (j) below, Short Term Indebtedness, in a total principal amount which at the time incurred does not, together with the principal amount of all other such Short Term Indebtedness of the Obligated Group then outstanding under this subsection (d) but excluding the principal payable on all Funded Indebtedness during the next succeeding 12 months, exceed 10% of the Revenues of the Obligated Group for the most recent Fiscal Year for which financial statements reported upon by independent certified public accountants are available; provided, however, that the Obligated Group covenants that for a period of 20 consecutive calendar days in each Fiscal Year the total amount of such Short Term Indebtedness of the Obligated Group outstanding under this subsection (d) shall be reduced to zero.

(e)    Balloon Indebtedness if:

(i)    Subject to the proviso following subsection (j) below, (A)   there is in effect at the time such Balloon Indebtedness is incurred a binding irrevocable commitment to provide financing sufficient to pay the principal amount of such Balloon Indebtedness coming due in each consecutive 12 month period in which 25% or more of the original principal amount of such Balloon Indebtedness comes due; and

(B)    the conditions set forth in subsection (a) are met if it is assumed that for any Fiscal Year in which 25% or more of the original principal amount of such Balloon Indebtedness comes due, (1) the portion of Balloon Indebtedness coming due in such Fiscal Year matures, bears interest and is payable in accordance with the terms of the financing described in clause (A); or

(ii)    (A) the aggregate principal amount of all Balloon Indebtedness issued and outstanding pursuant to this subsection (e)(ii), taking into account the Balloon Indebtedness to be incurred, does not exceed 25% of the Revenues of the Obligated Group for the most recent Fiscal Year for which financial statements reported upon by independent certified public accountants are available, and

(B)    the conditions set forth in subsection (a) are met if it is assumed that for any Fiscal Year in which 25% or more of the original principal amount of such Balloon Indebtedness comes due, it is assumed that the portion of Balloon Indebtedness coming due in such Fiscal Year matures over 25 years from the date of issuance of the Balloon Indebtedness, bears interest on the unpaid balance at the Projected Rate and is payable on a level annual debt service basis over a period of no more than 25 years;  ; or

(iii)    Subject to the proviso following subsection (j) below, the Balloon Indebtedness to be incurred has a remaining term of five years or greater beginning in such fiscal year, and

(1)    the Member incurring such Balloon Indebtedness establishes in an Officer's Certificate filed with the Master Trustee an amortization schedule for such Balloon Indebtedness, which amortization schedule shall provide for payments of principal and interest for each Fiscal Year that are not less than the amounts required to make any actual payments required to be made in such Fiscal Year by the terms of such Balloon Indebtedness;

(2)    such Member agrees in such Officer's Certificate to deposit each Fiscal Year with a bank or trust company (pursuant to an agreement between such Member and such bank or trust company) the amount of principal shown on such amortization schedule net of any amount of principal actually paid on such Balloon Indebtedness during such Fiscal Year (other than from amounts on deposit with such

bank or trust company) which deposit shall be made prior to any such required actual payment during such Fiscal Year if the amounts so on deposit are intended to be the source of such actual payments; and

(3)    the conditions described in subsection (a) above are met with respect to such Balloon Indebtedness when it is assumed that such Balloon Indebtedness is actually payable in accordance with such amortization schedule.

(f)    Subject to the proviso following subsection (j) below, Put Indebtedness if:

(i)    the amount of such Put Indebtedness does not exceed 10% of the Revenues of the Obligated Group for the most recent Fiscal Year for which financial statements reported upon by independent certified public accountants are available and the conditions set forth in subsection (a) above are met with respect to such Put Indebtedness when it is assumed that (A) such Put Indebtedness bears interest at the Projected Rate and is payable on a level annual debt service basis over a period of no more than 30 years commencing with the next succeeding Put Date, or (B) such Put Indebtedness bears interest at the Projected Rate and is payable according to its actual principal amortization schedule, but this subsection (i) shall only be used if the debt service of all Indebtedness of the Obligated Group outstanding, when the Put Indebtedness debt service being calculated is calculated according to this subsection (i), varies no more than 10% per year;

(ii)    (A)    there is in effect at any time such Put Indebtedness is incurred a binding commitment (including without limitation letters or lines of credit or insurance) which may be subject only to commercially reasonable contingencies by a financial institution or bond insurer or surety generally regarded as responsible, to provide financing sufficient to pay the principal amount of such Put Indebtedness on any Put Date, and (B) the conditions set forth in subsection (a) are met for any Fiscal Year in which 25% or more of the original principal amount of such Put Indebtedness may come due when it is assumed that (1) the portion of Put Indebtedness which may come due in such Fiscal Year matures over 30 years from the date of issuance of the Put Indebtedness, bears interest on the unpaid balance at the Projected Rate and is payable on a level annual debt service basis over a period of no more than 30 years or (2) the portion of Put Indebtedness which may come due in such Fiscal Year matures according to its actual principal amortization schedule, bears interest on the unpaid balance at the Projected Rate, but this subsection (ii) shall only be used if the amortization of all Indebtedness of the Obligated Group outstanding, when the Balloon Indebtedness debt service being calculated is calculated according to this subsection (ii), varies more than 10% per year; or

(iii)    the aggregate principal amount of all Put Indebtedness issued pursuant to this-subsection (e) does not exceed 10% of the Revenues of the Obligated Group for the most recent Fiscal Year for which financial statements reported on by independent certified public accountants are available.

(g)    Non Recourse Indebtedness.

(h)     Subordinated Indebtedness.

(i)     Commitment Indebtedness.

(j)     Subject to the proviso below, Indebtedness the principal amount of which at the time incurred, together with the aggregate principal amount of all other Indebtedness then outstanding which was issued pursuant to the provisions of this subsection (n) and which has not been subsequently reclassified as having been issued under another subsection of this Section 4.16, does not exceed 10% of the Revenues of the Obligated Group for the latest preceding Fiscal Year for which financial statements reported upon by independent certified public accountants are available;

provided, however, that the total amount of all Indebtedness outstanding which was issued pursuant to the provisions of subsections (b), (d), (e)(i), (e)(iii), (f) and (j) shall not exceed 15% of the Revenues of the Obligated Group for the most recent Fiscal Year for which financial statements reported on by independent certified public accountants are available.

It is agreed and understood by the parties hereto that various types of Indebtedness may be incurred under any of the above referenced subsections with respect to which the tests set forth in such subsection are met and need not be incurred under only a subsection specifically referring to such type of Indebtedness (e.g., Balloon Indebtedness and Put Indebtedness may be incurred under subsection (a) above if the tests therein are satisfied).

Each Member covenants that prior to, or as soon as reasonably practicable after, the incurrence of Indebtedness by such Member for money borrowed or credit extended, or the equivalent thereof, after the date of issuance of the Series 2019 Note, it will deliver to the Master Trustee an Officer's Certificate which identifies the Indebtedness incurred, identifies the subsection of this Section 4.16 pursuant to which such Indebtedness was incurred, demonstrates compliance with the provisions of such subsection and attaches a copy of the instrument evidencing such Indebtedness.

Each Member agrees that, prior to incurring Additional Indebtedness for money borrowed from or credit extended by entities other than Related Issuers, sellers of real or personal property for purchase money debt, lessors of such property or banks or other institutional lenders, it will provide the Master Trustee with an opinion of Independent Counsel acceptable to the Master Trustee to the effect that, to such Counsel's knowledge, such Member has complied in all material respects with all applicable state and federal laws regarding the sale of securities in connection with the incurrence of such Additional Indebtedness (including the issuance of any securities or other evidences of indebtedness in connection therewith) and such Counsel has no reason to believe that a right of rescission under such laws exists on the part of the entities to which such Additional Indebtedness is to be incurred.

The provisions of this Master Indenture notwithstanding, the Members of the Obligated Group may not incur any Additional Indebtedness the proceeds of which will be used for the acquisition of real Property or the construction of any Facilities unless the right, title and interest in any assets to be financed or refinanced with the proceeds of such Additional Indebtedness and the real estate upon which such assets will be located have been mortgaged and assigned to the

Master Trustee pursuant to a mortgage in substantially the form of the Mortgage and such assets and real estate are not subject to any other Lien except for Permitted Encumbrances.

Section 4.17 <u>Calculation of Debt Service and Debt Service Coverage</u>. The various calculations of the amount of Indebtedness of a Person, the amortization schedule of such Indebtedness and the debt service payable with respect to such Indebtedness required under certain provisions of this Master Indenture shall be made in a manner consistent with that adopted in Section 4.16 and in this Section 4.17. In the case of Balloon or Put Indebtedness issued pursuant to subsection (e) or (f) of Section 4.16 hereof, unless such Indebtedness is reclassified pursuant to this Section 4.17 as having been issued pursuant to another subsection of Section 4.16, the amortization schedule of such Indebtedness and the debt service payable with respect to such Indebtedness for future periods shall be calculated on the assumption that such Indebtedness is being issued simultaneously with such calculation. With respect to Put Indebtedness, if the option of the holder to require that such Indebtedness be paid, purchased or redeemed prior to its stated maturity date, or if the requirement that such Indebtedness be paid, purchased or redeemed prior to its stated maturity date (other than at the option of such holder and other than pursuant to any mandatory sinking fund or any similar fund), has expired or lapsed as of the date of calculation, such Put Indebtedness shall be deemed payable in accordance with its terms.

In determining the amount of debt service payable on Indebtedness in the course of the various calculations required under certain provisions of this Master Indenture, if the terms of the Indebtedness being considered are such that interest thereon for any future period of time is expressed to be calculated at a varying rate per annum, a formula rate or a fixed rate per annum based on a varying index, then for the purpose of making such determination of debt service, interest on such Indebtedness for such period (the "Determination Period") shall be computed by assuming that the rate of interest applicable to the Determination Period is equal to the average of the rate of interest (calculated in the manner in which the rate of interest for the Determination Period is expressed to be calculated) which was in effect on the last date of each of the 12 full calendar months immediately preceding the month in which such calculation is made; provided that if the index or other basis for calculating such interest was not in existence for at least 12 full calendar months next preceding the date of calculation, the rate of interest for such period shall be deemed to be the average rate of interest that was in effect on the last day of each full calendar month next preceding the date of calculation; and if the average rate of interest borne by such Indebtedness for such shorter period cannot be calculated, the rate of interest for such period shall be deemed to be the Projected Rate.

Obligations issued to secure Indebtedness permitted to be incurred under Section 4.16 shall not be treated as Additional Indebtedness.

No debt service shall be deemed payable with respect to Commitment Indebtedness until such time as funding occurs under the commitment which gave rise to such Commitment Indebtedness. From and after such funding, the amount of such debt service shall be calculated in accordance with the actual amount required to be repaid on such Commitment Indebtedness and the actual interest rate and amortization schedule applicable thereto. No Additional Indebtedness shall be deemed to arise when any funding occurs under any such commitment or any such commitment is renewed upon terms which provide for substantially the same terms of repayment of amounts disbursed pursuant to such commitment as obtained prior to such renewal. In addition,

no Additional Indebtedness shall be deemed to arise when Indebtedness which bears interest at a variable rate of interest is converted to Indebtedness which bears interest at a fixed rate or the method of computing the variable rate on such Indebtedness is changed or the terms upon which Indebtedness, if Put Indebtedness, may be or is required to be tendered for purchase are changed, if such conversion or change is in accordance with the provisions applicable to such variable rate Indebtedness or Put Indebtedness in effect immediately prior to such conversion or change.

Balloon Indebtedness incurred as provided under subsection (e) of Section 4.16, unless reclassified pursuant to this Section 4.17, shall be deemed to be payable in accordance with the assumptions set forth in subsection (e) of Section 4.16. Put Indebtedness incurred as provided under subsection (f) of Section 4.16, unless reclassified pursuant to this Section 4.17, shall be deemed to be payable in accordance with the assumptions set forth in subsection (f) of Section 4.16.

For the purpose of determining whether any particular Guaranty may be incurred, it shall be assumed that 100% of the Indebtedness guaranteed is Funded Indebtedness of the guarantor under such Guaranty. For the purpose of calculating any historical Debt Service Requirements, the guarantor's Debt Service Requirements under a Guaranty shall be deemed to be the actual amount paid on such Guaranty by the guarantor. For any other purpose, a guarantor shall be considered liable for 100% of the annual debt service requirement on the Indebtedness guaranteed.

For purposes of the various calculations required under this Master Indenture for Capitalized Leases, the Capitalized Rentals under a Capitalized Lease at the time of such calculation shall be deemed to be the principal payable thereon.

Each Member may elect to have Indebtedness issued pursuant to one provision of Section 4.16 reclassified as having been incurred under another provision of Section 4.16, by demonstrating compliance with such other provision on the assumption that such Indebtedness is being reissued on the date of delivery of the materials required to be delivered under such other provision including the certification of any applicable Projected Rate. From and after such demonstration, such Indebtedness shall be deemed to have been incurred under the provision with respect to which such compliance has been demonstrated until any subsequent reclassification of such Indebtedness.

Anything herein to the contrary notwithstanding, any portion of any Indebtedness of any Member for which an Interest Rate Agreement has been obtained by such Member shall be deemed to bear interest for the period of time that such Interest Rate Agreement is in effect at a net rate which takes into account the interest payments made by such Member on such Indebtedness and the payments made or received by such Member on such Interest Rate Agreement; provided that the long term credit rating of the provider of such Interest Rate Agreement (or any guarantor thereof) is in one of the three highest rating categories of any Rating Agency (without regard to any refinements of gradation of rating category by numerical modifier or otherwise). In addition, so long as any Indebtedness is deemed to bear interest at a rate taking into account an Interest Rate Agreement, any payments made by a Member on such Interest Rate Agreement shall be excluded from Expenses and any payments received by a Member on such Interest Rate Agreement shall be excluded from Revenues, in each case, for all purposes of this Master Indenture.

Section 4.18 <u>Sale or Lease of Property</u>. Each Member agrees that it will not sell, lease, donate, transfer or otherwise dispose (including without limitation any involuntary disposition) of Property (either real or personal property, including Cash and Investments) unless the Obligated Group Representative determines that the Property has been sold, leased, donated, transferred or otherwise disposed of in one or more of the following transfers or other dispositions of Property:

        (a)     Investments at fair market value in return for cash or other Investments;

        (b)     Cash in the ordinary course of business in an arm's length transaction;

        (c)     Tangible personal property to any Person, if prior to such sale, lease or other disposition there is delivered to the Master Trustee an Officer's Certificate of a Member stating that, in the judgment of the signer, such Property has, or within the next succeeding 24 calendar months is reasonably expected to, become inadequate, obsolete, worn out, unsuitable, unprofitable, undesirable or unnecessary and the sale, lease or other disposition thereof will not impair the structural soundness, efficiency or economic value of the remaining Property;

        (d)     From a Member to another Member; provided that no portion of the Project financed with proceeds of the Series 2019 Bonds may be transferred by the Obligor to any other Member unless the Bond Trustee has received an opinion of nationally recognized bond counsel to the effect that such transfer will not adversely affect (i) the validity of the Series 2019 Bonds or any other Related Bonds or (ii) with respect to the Series 2019 Bonds or any Related Bonds the interest on which is tax-exempt, the exclusion of interest on the Series 2019 Bonds or such Related Bonds from the gross income of the owners thereof for federal income tax purposes;

        (e)     Tangible personal property upon fair and reasonable terms no less favorable to the Member than would be obtained in a comparable arm's length transaction;

        (f)     The Property sold, leased, donated, transferred or otherwise disposed of does not, for any consecutive 12 month period, exceed 3% of the total Book Value or, at the option of the Obligated Group Representative, the Current Value of all Property of the Obligated Group and (i) the Historical Pro Forma Debt Service Coverage Ratio was not less than 1.30:1 for the last Fiscal Year for which audited financial statements have been delivered to the Master Trustee; provided that if such transfer is of cash or investments, then in calculating the Historical Debt Service Coverage Ratio for purposes of such transfer, the Income Available for Debt Service will be reduced by one year's estimated interest earnings attributable the moneys to be used for such transfer using, at the option of the Obligated Group Representative, either (1) the current budgeted investment rate, as certified in an Officer's Certificate, or (2) the actual average investment rate on the transferred funds, as certified in a report of a Consultant , and (ii) as of the end of the last fiscal quarter for which financial statements have been delivered to the Master Trustee as required under Section 4.15 hereof, the Obligated Group had not less than 180 Days Cash on Hand after giving effect to the transaction. If the Historical Debt Service Coverage Ratio as calculated above is not less than 1.30:1, the foregoing percentage of the total Book Value or Current Value may be increased as follows under the following conditions:

        (A)     to 5%, if Days Cash on Hand would not be less than 200 after the effect of such sale, lease or disposition of assets; or

(B)     to 7.5%, if Days Cash on Hand would not be less than 300 after the effect of such sale, lease or disposition of assets; or

(C)     to 10%, if Days Cash on Hand would not be less than 400 after the effect of such sale, lease or disposition of assets.

(g)     To any Person if such Property consists solely of assets which are specifically restricted by the donor or grantor to a particular purpose which is inconsistent with their use for payment on the Obligations.

For avoidance of doubt, it is understood that this Section 4.18 does not prohibit any transfer of cash by a Member in payment of any of its obligations, indebtedness and liabilities, the incurrence of which obligation, indebtedness or liability did not or would not, either immediately or with the giving of notice, the passage of time or both, result in the occurrence of an Event of Default.

For purposes of this Section 4.18, payments by the Obligated Group of any development, marketing, operating, or other subordinated fees that have been deferred from the year in which they were originally due as a result of subordination will not be treated as a disposition of Property.

Each Member further agrees that it will not sell, lease, donate or otherwise dispose of Property (A) which could reasonably be expected at the time of such sale, lease, donation or disposition to result in a reduction of the Historical Pro Forma Debt Service Coverage Ratio for the Obligated Group such that the Master Trustee would be obligated to require the Obligated Group to retain a Consultant pursuant to Section 4.11 hereof, or (B) if a Consultant has been retained in the circumstances described in Section 4.11 hereof, such action, in the opinion of such Consultant, will have an adverse effect on the Income Available for Debt Service of the Obligated Group.

Upon Request of the Obligated Group Representative accompanied by an Officer's Certificate and an Opinion of Counsel to the effect that the conditions precedent for the disposition of such property set forth in this Section 4.18 (other than the condition precedent set forth in Section 4.18(d) above) have been satisfied, the rights, title, liens, security interests and assignments herein granted shall cease, determine and be void as to such property only and the lien of this Indenture shall be released by the Master Trustee as to such property in due form at the expense of the Obligated Group Members;

Section 4.19   Liens on Property. Each Member covenants that it will not create or permit to be created or remain and, at its cost and expense, will promptly discharge or terminate, any Liens on its Property or any part thereof which are not Permitted Encumbrances.

Section 4.20   Liquidity Covenant. (a)    The Obligated Group covenants that it will calculate the Days Cash on Hand on each Testing Date, and will deliver a copy of such calculation to the Required Information Recipient no later than 45 days following the applicable Testing Date, provided that a copy of the calculation for the December 31 Testing Date shall be redelivered with the audited financial statements for the applicable Fiscal Year based on the data in such audited financial statements.

(b)     If Days Cash on Hand of the Obligated Group is less than 120 for two consecutive Testing Dates, the Obligated Group Representative, shall, within 30 days following the delivery of the calculation described herein deliver to the Master Trustee an Officer's Certificate to the Master Trustee setting forth in reasonable detail the reasons for such failure to achieve 120 Days Cash on Hand (the "Liquidity Requirement") and adopting a specific plan setting forth steps to be taken in order to generate Days Cash on Hand at least equal to 120 as of the following Testing Date.

(c)     If Days Cash on Hand of the Obligated Group is less than the Liquidity Requirement for three consecutive Testing Dates, the Obligated Group Representative, at the Obligated Group's expense, shall select a Consultant within 30 days following the delivery of the calculation described herein to make recommendations with respect to the rates, fees and charges of the Obligated Group and the Obligated Group's methods of operation and other factors affecting its financial condition in order to increase Days Cash on Hand to at least 120 as of the following Testing Date.  The Obligated Group Representative shall file a copy or summary of the Consultant's report and recommendations, if any, with each Member and each Required Information Recipient within 60 days after the date such Consultant is actually engaged. and shall simultaneously cause a copy of the Consultant's report and recommendations, if any, to be filed in a password-protected data room (other than one provided by Intralinks or BOX) that may be accessed by beneficial owners of Related Bonds and potential purchasers of Related Bonds.  Each Member of the Obligated Group shall follow each recommendation of the Consultant applicable to it to the extent feasible (as determined in the reasonable judgment of the Governing Body of the Member) and permitted by law.

(d)     Failure of the Obligated Group to achieve the Liquidity Requirement for any Testing Date shall not constitute an Event of Default under this Master Indenture if the Obligated Group takes all action necessary to comply with the procedures set forth above for adopting a plan and follows each recommendation contained in such plan or Consultant's report to the extent feasible (as determined in the reasonable judgment of the Governing Body of the Obligated Group Representative) and permitted by law.  Notwithstanding the preceding sentence, failure to achieve Days Cash on Hand of at least 60 as of any Testing Date shall constitute an Event of Default hereunder.

(e)     Provided that the Obligated Group has implemented the recommendations of the most recent Consultant's report delivered under this Section, the Obligated Group shall not be required to retain more than one Consultant's report under this Section in any 12 month period.

Section 4.21     [Reserved.]

Section 4.22     Occupancy Covenant.  The Obligated Group covenants that for each fiscal quarter commencing with the first fiscal quarter following the fiscal quarter in which the Effective Date occurs (each an "Occupancy Quarter"), the Obligated Group will use its best efforts to have Occupied the percentage of the total number of all Independent Living Units (the "Percentage of Units Occupied") at or above 88%, which level shall be measured as of the last day of the applicable Occupancy Quarter (the "Occupancy Requirement.") The Obligated Group Representative will deliver a copy of such calculation to the Required Information Recipient no later than 30 days following the end of each Occupancy Quarter.

If the Percentage of Units Occupied for any two consecutive Occupancy Quarters is less than the Occupancy Requirement, the Obligated Group Representative shall within 30 days thereafter submit an Officer's Certificate to the Master Trustee setting forth in detail the reasons therefor and the plan to increase the Percentage of Units Occupied to at least the Occupancy Requirement set forth above for future periods (a "Corrective Occupancy Action Plan").

If the Percentage of Units Occupied for any three consecutive Occupancy Quarters is less than the Occupancy Requirement, the Obligated Group Representative shall select a Consultant within 30 days thereafter to make recommendations regarding the actions to be taken to increase the Percentage of Units Occupied to at least the Occupancy Requirement set forth above for future periods. Within 60 days after the engagement of any such Consultant, the Obligated Group Representative shall cause a summary or copy of the Consultant's report and recommendations to be filed with each Member and each Required Information Recipient, and shall simultaneously cause a copy of the Consultant's report and recommendations, if any, to be filed in a password-protected data room (other than one provided by Intralinks or BOX) that may be accessed by beneficial owners of Related Bonds and potential purchasers of Related Bonds.. Each Member shall follow each recommendation of the Consultant to the extent feasible (as determined in the reasonable judgment of the Governing Board of such Member) and permitted by law.

Notwithstanding any other provision of this Master Indenture, failure of the Obligated Group to achieve the Occupancy Requirement for any Occupancy Quarter shall not constitute an Event of Default under this Master Indenture if the Obligated Group takes all action necessary to comply with the procedures set forth above for preparing a Corrective Occupancy Action Plan and for obtaining a Consultant's report and adopting a plan and follows each recommendation contained in such Corrective Occupancy Action Plan or Consultant's report to the extent feasible (as determined in the reasonable judgment of the Governing Body of the Obligated Group Representative) and permitted by law.

Provided that the Obligated Group has implemented the recommendations of the most recent Consultant's report delivered under this Section, the Obligated Group shall not be required to obtain more than one Consultant's report under this Section in any two consecutive Fiscal Years.

Section 4.23   [Reserved]

Section 4.24   Deposits on Effective Date.  (a) On the Effective Date, the Obligor shall cause the bond trustee for the Series 2009 Bonds to transfer all cash and investments in the reserve fund for the Series 2009 Bonds to the Series 2019 Bond Trustee for deposit in the Reserve Fund established under Related Bond Indenture for the Series 2019 Bonds.

(b)     On the Effective Date the Obligor shall transfer, deposit or apply all unrestricted Cash and Investments (excluding amounts on deposit in the Liquidity Support Fund and amounts available under the Liquidity Support Agreement) of the Obligor as follows:

> First:     To pay refunds of Entrance Fees that as of the Effective Date are required to be paid by Residency Agreements, as set forth in a certificate of an Authorized Representative of the

Obligor delivered to the Master Trustee that includes the amount of such refunds.

Second: To the Master Trustee to pay all unpaid professional fees and expenses of the bond restructuring effected in the Obligor's bankruptcy proceeding, as set forth in a certificate of an Authorized Representative of the Obligor delivered to the Master Trustee;

Third: Retained by the Obligor for deposit in the Operating Account an amount equal to $_____, which the Obligor has certified to the Master Trustee equals (after deduction of the amounts in paragraphs First and Second above) 100% of the Cash and Investments (excluding amounts on deposit in the Liquidity Support Fund and amounts available under the Liquidity Support Agreement) as of the Effective Date up to 30 Days Cash on Hand plus 50% of the Cash and Investments (excluding amounts on deposit in the Liquidity Support Fund and amounts available under the Liquidity Support Agreement) as of the Effective Date in excess of 30 Days Cash on Hand up to 60 Days Cash on Hand;

Fourth: To the Series 2019 Bond Trustee for deposit to the Reserve Fund established under the Related Bond Indenture for the Series 2019 Bonds, $_____, which the Obligor has certified to the Master Trustee equals 100% of the Cash and Investments (excluding amounts on deposit in the Liquidity Support Fund and amounts available under the Liquidity Support Agreement) as of the Effective Date (after deduction of the amounts in paragraphs First, Second and Third above), but which amount, together with the amount transferred from the reserve fund for the Series 2009 Bonds pursuant to Section 4.24(a) is no greater than the Reserve Requirement for the Series 2019 Bonds;

Fifth: Any balance remaining after the transfers described in paragraphs First, Second, Third and Fourth above shall be transferred to the Operating Account.

(c) Thereafter, each Obligated Group Member shall deposit into the Operating Account upon receipt all Gross Revenues of such Obligated Group Member, provided that upon the occurrence and during the continuance of an Event of Default, each Obligated Group Member shall upon receipt deposit with the Master Trustee all Gross Revenues of such Obligated Group Member for deposit to the Revenue Fund to be applied in accordance with Section 3.05.

Section 4.25  Reserve Fund for Series 2019 Bonds.  Until the amount on deposit in the Reserve Fund for the Series 2019 Bonds under the Related Bond Indenture equal the Reserve Requirement as defined in the Related Bond Indenture for the Series 2019 Bonds, the Obligated Group shall, on or before the 1st day of each month, commencing the month after the month in which the Effective Date occurs to and including the 24th month after the month in which the Effective Date occurs, pay to the Series 2019 Bond Trustee for deposit to the Reserve Fund established under the Related Bond Indenture for the Series 2019 Bonds an amount equal to the lesser of (a) the amount required for the amount on deposit in such Reserve Fund to equal the Reserve Fund Requirement under such Related Bond Indenture or (b)(i) 50% of Cash and Investments (excluding amounts on deposit in the Liquidity Support Fund and amounts available under the Liquidity Support Agreement) as of the last day of the preceding month in excess of 30 Days Cash on Hand but not in excess of 60 Days Cash on Hand, plus (ii) 100% of Cash and Investments (excluding amounts on deposit in the Liquidity Support Fund and amounts available under the Liquidity Support Agreement) in excess of 60 Days Cash on Hand. Together with each such deposit required by the first sentence of this Section, the Obligated Group Representative shall deliver to the Series 2019 Bond Trustee a certification of the Obligated Group Representative of its compliance with this requirement, which certification shall include the amount of such Cash and Investments as of the applicable month end and the amount corresponding to 30 and 60 Days Cash on Hand as of the most recent quarter for which Days Cash on Hand has been computed and reported in accordance with Section 415(b)(ii). The monthly deposits required by the first sentence of this Section shall be made on the 1st Business Day of the month following the month for which the calculation of Days Cash on Hand is made. From and after the date on which the amount on deposit in the Reserve Fund for the Series 2019 Bonds equals the Reserve Requirement therefor, the Obligated Group shall make such payments to the Series 2019 Bond Trustee for deposit in such Reserve Fund as are required by the Related Loan Agreement or the Related Bond Indenture for the Series 2019 Bonds.

Section 4.26  Rating Application.  The Obligated Group Representative covenants that it will seek a rating of the Series 2019 Bonds from any Rating Agency each year after a determination is made by the Obligated Group Representative in consultation with a qualified investment banker or financial consultant that an investment grade rating is reasonably obtainable, until achievement of an investment grade rating, provided that if during any such year the Obligated Group Representative receives a preliminary indication from such Rating Agency that the Series 2019 Bonds will not be assigned an investment grade rating, the Obligated Group Representative shall withdraw its rating request for such year. The Obligated Group Representative further covenants that, upon request by the holders of a majority in principal amount of the Obligations, it will consult with a qualified investment banker or financial consultant whether that an investment grade rating, provided that such request shall not be made more than once in any 24 month period.

Section 4.27  Management Agreements; Oversight Fees.  The Obligor covenants that any agreement for management of the Facilities, or any portion or aspect thereof, will provide for payment by the Obligated Group of compensation for such services that does not, together with any home office or similar fee payable to any Affiliate, exceed 6% of Actual Monthly Revenues (as defined under the Master Management Services Agreement dated September 7, 2017 between the Obligor and Seniority, Inc.) Any management agreement with an Affiliate shall provide that during the continuance of any failure of the Obligor to make monthly deposits (to the extent required) of debt service with any Related Bond Trustee or any payment default on any

Outstanding Obligations hereunder, 50% of the payment due to the Affiliate under such management agreement shall be deferred until all scheduled amounts due and payable to the Related Bond Trustee or on the Outstanding Obligations have been paid. Any management fees due and not paid by the Obligated Group to an Affiliate under the provisions described in the preceding sentence shall be deferred and become payable at such subsequent time when all scheduled amounts due and payable to the Related Bond Trustee or on the Outstanding Obligations have been paid.

Section 4.28    [Reserved.]

Section 4.29    Actuarial Study.  During the Fiscal Year ending December 31, _____, and at least once every three Fiscal Years thereafter, the Obligated Group Representative, at the Obligated Group's expense, shall provide the actuarial study described below or a summary thereof to each Member and each Required Information Recipient.  The actuarial study shall be prepared by a Consultant and include (i) the amount, if any, of the Obligated Group's obligations to provide services under the Residency Agreements anticipated to be in excess of those that could be satisfied using the rates, fees and charges for the Project then in effect, and (ii) recommendations, if any, with respect to the rates, fees and charges of the Members and the Obligated Group's methods of operation and other factors affecting its financial condition in order to enable the Obligated Group to satisfy such obligations.  Each Member shall follow each recommendation of the Consultant applicable to it to the extent feasible (as determined in the reasonable judgment of the Governing Body of the Obligated Group Representative) and permitted by law.

ARTICLE V
CONSOLIDATION, MERGER, CONVEYANCE AND TRANSFER

Section 5.01    Merger, Consolidation, Sale or Conveyance.  (a) Each Member agrees that it will not merge into, or consolidate with, one or more corporations which are not Members, or allow one or more of such corporations to merge into it, or sell or convey all or substantially all of its Property to any Person who is not a Member, unless:

(i)    Any successor corporation to such Member (including without limitation any purchaser of all or substantially all the Property of such Member) is a corporation organized and existing under the laws of the United States of America or a state thereof and shall execute and deliver to the Master Trustee an appropriate instrument, satisfactory to the Master Trustee, containing the agreement of such successor corporation to assume, jointly and severally, the due and punctual payment of the principal of, premium, if any, and interest on all Obligations according to their tenor and the due and punctual performance and observance of all the covenants and conditions of this Master Indenture to be kept and performed by such Member;

(ii)    Immediately after such merger or consolidation, or such sale or conveyance, no Member would be in default in the performance or observance of any covenant or condition of any Related Bond Indenture, Related Loan Agreement or this Master Indenture;

(iii)    The Investment Grade Condition is satisfied upon such merger, consolidation, sale or conveyance, or the Obligated Group Representative shall have obtained, and delivered to the Master Trustee, Noteholder Consent to such transaction;

(iv)     Assuming that any Indebtedness of any successor or acquiring corporation is Indebtedness of such Member and that the Revenues and Expenses of the Member for such most recent Fiscal Year include the Revenues and Expenses of such other corporation (A) immediately after such merger or consolidation, sale or conveyance, the Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group for the most recent Fiscal Year for which financial statements that have been reported upon by independent certified public accountants are available would be not less than 1.20:1 or that such Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group is greater than the Historical Debt Service Coverage Ratio of the Obligated Group was for such Fiscal Year prior to such merger or consolidation, sale or conveyance and (B) immediately after such merger or consolidation, sale or conveyance, the Obligated Group would have at least 120 Days Cash on Hand for the most recent quarter after adjustment for the change or that Days Cash on Hand of the Obligated Group would be greater than such calculation would be immediately prior to such merger or consolidation, sale or conveyance; and

(v)     If all amounts due or to become due on all Related Bonds have not been fully paid to the holders thereof or fully provided for, there shall be delivered to the Master Trustee an Opinion of Bond Counsel to the effect that under then existing law the consummation of such merger, consolidation, sale or conveyance would not adversely affect the validity of such Related Bonds or the exemption otherwise available from federal or state income taxation of interest payable on such Related Bonds.

(b)     In case of any such consolidation, merger, sale or conveyance and upon any such assumption by the successor corporation, such successor corporation shall succeed to and be substituted for its predecessor, with the same effect as if it had been named herein as such Member. Each successor, assignee, surviving, resulting or transferee corporation of a Member must agree to become, and satisfy the conditions described in Section 6.01 hereof to becoming, a Member of the Obligated Group prior to any such succession, assignment or other change in such Member's corporate status. Any successor corporation to such-Member thereupon may cause to be signed and may issue in its own name Obligations hereunder and the predecessor corporation shall be released from its obligations hereunder and under any Obligations, if such predecessor corporation shall have conveyed all Property owned by it (or all such Property shall be deemed conveyed by operation of law) to such successor corporation. All Obligations so issued by such successor corporation hereunder shall in all respects have the same legal rank and benefit under this Master Indenture as Obligations theretofore or thereafter issued in accordance with the terms of this Master Indenture as though all of such Obligations had been issued hereunder by such prior Member without any such consolidation, merger, sale or conveyance having occurred.

(c)     In case of any such consolidation, merger, sale or conveyance such changes in phraseology and form (but not in substance) may be made in Obligations thereafter to be issued as may be appropriate.

(d)     The Master Trustee may rely upon an opinion of Independent Counsel as conclusive evidence that any such consolidation, merger, sale or conveyance, and any such assumption, complies with the provisions of the Master Indenture summarized under this caption and that it is proper for the Master Trustee under the provisions of the Master Indenture to join in the execution of any instrument required to be executed and delivered by the Master Trustee.

## ARTICLE VI
## MEMBERSHIP IN THE OBLIGATED GROUP

Section 6.01    Admission of Obligated Group Members.  Any other Person may become a Member of the Obligated Group if:

(a)    Such Person is a business entity;

(b)    Such Person shall execute and deliver to the Master Trustee a Supplement in a form acceptable to the Master Trustee which shall be executed by the Master Trustee and the Obligated Group Representative, containing the agreement of such Person (i) to become a Member of the Obligated Group and thereby to become subject to compliance with all provisions of this Master Indenture and (ii) unconditionally and irrevocably (subject to the right of such Person to cease its status as a Member of the Obligated Group pursuant to the terms and conditions of Section 6.03 hereof) to jointly and severally make payments upon each Obligation;

(c)    The Obligated Group Representative and each Member shall have approved the admission of such Person to the Obligated Group;

(d)    The Investment Grade Condition is satisfied upon such admission, or the Obligated Group Representative shall have obtained, and delivered to the Master Trustee, Noteholder Consent to such transaction;

(e)    The Master Trustee shall have received (i) an Officer's Certificate of the Obligated Group Representative which (A) demonstrates that (1) immediately upon such Person becoming a Member of the Obligated Group, the Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group for the most recent Fiscal Year for which financial statements that have been reported upon by independent certified public accountants are available, after adjustment for the addition of the new Member, would be not less than 1.20:1, or that such Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group with such Person is greater than the Historical Debt Service Coverage Ratio of the Obligated Group was for such Fiscal Year without such Person becoming a Member of the Obligated Group, and (2) immediately upon such Person becoming a Member of the Obligated Group, the Obligated Group would have at least 120 Days Cash on Hand based, with respect to pre-existing Members of the Obligated Group, on the most recent quarterly financial statements delivered to the Master Trustee pursuant to Section 4.15 hereof and, in the case of the incoming Obligated Group Member, its most recent quarterly financial statements, or that such calculation of the Days Cash on Hand of the Obligated Group is greater than such calculation would be without such Person becoming a Member of the Obligated Group; and (B) states that immediately after such Person becoming a Member of the Obligated Group, no event of default will exist hereunder and no event shall have occurred which with the passage of time or the giving of notice, or both, would become such an event of default; (ii) an opinion of Independent Counsel in form and substance acceptable to the Master Trustee to the effect that (x) the instrument described in Section 6.01(b) above has been duly authorized, executed and delivered and constitutes a legal, valid and binding agreement of such Person, enforceable in accordance with its terms, subject to customary exceptions for bankruptcy, insolvency and other laws generally affecting enforcement of creditors' rights and application of general principles of equity and (y) the addition of such Person to the Obligated Group will not adversely affect the

status as a Tax Exempt Organization of any Member which otherwise has such status; (iii) evidence from each Rating Agency then maintaining a rating on any series of Related Bonds to the effect that the admission of such Person to the Obligated Group will not result in a lower rating on such series of Related Bonds; (iv) if all amounts due or to become due on all Related Bonds have not been paid to the holders thereof and provision for such payment has not been made in such manner as to have resulted in the defeasance of all Related Bond Indentures, an Opinion of Bond Counsel to the effect that under then existing law the consummation of such transaction would not adversely affect the validity of any Related Bonds or any exemption from federal or state income taxation of interest payable on such Bonds otherwise entitled to such exemption; provided that in making the calculation called for by subsection (e)(i) above, (x) there shall be excluded from Revenues any Revenues generated by Property of such Person transferred or otherwise disposed of by such Person since the beginning of the Fiscal Year during which such Person's entry into the Obligated Group occurs and (y) there shall be excluded from Expenses any Expenses related to Property of such Person transferred or otherwise disposed of by such Person since the beginning of the Fiscal Year during which such Person's entry into the Obligated Group Occurs.

Each successor, assignee, surviving, resulting or transferee corporation of a Member must agree to become, and satisfy the above described conditions to becoming, a Member of the Obligated Group prior to any such succession, assignment or other change in such Member's corporate status.

Section 6.02 <u>Obligated Group Members</u>. Upon any Person's becoming an Obligated Group Member as provided in Section 6.01:

(a) the Master Trustee may pursue any remedies consequent upon an Event of Default against any Obligated Group Member, or all of them, without notice to, demand upon or joinder of (and without in any way releasing) any of the others, or against any one or more or all of them at the same time or at different times;

(b) any right of contribution or right acquired by subrogation by any Obligated Group Member against any other Obligated Group Member arising out of the payment of Debt shall be subordinated to the rights of the Master Trustee and the Holders of Obligations; and

(c) each Obligated Group Member shall designate the Obligated Group Representative as its attorney in fact with full power of substitution to perform, satisfy, and discharge every obligation, covenant, duty or liability to be performed on the part of the Obligated Group Member hereunder.

Section 6.03 <u>Withdrawal of Obligated Group Members</u>. Each Member covenants that it will not take any action, corporate or otherwise, which would cause it or any successor thereto into which it is merged or consolidated under the terms of the Master Indenture to cease to be a Member of the Obligated Group unless:

(a) prior to cessation of such status, there is delivered to the Master Trustee an Opinion of Bond Counsel to the effect that, under then existing law, the cessation by the Member of its status as a Member will not adversely affect the validity of any Related Bond or any

exemption from federal or state income taxation of interest payable thereon to which such Bond would otherwise be entitled;

(b)     The Investment Grade Condition is satisfied upon such cessation of status as a Member of the Obligated Group, or the Obligated Group Representative shall have obtained, and delivered to the Master Trustee, Noteholder Consent to such cessation;

(c)     prior to the cessation of such status, there is delivered to the Master Trustee an Officer's Certificate of the Obligated Group Representative to the effect that: (i) (A) immediately after such cessation the Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group for the most recent Fiscal Year for which financial statements that have been reported upon by independent certified public accountants are available, after adjustment for the removal of the Member, would be not less than 1.20:1 or that such Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group is greater than the Historical Debt Service Coverage Ratio of the Obligated Group was for such Fiscal Year prior to such cessation and (B) immediately after such cessation, the Obligated Group would have at least 120 Days Cash on Hand requirements for the most recent quarter after adjustment for the removal of the Member, or that such calculation of the Days Cash on Hand of the Obligated Group is greater than such calculation would be immediately prior to such cessation; (ii) immediately after such cessation, no event of default exists hereunder and no event shall have occurred which with the passage of time or the giving of notice, or both, would become such an event of default; (iii) evidence from each Rating Agency then maintaining a rating on any series of Related Bonds to the effect that the withdrawal of such Person from the Obligated Group will not result in a lower rating on such series of Related Bonds.

(d)     prior to such cessation there is delivered to the Master Trustee an opinion of Independent Counsel (which Counsel and opinion are acceptable to the Master Trustee) to the effect that the cessation by such Member of its status as a Member will not adversely affect the status as a Tax Exempt Organization of any Member which otherwise has such status;

(e)     if any Related Bonds were rated by a Rating Agency prior to the Person withdrawing from the Obligated Group, the Master Trustee has received evidence from such Rating Agency, satisfactory to the Master Trustee, that the rating(s) on such Related Bonds will not be reduced or withdrawn as a result of such Person withdrawing from the Obligated Group; and

(f)     prior to cessation of such status, the Obligated Group Representative and each Member, consents in writing to the withdrawal by such Member.

Section 6.04     Successor Obligated Group Representative.  Tarrant County Senior Living Center Inc. shall serve as the Obligated Group Representative until such time as Tarrant County Senior Living Center Inc. either (i) withdraws from the Obligated Group in accordance with this Article VI or (ii) delivers to the Master Trustee its resignation as the Obligated Group Representative. Tarrant County Senior Living Center Inc. covenants to fulfill all of the duties of the Obligated Group Representative under this Indenture. Tarrant County Senior Living Center Inc. agrees that it shall not withdraw from the Obligated Group or resign as Obligated Group Representative until Tarrant County Senior Living Center Inc. has appointed another Obligated

Group Representative and such successor Obligated Group Representative has accepted its duties in writing. Each Obligated Group Member by becoming an Obligated Group Member acknowledges that the Obligated Group Representative has certain powers and duties under this Master Indenture and authorizes the Obligated Group Representative to exercise such powers and carry out such duties.

## ARTICLE VII
## REMEDIES OF THE MASTER TRUSTEE AND HOLDERS OF SECURED OBLIGATIONS IN EVENT OF DEFAULT

Section 7.01 Events of Default. Event of Default, as used herein, shall mean any of the following events, whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or come about or be effected by operation of law or pursuant to or in compliance with any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body:

(a) default in the payment of the principal of (or premium, if any) or interest on any Obligation when it becomes due and payable at its Maturity and the continuance of such default beyond the period of grace, if any, provided in the instrument creating such Obligation; or

(b) any Obligated Group Member shall fail duly to observe or perform any other covenant or agreement (other than a covenant or agreement whose performance or observance is elsewhere in this Section specifically dealt with) on the part of such Person contained in this Indenture for a period of 45 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Obligated Group Representative by the Master Trustee, or to the Obligated Group Representative and the Master Trustee by the Holders of at least 25% in aggregate principal amount of Obligations then Outstanding; provided that if any such default can be cured by such Obligated Group Member but cannot be cured within the 45 day curative period described above, the Master Trustee may upon request by the Obligated Group Representative extend the cure period by a number of days specified by the Master Trustee, and, if such an extension of the cure period is granted by the Master Trustee, it shall not constitute an Event of Default if (i) corrective action is instituted by such Obligated Group Member within such 45 day period and diligently pursued until the default is corrected and (ii) the default is corrected within such extended cure period; or

(c) a decree or order by a court having jurisdiction in the premises shall have been entered adjudging any Obligated Group Member a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization or arrangement of any Obligated Group Member under the Federal Bankruptcy Code or any other similar applicable Federal or state law, and such decree or order shall have continued undischarged and unstayed for a period of 60 days; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver or trustee or assignee in bankruptcy or insolvency of any Obligated Group Member or of its property, or for the winding up or liquidation of its affairs, shall have been entered, and such decree or order shall have remained in force undischarged and unstayed for a period of 60 days; or

(d) any Obligated Group Member shall institute proceedings to be adjudicated a voluntary bankrupt, or shall consent to the institution of a bankruptcy proceeding against it, or

shall file a petition or answer or consent seeking reorganization or arrangement under the Federal Bankruptcy Code or any other similar applicable Federal or state law, or shall consent to the filing of any such petition, or shall consent to the appointment of a receiver or trustee or assignee in bankruptcy or insolvency of it or of its Trust Estate, or shall make assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due, or action shall be taken by the Governing Body of any Obligated Group Member in furtherance of any of the aforesaid purposes; or

(e)     any Obligated Group Member shall fail to pay or make provision for payment of any recourse Indebtedness (other than Subordinated Indebtedness owed to an Affiliate of the Obligated Group Member) having a principal balance of not less than $100,000 and the continuance of such failure beyond the applicable grace period, if any; or

(f)     the Master Trustee has received written notice that an event of default, as therein defined, under any instrument under which Obligations may be incurred or secured, or under any Related Bond Indenture, has occurred and is continuing beyond the applicable period of grace, if any; or

(g)     an Event of Default described in Section 4.11 or 4.20 shall have occurred; or

(h)     an event of default shall have occurred under the Liquidity Support Agreement.

Section 7.02     Acceleration of Maturity; Rescission and Annulment.     If an Event of Default occurs and is continuing, then and in every such case the Master Trustee or the Holders of not less than 25% in principal amount of the Outstanding Obligations may declare the principal of all the Obligations to be due and payable immediately, by a notice in writing to the Obligated Group Representative and all of the Holders of Obligations (and to the Master Trustee if given by Holders of Obligations), and upon any such declaration such principal shall become immediately due and payable.

At any time after such a declaration of acceleration has been made and before a judgment or decree for payment of the money due has been obtained by the Master Trustee as hereinafter in this Article provided, the Holders of a majority in principal amount of the affected Outstanding Obligations or, if less than a majority, 100% of those Holders of Obligations that caused the applicable acceleration, by written notice to the Obligated Group Representative and the Master Trustee, may rescind and annul such declaration and its consequences.

No such rescission shall affect any subsequent default or impair any right consequent thereon.

Section 7.03     Entry.     As to all real property and fixtures included in the Trust Estate, the Obligor agrees that upon the occurrence of an Event of Default the Obligor, upon demand of the Master Trustee during the continuance thereof, shall forthwith surrender to the Master Trustee or its agent (or to a receiver appointed by a court) the actual possession of, and it shall be lawful for the Master Trustee by such officers or agents as it may appoint (or by receiver appointed by a court) to enter and take possession of, the Trust Estate (and the books, papers, and accounts of the

Obligated Group Members) and to hold, operate, and manage the Trust Estate (including the managing of all needful repairs, and such alterations, additions, and improvements as to the Master Trustee shall seem wise) and to receive the rents, issues, tolls, profits, revenues, and other income thereof, and, after deducting the costs and expenses of entering, taking possession, holding, operating, and managing the Trust Estate, as well as payments for taxes, insurance, and other proper charges upon the Trust Estate including without limitation, reasonable compensation to itself, its agents, and counsel, to apply the same as provided in Section 7.09.

Section 7.04    Powers of Sale, Transfer, Assignment, Lease, and Other Dispositions; Suits for Enforcement.  In case an Event of Default shall occur and be continuing, the Master Trustee, in its discretion may, subject to the provisions of Section 7.18 (7.18???):

(a)     as to all of the real property and fixtures included in the Trust Estate, enforce this trust and sell such property as an entirety or in parcels, by one sale or by several sales, held at one time or at different times as the Master Trustee may elect (all rights to a marshalling of the assets of the Obligated Group Members, including the Trust Estate, or to a sale in inverse order of alienation, being for the Obligated Group Members and their respective successors and assigns, expressly and specifically hereby waived), at the County Courthouse in any County in which a part of the real properties included in the Trust Estate are situated in the area in such Courthouse designated for real property foreclosure sales in accordance with applicable law, each such sale to be made on the first Tuesday of some month between the hours of 10:00 o'clock a.m. and 4:00 o'clock p.m., prevailing local time, to the highest bidder for cash at public auction, after the Master Trustee (or a Person or Persons selected by the Master Trustee) shall have given notices of the proposed sale in the manner hereinafter set forth, and may make due conveyance to the purchaser or purchasers, with general warranty of title to such purchaser or purchasers binding upon the Obligated Group Members and their respective successors and assigns.  The Master Trustee (or a Person or Persons selected by the Master Trustee) shall give notice of such proposed sale by posting written notice of the time, place, and terms of sale at the location designated by law and, by filing a copy of such written notice in the office of the County Clerk, of the County in which the sale is to be made for at least 21 consecutive days preceding the date of the sale.  Where such real properties to be sold are situated in more than one County, one notice shall be posted at the location designated by law, and a copy of such notice shall be filed with the County Clerk, of each County in which a part of said real properties to be sold is situated, and such notices shall designate the county where such real properties will be sold, which may be any County in which a part of said real properties is situated.  In addition to the foregoing notice or notices to be posted and filed by the Master Trustee (or by a Person or Persons selected by the Master Trustee), the Master Trustee shall, at least 21 days preceding the date of sale, serve written notice of the proposed sale by certified mail on each debtor obligated to pay the Obligations according to the records of the Master Trustee.  The service of such shall be completed upon deposit of the notice, enclosed in a post paid wrapper, properly addressed to each such debtor at the most recent address as shown by the records of the Master Trustee, in a post office or an official depository under the care and custody of the United States Postal Service.  The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service.  In this respect and to the full extent that it may legally do so, the Obligor also expressly covenants, stipulates, and agrees that (a) the address of the Obligor set out in Section 1.05 of this Indenture shall be deemed and considered conclusively to be and remain at all times the most recent address of such debtor obligated to pay the Master Trustee as shown by the records of the

Master Trustee, provided such address may be changed from time to time only by express written notice of change thereof signed by the Obligor and actually delivered to and received by the Master Trustee and setting forth a new address with such new address for such debtor and the most recent addresses for other debtors then held by the Master Trustee being deemed and considered conclusively to be and remain at all times thereafter, until changed in the manner herein provided, the most recent address of all debtors, including, without limitation, the Obligated Group Members, obligated to pay the Obligations as shown by the records of the Master Trustee, (b) the records of the Master Trustee shall not be deemed to reflect any change in the respective names or identities of the Obligated Group Members or others obligated or to become obligated to pay the Obligations (to whom notice of a proposed sale shall be required to be mailed as above provided) unless and until express written notice of such change signed by all such debtors obligated to pay the Obligations shall have been actually delivered to and received by the Master Trustee, and (c) no notice of such sale or sales other than the notices hereinabove provided and as hereinafter provided in this Subsection (a) shall be required to be given to the Obligor, or any other Person and any other notice is expressly waived. At any sale conducted under this instrument, credit upon all or any part of the Obligations shall be deemed cash paid for the purpose of this paragraph. The proceeds arising from such sale or sales shall be applied by the Master Trustee as provided in Section 7.09. The provision hereof with respect to posting and giving notices of sale are intended to comply with the provisions of the Texas Property Code, and in the event the requirement for any notice under the Texas Property Code shall be eliminated or the prescribed manner of giving same is modified by future amendment to the Texas Property Code, the requirement for such particular notice shall be stricken from or modified in this instrument in conformity with such amendment. The manner prescribed in this Subsection (a) for serving or giving any notice, other than notice to be posted or caused to be posted by the Master Trustee, shall not be deemed exclusive, but such notice or notices may be given in any manner which may be permitted by applicable law, or

(b)     protect and enforce its rights and the rights of the Master Trustee under this Indenture by sale pursuant to judicial proceedings or by a suit, action, or proceeding in equity or at law or otherwise, whether for the specific performance of any covenant or agreement contained in this Indenture or in aid of the execution of any power granted in this Indenture or for the foreclosure of this Indenture or for the enforcement of any other legal, equitable, or other remedy, as the Master Trustee, being advised by counsel, shall deem most effectual to protect and enforce any of the rights of the Master Trustee, or

(c)     as to all or part of the personal property (tangible or intangible) and fixtures included in the Trust Estate (such portion of the Trust Estate herein referred to as the "Collateral"),

(i)     proceed under the Texas Uniform Commercial Code and exercise with respect to the Collateral all the rights, remedies, and powers of a secured party under the Texas Uniform Commercial Code, including, without limitation, the right and power to sell, at public or private sale or sale, or otherwise dispose of, lease, or utilize, the Collateral and any part or parts thereof in any manner authorized or permitted under the Texas Uniform Commercial Code after default by a debtor, and, to the extent permitted by law, the Obligor expressly waives any notice of sale or other disposition of the Collateral and any other rights and remedies of a debtor or formalities prescribed by law relative to sale or disposition of the Collateral or exercise of any other right or remedy of the Master Trustee existing after default hereunder, and, to the extent any

such notice is required and cannot be waived, the Obligor agrees that if such notice is mailed, postage prepaid, to the Master Trustee at its address stated in the first paragraph hereof at least ten days before the time of the sale or disposition, such notice shall be deemed reasonable and shall fully satisfy any requirement for giving of said notice,

(ii) take possession of the Collateral and enter upon any premises where the same may be situated for such purpose without being deemed guilty of trespass and without liability for damages thereby occasioned and take any action deemed necessary or appropriate or desirable by the Master Trustee, at its option and in its discretion, to repair, refurbish, or otherwise prepare the Collateral for sale, lease, or other use or disposition as herein authorized,

(iii) transfer at any time to itself or to its nominee the Collateral, or any part thereof, and receive the money, income proceeds, or benefits attributable or accruing thereto and hold the same as security for the Outstanding Obligations or apply same as herein provided, and

(iv) require the Members to assemble the Collateral and make it available to the Trustee at a place to be designated by the Trustee that is reasonably convenient to all parties.

The Master Trustee shall be fully subrogated to the rights of all vendor's lienholders and other lienholders whose indebtedness is paid in whole or in part from proceeds of Obligations.

The filing of a suit to foreclose any lien, mortgage, or security interest hereunder shall never be considered an election so as to preclude foreclosure under any power of sale herein contained after dismissal of such a suit.

Any such sale (including notice thereof) shall comply with the applicable requirements, at the time of the sale, of Section 51.002 of the Texas Property Code or, if and to the extent such statute is not then in force, with the applicable requirements, at the time of the sale, of the successor statute or statutes, if any, governing sales of Texas real property under powers of sale conferred by deeds of trust. If there is no statute in force at the time of the sale governing sales of Texas real property under powers of sale conferred by deeds of trust, such sale shall comply with applicable law, at the time of the sale, governing sales of Texas real property under powers of sale conferred by deeds of trust.

Section 7.05    Incidents of Sale. Upon any sale of any of the Trust Estate, whether made under the power of sale hereby given or pursuant to judicial proceedings, to the extent permitted by law:

(a) any Holder or Holders of Obligations or the Master Trustee may bid for and purchase the property offered for sale, and upon compliance with the terms of sale may hold, retain, and possess and dispose of such property, without further accountability, and may, in paying the purchase money therefor, deliver any Outstanding Obligations or claims for interest thereon in lieu of cash to the amount which shall, upon distribution of the net proceeds of such sale, be payable thereon, and such Obligations, in case the amounts so payable thereon shall be less than the amount due thereon, shall be returned to the Holders thereof after being appropriately stamped to show partial payment;

(b)     the Master Trustee may make and deliver to the purchaser or purchasers a good and sufficient deed, bill of sale, and instrument of assignment and transfer of the property sold;

(c)     the Master Trustee is hereby irrevocably appointed the true and lawful attorney of each Member, in its name and stead, to make all necessary deeds, bills of sale, and instruments of assignment and transfer of the property thus sold; and for that purpose it may execute all necessary deeds, bills of sale, and instruments of assignment and transfer, and may substitute one or more persons, firms, or corporation with like power, each Member hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof; but if so requested by the Master Trustee or by any purchaser, any Member shall ratify and confirm any such sale or transfer by executing and delivering the Master Trustee or to such purchaser or purchasers all proper deeds, bills of sale, instruments of assignment and transfer, and release as may be designated in any such request;

(d)     rights, titles, interests, claims, and demands whatsoever, either at law or in equity or otherwise, of the Members of, in, and to the property so sold shall be divested and such sale shall be a perpetual bar both at law and in equity against each of the Members and their respective successors and assigns, and against any and all persons claiming or who may claim the property sold or any part thereof by, through, or under the Members or their respective successors and assigns; and

(e)     receipt of the Master Trustee or of the officer making such sale shall be a sufficient discharge to the purchaser or purchasers at such sale for his or their purchaser money and such purchaser or purchasers and his or their assigns or personal representative shall not, after paying such purchase money and receiving such receipt, be obligated to see to the application of such purchase money, or be in any wise answerable for any loss, misapplication, or non-application thereof.

Upon a sale of substantially all the Trust Estate, whether made under the power of sale hereby granted or pursuant to judicial proceedings, the Obligated Group Representative will permit, to the extent permitted by law, the purchaser thereof and its successors and assigns to take and use the names of the Members and to carry on business under such name or any variant thereof and to use and employ any and all other trade names, brands, and trademarks of the Members; and in such event, upon written request of such purchaser, its successors, or its assigns, any Member will, at the expense of the purchaser, change its name in such manner as to eliminate any similarity.

Section 7.06    Collection of Indebtedness and Suits for Enforcement by Master Trustee. The Obligated Group Members covenant (subject to any notice and grace periods contained herein) that if

(a)     default is made in the payment of any installment of interest on any Obligation when such interest becomes due and payable, or

(b)     default is made in the payment of the principal of (or premium, if any, on), or any installment of principal (or premium, if any, on) any Obligation at the maturity (including acceleration) thereof, each Obligated Group Member will, upon demand of the Master Trustee,

pay to it, for the benefit of the Holders of such Obligations, the whole amount then due and payable on such Obligations for principal (and premium, if any) and interest, with interest at the rate borne by the Obligations upon the overdue principal (and premium, if any) and, to the extent not prohibited by applicable law, overdue interest; and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Master Trustee, its agents and counsel.

If the Obligated Group Members fail to pay any of the foregoing amounts forthwith upon demand, the Master Trustee, in its own name and as trustee of an express trust, may institute a judicial proceeding for the collection of the sums so due and unpaid, and may prosecute such proceeding to judgment or final decree, and may enforce the same against the Obligated Group Members or any other obligor upon the Obligations and collect the moneys adjudged or decreed to be payable in the manner provided by law out of the property of the Obligated Group Members or any other obligor upon the Obligations, wherever situated.

If an Event of Default occurs and is continuing, the Master Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Holders of Obligations by such appropriate judicial proceedings as the Master Trustee shall deem most effectual to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy.

Section 7.07    Master Trustee May File Proofs of Claim.   In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition, or other judicial proceeding relative to the Obligated Group Members or any other obligor upon the Obligations or the property of the Obligated Group Members or of such other obligor or their creditors, the Master Trustee (irrespective of whether the principal of the Obligations shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Master Trustee shall have made any demand on the Obligated Group Members for the payment of overdue principal, premium, or interest) shall be entitled and empowered, by intervention in such proceeding or otherwise, (i) to file and prove a claim for the whole amount of principal (and premium, if any) and interest owing and unpaid in respect of the Obligations and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Master Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Master Trustee, its agents and counsel which shall be deemed an administrative claim) and of the Holders of Obligations allowed in such judicial proceeding, and (ii) to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same; and any receiver, assignee, trustee, liquidator, sequestrator, custodian, or other similar official in any such judicial proceeding is hereby authorized by each Holder of Obligations to make such payments to the Master Trustee, and in the event that the Master Trustee shall consent to the making of such payments directly to the Holders of Obligations, to pay to the Master Trustee any amount due to it for the reasonable compensation, expenses, disbursements, and advances of the Master Trustee, its agents and counsel, and any other amounts due the Master Trustee under this Indenture which shall be deemed an administrative claim.

Nothing herein contained shall be deemed to authorize the Master Trustee to authorize or consent to or accept or adopt on behalf of any Holder of Obligations any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Holder thereof, or to authorize the Master Trustee to vote in respect of the claim of any Holder of Obligations in any such proceeding.

Section 7.08  Master Trustee May Enforce Claims Without Possession of Obligations. All rights of action and claims under this Indenture or the Obligations may be prosecuted and enforced by the Master Trustee without the possession of any of the Obligations or the production thereof in any proceeding relating thereto, and any such proceeding instituted by the Master Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements, and advances of the Master Trustee, its agents and counsel, be for the ratable benefit of the Holders of the Obligations in respect of which such judgment has been recovered.

Section 7.09  Application of Money Collected.  Any money collected by the Master Trustee pursuant to this Article and any proceeds of any sale (after deducting the costs and expenses of such sale, including a reasonable compensation to the Master Trustee, its agents and counsel, and any taxes, assessments, or liens prior to the lien of this Indenture, except any thereof subject to which such sale shall have been made), whether made under any power of sale herein granted or pursuant to judicial proceedings, together with, in the case of any entry or sale as otherwise provided herein, any other sums then held by the Master Trustee as part of the Trust Estate, shall be deposited in the Revenue Fund created by this Indenture, shall be applied in the order specified in Section 3.05, at the date or dates fixed by the Master Trustee and, in case of the distribution of such money on account of principal (or premium, if any), upon presentation of the Obligations and the notation thereon of the payment if only partially paid and upon surrender thereof if fully paid.

In the event the Master Trustee incurs expenses or renders services in any proceedings which result from the occurrence or continuance of an Event of Default under Section 7.01(c) or 7.01(d) hereof, or from the occurrence of any event which, by virtue of the passage of time, would become such Event of Default, the expenses so incurred and compensation for services so rendered are intended to constitute expenses of administration under the United States Bankruptcy Code or equivalent law.

Section 7.10  Limitation on Suits.  No Holder of any Obligation shall have any right to institute any proceeding, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless

(a)  such Holder has previously given written notice to the Master Trustee of a continuing Event of Default;

(b)  the Holders of not less than 25% in principal amount of the Outstanding Obligations shall have made written request to the Master Trustee to institute proceedings in respect of such Event of Default in its own name as Master Trustee hereunder;

(c)     such Holder or Holders have offered to the Master Trustee indemnity satisfactory to it against the costs, expenses and liabilities to be incurred in compliance with such request;

(d)     the Master Trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(e)     no direction inconsistent with such written request has been given to the Master Trustee during such 60 day period by the Holders of a majority in principal amount of the Outstanding Obligations; it being understood and intended that no one or more Holders of Obligations shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Obligations, or to obtain or to seek to obtain priority or preference over any other Holders or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Obligations.

Section 7.11     Unconditional Right of Holders of Obligations to Receive Principal, Premium and Interest.  Notwithstanding any other provision in this Indenture, the Holder of any Obligation shall have the right which is absolute and unconditional to receive payment of the principal of (and premium, if any) and (subject to Section 2.07) interest on such Obligation on the respective Stated Maturities expressed in such Obligation (or, in the case of redemption, on the redemption date) and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder.

Section 7.12     Restoration of Rights and Remedies.  If the Master Trustee or any Holder of Obligations has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Master Trustee or to such Holder of Obligations, then and in every such case the Obligated Group Members, the Master Trustee and the Holders of Obligations shall, subject to any determination in such proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Master Trustee and the Holders of Obligations shall continue as though no such proceeding had been instituted.

Section 7.13     Rights and Remedies Cumulative.  No right or remedy herein conferred upon or reserved to the Master Trustee or to the Holders of Obligations is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 7.14     Delay or Omission Not Waiver.  No delay or omission of the Master Trustee or of any Holder of any Obligation to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this Article or by law to the Master Trustee or to the Holders of Obligations may be exercised from time to time, and as often as may be deemed expedient, by the Master Trustee or by the Holders of Obligations, as the case may be.

Section 7.15    Control by Holders of Obligations.   The Holders of a majority in principal amount of the Outstanding Obligations shall have the right to direct the time, method, and place of conducting any proceeding for any remedy available to the Master Trustee or exercising any trust or power conferred on the Master Trustee, provided that:

(a)    such direction shall not be in conflict with any rule of law or with this Indenture,

(b)    the Master Trustee may take any other action deemed proper by the Master Trustee which is not inconsistent with such direction; and

(c)    the Master Trustee shall not be required to act on any direction given to it pursuant to this Section until indemnity as set forth in Section 8.03(e) hereof is provided to it by such Holders.

Section 7.16    Waiver of Past Defaults.   The Holders of not less than a majority in principal amount of the Outstanding Obligations may on behalf of the Holders of all the Obligations waive any past default hereunder and its consequences, except a default:

(a)    in the payment of the principal of (or premium, if any) or interest on any Obligation, or

(b)    in respect of a covenant or provision hereof which under Article IX cannot be modified or amended without the consent of the Holder of each Outstanding Obligation affected.

Upon any such waiver, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

Section 7.17    Undertaking for Costs.   All parties to this Indenture agree, and each Holder of any Obligation by his acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Master Trustee for any action taken or omitted by it as Master Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section shall not apply to any suit instituted by the Master Trustee, to any suit instituted by any Holder of Obligations, or group of Holders of Obligations, holding in the aggregate more than 10% in principal amount of the Outstanding Obligations, or to any suit instituted by any Holder of Obligations for the enforcement of the payment of the principal of (or premium, if any) or interest on any Obligation on or after the respective Stated Maturities expressed in such Obligation (or, in the case of redemption, on or after the redemption date).

Section 7.18    Waiver of Stay or Extension Laws.   Each Obligated Group Member covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law

wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and each Obligated Group Member (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay, or impede the execution of any power herein granted to the Master Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 7.19   Inapplicability of Finance Code.   In no event shall the provisions of V.T.C.A., Finance Code, Ch. 346 of the Revised Civil Statutes of Texas (which regulates certain revolving credit loan accounts and revolving tri-party accounts) apply to the loan evidenced by the Obligations secured hereby.

ARTICLE VIII
CONCERNING THE MASTER TRUSTEE

Section 8.01   Duties and Liabilities of Master Trustee.   (a) Except during the continuance of an Event of Default, the Master Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Master Trustee.

(b)   In case any Event of Default has occurred and is continuing, the Master Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a reasonably prudent person would exercise or use under the circumstances in the conduct of his own affairs.

(c)   No provision of this Indenture shall be construed to relieve the Master Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except, that:

(1)   this Subsection shall not be construed to limit the effect of Subsection (a) of this Section;

(2)   the Master Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proved that the Master Trustee was negligent in ascertaining the pertinent facts;

(3)   the Master Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the holders of not less than a majority in aggregate principal amount of Obligations then Outstanding relating to the time, method, and place of conducting any proceeding for any remedy available to the Master Trustee, or exercising any trust or power conferred upon the Master Trustee, under this Indenture;

(4)   no provision of this Indenture shall require the Master Trustee to expend or risk its funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have grounds for believing that

80

the repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it; and

(5)    in the absence of bad faith on its part, the Master Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Master Trustee and conforming to the requirements of this Indenture; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Master Trustee, the Master Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture.

(d)    Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Master Trustee shall be subject to the provisions of this Section.

Section 8.02   Notice of Defaults.  Within 60 days after the occurrence of any default hereunder of which the Master Trustee is deemed to have knowledge as provided in Section 8.03(h) hereof, the Master Trustee shall transmit by mail to all Holders of Obligations, notice of such default, unless such default shall have been cured or waived; provided, however, that except in the case of a default in the payment of the principal of (or premium, if any) or interest on any Obligations or in the payment of any sinking or purchase fund installment, the Master Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee or a trust committee of directors and/or Responsible Officers of the Master Trustee in good faith determine that the withholding of such notice is in the interest of the Holders of Obligations. For the purpose of this Section, the term "default" means any event which is, or after notice or lapse of time or both would become, an Event of Default.

Section 8.03   Certain Rights of Master Trustee.  Except as otherwise provided in Section 8.01:

(a)    The Master Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, approval, bond, debenture, coupon, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties and shall not be required to verify the accuracy of any information or calculations required to be included therein or attached thereto;

(b)    Any request or direction of any Person mentioned herein shall be sufficiently evidenced by a Request of such Person; and any resolution of the Governing Body of any Person may be evidenced to the Master Trustee by a Board Resolution of such Person;

(c)    Whenever in the administration of this Indenture the Master Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering, or omitting any

action hereunder, the Master Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's Certificate;

(d)     The Master Trustee may consult with counsel and the written advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon;

(e)     The Master Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders of Obligations pursuant to the provisions of this Indenture, unless such Holders shall have provided to the Master Trustee security or indemnity satisfactory to it against the costs, expenses, and liabilities which might be incurred by it in connection with such request or direction;

(f)     The Master Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, approval, bond, debenture, coupon, or other paper or document but the Master Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Master Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records, and premises of the Obligated Group Members and each other obligor on the Obligations, personally or by agent or attorney;

(g)     The Master Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Master Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care hereunder;

(h)     The Master Trustee shall not be deemed to have knowledge of any default (as defined in Section 8.02 hereof) hereunder, except an Event of Default under Section 7.01(a) hereof, unless a Responsible Officer has actually received notice of such default in writing from any Obligated Group Member or the Holder of any Obligation, referencing the Obligations and describing such default;

(i)     The permissive right of the Master Trustee to do things enumerated in this Indenture shall not be construed as a duty (except as otherwise herein provided). It shall not be the duty of the Master Trustee, except as herein provided, to see that any duties or obligations herein imposed upon any Obligated Group Member or any other Person are performed, and the Master Trustee shall not be liable or responsible for the failure of any Obligated Group Member or any other Person to perform any act required of it or them by this Indenture;

(j)     The Master Trustee is not required to give any bond or surety with respect to the performance of its duties or the exercise of its powers under this Indenture;

(k)     In the event the Master Trustee receives inconsistent or conflicting requests and indemnity from two or more groups of holders of Obligations, each representing less than a majority in aggregate principal amount of the Obligations Outstanding, the Master Trustee, in its sole discretion, may determine what action, if any, shall be taken;

(l)     The Master Trustee's immunities and protections from liability in connection with the performance of its duties under this Indenture shall extend to the Master Trustee's officers, directors, agents and employees. Such immunities and protections, together with the Master Trustee's right to compensation, shall survive the Master Trustee's resignation or removal and final payment of the Obligations; and

(m)     Except for information provided by the Master Trustee concerning the Master Trustee, the Master Trustee shall have no responsibility for any information in any offering memorandum or other disclosure material distributed with respect to the Obligations, and the Master Trustee shall have no responsibility for compliance with any state or federal securities laws in connection with the Obligations.

Section 8.04   Not Responsible For Recitals or Issuance of Obligations. The recitals contained herein and in the Obligations (other than the certificate of authentication on such Obligations) shall be taken as the statements of the Obligated Group Members, and the Master Trustee assumes no responsibility for their correctness. The Master Trustee makes no representations as to the validity or sufficiency of this Indenture or of the Obligations. The Master Trustee shall not be accountable for the use or application by the Obligated Group Members of any of the Obligations or of the proceeds of such Obligations. The Master Trustee is not a party to, and is not responsible for, and makes no representation with respect to matters set forth in any preliminary official statement, official statement, or similar document prepared and distributed in connection with the transactions contemplated in this Indenture.

Section 8.05   Master Trustee or Registrar May Own Obligations. The Master Trustee, any Paying Agent, registrar, or any other agent of the Obligated Group Members, in its individual or any other capacity, may become the owner or pledgee of Obligations and may otherwise deal with the Obligated Group Members with the same rights it would have if it were not Master Trustee, Paying Agent, Obligation registrar, or such other agent.

Section 8.06   Money to Be Held in Trust. All money received by the Master Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated from other funds except to the extent required by law. The Master Trustee shall be under no liability for interest on any money received by it hereunder other than such interest as it expressly agrees to pay.

Section 8.07   Compensation and Expenses of Master Trustee. The Obligated Group Members agree

(a)     to pay to the Master Trustee from time to time reasonable compensation for all services rendered by it hereunder, including such compensation as may be agreed to in any separate agreement of an Obligated Group Member with the Master Trustee;

(b)     to reimburse the Master Trustee upon its request for all expenses, disbursements and advances incurred or made by the Master Trustee in accordance with any provision of this Indenture (including the compensation and the expenses and disbursements, of its agents and counsel; and

(c)  each Obligated Group Member shall indemnify the Master Trustee for, and hold it harmless against any loss, liability or expense incurred by it (other than any portion thereof finally adjudicated to be attributable to negligence or bad faith by the Master Trustee), arising out of and in connection with the acceptance or administration of this trust, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder.

Section 8.08   Corporate Master Trustee Required; Eligibility.  There shall at all times be a Master Trustee hereunder which shall be a banking corporation, bank or trust company organized and doing business under the laws of the United States of America or of any state, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by Federal or State banking authority.  If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  If at any time the Master Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign promptly in the manner and with the effect hereinafter specified in this Article.

Section 8.09   Resignation and Removal; Appointment of Successor.  (a) No resignation or removal of the Master Trustee and no appointment of a successor Master Trustee pursuant to this Article shall become effective until the acceptance of appointment by the successor Master Trustee under Section 8.10.

(b)  The Master Trustee may resign at any time by giving written notice thereof to the Obligated Group Representative.  If an instrument of acceptance by a successor Master Trustee shall not have been delivered to the Master Trustee within 30 days after the giving of such notice of resignation, the resigning Master Trustee may petition any court of competent jurisdiction for the appointment of a successor Master-Trustee.

(c)  The Master Trustee may be removed at any time by act of the Holders of a majority in principal amount of the Outstanding Obligations delivered to the Master Trustee and to the Obligated Group Representative or by the Obligated Group Representative with the written consent of the Holders of a majority in principal amount of the Outstanding Obligations.

(d)  If at any time:

(1)  the Master Trustee shall cease to be eligible under Section 8.08 and shall fail to resign after written request therefor by the Obligated Group Representative or by any such Holder of Obligations, or

(2)  the Master Trustee shall become incapable of acting or shall be adjudged a bankrupt or insolvent or a receiver of the Master Trustee or of its property shall be appointed or any public officer shall take charge or control of the Master Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then, in any such case, (A) the Obligated Group Representative by written

84

request may remove the Master Trustee, or (B) subject to Section 7.17, any Holder of Obligations who has been a bona fide Holder of a Obligation for at least 6 months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Master Trustee and the appointment of successor Master Trustee.

(e)     If the Master Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of Master Trustee for any cause, the Obligated Group Representative, by an Obligated Group Representative Request, shall promptly appoint a successor Master Trustee, provided that if prior to such appointment or within one year after such resignation, removal or incapability, or the occurrence of such vacancy, a successor Master Trustee shall be appointed by Act of the Holders of a majority in principal amount of the Outstanding Obligations delivered to the Obligated Group Representative and the retiring Master Trustee, the successor Master Trustee so appointed shall, forthwith upon its acceptance of such appointment, become the successor Master Trustee and supersede the successor Master Trustee appointed by the Obligated Group Representative. If no successor Master Trustee shall have been so appointed by the Obligated Group Representative or the Holders of Obligations and accepted appointment in the manner hereinafter provided, any Holder of Obligations who has been a bona fide Holder of a Obligation for at least 6 months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Master Trustee.

The Obligated Group Representative shall give notice of each resignation and each removal of the Master Trustee and each appointment of a successor Master Trustee by mailing written notice of such event by first class mail, postage prepaid, to the registered Holders of Obligations at their addresses as shown in the Obligation Register. Each notice shall include the name and address of the designated corporate trust office of the successor Master Trustee.

Section 8.10     Acceptance of Appointment by Successor. Every successor Master Trustee appointed hereunder shall execute, acknowledge and deliver to the Obligated Group Representative and to the retiring Master Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Master Trustee shall become effective and such successor Master Trustee, without any further act, deed, or conveyance, shall become vested with all the rights, powers, trusts, and duties of the retiring Master Trustee; but, on request of the Obligated Group Representative or the successor Master Trustee, such retiring Master Trustee shall, upon payment of its charges and the amounts due to it hereunder, execute and deliver an instrument transferring to such successor Master Trustee all the rights, powers, and trusts of the retiring Trustee, and shall duly assign, transfer, and deliver to the successor Master Trustee all property and money held by such retiring Master Trustee hereunder. Upon request of any such successor Master Trustee, the Obligated Group Representative shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Master Trustee all such rights, powers, and trusts.

No successor Master Trustee shall accept its appointment unless at the time of such acceptance such successor Master Trustee shall be qualified and eligible under this Article. The indemnity provided for in Section 8.07(c) herein shall continue to be binding upon the Members of the Obligated Group for the benefit of the retiring or removed Master Trustee.

Section 8.11    Merger or Consolidation.  Any entity into which the Master Trustee may be merged or with which it may be consolidated, or any entity resulting from any merger or consolidation to which the Master Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Master Trustee, shall be the successor Master Trustee hereunder, provided such entity shall be otherwise qualified and eligible under this Article, without the execution or filing of any paper or any further act on the part of any of the parties hereto.  In case any Obligations shall have been authenticated, but not delivered, by the Master Trustee then in office, any successor by merger or consolidation to such authenticating Master Trustee may adopt such authentication and deliver the Obligations so authenticated with the same effect as if such successor Master Trustee had itself authenticated such Obligations.

Section 8.12    Master Trustee as Related Bond Trustee.  The Master Trustee may serve as Related Bond Trustee under any Related Bond Indenture.

ARTICLE IX
SUPPLEMENTS AND AMENDMENTS

Section 9.01    Supplements Without Consent of Holders of Obligations.  Without the consent of the Holders of any Obligations, each Obligated Group Member and the Master Trustee at any time may enter into one or more Supplements for any of the following purposes:

(a)    to evidence the succession of another Person to an Obligated Group Member, or successive successions, and the assumption by the successor Person of the covenants, agreements and obligations of an Obligated Group Member as permitted by this Indenture or to evidence additions to, or withdrawals from, membership in the Obligated Group in accordance with the provisions of Article VI hereof;

(b)    to add to the covenants of the Obligated Group Members for the benefit of the Holders of Obligations, or to surrender any right or power herein conferred upon the Obligated Group Members, or to add to the Events of Default enumerated in Section 7.01;

(c)    to cure any ambiguity or to correct or supplement any provision herein that may be inconsistent with any other provision herein, or to make any other provision with respect to matters or questions arising under this Indenture that shall not be inconsistent with this Indenture, provided such action shall not adversely affect the interests of the Holders of Obligations;

(d)    to modify or supplement this Indenture in such manner as may be necessary or appropriate to qualify this Indenture under the Trust Indenture Act of 1939 as then amended, or under any similar Federal or State statute or regulation, including provisions whereby the Master Trustee accepts such powers, duties, conditions and restrictions hereunder and the Obligated Group Members undertake such covenants, conditions or restrictions additional to those contained in this Indenture as would be necessary or appropriate so to qualify this Indenture; provided, however, that nothing herein contained shall be deemed to authorize inclusion in this Indenture or in any Supplements provisions referred to in Section 316(a)(2) of the said Trust Indenture Act or any corresponding provision provided for in any similar statute hereafter in effect;

(e)    to create and provide for the issuance of Obligations as permitted hereunder;

86

(f)     to increase or maintain any credit rating assigned to any Series of Related Bonds by a Rating Agency so long as no Obligation issued hereunder shall be secured on a basis senior to other Obligations; and

(g)     to make any amendment to any provision of this Indenture or to any Supplement which is only applicable to Obligations issued thereafter or which will not apply so long as any Obligation then Outstanding remains Outstanding.

Section 9.02    Supplements With Consent of Holders of Obligations.    With the consent of the Holders of not less than a majority in principal amount of the Outstanding Obligations, by Act of said Holders delivered to the Obligated Group Representative and the Master Trustee, each Obligated Group Member and the Master Trustee may enter into Supplements for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or of modifying in any manner the rights of the Holders of the Obligations under this Indenture; provided, however, that no such Supplement shall, without the consent of the Holder of each Outstanding Obligations affected thereby,

(a)     change the Stated Maturity of the principal of, or any installment of interest on, any Obligations or any date for mandatory redemption thereof, or reduce the principal amount thereof or the interest thereon or any premium payable upon the redemption thereof, or change any Place of Payment where, or the coin or currency in which, any Obligations or the interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the Stated Maturity thereof (or, in the case of redemption, on or after the redemption date), or

(b)     reduce the percentage in principal amount of the Outstanding Obligations, the consent of whose Holders is required for any such Supplement, or the consent of whose Holders is required for any waiver (of compliance with certain provisions of this Indenture or certain defaults hereunder and their consequences) provided for in this Indenture, or

(c)     modify any of the provisions of this Section or Section 7.16, except to increase any such percentage or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Obligation affected thereby.

It shall not be necessary for any Act of Holders of Obligation under this Section to approve the particular form of any proposed Supplement, but it shall be sufficient if such Act shall approve the substance thereof.

Section 9.03    Execution of Supplements.    In executing, or accepting the additional trusts created by, any Supplement permitted by this Article or the modifications thereby of the trusts created by this Indenture the Master Trustee shall be entitled to receive, and shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such Supplemental is authorized or permitted by this Indenture and that all conditions precedent thereto have been complied with. In connection with the execution and delivery of a Supplement pursuant to Section 9.01(c), the Master Trustee, in its discretion, may determine whether or not in accordance with such Section the Holders of the Bond Obligations would be affected by such Supplement, and any such determination shall be binding and conclusive on the Members of the Obligated Group, and the Holders of the Obligations. The Master Trustee may receive and be entitled to rely upon an

Opinion of Counsel as conclusive evidence as to whether the Holders of the Obligations would be so affected by any such Supplement. The Master Trustee may, but shall not (except to the extent required in the case of a Supplement entered into under Section 9.01(d)) be obligated to, enter into any such Supplement which affects the Master Trustee's own rights, duties or immunities under this Indenture or otherwise.

Section 9.04    Effect of Supplement.  Upon the execution of any Supplement under this Article, this Indenture shall, with respect to each series of Obligations to which such Supplement applies, be modified in accordance therewith, and such Supplement shall form a part of this Indenture for all purposes, and every Holder of Obligations thereafter or (except to the extent provided pursuant to Section 9.01(h)) theretofore authenticated and delivered hereunder shall be bound thereby.

Section 9.05    Obligations May Bear Notation of Changes.  Obligations authenticated and delivered after the execution of any Supplement pursuant to this Article may bear a notation in form approved by the Master Trustee as to any matter provided for in such Supplement. If the Obligated Group Representative or the Master Trustee shall so determine, new Obligations so modified as to conform, in the opinion of the Master Trustee and the Obligated Group Representative, to any such Supplement may be prepared and executed by the applicable Obligated Group Member and authenticated and delivered by the Master Trustee in exchange for Obligations then Outstanding.

Section 9.06    Substitution or Addition of Lifespace Master Notes.  The Obligated Group and the Master Trustee may, without the consent of or notice (except as set forth in paragraph (c)) to any Holders of Obligations, amend or supplement this Master Indenture to modify, amend, change or remove any covenant, agreement, term or provision of this Master Indenture (other than a modification of the type described in subparagraphs (a) through (e) in Section 902) in order to effect the substitution of Lifespace Master Indenture Notes (the "Lifespace Replacement Notes") for all Outstanding Obligations hereunder or, if the Members of the Obligated Group are not included in the Lifespace Obligated Group, the issuance of Lifespace Master Indenture Notes that guarantee payment by the Members of the Obligations (the "Lifespace Guaranty Notes" and, together with Lifespace Replacement Notes, the "New Lifespace Notes", and either transaction the "Obligated Group Transaction"), subject to the following requirements and conditions:

(a)    The modifications, amendments, changes and removals permitted by this Section shall include those necessary or appropriate to implement the Obligated Group Transaction and to effect (1) if applicable, the inclusion of each of the Members in the Lifespace Obligated Group, (2) the issuance of the New Lifespace Notes of the Lifespace Obligated Group under the Lifespace Master Indenture in substitution for or in addition to, as applicable, , and providing for identical payment obligations and payees as, any then Outstanding Obligations hereunder, which New Lifespace Note or Notes would constitute joint and several obligations of the members of the Lifespace Obligated Group, secured on a parity with all other obligations under the Lifespace Master Indenture, or, if there are obligations of differing seniority under the Lifespace Master Indenture, on a parity with the most senior liens and most senior obligations issued or issuable under the Lifespace Master Indenture, (3) the replacement of all or any portion of the. Obligated Group's financial and operating covenants and related definitions set forth in this Master Indenture with the Lifespace Obligated Group's financial and operating covenants and related definitions set

forth in the Lifespace Master Indenture, (4) if the Members hereunder are included in the Lifespace Obligated Group, the pledging of the Gross Revenues of the Members to the Lifespace Master Trustee to secure all Lifespace Master Indenture Notes, including the Lifespace Replacement Notes; (5) if the Members hereunder are included in the Lifespace Obligated Group, the mortgaging and pledging of the Mortgaged Property of the Members to the Lifespace Master Trustee to secure the Lifespace Replacement Notes and, if so elected by the Lifespace Obligated Group, any or all other obligations under the Lifespace Master Indenture on a parity or junior basis to the lien securing the Lifespace Replacement Notes; for the avoidance of doubt, if the Members hereunder are not included in the Lifespace Obligated Group, the Outstanding Obligations hereunder shall remain Outstanding hereunder and shall remain secured hereunder by the Gross Revenues of the Members and the Mortgaged Property, and neither the Gross Revenues of the Members nor the Mortgaged Property shall secure any obligations under the Lifespace Master Indenture.

(b)     The Obligated Group may implement the Obligated Group Transaction, and the Master Trustee upon the request of the Obligated Group Representative shall implement the Obligated Group Transaction, if and only if:

(1)     the Obligated Group Representative gives written notice of the substance of such proposed Obligated Group Transaction to each Rating Agency that has in effect a rating for any Obligations or Related Bonds then Outstanding prior to the date such Obligated Group Transaction is to take effect, and (i) each such Rating Agency (or, if no Rating Agency has in effect a rating for any Obligations or Related Bonds then Outstanding without taking into account any Credit Facility, at least one Rating Agency selected by the Obligated Group Representative) shall confirm in writing prior to the implementation of the Obligated Group Transaction that the ratings on any Related Bonds outstanding at the time of the Obligated Group Transaction shall be not less than "BBB-", and (ii) the Obligated Group Representative delivers an Officer's Certificate certifying that after giving effect to such New Lifespace Notes and assuming that the Lifespace Obligated Group constituted the Obligated Group under this Master Indenture, the Lifespace Obligated Group could demonstrate compliance with the provisions of Section 4.16(a), assuming the incurrence of $1.00 of additional Funded Indebtedness, (iii) the Lifespace Master Indenture contains a pledge of Gross Revenues of each member of the Lifespace Obligated Group substantially similar to the pledge of Gross Revenues as defined hereunder immediately prior to the Obligated Group Transaction, which pledge secures the New Lifespace Note or Notes, as applicable, on a parity with all other obligations under the Lifespace Master Indenture, or, if there are obligations of differing seniority under the Lifespace Master Indenture, on a parity with the most senior obligations issued or issuable under the Lifespace Master Indenture and (iv) the Mortgaged Property, as defined hereunder immediately prior to the Obligated Group Transaction, secures the Lifespace Replacement Note or Lifespace Replacement Notes, if and as applicable, on a first mortgage and first lien basis, subject only to Permitted Encumbrances as defined under the Lifespace Master Indenture; provided

that, , the first mortgage and first lien on the Mortgaged Property securing the Lifespace Replacement Note or Notes, if and as applicable, may also secure, on a parity or junior basis to the lien securing the Lifespace Replacement Note or Notes, other obligations issued under the Lifespace Master Indenture;

(2)    a copy of the Lifespace Master Indenture is delivered to the Master Trustee; and

(3)    original Lifespace Replacement Notes replacing, or original Lifespace Guaranty Notes guaranteeing, all Obligations Outstanding under this Master Indenture, which New Lifespace Notes are issued by or on behalf of the Lifespace Obligated Group under and pursuant to and secured by the Lifespace Master Indenture and shall have been duly authenticated by the Lifespace Master Trustee under the terms of the Lifespace Master Indenture; and

(4)    at or prior to the implementation of the Obligated Group Transaction, there shall also be delivered to the Master Trustee, each Related Bond Issuer and each Related Bond Trustee, (A) an Opinion of Bond Counsel to the effect that under then existing law the implementation of the Obligated Group Transaction and the execution of the amendments or supplements contemplated in this Section, in and of themselves, would not adversely affect the validity of any Outstanding Related Bonds or the exclusion from federal income taxation of interest payable on such Related Bonds, and (B) an Opinion of Counsel to the effect that (i) the New Lifespace Note or Notes to be delivered to secure any Indebtedness or Related Bonds constitute legal, valid and binding obligations of the members of the Lifespace Obligated Group enforceable in accordance with their terms subject to customary exceptions, (ii) the New Lifespace Note or Notes to be delivered to secure any Indebtedness or Related Bonds are secured by a perfected security interest in the Gross Revenues of each member of the Lifespace Obligated Group and in all other property of the Lifespace Obligated Group subject to the lien securing such New Lifespace Note or Notes that is capable of perfection under the Uniform Commercial Code by the filing of financing statements; (iii) the issuance of the New Lifespace Note or Notes will not cause such Related Bonds or such New Lifespace Note or Notes to become subject to the registration requirements pursuant to the Securities Act of 1933, as amended (or that such Related Bonds or Obligations have been so registered if registration is required) and will not subject the Lifespace Master Indenture to the qualification provisions of the Trust Indenture Act of 1939, as amended (or that the Lifespace Master Indenture has been so qualified if qualification is required) and (iv) the conditions of this Section 9.06 have been satisfied.

(c)    In addition, not less than 15 days prior to the implementation of the Obligated Group Transaction, the Obligated Group Representative shall give written notice thereof

to the Required Information Recipients, and prior to the implementation of the Obligated Group Transaction a copy of the Lifespace Master Indenture as amended in connection with the Obligated Group Transaction shall have been provided to the Required Information Recipients.

ARTICLE X
SATISFACTION AND DISCHARGE OF INDENTURE; UNCLAIMED MONEYS

Section 10.01  Satisfaction and Discharge of Indenture.  If at any time the Obligated Group Members shall have paid or caused to be paid the principal of (and premium, if any) and interest on all the Obligations Outstanding hereunder, as and when the same shall have become due and payable, and if the Obligated Group Members shall also pay or provide for the payment of all other sums payable hereunder by each Obligated Group Member then this Indenture shall cease to be of further effect (except as to (1) rights of registration of transfer and exchange, (2) substitution of mutilated, defaced, or apparently destroyed, lost or stolen Obligations, (3) rights of Holders to receive payments of principal thereof (and premium, if any) and interest thereon, (4) the rights, remaining obligations, if any, and immunities of the Master Trustee hereunder and (5) the rights of the Holders as beneficiaries hereof with respect to the property so deposited with the Master Trustee payable to all or any of them) and the Master Trustee, on the Obligated Group Representative's Request accompanied by an Officer's Certificate and an Opinion of Counsel (both to the effect that all conditions precedent in this Indenture relating to the satisfaction and discharge of this Indenture have been satisfied) and at the cost and expense of the Obligated Group Representative, shall execute proper instruments acknowledging satisfaction of and discharging this Indenture.

Notwithstanding the satisfaction and discharge of this Indenture, the obligations of the Obligated Group Members to the Master Trustee under Section 8.07 and, if funds shall have been deposited with the Master Trustee pursuant to Section 10.02, the obligations of the Master Trustee under Section 10.03 shall survive.

Section 10.02  Obligations Deemed Paid.  Obligations of any series shall be deemed to have been paid if (a) (1) in case such Obligations are to be redeemed on any date prior to their Stated Maturity, the Obligated Group Representative by Obligated Group Representative Request shall have given to the Master Trustee in form satisfactory to it irrevocable instructions to give notice of redemption of such Obligations on said redemption date, (2) there shall have been deposited with the Master Trustee either money sufficient, or Defeasance Obligations the principal of and the interest on which will provide money sufficient without reinvestment (as established by an Officer's Certificate delivered to the Master Trustee accompanied by a report of an Independent Accountant setting forth the calculations upon which such Officer's Certificate is based), to pay when due the principal of (and premium, if any) and interest due and to become due on said Obligations on and prior to the redemption date or Stated Maturity thereof, as the case may be, and (3) in the event said Obligations are not by their terms subject to redemption within the next 45 days, the Obligated Group Representative by Obligated Group Representative Request shall have given the Master Trustee in form satisfactory to it irrevocable instructions to give a notice to the Holders of such Obligations that the deposit required by (2) above has been made with the Master Trustee and that said Obligations are deemed to have been paid in accordance with this Section and stating such maturity or redemption date upon which money is to be available for the payment of the principal of (and premium, if any) and interest on said Obligations or (b) such Obligations

are delivered to the Master Trustee by the Related Bond Trustee together with instructions from the Obligated Group Representative directing the Master Trustee to retire and cancel such Obligations.

Section 10.03 <u>Application of Trust Money</u>. The Defeasance Obligations and money deposited with the Master Trustee pursuant to Section 10.02 and principal or interest payments on any such Defeasance Obligations shall be held in trust, shall not be sold or reinvested, and shall be applied by it, in accordance with the provisions of the Obligations and this Indenture, to the payment, either directly or through any Paying Agent (including the Obligated Group Representative acting as Paying Agent) as the Master Trustee-may determine, to the Persons entitled thereto, of the principal (and premium, if any) and interest for whose payment such money or Defeasance Obligations were deposited; provided that, upon delivery to the Master Trustee of an Officer's Certificate (accompanied by the report of an Independent Accountant setting forth the calculations upon which such Officer's Certificate is based) establishing that the money and Defeasance Obligations on deposit following the taking of the proposed action will be sufficient for the purposes described in clause (2) of Section 10.02, any money received from principal or interest payments on Defeasance Obligations deposited with the Master Trustee or the proceeds of any sale of such Defeasance Obligations, if not then needed for such purpose, shall, upon Obligated Group Representative Request be reinvested, to the extent practicable, in other Defeasance Obligations or disposed of as requested by the Obligated Group Representative. For purposes of any calculation required by this Article, any Defeasance Obligation which is subject to redemption at the option of its issuer, the redemption date for which has not been irrevocably established as of the date of such calculation, shall be assumed to cease to bear interest at the earliest date on which such obligation may be redeemed at the option of the issuer and the principal of such obligation shall be assumed to be received at its stated maturity.

Section 10.04 <u>Payment of Related Bonds</u>. Notwithstanding any other provision of this Article X, no Obligation will be considered paid or deemed to have been paid unless the Related Bonds, if any, have been paid or deemed paid pursuant to the Related Bond Indenture.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

Section 11.01 <u>No Personal Liability</u>. No recourse under this Indenture or any Obligations shall be had against any officer, director, agent or employee, as such, past, present, or future, of any Obligated Group Member, any Affiliate, the Master Trustee or of any successor corporation; it being expressly understood that this Indenture and the obligations incurred hereunder are solely obligations of the entities named herein as obligors, and that no personal liability whatever shall attach to such persons or any of them, under this Indenture or any Obligations.

Section 11.02 <u>Texas Contract</u>. This Indenture and the Obligations shall be deemed to be contracts made under the laws of the State of Texas, and for all purposes shall be construed in accordance with the laws of said State applicable to contracts made and to be performed in said State.

Section 11.03 <u>Legal Holidays</u>. If the date for making any payment or the last date for performance of any act or the exercising of any right, as provided in this Indenture, shall be a legal

holiday or a day on which banking institutions in Dallas, Texas or [Minneapolis, Minnesota] are authorized by law to remain closed, such payment may be made or act performed or right exercised on the next succeeding day not a legal holiday or a day on which such banking institutions are authorized by law to remain closed with the same force and effect as if done on the nominal date provided in this Indenture.

Section 11.04 <u>Benefits of Provisions of Indenture and Obligations</u>. Nothing in this Indenture or in the Obligations, expressed or implied, shall give or be construed to give any Person, other than the parties hereto, and the Holders of such Obligations, any legal or equitable right, remedy, or claim under or in respect of this Indenture, or under any covenant, condition, and provision herein contained; all its covenants, conditions, and provisions being for the sole benefit of the parties hereto and of the Holders of such Obligations.

Section 11.05 <u>Execution in Counterparts; Electronic Transactions</u>. This Indenture may be executed in any number of counterparts, each of which shall be an original; but such counterparts shall together constitute but one and the same instrument. The transaction described herein may be conducted and this Master Indenture and related documents may be stored by electronic means. Copies, telecopies, facsimiles, electronic files and other reproductions of original executed documents shall be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

Section 11.06 <u>UCC Financing Statements</u>. The Members of the Obligated Group hereby expressly grant to the Master Trustee the full right and authority to file any Uniform Commercial Code financing statement, continuation statement or amendment that may be required by law or is necessary to maintain any security interest granted by the Obligated Group to the Master Trustee pursuant to this Master Indenture. Notwithstanding anything to the contrary contained herein, the Master Trustee shall not be responsible for any initial filings of any financial statements or the information contained therein (including the exhibits thereto), the perfection of any such security interests by such initial filings, or the accuracy of sufficiency of any description of collateral or name or location of an Obligated Group Member in such filings, and unless the Master Trustee shall have been notified by the Obligated Group in writing that any such initial filing, description of collateral or name or location was or has become defective or inaccurate, the Master Trustee shall be fully protected in relying on such initial filing and descriptions in filing any financing or continuation statement(s) pursuant to this Section. Subject to the foregoing, the Master Trustee shall file continuation statements for any initial financing statement delivered to it on the Effective Date at such times as necessary to avoid a lapse in the effectiveness of such initial financing statements. The Obligated Group shall be responsible for and shall pay any reasonable expenses, including legal fees incurred by the Master Trustee under this section.

**ML Draft – 1/28/2019**
**FOR SETTLEMENT/**
**DISCUSSION PURPOSES ONLY**

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed by persons thereunto duly authorized, as of the day and year first above written.

TARRANT COUNTY SENIOR LIVING CENTER
INC., as the initial Obligated Group Member

By: _____
     President

UMB BANK, NATIONAL ASSOCIATION, as
Master Trustee

By: _____

Title:

Signature Page to Amended and Restated Master Trust Indenture,
Deed of Trust and Security Agreement

**ML Draft – 1/28/2019**
**FOR SETTLEMENT/**
**DISCUSSION PURPOSES ONLY**

STATE OF TEXAS

COUNTY OF DALLAS

     This instrument was acknowledged before me on _____2019, by Charles B. Brewer, who is President Tarrant County Senior Living Center Inc., a Texas nonprofit corporation, for and on behalf of said corporation.

                                                 _____

                                               Notary Public, State of Texas

     (Seal)

STATE OF _____

COUNTY OF _____

     This instrument was acknowledged before me on _____, 2019, by _____, who is a _____ of UMB Bank, National Association, a national banking association, for and on behalf of said organization.

                                                 _____

                                               Notary Public

     (Seal)

**ML Draft – 1/28/2019**
**FOR SETTLEMENT/**
**DISCUSSION PURPOSES ONLY**

EXHIBIT A

Legal Description

(Stayton at Museum Way)

Being Lot 1, Block 1 of GREYSTONE ADDITION, an Addition to the City of Fort Worth, Tarrant County, Texas, as recorded in Cabinet A, Slide 11920, Plat Records, Tarrant County, Texas.

**ML Draft – 1/28/2019**
**FOR SETTLEMENT/**
**DISCUSSION PURPOSES ONLY**

EXHIBIT B

EXISTING LIENS

[None]

87584900v.1

TARRANT COUNTY CULTURAL EDUCATION FACILITIES FINANCE CORPORATION

TO

UMB BANK,
NATIONAL ASSOCIATION, AS BOND TRUSTEE

INDENTURE OF TRUST

DATED AS OF [NOVEMBER 1], 2019

TARRANT COUNTY CULTURAL EDUCATION FACILITIES FINANCE CORPORATION
RETIREMENT FACILITY REVENUE BONDS
(THE STAYTON AT MUSEUM WAY PROJECT)
SERIES 2019

## TABLE OF CONTENTS

Page

ARTICLE I        ARTICLE I DEFINITIONS...................................................................................13

Section 1.01     Definitions..............................................................................................13
Section 1.02     Recital Incorporation.............................................................................13

ARTICLE II       AUTHORIZATION, TERMS, EXECUTION AND ISSUANCE OF
                 BONDS ...................................................................................................13

Section 2.01     Authorized Amount of Series 2019 Bonds .........................................13
Section 2.02     All Bonds Equally and Ratably Secured; Bonds Not an Obligation of
                 Issuer ....................................................................................................13
Section 2.03     Authorization of Series 2019 Bonds ...................................................13
Section 2.04     Execution of Bonds, Signatures ..........................................................14
Section 2.05     Registration and Exchange of Bonds; Persons Treated as Owners.....14
Section 2.06     Lost, Stolen, Destroyed, and Mutilated Bonds ..................................15
Section 2.07     Delivery of Series 2019 Bonds ...........................................................16
Section 2.08     Bond Trustee's Authentication Certificate..........................................16
Section 2.09     Issuance of Additional Bonds .............................................................17
Section 2.10     Requirements for Authentication and Delivery of Additional Bonds....17
Section 2.11     Cancellation and Destruction of Bonds By the Bond Trustee ...........17
Section 2.12     Book Entry Only System ....................................................................17
Section 2.13     Successor Securities Depository; Transfers Outside Book Entry Only
                 System ..................................................................................................18
Section 2.14     Payments to Cede & Co ......................................................................18
Section 2.15     Beneficial Owner Register ..................................................................18

ARTICLE III      REVENUES AND FUNDS ....................................................................19

Section 3.01     Additional Bonds .................................................................................19
Section 3.02     Creation of the Bond Fund...................................................................19
Section 3.03     Payments into the Bond Fund ..............................................................19
Section 3.04     Use of Moneys in the Principal Account and the Interest Account .....19
Section 3.05     Custody of the Bond Fund ...................................................................20
Section 3.06     [Construction Fund ..............................................................................20
Section 3.07     Completion Certificate.........................................................................20
Section 3.08     Creation of the Reserve Fund...............................................................20
Section 3.09     Payments into the Reserve Fund ..........................................................20
Section 3.10     Use of Moneys in the Reserve Fund ...................................................20
Section 3.11     Custody of the Reserve Fund ...............................................................21
Section 3.12     Nonpresentment of Bonds...................................................................21
Section 3.13     Bond Trustee's and Paying Agents' Fees, Charges, and Expenses .....21
Section 3.14     Moneys to be Held in Trust..................................................................22
Section 3.15     Repayment to the Obligor from the Funds...........................................22
Section 3.16     Rebate Fund .........................................................................................22
Section 3.17     [Reserved] ............................................................................................24
Section 3.18     Cost of Issuance Fund .........................................................................24

| ARTICLE IV | COVENANTS OF THE ISSUER | 24 |
|---|---|---|
| Section 4.01 | Performance of Covenants: Authority | 24 |
| Section 4.02 | Payments of Principal, Premium, If Any, and Interest | 25 |
| Section 4.03 | Supplemental Indentures: Recordation of Bond Indenture and Supplemental Indentures | 25 |
| Section 4.04 | Lien of Bond Indenture | 25 |
| Section 4.05 | Rights Under the Agreement | 25 |
| Section 4.06 | Tax Covenants | 25 |
| Section 4.07 | Change in Law | 26 |
| Section 4.08 | Program Investment | **Error! Bookmark not defined.** |
| ARTICLE V | REDEMPTION OF BONDS | 26 |
| Section 5.01 | Optional Redemption of Series 2019 Bonds | 26 |
| Section 5.02 | Sinking Fund Redemption | 27 |
| Section 5.03 | Method of Selection of Bonds in Case of Partial Redemption; Redemption Priority | 28 |
| Section 5.04 | Notice of Redemption | 28 |
| Section 5.05 | Bonds Due and Payable on Redemption Date; Interest Ceases to Accrue | 29 |
| Section 5.06 | Cancellation | 30 |
| Section 5.07 | Partial Redemption of Fully Registered Bonds | 30 |
| Section 5.08 | Special Redemption | 30 |
| ARTICLE VI | INVESTMENTS | 30 |
| Section 6.01 | Investment of Bond Fund, Construction Fund and Reserve Fund Moneys | 30 |
| Section 6.02 | Allocation and Transfers of Investment Income | 30 |
| Section 6.03 | Valuation of Permitted Investments | 31 |
| ARTICLE VII | DISCHARGE OF BOND INDENTURE | 31 |
| Section 7.01 | Discharge of the Bond Indenture | 31 |
| ARTICLE VIII | DEFAULTS AND REMEDIES | 33 |
| Section 8.01 | Events of Default | 33 |
| Section 8.02 | Remedies on Events of Default | 33 |
| Section 8.03 | Majority of Bondholders May Control Proceedings | 34 |
| Section 8.04 | Rights and Remedies of Bondholders | 35 |
| Section 8.05 | Application of Moneys | 35 |
| Section 8.06 | Bond Trustee May Enforce Rights Without Bonds | 37 |
| Section 8.07 | Bond Trustee to File Proofs of Claim in Receivership, Etc | 37 |
| Section 8.08 | Delay or Omission No Waiver | 37 |
| Section 8.09 | Discontinuance of Proceedings on Default, Position of Parties Restored | 37 |
| Section 8.10 | Enforcement of Rights | 37 |
| Section 8.11 | Undertaking for Costs | 38 |
| Section 8.12 | Waiver of Events of Default | 38 |
| ARTICLE IX | CONCERNING THE BOND TRUSTEE AND PAYING AGENTS | 38 |
| Section 9.01 | Duties of the Bond Trustee | 38 |
| Section 9.02 | Fees and Expenses of Bond Trustee and Paying Agent | 41 |

Section 9.03    Resignation or Replacement of Bond Trustee ................................................42
Section 9.04    Conversion, Consolidation or Merger of Bond Trustee................................43
Section 9.05    Designation and Succession of Paying Agent....................................................43
Section 9.06    [Reserved.] ...............................................................................................43
Section 9.07    [Reserved.] ...............................................................................................43

ARTICLE X     SUPPLEMENTAL INDENTURES AND AMENDMENTS TO THE
              AGREEMENT ...........................................................................................44

Section 10.01   Supplemental Indentures Not Requiring Consent of Bondholders.................44
Section 10.02   Supplemental Indentures Requiring Consent of Bondholders.........................44
Section 10.03   Execution of Supplemental Indenture................................................................45
Section 10.04   Consent of Obligor ...........................................................................................45
Section 10.05   Amendments, Etc., of the Agreement Not Requiring Consent of
              Bondholders .......................................................................................................46
Section 10.06   Amendments, Etc., of the Agreement or Master Indenture Requiring
              Consent of Bondholders....................................................................................46

ARTICLE XI    MISCELLANEOUS ...........................................................................................47

Section 11.01   Evidence of Signature of Bondholders and Ownership of Bonds ...................47
Section 11.02   No Personal Liability .........................................................................................47
Section 11.03   Limited Obligation............................................................................................47
Section 11.04   Parties Interested Herein ...................................................................................48
Section 11.05   Titles, Headings, Etc ..........................................................................................48
Section 11.06   Severability ........................................................................................................48
Section 11.07   Governing Law...................................................................................................48
Section 11.08   Execution of Counterparts.................................................................................48
Section 11.09   Notices................................................................................................................48
Section 11.10   Payments Due on Holidays ................................................................................49

INDENTURE OF TRUST

THIS INDENTURE OF TRUST dated as of [November 1], 2019, between TARRANT COUNTY CULTURAL EDUCATION FACILITIES FINANCE CORPORATION, a nonstock nonprofit cultural educational facilities finance corporation duly organized and existing under the laws of the State of Texas (the "Issuer"), and UMB BANK, NATIONAL ASSOCIATION, a national banking association with trust powers having an office in Minneapolis, Minnesota, as Bond Trustee, being authorized to accept and execute trusts of the character herein set out,

WITNESSETH:

WHEREAS, the Issuer was created pursuant to the Cultural Education Facilities Finance Corporation Act, Article 1528m, V.A.T.C.S., as amended (the "Act"); and

WHEREAS, the Issuer is authorized by the Act to sell and deliver its bonds for the purpose of financing or refinancing the cost of a health facility, as defined in Chapter 221, Texas Health and Safety Code, as amended (the "Health Facility Act"); and

WHEREAS, the Issuer is further authorized by the Act to make a loan of the proceeds of its bonds in the amount of all or part of the cost of the health facility or health facilities for which such bonds have been authorized and, at the option of the Issuer, for the deposit to a reserve fund or reserve funds for the bonds; and

WHEREAS, the execution and delivery of this Indenture of Trust (hereinafter sometimes referred to as the "Bond Indenture"), and the issuance of the bonds hereinafter authorized under this Bond Indenture, pursuant to the provisions of the Act, have been in all respects duly and validly authorized by a resolution duly adopted and approved by the Board of Directors of the Issuer; and

WHEREAS, the Issuer is authorized by law and deems necessary, in accordance with its powers described above, and has duly authorized and directed that its bonds, to be known as "Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2019", be issued (all bonds from time to time outstanding under the terms of this Bond Indenture being hereinafter referred to as the "Series 2019 Bonds" or the "Bonds"); and

WHEREAS, the proceeds of the Series 2019 Bonds shall be loaned to Tarrant County Senior Living Center Inc. (the "Obligor") pursuant to a Loan Agreement dated as of [November 1], 2019 (the "Agreement") between the Issuer and the Obligor; and

WHEREAS, to secure the payment of the principal of the Series 2019 Bonds, premium, if any, and the interest thereon and the performance and observance of the covenants and conditions herein contained the Issuer has authorized the execution and delivery of this Bond Indenture; and

WHEREAS, the Issuer has previously authorized and issued its Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2009A in the original principal amount of $100,275,000 (the "Series 2009A Bonds") and its Tarrant County Cultural Education Facilities Finance Corporation

Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2009B, Accelerated Redemption Reset Option Securities (ARROS) in the original principal amount of $10,000,000 (the "Series 2009B Bonds" and together with the Series 2009A Bonds, the "Series 2009 Bonds"), which Series 2009 Bonds are outstanding in the principal amount of $[105,795,000]; and

WHEREAS, the Issuer has previously authorized and issued its Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2009C-1, Tax-Exempt Mandatory Paydown Securities in the original principal amount of $31,300,000 (the "Series 2009C-1 Bonds") and its Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2009C-2, Tax-Exempt Mandatory Paydown Securities in the original principal amount of $25,000,000 (the "Series 2009C-2 Bonds"), which Series 2009C-1 Bonds and Series 2009C-2 Bonds have been paid in accordance with their terms and are no longer outstanding; and

WHEREAS, the Obligor is in default of certain covenants relating to the Series 2009 Bonds, and the Obligor and a majority in principal amount of the Series 2009 Bonds have reached an agreement to restructure the Series 2009 bonds through the issuance and exchange of the Series 2019 Bonds for the outstanding Series 2009 Bonds (the "Exchange"); and

WHEREAS, the Obligator voluntarily filed for reorganization under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") and _____, 2019, and submitted to the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") a plan of reorganization (the "Plan"), which Plan provides for, among other matters, the Exchange of the Series 2019 Bonds for the outstanding Series 2009 Bonds; and

WHEREAS, on _____, 2019, the Bankruptcy Court issued its order (the "Bankruptcy Court Order") approving the Plan effective as of November ___, 2019, including approval of the Exchange of the Series 2019 Bonds for a like principal amount of the outstanding Series 2009 Bonds; and

WHEREAS, the Obligor has requested that the Issuer authorize and approve the issuance of the Series 2019 Bonds on the Exchange Date; and

WHEREAS, the Issuer has determined to issue the Series 2019 Bonds in the Aggregate Principal Amount of $[105,795,000] for the purpose of refinancing the outstanding Series 2009 Bonds and accrued and unpaid interest thereon, through the Exchange, which Series 2009 Bonds financed the cost of certain health facilities located in the City of Fort Worth, Tarrant County, Texas, funded a debt service reserve fund and paid a portion of the cost of issuance of the Series 2009 Bonds; and

WHEREAS, the Series 2019 Bonds, the Bond Trustee's Authentication Certificate, the Comptroller's Registration Certificate and the Assignment are to be substantially in the following forms, with such necessary or appropriate variations, omissions, and insertions as permitted or required by this Bond Indenture:

(FORM OF SERIES 2019 BOND)
(Face of Bond)

## TARRANT COUNTY CULTURAL EDUCATION FACILITIES FINANCE CORPORATION
## RETIREMENT FACILITY REVENUE BONDS
## (THE STAYTON AT MUSEUM WAY PROJECT)
## SERIES 2019

No. R- _____ $[105,795,000]

| Interest Rate | Maturity Date | Delivery Date | Dated | CUSIP |
|---|---|---|---|---|
| 5.75% | [November 1], 2054] | [November ___], 2019 | [November 1], 2019 | |

REGISTERED OWNER:   CEDE & CO.
PRINCIPAL AMOUNT:  [ONE HUNDRED FIVE MILLION SEVEN HUNDRED NINETY-FIVE THOUSAND] DOLLARS

TARRANT COUNTY CULTURAL EDUCATION FACILITIES FINANCE CORPORATION, a nonstock nonprofit cultural educational facilities finance corporation duly organized and existing under the laws of the State of Texas (the "Issuer"), created and acting on behalf of Tarrant County, Texas, for value received, promises to pay, from the sources described herein, to the registered owner specified above, or registered assigns, the principal amount specified above, on the maturity date specified above (unless this Bond shall have been called for prior redemption) and to pay, from such sources, interest on said sum on [May 1] and [November 1] of each year, commencing [May 1], 2020, at the interest rate specified above, until payment of the principal hereof has been made or provided for. This Bond will bear interest from the most recent interest payment date to which interest has been paid or provided for, or, if no interest has been paid, from [November 1], 2019.

NEITHER THE STATE OF TEXAS NOR ANY POLITICAL SUBDIVISION OR AGENCY OF THE STATE OF TEXAS, INCLUDING TARRANT COUNTY, TEXAS, SHALL BE LIABLE OR OBLIGATED (GENERALLY, SPECIALLY, MORALLY OR OTHERWISE) TO PAY THE PRINCIPAL OF THIS BOND OR THE PREMIUM, IF ANY, OR INTEREST HEREON, AND NEITHER THE FAITH AND CREDIT NOR THE TAXING POWER OF THE STATE OF TEXAS, TARRANT COUNTY, TEXAS, OR ANY OTHER POLITICAL SUBDIVISION OR AGENCY THEREOF IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST ON THE BONDS. THE ISSUER HAS NO TAXING POWER.

This Bond and the series of Bonds of which it is a part have been issued under and pursuant to the provisions of the Cultural Education Facilities Finance Act, Article 1528m, V.A.T.C.S., as amended (the "Act"). This Bond is a limited obligation of the Issuer payable solely from the revenues, receipts and resources of the Issuer pledged to its payment and not from any other

3

revenues, funds or assets of the Issuer. No owner of any Bonds has the right to compel Tarrant County, Texas to pay the principal of, interest or redemption premium, if any, on the Bonds.

The principal of and premium, if any, on this Bond are payable upon the presentation and surrender hereof at the [Minneapolis, Minnesota] trust office of UMB Bank, National Association, as trustee, or at the designated corporate trust office of its successor in trust (the "Bond Trustee") under an Indenture of Trust dated as of [November 1], 2019 (the "Bond Indenture") by and between the Issuer and the Bond Trustee. Interest on this Bond will be paid on each interest payment date (or, if such interest payment date is not a business day, on the next succeeding business day), by check or draft mailed to the person in whose name this Bond is registered (the "registered owner") in the registration records of the Issuer maintained by the Bond Trustee at the address appearing thereon at the close of business on the last day of the calendar month next preceding such interest payment date (the "Regular Record Date") or by wire transfer of same day funds upon receipt by the Bond Trustee prior to the Regular Record Date of a written request by a registered owner of $1,000,000 or more in aggregate principal amount of Bonds. The CUSIP number and appropriate dollar amounts for each CUSIP number shall accompany all payments of principal of, redemption premium, if any, and interest on the Bonds. Any such interest not so timely paid or duly provided for shall cease to be payable to the person who is the registered owner hereof at the close of business on the Regular Record Date and shall be payable to the person who is the registered owner hereof at the close of business on a Special Record Date (as defined in the hereinafter defined Agreement), for the payment of any defaulted interest. Such Special Record Date shall be fixed by the Bond Trustee whenever moneys become available for payment of the defaulted interest, and notice of the Special Record Date shall be given to the registered owners of such Bonds not less than ten days prior to such Special Record Date. Alternative means of payment of interest may be used if mutually agreed upon between the owner of this Bond and the Bond Trustee, as provided in the Bond Indenture. All such payments shall be made in lawful money of the United States of America without deduction for the services of the Bond Trustee.

This Bond shall be issued pursuant to a book entry system administered by The Depository Trust Company (together with any successor thereto, "Securities Depository"). The book entry system will evidence beneficial ownership of the Bonds with transfers of ownership effected on the register held by the Securities Depository pursuant to rules and procedures established by the Securities Depository. So long as the book entry system is in effect, transfer of principal, interest and premium payments, and provisions of notices or other communications, to beneficial owners of the Bonds will be the responsibility of the Securities Depository as set forth in the Bond Indenture.

This Bond is one of a duly authorized issue of bonds of the Issuer known as "Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Series 2019" (the "Series 2019 Bonds") and issued in an Aggregate Principal Amount (as defined in the hereinafter defined Agreement) of $[105,795,000] for the purpose of refinancing the outstanding principal amount of the Issuer's Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Series 2009A and Series 2009B, the proceeds of which were used to finance and refinance the cost of certain health facilities owned and operated by Tarrant County Senior Living Center Inc., a Texas nonprofit corporation (the "Obligor"), located in the

4

City of Fort Worth, Tarrant County, Texas (the "Project"), to fund a debt service reserve fund for the Series 2009 Bonds and to pay a portion of the cost of issuance of the Series 2009 Bonds.

The refinancing of the Series 2009 Bonds is being effected through the exchange of the outstanding Series 2009 Bonds for the Series 2019 Bonds (the "Exchange") and the replacement of the loan agreement between the Issuer and the Obligor for the loan of the proceeds of the Series 2009 Bonds with a loan agreement between the Issuer and the Obligor for the repayment by the Obligor of a replacement loan by the Issuer in an amount equal to the principal amount of the Series 2019 Bonds, together with interest thereon. To provide for its loan repayment obligations, the Obligor has issued its Series 2019 Note (the "Series 2019 Note") under a Loan Agreement dated as of [November 1], 2019, between the Issuer and the Obligor (the "Agreement"). The Series 2019 Note is issued pursuant to an Amended and Restated Master Trust Indenture, Deed of Trust and Security Agreement dated as of [November 1], 2019, as supplemented (the "Master Indenture"), between the Obligor and UMB Bank, National Association, successor master trustee (in such capacity, the "Master Trustee") to The Bank of New York Mellon Trust Company, National Association, as original master trustee. Pursuant to the Master Indenture, the Obligor has pledged and granted a security interest in the Gross Revenues and the Mortgaged Property (as defined in the Master Indenture) to the Master Trustee to secure the Series 2019 Note.

Additional obligations on a parity with the Series 2019 Note may be issued pursuant to the Master Indenture subject to the conditions and terms contained therein, and the payments on such additional obligations will also be secured by a pledge of the Gross Revenues and Mortgaged Property.

This Bond and the claims for interest hereon are payable only out of the revenues derived by the Issuer pursuant to the Agreement. The Series 2019 Bonds are issued under and are equally and ratably secured and are entitled to the protection given by the Bond Indenture.

No recourse under or upon any obligation, covenant, or agreement contained in the Bond Indenture, or in any Bond, or under any judgment obtained against the Issuer or by the enforcement of any assessment or by any legal or equitable proceeding by virtue of any constitution or statute or otherwise or under any circumstances, under or independent of the Bond Indenture, shall be had against any director, incorporator, officer, agent, employee, or representative as such, past, present or future, of the Issuer, either directly or through the Issuer or otherwise, for the payment for or to the Issuer or for or to the registered owner of any Bond issued thereunder or otherwise, of any sum that may be due and unpaid by the Issuer upon any such Bond.

Neither the directors, incorporators, officers, agents, employees or representatives of the Issuer past, present or future, nor any person executing this Bond or the Bond Indenture, shall be personally liable hereon or thereon or be subject to any personal liability by reason of the issuance hereof and thereof, whether by virtue of any constitution, statute or rule of law or by the enforcement of any assessment or penalty, or otherwise, all such liability being expressly released and waived as a condition of and in consideration for the execution of the Bond Indenture and the issuance of this Bond.

Reference is hereby made to the Bond Indenture and all indentures supplemental thereto and the Master Indenture for a description of the revenues pledged, the nature and extent of the

security, the rights, duties, and obligations of the Issuer, the Bond Trustee and the owners of the Series 2019 Bonds, and the terms and conditions upon which the Bonds are secured.

The Series 2019 Bonds are subject to optional redemption prior to maturity by the Issuer at the direction of the Obligor in whole or in part on any date prior to [_____], 202[2] at a redemption price equal to 107% of the principal amount of Series 2019 Bonds to be redeemed, together with accrued interest to the redemption date, and thereafter at a redemption price that shall decline by 1% of the principal amount of Series 2019 Bonds to be redeemed on each [_____], beginning on [_____], 202[2] until [_____], 202[8], on and after which the redemption price shall be equal to 100% of the principal amount of Series 2019 Bonds to be redeemed, together with accrued interest to the redemption date.

The Series 2019 Bonds are subject to mandatory sinking fund redemption at a redemption price equal to the principal amount thereof plus accrued interest to the redemption date. As and for a sinking fund for the redemption of Series 2019 Bonds, the Issuer shall cause to be deposited into the Principal Account of the Bond Fund a sum which is sufficient to redeem on [_____] of each of the following years (after credit as provided below) the following principal amounts of Series 2019 Bonds, plus accrued interest to the redemption date:

| Year | Amount | Year | Amount |
|------|--------|------|--------|

[insert sinking fund schedule] –

*maturity

Unless an Event of Default shall have occurred and be continuing, at the option of the Obligor to be exercised by delivery of a written certificate to the Bond Trustee on or before the forty fifth day next preceding any sinking fund redemption date, it may (i) deliver to the Bond Trustee for cancellation Series 2019 Bonds or portions thereof of the same maturity, in an Aggregate Principal Amount desired by the Obligor or (ii) specify a principal amount of Series 2019 Bonds or portions thereof, which prior to said date have been redeemed (otherwise than through the operation of the sinking fund) and canceled by the Bond Trustee at the request of the Obligor and not theretofore applied as a credit against any sinking fund redemption obligation.

The Series 2019 Bonds shall be subject to special redemption by the Issuer at the direction of the Obligor prior to their scheduled maturities, in whole or in part at a redemption price equal to the principal amount thereof plus accrued interest from the most recent interest payment date to the redemption date on any date in case of damage or destruction to, or condemnation of, any property, plant, and equipment of any Obligated Group Member, to the extent that the net proceeds of insurance or condemnation award exceed the Threshold Amount (as defined in the Master Indenture) and the Obligor has determined not to use, or is unable to use, such net proceeds or award to repair, rebuild or replace such property, plant, and equipment.

If less than all Series 2019 Bonds are to be optionally redeemed, the selection of particular Series 2019 Bonds to be redeemed shall be made by the Securities Depository or by lot by the Bond Trustee. Notice of the call for any redemption shall be given by the Bond Trustee by sending a copy of the redemption notice by mail not more than 60 nor less than 30 days prior to the

redemption date to the registered owner of each Series 2019 Bond to be redeemed as shown on the registration records kept by the Bond Trustee, as provided in the Bond Indenture. Series 2019 Bonds or portions thereof called for redemption will cease to bear interest after the specified redemption date, provided funds for their payment are on deposit at the place of payment at that time.

The Series 2019 Bonds are issuable as fully registered Bonds in denominations of $5,000 and any integral multiple thereof and are exchangeable for an equal Aggregate Principal Amount of fully registered Series 2019 Bonds of the same maturity of other authorized denominations at the aforesaid office of the Bond Trustee but only in the manner and subject to the limitations and on payment of the charges provided in the Bond Indenture.

This Bond is fully transferable by the registered owner hereof in person or by his or her duly authorized attorney on the registration books kept at the principal office of the Bond Trustee upon surrender of this Bond together with a duly executed written instrument of transfer satisfactory to the Bond Trustee. Upon such transfer a new fully registered Series 2019 Bond of authorized denomination or denominations for the same Aggregate Principal Amount and maturity will be issued to the transferee in exchange therefor, all upon payment of the charges and subject to the terms and conditions set forth in the Bond Indenture.

The Bond Trustee will not be required to transfer or exchange any Series 2019 Bond after the mailing of notice calling such Series 2019 Bond or any portion thereof for redemption has been given as herein provided, nor during the period beginning at the opening of business 15 days before the day of mailing by the Bond Trustee of a notice of prior redemption and ending at the close of business on the day of such mailing.

The Issuer and the Bond Trustee may deem and treat the person in whose name this Bond is registered as the absolute owner hereof for the purpose of making payment (except to the extent otherwise provided hereinabove and in the Bond Indenture with respect to Regular and Special Record Dates for the payment of interest) and for all other purposes, and neither the Issuer nor the Bond Trustee shall be affected by any notice to the contrary. The principal of, premium, if any, and interest on this Bond shall be paid free from and without regard to any equities between the Obligor and the original or any intermediate owner hereof, or any setoffs or counterclaims.

The owner of this Bond shall have no right to enforce the provisions of the Bond Indenture or to institute action to enforce the covenants therein, or to take any action with respect to any event of default under the Bond Indenture, or to institute, appear in or defend any suit or other proceedings with respect thereto, except as provided in the Bond Indenture. In case an event of default under the Bond Indenture shall occur, the principal of all of the Bonds at any such time Outstanding under the Bond Indenture may be declared or may become due and payable, upon the conditions and in the manner and with the effect provided in the Bond Indenture. The Bond Indenture provides that such declaration may in certain events be waived by the Bond Trustee or the owners of a requisite principal amount of the Bonds Outstanding under the Bond Indenture.

To the extent permitted by, and as provided in, the Bond Indenture, modifications or amendments of the Bond Indenture, or of any indenture supplemental thereto, and of the rights and obligations of the Issuer and of the owners of the Bonds may be made with the consent of the

Issuer and the Bond Trustee and, in certain instances, of not less than a majority in Aggregate Principal Amount of the Bonds then Outstanding; and, in certain other instances, of not less than all of the Bonds affected thereby. Any such consent by the owner of this Bond shall be conclusive and binding upon such owner and upon all future owners of this Bond and of any Bond issued upon the transfer or exchange of this Bond whether or not notation of such consent is made upon this Bond.

IT IS HEREBY CERTIFIED, RECITED AND DECLARED that all acts, conditions and things required to exist, happen and be performed precedent to and in the execution and delivery of the Bond Indenture and issuance of this Bond do exist, have happened and have been performed in due time, form and manner as required by law.

THIS BOND shall not be entitled to any benefit under the Bond Indenture, or any indenture supplemental thereto, or become valid or obligatory for any purpose until (i) the Bond Trustee shall have manually signed the certificate of authentication hereon or (ii) a manually signed Comptroller's Registration Certificate is attached hereto.

IN WITNESS WHEREOF, Tarrant County Cultural Education Facilities Finance Corporation has caused this Bond to be executed with the manual or facsimile signatures of its President and Secretary, and a facsimile of its corporate seal to be hereto affixed or printed, all as of the date set forth above.

TARRANT COUNTY CULTURAL EDUCATION
FACILITIES FINANCE CORPORATION

By: _____
                      President

(SEAL)

Attest:

_____
Secretary

(FORM OF TRUSTEE'S CERTIFICATE OF AUTHENTICATION)

This is one of the Series 2019 Bonds referred to in the within mentioned Bond Indenture.

Date of Authentication:                    UMB BANK, NATIONAL ASSOCIATION,
                                      as Bond Trustee

By: _____
Authorized Signatory

(END OF FORM OF TRUSTEE'S CERTIFICATE OF AUTHENTICATION)

(FORM OF COMPTROLLER'S REGISTRATION CERTIFICATE)
(To be attached to initial Bonds only)

COMPTROLLER'S REGISTRATION CERTIFICATE: REGISTER NO.

I hereby certify that this Bond has been examined, certified as to validity, and approved by the Attorney General of the State of Texas, and that this Bond has been registered by the Comptroller of Public Accounts of the State of Texas.

Witness my signature and seal this _____

Comptroller of Public Accounts
of the State of Texas

[SEAL]

(END OF FORM OF COMPTROLLER'S REGISTRATION CERTIFICATE)

[FORM OF ASSIGNMENT]

ASSIGNMENT

For value received, the undersigned hereby sells, assigns and transfers unto
_____ the within Bond, and does hereby irrevocably constitute and appoint
_____ attorney to transfer such Bond on the books kept for registration and
transfer of the within Bond, with full power of substitution in the premises.

Date: _____

NOTICE: The signature to this Assignment must correspond with the name as it appears upon the face of the within Bond in every particular, without enlargement or alteration or any change whatsoever.

Signature Guaranteed By:


_____
Authorized Signatory


NOTE: the signature to this Assignment must be guaranteed by a financial institution that is a member of the Securities Transfer Agents Medallion Program ("STAMP"), the Stock Exchange Medallion Program ("SEMP") or the New York Stock Exchange, Inc. Medallion Signature Program ("MSP").

* * * [END OF SERIES 2009 BOND FORM] * * *

WHEREAS, all things necessary to make the Series 2019 Bonds, when authenticated by the Bond Trustee and issued as in this Bond Indenture provided, the valid, binding, and legal obligations of the Issuer and to constitute this Bond Indenture a valid, binding, and legal instrument for the security of the Bonds in accordance with its terms, have been done and performed

NOW, THEREFORE, THIS INDENTURE OF TRUST WITNESSETH:

That the Issuer, in consideration of the premises and of the mutual covenants herein contained and of the purchase and acceptance of the Series 2019 Bonds by the owners thereof and of the sum of One Dollar to it duly paid by the Bond Trustee at or before the execution and delivery of these presents, and for other good and valuable consideration, the receipt of which is hereby acknowledged, in order to secure the payment of the principal of, premium, if any, and interest on all Bonds at any time Outstanding under this Bond Indenture, according to their tenor and effect, and to secure the performance and observance of all the covenants and conditions in the Bonds and herein contained, and to declare the terms and conditions upon and subject to which the Bonds are issued and secured, has executed and delivered this Bond Indenture and has granted, bargained, sold, warranted, alienated, remised, released, conveyed, assigned, pledged, set over, and confirmed, and by these presents does grant, bargain, sell, warrant, alien, remise, release, convey, assign, pledge, set over, and confirm unto UMB Bank, National Association, as trustee, and to its

successors and assigns forever, all and singular the following described property, franchises, and income:

A. All of the Issuer's right, title and interest in and to any Note delivered by the Obligor to the Issuer pursuant to the Agreement; and

B. All of the Issuer's right, title and interest in and to the Agreement (except for the rights of the Issuer to receive payments, if any, under Sections 5.7, 7.5, and 9.5 of the Agreement), together with all powers, privileges, options and other benefits of the Issuer contained in the Agreement; provided, however, that nothing in this clause shall impair, diminish or otherwise affect the Issuer's obligations under the Agreement or, except as otherwise provided in this Bond Indenture, impose any such obligations on the Bond Trustee; and

C. Amounts on deposit from time to time in the Bond Fund and Reserve Fund, but excluding the Rebate Fund (all as defined in the Agreement), subject to the provisions of this Bond Indenture permitting the application thereof for the purposes and on the terms and conditions set forth herein; and

D. Any and all property of every kind or description which may from time to time hereafter be sold, transferred, conveyed, assigned, hypothecated, endorsed, deposited, pledged, mortgaged, granted or delivered to, or deposited with the Bond Trustee as additional security by the Issuer or anyone on its part or with its written consent, or which pursuant to any of the provisions hereof or of the Agreement or any Note may come into the possession of or control of the Bond Trustee or a receiver appointed pursuant to Article VIII hereof, as such additional security; and the Bond Trustee is hereby authorized to receive any and all such property as and for additional security for the payment of the Bonds, and to hold and apply all such property subject to the terms hereof.

TO HAVE AND TO HOLD the same with all privileges and appurtenances hereby conveyed and assigned, or agreed or intended to be, to the Bond Trustee and its successors in said trust and assigns forever;

IN TRUST, NEVERTHELESS, upon the terms herein set forth for the equal and proportionate benefit, security, and protection of all owners of the Bonds issued under and secured by this Bond Indenture without privilege, priority, or distinction as to the lien or otherwise of any of the Bonds over any other of the Bonds;

PROVIDED, HOWEVER, that if the Issuer, its successors or assigns, shall pay, or cause to be paid, the principal of the Bonds and the premium, if any, and the interest due or to become due thereon, at the times and in the manner mentioned in the Bonds according to the true intent and meaning thereof, and shall cause the payments to be made into the Bond Fund as hereinafter required or shall provide, as permitted hereby, for the payment thereof by depositing with the Bond Trustee the entire amount due or to become due hereon, or certain securities as herein permitted and shall keep, perform, and observe all the covenants and conditions pursuant to the terms of this Bond Indenture to be kept, performed, and observed by it, and shall pay or cause to be paid to the Bond Trustee all sums of money due or to become due to it in accordance with the terms and provisions hereof, then upon such final payments this Bond Indenture and the rights hereby granted

shall cease, determine, and be void; otherwise this Bond Indenture to be and remain in full force and effect.

THIS BOND INDENTURE FURTHER WITNESSETH and it is expressly declared that all Bonds issued and secured hereunder are to be issued, authenticated, and delivered and all said rights hereby pledged and assigned are to be dealt with and disposed of under, upon, and subject to the terms, conditions, stipulations, covenants, agreements, trusts, uses, and purposes as hereinafter expressed, and the Issuer has agreed and covenanted, and does hereby agree and covenant, with the Bond Trustee and with the respective owners from time to time of the Bonds as follows:

[END OF PREAMBLE]

## ARTICLE I

## ARTICLE I DEFINITIONS

Section 1.01    Definitions.  All defined words and phrases used in this Bond Indenture shall have the meaning given and ascribed to such words and phrases in Article I of the Agreement.

Section 1.02    Recital Incorporation.    The recitals set forth in the beginning of this Indenture are hereby incorporated herein.

## ARTICLE II

## AUTHORIZATION, TERMS, EXECUTION AND ISSUANCE OF BONDS

Section 2.01    Authorized Amount of Series 2019 Bonds.  No Series 2019 Bonds may be issued under this Bond Indenture except in accordance with this Article.  The total original principal amount of Series 2019 Bonds that may be issued hereunder is hereby expressly limited to $[105,795,000], except as provided in Section 2.06 hereof.

Section 2.02    All Bonds Equally and Ratably Secured; Bonds Not an Obligation of Issuer. All Series 2019 Bonds issued under this Bond Indenture and at any time Outstanding shall in all respects be equally and ratably secured hereby, without preference, priority, or distinction, so that all Series 2019 Bonds at any time issued and Outstanding hereunder shall have the same right, lien, and preference under and by virtue of this Bond Indenture, and shall all be equally and ratably secured hereby.  The Series 2019 Bonds shall be payable solely out of the revenues and other security pledged hereby and shall not constitute an indebtedness of the Issuer within the meaning of any state constitutional provision or statutory limitation and shall never constitute nor give rise to a pecuniary liability of the Issuer.

Section 2.03    Authorization of Series 2019 Bonds.

(a)     There is hereby authorized to be issued hereunder and secured hereby an issue of bonds designated as the "Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Series 2019." The Series 2019 Bonds shall be numbered consecutively upward from R-1.

(b)     The Series 2019 Bonds shall bear interest from the most recent interest payment date to which interest has been paid or provided for, or, if no interest has been paid, from [November 1], 20[19].  The Series 2019 Bonds shall bear interest on the basis of a 360 day year composed of twelve 30 day months payable each [May 1] and each [November 1] beginning [May 1], 2020, at the rate per annum of 5.75% and shall mature on [November 1], [2054.]

(c)     The Series 2019 Bonds shall be issued in Authorized Denominations and shall be dated as of [November1, 2019].  The Series 2019 Bonds are subject to prior redemption as herein set forth and shall be substantially in the form and tenor hereinabove recited with appropriate variations, omissions, and insertions as are permitted or required by this Bond Indenture.

(d)     The principal of and premium, if any, on the Series 2019 Bonds shall be payable in lawful money of the United States of America at the Payment Office of the Bond Trustee, or at the designated corporate trust office of its successor, upon presentation and surrender of the Series 2019 Bonds. Payment of interest on any Series 2019 Bond shall be made to the person who is the registered owner thereof at the close of business on the Regular Record Date for such Interest Payment Date by check mailed by the Bond Trustee on such Interest Payment Date to such registered owner at his or her address as it appears on the registration records kept by the Bond Trustee or by wire transfer of same day funds upon receipt by the Bond Trustee prior to the Regular Record Date of a written request by a registered owner of $1,000,000 or more in aggregate principal amount of Bonds. The CUSIP number and appropriate dollar amounts for each CUSIP number shall accompany all payments of principal, premium, if any, and interest on the Series 2019 Bonds.

Any such interest not so timely paid or duly provided for shall cease to be payable to the person who is the registered owner of such Series 2019 Bond at the close of business on the Regular Record Date and shall be payable to the person who is the registered owner thereof at the close of business on a Special Record Date for the payment of any such defaulted interest. Such Special Record Date shall be fixed by the Bond Trustee whenever moneys become available for payment of the defaulted interest, and notice of the Special Record Date shall be given to the registered owners of the Series 2019 Bonds not less than ten days prior thereto by first class postage prepaid mail to each such registered owner as shown on the registration records, stating the date of the Special Record Date and the date fixed for the payment of such defaulted interest. Alternative means of payment of interest may be used if mutually agreed upon between the owners of any Series 2019 Bonds and the Bond Trustee. All such payments shall be made in lawful money of the United States of America.

Notwithstanding the foregoing, payments of the principal of and interest on any Bonds that are subject to the book entry system as provided in Article II of this Bond Indenture shall be made in accordance with the rules, regulations and procedures established by the securities depository in connection with the book entry system.

Section 2.04    Execution of Bonds, Signatures.  The Bonds shall be executed on behalf of the Issuer by its President and its corporate seal shall be thereunto affixed and attested by the Secretary. The signatures of such officers and the seal of the Issuer may be in facsimile. In case any officer who shall have signed any of the Bonds shall cease to hold such office and any of such Bonds shall have been authenticated by the Bond Trustee or delivered or sold, such Bonds with the signatures thereto affixed may, nevertheless, be authenticated by the Bond Trustee, and delivered, and may be sold by the Issuer, as though the person or persons who signed such Bonds had remained in office.

Section 2.05    Registration and Exchange of Bonds; Persons Treated as Owners.  The Issuer shall cause books for the registration and for the transfer of the Bonds as provided in this Bond Indenture to be kept by the Bond Trustee which is hereby appointed the bond registrar of the Issuer for the Series 2019 Bonds. Upon surrender for transfer of any fully registered Bond at the Payment Office of the Bond Trustee, duly endorsed for transfer or accomplished by an assignment duly executed by the registered owner or his attorney duly authorized in writing, the Issuer shall execute and the Bond Trustee shall authenticate and deliver in the name of the transferee or

transferees a new fully registered Bond or Bonds of a like Aggregate Principal Amount for a like principal amount and maturity.

The Issuer shall execute and the Bond Trustee shall authenticate and deliver Bonds which the Bondholder making the exchange is entitled to receive, bearing numbers not contemporaneously Outstanding. The execution by the Issuer of any fully registered Bond of any denomination shall constitute full and due authorization of such denomination and the Bond Trustee shall thereby be authorized to authenticate and deliver such Bond.

The Bond Trustee shall not be required to transfer or exchange any Bond after the mailing of notice calling such Bond or any portion thereof for redemption has been given as herein provided, nor during the period beginning at the opening of business fifteen days before the day of mailing by the Bond Trustee of a notice of prior redemption and ending at the close of business on the day of such mailing except for Bondholders of $1,000,000 or more in aggregate principal amount of the Series 2019 Bonds.

As to any Bond, the Person in whose name the same shall be registered shall be deemed and regarded as the absolute owner thereof for all purposes, and payment of principal of or interest on any Bond shall be made only to or upon the written order of the registered owner thereof or his legal representative, but such registration may be changed as hereinabove provided. All such payments shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums paid.

The Bond Trustee shall require the payment by any Bondholder requesting exchange or transfer of any tax or other governmental charge required to be paid with respect to such exchange or transfer.

Section 2.06  Lost, Stolen, Destroyed, and Mutilated Bonds.  Upon receipt by the Bond Trustee of evidence satisfactory to it of the ownership of and the loss, theft, destruction, or mutilation of any Bond and, in the case of a lost, stolen, or destroyed Bond, of indemnity satisfactory to it, and upon surrender and cancellation of the Bond if mutilated, (i) the Issuer shall execute, and the Bond Trustee shall authenticate and deliver, a new Bond of the same series, date and maturity as the lost, stolen, destroyed or mutilated Bond in lieu of such lost, stolen, destroyed, or mutilated Bond or (ii) if such lost, stolen, destroyed, or mutilated Bond shall have matured or have been called for redemption, in lieu of executing and delivering a new Bond as aforesaid, the Issuer may pay such Bond. Any such new Bond shall bear a number not contemporaneously Outstanding. The applicant for any such new Bond may be required to pay all expenses and charges of the Issuer and of the Bond Trustee in connection with the issue of such new Bond. All Bonds shall be held and owned upon the express condition that, to the extent permitted by law, the foregoing conditions are exclusive with respect to the replacement and payment of mutilated, destroyed, lost, or stolen Bonds, negotiable instruments, or other securities. If, after the delivery of such new Bond, a bona fide purchaser of the original Bond in lieu of which such duplicate Bond was issued presents for payment such original Bond, the Obligor or the Bond Trustee shall be entitled to recover upon such new Bond from the person to whom it was delivered or any person taking therefrom, except a bona fide purchaser, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Obligor or the Bond Trustee in connection therewith.

Section 2.07    Delivery of Series 2019 Bonds.   Upon the execution and delivery of this Bond Indenture, the Issuer shall execute and deliver to the Bond Trustee and the Bond Trustee shall authenticate the Series 2019 Bonds and deliver them to the Securities Depository for crediting to the participant accounts of the beneficial owners of the Series 2009 Bonds in accordance with the provisions of the Plan as hereinafter in this Section provided.

Prior to the delivery by the Bond Trustee of any of the Series 2019 Bonds there shall be filed with and delivered to the Bond Trustee at least:

(a)    A Certified Resolution authorizing the execution and delivery of the Agreement and this Bond Indenture and the issuance of the Series 2019 Bonds.

(b)    Original executed counterparts of the Agreement, this Bond Indenture, the Supplemental Indenture and the Master Indenture.

(c)    The Series 2019 Note, duly executed and authenticated and duly assigned and payable to the Bond Trustee.

(d)    A request and authorization to the Bond Trustee on behalf of the Issuer and signed by its President to authenticate and deliver the Series 2019 Bonds to the Securities Depository for crediting to the participant accounts of the beneficial owners of the Series 2009 Bonds in accordance with the provisions of the Plan.

(e)    An Opinion of Bond Counsel to the effect that the Series 2019 Bonds have been duly and validly authorized, issued and delivered and constitute valid and binding obligations of the Issuer, enforceable against the Issuer in accordance with their terms, that the interest payable on the Series 2019 Bonds is excludable from gross income for federal income tax purposes and that each of the instruments to which the Issuer is a party has been duly and validly authorized, executed and delivered by the Issuer and constitutes the legal, valid and binding obligation of the Issuer, enforceable against the Issuer in accordance with its terms, subject to customary qualifications on enforceability.

(f)    The favorable opinion or opinions of the Attorney General of Texas with respect to the validity of the Series 2019 Bonds.

(g)    The deposit into the Reserve Fund of the amounts required by Section 4.23 of the Master Indenture from unrestricted cash of the Obligor and by Section 4.24 of the Master Indenture from monies held by the Bond Trustee in the reserve fund established under the bond indenture for the Series 2009 Bonds.

(h)    A copy of the Bankruptcy Court Order, in form and substance acceptable to counsel to the Issuer, approving the Plan and the Exchange of the Series 2019 Bonds for the outstanding Series 2009 Bonds.

Section 2.08    Bond Trustee's Authentication Certificate.    The Bond Trustee's authentication certificate upon the Bonds shall be substantially in the form and tenor hereinbefore provided.  No Bond shall be secured hereby or entitled to the benefit hereof, or shall be valid or obligatory for any purpose, unless (i) the certificate of authentication, substantially in such form,

has been duly executed by the Bond Trustee or (ii) a manually signed Comptroller's Registration Certificate has been attached thereto; and such certificate of the Bond Trustee upon any Bond shall be conclusive evidence and the only competent evidence that such Bond has been authenticated and delivered hereunder. The Bond Trustee's certificate of authentication shall be deemed to have been duly executed by it if manually signed by an authorized signatory of the Bond Trustee, but it shall not be necessary that the same person sign the certificate of authentication on all of the Bonds issued hereunder.

Section 2.09    [Reserved]

Section 2.10    [Reserved]

Section 2.11    Cancellation and Destruction of Bonds By the Bond Trustee.  Whenever any Outstanding Bonds shall be delivered to the Bond Trustee for the cancellation thereof pursuant to this Bond Indenture, upon payment of the principal amount or interest represented thereby or for replacement pursuant to Section 2.06 hereof, such Bonds shall be promptly cancelled and treated in accordance with the Bond Trustee's standard retention policies.  In the event of destruction of the Bonds by the Bond Trustee, a certificate of destruction evidencing such destruction shall be furnished by the Bond Trustee to the Issuer and the Obligor upon written request.

Section 2.12    Book Entry Only System.  The Bonds shall be initially issued in the form of a single fully registered Bond registered in the name of Cede & Co., as nominee of DTC, and except as provided in Section 2.13 hereof, all of the outstanding Bonds shall be registered in the name of Cede & Co., as nominee of DTC.

With respect to Bonds registered in the name of Cede & Co., as nominee of DTC, the Issuer and the Bond Trustee shall have no responsibility or obligation to any participant in DTC (a "DTC Participant") or to any person on behalf of whom such a DTC Participant holds an interest in the Bonds, except as provided in this Indenture. Without limiting the immediately preceding sentence, the Issuer and the Bond Trustee shall have no responsibility or obligation with respect to (i) the accuracy of the records of DTC, Cede & Co. or any DTC Participant with respect to any ownership interest in the Bonds, (ii) the delivery to any DTC Participant or any other person, other than a Bondholder, as shown on the registration books, of any notice with respect to the Bonds, including any notice of redemption, or (iii) the payment to any DTC Participant or any other person, other than a Bondholder as shown in the registration books, of any amount with respect to principal of, premium, if any, or interest on, the Bonds.  Notwithstanding any other provision of this Bond Indenture to the contrary, the Issuer and the Bond Trustee shall be entitled to treat and consider the person in whose name each Bond is registered in the registration books as the absolute owner of such Bond for the purpose of payment of principal, premium, if any, and interest with respect to such Bond, for the purpose of giving notices of redemption and other matters with respect to such Bond, for the purpose of registering transfers with respect to such Bond, and for all other purposes whatsoever.  The Bond Trustee shall pay all principal of, premium, if any, and interest on the Bonds only to or upon the order of the respective owners, as shown in the registration books as provided in this Bond Indenture, or their respective attorneys duly authorized in writing, and all such payments shall be valid and effective to fully satisfy and discharge the Issuer's obligations with respect to payment of principal of, premium, if any, and interest on, the Bonds to the extent

of the sum or sums so paid. No person other than an owner, as shown in the registration books, shall receive a Bond certificate evidencing the obligation of the Issuer to make payments of principal, premium, if any, and interest, pursuant to this Bond Indenture. Upon delivery by DTC to the Bond Trustee of written notice to the effect that DTC has determined to substitute a new nominee in place of Cede & Co., and subject to the provisions in this Bond Indenture with respect to payment of interest to the registered owner at the close of business on the Record Date, the word "Cede & Co." in this Bond Indenture shall refer to such new nominee of DTC.

Section 2.13 <u>Successor Securities Depository; Transfers Outside Book Entry Only System</u>.

(a) In the event that DTC advises the Bond Trustee that it is no longer capable of discharging its responsibilities described herein and in the representation letter of the Issuer to DTC (the "DTC Letter"), the Issuer, at the request of the Bond Trustee, shall (i) appoint a successor securities depository, qualified to act as such under Section 17(a) of the Securities Exchange Act of 1934, as amended, notify DTC and DTC Participants, identified by DTC, of the appointment of such successor securities depository and transfer one or more separate Bonds to such successor securities depository or (ii) notify DTC and DTC Participants, identified by DTC, of the availability through DTC of Bonds and transfer one or more separate Bonds to DTC Participants, identified by DTC, having Bonds credited to their DTC accounts. In such event, the Bonds shall no longer be restricted to being registered in the registration books in the name of Cede & Co., as nominee of DTC, but may be registered in the name of the successor securities depository, or its nominee, or in whatever name or names Bondholders transferring or exchanging Bonds shall designate, in accordance with the provisions of this Bond Indenture.

(b) Upon the written consent of [100%] of the beneficial owners of the Bonds, the Bond Trustee, in accordance with the DTC Letter, shall withdraw the Bonds from DTC, and authenticate and deliver Bonds fully registered to the assignees of DTC or its nominee. If the request for such withdrawal is not the result of any Issuer or Obligor action or inaction, such withdrawal, authentication and delivery shall be at the cost and expense (including costs of printing, preparing and delivering such Bonds) of the Persons requesting such withdrawal, authentication and delivery.

Section 2.14 <u>Payments to Cede & Co</u>. Notwithstanding any other provision of this Bond Indenture to the contrary, so long as any Bond is registered in the name of Cede & Co., as nominee of DTC, all payments with respect to principal of, premium, if any, and interest on, such Bond and all notices, transfers and deliveries with respect to such Bond shall be made and given, respectively, in the manner provided in the DTC Letter.

Section 2.15 <u>Beneficial Owner Register</u>.

In its discretion, upon receipt of written certification from a beneficial owner of Bonds (a "Beneficial Owner"), in form satisfactory to the Bond Trustee, as to its beneficial ownership of a specified principal amount of Bonds, the Bond Trustee shall be permitted to deem such Beneficial Owner the Holder of the stated principal amount of the applicable Bonds for purposes of any consent, request, direction, approval, objection or other instrument or action required or permitted

by this Bond Indenture or the Agreement to be executed or taken by any Holder of the Bonds (other than the transfer of a Bond) to which such certification is attached, and any such consent, request, direction, approval, objection or other instrument or action taken by such Beneficial Owner shall be fully effective as if taken by a Holder of an equivalent principal amount of Bonds, provided that in the event of conflicting instruments executed by the actual Holder and a Beneficial Owner, the action of the Holder shall govern.

## ARTICLE III

## REVENUES AND FUNDS

Section 3.01    [Reserved]

Section 3.02    Creation of the Bond Fund. There is hereby created by the Issuer and ordered established with the Bond Trustee a trust fund to be designated as the "Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Bond Fund" (the "Bond Fund"). There are hereby created by the Issuer and ordered established with the Bond Trustee two separate accounts within the Bond Fund to be designated as the Principal Account and the Interest Account, respectively. Moneys on deposit in the Principal Account shall be used to pay the principal of and premium, if any, on the Bonds, when due and payable. Moneys on deposit in the Interest Account shall be used to pay the interest on the Bonds.

Section 3.03    Payments into the Bond Fund. There shall be deposited into the Interest Account any accrued interest received from the sale of Bonds to the initial purchasers thereof. In addition, there shall also be deposited into the Principal Account or the Interest Account, as and when received, (i) all payments on the Series 2019 Note, (ii) all moneys transferred to the Bond Fund from the Reserve Fund pursuant to Section 3.10 hereof, (iii) all other moneys required to be deposited therein pursuant to the Agreement, and (iv) all other moneys received by the Bond Trustee when accompanied by directions that such moneys are to be paid into the Principal Account or the Interest Account. There also shall be retained or deposited in the Principal Account or the Interest Account all interest and other income received on investments or moneys required to be transferred thereto, in accordance with Section 6.02 hereof. The Issuer hereby covenants and agrees that so long as any of the Bonds are Outstanding it will deposit, or cause to be deposited, into the Principal Account or the Interest Account for its account sufficient sums from revenues and receipts derived from the Agreement promptly to meet and pay the principal of, premium, if any, and interest on the Bonds as the same become due and payable.

Section 3.04    Use of Moneys in the Principal Account and the Interest Account. The amounts deposited into the Interest Account pursuant to Section 3.01 hereof shall be used to pay accrued interest on the Bonds on the first Interest Payment Date. Except as provided in Sections 3.15 and 8.05 hereof, moneys in the Principal Account or the Interest Account shall be used solely for the payment of the principal of, premium, if any, and interest on the Bonds on a pro rata basis.

Section 3.05    Custody of the Bond Fund.  The Bond Fund shall be in the custody of the Bond Trustee but in the name of the Issuer, and the Issuer hereby authorizes and directs the Bond Trustee to withdraw sufficient funds from the Principal Account or the Interest Account of the Bond Fund to pay the principal of, premium, if any, and interest on the Bonds as the same come due and payable, which authorization and direction the Bond Trustee hereby accepts.

Section 3.06    [Reserved].

Section 3.07    [Reserved].

Section 3.08    Creation of the Reserve Fund.

(a)    There is hereby created and established with the Bond Trustee a trust fund designated as the "Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Debt Service Reserve Fund" (the "Reserve Fund").

(b)    Moneys on deposit in the Reserve Fund shall be used solely to provide a reserve for the payment of the principal of and interest on the Series 2019 Bonds.

Section 3.09    Payments into the Reserve Fund.  In addition to the deposits required by Section 2.07(g) hereof, there shall be deposited into the Reserve Fund any Reserve Fund Obligations delivered by the Obligor to the Bond Trustee pursuant to Section 5.6 of the Agreement. In addition, there shall be deposited into the Reserve Fund all moneys required to be transferred thereto pursuant to Section 6.02 hereof, all moneys required to be transferred thereto pursuant to Section 3.03 of the Master Indenture, and all other moneys received by the Bond Trustee when accompanied by directions that such moneys are to be paid into the Reserve Fund.  There shall also be retained in the Reserve Fund all interest and other income received on investments of Reserve Fund moneys to the extent provided in Section 6.02 hereof.

Section 3.10    Use of Moneys in the Reserve Fund.

(a)    Except as provided herein and in Section 3.15 hereof, moneys in the Reserve Fund shall be used solely for the payment of the principal of and interest on the Series 2019 Bonds in the event moneys in the Bond Fund are insufficient to make such payments when due, whether on an interest payment date, redemption date, maturity date, acceleration date or otherwise.

(b)    Upon the occurrence of an Event of Default of which the Bond Trustee is deemed to have notice hereunder and the election by the Bond Trustee of the remedy specified in Section 8.02(a) hereof, any Reserve Fund Obligations in the Reserve Fund shall, subject to the provisions of Section 3.16 hereof, be transferred by the Bond Trustee to the Principal Account and applied in accordance with Section 8.05 hereof.  On [May 1] and [November 1] in each year, any earnings on the Reserve Fund Obligations on deposit in the Reserve Fund that are in excess of the Reserve Fund Requirement shall be transferred into the Interest Account of the Bond Fund.

(c)     On the final maturity date of the Series 2019 Bonds, any Reserve Fund Obligations in the Reserve Fund may, upon the direction of the Obligor, be used to pay the principal of and interest on the Series 2019 Bonds on such final maturity date.

(d)     If at any time moneys in the Reserve Fund are sufficient to pay the principal or redemption price of all Bonds, the Bond Trustee may use the moneys on deposit in the Reserve Fund to pay such principal or redemption price of the Bonds.

Section 3.11    Custody of the Reserve Fund. The Reserve Fund shall be in the custody of the Bond Trustee but in the name of the Issuer, and the Issuer hereby authorizes and directs the Bond Trustee to transfer sufficient moneys from the Reserve Fund to the Bond Trustee for deposit to the Bond Fund to pay the principal of and interest on the Bonds for the purposes herein described, which authorization and direction the Bond Trustee hereby accepts. In the event there shall be a deficiency in the Principal Account or the Interest Account on any payment date for the Bonds, the Bond Trustee shall promptly make up such deficiency from the Reserve Fund. No later than the Business Day following any such transfer that reduces the value of the Reserve Fund to an amount below the Reserve Fund Requirement, the Bond Trustee shall provide written notice to the Obligor of the amount of such transfer and the amount of such deficiency.

Section 3.12    Nonpresentment of Bonds. In the event that any Bonds shall not be presented for payment when the principal thereof or interest thereon becomes due, either at maturity, the date fixed for redemption thereof, or otherwise, if funds sufficient for the payment thereof shall have been deposited into the Bond Fund or otherwise made available to the Bond Trustee for deposit therein as provided in Section 3.03 hereof, all liability of the Issuer to the owner or owners thereof for the payment of such Bonds shall forthwith cease, determine and be completely discharged, and thereupon it shall be the duty of the Bond Trustee to hold such fund or funds, without liability for interest thereon, for the benefit of the owner or owners of such Bonds, who shall thereafter be restricted exclusively to such fund or funds for any claim of whatever nature on his or their part under this Bond Indenture or on, or with respect to, said Bond, and all such funds shall remain uninvested. If any Bond shall not be presented for payment within the period of two years following the date of final maturity of such Bond, the Bond Trustee shall, to the extent required by law, transfer such funds to the state treasury of the state in which the principal office of the Bond Trustee is located, in which case the owner of such Bonds shall look only to such state for payment, or, in the alternative, to the extent permitted by law, the Bond Trustee shall, upon request in writing by the Obligor, return such funds to the Obligor free of any trust or lien and such Bond shall, subject to the defense of any applicable statute of limitation, thereafter be an unsecured obligation of the Obligor. In either event, the Bond Trustee shall have no further responsibility with respect to such moneys or payment of such Bonds. Thereafter, the Bondholders shall be entitled to look only to the Obligor for payment, and then only to the extent of the amount so repaid by the Bond Trustee. The Obligor shall not be liable for any interest on any sums paid to it.

Section 3.13    Bond Trustee's and Paying Agents' Fees, Charges, and Expenses. Pursuant to the provisions of the Agreement, the Obligor has agreed to pay to the Bond Trustee and to each Paying Agent, commencing with the effective date of the Agreement and continuing until the principal of, premium, if any, and interest on the Bonds shall have been fully paid or provision for the payment thereof shall have been made in accordance with the provisions of this Bond

Indenture, the reasonable and necessary fees and expenses (including reasonable attorneys' fees) of the Bond Trustee and each Paying Agent, as and when the same become due, upon the submission by the Bond Trustee and each Paying Agent of a statement therefor.

Section 3.14    Moneys to be Held in Trust.  All moneys required to be deposited with or paid to the Bond Trustee under any provision of this Bond Indenture (except moneys in the Rebate Fund) shall be held by the Bond Trustee in trust for the purposes specified in this Bond Indenture, and except for moneys deposited with or paid to the Bond Trustee for the redemption of Bonds for which the notice of redemption has been duly given, shall, while held by the Bond Trustee, constitute part of the Trust Estate and be subject to the lien hereof.

Section 3.15    Repayment to the Obligor from the Funds.  Any amounts remaining in the Bond Fund or Reserve Fund after payment in full of the Bonds (or after making provision for such payment), the fees and expenses of the Bond Trustee and the Paying Agents (including attorneys' fees, if any), the Administration Expenses, and all other amounts required to be paid hereunder and under the Agreement shall be paid to the Obligor upon the termination of the Agreement.

Section 3.16    Rebate Fund.

(a)    A special Rebate Fund is hereby established by the Issuer. The Rebate Fund shall be for the sole benefit of the United States of America and shall not be subject to the claim of any other Person, including without limitation the Bondholders. The Rebate Fund is established for the purpose of complying with Section 148 of the Code and the Treasury Regulations promulgated pursuant thereto.  The money deposited in the Rebate Fund, together with all investments thereof and investment income therefrom, shall be held in trust and applied solely as provided in this Section. The Rebate Fund is not a portion of the Trust Estate and is not subject to the lien of this Bond Indenture. Notwithstanding the foregoing, the Bond Trustee with respect to the Rebate Fund is afforded all the rights, protections and immunities otherwise accorded to it hereunder.

(b)    Within 60 days after the close of each fifth "Bond Year," the Bond Trustee shall receive from the Obligor a computation in the form of a certificate of an officer of the Obligor of the amount of "Excess Earnings," if any, for the period beginning on the date of delivery of the Bonds and ending at the close of such "Bond Year" and the Obligor shall pay to the Bond Trustee for deposit into the Rebate Fund an amount equal to the difference, if any, between the amount then in the Rebate Fund and the Excess Earnings so computed. The term "Bond Year" means with respect to the Bonds each one-year period ending on the anniversary of the date of delivery of the Bonds or such other period as may be elected by the Issuer in accordance with the Regulations and notice of which election has been given to the Bond Trustee. If, at the close of any Bond Year, the amount in the Rebate Fund exceeds the amount that would be required to be paid to the United States of America under paragraph (d) below if the Bonds had been paid in full, such excess may, at the request of the Obligor, be transferred from the Rebate Fund and paid to the Obligor.

(c)    In general, "Excess Earnings" for any period of time means the sum of

(i)    the excess of --

22

(A) the aggregate amount earned during such period of time on all "Nonpurpose Investments" (including gains on the disposition of such Obligations) in which "Gross Proceeds" of the issue are invested (other than amounts attributable to an excess described in this subparagraph (c)(i)), over

(B) the amount that would have been earned during such period of time if the "Yield" on such Nonpurpose Investments (other than amounts attributable to an excess described in this subparagraph (c)(i)) had been equal to the yield on the issue, plus

(ii) any income during such period of time attributable to the excess described in subparagraph (c)(i) above.

The term Nonpurpose Investments, Gross Proceeds, Issue Date and Yield shall have the meanings given to such terms in section 148 of the Code and the Regulations promulgated pursuant to such section.

(d) The Bond Trustee shall, as directed in writing by the Obligor, pay to the United States of America at least once every five years, to the extent that funds are available in the Rebate Fund or otherwise provided by the Obligor, an amount that ensures that at least 90 percent of the Excess Earnings from the date of delivery of the Bonds to the close of the period for which the payment is being made will have been paid. The Bond Trustee shall pay to the United States of America not later than 60 days after the Bonds have been paid in full as directed by the Obligor in writing, to the extent that funds are available in the Rebate Fund or otherwise provided by the Obligor, 100 percent of the amount then required to be paid under Section 148(f) of the Code as a result of Excess Earnings.

(e) The amounts to be computed, paid, deposited or disbursed under this section shall be determined by the Obligor acting on behalf of the Issuer within thirty days after each Bond Year after the date of issuance of the Bonds. By such date, the Obligor shall also notify, in writing, the Bond Trustee and the Issuer of the determinations the Obligor has made and the payment to be made pursuant to the provisions of this section. Upon written request of any registered owner of Bonds, the Obligor shall furnish to such registered owner of Bonds a certificate (supported by reasonable documentation, which may include calculation by Bond Counsel or by some other service organization) showing compliance with this section and other applicable provisions of section 148 of the Code.

(f) The Bond Trustee shall maintain a record of the periodic determinations by the Obligor of the Excess Earnings for a period beginning on the first anniversary date of the issuance of the Bonds and ending on the date six years after the final retirement of the Bonds. Such records shall state each such anniversary date and summarize the manner in which the Excess Earnings, if any, was determined.

(g) If the Bond Trustee shall declare the principal of the Bonds and the interest accrued thereon immediately due and payable as the result of an Event of Default specified in this Bond Indenture, or if the Bonds are optionally or mandatorily prepaid or redeemed prior to

maturity as a whole in accordance with their terms, any amount remaining in any of the funds shall be transferred to the Rebate Fund to the extent that the amount therein is less than the Excess Earnings computed by the Obligor as of the date of such acceleration or redemption, and the balance of such amount shall be used immediately by the Bond Trustee for the purpose of paying principal of, redemption premium, if any, and interest on the Bonds when due. In furtherance of such intention, the Issuer hereby authorizes and directs its President to execute any documents, certificates or reports required by the Code and to make such elections, on behalf of the Issuer, which may be permitted by the Code as are consistent with the purpose for the issuance of the Bonds.

(h)     The requirements contained in this Section relating to the computation and payment of Excess Earnings shall not be applicable if all Gross Proceeds of the Bonds are expended in compliance with Treasury Regulations Section 1.148-7.

(i)     Notwithstanding any of the provisions of this Section, the Bond Trustee shall have no duty or responsibility with respect to the Rebate Fund except to follow the specific written instructions of the Obligor.

Section 3.17    [Reserved]

Section 3.18    [Reserved]

ARTICLE IV

COVENANTS OF THE ISSUER

Section 4.01    Performance of Covenants; Authority.    The Issuer covenants that it will faithfully perform at all times any and all covenants, undertakings, stipulations, and provisions contained in this Bond Indenture, in any and every Bond and in all proceedings of the Board of Directors pertaining hereto; provided, however, that except for the covenant of the Issuer set forth in Section 4.02 hereof relating to payment of the Bonds, the Issuer shall not be obligated to take any action or execute any instrument pursuant to any provision hereof until it shall have been requested to do so by the Obligor or by the Bond Trustee, or shall have received the instrument to be executed and at the option of the Issuer shall have received from the party requesting such execution assurance satisfactory to the Issuer that the Issuer shall be reimbursed for its reasonable expenses incurred or to be incurred in connection with taking such action or executing such instrument. The Issuer covenants that it is duly authorized under the laws of the State of Texas, including particularly and without limitation the Act, to issue the Series 2019 Bonds and to execute this Bond Indenture, and to pledge the revenues and receipts hereby pledged, and to assign its rights under and pursuant to the Agreement and the Series 2019 Note in the manner and to the extent herein set forth, that all action on its part and to the extent herein set forth, that all action on its part for the issuance of the Series 2019 Bonds and the execution and delivery of this Bond Indenture has been duly and effectively taken and will be duly taken as provided herein, and that the Series 2019 Bonds in the hands of the owners thereof are and will be valid and enforceable limited obligations of the Issuer according to the import hereof, except as enforcement thereof and hereof may be limited by bankruptcy, insolvency, moratorium, reorganization and other similar

laws affecting the rights of creditors and by the application of general principles of equity, if such remedies are pursued.

Section 4.02    Payments of Principal, Premium, If Any, and Interest.  The Issuer will promptly pay or cause to be paid the principal of, premium, if any, and interest on all Bonds issued hereunder according to the terms hereof. The principal, premium, if any, and interest payments are payable solely from revenues and other amounts derived from the Series 2019 Note, and from the other security pledged hereby, which revenues and security are hereby specifically pledged to the payment thereof in the manner and to the extent herein specified. Nothing in the Bonds or in this Bond Indenture shall be considered or construed as pledging any funds or assets of the Issuer other than those pledged hereby.

Section 4.03    Supplemental Indentures: Recordation of Bond Indenture and Supplemental Indentures.  The Issuer will execute and deliver all indentures supplemental hereto, and will cause this Bond Indenture, the Agreement, and all supplements hereto and thereto, as well as all security instruments and financing statements relating thereto, to be filed in each office required by law in order to publish notice of the liens created by this Bond Indenture and the Agreement. The Bond Trustee, at the Obligor's expense, will cause all continuation statements and all supplements to any financing statement or continuation statement and other instruments as may be required, at all times to be recorded, registered and filed in such manner and in such places as may be required by law in order fully to preserve and protect the security of the Bondholders and all rights of the Bond Trustee hereunder.

Section 4.04    Lien of Bond Indenture.  The Issuer hereby agrees not to create any lien having priority or preference over the lien of this Bond Indenture upon the Trust Estate or any part thereof, other than the security interest granted by it to the Bond Trustee, except as otherwise specifically provided in Article VIII hereof. The Issuer agrees that no obligations the payment of which is secured by payments or other moneys or amounts derived from the Agreement and the other sources provided herein will be issued by it except in accordance with Sections 2.09 and 2.10 of this Bond Indenture.

Section 4.05    Rights Under the Agreement.  The Issuer will observe all of the obligations, terms and conditions required on its part to be observed or performed under the Agreement. The Issuer agrees that wherever in the Agreement it is stated that the Issuer will notify the Bond Trustee, give the Bond Trustee some right or privilege, or in any way attempts to confer upon the Bond Trustee the ability for the Bond Trustee to protect the security for payment of the Bonds, that such part of the Agreement shall be as though it were set out in this Bond Indenture in full.

The Issuer agrees that the Bond Trustee as assignee of the Agreement may enforce, in its name or in the name of the Issuer, all rights of the Issuer (except those rights to indemnification and payment under Sections 5.7, 7.5 and 9.5 thereof) and all obligations of the Obligor under and pursuant to the Agreement for and on behalf of the Bondholders, whether or not the Issuer is in default hereunder.

Section 4.06    Tax Covenants.

The Issuer (to the extent within its power or direction) shall not use or permit the use of any proceeds of Series 2019 Bonds or any other funds of the Issuer, directly or indirectly, in any manner, and shall not take or permit to be taken any other action or actions, which would adversely affect the exclusion of the interest on any Series 2019 Bond from gross income for federal income tax purposes.

The Issuer (to the extent within its power or direction) agrees that so long as any of the Series 2019 Bonds remain Outstanding, it will comply with the provisions of the Tax Agreement applicable to the Issuer.

The Bond Trustee agrees to comply, at the direction of the Issuer or the Obligor, with any obligations expressly assumed by the Bond Trustee under the Tax Agreement, and upon receipt of the Tax Agreement and any Opinion of Bond Counsel which sets forth such requirements, to comply with any statute, regulation or ruling that may apply to it as Bond Trustee hereunder and relating to reporting requirements or other requirements necessary to preserve the exclusion from federal gross income of the interest on the Series 2019 Bonds, provided that nothing herein shall require the Bond Trustee to take any action that might result in personal liability for the Bond Trustee. The Bond Trustee from time to time may cause a firm of attorneys, consultants or independent accountants or an investment banking firm to supply the Bond Trustee, on behalf of the Issuer, with such information as the Bond Trustee, on behalf of the Issuer, may request in order to determine in a manner reasonably satisfactory to the Bond Trustee, on behalf of the Issuer, all matters relating to (a) the actuarial yields on the Series 2019 Bonds as the same may relate to any data or conclusions necessary to verify that the Series 2019 Bonds are not "arbitrage bonds" within the meaning of Section 148 of the Code, and (b) compliance with rebate requirements of Section 148(f) of the Code. Payment for costs and expenses incurred in connection with supplying the foregoing information shall be made by the Obligor.

The foregoing covenants of this Section shall remain in full force and effect notwithstanding the defeasance of the Series 2019 Bonds pursuant to **Article VII** or any other provision of this Bond Indenture, until the final maturity date of the Series 2019 Bonds and payment thereof.

Section 4.07    Change in Law. To the extent that published rulings of the Internal Revenue Service, or amendments to the Code or the Regulations modify the covenants of the Issuer that are set forth in this Bond Indenture or that are necessary for interest on any issue of the Bonds to be excludable from gross income for federal income tax purposes, the Issuer, upon receiving the written Opinion of Bond Counsel to such effect, will comply, at the expense of the Obligor, with such modifications and direct the Bond Trustee to take such action as may be required to comply with such modifications.

# ARTICLE V

# REDEMPTION OF BONDS

Section 5.01    Optional Redemption of Series 2019 Bonds.

(a)    The Series 2019 Bonds are subject to optional redemption prior to maturity by the Issuer at the direction of the Obligor in whole or in part on any date, at a redemption price equal to the percentage of the principal amount of Series 2019 Bonds to be redeemed set forth below, together with accrued interest to the redemption date.

| Redemption Date | Percentage of Principal Amount |
|---|---|
| Prior to _____, 202[2] | 107% |
| _____, 202[2] to _____, 202[3] | 106% |
| _____, 202[3] to _____, 202[4] | 105% |
| _____, 202[4] to _____, 202[5] | 104% |
| _____, 202[5] to _____, 202[6] | 103% |
| _____, 202[6] to _____, 202[7] | 102% |
| _____, 202[7] to _____, 202[8] | 101% |
| _____, 202[8] and thereafter | 100% |

Section 5.02  Sinking Fund Redemption.

(a)  The Series 2019 Bonds are subject to mandatory sinking fund redemption at a redemption price equal to the principal amount thereof plus accrued interest to the redemption date. As and for a sinking fund for the redemption of Series 2019 Bonds, the Issuer shall cause to be deposited into the Principal Account of the Bond Fund a sum which is sufficient to redeem on _____ of each of the following years (after credit as provided below) the following principal amounts of Series 2019 Bonds, plus accrued interest to the redemption date:

| Year | Amount | Year | Amount |
|---|---|---|---|
| [Insert Schedule] | | | |

_____

*maturity

(b)  On or before the thirtieth day prior to each sinking fund payment date, the Bond Trustee shall proceed to select for redemption (by lot in such manner as the Bond Trustee may determine) from all Series 2019 Bonds Outstanding a principal amount of such Series 2019 Bonds equal to the Aggregate Principal Amount of such Series 2019 Bonds redeemable with the required sinking fund payment, and shall call such Series 2019 Bonds or portions thereof ($5,000 or any integral multiple thereof) for redemption from the sinking fund on the next _____, and give notice of such call. At the option of the Obligor to be exercised by delivery of a written certificate to the Bond Trustee on or before the forty fifth day next preceding any sinking fund redemption date, it may (i) provided no Event of Default has occurred and is continuing, deliver to the Bond Trustee for cancellation Series 2019 Bonds or portions thereof in an Aggregate Principal Amount desired by the Obligor or (ii) specify a principal amount of Series 2019 Bonds

27

or portions thereof which prior to said date have been redeemed (otherwise than through the operation of the sinking fund) and canceled by the Bond Trustee at the request of the Obligor and not theretofore applied as a credit against any sinking fund redemption obligation. Each such Series 2019 Bond or portion thereof so delivered or previously redeemed shall be credited by the Bond Trustee at 100% of the principal amount thereof against the obligation of the Issuer to redeem Series 2019 Bonds on such sinking fund redemption date. Any excess shall be credited against the next sinking fund redemption obligation to redeem Series 2019 Bonds. In the event that the Obligor shall avail itself of the provisions of clause (i) of the second sentence of this paragraph, the certificate required by the second sentence of this paragraph shall be accompanied by the Series 2019 Bonds or portions thereof to be canceled.

Section 5.03 Method of Selection of Bonds in Case of Partial Redemption; Redemption Priority.

(a) In the event that less than all of the Outstanding Series 2019 Bonds are to be redeemed as provided in Sections 5.01, 5.08 or 5.11 hereof, the Series 2019 Bonds to be redeemed shall be selected by the Securities Depository or by lot in such manner as the Bond Trustee may determine.

(b) If a Series 2019 Bond is of a denomination larger than the minimum Authorized Denomination, a portion of such Series 2019 Bond may be redeemed, but Series 2019 Bonds shall be redeemed only in the principal amount of an Authorized Denomination and no Series 2019 Bond may be redeemed in part if the principal amount to be Outstanding following such partial redemption is not an Authorized Denomination.

Section 5.04 Notice of Redemption. Series 2019 Bonds shall be called for redemption by the Bond Trustee as herein provided upon receipt by the Bond Trustee at least 45 days prior to the redemption date (or such later date as shall be acceptable to the Bond Trustee) of a certificate of the Obligor specifying the principal amount of Series 2019 Bonds to be called for redemption, the applicable redemption price or prices and the provision or provisions of this Bond Indenture pursuant to which such Series 2019 Bonds are to be called for redemption. The provisions of the preceding sentence shall not apply to the redemption of Series 2019 Bonds pursuant to the sinking fund provided in Section 5.02 hereof, and such Series 2019 Bonds shall be called for redemption by the Bond Trustee without the necessity of any action by the Obligor or the Issuer. In case of every redemption, the Bond Trustee shall cause notice of such redemption to be given by mailing by first class mail, postage prepaid, a copy of the redemption notice to the owners of the Series 2019 Bonds designated for redemption in whole or in part, at their addresses as the same shall last appear upon the registration books, in each case not more than 60 nor less than 30 days prior to the redemption date. In addition, notice of redemption shall be sent by first class or registered mail, return receipt requested, or by overnight delivery service (1) contemporaneously with such mailing: (A) to any owner of $1,000,000 or more in principal amount of Series 2009 Bonds and (B) to at least two or more information services of national recognition that disseminate redemption information with respect to municipal bonds; and (2) to any securities depository registered as such pursuant to the Securities Exchange Act of 1934, as amended, that is an owner of Series 2019 Bonds to be redeemed so that such notice is received at least two days prior to such mailing date. An additional notice of redemption shall be given by certified mail, postage prepaid, mailed not less than 60 nor more than 90 days after the redemption date to any owner of Series

2019 Bonds selected for redemption that has not surrendered the Series 2019 Bonds called for redemption, at the address as the same shall last appear upon the registration books.

All notices of redemption shall state:

(1) the redemption date,

(2) the redemption price,

(3) the identification, including complete designation (including series) and issue date of the Series 2019 Bonds and the CUSIP number (and in the case of partial redemption, certificate number and the respective principal amounts, interest rates and maturity dates) of the Series 2019 Bonds to be redeemed,

(4) that on the redemption date the redemption price will become due and payable upon each such Series 2019 Bonds, and that interest thereon shall cease to accrue from and after said date,

(5) the name and address of the Bond Trustee and any paying agent for such Series 2019 Bonds, including the place where such Series 2019 Bonds are to be surrendered for payment of the redemption price and the name and phone number of a contact person at such address.

Provided, however, that failure to give any such notice, or any defect therein, shall not affect the validity of any proceedings for the redemption of any Series 2019 Bonds for which the notice required hereunder was given.

Section 5.05 Bonds Due and Payable on Redemption Date; Interest Ceases to Accrue. On or before the business day prior to the redemption date specified in the notice of redemption, an amount of money sufficient to redeem all Series 2019 Bonds called for redemption at the appropriate redemption price, including accrued interest to the date fixed for redemption, shall be deposited with the Bond Trustee. If at the time of mailing of notice of any optional redemption in connection with a refunding of all or a portion of the Series 2019 Bonds the Obligor shall not have deposited with the Bond Trustee moneys sufficient to redeem all of the Series 2019 Bonds called for redemption, such notice may state that it is conditional in that it is subject to the deposit of the proceeds of refunding bonds with the Bond Trustee not later than the redemption date, and such notice shall be of no effect unless such moneys are so deposited; provided that such conditional notice shall not be given more than twice within any six month period. On the redemption date the principal amount of each Series 2019 Bond to be redeemed, together with the accrued interest thereon to such date and redemption premium, if any, shall become due and payable; and from and after such date, notice having been given and deposit having been made in accordance with the provisions of this Article V, then, notwithstanding that any Series 2019 Bonds called for redemption shall not have been surrendered, no further interest shall accrue on any such Series 2019 Bonds. From and after such date of redemption (such notice having been given and such deposit having been made), the Series 2019 Bonds to be redeemed shall not be deemed to be Outstanding hereunder, and the Issuer shall be under no further liability in respect thereof.

Section 5.06    Cancellation.  All Bonds which have been redeemed shall be cancelled by the Bond Trustee and treated as provided in Section 2.11 hereof.

Section 5.07    Partial Redemption of Fully Registered Bonds.  Upon surrender of any fully registered Bond for redemption in part only, the Issuer shall execute and the Bond Trustee shall authenticate and deliver to the owner thereof, at the expense of the Obligor, a new Bond or Bonds of the same series and of the same maturity of Authorized Denominations in an Aggregate Principal Amount equal to the unredeemed portion of the Bond surrendered.

Section 5.08    Special Redemption.  The Bonds shall be subject to special redemption by the Issuer at the direction of the Obligor prior to their scheduled maturities, in whole or in part at a redemption price equal to the principal amount thereof plus accrued interest from the most recent interest payment date to the redemption date on any date in case of damage or destruction to, or condemnation of, any property, plant, and equipment of any Obligated Group Member, to the extent that the net proceeds of insurance or condemnation award exceed the Threshold Amount (as defined in the Master Indenture) and the Obligor has determined not to use or is unable to use such net proceeds or award to repair, rebuild or replace such property, plant, and equipment.

ARTICLE VI

INVESTMENTS

Section 6.01    Investment of Bond Fund and Reserve Fund Moneys.  Any moneys held as part of the Bond Fund or Reserve Fund shall be invested or reinvested by the Bond Trustee at the written request and direction of the Obligor (upon which the Bond Trustee is entitled to rely) in Permitted Investments. All Permitted Investments shall be either subject to redemption at any time at a fixed value at the option of the owner thereof or shall mature or be marketable not later than the business day prior to the date on which the proceeds are expected to be expended. For the purpose of any investment or replacement under this Section, the Permitted Investments shall be deemed to mature at the earliest date on which the Obligor is, on demand, obligated to pay a fixed sum in discharge of the whole of such obligation. The Bond Trustee may make any and all investments permitted by the provisions of this Section through its trust department. In order to comply with the directions of the Obligor, the Bond Trustee may sell, at the best price obtainable, or present for redemption, or may otherwise cause liquidation prior to their maturities, any of the obligations in which funds have been invested, and the Bond Trustee shall not be liable for any loss or penalty of any nature resulting therefrom. In order to avoid loss in the event of any need for funds, the Obligor may instruct the Bond Trustee, in lieu of a liquidation or redemption of investments in the fund or account needing funds, to exchange such investment for investments in another fund or account that may be liquidated at no, or at reduced, loss. The Bond Trustee shall be under no liability for interest on any moneys received hereunder unless specifically agreed to in writing.

Section 6.02    Allocation and Transfers of Investment Income.  Any investments in any Fund shall be held by or under the control of the Bond Trustee and shall be deemed at all times a part of the Fund from which the investment was made. Any loss resulting from such investments shall be charged to such Fund. The Bond Trustee shall not be liable for any loss or penalty resulting from any such investment made in accordance with any permitted direction by a Obligor or for the

Bonds becoming "arbitrage bonds" by reason of any such investment. Any interest or other gain from any fund from any investment or reinvestment pursuant to Section 6.01 hereof shall be allocated and transferred as follows:

(a) Any interest or other gain realized as a result of any investments or reinvestments of moneys in the Principal Account and the Interest Account of the Bond Fund shall be credited at least semiannually to the Interest Account unless a deficiency exists in the Reserve Fund, in which case such interest or other gain shall be paid into the Reserve Fund forthwith.

(b) Any interest or other gain realized as a result of any investments or reinvestments of moneys in the Reserve Fund shall be credited to a the Reserve Fund if a deficiency exists therein at that time. If a deficiency does not exist in the Reserve Fund at that time, such interest or other gain on other amounts paid into the Reserve Fund shall be paid for deposit into the Interest Account of the Bond Fund, at least semiannually.

The Bond Trustee shall sell and reduce to cash a sufficient portion of such investments whenever the cash balance in any fund is insufficient for the purposes of such fund.

Section 6.03  Valuation of Permitted Investments. Accounting and valuation of Permitted Investments in any Fund or Account will be performed as follows:

On a monthly basis the Bond Trustee shall furnish to the Obligor a full and complete statement of all receipts and disbursements of Permitted Investments in any Fund and Account covering such period, including a statement of the assets contained in each Fund and Account. Assets will be valued at market value in accordance with the normal valuation procedures of the Bond Trustee. Valuation of Permitted Investments shall include accrued interest thereof through the valuation date.

# ARTICLE VII

# DISCHARGE OF BOND INDENTURE

Section 7.01  Discharge of the Bond Indenture. If, when the Bonds secured hereby shall become due and payable in accordance with their terms or otherwise as provided in this Bond Indenture and the whole amount of the principal of, premium, if any, and interest due and payable upon all of the Bonds shall be paid, or provision shall have been made for the payment of the same, together with all other sums payable hereunder (including but not limited to the fees and expenses of the Bond Trustee and any Paying Agent, in accordance with Section 3.13 hereof), then the right, title and interest of the Bond Trustee in and to the Trust Estate and all covenants, agreements and other obligations of the Issuer to the Bondholders shall thereupon cease, terminate and become void and be discharged and satisfied. In such event, upon the written request of the Issuer or of the Obligor, and upon receipt of an Opinion of Counsel to the effect that all conditions precedent herein provided relating to the satisfaction and discharge of this Bond Indenture have been complied with, the Bond Trustee shall execute such documents as may be reasonably required by the Issuer and shall turn over to the Obligor any surplus in the Bond Fund and Reserve Fund.

All Outstanding Bonds shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in this Section if (i) in case said Bonds are to be redeemed on any date prior to their maturity, the Obligor shall have given to the Bond Trustee in form satisfactory to it irrevocable written instructions to give on a date in accordance with the provisions of Section 5.04 hereof notice of redemption of such Bonds on said redemption date, such notice to be given in accordance with the provisions of Section 5.04 hereof, (ii) there shall have been deposited with the Bond Trustee (or another Paying Agent) either moneys in an amount which shall be sufficient, or Government Obligations which shall not contain provisions permitting the redemption thereof at the option of the issuer, or any other Person other than the holder thereof, the principal of and the interest on which when due, and without any reinvestment thereof, will provide moneys which, together with the moneys, if any, deposited with or held by the Bond Trustee or any Paying Agent at the same time (including the Bond Fund and the Reserve Fund), shall be sufficient, in the opinion of an independent certified public accountant, to pay when due the principal of, premium, if any, and interest due and to become due on said Bonds on or prior to the redemption date or maturity date thereof, as the case may be, and (iii) in the event that said Bonds are not by their terms subject to redemption within the next 45 days, the Obligor shall have given the Bond Trustee in form satisfactory to it irrevocable written instructions to give, as soon as practicable in the same manner as the notice of redemption is given pursuant to Section 5.04 hereof, a notice to the owners of such Bonds that the deposit required by subclause (ii) above has been made with the Bond Trustee (or another depository) and that said Bonds are deemed to have been paid in accordance with this Section and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal of, premium, if any, and interest on said Bonds. Neither the Government Obligations nor moneys deposited with the Bond Trustee pursuant to this Section nor principal or interest payments on any such Government Obligations shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal of, premium, if any, and interest on said Bonds; provided any such cash received from such principal or interest payments on such Government Obligations deposited with the Bond Trustee, if not then needed for such purpose, shall, at the written direction of the Obligor, either (1) be reinvested, to the extent practicable, in Government Obligations of the type described in clause (ii) of this paragraph maturing at the times and in amounts sufficient to pay when due the principal of, premium, if any, and interest to become due on said Bonds on or prior to such redemption date or maturity date thereof, as the case may be or (2) be used to pay principal and/or interest on the Bonds. At such time as any Bond shall be deemed paid as aforesaid, it shall no longer be secured by or entitled to the benefits of this Bond Indenture, except for the purpose of any payment from such moneys or Government Obligations deposited with the Bond Trustee and the purpose of transfer and exchange pursuant to Section 2.05 hereof.

The release of the obligations of the Issuer under this Section shall be without prejudice to the rights of the Bond Trustee to be paid reasonable compensation for all services rendered by it hereunder and all its reasonable and necessary expenses, charges and other disbursements incurred on or about the administration of the trust hereby created and the performance of its powers and duties hereunder.

ARTICLE VIII

DEFAULTS AND REMEDIES

Section 8.01    Events of Default. If any of the following events occur, it is hereby defined as and shall be deemed an "Event of Default":

(a)    Default in the payment of the principal of or premium, if any, on any Bond when the same shall become due and payable, whether at the stated maturity thereof, or upon proceedings for redemption or as required by the sinking fund provisions hereof or otherwise.

(b)    Default in the payment of any installment of interest on any Bond when the same shall become due and payable.

(c)    An event of default under the Master Indenture or the Agreement.

(d)    Failure by the Issuer in the performance or observance of any other of the covenants, agreements or conditions in its part in this Bond Indenture or in the Bonds contained, which failure shall continue for a period of 60 days after written notice specifying such failure and requesting that it be remedied, is given to the Issuer and the Obligor by the Bond Trustee or to the Issuer, the Obligor and to the Bond Trustee by the owners of not less than 25% in principal amount of the Bonds Outstanding.

(e)    A transfer therefrom to the Bond Fund reduces the value of the cash and Permitted Investments in the Reserve Fund to an amount below the Reserve Fund Requirement, unless the Obligor has provided to the Bond Trustee funds sufficient to replenish the Reserve Fund to the Reserve Fund Requirement within 10 Business Days after transmittal of the notice required under Section 3.11 hereof.

Section 8.02    Remedies on Events of Default. Upon the occurrence of an Event of Default, the Bond Trustee shall have the following rights and remedies:

(a)    The Bond Trustee may, if so directed by the Bondholders of at least 25% in Aggregate Principal Amount of the Bonds Outstanding or in the event that the payment of the principal of and accrued interest on any Note has been declared due and payable immediately by the Master Trustee, by notice in writing given to the Issuer and the Obligor, declare the principal amount of all Bonds then Outstanding and the interest accrued thereon to be immediately due and payable and said principal and interest shall thereupon become immediately due and payable. Upon any declaration of acceleration hereunder, the Bond Trustee shall give notice thereof to the Bondholders by the same means as a notice of redemption under Article V hereof, stating the date upon which such acceleration occurred.

The provisions of the preceding paragraph, however, are subject to the condition that if, after the payment of the principal of, and accrued interest on, the Bonds has been declared due and payable immediately, the Bondholders of a majority in Aggregate Principal Amount of the Bonds Outstanding or, if less, 100% of the Bondholders that directed the applicable acceleration of the Bonds direct the Bond Trustee to annul such acceleration, the declaration of the acceleration of the Bonds shall be annulled, and the Bond Trustee shall promptly give written notice of such

annulment to the Issuer and the Obligor and notice to Bondholders by the same means as a notice of redemption under Article V hereof; but no such annulment shall extend to or affect any subsequent Event of Default or impair any right or remedy consequent thereon;

(b)     The Bond Trustee may, by mandamus, or other suit, action or proceeding at law or in equity, enforce the rights of the Bondholders, and require the Issuer or the Obligor or both of them to carry out the agreements with or for the benefit of the Bondholders and to perform its or their duties under the Act, the Agreement and this Bond Indenture.

(c)     The Bond Trustee may, by action or suit in equity, require the Issuer to account as if it were the trustee of an express trust for the Bondholders but any such judgment against the Issuer shall be enforceable only against the funds and accounts hereunder in the hands of the Bond Trustee.

(d)     The Bond Trustee may, by action or suit in equity, enjoin any acts or things which may be unlawful or in violation of the rights of the Bondholders.

(e)     The Bond Trustee may, upon the filing of a suit or other commencement of judicial proceedings to enforce the rights of the Bond Trustee and the Bondholders, have appointed a receiver or receivers of the Trust Estate upon a showing of good cause with such powers as the court making such appointment may confer.

(f)     The Bond Trustee may exercise its rights under the Master Indenture as a Holder of the Series 2019 Note and any other Note held by the Bond Trustee.

No right or remedy is intended to be exclusive of any other right or remedy, but each and every such right or remedy shall be cumulative and in addition to any other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

If any Event of Default shall have occurred and if requested by the owners of at least 25% in Aggregate Principal Amount of Bonds then Outstanding and indemnified as provided in Section 9.01(m) hereof (except the remedy under Section 8.02(a) above, for which no indemnity may be required), the Bond Trustee shall be obligated to exercise such one or more of the rights and powers conferred by this Section as it, being advised by counsel, shall deem most expedient in the interests of such Bondholders.  In the event the Bond Trustee shall receive inconsistent or conflicting requests and indemnity from two or more groups of owners of Outstanding Bonds, each representing less than a majority of the aggregate principal amount of the Outstanding Bonds, the Bond Trustee, in its sole discretion, may determine what action, if any, shall be taken.

Section 8.03     Majority of Bondholders May Control Proceedings.  Anything in this Bond Indenture to the contrary notwithstanding the owners of at least a majority in Aggregate Principal Amount of the Bonds then Outstanding shall have the right, at any time, to the extent permitted by law, by an instrument or instruments in writing executed and delivered to the Bond Trustee, to direct the time, method, and place of conducting all proceedings, to be taken in connection with the enforcement of the terms and conditions of this Bond Indenture, or for the appointment of a receiver, and any other proceedings hereunder; provided that such direction shall not be otherwise than in accordance with the provisions hereof and provided, further, that notwithstanding anything to the contrary in this Bond Indenture, the Issuer shall have the sole ability to direct the method

and place of conducting all proceedings to be taken in connection with the enforcement of Section 4.10 of the Agreement. The Bond Trustee shall not be required to act on any direction given to it pursuant to this Section until indemnity as set forth in Section 9.01(m) hereof is provided to it by such Bondholders.

Section 8.04 <u>Rights and Remedies of Bondholders</u>. No owner of any Bond shall have any right to institute any suit, action, or proceeding in equity or at law for the enforcement of this Bond Indenture or for the execution of any trust hereof or for the appointment of a receiver or any other applicable remedy hereunder, unless a default has occurred of which the Bond Trustee has been notified as provided in Section 9.01 hereof, or of which by said Section it is deemed to have notice, nor unless such default shall have become an Event of Default and the owners of at least a majority in Aggregate Principal Amount of Bonds then Outstanding shall have made written request to the Bond Trustee and shall have offered reasonable opportunity either to proceed to exercise the powers hereinbefore granted or to institute such action, suit, or proceeding in their own names, nor unless they have also offered to the Bond Trustee indemnity as provided in Section 9.01(m) hereof, nor unless the Bond Trustee shall thereafter fail or refuse to exercise the powers hereinbefore granted, or to institute such action, suit, or proceeding in its own name; and such notification, request, and offer of indemnity are hereby declared in every case at the option of the Bond Trustee to be conditions precedent to the execution of the powers and trusts of this Bond Indenture, and to any action or cause of action for the enforcement of this Bond Indenture, or for the appointment of a receiver or for any other remedy hereunder; it being understood and intended that no one or more owners of the Bonds shall have the right in any manner whatsoever to affect, disturb, or prejudice the lien of this Bond Indenture by his, her, its, or their action or to enforce any right hereunder except in the manner herein provided and that all proceedings at law or in equity shall be instituted, had, and maintained in the manner herein provided and for the equal benefit of the owners of all Bonds then Outstanding. Nothing in this Bond Indenture contained shall, however, affect or impair the right of any owner of Bonds to enforce the payment of the principal of, premium, if any, or interest on any Bond at and after the maturity thereof, or the obligation of the Issuer to pay the principal of, premium, if any, and interest on each of the Bonds to the respective owners of the Bonds at the time and place, from the source and in the manner herein, and in the Bonds expressed.

Section 8.05 <u>Application of Moneys</u>.

(a)     Subject to the provisions of subparagraph (c) hereof, all moneys received by the Bond Trustee pursuant to any right given or action taken under the provisions of this Article shall, after payment of the costs and expenses of the proceedings resulting in the collection of such moneys and the expenses, liabilities, and advances incurred or made by the Bond Trustee, be deposited into the Bond Fund, and all moneys so deposited into the Bond Fund and all moneys held in or deposited into the Bond Fund during the continuance of an Event of Default and available for payment of the Bonds under the provisions of Section 3.04 hereof shall (after payment of the fees and expenses of the Bond Trustee) be applied as follows:

(i)     Unless the principal of all of the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied:

First: To the payment to the Persons entitled thereto of all installments of interest then due on the Bonds in the order of the maturity of the installments of such interest and, if the amount available shall not be sufficient to pay in full any particular installment, then to the payment ratably, according to the amounts due on such installment, to the Persons entitled thereto, without any discrimination or privilege; and

Second: To the payment to the Persons entitled thereto of the unpaid principal of any of the Bonds which shall have become due (other than Bonds called for redemption for the payment of which moneys are held pursuant to the provisions of this Bond Indenture), in the order of their due dates, with interest on such Bonds from the respective dates upon which they become due at the rate of interest borne by such Bonds and, if the amount available shall not be sufficient to pay in full Bonds due on any particular date, together with such interest, then to the payment ratably, according to the amount of principal due on such date, to the persons entitled thereto, without any discrimination or privilege.

(ii) If the principal of all the Bonds shall have become due or shall have been declared due and payable, all such moneys shall be applied to the payment of the principal and interest then due and unpaid upon all of the Bonds (together with interest on overdue installments of principal at the rate of interest borne by each Bond), without preference or priority of principal over interest, any other installment of interest, or of any Bond over any other Bond, ratably, according to the amounts due respectively for principal and interest, to the Persons entitled thereto without any discrimination or privilege.

(iii) If the principal of all the Bonds shall have been declared due and payable, and if such declaration shall thereafter have been rescinded and annulled under the provisions of this Article then, subject to the provisions of paragraph (ii) of this Section in the event that the principal of all the Bonds shall later become due or be declared due and payable, the moneys shall be applied in accordance with the provisions of the foregoing paragraph (i) of this Section.

(b) Whenever moneys are to be applied pursuant to the provisions of this Section, such moneys shall be applied at such times, and from time to time, as the Bond Trustee shall determine, having due regard to the amount of such moneys available for application and the likelihood of additional moneys becoming available for such application in the future. Whenever the Bond Trustee shall apply such moneys, it shall fix the date (which shall be an Interest Payment Date unless it shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue. The Bond Trustee shall give such notice as it may deem appropriate of the deposit of any such moneys and of the fixing of any such date, and shall not be required to make payment to the owner of any unpaid Bond until such unpaid Bond shall be presented to the Bond Trustee for appropriate endorsement or for cancellation if fully paid.

(c) Whenever all of the Bonds and interest thereon have been paid under the provisions of this Section and all expenses and fees of the Bond Trustee and the Paying Agents and all Administration Expenses have been paid, any balance remaining in any funds shall be paid to the Obligor as provided in Section 3.15 hereof.

Section 8.06   Bond Trustee May Enforce Rights Without Bonds.  All rights of action and claims under this Bond Indenture or any of the Bonds Outstanding hereunder may be enforced by the Bond Trustee without the possession of any of the Bonds or the production thereof in any trial or proceedings relative thereto; and any suit or proceeding instituted by the Bond Trustee shall be brought in its name as Bond Trustee, without the necessity of joining as plaintiffs or defendants any owners of the Bonds and any recovery of judgment shall be for the ratable benefit of the owners of the Bonds, subject to the provisions of this Bond Indenture.

Section 8.07   Bond Trustee to File Proofs of Claim in Receivership, Etc.  In the case of any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition, or other judicial proceedings affecting the Obligor, the Bond Trustee shall, to the extent permitted by law, be entitled to file such proofs of claims and other documents as may be necessary or advisable in order to have claims of the Bond Trustee and of the Bondholders allowed in such proceedings for the entire amount due and payable by the Issuer under the Bond Indenture or by the Obligor at the date of the institution of such proceedings and for any additional amounts which may become due and payable by it after such date, without prejudice, however, to the right of any Bondholder to file a claim in his, her or its own behalf.

No provision of this Bond Indenture empowers the Bond Trustee to authorize, consent to, accept or adopt on behalf of any Bondholder any plan or reorganization, arrangement, adjustment or composition affecting any of the rights of any Bondholders, or authorizes the Bond Trustee to vote in respect of the claim in any proceeding described in this Section.

In the event the Bond Trustee incurs expenses or renders services in any proceedings affecting the Obligor and described in this Section, the expenses so incurred and compensation for services so rendered are intended to constitute expenses of administration under the United States Bankruptcy Code or equivalent law.

Section 8.08   Delay or Omission No Waiver.  No delay or omission of the Bond Trustee or of any Bondholder to exercise any right or power accruing upon any default or Event of Default shall exhaust or impair any such right or power or shall be construed to be a waiver of any such default or Event of Default, or acquiescence therein; and every power and remedy given by this Bond Indenture may be exercised from time to time and as often as may be deemed expedient.

Section 8.09   Discontinuance of Proceedings on Default, Position of Parties Restored.  In case the Bond Trustee shall have proceeded to enforce any right under this Bond Indenture, and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Bond Trustee, then and in every such case the Issuer and the Bond Trustee shall be restored to their former positions and rights hereunder with respect to the Trust Estate, and all rights, remedies, and powers of the Bond Trustee shall continue as if no such proceedings had been taken.

Section 8.10   Enforcement of Rights.  The Bond Trustee, as pledgee and assignee for security purposes of all the right, title, and interest of the Issuer in and to the Agreement (except those rights under Section 5.7, 7.5, and 9.5 thereof) and the Notes shall, upon compliance with applicable requirements of law and except as otherwise set forth in this Article VIII, shall have standing to enforce each and every right granted to the Issuer under the Agreement and under the

Notes. The Issuer and the Bond Trustee hereby agree, without in any way limiting the effect and scope thereof, that the pledge and assignment hereunder to the Bond Trustee of any and all rights of the Issuer in and to the Note and the Agreement shall constitute an agency appointment coupled with an interest on the part of the Bond Trustee which, for all purposes of this Bond Indenture, shall be irrevocable and shall survive and continue in full force and effect notwithstanding the bankruptcy or insolvency of the Issuer or its default hereunder or on the Bonds. Subject to Section 9.01 hereof, in exercising such right and the rights given the Bond Trustee under this Article VIII, the Bond Trustee shall take such action as, in the judgment of the Bond Trustee, would best serve the interests of the Bondholders, taking into account the provisions of the Master Indenture, together with the security and remedies afforded to owners of the Note.

Section 8.11 <u>Undertaking for Costs</u>. All parties to this Indenture agree, and each Holder of any Bond by his acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Bond Indenture, or in any suit against the Bond Trustee for any action taken or omitted by it as Bond Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion access reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section shall not apply to any suit instituted by the Bond Trustee, to any suit instituted by any Bondholder, or group of Bondholders, holding in aggregate more than 10% in principal amount of the Outstanding Bonds, or to any suit instituted by a Bondholder for the enforcement of the payment of the principal of (or premium, if any) or interest on any Bond on or after the respective maturities thereof expressed in such Bond (or, in the case of redemption, on or after the redemption date).

Section 8.12 <u>Waiver of Events of Default</u>. The Bond Trustee, upon the written request of the Owners of a majority in aggregate principal amount of the Bonds then Outstanding shall waive any Event of Default hereunder; provided, however, that the Bond Trustee may not waive an Event of Default described in subparagraph (a) of Section 8.01 hereof without the written consent of the registered owners of all Bonds then Outstanding; and provided, further, that notwithstanding anything to the contrary in this Bond Indenture, the Issuer shall have the sole ability to waive any Event of Default in connection with the covenants and obligations of the Obligor under Section 4.10 of the Agreement.

ARTICLE IX

CONCERNING THE BOND TRUSTEE AND PAYING AGENTS

Section 9.01 <u>Duties of the Bond Trustee</u>. The Bond Trustee hereby accepts the trust imposed upon it by this Bond Indenture and agrees to perform said trusts, but only upon and subject to the following express terms and conditions, and no implied covenants or obligations shall be read into this Bond Indenture against the Bond Trustee:

(a) The Bond Trustee, prior to the occurrence of an Event of Default and after the curing of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Bond Indenture. In case an Event of Default has occurred (which has not been cured) the Bond Trustee shall exercise such of the rights and

powers vested in it by this Bond Indenture and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs.

(b)     The Bond Trustee may execute any of the trusts or powers hereof and perform any of its duties hereunder, either directly or by or through attorneys, agents, receivers, or employees, and the Bond Trustee shall not be responsible for any misconduct or negligence on the part of any receiver, agent or attorney appointed with due care by it hereunder, and shall be entitled to act upon an Opinion of Counsel concerning all matters of trust hereof and the duties hereunder, and may in all cases pay such reasonable compensation to all such attorneys, agents, receivers, and employees as may reasonably be employed in connection with the trust hereof. The Bond Trustee may act upon an Opinion of Counsel and shall not be responsible for any loss or damage resulting from any action or nonaction taken by or omitted to be taken in good faith in reliance upon such Opinion of Counsel.

(c)     The Bond Trustee shall not be responsible for any recital herein or in the Bonds (except in respect to the certificate of authentication by the Bond Trustee endorsed on the Bonds and the acceptance of the trusts hereunder).

(d)     The Bond Trustee shall not be accountable for the use of any Bonds authenticated or delivered hereunder or the proceeds thereof, or for any moneys disbursed by the Bond Trustee in accordance with this Bond Indenture. The Bond Trustee makes no representations as to the validity or sufficiency of this Bond Indenture or the Bonds. The Bond Trustee is not a party to, is not responsible for, and makes no representations with respect to matters set forth in any preliminary official statement, or similar document prepared and distributed in connection with the sale of the Bonds. The Bond Trustee may become the owner of the Bonds with the same rights which it would have if not Bond Trustee.

(e)     The Bond Trustee shall be protected in acting upon any notice, request, consent, certificate, order, affidavit, letter, telegram, teletransmission or other paper or document reasonably believed to be genuine and correct and to have been signed or sent by the proper person or persons. Any request or direction of the Issuer or the Obligor mentioned herein shall be sufficiently evidenced by a written request, order, or consent signed in the name of the Issuer or Obligor, by the Issuer Representative, or Obligor, as the case may be. Any action taken by the Bond Trustee pursuant to this Bond Indenture upon the request or authority or consent of any person who at the time of making such request or giving such authority or consent is the owner of any Bonds shall be conclusive and binding upon all future owners of the same Bond and upon Bonds issued in place thereof.

(f)     As to the existence or nonexistence of any fact or matter or as to the sufficiency or validity of any instrument, paper, or proceeding, the Bond Trustee shall be entitled to rely and shall be protected in acting or refraining to act upon a certificate signed on behalf of the Issuer or the Obligor by the Issuer Representative or Obligor or such other person as may be designated for such purpose by Certified Resolution as sufficient evidence of the facts therein contained, and prior to the occurrence of a default of which the Bond Trustee has been notified as provided in subsection (h) of this Section, or of which by said subsection it is deemed to have notice, shall also be at liberty to accept a similar certificate to the effect that any particular dealing,

transaction, or action is necessary or expedient, but may at its discretion secure such further evidence deemed necessary or advisable, but shall in no case be bound to secure the same.

(g)     The permissive right of the Bond Trustee to do things enumerated in this Bond Indenture shall not be construed as a duty (except as otherwise herein provided) and the Bond Trustee shall not be answerable for other than its own negligence or willful misconduct, except that:

(1)     the Bond Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proved that the Bond Trustee was negligent in ascertaining the pertinent facts;

(2)     the Bond Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Bondholders of at least a majority in Aggregate Principal Amount of the Outstanding Bonds relating to the time, method, and place of conducting any proceeding for any remedy available to the Bond Trustee, or exercising any trust or power conferred upon the Bond Trustee, under this Bond Indenture; and

(3)     the Bond Trustee shall not be liable if the Bond Trustee reasonably relies in good faith upon an Officer's Certificate delivered pursuant to this Bond Indenture or an Opinion of Counsel.

(h)     The Bond Trustee shall not be required to take notice or be deemed to have notice of any default hereunder except failure by the Issuer to cause to be made any of the payments to the Bond Trustee required to be made by Article III hereof unless the Bond Trustee shall be specifically notified in writing of such default by the Issuer or by the owners of at least a majority in Aggregate Principal Amount of Bonds then Outstanding and all notices or other instruments required by this Bond Indenture to be delivered to the Bond Trustee, must, in order to be effective, be delivered to a Responsible Officer at the designated corporate trust office of the Bond Trustee, and in the absence of such notice so delivered, the Bond Trustee may conclusively assume there is no default except as aforesaid.

(i)     All moneys received by the Bond Trustee shall, until used or applied or invested as herein provided, be held in trust in the manner and for the purposes for which they were received, but need not be segregated from other funds except to the extent required by this Bond Indenture or law.

(j)     At any and all reasonable times the Bond Trustee and its duly authorized agents, attorneys, experts, engineers, accountants, and representatives shall have the right, but shall not be required, to inspect the Project, including all books, papers, and records of the Issuer and the Obligor pertaining to the Project and the Bonds.

(k)     The Bond Trustee shall not be required to give any bond or surety in respect of the execution of the said trusts and powers or otherwise in respect of the premises, and no provision of this Bond Indenture shall require the Bond Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the

exercise of any of its rights or powers, if it shall have grounds for believing that repayment of such funds or indemnity satisfactory against such risk or liability is not assured to it.

(l) Notwithstanding anything in this Bond Indenture contained, the Bond Trustee shall have the right, but shall not be required, to demand in respect of the authentication of any Bonds, the withdrawal of any cash, or any action whatsoever within the purview of this Bond Indenture, any showings, certificates, opinion, appraisals, or other information, or corporate action or evidence thereof, in addition to that by the terms hereof required, as a condition of such action by the Bond Trustee deemed desirable for the purpose of establishing the right of the Issuer to the authentication of any Bonds, the withdrawal of any cash, or the taking of any other action by the Bond Trustee.

(m) Before taking any action under this Section or Article VIII hereof, the Bond Trustee may require that indemnity reasonably satisfactory to it be furnished to it for the reimbursement of its fees, costs, liabilities and all expenses (including attorneys fees) which it may incur and to protect it against all liability, except liability which may result from its negligence or willful misconduct, by reason of any action so taken.

(n) Except as provided in Section 9.01(a) above, it shall not be the duty of the Bond Trustee, except as expressly provided herein, to see that any duties or obligations imposed herein or in the Agreement upon the Issuer, the Obligor, or other Persons are performed, and the Bond Trustee shall not be liable or responsible because of the failure of the Issuer, the Obligor, or other Persons to perform any act required of them pursuant to the terms of this Bond Indenture.

(o) In acting or omitting to act pursuant to the provisions of the Agreement, the Bond Trustee shall be entitled to and be protected by the rights and immunities accorded to it by the terms of this Bond Indenture.

(p) In the event the Bond Trustee receives inconsistent or conflicting requests and indemnity from two or more groups of holders of Bonds, each representing less than a majority in aggregate principal amount of the Bonds Outstanding, the Bond Trustee, in its sole discretion, may determine what action, if any, shall be taken.

(q) The Bond Trustee's immunities and protections from liability in connection with the performance of its duties under this Bond Indenture shall extend to the Bond Trustee's officers, directors, agents and employees. Such immunities and protections, together with the Bond Trustee's right to compensation, shall survive the Bond Trustee's resignation or removal and final payment of the Bonds.

Section 9.02 Fees and Expenses of Bond Trustee and Paying Agent. The Issuer agrees, but solely from any funds received from the Obligor pursuant to the Agreement,

(a) to pay to the Bond Trustee, each Paying Agent and all other agents their reasonable and necessary fees for services rendered hereunder as and when the same become due and all expenses (including attorneys' fees) reasonably and necessarily made or incurred by the Bond Trustee, such Paying Agent or such other agent in connection with such services as and when the same become due as provided in Section 3.13 hereof; and

(b)     to reimburse the Bond Trustee upon its request for all reasonable expenses, disbursements, and advances incurred or made by the Bond Trustee in accordance with any provisions of this Bond Indenture (including the reasonable compensation, expenses, and disbursements of its agents and counsel), except any such expense, disbursement, or advance as may be attributable to the negligence or bad faith of the Bond Trustee.

As security for the performance of the obligations of the Issuer under this Section, the Bond Trustee shall be secured under this Bond Indenture by a lien prior to the Bonds for the payment of the expenses and reimbursements due hereunder, and shall have the right to use and apply any trust funds held by it hereunder for such purpose.

Section 9.03    Resignation or Replacement of Bond Trustee.  The present or any future Bond Trustee may resign by giving to the Issuer, the Obligor and each Bondholder thirty days' notice of such resignation. Such resignation shall not be effective until such time as a successor Bond Trustee shall have accepted its appointment. The present or any future Bond Trustee may be removed at any time by an instrument in writing executed by the owners of at least a majority in Aggregate Principal Amount of Bonds Outstanding or by the Obligor with the written consent of the owners of at least a majority in Aggregate Principal Amount of Bonds Outstanding, or, upon a substitution for the Series 2019 Note of a master note or notes issued under the master indenture for the Lifespace Obligated Group (as defined in the Master Indenture) in accordance with Section 9.06 of the Master Indenture, by the Obligor without the written consent of any owners of Bonds.

In case the present or any future Bond Trustee shall at any time resign or be removed or otherwise become incapable of acting, a successor may be appointed by the owners of at least a majority in Aggregate Principal Amount of the Bonds Outstanding by an instrument or concurrent instruments signed by such Bondholders, or their attorneys in fact duly appointed; provided that the Issuer may, by an instrument executed by order of the Board of Directors, appoint a successor until a new successor shall be appointed by the Bondholders as herein authorized. The Issuer upon making such appointment shall forthwith give notice thereof to each Bondholder and to the Obligor, which notice may be given concurrently with the notice of resignation given by any resigning Bond Trustee. Any successor so appointed by the Issuer shall immediately and without further act be superceded by a successor appointed in the manner above provided by the owners of at least a majority in Aggregate Principal Amount of the Bonds Outstanding. In the event that the Issuer does not so act within thirty days after notice of resignation, the Bond Trustee shall have the right to petition a court of competent jurisdiction to appoint a successor Bond Trustee.

Every successor Bond Trustee shall always be a bank, banking corporation or trust company duly organized under the laws of the United States of America or any state or territory thereof, with trust powers in good standing, qualified to act hereunder, and having a combined capital and surplus of not less than $50,000,000. Any successor appointed hereunder shall execute, acknowledge, and deliver to the Issuer and the predecessor Bond Trustee an instrument accepting such appointment hereunder and thereupon such successor shall, without any further act, deed, or conveyance, become vested with all the estates, properties, rights, powers, and trusts of its predecessor in the trust hereunder with like effect as if originally named as Bond Trustee herein; but the Bond Trustee retiring shall, nevertheless, on the written demand of its successor, execute and deliver an instrument conveying and transferring to such successor, upon the trusts herein expressed, all the estates, properties, rights, powers, and trusts of the predecessor, who shall, upon

payment of the expenses, charges and other disbursements which are due and owing to it pursuant to Sections 3.13 and 9.02 hereof, duly assign, transfer and deliver to the successor all properties and moneys held by it under this Bond Indenture. Should any instrument in writing from the Issuer be required by any successor for more fully and certainly vesting in and confirming to it all of such estates, properties, rights, powers, and trusts, the Issuer shall, on request of such successor, make, execute, acknowledge, and deliver the deeds, conveyances, and necessary instruments in writing.

The notices herein provided for shall be given by mailing a copy thereof to the Obligor and the registered owners of the Bonds at their addresses as the same shall last appear on the registration books. The instruments evidencing the resignation or removal of the Bond Trustee and the appointment of a successor hereunder, together with all other instruments provided for in this Section shall be filed and/or recorded by the successor Bond Trustee in each recording office where this Bond Indenture shall have been filed and/or recorded.

Section 9.04    Conversion, Consolidation or Merger of Bond Trustee. Any bank, banking corporation or trust company into which the Bond Trustee merges or is consolidated, or to which it (or a receiver on its behalf) may sell or transfer its corporate trust business as a whole, or substantially as a whole, shall be the successor of the Bond Trustee under this Bond Indenture with the same rights, powers, duties, and obligations and subject to the same restrictions, limitations, and liabilities as its predecessor, all without the execution or filing of any papers or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding. In case any of the Bonds to be issued hereunder shall have authenticated, but not delivered, any successor Bond Trustee may adopt the certificate of any predecessor Bond Trustee, and deliver the same as authenticated; and, in case any of such Bonds shall not have been authenticated, any successor Bond Trustee may authenticate such Bonds in the name of such successor Bond Trustee.

Section 9.05    Designation and Succession of Paying Agent. The Bond Trustee shall be the Paying Agent or Paying Agents for the Bonds.

Any bank or trust company with or into which any Paying Agent may be merged or consolidated, or to which the assets and business of such Paying Agent may be sold, shall be deemed the successor of such Paying Agent for the purposes of this Bond Indenture. If the position of Paying Agent shall become vacant for any reason, the Issuer shall, within thirty days thereafter, appoint such bank or trust company as shall be specified by the Obligor and located in the same city as such Paying Agent to fill such vacancy; provided, however, that if the Issuer shall fail to appoint such Paying Agent within said period, the Bond Trustee shall make such appointment.

The Paying Agents, if any, shall enjoy the same protective provisions in the performance of their duties hereunder as are specified in Section 9.01 hereof with respect to the Bond Trustee insofar as such provisions may be applicable.

Section 9.06    [Reserved.]

Section 9.07    [Reserved.]

ARTICLE X

SUPPLEMENTAL INDENTURES AND AMENDMENTS TO THE AGREEMENT

Section 10.01 Supplemental Indentures Not Requiring Consent of Bondholders. The Issuer and the Bond Trustee may, without the consent of, but with notice thereof to the Bondholders as provided in Section 10.02, enter into such indentures or agreements supplemental hereto (which supplemental indentures or agreements shall thereafter form a part hereof) for any one or more or all of the following purposes:

(a)    To add to the covenants and agreements in this Bond Indenture contained other covenants and agreements thereafter to be observed for the protection or benefit of the Bondholders.

(b)    To cure any ambiguity, or to cure, correct, or supplement any defect or inconsistent provision contained in this Bond Indenture, or to make any provisions with respect to matters arising under this Bond Indenture or for any other purpose if such provisions are necessary or desirable and do not, in the judgment of the Bond Trustee, adversely affect the interests of the owners of Bonds.

(c)    To subject to this Bond Indenture additional revenues, properties, or collateral.

(d)    To qualify this Bond Indenture under the Trust Indenture Act of 1939, if such be hereafter required in the Opinion of Counsel.

(e)    To satisfy any requirements imposed by a rating agency if necessary to maintain the then current rating on the Bonds.

(f)    To maintain the extent to which the interest on the Bonds is not includable in the gross income of the recipients thereof, if in the opinion of Bond Counsel such supplemental indenture or agreement is necessary.

(g)    To modify or amend this Bond Indenture to provide for a substitution of master note or notes issued under the master indenture for the Lifespace Obligated Group (as defined under the Master Indenture) for the Series 2019 Note in accordance with Section 9.06 of the Master Indenture, subject, however, to the limitations set forth Section 10.02 (a) through (c).

Section 10.02 Supplemental Indentures Requiring Consent of Bondholders. The owners of not less than a majority in Aggregate Principal Amount of the Bonds then Outstanding shall have the right, from time to time, to consent to and approve the execution by the Issuer and the Bond Trustee of such indenture or indentures supplemental hereto (exclusive of supplemental indentures entered into pursuant to Section 10.01 hereof), as shall be deemed necessary or desirable by the Issuer for the purpose of modifying, altering, amending, adding to, or rescinding, in any particular, any of the terms or provisions contained in this Bond Indenture; provided, however, that without the consent of the owners of all the Bonds at the time Outstanding nothing herein contained shall permit, or be construed as permitting any of the following:

44

(a)     An extension of the maturity of, or a reduction of the principal amount of, or a reduction of the rate of, or extension of the time of payment of interest on, or a reduction of a premium payable upon any redemption of, any Bond.

(b)     A privilege or priority of any Bond or Bonds over any other Bond.

(c)     A reduction in the Aggregate Principal Amount of the Bonds required for consent to any supplemental indenture.

Upon the execution of any supplemental indenture pursuant to the provisions of this Section, this Bond Indenture shall be deemed to be modified and amended in accordance therewith, and the respective rights, duties, and obligations under this Bond Indenture of the Issuer, the Bond Trustee and all owners of Bonds then Outstanding shall thereafter be determined, exercised, and enforced hereunder, subject in all respects to such modifications and amendments.

If at any time the Issuer shall request the Bond Trustee to enter into such supplemental indenture for any of the purposes of this Section, the Bond Trustee shall, upon being satisfactorily indemnified with respect to costs, fees and expenses (including attorneys' fees), cause notice of the proposed execution of such supplemental indenture to be mailed to the registered owners of the Bonds at their addresses as the same last appear on the registration books.  Such notice shall briefly set forth the nature of the proposed supplemental indenture and shall state that copies thereof are on file at the designated office of the Bond Trustee for inspection by all Bondholders.

Section 10.03  Execution of Supplemental Indenture.  The Bond Trustee is authorized to join with the Issuer in the execution of any such supplemental indenture and to make further agreements and stipulations which may be contained therein, but the Bond Trustee shall not be obligated to enter into any such supplemental indenture which affects its rights, duties, or immunities under this Bond Indenture.  The Bond Trustee shall be entitled to receive, and shall be fully protected in relying upon, an Opinion of Counsel stating that the execution and delivery of a supplemental indenture is authorized or permitted by this Bond Indenture and has been effected in compliance with the provisions hereof.  In connection with a supplemental indenture entered into pursuant to Section 10.01(b) hereof, the Bond Trustee may in its discretion receive an Opinion of Counsel as conclusive evidence as to whether the Bondholders would be so affected by any such modification or amendment to this Bond Indenture.

Any supplemental indenture executed in accordance with the provisions of this Article shall thereafter form a part of this Bond Indenture; and all the terms and conditions contained in any such supplemental indenture as to any provision authorized to be contained therein shall be deemed to be part of this Bond Indenture for any and all purposes.  In case of the execution and delivery of any supplemental indenture, express reference may be made thereto in the text of the Bonds issued thereafter, if any, if deemed necessary or desirable by the Bond Trustee.

Section 10.04  Consent of Obligor.  Anything herein to the contrary notwithstanding, a supplemental indenture under this Article shall not become effective unless and until the Obligor shall have consented in writing to the execution and delivery of such supplemental indenture unless an Event of Default has occurred and is continuing under this Bond Indenture, in which case no consent of the Obligor shall be required.  The Bond Trustee shall cause notice of the proposed

execution of any supplemental indenture together with a copy of the proposed supplemental indenture to be mailed to the Obligor at least fifteen days prior to the proposed date of execution of such supplemental indenture.

Section 10.05 <u>Amendments, Etc., of the Agreement Not Requiring Consent of Bondholders</u>. The Issuer and the Bond Trustee shall, without the consent of or notice to the Bondholders, consent to any amendment, change, or modification of the Agreement as may be required (i) by the provisions of the Agreement and this Bond Indenture, (ii) for the purpose of curing any ambiguity or formal defect or omission, (iii) to satisfy any requirements imposed by a rating agency if necessary to maintain the then current rating on the Bonds, (iv) to maintain the extent to which the interest on the Bonds is not includable in the gross income of the recipients thereof, if in the opinion of Bond Counsel such amendment is necessary, (v) to modify or amend the Agreement to provide for a substitution of master note or notes issued under the master indenture for the Lifespace Obligated Group (as defined in the Master Indenture) for the Series 2019 Note in accordance with Section 9.06 of the Master Indenture, subject, however, to the limitations set forth Section 10.02 (a) through (c), and (vi) in connection with any other change therein which does not adversely affect the Bond Trustee or the owners of the Bonds.

Section 10.06 <u>Amendments, Etc., of the Agreement or Master Indenture Requiring Consent of Bondholders</u>. Except for the amendments, changes, or modifications as provided in Section 10.05 hereof, neither the Issuer nor the Bond Trustee shall consent to any other amendment, change, or modification of the Agreement, and the Bond Trustee shall not consent as Holder of the Series 2019 Note to any amendment, change, or modification of the Master Indenture, without the giving of notice to and the written approval or consent of the owners of not less than a majority in Aggregate Principal Amount of the Bonds at the time Outstanding given and procured as provided in Section 10.02 hereof. If at any time the Issuer and the Obligor shall request the consent of the Bond Trustee to any such proposed amendment, change, or modification of the Agreement or the Obligor shall request the consent of the Bond Trustee to any such proposed amendment, change, or modification of the Master Indenture, the Bond Trustee shall, upon being satisfactorily indemnified with respect to expenses, cause notice of such proposed amendment, change, or modification to be given in the same manner as provided in Section 10.02 hereof. Such notice shall briefly set forth the nature of such proposed amendment, change, or modification and shall state that copies of the instrument embodying the same are on file at the designated office of the Bond Trustee for inspection by all Bondholders.

In executing or consenting to any amendment, change or modification of the Agreement or the Master Indenture, the Bond Trustee shall be entitled to receive, and shall be fully protected in relying upon, an Opinion of Counsel stating that the execution and delivery of or consent to such amendment, change, modification of the Agreement or Master Indenture is authorized or permitted by this Bond Indenture and the Agreement and has been effected in compliance with the provisions of this Bond Indenture and the Agreement. The Bond Trustee may, but shall not be obligated to, enter into or consent to any such amendment, change, or modification which affects the Bond Trustee's own rights, duties or immunities. In connection with any amendment, change or modification in connection with Section 10.05(vi), the Bond Trustee may receive an Opinion of Counsel as conclusive evidence as to whether the Bondholders would be prejudiced by any such amendment, change, or modification of the Agreement.

ARTICLE XI

MISCELLANEOUS

Section 11.01 Evidence of Signature of Bondholders and Ownership of Bonds. Any request, consent, or other instrument which the Bond Indenture may require or permit to be signed and executed by the Bondholders may be in one or more instruments of similar tenor, and shall be signed or executed by such Bondholders in person or by their attorneys appointed in writing. Proof of the execution of any such instrument or of an instrument appointing any such attorney, or of the ownership of Bonds shall be sufficient (except as otherwise herein expressly provided) if made in the following manner, but the Bond Trustee may, nevertheless, in its discretion, require further or other proof in cases where it deems the same desirable:

(a) The fact and date of the execution by any Bondholder or his attorney of such instrument may be proved by the certificate of any officer authorized to take acknowledgments in the jurisdiction in which he purports to act that the person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before a notary public.

(b) The ownership of any fully registered Bond and the amount and numbers of such Bonds and the date of holding the same shall be proved by the registration books of the Issuer kept by the Bond Trustee. Any request or consent of the owner of any Bond shall bind all future owners of such Bond in respect of anything done or suffered to be done by the Issuer or the Bond Trustee in accordance therewith.

Section 11.02 No Personal Liability. No recourse under or upon any obligation, covenant or agreement contained in this Bond Indenture, or in any Bond hereby secured, or under any judgment obtained against the Issuer, or by the enforcement of any assessment or by any legal or equitable preceding by virtue of any constitution or statute or otherwise or under any circumstances, under or independent of this Bond Indenture, shall be had against any officer, director, agent or employee, as such, past, present or future, of any of the Issuer, the Bond Trustee or Tarrant County, Texas, either directly or through the Issuer, or otherwise, for the payment for or to the Issuer or any receiver thereof, or for or to the holder of any Bond issued hereunder or otherwise of any sum that may be due and unpaid by the Issuer upon any such Bond. Any and all personal liability of every nature, whether at common law or in equity, or by statute or by constitution or otherwise, of any such person to respond by reason of any act or omission on his part or otherwise, for the payment for or to the Issuer or any receiver thereof or for or to the holder of any Bond issued hereunder or otherwise, of any sum that may remain due and unpaid upon the Bonds hereby secured or any of them, is hereby expressly waived and released as a condition of and consideration for the execution of this Bond Indenture and the issue of such Bonds.

Section 11.03 Limited Obligation. Neither the State of Texas, nor Tarrant County, Texas, shall in any event be liable for the payment of the principal of, premium, if any, or interest on any of the Bonds issued hereunder. The Bonds are limited obligations of the Issuer payable solely from the revenues, receipts and resources of the Issuer pledged to their payment and not from any other revenues, funds or assets of the Issuer. None of the Bonds of the Issuer issued hereunder shall be construed or constitute an indebtedness of the Issuer or an indebtedness or obligation

(special, moral or general) of the State of Texas or Tarrant County, Texas within the meaning of any constitutional or statutory provision whatsoever.

Section 11.04 <u>Parties Interested Herein</u>. With the exception of rights herein expressly conferred on the Obligor, nothing in this Bond Indenture expressed or implied is intended or shall be construed to confer upon, or to give to, any person other than the Issuer, the Bond Trustee, the Paying Agents, and the owners of the Bonds, any right, remedy, or claim under or by reason of this Bond Indenture, and any covenants, stipulations, promises, and agreements in this Bond Indenture contained by and on behalf of the Issuer shall be for the sole and exclusive benefit of the Issuer, the Bond Trustee and the owners of the Bonds.

Section 11.05 <u>Titles, Headings, Etc</u>. The titles and headings of the articles, sections, and subdivisions of this Bond Indenture have been inserted for convenience of reference only and shall in no way modify or restrict any of the terms or provisions hereof.

Section 11.06 <u>Severability</u>. In the event any provision of this Bond Indenture shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof.

Section 11.07 <u>Governing Law</u>. This Bond Indenture shall be governed and construed in accordance with the laws of the State of Texas.

Section 11.08 <u>Execution of Counterparts; Electronic Transactions</u>. This Bond Indenture may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument. The transaction described herein may be conducted and this Bond Indenture and related documents may be stored by electronic means. Copies, telecopies, facsimiles, electronic files and other reproductions of original executed documents shall be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

Section 11.09 <u>Notices</u>. Any notice, request or other communication under this Agreement shall be given in writing and shall be deemed to have been given by either party to the other party at the addresses shown below upon any of the following dates:

       (a)    The date of notice by telefax, telecopy, or similar telecommunications, which is confirmed promptly in writing;

       (b)    Three Business Days after the date of the mailing thereof, as shown by the post office receipt if mailed to the other party hereto by registered or certified mail;

       (c)    The date of the receipt thereof by such other party if not given pursuant to (a) or (b) above. The address for notice for each of the parties shall be as follows:

Tarrant County Cultural Education Facilities Finance Corporation
c/o Brown Pruitt Wambsganss Ferrill & Dean, P.C.
201 Main Street
Suite 801
Fort Worth, Texas 76102

Attention: Secretary, Randal L. Dean
Telephone: (817) 338-4888
Telecopier No.: (817) 338-0700

81

Obligor:

Tarrant County Senior Living Center Inc.
c/o Lifespace Communities, Inc.
4201 Corporate Drive
West Des Moines, Iowa 50266
Telephone: (515) 309-4456
Telecopier: _____
Attention: Chief Financial Officer

with a copy to:

Lifespace Communities, Inc.
4201 Corporate Drive
West Des Moines, Iowa 50266
Telephone: (515) 309-4456
Telecopier: _____
Attention: Jodi Hirsch, Senior Vice President and General Counsel

Bond Trustee:

UMB Bank, National Association
[insert]

Notwithstanding the foregoing, notices to the Bond Trustee shall be effective only upon receipt.

Section 11.10 <u>Payments Due on Holidays</u>. If the date for making any payment or the last day for performance of any act or the exercising of any right, as provided in this Bond Indenture, shall be a legal holiday or a day on which banking institutions in Dallas, Texas or Minneapolis, Minnesota, are authorized by law to remain closed, such payment may be made or act performed or right exercised on the next succeeding day not a legal holiday or a day on which such banking institutions are authorized by law to remain closed with the same force and effect as if done on the nominal date provided in this Bond Indenture.

49

IN WITNESS WHEREOF, TARRANT COUNTY CULTURAL EDUCATION FACILITIES FINANCE CORPORATION has caused this Bond Indenture to be executed on its behalf by its President, and UMB BANK, NATIONAL ASSOCIATION has caused this Bond Indenture to be executed on its behalf by its duly authorized officer to evidence its acceptance of the trusts hereby created, all as of the date first above written.

TARRANT COUNTY CULTURAL EDUCATION
FACILITIES FINANCE CORPORATION


By: _____
                              President


UMB BANK, NATIONAL ASSOCIATION,
as Bond Trustee


By: _____
                      Authorized Signatory

Indenture of Trust Signature Page
Series 2019

TARRANT COUNTY CULTURAL EDUCATION FACILITIES FINANCE CORPORATION

and

TARRANT COUNTY SENIOR LIVING CENTER INC.

LOAN AGREEMENT

DATED AS OF [NOVEMBER 1], 2019

TARRANT COUNTY CULTURAL EDUCATION FACILITIES FINANCE CORPORATION
RETIREMENT FACILITY REVENUE BONDS
(THE STAYTON AT MUSEUM WAY PROJECT)
SERIES 2019

TABLE OF CONTENTS
[to be updated]

(This Table of Contents is not a part of this
Loan Agreement and is only for convenience of reference)

PAGE

ARTICLE I

Definitions

Section 1.1  Definitions........................................................**Error! Bookmark not defined.**

ARTICLE II

Representations

Section 2.1  Representations by the Issuer........................**Error! Bookmark not defined.**

Section 2.2  Representations by the Obligor......................**Error! Bookmark not defined.**

ARTICLE III

Term of Agreement

Section 3.1  Term of this Agreement ................................**Error! Bookmark not defined.**

ARTICLE IV

Issuance of the Bonds

Section 4.1  Agreement to Issue Bonds ............................**Error! Bookmark not defined.**

Section 4.2  Modifications of the Projects ........................**Error! Bookmark not defined.**

Section 4.3  Covenants Regarding Tax Exemption ..........**Error! Bookmark not defined.**

Section 4.4  [Reserved] .....................................................**Error! Bookmark not defined.**

Section 4.5  Representations and Warranties as to Tax Exempt Status of Obligor .. **Error! Bookmark not defined.**

Section 4.6  Disposition of the Project..............................**Error! Bookmark not defined.**

ARTICLE V

Loan of Bond Proceeds; Note; Provision for Payment

Section 5.1  Loan of Bond Proceeds .................................**Error! Bookmark not defined.**

Section 5.2  Repayment of Loan .......................................**Error! Bookmark not defined.**

Section 5.3  Credits ...........................................................**Error! Bookmark not defined.**

Section 5.4  Note ...............................................................**Error! Bookmark not defined.**

Section 5.5  Payment of Bond Trustee's and Paying Agent's Fees and Expenses ... **Error! Bookmark not defined.**

Section 5.6    Reserve Fund.................................................**Error! Bookmark not defined.**

Section 5.7    Payment of Administration Expenses...........**Error! Bookmark not defined.**

Section 5.8    Payees of Payments......................................**Error! Bookmark not defined.**

Section 5.9    Obligations of Obligor Hereunder Unconditional....... **Error! Bookmark not defined.**

## ARTICLE VI

### Maintenance and Insurance

Section 6.1    Maintenance and Modifications of Projects by Obligor .... **Error! Bookmark not defined.**

Section 6.2    Insurance .......................................................**Error! Bookmark not defined.**

## ARTICLE VII

### Special Covenants

Section 7.1    No Warranty of Merchantability, Condition or Suitability by the Issuer .............................................................**Error! Bookmark not defined.**

Section 7.2    Right of Access to the Project......................**Error! Bookmark not defined.**

Section 7.3    Nonsectarian Use .........................................**Error! Bookmark not defined.**

Section 7.4    Further Assurances.......................................**Error! Bookmark not defined.**

Section 7.5    INDEMNIFICATION ...................................**Error! Bookmark not defined.**

Section 7.6    Authority of Obligor ....................................**Error! Bookmark not defined.**

Section 7.7    Authority of Issuer Representative...............**Error! Bookmark not defined.**

Section 7.8    No Personal Liability ...................................**Error! Bookmark not defined.**

Section 7.9    Fees and Expenses.......................................**Error! Bookmark not defined.**

## ARTICLE VIII

### Assignment and Leasing

Section 8.1    Assignment and Leasing by Obligor............**Error! Bookmark not defined.**

Section 8.2    Assignment and Pledge by Issuer ................**Error! Bookmark not defined.**

## ARTICLE IX

### Failure to Perform Covenants and Remedies Therefor

Section 9.1    Event of Default ...........................................**Error! Bookmark not defined.**

Section 9.2    Remedies......................................................**Error! Bookmark not defined.**

Section 9.3    Discontinuance of Proceedings....................**Error! Bookmark not defined.**

Section 9.4    No Remedy Exclusive...................................**Error! Bookmark not defined.**

| | | |
|---|---|---|
| Section 9.5 | Agreement to Pay Attorneys' Fees and Expenses....... | **Error! Bookmark not defined.** |
| Section 9.6 | Waivers ........................................................ | **Error! Bookmark not defined.** |

### ARTICLE X

#### Prepayment of Note

| | | |
|---|---|---|
| Section 10.1 | General Option to Prepay Note ..................... | **Error! Bookmark not defined.** |
| Section 10.2 | Conditions to Exercise of Option ................. | **Error! Bookmark not defined.** |

### ARTICLE XI

#### Miscellaneous

| | | |
|---|---|---|
| Section 11.1 | Notices............................................................ | **Error! Bookmark not defined.** |
| Section 11.2 | Binding Effect ................................................ | **Error! Bookmark not defined.** |
| Section 11.3 | Severability ................................................... | **Error! Bookmark not defined.** |
| Section 11.4 | Amounts Remaining in Funds........................ | **Error! Bookmark not defined.** |
| Section 11.5 | Amendments, Changes, and Modifications .. | **Error! Bookmark not defined.** |
| Section 11.6 | Execution in Counterparts; Electronic Transactions... | **Error! Bookmark not defined.** |
| Section 11.7 | Payment.......................................................... | **Error! Bookmark not defined.** |
| Section 11.8 | Governing Law............................................... | **Error! Bookmark not defined.** |
| Section 11.9 | No Pecuniary Liability of Issuer .................. | **Error! Bookmark not defined.** |
| Section 11.10 | Payments Due on Holidays ........................... | **Error! Bookmark not defined.** |
| Section 11.11 | No Individual Liability.................................. | **Error! Bookmark not defined.** |
| Section 11.12 | Survival of Covenants................................... | **Error! Bookmark not defined.** |
| Exhibit A | Project Description .................................................................... | A-1 |

LOAN AGREEMENT

THIS LOAN AGREEMENT dated as of [November 1], 2019, between TARRANT COUNTY CULTURAL EDUCATION FACILITIES FINANCE CORPORATION, a nonprofit cultural educational facilities finance corporation duly organized and existing under the laws of the State of Texas (the "Issuer"), and TARRANT COUNTY SENIOR LIVING CENTER INC., a nonprofit corporation duly organized and existing under the laws of the State of Texas (the "Obligor"),

WITNESSETH:

WHEREAS, the Issuer is a nonstock nonprofit cultural educational facilities finance corporation organized and existing under the laws of the State of Texas, created and acting on behalf of Tarrant County, Texas; and

WHEREAS, the Issuer is authorized under the Cultural Education Facilities Finance Corporation Act, Article 1528m, V.A.T.C.S., as amended (the "Act"), to enter into loan agreements and to issue its bonds and loan the proceeds thereof to provide for the financing and refinancing of the acquisition, construction or installation of health facilities; and

WHEREAS, the Obligor has requested the Issuer to issue its bonds in an amount sufficient to provide for the refinancing of a portion of the cost of acquiring, constructing, and equipping certain health facilities for the Obligor through the exchange of such bonds for bonds previously issued by the Issuer for such purpose; and

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants hereinafter contained, the parties hereto formally covenant, agree and bind themselves as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.  Except as otherwise provided herein, the terms used in this Agreement shall have the meanings given such terms in the Master Indenture.  In addition to such terms defined in the Master Indenture, the following terms, except where the context indicates otherwise, shall have the respective meanings set forth below.

"Account" means any account established within a Fund.

"Act" means the Cultural Education Facilities Finance Corporation Act, Article 1528m, V.A.T.C.S., as amended from time to time.

"Administration Expenses" means the reasonable and necessary fees and expenses incurred by the Issuer pursuant to this Agreement and the Bond Indenture.

"Affiliate" means, with respect to any Person, any Person that directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such first Person.  A Person shall be deemed to control another Person for the purposes of this definition if

such Person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of the second Person, whether through the ownership of voting securities, common directors, trustees or officers, by contract or otherwise.

"Aggregate Principal Amount" means the outstanding principal amount including, in the case of a security sold at a discount to the purchaser thereof the accreted value of such discount calculated in accordance with the documents authorizing such security, or if not so defined, generally accepted accounting principles.

"Agreement" or "Loan Agreement" means this Loan Agreement and any amendments and supplements hereto made in conformity herewith and with the Bond Indenture.

"Authorized Denominations" means the denomination of $5,000 or any integral multiple thereof.

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas.

"Bankruptcy Court Order" means the order of the Bankruptcy Court approving the Plan, including the Exchange of the Series 2019 Bonds for the outstanding Series 2009 Bonds.

"Board" or "Board of Directors" means the governing body of the Issuer.

"Bond Counsel" means Gilmore & Bell, P.C., and its successors or such other nationally recognized bond counsel as may be selected by the Obligor with the approval of the Issuer and the Bond Trustee, which approval may not be unreasonably withheld.

"Bond Fund" means the Bond Fund created in Section 3.02 of the Bond Indenture.

"Bond Indenture" means the Indenture of Trust of even date herewith relating to the Bonds between the Issuer and the Bond Trustee, including any indentures supplemental thereto made in conformity therewith.

"Bondholder" or "owner" of the Bonds mean the registered owner of any fully registered Bond.

"Bonds" means the Series 2019 Bonds.

"Bond Trustee" means UMB Bank, National Association, being the registrar, a paying agent and the trustee under the Bond Indenture, or any successor corporate trustee.

"Business Day" means any day other than (i) a Saturday, a Sunday or, in the City of New York, New York, or in Minneapolis, Minnesota (or, if different, in the city in which the designated corporate trust office of the Bond Trustee is located), a day on which banking institutions are authorized or required by law or executive order to close, or (ii) a day on which the New York Stock Exchange is closed.

"Certified Resolution" means a resolution duly adopted by the Board of Directors, certified by the Secretary.

"Code" means the Internal Revenue Code of 1986, as amended.

"Delivery Date" means the date the Bonds are delivered to the Securities Depository for crediting to the beneficial owners of the Series 2009 Bonds in accordance with the Plan in Exchange for the cancellation of the Series 2009 Bonds.

"Effective Date" means the date set forth in the Bankruptcy Court Order for the effective date of the Plan, including the Exchange of the Series 2019 Bonds for the outstanding Series 2009 Bonds

"Event of Default" means those defaults specified in Section 8.01 of the Bond Indenture.

"Funds" means the Bond Fund and the Reserve Fund]

"Government Obligations" means direct obligations of, or obligations the principal of and interest on which are guaranteed by, the United States of America, including (in the case of direct obligations of the United States of America) evidences of direct ownership of proportionate interests in future interest or principal payments of such obligations.  Investments in such proportionate interests must be limited to circumstances wherein (a) a bank or trust company acts as custodian and holds the underlying Government Obligations; (b) the owner of the investment is the real party in interest and has the right to proceed directly and individually against the Obligor of the underlying Government Obligations; and (c) the underlying Government Obligations are held in a special account, segregated from the custodian's general assets, and are not available to satisfy any claim of the custodian, any person claiming through the custodian, or any person to whom the custodian may be obligated.

"Health Facility Act" means the Health Facilities Development Act, Chapter 221, Texas Health and Safety Code, as amended from time to time.

"Immediate Notice" shall mean notice by telephone, telegram, telex, telecopier or other telecommunication device, receipt of which has been confirmed by the recipient, to such phone numbers or addresses as are specified in Section 11.09 of the Bond Indenture or such other phone number or address as the addressee shall have directed in writing, promptly followed by written notice by overnight carrier or delivery service, expenses prepaid, to such addresses.

"Interest Account" means the account of such name in the Bond Fund created in Section 3.02 of the Bond Indenture.

"Interest Payment Date" means, each [May 1] and [November 1], commencing [May 1], 2020, or, if such day is not a business day, the immediately succeeding business day in the years during which the Series 2019 Bonds are Outstanding under the provisions of the Bond Indenture.

"Issuer" means Tarrant County Cultural Education Facilities Finance Corporation, or any public corporation succeeding to its rights and obligations under this Agreement.

"Issuer Representative" means the President of the Issuer or such other person at the time, and from time to time, designated by written certificate of the Issuer furnished to the Obligor and the Bond Trustee containing the specimen signature of such person and signed on behalf of the Issuer by its President. Such certificate shall designate an alternate or alternates, any of whom may act at any time as Issuer Representative.

"Master Indenture" means the Amended and Restated Master Trust Indenture, Deed of Trust and Security Agreement dated as of [November 1], 2019, between the Obligor and the Master Trustee, including any supplements or amendments thereto and modifications thereof.

"Master Trustee" means UMB Bank, National Association, as successor master trustee under the Master Indenture, and its successors as master trustee thereunder.

"Note" means the Series 2019 Note.

"Obligated Group Members" has the meaning given such term in the Master Indenture.

"Obligated Group Representative" means (i) Tarrant County Senior Living Center Inc., a nonprofit corporation incorporated under the laws of the State of Texas, and (ii) any surviving, resulting or transferee corporation.

"Obligor" means Tarrant County Senior Living Center Inc., a Texas nonprofit corporation, and any and all successors thereto in accordance with the Master Indenture.

"Opinion of Bond Counsel" shall mean an opinion in writing signed by legal counsel selected by the Obligor and reasonably acceptable to the Issuer and the Bond Trustee who shall be nationally recognized in matters pertaining to the validity of obligations of governmental issuers and the exemption from federal income taxation of interest on such obligations.

"Opinion of Counsel" means an opinion in writing signed by an attorney or firm of attorneys, acceptable to the Bond Trustee, who may be counsel to the Obligor or other counsel.

"Outstanding" means, as of any particular time, all Bonds which have been duly authenticated and delivered by the Bond Trustee under the Bond Indenture, except:

(a)     Bonds theretofore cancelled by the Bond Trustee or delivered to the Bond Trustee for cancellation after purchase in the open market or because of payment at or redemption prior to maturity;

(b)     Bonds for the payment or redemption of which cash funds (or Government Obligations to the extent permitted in Section 7.01 of the Bond Indenture) shall have been theretofore irrevocably deposited with the Bond Trustee (whether upon or prior to the maturity or redemption date of any such Bonds); provided that if such Bonds are to be redeemed prior to the maturity thereof, notice of such redemption shall have been given or arrangements satisfactory to the Bond Trustee shall have been made therefor, or waiver of such notice satisfactory in form to the Bond Trustee, shall have been filed with the Bond Trustee and provided further that prior to such payment or redemption, the Bonds to be paid or redeemed shall be deemed to be Outstanding for the purpose of transfers and exchanges under Section 2.05 of the Bond Indenture; and

(c)     Bonds in lieu of which other Bonds have been authenticated under Section 2.06 of the Bond Indenture.

"Paying Agent" means any bank or trust company, including the Bond Trustee, designated pursuant to the Bond Indenture to serve as a paying agency or place of payment for the Bonds, and any successor designated pursuant to the Bond Indenture.

"Payment Office" with respect to the Bond Trustee or other Paying Agent means the office maintained by the Bond Trustee or any affiliate of the Bond Trustee or of another Paying Agent for the payment of interest and principal on the Bonds.

"Permitted Investments" has the meaning assigned to such term in the Master Indenture.

"Person" means an individual, association, unincorporated organization, corporation, limited liability company, partnership, joint venture, business trust or a government or an agency or a political subdivision thereof, or any other entity.

"Plan" means the plan of reorganization filed by the Obligor in the Bankruptcy Court on _____, 2019, as amended.

"Principal Account" means the account of such name in the Bond Fund created in Section 3.02 of the Bond Indenture.

"Project" means the Project described in Exhibit A hereto.

"Rebate Fund" means that special fund established in the name of the Issuer with the Bond Trustee pursuant to Section 3.16 of the Bond Indenture.

"Registered Owner" or "Owners" means the person or persons in whose name or names a Bond shall be registered on books of the Issuer kept by the Bond Trustee for that purpose in accordance with the terms of the Bond Indenture.

"Regular Record Date" means the  [1st day of the month of][15th day of the month preceding] each regularly scheduled Interest Payment Date.

"Regulations" means the applicable proposed, temporary or final Income Tax Regulations promulgated under the Code or, to the extent applicable to the Code, under the Internal Revenue Code of 1986, as such regulations may be amended or supplemented from time to time.

"Reserve Fund" means the Reserve Fund created in Section 3.08 of the Bond Indenture. "Reserve Fund Obligations" means cash and Permitted Investments.

"Reserve Fund Requirement" means an amount equal to $_____ [maximum annual debt service on the Series 2019 Bonds].

"Responsible Officer" when used with respect to the Bond Trustee means an officer in the corporate trust department of the Bond Trustee having direct responsibility for administration of the Bond Indenture.

"Securities Depository" means The Depository Trust Company, New York, New York, and any successor thereto as permitted by the Bond Indenture.

"Series 2009 Bonds" means the Series 2009A Bonds and the Series 2009B Bonds.

"Series 2009 Debt Service Reserve Fund" means the "Reserve Fund" established under the bond indenture for the Series 2009 Bonds.

"Series 2009A Bonds" means Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Series 2009A in the original principal amount of $100,275,000.

"Series 2009B Bonds" means Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Series 2009B, Accelerated Redemption Reset Option Securities (ARROS) in the original principal amount of $10,000,000.

"Series 2019 Bonds" means the Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Series 2019.

"Series 2019 Note" means the Note issued by the Obligor pursuant to the Supplemental Indenture relating to the Series 2019 Bonds.

"Special Record Date" means a special date fixed to determine the names and addresses of owners of Series 2019 Bonds for purposes of paying interest on a special interest payment date for the payment of defaulted interest, all as further provided in Section 2.03 of the Bond Indenture.

"Supplemental Indenture" means the Supplemental Indenture Number 2, dated as of [November 1], 2019, by the Obligor executed and delivered to the Master Trustee, supplemental to the Master Indenture, providing for the issuance of the Series 2019 Note.

"Tax Agreement" means the Tax Compliance Agreement dated as of [November 1], 2019, among the Issuer, the Obligor and the Bond Trustee, as from time to time amended in accordance with the provisions thereof.

"Trust Estate" means the property pledged and assigned to the Bond Trustee pursuant to the granting clauses of the Bond Indenture.

Certain additional terms are defined in Section 7.5 hereof.

## ARTICLE II

## REPRESENTATIONS

Section 2.1    <u>Representations by the Issuer</u>.  The Issuer represents that:

(a)     The Issuer is a nonstock nonprofit cultural education facilities finance corporation duly organized and validly existing under and pursuant to the laws of the State of Texas and has full power and authority under the laws of the State of Texas (including, in particular, the Act) to enter into the transactions contemplated by this Agreement and to carry out its obligations hereunder. By proper corporate action the Issuer has duly authorized the execution and delivery of this Agreement and the Bond Indenture and the performance of its obligations under this Agreement and the Bond Indenture.

(b)     To the best of the Issuer's knowledge, neither the execution and delivery of the Series 2019 Bonds, the Bond Indenture or this Agreement, the consummation of the transactions contemplated thereby and hereby nor the fulfillment of or compliance with the terms and conditions or provisions of the Series 2019 Bonds, the Bond Indenture or this Agreement conflict with or result in the breach of any of the terms, conditions or provisions of any constitutional provision or statute of the State of Texas or the articles of incorporation or bylaws of the Issuer or of any agreement or instrument or judgment, order or decree of which the Issuer has notice that it is a party or constitute a default under any of the foregoing or result in the creation or imposition of any prohibited lien, charge or encumbrance of any nature upon any property or assets of the Issuer under the terms of any instrument or agreement.

(c)     To refinance the Series 2009 Bonds through the Exchange in accordance with the Plan and the Bankruptcy Court Order, which Series 2009 Bonds financed a portion of the costs of the Project, funded a debt service reserve fund for the Series 2009 Bonds, and paid a portion of the costs of issuance of the Series 2009 Bonds,, the Issuer proposes to issue the Series 2019 Bonds. The Series 2019 Bonds shall be in the principal amount, mature, bear interest, be subject to redemption prior to maturity, be secured, and have such other terms and conditions as are set forth in the Bond Indenture.

(d)     The Series 2019 Bonds are to be issued under and secured by the Bond Indenture pursuant to which the Issuer's interest in this Agreement and in the Series 2019 Note, and the revenues and receipts derived by the Issuer from the Series 2019 Note, will be pledged and assigned to the Bond Trustee as security for payment of the principal of, premium, if any, and interest on the Series 2019 Bonds.

(e)     The Obligor has represented to the Issuer that the Project constitutes a "health facility" within the meaning of the Health Facility Act. The Project will promote the health and general welfare of the residents of the City of Fort Worth, Tarrant County, Texas by improving the adequacy and accessibility of health care within the State of Texas.

(f)     The issuance of the Series 2019 Bonds and the execution of this Agreement and the Bond Indenture have been approved by the Issuer at a duly constituted meeting.

(g)     Except as otherwise permitted by this Agreement, the Issuer covenants that it has not and will not pledge the income and revenues derived from this Agreement other than to secure the Bonds.

Section 2.2    <u>Representations by the Obligor</u>.  The Obligor represents that:

7

(a)     The Obligor is a nonprofit corporation duly incorporated and in good standing under the laws of the State of Texas, has power to enter into this Agreement, the Master Indenture, the Supplemental Indenture and the Series 2019 Note, and by proper corporate action has duly authorized the execution and delivery of this Agreement, the Master Indenture, the Supplemental Indenture and the Series 2019 Note.

(b)     Neither the execution and delivery of this Agreement, the Master Indenture, the Supplemental Indenture and the Series 2019 Note, the consummation of the transactions contemplated hereby and thereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement, the Master Indenture, the Supplemental Indenture or the Series 2019 Note, conflict with or result in a breach of any of the terms, conditions or provisions of any corporate restriction or any agreement or instrument to which the Obligor is now a party or by which it is bound or constitute a default under any of the foregoing.

(c)     The Obligor intends to operate or to cause the Project to be operated as a "health facility" within the meaning of the Health Facility Act to the expiration or sooner termination of this Agreement as provided herein for the purpose of providing health care services as provided in the Health Facility Act.

(d)     No event of default or any event which, with the giving of notice or the lapse of time, or both, would constitute an event of default under the Master Indenture, has occurred and is continuing as of the Effective Date.

(e)     Taking into account the issue price (as defined in Section 1273 of the Code) of the stated maturity of the Bonds, the average term of the Bonds of such issue does not and will not exceed 120% of the average reasonably expected economic life of the Project to be refinanced by the Bonds, weighted in proportion to the respective cost of each item comprising the property the cost of which has been or will be financed, directly or indirectly, with the Net Proceeds of the Bonds. For purposes of the preceding sentence, the reasonably expected economic life of property shall be determined as of the later of (A) the date of delivery for the Bonds, or (B) the date on which such property was or is placed in service (or expected to be placed in service). In addition, land shall not be taken into account in determining the reasonably expected economic life of property, except that, in the event 25% or more of the collective Net Proceeds of the Bonds, directly or indirectly, have been expended for land, such land shall be treated as having an economic life of 30 years and shall be taken into account for purposes of determining the reasonably expected economic life of such property.

(f)     To the best of the Obligor's knowledge, information and belief, all of the documents, instruments and written information supplied by or on behalf of the Obligor, which have been reasonably relied upon by Bond Counsel in rendering their opinion with respect to the exclusion from gross income of the interest on the Bonds for federal income tax purposes or counsel to the Obligor in rendering its opinion with respect to the status of the Obligor under Section 501(c)(3) of the Code, are true and correct in all material respects, do not contain any untrue statement of a material fact and do not omit to state any material fact necessary to be stated therein to make the information provided therein, in light of the circumstances under which such information was provided, not misleading.

## ARTICLE III

## TERM OF AGREEMENT

Section 3.1     Term of this Agreement.  Subject to Section 11.12 herein, this Agreement shall remain in full force and effect from the date of delivery hereof until such time as all of the Bonds shall have been fully paid or provision made for such payment pursuant to the Bond Indenture and all reasonable and necessary fees and expenses of the Bond Trustee and the Issuer accrued and to accrue through final payment of the Bonds and all liabilities of the Obligor with respect to the Bonds accrued and to accrue through final payment of the Bonds have been paid.

## ARTICLE IV

## ISSUANCE OF THE BONDS

Section 4.1     Agreement to Issue Bonds.  On the Effective Date the Issuer will issue and cause to be delivered as provided herein the Series 2019 Bonds and cooperate with the Obligor in directing the bond trustee for the Series 2009 Bonds to transfer any monies in the reserve fund for the Series 2009 Bonds to the Reserve Fund for the Series 2019 Bonds, as required by Section 4.24 of the Master Indenture.

Section 4.2     Modifications of the Projects.  The Obligor hereby covenants and agrees that no changes or modifications, or substitutions, deletions, or additions shall be made with respect to the Project if such change disqualifies such Project under the Act.

Section 4.3     Covenants Regarding Tax Exemption.  Concurrently with the execution and delivery of this Loan Agreement, the Obligor, the Issuer, and the Bond Trustee are executing and delivering a Tax Agreement relating to the exclusion of interest on the Series 2019 Bonds for federal income tax purposes.  The Obligor covenants and agrees that it will not take any action or permit any action to be taken that would adversely affect the exclusion from gross income for federal income tax purposes of the interest on the Series 2019 Bonds and will take whatever action, or refrain from whatever action, necessary to comply with the requirements of the Code to maintain the exclusion from gross income for federal income tax purposes of the interest on the Series 2019 Bonds, and the Obligor shall comply with the Tax Agreement and will pay or provide for payment to the United States Government or the Bond Trustee, all rebate payments required under Section 148(f) of the Code and the Tax Agreement, to the extent such amounts are not available to the Bond Trustee in the Rebate Fund held under the Bond Indenture.  This covenant shall survive payment in full or defeasance of the Series 2019 Bonds.

Section 4.4     [Reserved]

Section 4.5     Representations and Warranties as to Tax Exempt Status of Obligor.  The Obligor hereby represents and warrants as follows:

(a)     the Obligor is an organization exempt from federal income taxation under Section 501(a) of the Code by virtue of being described in Section 501(c)(3) of the Code;

9

(b)        the purposes, character, activities and methods of operation of the Obligor have not changed materially since its organization and are not materially different from the purposes, character, activities and methods of operation at the time of its receipt of a determination by the Internal Revenue Service that it is an organization described in Section 501(c)(3) of the Code (the "Determination");

(c)        the Obligor has not diverted a substantial part of its corpus or income for a purpose or purposes other than the purpose or purposes for which it is organized or disclosed to the Internal Revenue Service in connection with its Determination;

(d)        the Obligor has not operated since its organization in a manner that would result in it being classified as an "action" organization within the meaning of section 1.501(c)(3)-1(c)(3) of the Regulations including, but not limited to, promoting or attempting to influence legislation by propaganda or otherwise as a substantial part of its activities;

(e)        with the exception of the payment of compensation (and the payment or reimbursement of expenses) which is not excessive and is for personal services which are reasonable and necessary to carrying out the purposes of the Obligor, no person controlled by any such individual or individuals nor any person having a personal or private interest in the activities of the Obligor has acquired or received, directly or indirectly, any income or assets, regardless of form, of the Obligor during the current Fiscal Year and the period, if any, preceding the current Fiscal Year, other than as reported to the Internal Revenue Service by the Obligor;

(f)        the Obligor is not a "private foundation" within the meaning of Section 509(a) of the Code;

(g)        the Obligor has not received any indication or notice whatsoever to the effect that its exemption under Section 501(a) of the Code as an organization described in Section 501(c)(3) of the Code has been revoked or modified, or that the Internal Revenue Service is considering revoking or modifying such exemption, and such exemption is still in full force and effect;

(h)        the Obligor has filed with the Internal Revenue Service all requests for determination, reports and returns required to be filed by it and such requests for determination, reports and returns have not omitted or misstated any material fact and has notified the Internal Revenue Service of any changes in its organization and operation since the date of its Determination;

(i)        the Obligor has not devoted more than an insubstantial part of its activities in furtherance of a purpose other than an exempt purpose within the meaning of Section 501(c)(3) of the Code;

(j)        the Obligor has not taken any action, nor does it know of any action that any other person has taken, nor does it know of the existence of any condition, which would cause the Obligor to lose its exemption from taxation under Section 501(a) of the Code or cause the interest on the Bonds to become taxable to the recipient thereof because such interest is not excludable from the gross income of such recipient for federal income tax purposes under Section 103(a) of the Code; and

(k)    the Obligor shall direct the bond trustee for the Series 2009 Bonds to transfer any monies in the reserve fund for the Series 2009 Bonds to the Reserve Fund for the Series 2019 Bonds and to make the other transfers of cash and investments, if any, required by Section 4.24 of the Master Indenture

Section 4.6    Disposition of the Project.    The Obligor covenants that the property constituting the Project will not be sold or otherwise disposed in a transaction resulting in the receipt by the Obligor of cash or other compensation, unless the Obligor obtains an Opinion of Bond Counsel that such sale or other disposition will not adversely affect the tax-exempt status of the Bonds.

<div align="center">

**ARTICLE V**

**LOAN OF BOND PROCEEDS; NOTE; PROVISION FOR PAYMENT**

</div>

Section 5.1    Loan of Bond Proceeds.    The Obligor hereby agrees that the issuance of the Series 2019 Bonds shall be deemed to be a loan from the Issuer of an amount equal to the principal amount of the Series 2019 Bonds to refinance the Series 2009 Bonds. The Obligor agrees to repay the loan pursuant to the provisions set forth in Section 5.2 hereof.

Section 5.2    Repayment of Loan.    The Obligor shall make the following payments in repayment of the loan of the proceeds of the Series 2019 Bonds by the Issuer to the Obligor and to provide for payment of the principal of, redemption premium, if any, and interest on the Series 2019 Bonds, directly to the Bond Trustee, in immediately available funds, for deposit in the Bond Fund, on the following dates, and otherwise as set out below:

(a)    *Bond Fund-Interest:* On or before 11:00 a.m., central time, on the 15th day of each month, commencing [_____ 15, 2020] an amount equal to one-sixth of the amount of interest to become due on the Series 2019 Bonds on the next Interest Payment Date (or, if less, the amount which, together with other funds then available for such purpose in the Bond Fund, shall equal the interest to become due on the Series 2019 Bonds on the next Interest Payment Date), and on or before 11:00 a.m., central time, on the Business Day prior to any date that any payment of interest is required to be made in respect of the Series 2019 Bonds pursuant to the Bond Indenture, an amount which, together with any other moneys available for such purpose in the Bond Fund, is not less than the interest is due.

(b)    *Bond Fund-Principal:* On or before 11:00 a.m., central time, on the 15th day of each month, commencing [_____ 15, 2024] an amount equal to one-twelfth of the amount of principal to become due on the Series 2019 Bonds on the next principal payment date, whether at maturity or upon mandatory sinking fund redemption (or, if less, the amount which, together with other funds then available for such purpose in the Bond Fund, shall equal the principal to become due on the Series 2019 Bonds on such next principal payment date), and on or before 11:00 a.m., central time, on the Business Day prior to the date on which principal on the Series 2019 Bonds is due (including without limitation, as a result of acceleration), an amount which, together with any other moneys available for such purpose in the Bond Fund, is not less than the principal due on the Series 2019 Bonds on such principal payment date.

(c)     *Bond Fund-Redemption:* On or before the date required by this Loan Agreement or the Bond Indenture, the amount required to redeem Series 2019 Bonds then Outstanding if the Obligor exercises its right to redeem Series 2019 Bonds under any provision of the Bond Indenture or if any Series 2019 Bonds are required to be redeemed (other than pursuant to mandatory sinking fund redemption provisions) under any provision of the Bond Indenture.

If the Obligor fails to make any of the payments required in this Section, the item or installment so in default shall continue as an obligation of the Obligor until the amount in default shall have been fully paid, and the Obligor agrees to pay the same with interest thereon from the date when such payment was due until paid in full, at the rate of interest borne by the Series 2019 Bonds.

In the event that the Obligor, following payment of the applicable month's operating expenses, lacks funds (other than amounts in the Liquidity Support Account or available under the Liquidity Support Agreement) for the payment of any monthly payment described under subsection (a) or (b) above, the Obligor shall not be deemed in default of its obligation to make the applicable monthly loan payment to the Bond Fund if the applicable amount (the "Monthly Deficit"), together with any prior Monthly Deficit that remains unfunded in the Bond Fund, is less than amounts available for transfer to the Bond Fund in the Liquidity Support Account held by the Master Trustee plus the then remaining Unfunded Liquidity Support obligation under the Liquidity Support Agreement, provided that the existence of any Monthly Deficit shall constitute a default if the amount of all Monthly Deficits occurring prior to the fourth Business Day preceding an Interest Payment Date is not funded to the Bond Fund from sources other than the Debt Service Reserve Fund on the fourth Business Day preceding the applicable Interest Payment Date or, if earlier, if amounts available for transfer to the Bond Fund in the Liquidity Support Account held by the Master Trustee plus the then remaining Unfunded Liquidity Support obligation under the Liquidity Support Agreement are reduced to an aggregate amount that is less than such unfunded Monthly Deficits. The amount of any unfunded Monthly Deficits shall be deducted from amounts available in the Liquidity Support Account or under the Liquidity Support Agreement for purposes of any Days Cash on Hand calculation made as of a date such Monthly Deficits are in existence.

Section 5.3     Credits. Any amount in either account of the Bond Fund at the close of business of the Bond Trustee on the day immediately preceding any payment date on the Series 2019 Note in excess of the aggregate amount then required to be contained in such account of the Bond Fund pursuant to Section 5.2 hereof shall be credited pro rata against the payments due by the Obligor on such next succeeding principal or interest payment date on the Series 2019 Note.

In the event that all of the Bonds then Outstanding are called for redemption, any amounts contained in the Reserve Fund and the Bond Fund at the close of business of the Bond Trustee on the day immediately preceding such redemption date shall be credited against the payments due by the Obligor on the Series 2019 Note, as provided below.

The principal amount of any Series 2019 Bonds to be applied by the Bond Trustee as a credit against any sinking fund payment pursuant to Section 5.02 of the Bond Indenture shall be credited against the obligation of the Obligor with respect to payment of installments of principal of the Series 2019 Note as described in the Supplemental Indenture.

The cancellation by the Bond Trustee of any Series 2019 Bonds purchased by the Obligor or of any Series 2019 Bonds redeemed or purchased by the Issuer through funds other than funds received on the Series 2019 Note shall constitute payment of a principal amount of the Series 2019

12

Note equal to the principal amount of the Series 2019 Bonds so cancelled. Upon receipt of written notice from the Bond Trustee of such cancellation, the Master Trustee shall at the request of the Obligor endorse on the Series 2019 Note such payment of such principal amount thereof.

Section 5.4    Note. Concurrently with the sale and delivery by the Issuer of the Series 2019 Bonds, the Obligor shall execute and deliver the Series 2019 Note substantially in the form set forth in the Supplemental Indenture.

Section 5.5    Payment of Bond Trustee's and Paying Agent's Fees and Expenses. The Obligor agrees to pay the reasonable and necessary fees and expenses (including attorney's fees) of the Bond Trustee and any Paying Agents as and when the same become due, upon submission by the Bond Trustee or any Paying Agent of a statement therefor.

Section 5.6    Reserve Fund. (a) In the event any moneys in the Reserve Fund are transferred to the Bond Trustee for deposit to the Bond Fund pursuant to Section 3.10 or 3.11 of the Bond Indenture, except if such moneys are transferred due to the redemption of all Bonds, the Obligor agrees to deposit within ten Business Days after notice from the Bond Trustee of such withdrawal additional Reserve Fund Obligations in an amount sufficient to satisfy the Reserve Fund Requirement.

(a)    In the event the value of the Reserve Fund Obligations (as determined pursuant to the statement of the Bond Trustee furnished in accordance with Section 6.03 of the Bond Indenture) on deposit in the Reserve Fund is less than the 95% of the Reserve Fund Requirement as a result of a reduction in the value of the Reserve Fund Obligations, the Obligor agrees to deposit additional Reserve Fund Obligations in an amount sufficient to satisfy the Reserve Fund Requirement or, if less, the amount in the reduction in value of the Reserve Fund Obligations, such amount to be deposited in no more than three equal consecutive monthly installments, the first installment to be made within 30 days of such receipt of written notice from the Bond Trustee of a deficiency.

Section 5.7    Payment of Administration Expenses. In consideration of the agreement of the Issuer to issue the Bonds and loan the proceeds thereof to provide financing for the Project, the Obligor hereby agrees to pay any and all costs paid or incurred by the Issuer in connection with the financing or refinancing of the Project, whenever incurred, including out of pocket expenses and compensation in connection with the issuance of Bonds, including, without limitation, reasonable sums for reimbursement of the fees and expenses incurred by the Issuer's financial advisors, consultants and legal counsel in connection with such Project and the issuance of the Bonds.

Section 5.8    Payees of Payments. The payments on the Series 2019 Note pursuant to Section 5.2 hereof shall be paid in funds immediately available at the Payment Office of the Bond Trustee, directly to the Bond Trustee for the account of the Issuer and shall be deposited into the appropriate account of the Bond Fund. The amounts provided for in Section 5.6 hereof shall be paid to the Bond Trustee for the account of the Issuer and shall be deposited into the Reserve Fund. The payments to be made to the Bond Trustee and the Paying Agent under Section 5.5 hereof shall be paid directly to the Bond Trustee and the Paying Agent for their own use. The payments for

Administration Expenses under Section 5.7 hereof shall be paid directly to the Issuer for its own use.

Section 5.9    Obligations of Obligor Hereunder Unconditional. The obligations of the Obligor to make the payments required in Section 5.2 hereof shall be absolute and unconditional. The Obligor will not suspend or discontinue, or permit the suspension or discontinuance of, any payments provided for in Section 5.2 hereof for any cause including, without limiting the generality of the foregoing, any acts or circumstances that may constitute failure of consideration, eviction or constructive eviction, destruction of or damage to the Project, commercial frustration of purpose, any change in the tax or other laws or administrative rulings of or administrative actions by the United States of America or the State of Texas or any political subdivision of either, or any failure of the Issuer to perform and observe any agreement, whether express or implied, or any duty, liability, or obligation arising out of or connected with this Agreement, whether express or implied. Nothing contained in this Section shall be construed to release the Issuer from the performance of any agreements on its part herein contained; and in the event the Issuer shall fail to perform any such agreement, the Obligor may institute such action against the Issuer as the Obligor may deem necessary to compel performance, provided that no such action shall violate the agreements on the part of the Obligor contained herein and the Issuer shall not be required to pay any costs, expenses, damages or any amounts of whatever nature except for amounts received pursuant to this Agreement. Nothing herein shall be construed to impair the Obligor's right to institute an independent action for any claim that it may have against the Issuer, the Bond Trustee, any Bondholder or any other third party. The Obligor may, however, at its own cost and expense and in its own name or in the name of the Issuer, prosecute or defend any action or proceedings or take any other action involving third persons which the Obligor deems reasonably necessary in order to secure or protect this right of possession, occupancy, and use hereunder, and in such event the Issuer hereby agrees to cooperate fully with the Obligor.

## ARTICLE VI

## MAINTENANCE AND INSURANCE

Section 6.1    Maintenance and Modifications of Projects by Obligor. The Obligor may, at its own expense, cause to be made from time to time any additions, modifications or improvements to the Project provided such additions, modifications or improvements do not impair the character of the Project as a "health facility" within the meaning of the Health Facility Act or impair the extent of the exemption of interest on the Bonds from Federal income taxation.

Section 6.2    Insurance. Throughout the term of this Agreement, the Obligor will, at its own expense, provide or cause to be provided insurance against loss or damage to the Project in accordance with the terms of the Master Indenture.

## ARTICLE VII

## SPECIAL COVENANTS

Section 7.1    No Warranty of Merchantability, Condition or Suitability by the Issuer. The Issuer makes no warranty, either express or implied, as to the condition of the Project or that the

Project will be suitable for the Obligor's purposes or needs. Without limiting the effect of the preceding sentence, it is expressly agreed that in connection with each sale or conveyance pursuant to this Agreement (i) the Issuer makes NO WARRANTY OF MERCHANTABILITY and (ii) THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION CONTAINED HEREIN.

Section 7.2    <u>Right of Access to the Project</u>. The Obligor agrees that the Issuer, the Bond Trustee, and any of their duly authorized agents shall have the right at all reasonable times upon reasonable notice to the Obligor to examine and inspect the Project to determine that the Obligor is in compliance with the terms and conditions of this Agreement; provided that any such inspection will be conducted in a manner that will minimize any intrusion on the operations of the Project.

Section 7.3    <u>Nonsectarian Use</u>. The Obligor agrees that no proceeds of the Bonds will be used to construct, acquire or install any portion of the Project which is intended to be used or which are being used for sectarian purposes.

Section 7.4    <u>Further Assurances</u>. The Issuer and the Obligor agree that they will, from time to time, execute, acknowledge, and deliver, or cause to be executed, acknowledged, and delivered, such supplements hereto and such further instruments as may reasonably be required for carrying out the intention of or facilitating the performance of this Agreement.

Section 7.5    <u>INDEMNIFICATION</u>. (a) THE OBLIGOR AGREES THAT IT WILL AT ALL TIMES INDEMNIFY AND HOLD HARMLESS EACH OF THE INDEMNIFIED PARTIES AGAINST ANY AND ALL LOSSES OR CLAIMS, INCLUDING LOSSES AS A RESULT OF THE NEGLIGENT ACTS OR OMISSIONS OF ANY INDEMNIFIED PARTY, OTHER THAN LOSSES RESULTING FROM FRAUD, WILLFUL MISCONDUCT OR THEFT ON THE PART OF THE INDEMNIFIED PARTY CLAIMING INDEMNIFICATION. THE OBLIGOR ALSO SHALL INDEMNIFY THE BOND TRUSTEE FOR, AND DEFEND AND HOLD IT HARMLESS AGAINST, ANY LOSS, LIABILITY, CLAIMS OR DEMANDS OR EXPENSES (INCLUDING ATTORNEYS FEES) INCURRED WITHOUT NEGLIGENCE OR BAD FAITH ON ITS PART, ARISING OUT OF OR IN CONNECTION WITH THE ACCEPTANCE OR ADMINISTRATION OF THE TRUST CREATED UNDER THE BOND INDENTURE OR THE PERFORMANCE OF ITS DUTIES UNDER

THE BOND INDENTURE, INCLUDING THE COSTS AND EXPENSES OF DEFENDING ITSELF AGAINST ANY CLAIM OR LIABILITY IN CONNECTION WITH THE EXERCISE OR PERFORMANCE OF ANY OF ITS POWERS OR DUTIES UNDER THE BOND INDENTURE. THE BOND TRUSTEE MAY ENFORCE ITS RIGHTS UNDER THE PRECEDING SENTENCE AS A THIRD PARTY BENEFICIARY OF THIS AGREEMENT.

(a)    NONE OF THE INDEMNIFIED PARTIES SHALL BE LIABLE TO THE OBLIGOR FOR, AND THE OBLIGOR HEREBY RELEASES EACH OF THEM FROM, ALL LIABILITY TO THE OBLIGOR FOR, ALL INJURIES, DAMAGES OR DESTRUCTION TO ALL OR ANY PART OF ANY PROPERTY OWNED OR CLAIMED BY THE OBLIGOR THAT DIRECTLY OR INDIRECTLY RESULT FROM, ARISE OUT OF OR RELATE TO THE DESIGN, CONSTRUCTION, OPERATION, USE, OCCUPANCY, MAINTENANCE OR

OWNERSHIP OF THE PROJECT OR ANY PART THEREOF, EVEN IF SUCH INJURIES, DAMAGES OR DESTRUCTION DIRECTLY OR INDIRECTLY RESULT FROM, ARISE OUT OF OR RELATE TO, IN WHOLE OR IN PART, ONE OR MORE ACTS OR OMISSIONS, INCLUDING ACTS OR OMISSIONS CONSTITUTING NEGLIGENCE ON THE PART OF ANY INDEMNIFIED PARTY (BUT NOT INCLUDING ACTS OR OMISSIONS CONSTITUTING FRAUD, WILLFUL MISCONDUCT OR THEFT ON THE PART OF THE INDEMNIFIED PARTY CLAIMING RELEASE) IN CONNECTION WITH THE ISSUANCE OF ANY SERIES OF THE BONDS OR IN CONNECTION WITH THE PROJECT.

(b)     Each Indemnified Person, as appropriate, shall reimburse the Obligor for payments made by the Obligor pursuant to this Section to the extent of any proceeds, net of all expenses of collection, actually received by it from any other source (but not from the proceeds of any claim against any other Indemnified Person) with respect to any Loss to the extent necessary to prevent a recovery of more than the Loss by such Indemnified Person with respect to such Loss. At the request and expense of the Obligor, each Indemnified Person shall claim or prosecute any such rights of recovery from other sources (other than any claim against another Indemnified Person) and such Indemnified Person shall assign its rights to such rights of recovery from other sources (other than any claim against another Indemnified Person), to the extent of such required reimbursement, to the Obligor.

(c)     In case any Claim shall be brought or, to the knowledge of any Indemnified Person, threatened against any Indemnified Person in respect of which indemnity may be sought against the Obligor, such Indemnified Person promptly shall notify the Obligor in writing; provided, however, that any failure so to notify shall not relieve the Obligor of its obligations under this Section.

(d)     The Obligor shall have the right to assume the investigation and defense of all Claims, including the employment of counsel and the payment of all expenses. Each Indemnified Person shall have the right to employ separate counsel in any such action and participate in the investigation and defense thereof, but the fees and expenses of such counsel shall be paid by such Indemnified Person unless (i) the employment of such counsel has been specifically authorized by the Obligor, in writing, (ii) the Obligor has failed after receipt of notice of such Claim to assume the defense and to employ counsel, or (iii) the named parties to any such action (including any impleaded parties) include both an Indemnified Person and the Obligor, and the Indemnified Person shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or additional to those available to the Obligor (in which case, if such Indemnified Person notifies the Obligor in writing that it elects to employ separate counsel at the Obligor's expense, the Obligor shall not have the right to assume the defense of the action on behalf of such Indemnified Person; provided, however, that the Obligor shall not, in connection with any one action or separate but substantially similar or related actions in the same jurisdiction arising out of the same general allegation or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys for the Indemnified Parties, which firm shall be designated in writing by the Indemnified Parties).

(e)     Each Indemnified Person shall cooperate with the Obligor, and the Obligor shall cooperate with each Indemnified Person, in the defense of any action or Claim. The Obligor shall not be liable for any settlement of any action or Claim without the Obligor's consent but, if

any such action or Claim is settled with the consent of the Obligor or there be final judgment for the plaintiff in any such action or with respect to any such Claim, the Obligor shall indemnify and hold harmless the Indemnified Parties from and against any Loss by reason of such settlement or judgment to the extent provided in Subsection (a).

(f)     The provisions of this Section shall survive the termination of this Agreement, and the obligations of the Obligor hereunder shall apply to Losses or Claims under Subsection (a) whether asserted prior to or after the termination of this Agreement. In the event of failure by the Obligor to observe the covenants, conditions and agreements contained in this Section, any Indemnified Person may take any action at law or in equity to collect amounts then due and thereafter to become due, or to enforce performance and observance of any obligation, agreement or covenant of the Obligor under this Section. The obligations of the Obligor under this Section shall not be affected by any assignment or other transfer by the Issuer of its rights, titles or interests under this Agreement to the Bond Trustee pursuant to the Bond Indenture and will continue to inure to the benefit of the Indemnified Parties after any such transfer. The provisions of this Section shall be cumulative with and in addition to any other agreement by the Obligor to indemnify any Indemnified Person.

(g)     The following terms have the meanings assigned to them below whenever they are used in this Agreement:

"Claims" shall mean all claims, lawsuits, causes of action and other legal actions and proceedings of whatever nature brought against (whether by way of direct action, counter claim, cross action or impleader) any Indemnified Party, even if groundless, false, or fraudulent, so long as the claim, lawsuit, cause of action or other legal action or proceeding is alleged or determined, directly or indirectly, to arise out of, to result from, to relate to or to be based upon, in whole or in part: (a) the issuance of the Bonds, (b) the duties, activities, acts or omissions (EVEN IF NEGLIGENT) of any Person in connection with the issuance of the Bonds, or the obligations of the various parties arising under the Bond Indenture, this Agreement or the Master Indenture, or (c) the duties, activities, acts or omissions (EVEN IF NEGLIGENT) of any Person in connection with the design, construction, installation, operation, use, occupancy, maintenance or ownership of the Projects or any part thereof.

"Indemnified Party" shall mean one or more of the Issuer, Tarrant County, Texas, and any of their respective officers, directors, councilpersons, officials, consultants, agents, servants, and employees, and any successor to any of such Persons. [*County has to approve this bond issue and is not likely to do so if its standard indemnification language is different from its prior bond issues.*]

"Indemnified Persons" means the Indemnified Parties and the Bond Trustee.

"Losses" means losses, costs, damages, expenses, judgments, and liabilities of whatever nature (including, but not limited to, reasonable attorney's, accountant's and other professional's fees, litigation and court costs and expenses, amounts paid in settlement and amounts paid to discharge judgments and amounts payable by an Indemnified Persons to any other Person under any arrangement providing for indemnification of that Person) directly or indirectly resulting from arising out of or relating to one or more Claims.

Section 7.6    Authority of Obligor.  Whenever under the provisions of this Agreement the approval of the Obligor is required, or the Issuer or the Bond Trustee are required to take some action at the request of the Obligor, such approval or such request shall be made by the Obligor unless otherwise specified in this Agreement and the Issuer or the Bond Trustee shall be authorized to act on any such approval or request and the Obligor shall have no complaint against the Issuer or the Bond Trustee as a result of any action taken.

Section 7.7    Authority of Issuer Representative.  Whenever under the provisions of this Agreement the approval of the Issuer or the Bond Trustee are required, or the Obligor is required to take some action at the request of the Issuer, such approval or such request shall be made by the Issuer Representative unless otherwise specified in this Agreement and the Obligor or the Bond Trustee shall be authorized to act on any such approval or request and the Issuer shall have no complaint against the Obligor or the Bond Trustee as a result of any such action taken.

Section 7.8    No Personal Liability.  No obligations contained in the Bonds, the Bond Indenture or this Agreement shall be deemed to be the obligations of any officer, director, council member, trustee, agent or employee of the Issuer, the Bond Trustee, the Obligor or Tarrant County, Texas, in his or her individual capacity, and neither the Board of Directors, the governing body of the Obligor, the Bond Trustee or Tarrant County, Texas, any official of the Issuer or Tarrant County, Texas nor any official of the Issuer executing the Bonds, the Bond Indenture or this Agreement shall be liable personally thereon or be subject to any personal liability or accountability with respect thereto.

Section 7.9    Fees and Expenses.  The Obligor agrees to pay promptly upon demand therefor all costs paid, incurred or charged by the Issuer in connection with the Bonds, including without limitation, (i) all fees required to be paid to the Issuer with respect to the Bonds, (ii) all out of pocket expenses and costs of issuance of the Bonds and effecting the Plan and the Exchange (including reasonable fees and expenses of attorneys employed by the Issuer) reasonably incurred by the Issuer in connection with the issuance of the Bonds and (iii) all out of pocket expenses (including reasonable fees and expenses of attorneys employed by the Issuer) reasonably incurred by the Issuer in connection with the enforcement of any of its rights or remedies or the performance of its duties under the Bond Indenture or this Agreement.

## ARTICLE VIII

## ASSIGNMENT AND LEASING

Section 8.1 <u>Assignment and Leasing by Obligor</u>. This Agreement may be assigned, and all or any portion of the Project may, subject to the terms of the Master Indenture, be leased by the Obligor without the consent of either the Issuer or the Bond Trustee, provided that each of the following conditions is complied with:

(a) No assignment or leasing shall relieve the Obligor from primary liability for any of its obligations hereunder, and in the event of any such assignment or leasing the Obligor shall continue to remain primarily liable for payment of the loan payments and other payments specified in Article V hereof and for performance and observance of the other covenants and agreements contained herein; provided that if (i) the Obligor withdraws from the Obligated Group (as defined in the Master Indenture) and is released from its obligations on the Series 2019 Note by the Master Trustee pursuant to the Master Indenture and (ii) this Agreement has been assigned to a remaining member of such Obligated Group in accordance with this Section 8.1, the Obligor shall also be released from its liability for its obligations hereunder, including payment of the loan payments and other payments specified in Article V hereof and the performance and observance of the other covenants and agreements contained herein.

(b) The assignee or lessee shall assume in writing the obligations of the Obligor hereunder to the extent of the interest assigned or leased, provided that the provisions of this subsection shall not apply to a lease of a portion of the Project or an operating contract for the performance by others of Obligor or medical services on or in connection with the Project, or any part thereof.

(c) The Obligor shall, within 30 days after the delivery thereof, furnish or cause to be furnished to the Issuer and the Bond Trustee a true and complete copy of each such assumption of obligations and assignment or lease of the Project, as the case may be.

Section 8.2 <u>Assignment and Pledge by Issuer</u>. Solely pursuant to the Bond Indenture, the Issuer may assign its interest in and pledge any moneys receivable under the Series 2019 Note and this Agreement (except in respect of certain rights to indemnification and for Administration Expenses, indemnification and payment of attorneys' fees and expenses pursuant to Sections 5.7, 7.5 and 9.5 hereof) to the Bond Trustee as security for payment of the principal of, premium, if any, and interest on the Bonds. The Obligor consents to such assignment and pledge.

## ARTICLE IX

## FAILURE TO PERFORM COVENANTS AND REMEDIES THEREFOR

Section 9.1 <u>Event of Default</u>. Failure of the Obligor to pay when due any payment (other than failure to make any payment on the Series 2019 Note, which default shall have no grace period) required to be made under this Agreement or to observe and perform any covenant, condition or agreement on its part to be observed or performed hereunder, and continuation of such failure for a period of 60 days after written notice, specifying such failure and requesting that it be

remedied, is given to the Obligor by the Issuer or the Bond Trustee, the Issuer or the Bond Trustee shall constitute an Event of Default hereunder and thereupon the Issuer and the Bond Trustee shall have the remedies provided in Section 9.2 hereof.

Section 9.2    Remedies.  Upon the occurrence of an Event of Default under Section 9.1 hereof, the Issuer or the Bond Trustee, as assignee or successor of the Issuer, upon compliance with all applicable law, in its discretion may take any one or more of the following steps:

(a)    by mandamus, or other suit, action or proceeding at law or in equity, enforce all rights of the Issuer, and require the Obligor to carry out any agreements with or for the benefit of the Bondholders and to enforce performance and observance of any duty, obligation, agreement or covenant of the Obligor under the Act or this Agreement; or

(b)    by action or suit in equity require the Obligor to account as if it were the trustee of an express trust for the Issuer; or

(c)    by action or suit in equity enjoin any acts or things which may be unlawful or in violation of the rights of the Issuer; or

(d)    upon the filing of a suit or other commencement of judicial proceedings to enforce the rights of the Bond Trustee and the Bondholders, have appointed a receiver or receivers of the Trust Estate upon a showing of good cause with such powers as the court making such appointment may confer.

Section 9.3    Discontinuance of Proceedings.  In case any proceeding taken by the Issuer or the Bond Trustee on account of any Event of Default under Section 9.1 shall have been discontinued or abandoned for any reason, or shall have been determined adversely to the Issuer or the Bond Trustee, then and in every case the Issuer and the Bond Trustee shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies and powers of the Issuer and the Bond Trustee shall continue as though no such proceeding had been taken.

Section 9.4    No Remedy Exclusive.  No remedy herein conferred upon or reserved to the Issuer or the Bond Trustee is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement or now or hereafter existing at law or in equity or by statute.  No delay or omission to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right or power may be exercised from time to time and as often as may be deemed expedient.  In order to entitle the Issuer or the Bond Trustee to exercise any remedy reserved to it in this Article, it shall not be necessary to give any notice, other than notice required in Section 9.1 hereof.  Such rights and remedies given the Issuer hereunder shall also extend to the Bond Trustee and the holders of the Bonds, subject to the Bond Indenture.

Section 9.5    Agreement to Pay Attorneys' Fees and Expenses.  In the event the Issuer or the Bond Trustee should employ attorneys or incur other expenses for the enforcement of performance or observance of any obligation or agreement on the part of the Obligor herein or in the Bond Indenture contained, the Obligor agrees that it will on demand therefor pay to the Issuer

or the Bond Trustee, as the case may be, the reasonable fee of such attorneys and such other reasonable expenses incurred by the Issuer or the Bond Trustee.

Section 9.6    Waivers.  In the event any agreement contained in this Agreement should be breached by either party and thereafter waived by the other party, such waiver shall be limited to the particular breach waived and shall not be deemed to waive any other breach hereunder.  In view of the assignment of the Issuer's rights in and under this Agreement to the Bond Trustee under the Bond Indenture, the Issuer shall have no power to waive any failure to perform under Section 9.1 hereunder without the consent of the Bond Trustee (other than a failure to observe the covenants contained in Section 4.10 hereof, which may be waived by the Issuer without the consent of the Bond Trustee).

## ARTICLE X

## PREPAYMENT OF NOTE

Section 10.1    General Option to Prepay Note.  The Obligor shall have and is hereby granted the option exercisable at any time to prepay all or any portion of its payments due or to become due on the Series 2019 Note by depositing with the Bond Trustee for payment into the Bond Fund an amount of money or Government Obligations the principal and interest on which when due, will be equal to an amount sufficient to pay the principal of, premium, if any, and interest on any portion of the Bonds then Outstanding under the Bond Indenture, without penalty.  The exercise of the option granted by this Section shall not be cause for redemption of Bonds unless such redemption is permitted at that time under the provisions of the Bond Indenture and the Obligor specifies the date for such redemption.  In the event the Obligor prepays all of its payments due and to become due on the Series 2019 Note by exercising the option granted by this Section and upon payment of all reasonable and necessary fees and expenses of the Bond Trustee, the Issuer and any Paying Agent accrued and to accrue through final payment of the Bonds called for redemption as a result of such prepayment and of all Administration Expenses through final payment of the Bonds called for redemption as a result of such prepayment, this Agreement shall terminate; provided that no such termination shall occur unless all of the Bonds are no longer Outstanding.

Section 10.2    Conditions to Exercise of Option.  To exercise the option granted in Section 10.1 hereof, the Obligor shall give written notice to the Issuer and the Bond Trustee which shall specify therein the date of such redemption, which date shall be not less than 45 days from the date the notice is mailed.

## ARTICLE XI

## MISCELLANEOUS

Section 11.1    Notices.  Any notice, request or other communication under this Agreement shall be given in writing and shall be deemed to have been given by either party to the other party at the addresses shown below upon any of the following dates:

21

(a)     The date of notice by telefax, telecopy, or similar telecommunications, which is confirmed promptly in writing;

(b)     Three Business Days after the date of the mailing thereof, as shown by the post office receipt if mailed to the other party hereto by registered or certified mail;

(c)     The date of the receipt thereof by such other party if not given pursuant to (a) or (b) above.

The address for notice for each of the parties shall be as follows:

> Tarrant County Cultural Education Facilities Finance Corporation
> c/o Brown Pruitt Wambsganss Ferrill & Dean, P.C.
> 201 Main Street
> Suite 801
> Fort Worth, Texas 76102
> Attention: Secretary, Randal L. Dean
> Telephone: (817) 338-4888
> Telecopier No.: (817) 338-0700

Obligor:

> Tarrant County Senior Living Center Inc.
> c/o Lifespace Communities, Inc.
> 4201 Corporate Drive
> West Des Moines, Iowa 50266
> Telephone: (515) 309-4456
> Telecopier: _____
> Attention: Chief Financial Officer

with a copy to:

> Lifespace Communities, Inc.
> 4201 Corporate Drive
> West Des Moines, Iowa 50266
> Telephone: (515) 309-4456
> Telecopier: _____
> Attention: Jodi Hirsch, Senior Vice President and General Counsel

Bond Trustee:

> UMB Bank,
> National Association
> [address]
> Attention:
> Telephone:
> Telecopy:

Notwithstanding the foregoing, notices to the Bond Trustee shall be effective only upon receipt.

Section 11.2 <u>Binding Effect</u>. This Agreement shall inure to the benefit of and shall be binding upon the Issuer, the Obligor, and their respective successors and assigns, subject, however, to the limitations contained in Sections 8.1, 8.2 and 11.9 hereof.

Section 11.3 <u>Severability</u>. In the event any provision of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof.

Section 11.4 <u>Amounts Remaining in Funds</u>. It is agreed by the parties hereto that any amounts remaining in the Bond Fund or the Reserve Fund upon expiration or sooner termination of this Agreement, after payment in full of the Bonds (or provision for payment thereof having been made in accordance with the provisions of the Bond Indenture), the fees, charges, and expenses of the Bond Trustee, the Issuer and the Paying Agent in accordance with the Bond Indenture, the Administration Expenses and all other amounts required to be paid under this Agreement and the Bond Indenture, shall belong to and be paid to the Obligor by the Bond Trustee or the Issuer.

Section 11.5 <u>Amendments, Changes, and Modifications</u>. Except as otherwise provided in this Agreement or in the Bond Indenture, subsequent to the initial issuance of Bonds and prior to their payment in full (or provision for the payment thereof having been made in accordance with the provisions of the Bond Indenture), this Agreement may not be effectively amended, changed, modified, altered, or terminated without the written consent of the Bond Trustee.

Section 11.6 <u>Execution in Counterparts; Electronic Transactions</u>. This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument. The transaction described herein may be conducted and this Agreement and related documents may be stored by electronic means. Copies, telecopies, facsimiles, electronic files and other reproductions of original executed documents shall be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

Section 11.7 <u>Payment</u>. At such time as the principal of, premium, if any, and interest on all Bonds Outstanding under the Bond Indenture shall have been paid, or shall be deemed to be paid, in accordance with the Bond Indenture, and all other sums payable by the Obligor under this Agreement shall have been paid, the Series 2019 Note shall be deemed to be fully paid and shall be delivered by the Bond Trustee to the Obligor.

Section 11.8 <u>Governing Law</u>. This Agreement shall be governed and construed in accordance with the law of the State of Texas.

Section 11.9 <u>No Pecuniary Liability of Issuer</u>. No provision, covenant, or agreement contained in this Agreement, or any obligations herein imposed upon the Issuer, or the breach thereof, shall constitute an indebtedness of the Issuer within the meaning of any Texas constitutional provision or statutory limitation or shall constitute or give rise to a pecuniary liability of the Issuer or a charge against its general credit. In making the agreements, provisions, and

covenants set forth in this Agreement, the Issuer has not obligated itself except with respect to the application of the revenues, income, and all other property therefrom, as hereinabove provided.

Section 11.10 <u>Payments Due on Holidays</u>. If the date for making any payment or the last date for performance of any act or the exercising of any right, as provided in this Agreement, shall be a legal holiday or a day on which banking institutions in Dallas, Texas or Minneapolis, Minnesota are authorized by law to remain closed, such payment may be made or act performed or right exercised on the next succeeding day not a legal holiday or a day on which such banking institutions are authorized by law to remain closed with the same force and effect as if done on the nominal date provided in this Agreement.

Section 11.11 <u>No Individual Liability</u>. No covenant or agreement contained in this Agreement or the Bond Indenture shall be deemed to be the covenant or agreement of any member of the Board of Directors or the governing body of the Obligor or the Bond Trustee or of any officer, director, trustee, agent or employee of the Issuer, the Bond Trustee or the Obligor or the governing body of Tarrant County, Texas, in his or her individual capacity, and none of such persons shall be subject to any personal liability or accountability by reason of the execution hereof, whether by virtue of any constitution, statute or rule of law, or by the enforcement or any assessment or penalty, or otherwise.

Section 11.12 <u>Survival of Covenants</u>. All covenants, agreements, representations and warranties made by the Obligor in this Agreement, the Bond Indenture, the Series 2019 Note and the Bonds, and in any certificates or other documents or instruments delivered pursuant to this Agreement or the Bond Indenture, shall survive the execution and delivery of this Agreement, and the Bond Indenture and the Series 2019 Note and shall continue in full force and effect until the Bonds and the Series 2019 Note are paid in full and all of the Obligor's other payment obligations (including without limitation the indemnification obligation under Section 7.5 and the obligations under Sections 5.5, 5.7 and 9.5 hereof) under this Agreement, the Bond Indenture, the Series 2019 Note and the Bonds are satisfied. All such covenants, agreements, representations and warranties shall be binding upon any successor and assigns of the Obligor.

IN WITNESS WHEREOF, the Issuer and the Obligor have caused this Agreement to be executed in their respective corporate names, all as of the date first above written.

TARRANT COUNTY CULTURAL EDUCATION
FACILITIES FINANCE CORPORATION

By: _____
     President

TARRANT COUNTY SENIOR LIVING CENTER
INC.

By: _____
     President

EXHIBIT A

PROJECT DESCRIPTION

    The Project consists of a continuing care retirement community with approximately 188 independent living units, 42 assisted living units, 20 memory support units and 46 nursing beds, together with common areas and parking areas, to be known as The Stayton at Museum Way located on approximately 2.5 acres at 2501 Museum Way, Fort Worth, Texas.

87584929v.1

**Final Draft: May 3, 2019**

## TARRANT COUNTY SENIOR LIVING CENTER INC.
### as the Obligated Group Representative

### and

## UMB BANK, NATIONAL ASSOCIATION
### as successor Master Trustee

### SUPPLEMENTAL MASTER TRUST INDENTURE NO. 2

### DATED AS OF [MAY __], 2019

### RELATING TO
### MASTER TRUST INDENTURE,
### DEED OF TRUST AND SECURITY AGREEMENT
### DATED AS OF OCTOBER 1, 2009

## SUPPLEMENTAL MASTER TRUST INDENTURE NO. 2

## TABLE OF CONTENTS

Page

Parties ........................................................................................................................ 1
Recitals ...................................................................................................................... 1

### ARTICLE I

### DEFINITIONS

Section 1.01.  Definitions of Terms ............................................................................. 2

### ARTICLE II

### AMENDMENT AND SUPPLEMENT OF MASTER INDENTURE

Section 2.01.  Amendment and Supplement of Section 3.03 Liquidity Support Account ......................... 2

### ARTICLE III

### REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 3.01.  Representations and Warranties ............................................................. 3
Section 3.02.  Covenants under the Master Indenture and Related Documents ............ 3
Section 3.03.  Further Action ....................................................................................... 3

### ARTICLE IV

### MISCELLANEOUS PROVISIONS

Section 4.01.  Ratification of Master Indenture ........................................................... 3
Section 4.02.  Limitation of Rights ............................................................................. 4
Section 4.03.  Electronic Transactions ........................................................................ 4
Section 4.04.  Binding Effect ...................................................................................... 4
Section 4.05.  Severability .......................................................................................... 4
Section 4.06.  Execution in Counterparts .................................................................... 4
Section 4.07.  Governing Law ..................................................................................... 4

Signatures ................................................................................................................ S-1

\*   \*   \*

## SUPPLEMENTAL MASTER TRUST INDENTURE NO. 2

**THIS SUPPLEMENTAL MASTER TRUST INDENTURE NO. 2**, dated as of [May ___], 2019, (this "Supplemental Master Indenture No. 2") between Tarrant County Senior Living Center Inc., as the obligor and the Obligated Group Representative acting on behalf of itself and all other Obligated Group Members under the hereinafter referred to Indenture (the "Obligor") and UMB Bank, National Association, as successor master trustee (the "Master Trustee"),

### WITNESSETH:

**WHEREAS**, this Supplemental Master Indenture No. 2 amends and supplements the Master Trust Indenture, Deed of Trust and Security Agreement dated as of October 1, 2009, (the "Original Master Indenture" and as amended and supplemented from time to time, including by Supplemental Indenture Number 1, dated as of October 1, 2009, and by this Supplemental Master Indenture No. 2, collectively referred to herein as the "Master Indenture") between the Obligor and the Master Trustee; and

**WHEREAS**, the Obligor and the Master Trustee are authorized under **Section 9.01(b)** of the Original Master Indenture, without the consent of the holders of the Obligations, to amend or supplement the Master Indenture for certain purposes therein, including to add to the covenants of the Obligated Group Members for the benefit of the Holders of Obligations, subject to the terms and provisions contained in the Master Indenture; and

**WHEREAS**, the Original Master Indenture provided for a Liquidity Support Agreement which has been fully drawn and no longer provides benefits to the Holders, and the Obligor has negotiated to obtain a new Liquidity Support Agreement for the benefit of the Holders and desires to supplement and amend **Section 3.03** of the Original Master Indenture to provide for the disbursement of funds and other matters relating to such new Liquidity Support Agreement; and

**WHEREAS**, all acts and things necessary to make this Supplemental Master Indenture No. 2, when executed by the Obligor, as Obligated Group Representative, the valid, binding and legal obligation of the Obligated Group Members, and to constitute these presents, together with the Master Indenture, a valid indenture and agreement according to its terms, have been done and performed, and the execution of this Supplemental Master Indenture No. 2 has in all respects been duly authorized, and the Obligor, in the exercise of the legal right and power vested in it, executes this Supplemental Master Indenture No. 2;

### NOW, THEREFORE, THIS INDENTURE WITNESSETH:

That in consideration of the mutual covenants, conditions and agreements which follow, the Obligor, on behalf of the Obligated Group Members, covenants and agrees with the Master Trustee as follows:

# ARTICLE I

## DEFINITION OF TERMS

**Section 1.01. Definition of Terms.**

(a)     The terms used in this Supplemental Master Indenture No. 2 shall, except as set forth below or as otherwise stated herein, have the meanings assigned to them in the **Section 1.01** of the Original Master Indenture or Supplemental Indenture Number 1 dated as of October 1, 2009 authorizing the Series 2009A Note, the Series 2009B Note and the Series 2009C Note, which Series 2009B Note and Series 2009C Note are no longer Outstanding under the Master Indenture.

(b)     From and after the date of execution and delivery of this Supplemental Master Indenture No. 2, the following terms in **Section 1.01** of the Original Master Indenture are amended to read in their entirety as follows:

"Liquidity Provider" means Lifespace Communities, Inc., an Iowa nonprofit corporation.

"Liquidity Support Agreement" means the Liquidity Support Agreement dated as of [_____ ], 2019, among the Obligor, the Liquidity Provider, and the Master Trustee.

(c)     For all purposes of the Master Indenture, the following words and terms have the following meanings:

"PSA Breach" has the meaning given that term in the Liquidity Support Agreement.

"Series 2009 Bond Indenture" has the meaning given that term in the Liquidity Support Agreement.

"Series 2009 Bond Trustee" has the meaning given that term in the Liquidity Support Agreement.

# ARTICLE II

## AMENDMENT AND SUPPLEMENT OF MASTER INDENTURE

**Section 2.01.     Amendment of Section 3.03 Liquidity Support Account.**  Section 3.03 of the Original Master Indenture is amended to read in its entirety as follows:

**Section 3.03.     Liquidity Support Account.**

(a)     The Master Trustee has previously established the Liquidity Support Account under the Original Master Indenture.  The Liquidity Support Account held by the Master Trustee continues in effect under this Supplemental Master Indenture No. 2.  Pursuant to the Liquidity Support Agreement, upon the execution and delivery hereof, the Liquidity Provider has deposited

2

$3,000,000 with the Master Trustee for credit to the Liquidity Support Account.

(b)     Upon receipt of a Series 2009 Bond Trustee Funded LSA Request in the form attached and delivered in accordance with **Section 3.1(c)** of the Liquidity Support Agreement, the Master Trustee shall deliver to the Series 2009 Bond Trustee from moneys in the Liquidity Support Account the amount so requested to be applied by the Series 2009 Bond Trustee to pay debt service on the Series 2009 Bonds.

(c)     Upon receipt of a Borrower Funded LSA Request in the form attached and delivered in accordance with **Section 3.1(d)** of the Liquidity Support Agreement, the Master Trustee shall deliver to the Obligor from moneys in the Liquidity Support Account the amount so requested to be by applied by Obligor to pay operating expenses of the Project.

(d)     Upon written notice to the Master Trustee from the Liquidity Provider that a PSA Breach has occurred, all remaining moneys in the Liquidity Support Account shall be paid to the Liquidity Support Provider, and the Liquidity Support Account shall be closed.

## ARTICLE III

## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 3.01.     Representations and Warranties.**     The Obligor, as the Obligated Group Representative acting on behalf of the Obligated Group Members, represents and warrants that (a) it is duly authorized under the laws of the State of Texas and all other applicable provisions of law to execute this Supplemental Master Indenture No. 2, and (b) all corporate action on the part of the Obligated Group Representative required by its governing documents and the Master Indenture to establish this Supplemental Master Indenture No. 2 as the binding obligation of the Obligated Group has been duly and effectively taken.

**Section 3.02.     Covenants under the Master Indenture and Related Documents.**     The Obligor, as the Obligated Group Representative acting on behalf of the Obligated Group Members, covenants and agrees that it will faithfully perform or cause to be performed at all times any and all covenants, agreements and undertakings, required on the part of the Obligated Group contained in the Master Indenture.

**Section 3.03.     Further Action.**     The Obligor, on its own behalf and as Obligated Group Representative, and the Master Trustee shall take such further actions as may be necessary or required to further effectuate the purposes of this Supplemental Master Indenture No. 2.

## ARTICLE IV

## MISCELLANEOUS PROVISIONS

**Section 4.01.     Ratification of Master Indenture.**     The Master Indenture, as amended and supplemented by this Supplemental Master Indenture No. 2 and as otherwise amended and supplemented, is in all respects ratified and confirmed and the Master Indenture as so amended and supplemented shall

3

be read, taken and construed as one and the same instrument. Except as herein otherwise expressly provided, all the provisions, definitions, terms and conditions of the Master Indenture, as amended and supplemented by this Supplemental Master Indenture No. 2 and as otherwise amended and supplemented, shall be deemed to be incorporated in, and made a part of, this Supplemental Master Indenture No. 2. All references to "this Master Indenture" or "this Indenture" in the Master Indenture shall be to the Master Indenture as amended and supplemented by this Supplemental Master Indenture No. 2 and as otherwise amended and supplemented from time to time.

**Section 4.02.    Limitation of Rights.**  Nothing in this Supplemental Master Indenture No. 2 or in the Obligations, express or implied, shall give or be construed to give any person, firm or corporation, other than the Obligor, the other Obligated Group Members, the Master Trustee, and the registered holders of the Obligations or their registered assigns, any legal or equitable right, remedy or claim under or in respect of this Supplemental Master Indenture No. 2, or under any covenant, condition and provision herein contained; all its covenants, conditions and provisions being for the sole benefit of the Obligor, the other Obligated Group Members, the Master Trustee, and of the registered holders of the Obligations or their registered assigns.

**Section 4.03.    Electronic Transactions**  The transactions described herein may be conducted and related documents may be stored by electronic means.  Copies, telecopies, facsimiles, electronic files and other reproductions of original executed documents shall be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

**Section 4.04.    Binding Effect.**  All the covenants, stipulations, promises and agreements in this Supplemental Master Indenture No. 2 by or on behalf of the Obligated Group Representative, the Obligor, the other Obligated Group Members or the Master Trustee shall inure to the benefit of and shall bind their respective successors and assigns, whether so expressed or not.

**Section 4.05.    Severability.**  If any provision in this Supplemental Master Indenture No. 2 or in the Obligations shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

**Section 4.06.    Execution in Counterparts.**  This Supplemental Master Indenture No. 2 may be executed in any number of counterparts, each of which shall be an original; and all of which shall together constitute but one and the same instrument.

**Section 4.07.    Governing Law.**  This Supplemental Master Indenture No. 2 shall be deemed to be a contract made under the laws of the State of Texas, and for all purposes shall be construed in accordance with the laws of said State.

**IN WITNESS WHEREOF,** the parties hereto have caused this Supplemental Master Indenture No. 2 to be duly executed and attested by the persons thereunto duly authorized, as of the day and year first above written.

**TARRANT COUNTY SENIOR LNING CENTER INC.,**
as an Obligated Group Member and as Obligated Group Representative

By:_____
Authorized Signatory

**UMB BANK NATIONAL ASSOCIATION**, as Master Trustee

By:_____
Authorized Signatory

S-1

**Final Draft: May 3, 2019**

---

**TARRANT COUNTY SENIOR LIVING CENTER INC.**
as the Obligated Group Representative

and

**UMB BANK, NATIONAL ASSOCIATION**
as successor Master Trustee

---

**SUPPLEMENTAL MASTER TRUST INDENTURE NO. 3**

---

**DATED AS OF [NOVEMBER 1], 2019**

---

**RELATING TO
TARRANT COUNTY CULTURAL EDUCATION
FACILITIES FINANCE CORPORATION
RETIREMENT FACILITIY REVENUE BONDS
(THE STAYTON AT MUSEUM WAY PROJECT)
SERIES 2019**

---

# SUPPLEMENTAL MASTER TRUST INDENTURE NO. 3

## TABLE OF CONTENTS

**Page**

Parties.................................................................................................................................1
Recitals...............................................................................................................................1

### ARTICLE I

### DEFINITIONS

Section 1.01.   Definitions...................................................................................................2

### ARTICLE II

### AUTHORIZATION OF SERIES 2019 NOTE

Section 2.01.   Authorization of Series 2019 Note..............................................................2
Section 2.02.   Form of Series 2019 Note............................................................................2
Section 2.03.   Conditions to Issuance and Delivery of Series 2019 Note..........................3
Section 2.04.   Payments on Series 2019 Note.....................................................................3
Section 2.05.   Prepayment and Redemption of Series 2019 Note.......................................3

### ARTICLE III

### SECURITY FOR SERIES 2019 NOTE

Section 3.01    Security for Series 2019 Note.......................................................................3

### ARTICLE IV

### REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 4.01.   Representations and Warranties....................................................................3
Section 4.02.   Covenants under the Master Indenture and Related Documents...................3
Section 4.03.   Further Action..............................................................................................4

### ARTICLE V

### MISCELLANEOUS PROVISIONS

Section 5.01.   Notices.........................................................................................................4
Section 5.02.   Ratification of Master Indenture..................................................................5
Section 5.03.   Limitation of Rights.....................................................................................5
Section 5.04.   Electronic Transactions................................................................................5
Section 5.05.   Binding Effect..............................................................................................5
Section 5.06.   Severability..................................................................................................5

**Section 5.07.**   Execution in Counterparts ............................................................................... 6
**Section 5.08.**   Governing Law ............................................................................................... 6

**Signatures** ........................................................................................ S-1

\*   \*   \*

## SUPPLEMENTAL MASTER TRUST INDENTURE NO. 3

**THIS SUPPLEMENTAL MASTER TRUST INDENTURE NO. 3**, dated as of [November 1], 2019, (this "Supplemental Master Indenture No. 3") between Tarrant County Senior Living Center Inc., a Texas nonprofit corporation, as the sole Obligated Group Member and as Obligated Group Representative (the "Obligated Group Representative") and UMB Bank, National Association, as master trustee (the "Master Trustee"),

## WITNESSETH:

**WHEREAS**, this Supplemental Master Indenture No. 3 supplements the Amended and Restated Master Trust Indenture, Deed of Trust and Security Agreement dated as of [November 1], 2019 (the "Existing Master Indenture" and as amended and supplemented from time to time, including by this Supplemental Master Indenture No. 3, the "Master Indenture") between the Obligated Group Representative and the Master Trustee; and

**WHEREAS**, concurrently with the execution and delivery of this Supplemental Master Indenture No. 3, the Tarrant County Cultural Education Facilities Finance Corporation ("Issuer") and UMB Bank National Association, as trustee ("Related Bond Trustee"), are entering into an Indenture of Trust of even date herewith ("Related Bond Indenture"), under which the Issuer will issue the $[_____] principal amount of Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2019, which will constitute Series 2019 Bonds and Related Bonds under the Master Indenture ("Series 2019 Bonds"), which Related Bonds are being issued in exchange for all outstanding Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2009A (the "Series 2009 Bonds") of the Issuer and accrued and unpaid interest thereon pursuant to the Bankruptcy Court Order (as defined in the Related Loan Agreement described below):

**WHEREAS**, the Issuer and the Obligated Group Representative are entering into a Loan Agreement of even date herewith ("Related Loan Agreement"), under which the Issuer will be deemed to have loaned the proceeds of the Series 2019 Bonds to the Obligated Group Representative to provide funds for the purpose of effecting the Exchange (as defined in the Related Loan Agreement) of the Series 2019 Bonds for the Series 2009 Bonds.

**WHEREAS,** pursuant to the Related Loan Agreement, the Obligated Group Representative has agreed to issue the Obligation (the "Series 2019 Note") created by this Supplemental Master Indenture No. 3 to evidence and secure the obligation of the Obligated Group Representative to make the payments required under the Related Loan Agreement; and

**WHEREAS**, the Obligated Group Representative is authorized under **Section 9.01(e)** of the Existing Master Indenture to issue and deliver of a new Obligation in the form of the Series 2019 Note to evidence and secure the obligations of the Obligated Group Representative under the Related Loan Agreement.

**WHEREAS**, all acts and things necessary to make the Series 2019 Note authorized by this Supplemental Master Indenture No. 3, when executed by the Obligated Group Representative, and authenticated and delivered by the Master Trustee as provided in the Existing Master Indenture and this Supplemental Master Indenture No. 3, the valid, binding and legal obligations of the Members of the Obligated Group, and to constitute these presents, together with the Existing Master Indenture, a valid

indenture and agreement according to its terms, have been done and performed, and the execution of this Supplemental Master Indenture No. 3 and the issuance hereunder and under the Existing Master Indenture of the Series 2019 Note authorized by this Supplemental Master Indenture No. 3 have in all respects been duly authorized, and the Obligated Group Representative, in the exercise of the legal right and power vested in it on behalf of the Obligated Group, executes this Supplemental Master Indenture No. 3 and proposes to make, execute, issue and deliver the Series 2019 Note authorized hereunder.

**NOW, THEREFORE,** in order to declare the terms and conditions upon which the Series 2019 Note authorized by this Supplemental Master Indenture No. 3 is authenticated, issued and delivered, and in consideration of the premises and the acquisition and acceptance of such Series 2019 Note by the Holder thereof, and in consideration of the mutual covenants, conditions and agreements which follow, the Obligated Group Representative acting on behalf of the Obligated Group, covenants and agrees with the Master Trustee as follows:

## ARTICLE I

## DEFINITION OF TERMS

*Section 1.01. Definitions.* The terms used in this Supplemental Master Indenture No. 3 shall, except as set forth below or as otherwise stated herein, have the meanings assigned to them in the Master Indenture.

## ARTICLE II

## AUTHORIZATION OF SERIES 2019 NOTE

*Section 2.01. Authorization of Series 2019 Note.* There is hereby created as an Obligation under the Master Indenture a promissory note to be known and entitled Tarrant County Senior Living Center Inc. Series 2019 Note (the *"Series 2019 Note"*). The Series 2019 Note, in the principal amount of $_____, shall be executed, authenticated and delivered in accordance with **Article II** of the Master Indenture.

*Section 2.02. Form of Series 2019 Note.* The Series 2019 Note created hereby shall be in the form of a fully registered Obligation without coupons, shall be dated [November 1], 2019, shall bear interest from its date on the principal balance thereof in the amount set forth in such Series 2019 Note, payable on the each [May 1] and [November 1], commencing [May 1], 2020, and shall be substantially in the form set forth in **Exhibit A** attached hereto, but with such changes as may be necessary to reflect the terms of such Series 2019 Note.

*Section 2.03. Conditions to Issuance and Delivery of Series 2019 Note.* The Series 2019 Note shall be issued on the Effective Date of the Bankruptcy Court Order (each as defined in the Related Bond Indenture), simultaneously with the delivery to the Master Trustee of the Opinion of Counsel to the Obligated Group required by **Section 2.05(b)** of the Existing Master Indenture.

*Section 2.04. Payments on Series 2019 Note.* The Series 2019 Note authorized hereunder shall be payable in installments in the amounts and on the dates, shall bear interest from the date of said Series 2019 Note at the respective rates, and shall have such other terms and provisions as are set forth in

or incorporated by reference into the form of Series 2019 Note attached hereto. Payments on the Series 2019 Note shall be made in the manner and in accordance with the provisions of the Master Indenture except to the extent that any contrary provision is made in this Supplemental Master Indenture or such Series 2019 Note.

**Section 2.05.** **_Prepayment and Redemption of Series 2019 Note._** The Series 2019 Note is subject to prepayment and redemption prior to maturity as provided in the Existing Master Indenture and, to the extent and with respect to the corresponding redemption or prepayment provisions of the Related Bond Indenture and the Related Loan Agreement, by paying the amount necessary to provide for the payment, prepayment, redemption, refunding or advance defeasance of the Series 2019 Bonds or any portion of the Series 2019 Bonds in the manner provided in and in accordance with the terms of the Related Bond Indenture and the Related Loan Agreement.

## ARTICLE III

### SECURITY FOR SERIES 2019 NOTE

**Section 3.01.** **_Security for Series 2019 Note._** The Series 2019 Note authorized hereunder stands on a parity with all Obligations issued and Outstanding under the Master Indenture and are equally and ratably secured by the Master Indenture, including the pledge and assignment of a security interest in the Trust Estate pursuant to the Granting Clauses of the Existing Master Indenture, including a pledge and assignment of all real property and all personal property, including Gross Revenues, of the Obligated Group.

## ARTICLE IV

### REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 4.01.** **_Representations and Warranties._** The Obligated Group Representative, acting on behalf of the Obligated Group Members, represents and warrants that:

(a)     it is duly authorized under the laws of the State of Texas and all other applicable provisions of law to execute this Supplemental Master Indenture No. 3 and to issue the Series 2019 Note hereunder;

(b)     all corporate action on the part of the Obligated Group Representative required by its governing documents and the Master Indenture to establish this Supplemental Master Indenture No. 3 as the binding obligation of the Obligated Group has been duly and effectively taken; and

(c)     all such action so required for the authorization and issuance of the Series 2019 Note has been duly and effectively taken.

**Section 4.02.** **_Covenants under the Master Indenture._** The Obligated Group Representative acting on behalf of the Obligated Group Members, covenants and agrees that it will faithfully perform or cause to be performed at all times any and all covenants, agreements and undertakings, required on the part of the Obligated Group contained in the Master Indenture.

**Section 4.03.** **Further Action.** The Obligated Group Representative and the Master Trustee shall take such further actions as may be necessary or required to further effectuate the purposes of this Supplemental Master Indenture No. 3.

## ARTICLE V

### MISCELLANEOUS PROVISIONS

**Section 5.01.** **Notices.** It shall be sufficient service of any notice, request, complaint, demand or other paper required by this Supplemental Master Indenture No. 3 to be given to or filed with the following parties if the same shall be given in the manner provided in the Existing Master Indenture addressed as follows:

(a) To the Obligated Group Representative or any other Member of the Obligated Group at:

Tarrant County Senior Living Center Inc.
c/o Lifespace Communities, Inc
4201 Corporate Drive
West Des Moines, Iowa 50266
Attention: (515) 309-4456
Telecopy: _____
Attention: Chief Financial Officer

with a copy to:

Lifespace Communities, Inc.
4201 Corporate Drive
West Des Moines, Iowa 50266
Telephone: (515) 309-4456
Telecopier: _____
Attention: Jodi Hirsch, Senior Vice President and General Counsel

(b) To the Master Trustee at:

UMB Bank, National Association

_____
[City, State of Master Trustee] _____
Attention: Corporate Trust Department
Telecopy: _____

(c) To the Issuer and the Related Bond Trustee:

At the address of such party and in the manner set forth in the Related Bond Indenture.

(d) To all other parties:

At the addresses specified in **Section 1.05** of the Master Indenture.

If, because of the temporary or permanent suspension of mail service or for any other reason, it is impossible or impractical to mail any notice in the manner herein provided, then such delivery of notice in lieu thereof as shall be made with the approval of the Master Trustee shall constitute a sufficient notice.

If notice to holder of the Series 2019 Note or owners of Series 2019 Bonds is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular holder or owner shall affect the sufficiency of such notice with respect to other holders or owners. Where the Master Indenture provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by holders or owners shall be filed with the Master Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

**Section 5.02. *Ratification of Master Indenture.*** The Existing Master Indenture, as supplemented by this Supplemental Master Indenture No. 3 and as otherwise amended and supplemented, is in all respects ratified and confirmed and the Existing Master Indenture as so amended and supplemented shall be read, taken and construed as one and the same instrument. Except as herein otherwise expressly provided, all the provisions, definitions, terms and conditions of the Existing Master Indenture, as amended and supplemented by this Supplemental Master Indenture No. 3 and as otherwise amended and supplemented, shall be deemed to be incorporated in, and made a part of, this Supplemental Master Indenture No. 3. All references to "this Master Indenture" in the Existing Master Indenture shall be to the Existing Master Indenture as supplemented by this Supplemental Master Indenture No. 3 and as otherwise amended and supplemented from time to time.

**Section 5.03. *Limitation of Rights.*** Nothing in this Supplemental Master Indenture No. 3 or in the Series 2019 Note, express or implied, shall give or be construed to give any person, firm or corporation, other than the Obligated Group Representative, the other Obligated Group Members, the Master Trustee, and the Holder of the Series 2019 Note or its registered assigns, any legal or equitable right, remedy or claim under or in respect of this Supplemental Master Indenture No. 3, or under any covenant, condition and provision herein contained; all its covenants, conditions and provisions being for the sole benefit of the Obligated Group Representative, the other Obligated Group Members, the Master Trustee, and of the Holder of the Series 2019 Note or its registered assigns.

**Section 5.04. *Electronic Transactions*** The transactions described herein may be conducted and related documents may be stored by electronic means. Copies, telecopies, facsimiles, electronic files and other reproductions of original executed documents shall be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

**Section 5.05. *Binding Effect.*** All the covenants, stipulations, promises and agreements in this Supplemental Master Indenture No. 3 by or on behalf of the Obligated Group Representative, the other Obligated Group Members or the Master Trustee shall inure to the benefit of and shall bind their respective successors and assigns, whether so expressed or not.

**Section 5.06. *Severability.*** If any provision in this Supplemental Master Indenture No. 3 or in the Series 2019 Note shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

***Section 5.07.*** ***Execution in Counterparts.*** This Supplemental Master Indenture No. 3 may be executed in any number of counterparts, each of which shall be an original; and all of which shall together constitute but one and the same instrument.

***Section 5.08.*** ***Governing Law.*** This Supplemental Master Indenture No. 3 and the Series 2019 Note shall be deemed to be a contract made under the laws of the State of Texas, and for all purposes shall be construed in accordance with the laws of said State.

*[Remainder of page intentionally left blank.]*

**IN WITNESS WHEREOF,** the parties hereto have caused this Supplemental Master Indenture No. 3 to be duly executed and attested by the persons thereunto duly authorized, as of the day and year first above written.

<div style="margin-left: 40%;">

**TARRANT COUNTY SENIOR LNING CENTER INC.,**
as the sole Obligated Group Member and as Obligated Group Representative


By:_____
Authorized Signatory



**UMB BANK NATIONAL ASSOCIATION,** as Master Trustee


By:_____
Authorized Signatory

</div>

**EXHIBIT A**
**TO SUPPLEMENTAL MASTER TRUST INDENTURE NO. 3**

**(FORM OF SERIES 2019 NOTE)**

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT**
**OF 1933, AS AMENDED OR ANY STATE SECURITIES LAW**

No. R-1

$ _____

**TARRANT COUNTY SENIOR LIVING CENTER INC.**
**SERIES 2019 NOTE**

| Date of Note | Final Maturity Date |
|---|---|
| [November 1], 2019 | [November 1], [2054] |

TARRANT COUNTY SENIOR LIVNG CENTER Inc., as an obligated group member and the obligated group representative (the "Obligated Group Representative") under the hereinafter defined Master Indenture, for value received, hereby promises to pay to TARRANT COUNTY CULTURAL EDUCATION FACILITIES FNANCE CORPORATION, or registered assigns, at the [St. Louis], Missouri, corporate trust office of UMB Bank, National Association, as bond trustee (with its successors and assigns, the "Bond Trustee") or at such other location as the Bond Trustee may from time to time by notice to the Obligated Group Representative require, the principal amount shown above on or prior to the final maturity date shown above, and earlier upon redemption in whole or in part of the Series 2019 Bonds described herein, in the amounts and on the dates as set forth in the hereinafter referred to Related Bond Indenture and in the hereinafter referred to Related Loan Agreement, and to pay to the Holder interest on the unpaid principal balance hereof from the date of this Note to the final maturity date or the redemption date at the rates of interest on the hereinafter described Series 2019 Bonds, until this Note is paid.

This Note is issued in the principal amount specified above of is dated as of [November 1], 2019 and is designated as the "Tarrant County Senior Living Center Inc. Series 2019 Note" (the "Note", and together with all other Obligations issued under the Master Indenture hereinafter defined, the "Obligations") issued under and pursuant to Supplemental Master Trust Indenture No. 3 dated as of [November 1], 2019 ("Supplemental Master Indenture No. 3"), supplementing the Amended and Restated Master Trust Indenture, Deed of Trust and Security Agreement, dated as of [November 1], 2019 (as supplemented and amended, the "Master Indenture"), between the Obligated Group Representative and UMB Bank, National Association, as master trustee (the "Master Trustee"), and delivered pursuant to a Loan Agreement dated as of [November 1], 2019 (the "Related Loan Agreement") between Tarrant County Cultural Education Facilities Finance Corporation (the "Issuer") and the Obligated Group Representative.

Pursuant to the terms of the Master Indenture, each of the Obligated Group Members described therein will be jointly and severally liable for the payment of this Note and all other Obligations.

This Note is issued for the purpose of securing the payment of the principal of, premium, if any, and interest on Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Series 2019 (the "Series 2019 Bonds") and the payment of the loan of the proceeds of the Series 2019 Bonds to the Obligated Group pursuant to the Related Loan Agreement. The Series 2019 Bonds were issued under the laws of the State of Texas, including particularly Article 1528m, V.A.T.C.S., as amended, and an Indenture of Trust dated as of [November 1], 2019 (the "Bond Indenture"), between the Issuer and the Bond Trustee, which Series 2019 Bonds are being issued in exchange for all outstanding Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2009A (the "Series 2009 Bonds") of the Issuer and accrued and unpaid interest thereon pursuant to the Bankruptcy Court Order (as defined in the Loan Agreement).

The amounts due on this Note shall be payable at the times and in the amounts as provided in the Related Bond Indenture and the Related Loan Agreement. The last such installment shall be in an amount sufficient to discharge all unpaid amounts due on this Note in full. The payments on this Note shall be made in lawful currency of the United States of America by depositing the same with the Bond Trustee, by check, draft or wire transfer in immediately available funds, at its office, at or prior to the opening of business on the date the same shall become due and payable, and by giving notice of payments to the hereinafter referred to Master Trustee as provided in the Master Indenture. The Obligated Group shall receive certain credits against its required payments on this Note equal to the corresponding amounts paid as or credited against payments of the principal, interest or other amounts on the Series 2019 Bonds, as specified in the Related Loan Agreement. The obligation evidenced by this Note shall terminate only when payment in full of all amounts due hereunder has been made or duly provided for in accordance with the Master Indenture and the Related Bond Indenture and Related Loan Agreement. The Master Trustee shall maintain, in accordance with its usual practice, an account or accounts evidencing the principal and interest and other amounts due hereunder. In any legal action or proceeding, such accounts shall, in the absence of manifest error, be conclusive and binding as to the existence and amounts of the obligations to the Holder therein recorded. Notwithstanding the foregoing, the failure to maintain such account or accounts or any error therein shall not affect the obligations of the Obligated Group hereunder.

All Obligations issued and Outstanding under the Master Indenture including this Note are equally and ratably secured by the Master Indenture. The Members of the Obligated Group jointly and severally agree under the Master Indenture to be liable on all Obligations, including this Note, issued under the Master Indenture. All Members of the Obligated Group are jointly and severally liable under the Master Indenture for the payment of all Obligations, including this Note, issued under the Master Indenture. Under the Master Indenture, the Obligated Group Representative may issue additional Obligations from time to time, and if issued, such additional Obligations will rank pari passu with this Note and all other Obligations issued under the Master Indenture, except as otherwise provided in the Master Indenture. Copies of the Master Indenture, the Related Bond Indenture and the Related Loan Agreement are on file with the Master Trustee and reference is made to the Master Indenture, the Related Bond Indenture and the Related Loan Agreement for the provisions with respect to the nature and extent of the security for and the rights of the Holder of this Note, the terms and conditions on which this Note is issued and the rights, duties and obligations of the Obligated Group Representative and the Master Trustee under the Master Indenture, to all of which the Holder hereof, by acceptance of this Note, assents. The Master Indenture may be modified, amended or supplemented to the extent and under the circumstances permitted by, and subject to the terms and conditions of, the Master Indenture.

To the extent permitted by and as provided in the Master Indenture, modifications or changes of the Master Indenture, or of any indenture supplemental thereto, and of the rights and obligations of the Obligated Group Members (as defined in the Master Indenture) and of the holders of the Obligations in any particular may be made with the consent of the Master Trustee and the Obligated Group Members and, in certain circumstances, with the consent of the holders of not less than a majority in aggregate

principal amount of the Obligations then Outstanding under the Master Indenture. No such modification or change shall be made which will reduce the percentage of the Obligations, the consent of the holders of which is required to consent to such supplemental indenture, or permit a preference or priority of any Obligation or Obligations over any other Obligation or Obligations, or which will effect a change in the times, amount and currency of payment of the principal of, and premium, if any, or interest on this Note or a reduction in the principal amount or redemption price of any Obligation or the rate of interest thereon, without the consent of the holder of such Obligation. Any such consent by the holder of this Note shall be conclusive and binding upon such holder and all future holders and owners hereof irrespective of whether or not any notation of such consent is made upon this Note.

This Note is subject to prepayment in the manner, under the circumstances, upon such notice and at the prices set forth in the Master Indenture and the Related Bond Indenture and the Related Loan Agreement. This Note may also be prepaid in whole or in part by paying the amount necessary to provide for the payment, prepayment, redemption, refunding or advance defeasance of the Series 2019 Bonds or any portion of the Series 2019 Bonds and the payment of the amounts due under the Related Bond Indenture and is subject to mandatory prepayment in the event of mandatory redemption of the Series 2019 Bonds in the amount necessary to provide for the payment of such mandatory redemption in the manner provided in the Related Bond Indenture.

Upon the occurrence of certain "Events of Default", as defined in the Master Indenture, the principal of all outstanding Obligations may be declared due and payable, and thereupon shall become due and payable as provided in the Master Indenture.

The holder of this Note shall have no right to enforce the provisions of the Master Indenture, or to institute any action to enforce the covenants therein, or to take any action with respect to any default under the Master Indenture, or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Master Indenture.

This Note shall be registered on the register to be maintained by the Master Trustee and this Note shall be transferable only upon said register at said office by the registered owner or by his duly authorized attorney. Such transfer shall be without charge to the holder hereof, but any taxes or other governmental charges required to be paid with respect to the same shall be paid by the holder requesting such transfer as a condition precedent to the exercise of such privilege. Upon any such transfer, the Obligated Group Representative shall execute and the Master Trustee shall authenticate and deliver in exchange for this Note a new registered Note without coupons, registered in the name of the transferee.

The Obligated Group Representative and other Obligated Group Members, the Master Trustee and any paying agent may deem and treat the person in whose name this Note is registered as the absolute owner hereof for all purposes; and neither the Obligated Group Representative and the other Obligated Group Members, any paying agent, the Master Trustee nor any Obligation registrar shall be affected by any notice to the contrary. All payments made to the registered owner hereof shall be valid and, to the extent of the sum or sums so paid, effectual to satisfy and discharge the liability for moneys payable on this Note.

No covenant or agreement contained in this Note or the Master Indenture shall be deemed to be a covenant or agreement of any officer, agent or employee of any of the Obligated Group Members in his individual capacity, and neither the Board of Directors of any of the Obligated Group Members nor any officer executing this Note shall be liable personally on this Note or be subject to any personal liability or accountability by reason of the issuance of this Note.

This Note shall not be entitled to any benefit under the Master Indenture, or be valid or become obligatory for any purpose, until this Note shall have been authenticated by execution by the Master Trustee, or its successor as Master Trustee, of the Certificate of Authentication inscribed hereon.

**IT IS HEREBY CERTIFIED** that all conditions, acts and things required to exist, happen and be performed under the Master Indenture precedent to and in the issuance of this Note, exist, have happened and have been performed, and that the issuance, authentication and delivery of this Note have been duly authorized by resolutions of the Obligated Group Representative duly adopted.

**IN WITNESS WHEREOF, Tarrant County Senior Living Inc.** has caused this Note to be executed in its name and on its behalf by the manual or facsimile signature of its [President or Vice President], and attested by the manual or facsimile signature of its Secretary or Assistant Secretary, and this Note to be dated as of the Dated Date shown above.

<div style="text-align:right">

**TARRANT COUNTY SENIOR LIVING CENTER INC.,** as Obligated Group Representative

By: _____
Title: _____

</div>

ATTEST:

By: _____
Title: _____

## MASTER TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Note is one of the Obligations described in the within-mentioned Master Indenture.

**UMB BANK, NATIONAL ASSOCIATION,**
as Master Trustee

By: _____
Title: Authorized Officer

A-5

**ENDORSEMENT**

Pay to the order of UMB Bank, National Association, Bond Trustee, pursuant to the Indenture of Trust described in this Note authorizing $_____ principal amount of Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2019, without recourse or warranty of any nature or description.

**TARRANT COUNTY CULTURAL EDUCATIONAL FACILITIES FINANCE CORPORATION**

By: _____
Title:

**Schedule 5 - Cash Collateral Agreement**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 19-xxxxx-xxx** |
| **TARRANT COUNTY SENIOR LIVING** | § | |
| **CENTER, INC,[1]** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |

### FINAL ORDER (1) AUTHORIZING THE DEBTOR TO USE THE CASH COLLATERAL OF UMB BANK, N.A., AS BOND TRUSTEE; (2) PROVIDING UMB BANK, N.A., AS BOND TRUSTEE, ADEQUATE PROTECTION; AND (3) MODIFYING THE AUTOMATIC STAY

This Final Order (1) Authorizing the Debtor to Use the Cash Collateral of UMB Bank, N.A., as Bond Trustee; (2) Providing UMB Bank, N.A., as Bond Trustee, Adequate Protection; and (3) Modifying the Automatic Stay (this "Final Order") is entered upon the motion (the "Motion") of the above-captioned debtor (the "Debtor" or "Borrower") requesting entry of an order authorizing the Debtor to use cash collateral of UMB Bank, N.A., in its capacity as Bond Trustee (the "Bond Trustee"), and to provide the Bond Trustee with adequate protection, and upon terms agreed to by the Debtor and the Bond Trustee. Capitalized terms used in this Final Order but not specifically defined have the meanings set forth in the Motion.

Upon the terms of the Motion, the stipulations, acknowledgements, statements and arguments of the Debtor and the Bond Trustee, including by their respective counsel at the

---

[1] The last four digits of the Debtor's federal tax identification number are xxxx.

87583461v.1

interim and final hearings on the Motion, and based further on the record of these proceedings, the Court makes the following findings of fact and rulings of law:

**The Debtor's Chapter 11 Case; Procedural Background; Jurisdiction; Notice**

A.      On _____, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and thereby commenced a case thereunder (the "Chapter 11 Case"). The Debtor is operating its business and managing its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. [As of the date hereof, no trustee or examiner has been appointed in the Chapter 11 Case.]/[No request has been made for the appointment of a trustee or examiner.]

B.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

C.      This Court held a hearing to consider granting the relief requested in the Motion on an interim basis on _____, 2019 (the "Interim Hearing"). Following the Interim Hearing, the Court entered an order approving the Motion on an interim basis on _____, 2019 (the "Interim Order") [Docket No. __]. Pursuant to the Interim Order, this Court scheduled a hearing to consider the Motion on a final basis, which hearing was held on ____, 2019 (the "Final Hearing").

D.      The Debtor has properly served notice of the Motion and the interim and final hearings thereon pursuant to sections 102, 361, 362 and 363 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 2002 and 4001, and the Local Bankruptcy Rules of this Court (the "Local Rules"), as applicable, as described more fully in Paragraph 3 hereof.

**The Secured Bond Obligations**

E.      The Issuer and the Bond Trustee are parties to an Indenture of Trust, dated as of

October 1, 2009 (the "Bond Indenture"), pursuant to which the Tarrant County Cultural Education Facilities Finance Corporation (the "Issuer") issued its Retirement Facility Revenue Bonds (The Stayton At Museum Way Project), Series 2009A, Series 2009B and Series 2009C (collectively, the "Bonds") in the initial principal amount of $166,575,000.

      F.    The Issuer loaned the proceeds of the Bonds to the Debtor pursuant to a Loan Agreement, dated as of October 1, 2009 (the "Loan Agreement").

      G.    The Debtor and the Master Trustee entered into a Master Bond Indenture, Deed of Trust and Security Agreement, dated as of October 1, 2009 (as amended by the Supplemental Indentures defined below and as it may be further amended from time to time in accordance with its terms, the "Master Indenture"), pursuant to which the Debtor issued the Tarrant County Senior Living Center Inc. Series 2009A, Series 2009B and Series 2009C Notes (collectively, the "Notes") to provide for its loan repayment obligations under the Loan Agreement.

      H.    The Debtor and the Master Trustee entered into a Supplemental Indenture Number 1, dated as of October 1, 2009 (the "First Supplemental Indenture"), pursuant to which the terms and conditions upon which the Notes were authenticated, issued and delivered were clarified, a Supplemental Indenture No. 2, dated as of May __, 2019, pursuant to which provisions relating to draws on the LSA (as defined below) were added (the "Second Supplemental Indenture"), and a Supplemental Indenture No. 3, dated as of May __, 2019 (the "Third Supplemental Indenture," and together with the First Supplemental Indenture and the Second Supplemental Indenture, the "Supplemental Indentures") pursuant to which the Debtor will issue a note securing its obligations relating to new bonds to be issued under the Plan of Reorganization (as defined below). The Bond Indenture, the Master Indenture, the Loan Agreement, the Supplemental Indentures, the Notes, the Mortgage (as defined below), the LSA and any other documents executed in connection with such documents or the Bonds are referred

to herein as the "Bond Documents".

I.        The Bond Trustee has the right to enforce the Borrower's obligation to pay the amounts borrowed from the Issuer, pursuant to its rights under the Master Indenture, and by the fact that the Issuer's rights under the Loan Agreement and the Notes (and its rights under the other Bond Documents) were assigned to the Bond Trustee pursuant to the Bond Indenture.

J.        Subject only to the provisions regarding certain Escrowed Entrance Fee Funds set forth in paragraph 23 below, the Bond Trustee has a security interest, lien and mortgage on substantially all of the Borrower's assets. Specifically, pursuant to the Master Indenture, the Debtor has pledged and granted to the Bond Trustee certain collateral, including but not limited to: (i) a first mortgage lien on the Debtor's continuing care retirement community located in Fort Worth, Texas (the "Facility") and the land on which the Debtor's Facility is located; (ii) a security interest in all personal property owned or hereafter acquired by the Debtor; and (iii) a security interest in all of the Gross Revenues (as defined in the Bond Documents) of the Debtor. In addition, all moneys and securities held by the Bond Trustee have been pledged and assigned to the Bond Trustee as security for the payment amounts owed on account of the Bonds. All of the collateral described in this Paragraph J is referred to as the "Prepetition Collateral". The Bond Trustee's liens on the Prepetition Collateral are referred to herein as the "Prepetition Liens".

K.        In addition, under the terms of the Bond Documents, certain accounts were established and are held by the Bond Trustee, including, but not limited to the following funds, each as defined in the Bond Documents: the Bond Fund, the Construction Fund, the Reserve Fund, the Entrance Fee Fund, the Working Capital Fund, the LSA, and the Revenue Fund (collectively, the "Trustee-Held Funds"). As of the Petition Date, the Trustee-Held Funds totaled approximately $____ million.

L.     The Debtor has acknowledged and agrees, and the Court finds, that the Trustee-Held Funds are held in trust for the holders of the Bonds (the "Bondholders"). In the alternative, the Debtor reaffirms its acknowledgement that the Bond Trustee holds a validly perfected possessory security interest in the Trustee-Held Funds, and is entitled to access the Trustee-Held Funds in accordance with the terms of the Bond Documents. To the extent that the automatic stay applies to such Trustee-Held Funds pursuant to section 362(a) of the Bankruptcy Code, as adequate protection for the use of the Trustee's Cash Collateral (as defined below), the Debtor stipulates to relief from such stay for the purpose of allowing the Bond Trustee to administer and apply the Trustee-Held Funds in accordance with the Bond Documents, including in the case of any funds held in the Liquidity Support Account. The Trustee-Held Funds shall be administered and applied as set forth in the Bond Documents and for the express purposes set forth therein, and shall not be used or made available to Debtor as Cash Collateral or otherwise pursuant to this Final Order or any other order entered in this Chapter 11 Case. Notwithstanding the foregoing acknowledgments in this paragraph L, if there is a breach of the PSA by a Directing Holder (as defined below), the Trustee, or the Master Trustee at the direction of the Directing Holders that prevents the consummation of the Plan of Reorganization or causes a termination of the PSA, any remaining amounts in the Liquidity Support Account shall, upon written request by Lifespace, Inc. ("Lifespace"), be returned to Lifespace as set forth in the LSA.

**The Plan Support Agreement, the Membership Substitution, the Liquidity Support Agreement and the Plan of Reorganization**

M.     On May __, 2019. The Bond Trustee entered into a Plan Support Agreement ("PSA") with the Debtor, Lifespace Communities, Inc. (the "Sponsor"), and certain bondholders constituting a majority of the holders of the Bonds (the "Directing Holders"), which among other things committed the Bond Trustee to support a pre-packaged plan of reorganization to be filed

-5-

by the Debtor on the Petition Date of this Chapter 11 Case (as such plan of reorganization was filed [Docket No. ___], the "Plan of Reorganization"). In addition, under the PSA, the Debtor and the Bond Trustee agreed to the form of this Final Order to allow the Debtor to use the Bond Trustee's Cash Collateral as set forth herein. The Debtor distributed the Plan of Reorganization, an accompanying disclosure statement, and a ballot to all creditors and other parties in interest entitled to vote on the Plan of Reorganization prior to the filing of this Chapter 11 Case. [As described more fully in the Declaration of ___ [Docket No. ___] filed on the first day of this Chapter 11 Case, each class of creditors entitled to vote on the Plan of Reorganization voted in favor of confirmation.]

N.      At the same time that the PSA was entered into, the Sponsor and the Debtor, among other parties, entered into an Affiliation Agreement dated ___ (the "Affiliation Agreement"), pursuant to which it was agreed that the Sponsor would be substituted for Senior Quality Lifestyles Corporation ("SQLC") as the sole member of the Debtor (the "Membership Substitution"). The Membership Substitution occurred on [June] ___, 2019. At the same time that the Membership Substitution occurred, the Debtor, the Sponsor, and the Bond Trustee entered into a Liquidity Support Agreement (the "LSA"). Under the LSA, the Sponsor provided $3,000,000 (the "Interim LSA Amount") to be held by the Bond Trustee in a newly-created account (the "Liquidity Support Account"), held under the Master Indenture.

**The Bond Claim**

O.      The Debtor stipulates that as of the Petition Date, the amounts due and owing under the Bonds and Bond Documents are not less than:

(i)     unpaid principal in the amount of $105,795,000;

(ii)    accrued but unpaid interest on the Bonds in the amount of $_____ (the aggregate of (i) and (ii) are referred to herein as the "Bond Claim"), which

interest continues to accrue on the Bonds at a per diem rate of $_____$, which interest will be added to the Bond Claim; and

(iii)      unliquidated, accrued and unpaid reasonable fees and expenses of the Bond Trustee and its professionals incurred through the Petition Date (the "Prepetition Expense Claim"). Such amounts when liquidated shall be added to the Bond Claim.

The Bond Trustee reserves any and all rights to amend the Bond Claim. Nothing herein shall be deemed to be a waiver of such rights. In the event the Bond Trustee amends the Bond Claim to increase the amount of such claim, the Debtor may challenge any amounts in excess of (i) and (ii) above.

## Use of Cash Collateral and Need for Adequate Protection

P.      The Debtor has requested the use of the Bond Trustee's Cash Collateral in connection with the Chapter 11 Case to preserve the value of its business and implement the Plan of Reorganization. Pursuant to the Bankruptcy Code, the Debtor is required to provide adequate protection to the Bond Trustee for the use of such Cash Collateral. As noted above, the form of this Final Order was agreed to by the Debtor and the Bond Trustee as part of the Forbearance Agreement and PSA, including the adequate protection provided herein. The Bond Trustee has informed the Debtor and the Court that the Bond Trustee does not consent to the use of Cash Collateral except upon the terms and conditions of this Final Order.

Q.      Without the use of Cash Collateral, the Debtor would suffer immediate and irreparable harm and would likely be required to cease operations immediately or, at a minimum, the Debtor's inability to use Cash Collateral would disrupt the Debtor as a going concern and would otherwise not be in the best interests of the Debtor or its creditors, including the Bondholders and residents of the Debtor's Facility. In lieu of giving the Bond Trustee relief from the automatic stay or attempting to obtain this Court's approval for use of Cash Collateral on a non-consensual basis, the Debtor wishes to provide adequate protection of the liens and security

interests of the Bond Trustee in Cash Collateral and other Prepetition Collateral on the terms set forth in this Final Order, reflecting the agreement of the Debtor and the Bond Trustee.

R. The Bond Trustee is willing to consent to the use of its Cash Collateral by the Debtor on the terms set forth in this Final Order, including that[, upon the full amount of the Interim LSA Amount being validly withdrawn from the Liquidity Support Account ("Interim LSA Depletion"),][2] Cash Collateral may be used solely in the amounts and categories set forth in the Updated Cash Collateral Budget (as defined below).

S. The terms of the proposed use of Cash Collateral, and this Final Order are fair and commercially reasonable, reflect the Debtor's prudent exercise of business judgment consistent with its fiduciary duties and constitute reasonably equivalent value and fair consideration. Good cause has been shown for the entry of this Final Order.

T. To the extent any portion of the foregoing constitute rulings of law, they shall constitute this Court's rulings with respect to the matters so-stated.

**NOW, THEREFORE, THE COURT HEREBY ORDERS AS FOLLOWS:**

1. Disposition. The Motion is granted on a final basis, on the terms set forth in this Final Order. The date of this Final Order shall be known as the "Effective Date." Any objections to the relief sought in the Motion that have not been previously resolved or withdrawn, and all reservations of rights contained therein, are overruled on the merits.

2. Jurisdiction. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334, and this matter constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409. The Debtor has operated its business and managed its property as Debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

---

[2] NTD: If this has occurred pre-petition, the clause will not be necessary because the Updated Cash Collateral Budget will already govern.

87583461v.1

3.     Notice. The Debtor has properly served notice of the Motion and the final hearing thereon pursuant to Sections 102, 361, 362, and 363 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001, and the Local Rules, which notice was sent to, among others: (i) counsel to the Bond Trustee; (ii) each of the Debtor's twenty largest unsecured creditors as set forth in the list filed by the Debtor in the Chapter 11 Case pursuant to Bankruptcy Rule 1007(d); (iii) the Office of the United States Trustee for the Northern District of Texas; (iv) the Office of the Attorney General of the State of Texas; (v) all known holders of liens on the Debtor's assets; (vi) all applicable governmental agencies to the extent required by the Bankruptcy Rules or Local Rules; (vii) all parties that have filed a notice of appearance in this Chapter 11 Case; and (viii) those who have formally appeared and requested service in these proceedings pursuant to Bankruptcy Rule 2002. This notice is appropriate in the particular circumstances and is sufficient for all purposes under the Bankruptcy Code and the applicable Bankruptcy Rules and Local Rules in respect to the relief requested.

4.     Good Cause. Good cause has been shown for entry of this Final Order.

5.     Authorization to Use Cash Collateral. The Debtor is authorized to use, as cash collateral (as defined in Section 363 of the Bankruptcy Code), Gross Revenues (as defined in the Master Indenture) and other cash received by the Debtor in the ordinary course of operations of its business, including all amounts currently held in the Debtor's operating account at [_____] (collectively, the "Cash Collateral"), until the earlier of (i) the Debtor's ability to use Cash Collateral terminates as the result of the occurrence of a Termination Event (as set forth below) or (ii) February 29, 2020. Such use of Cash Collateral is only permitted in accordance with the terms of this Final Order. [Upon depletion of the initial $3,000,000 deposited in the Liquidity Support Account ("Interim LSA Depletion"), (a) use of Cash Collateral shall be limited solely to the categories of expenses listed in the budget to be agreed upon by the Borrower and the Bond

Trustee in good faith (the "Cash Collateral Budget") and (b) such use of Cash Collateral shall be limited solely to pay expenses in the amounts and at the times listed in the Cash Collateral Budget][3] [Use of Cash Collateral shall be limited solely to the categories of expenses listed in the budget attached hereto as **Exhibit A** (the "Cash Collateral Budget")];[4] provided, however, that the Debtor shall have authority to use Cash Collateral in excess of, and at times different from, the amounts set forth in the Cash Collateral Budget (the "Budgeted Expenses") to the extent such a variance does not constitute a Termination Event described in paragraph 17(i) of this Final Order. Notwithstanding the foregoing, at all times during this Chapter 11 Case: (1) no amounts in excess of the applicable Budgeted Expenses shall be paid by Borrower to any affiliate of Lifespace or SQLC other than amounts payable under Stayton's (x) management agreements (provided, for the avoidance of doubt, that any such management agreements shall be subject to the limitations set forth in section II(H)(4) of the Forbearance Agreement notwithstanding any prior termination of the Forbearance Agreement) or (y) any administration and operational agreements pursuant to which an affiliate of Lifespace or SQLC pays costs incurred on Stayton's behalf to third parties and allocates to, and receives reimbursement of such costs from, Stayton, and (2) other than fees and expenses associated with this Chapter 11 Case and the transactions contemplated in the PSA that are disclosed to, and if applicable approved by, the Bankruptcy Court, Stayton shall incur expenses and pay disbursements only in the ordinary course.

6.    Exclusion from Cash Collateral. No party, other than the Debtor, may use the Cash Collateral of the Bond Trustee. The Debtor is not authorized to use and shall not use any Gross Revenues not derived in the ordinary course of the Debtor's operations. Nothing in the Interim Order, this Final Order, or in any subsequent order concerning the extension of the use of Cash Collateral, or other order of this Court entitles the Debtor to use any Trustee-Held Funds.

---

[3] Note: If Interim LSA Depletion has not occurred prior to filing.
[4] Note: If Interim LSA Depletion has occurred prior to filing.

87583461v.1

The Trustee-Held Funds are held in trust for the Bondholders. In the alternative, the Bond Trustee holds a validly perfected possessory security interest in the Trustee Held Funds, and is entitled to access the Trustee Held Funds in accordance with the terms of the Bond Documents. The Bond Trustee is granted relief from the automatic stay pursuant to Section 362 of the Bankruptcy Code for the purpose of allowing the Bond Trustee to administer and apply the Trustee-Held Funds in accordance with the Bond Documents, including in the case of the Liquidity Support Account, the LSA. Notwithstanding the foregoing provisions of this paragraph 6, if there is a breach of the PSA by a Directing Holder or the Trustee or the Mater Trustee at the direction of the Directing Holders that prevents the consummation of the Plan of Reorganization or causes a termination of the PSA, any remaining amounts in the Liquidity Support Account shall, upon written request by the Lifespace, be returned to Lifespace as set forth in the LSA.

7. <u>Prohibited Use of Cash Collateral</u>. Except as expressly provided in this Final Order, no Cash Collateral or proceeds thereof shall be used for the purpose of: (i) objecting to, or contesting in any manner, or raising any defense to, the validity, amount, extent, perfection, priority, or enforceability of the Bonds, the Prepetition Collateral, the Bond Claim, or any liens or security interests with respect thereto, or any other rights or interests of the Bond Trustee therein or in the Trustee-Held Funds; (ii) asserting any claims or defenses or causes of action arising out of, based upon, or related to, in whole or in part, the Bonds or the Bond Documents, against the Bond Trustee, the Bondholders in their capacity as such, or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, including with respect to payments made pursuant to the Bond Documents; (iii) seeking to modify any of the rights granted to the Bond Trustee hereunder; (iv) seeking to bifurcate any claims of the Bond Trustee; or (vi) pursuing confirmation of a plan of reorganization or liquidation other than the Plan of

Reorganization.

8.   Amendment or Extension of Budget. The Debtor may, at any time, propose to the Bond Trustee in writing (including by email) an amended Cash Collateral Budget, for the period covered by this Final Order. Any such proposed amendment or modification of the terms and conditions, or any amendment, modification, roll-forward or replacement of the Cash Collateral Budget itself, shall be subject to the prior written consent of the Bond Trustee. At such time as the amended budget becomes the Cash Collateral Budget, the Debtor shall file a copy thereof with this Court and serve it upon all parties entitled to notice in accordance with Bankruptcy Rule 4001(b).

9.   Adequate Protection Payments. In consideration of the Debtor's use of Cash Collateral and the diminution in its Prepetition Bond Collateral on and after the Petition Date, (i) on or before the tenth (10th) day of each month, the Debtor shall pay to the Bond Trustee for deposit to the Bond Fund with respect to the immediately preceding month, amounts representing the lesser of (a) the monthly debt service payment due for such month with respect to the Series 2009 Notes as set forth in the Bond Documents and (b) an amount equal to 75% of any positive Forbearance Net Cash Flow (as defined below) for the preceding month (each, an "Adequate Protection Payment"), provided, however, that such lesser amount shall not exceed the amount of unrestricted cash and investments cash (as calculated in the entry for "Ending Book Balance-Operating" in the Forbearance Budget) of the Debtor on the last day of the preceding month in excess of $5,464,000; and (ii) on November 15, 2019, the amount in the Bond Fund shall be paid by the Bond Trustee to the holders of the Bonds, but no draw shall be made from amounts on deposit in the Reserve Fund. Nothing herein constitutes a waiver of the amounts due with respect to the Series 2009 Notes and amounts due on the Series 2009 Notes and not paid as a result of the deferral in the preceding sentence shall become immediately due

-12-

and payable upon a Termination Event. For the purposes of this Order, "Forbearance Net Cash Flow" shall mean Net Cash Flow, as such term is calculated in the Forbearance Budget, including Net Entrance Fees, as such term is calculated in the Forbearance Budget. If Net Cash Flow as calculated under the Forbearance Budget is less than or equal to zero for a given month, Forbearance Net Cash Flow for the purposes of this Order shall be equal to zero.

10.     Any and all payments or proceeds remitted to the Bond Trustee pursuant to the provisions of this Final Order or otherwise shall be received by the Bond Trustee, free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on sections 506(c) and/or 552(b) of the Bankruptcy Code, whether directly or indirectly, all of which are hereby waived by the Debtor.

11.     Replacement Lien. Except as otherwise provided in this paragraph 11, as further adequate protection for any diminution in the value of Cash Collateral and other Prepetition Collateral resulting from the Debtor's use thereof after the Petition Date ("Diminution"), and solely to the extent of any Diminution, the Bond Trustee shall have a valid, perfected, and enforceable replacement lien and security interest (the "Replacement Lien") in (i) all assets of the Debtor existing on or after the Petition Date of the same type as the Prepetition Collateral, together with the proceeds, rents, products, and profits thereof, whether acquired or arising before or after the Petition Date, to the same extent, validity, perfection, enforceability, and priority of the liens and security interests of the Bond Trustee as of the Petition Date (the "Postpetition Bond Collateral"); and (ii) all other assets of the Debtor of any kind or nature whatsoever within the meaning of Section 541 of the Bankruptcy Code, whether acquired or arising prepetition or postpetition, together with all proceeds, rents, products, and profits thereof (the "Supplemental Collateral"; and, collectively with the Postpetition Bond Collateral, the "Collateral"); provided, however, Supplemental Collateral shall be exclusive of causes of action

-13-

87583461v.1

under Chapter 5 of the Bankruptcy Code and proceeds thereof with the exception of any causes of action pursuant to Section 542 of the Bankruptcy Code). The Replacement Lien shall be subject and subordinate to only the Carve Out (as defined below) and any valid and perfected liens existing on the Petition Date that are senior to Liens of the Bond Trustee against the Prepetition Collateral ("Prior Liens").

12. No Further Action Required. The approval of this Final Order by the Court shall be sufficient and conclusive evidence of the validity, extent, enforceability, and perfection of the Replacement Lien granted to the Bond Trustee, whether or not the Bond Trustee elects to file or record financing statements or any other documents that may otherwise be required under federal or state law in any jurisdiction, or to take such other steps as may otherwise be required to obtain, evidence, or perfect such liens under applicable law; provided, however, that upon the request of the Bond Trustee, the Debtor shall execute such other documents as may be reasonably requested to evidence and perfect such liens; that the Bond Trustee may, in its sole discretion, but shall not be required to, file a certified copy of this Final Order in any filing or recording office in any jurisdiction in which the Debtor has real or personal property; that the Debtor is authorized and directed to execute, or cause to be executed, all such financing statements or other documents upon the Bond Trustee's reasonable request; and that such filing or recording shall be accepted and shall constitute further evidence of perfection of the Bond Trustee's liens and security interests. No obligation, payment, transfer, or grant of security under this Final Order shall be stayed (other than by court order in an appeal from this Final Order), restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any otherwise applicable state law, or subject to any defense, reduction, setoff, recoupment, or counterclaim.

13. Superpriority Claim. As additional adequate protection for any Diminution, the

Bond Trustee shall have a superpriority administrative expense claim pursuant to Section 507(b) of the Bankruptcy Code with recourse to and payable from any and all assets of the Debtor's estate, including but not limited to rights of the Debtor in, choses in action, or claims of any kind whatsoever, choate or inchoate, present or residual that for any reason cannot be made the subject of the Replacement Lien (the "Superpriority Claim"). The Superpriority Claim shall be subject only to Prior Liens and the Carve Out and shall have priority, pursuant to Section 507(b) of the Bankruptcy Code, over any and all administrative expenses, diminution claims, and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c) (following entry of the Final Order), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtor, any successor trustee, or any creditor in this Chapter 11 Case, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment.

14.    <u>Allowance of Claim</u>. As set forth in paragraph 26 below, the entry of this Final Order by the Court shall be a conclusive and binding determination on all parties (x) as to the amount and validity of the Bond Claim, and (y) as to the scope, extent, perfection, validity, and enforceability, in all respects, of the Bond Trustee's security interests and liens in the Prepetition Collateral, including, without limitation, the Cash Collateral.

15.    <u>Financial Information</u>. As further additional adequate protection of the Bond Trustee's security interests in the Cash Collateral and the Prepetition Collateral, the Debtor shall (i) on Wednesday of each week, provide a report indicating all receipts received and disbursements made by the Debtor in the week ending on the prior Friday; (ii) host a weekly call

with the Bond Trustee and its professionals, the Directing Holders, and the Borrower's professional advisors, to discuss the weekly expense and disbursement report, the monthly financials of the Borrower, sales and reservations for the prior month, the status of the confirmation of the Plan of Reorganization, the results of operations, and other matters pertaining to the Facility and the Chapter 11 Case, and any other information reasonably requested by the Bond Trustee; and (iii) allow the Bond Trustee and its professionals and designees reasonable access, during normal business hours and on not less than 48 hours' notice, to the premises of the Debtor in order to conduct appraisals, analyses, and/or audits of the Prepetition Collateral and the Collateral, and shall otherwise reasonably cooperate in providing any other financial information reasonably requested by the Bond Trustee for this purpose. [Following Interim LSA Depletion, commencing with the second Wednesday after the Interim LSA Depletion, the Debtor shall provide to the Bond Trustee and the Directing Holders on Wednesday of every other week a report showing the cumulative actual expenses and the cumulative Budgeted Expenses for the four-week period ending the Friday preceding such Wednesday (each, a "Four-Week Testing Period") (except, that for the first such report shall compare the actual expenses and the cumulative Budgeted Expenses for the period between the Interim LSA Depletion and the Friday before the Wednesday the report is delivered), and detailing any variances of more than 12.5% and at least $10,000 from the expenditures and receipts in the Cash Collateral Budget for the corresponding Four-Week Testing Period, which report shall also be discussed on the weekly calls referenced above.] The Debtor shall provide to the Bond Trustee such other reports and information as the Bond Trustee may reasonably request from time to time.

16.     Compliance With Bond Documents. As further adequate protection against Diminution, the Debtor shall comply with those terms and provisions of the Bond Documents set forth on **Exhibit B** attached hereto and incorporated herein. The requirements of this Final Order

87583461v.1

shall be in addition to, and not in substitution for, the terms and provisions of the Bond

Documents set forth on Exhibit B; provided, however, in the event of any inconsistency between

the Bond Documents and this Final Order, the terms of this Final Order shall control.

17. Termination of Use of Cash Collateral With Notice. A Termination Event shall

be deemed to have occurred five (5) business days after written notice sent by the Bond Trustee

to the Debtor, its counsel, and the United States Trustee of the occurrence of any of the following

(a "Termination Event"):

> (i) [following Interim LSA Depletion,] the payment of any expense that would cause aggregate actual expenditures in the Cash Collateral Budget to exceed 112.5% of the total budgeted expenses in the Cash Collateral Budget for a Four-Week Test Period, provided, however, that entrance fee refunds, if any, shall not be counted against actual expenditures or total budgeted expenses, and, provided further that professional fees and any fees of Seniority, Inc. shall not be subject to any such variance. This foregoing variances shall be measured for each Four-Week Test Period. Any budgeted expenditures not paid in a particular budget period may be paid during a subsequent period and, for the purpose of calculating the variances set forth above, the Cash Collateral Budget will be revised to move such expenditures to the later period;

> (ii) the failure of the Debtor to pay, within ten (10) days of the applicable due date, all undisputed administrative expenses in full in accordance with their terms [as provided for in the Cash Collateral Budget] except for any expenses under sections 503(b)(9) or 546(c) of the Bankruptcy Code;

> (iii) the failure of the Debtor to timely pay all fees due under 28 U.S.C. § 1930;

> (iv) the failure to timely pay the monthly Adequate Protection Payment; and

> (v) the failure of the Debtor to comply with, keep, observe, or perform any of its agreements or undertakings under this Final Order.

Unless prior to the expiration of the five (5) business day period described in this paragraph 17

the Debtor has cured the Termination Event(s) specified in the Bond Trustee's notice, or

obtained an order of this Court, on notice to and with the opportunity to be heard by the Bond

-17-

87583461v.1

Trustee, that no such Termination Event has occurred, the authority of the Debtor to use Cash Collateral hereunder shall terminate without further action of any kind (the "Termination Date"), and all amounts owed as set forth in the Bond Claim shall be accelerated and immediately due and payable upon discretion of the Bond Trustee, and the Bond Trustee shall be automatically relieved of any further stay under Section 362 of the Bankruptcy Code, or other restriction on enforcement of its prepetition and postpetition liens and security interests in the Collateral to collect amounts due. Following the occurrence of a Termination Event under this Paragraph 17, the Debtor shall schedule a status conference within five business days after the occurrence of such Termination Event to discuss the outstanding issues related to the proceedings with the Court. Notwithstanding the foregoing provision regarding relief from the stay under Section 362 of the Bankruptcy Code, the Bond Trustee shall take no action with respect to the enforcement of its prepetition and postpetition liens and security interests in the Collateral or to collect the amounts due from the Debtor until such status conference has been held.

18. <u>Termination of Use of Cash Collateral Without Prior Notice</u>. The Debtor's authority to use Cash Collateral hereunder shall terminate without any further action by this Court, and a Termination Event shall occur without prior notice, upon the occurrence of any of the following (also a "Termination Event"):

(i)     Occurrence of the effective date of the Plan of Reorganization;

(ii)     the Chapter 11 Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(iii)     the earlier of (y) the date of the entry of an order of this Court appointing a Chapter 11 trustee or an examiner with enlarged powers (beyond those set forth in Sections 1104(c) and 1106(a)(3) and (4) of the Bankruptcy Code) for the Debtor; or (z) the date the Debtor files a

-18-

motion, application, or other pleading consenting to or acquiescing in any such appointment;

(iv) the Debtor files or supports confirmation of, or fails to actively oppose confirmation of, a plan of reorganization that is inconsistent with the Plan of Reorganization or that would result in the modification or amendment of the plan of Reorganization in a way that materially adversely affects the Bond Trustee;

(v) the Debtor fails to take all reasonable necessary steps in seeking to obtain from the Bankruptcy Court an order confirming the Plan of Reorganization by no later than [45 DAYS AFTER THE PETITION DATE];

(vi) the Debtor fails to take all reasonable steps so that the effective date of the Plan of Reorganization occurs not later than [February 29, 2020];

(vii) termination of the PSA;

(viii) an order is entered in the Chapter 11 Case over the objection of the Bond Trustee approving financing pursuant to Section 364 of the Bankruptcy Code that would grant an additional security interest or a lien on any Collateral or granting a superpriority administrative claim that is equal or superior to the superpriority administrative claim granted to the Bond Trustee under this Final Cash Collateral Order; and

(ix) an adversary proceeding or contested matter is commenced or joined by the Debtor challenging the amount, validity, enforceability, priority, or extent of the Bond Trustee's liens, security interests, or claims.

Upon the occurrence of a Termination Event described in this paragraph 18, the Debtor's authority to use Cash Collateral hereunder shall automatically terminate (also a "Termination Date"), and all amounts owed all amounts owed as set forth in the Bond Claim shall be accelerated and immediately due and payable upon discretion of the Bond Trustee, the Bond Trustee shall be permitted to exercise all available remedies without further notice or court order, and the Bond Trustee shall be automatically relieved of any further stay under Section 362 of the Bankruptcy Code, or other restriction on enforcement of its prepetition and postpetition liens and security interests in the Collateral to collect the amounts due. Following the occurrence of a

-19-

Termination Event under this Paragraph 18, the Debtor shall schedule a status conference within five business days after the occurrence of such Termination Event to discuss the outstanding issues related to the proceedings with the Court. Notwithstanding the foregoing provision regarding relief from the stay under Section 362 of the Bankruptcy Code, the Bond Trustee shall take no action with respect to the enforcement of its prepetition and postpetition liens and security interests in the Collateral or to collect the amounts due from the Debtor until such status conference has been held.

19.    <u>Claims and Causes of Action</u>. On behalf of itself and the estate, the Debtor reaffirms, and hereby waives, releases, and discharges the Bond Trustee, all Bondholders in their capacity as such, and their respective affiliates, agents, attorneys, professionals, officers, directors, and employees (collectively, the "<u>Released Parties</u>"), from any and all claims and causes of action arising out of, based upon, or related to, in whole or in part, the Bonds and the Bond Documents; any aspect of the prepetition relationship between the Bond Trustee and/or the Bondholders, and the Debtor; and any other acts or omissions by the Bond Trustee and/or the Bondholders in connection with either the Bond Documents or the Bond Trustee's and/or Bondholders' prepetition relationship with the Debtor. Further, the Debtor reaffirms its waiver and hereby waives any and all rights to object to or contest the amount of the Bond Claim or the Bond Trustee's security interest in the Prepetition Collateral and agrees not to challenge that all such claims and security interests have been duly perfected and are in all respects valid and enforceable first priority security interests and liens.

20.    <u>Failure of Adequate Protection</u>. Nothing herein shall constitute a waiver, release or modification of the rights of the Bond Trustee to assert a claim under Sections 364(c) and 507(b) of the Bankruptcy Code.

21.    <u>Deemed Request for Stay Relief</u>. This Final Order shall be deemed to constitute a

request as of the Petition Date by the Bond Trustee for relief from the automatic stay with respect to the Prepetition Collateral for purposes of any request for adequate protection granted hereunder.

22.     No Charge on Collateral; Carve Out. In partial consideration of the Debtor's continuing acknowledgement of the debt due and owing and the waiver of any claims under Section 506(c) (following entry of the Final Order) and Section 552(b) of the Bankruptcy Code, the Bond Trustee consents to certain expenses and professional fees incurred during the pendency of this Chapter 11 Case that shall be superior in all instances to the liens and claims of the Bond Trustee and all other parties (the "Carve Out"). For purposes hereof, the "Carve Out" means (a) the statutory fees of the United States Trustee pursuant to 28 U.S.C. § 1930 and the fees of the Clerk of this Court; and (b) for professionals retained by the Debtor or its estate and any statutory committee appointed in the chapter 11 cases pursuant to section 1103 of the Bankruptcy Code, the fees and expenses of such professional solely to the extent such fees and expenses (i) have actually been incurred by the corresponding professional between the Petition Date and the Termination Date, and (ii) have been allowed by the Court; provided, however, the amount of the "Carve Out" in (b) above shall be subject to a cap in the amount of $75,000 per week (with such amounts to be treated on a pro-rated basis for any partial weeks) for the period between the Petition Date and a Termination Date, minus the aggregate of (x) the amount of any retainer, deposit, or other identified funds that is available to pay such fees and expenses (including any amounts paid into any professional fee escrow), and (y) any additional amounts actually paid to such professionals (solely to the extent such payments are in addition to amounts included in the foregoing subsection (x)). The Debtor is authorized to use Cash Collateral to pay the fees, costs and expenses that constitute the Carve-Out, as the same may be due and payable, either during the period this Order remains in effect or thereafter, provided that no portion of the

Prepetition Collateral or the Cash Collateral may be used by the Debtor, any committee or any of their Professionals or any other person or entity to commence or prosecute (as opposed to analyze and investigate) any action, contest, challenge or objection with respect to the Creditor Parties, the Bonds, the Bond Documents, or the Prepetition Collateral. Nothing herein shall constitute a waiver of any right of the Bond Trustee to object to fees and expenses of any professionals or to challenge any assertion that any amount of the fees and expenses are not Unpaid. The entry of this Final Order shall continue to be a conclusive and binding determination on all parties that, except for the Carve Out, no costs or expenses of administration shall be imposed against the Bond Trustee or the Prepetition Collateral or the Collateral under Section 105 of the Bankruptcy Code or Section 506(c) or Section 552(b) of the Bankruptcy Code, or otherwise.

23. <u>Escrowed Entrance Fees</u>. To the extent the Debtor is holding entrance fees received following the Petition Date (the "<u>Entrance Fees</u>") in an escrow account pursuant to that *Agreed Order Authorizing Debtor to Escrow Certain Entrance Fees and Refund Certain Entrance Fees* (the "<u>Escrow Order</u>"), such Entrance Fees shall not be subject to the liens of the Bond Trustee until all conditions under that escrow are satisfied and the Debtor is authorized to release the funds from escrow pursuant to the Escrow Order or other order of the Court, at which time the Bond Trustee's liens will attach to the Debtor's right to receive any Entrance Fees released from the escrow account. The Debtor is authorized to make refund payments in accordance with the Escrow Order.[5] [For the avoidance of doubt, any entrance fees paid into an escrow account ("<u>Pre-Petition Escrow</u>") during the period following the Forbearance Date and prior to the Petition Date ("<u>Pre-Petition Entrance Fees</u>") shall not be deemed property of the Debtor's estate or subject to the liens or priority claims of the Bond Trustee until all conditions

---

[5]     Note: If post-petition entrance fees are escrowed, then refunds for corresponding escrows should not be paid until the escrow breaks.

under the applicable Pre-Petition Escrow are satisfied or the Debtor is authorized to release the funds from escrow pursuant to the an order of the Court, at which time the Bond Trustee's liens will attach to the Debtor's right to receive any Pre-Petition Entrance Fees released from such Pre-Petition Escrow.][6/]

24.   _Modification of Stay_. The automatic stay imposed by Section 362 of the Bankruptcy Code is hereby vacated and modified insofar as necessary to permit the Bond Trustee to: (i) receive any payments or distributions made by the Debtor to the Bond Trustee for and on behalf of the Bondholders, (ii) apply, allocate, or make payments from any of the funds or accounts maintained by the Bond Trustee (including, without limitation, the Trustee-Held Funds) in accordance with the terms of the Bond Documents, and (iii) take any action authorized by the Interim Order or this Final Order.

25.   _Preservation of Rights_. If any or all of the provisions of this Final Order are, at any time, modified, vacated or stayed, such stay, modification, or vacation shall not affect the validity, extent, priority, and enforceability of any lien, priority, or other benefit conferred under the Interim Order, or this Final Order prior to such stay, modification, or vacation.

26.   _Binding Effect_. This Final Order shall be binding on all creditors and parties in interest in this Chapter 11 Case, including, but not limited to, the Debtor and any successors thereto, any Chapter 11 or Chapter 7 trustee that is appointed or elected in this Chapter 11 Case _provided_, _however_, that this Final Order is without prejudice to the rights of an official committee of unsecured creditors (a "Committee") to, on behalf of the Debtor's estate, challenge the validity, amount, perfection, priority, extent or enforceability of the Bond Claim or the pre-petition security interests of the Bond Trustee (a "Committee Challenge"), so long as any such challenge is made on or before the date that is the earlier of (i) five (5) business days prior to the

---

[6/]   There is no intention to escrow entrance fees pre-petition, but rather shall do so only if necessary to consummate a sale.

date that the Court sets as the deadline for any objections to the Plan of Reorganization, or (ii) the date that is thirty (30) days after the Petition Date, after which time all such challenges shall be deemed finally and conclusively barred; provided further that if one or more claims are timely made under this paragraph 26 and properly filed, then except for such claims, all potential claims and causes of actions are hereby deemed forever waived and relinquished.

27.     No Competing Liens. Except as set forth herein, the Debtor shall not grant liens on, or security interests in, the Prepetition Collateral or the Collateral to any other party, pursuant to Section 364 of the Bankruptcy Code or otherwise, without the consent of the Bond Trustee.

28.     Reservation of Rights. Except as provided in this Final Order or as otherwise provided in the PSA, neither the Debtor nor the Bond Trustee waives any of its rights under the Bankruptcy Code, any applicable law, or the Bond Documents, including, without limitation, the right of the Debtor or the Bond Trustee at any time to seek any relief (or to oppose any such relief) under the Bankruptcy Code, or the right of the Debtor or the Bond Trustee to exercise any of its rights and remedies under the Bankruptcy Code at any time.

29.     Further Relief. Subject to the terms of the PSA, nothing herein shall (i) preclude the Bond Trustee from seeking any other relief that it may deem appropriate, including relief from the automatic stay; or (ii) prevent the Bond Trustee from asserting at some later time that its liens and security interests in the Prepetition Collateral are not being adequately protected.

30.     No Third Party Beneficiaries. Except as expressly provided herein, no rights are created hereunder for the benefit of any third party, any creditor, or any direct, indirect or incidental beneficiary except for the Bondholders, as set forth herein.

31.     Effectiveness. The rights and obligations of the parties under this Final Order shall be effective and enforceable as of the date of the Petition Date, and, for the avoidance of doubt, Bankruptcy Rule 6004(h) shall not apply hereto. If any or all of the provisions of this

87583461v.1

Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur, or stay shall not affect (i) the validity, extent, priority, or enforceability of any obligations incurred prior to the actual receipt of written notice by the Bond Trustee of the effective date of such reversal, modification, vacatur, or stay, or (ii) the validity, extent, or enforceability of the liens and claims granted hereunder.

32. <u>Notices</u>. All notices, requests, demands, waivers, and other communications required or permitted to be given under this Final Order shall be in writing and shall be deemed to have been duly given if (a) delivered personally, or (b) sent by email with a next-day or overnight mail or delivery:

    (a)    If to the Debtor to:

        Ankura Consulting Group, LLC
        Attn: Louis E. Robichaux IV
        15950 Dallas Parkway, Suite 750
        Dallas, TX 75248
        Telephone: (214) 200-3689
        E-mail: Louis.robichaux@ankura.com

        with a copy sent contemporaneously by email to:

        DLA Piper LLP (US)
        Attn: Thomas R. Califano, Esq.
        1251 Avenue of the Americas
        New York, NY 10020-1104
        Telephone: (212) 335-4500
        E-mail: thomas.califano@dlapiper.com

    (b)    If to the Bond Trustee to:

        UMB Bank, N.A.
        Attn: Virginia A. Housum
        Senior Vice President
        120 Sixth Street South, Suite 1400
        Minneapolis, MN 55403
        E-mail: Virginia.housum@umb.com

        with a copy sent contemporaneously by email to:

        Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
        Attn: Daniel S. Bleck, Esq.

87583461v.1

One Financial Center
Boston, MA 02111
Telephone: (617) 348-4498
E-mail: dsbleck@mintz.com

**###END OF ORDER###**

**<u>EXHIBIT C</u>**

2019 Bond Documents

**Schedule 4 - 2019 Bond Documents**

AMENDED AND RESTATED MASTER TRUST INDENTURE,
DEED OF TRUST AND SECURITY AGREEMENT

between

TARRANT COUNTY SENIOR LIVING CENTER INC.,
as the Initial Obligated Group Member

and

UMB BANK, NATIONAL ASSOCIATION
as successor Master Trustee

Amended and Restated as of
[November 1], 2019

TABLE OF CONTENTS

Page

ARTICLE I      DEFINITION OF TERMS, CONSTRUCTION AND CERTAIN GENERAL PROVISIONS ........................................................................5

Section 1.01      Definition of Terms...........................................................5
Section 1.02      Compliance Certificates and Reports.................................27
Section 1.03      Form of Documents Delivered to Master Trustee ...............28
Section 1.04      Acts of Holders of Obligations ........................................29
Section 1.05      Notices, etc., to Master Trustee and Obligated Group Members.........30
Section 1.06      Notices to Holders of Obligations; Waiver...........................30
Section 1.07      [Reserved.].....................................................................31
Section 1.08      Effect of Headings and Table of Contents............................31
Section 1.09      Successors and Assigns....................................................31
Section 1.10      Separability Clause .........................................................31

ARTICLE II      THE OBLIGATIONS ..........................................................31

Section 2.01      Series and Amount of Obligations.....................................31
Section 2.02      Appointment of Obligated Group Representative ................32
Section 2.03      Execution and Authentication of Obligations......................32
Section 2.04      Supplement Creating Obligations......................................32
Section 2.05      Conditions to Issuance of Obligations Hereunder ...............33
Section 2.06      List of Holders of Obligations .........................................33
Section 2.07      Optional and Mandatory Redemption.................................34
Section 2.08      Mutilated, Destroyed, Lost and Stolen Obligations.............34
Section 2.09      Cancellation ...................................................................34

ARTICLE III      FUNDS AND ACCOUNTS ...................................................35

Section 3.01      [Reserved.].....................................................................35
Section 3.02      [Reserved.].....................................................................35
Section 3.03      Liquidity Support Account ...............................................35
Section 3.04      [Reserved.].....................................................................36
Section 3.05      Revenue Fund .................................................................36
Section 3.06      Investment of Funds.........................................................37
Section 3.07      Allocation and Transfers of Investment Income...................37
Section 3.08      Master Trustee Relieved From Responsibility .....................37
Section 3.09      Payments on Subordinated Indebtedness.............................37

ARTICLE IV      REPRESENTATIONS AND COVENANTS OF THE OBLIGATED GROUP MEMBERS ...........................................................38

Section 4.01      Title to Mortgaged Trust Estate and Lien of this Instrument..............38
Section 4.02      Further Assurances...........................................................38
Section 4.03      Recording and Filing........................................................38
Section 4.04      Payment of Principal, Premium and Interest .......................39
Section 4.05      Payment of Taxes and Other Claims ..................................39
Section 4.06      Maintenance of Properties ................................................40

i

Section 4.07    Corporate Existence; Status of Obligor ...............................40
Section 4.08    Preservation of Qualifications..........................................41
Section 4.09    Additions to Facilities....................................................41
Section 4.10    Insurance.....................................................................41
Section 4.11    Rates and Charges.........................................................45
Section 4.12    Damage or Destruction ..................................................46
Section 4.13    Condemnation...............................................................48
Section 4.14    Other Provisions with Respect to Net Proceeds ................48
Section 4.15    Financial Statements, Bondholder Calls, Etc....................49
Section 4.16    Permitted Additional Indebtedness ..................................52
Section 4.17    Calculation of Debt Service and Debt Service Coverage .................57
Section 4.18    Sale or Lease of Property ...............................................59
Section 4.19    Liens on Property..........................................................60
Section 4.20    Liquidity Covenant .......................................................60
Section 4.21    [Reserved.]..................................................................61
Section 4.22    Occupancy Covenant .....................................................61
Section 4.23    [Reserved] ..................................................................62
Section 4.24    Deposits on Effective Date ............................................62
Section 4.25    Reserve Fund for Series 2019 Bonds...............................64
Section 4.26    Rating Application ........................................................64
Section 4.27    Management Agreements; Oversight Fees .........................64
Section 4.28    [Reserved.]..................................................................65
Section 4.29    Actuarial Study ...........................................................65

ARTICLE V        CONSOLIDATION, MERGER, CONVEYANCE AND TRANSFER .........65

Section 5.01    Merger, Consolidation, Sale or Conveyance ....................65

ARTICLE VI       MEMBERSHIP IN THE OBLIGATED GROUP .........................67

Section 6.01    Admission of Obligated Group Members...........................67
Section 6.02    Obligated Group Members ..............................................68
Section 6.03    Withdrawal of Obligated Group Members .........................68
Section 6.04    Successor Obligated Group Representative........................69

ARTICLE VII      REMEDIES OF THE MASTER TRUSTEE AND HOLDERS OF
                 SECURED OBLIGATIONS IN EVENT OF DEFAULT..............................70

Section 7.01    Events of Default .........................................................70
Section 7.02    Acceleration of Maturity; Rescission and Annulment........................71
Section 7.03    Entry...........................................................................71
Section 7.04    Powers of Sale, Transfer, Assignment, Lease, and Other
                 Dispositions; Suits for Enforcement ................................72
Section 7.05    Incidents of Sale...........................................................74
Section 7.06    Collection of Indebtedness and Suits for Enforcement by
                 Master Trustee.............................................................75
Section 7.07    Master Trustee May File Proofs of Claim .........................76
Section 7.08    Master Trustee May Enforce Claims Without Possession of
                 Obligations..................................................................77
Section 7.09    Application of Money Collected......................................77

ii

Section 7.10    Limitation on Suits....................................................................77
Section 7.11    Unconditional Right of Holders of Obligations to Receive Principal, Premium and Interest......................................78
Section 7.12    Restoration of Rights and Remedies.........................................78
Section 7.13    Rights and Remedies Cumulative.............................................78
Section 7.14    Delay or Omission Not Waiver.................................................78
Section 7.15    Control by Holders of Obligations.............................................79
Section 7.16    Waiver of Past Defaults...........................................................79
Section 7.17    Undertaking for Costs.............................................................79
Section 7.18    Waiver of Stay or Extension Laws............................................79
Section 7.19    Inapplicability of Finance Code................................................80

ARTICLE VIII    CONCERNING THE MASTER TRUSTEE.................................80

Section 8.01    Duties and Liabilities of Master Trustee....................................80
Section 8.02    Notice of Defaults..................................................................81
Section 8.03    Certain Rights of Master Trustee..............................................81
Section 8.04    Not Responsible For Recitals or Issuance of Obligations.................83
Section 8.05    Master Trustee or Registrar May Own Obligations.......................83
Section 8.06    Money to Be Held in Trust......................................................83
Section 8.07    Compensation and Expenses of Master Trustee..........................83
Section 8.08    Corporate Master Trustee Required; Eligibility............................84
Section 8.09    Resignation and Removal; Appointment of Successor.....................84
Section 8.10    Acceptance of Appointment by Successor..................................85
Section 8.11    Merger or Consolidation.........................................................86
Section 8.12    Master Trustee as Related Bond Trustee....................................86

ARTICLE IX    SUPPLEMENTS AND AMENDMENTS.....................................86

Section 9.01    Supplements Without Consent of Holders of Obligations.................86
Section 9.02    Supplements With Consent of Holders of Obligations.....................87
Section 9.03    Execution of Supplements.......................................................87
Section 9.04    Effect of Supplement.............................................................88
Section 9.05    Obligations May Bear Notation of Changes................................88
Section 9.06    Substitution of Lifespace Master Notes......................................88

ARTICLE X    SATISFACTION AND DISCHARGE OF INDENTURE; UNCLAIMED MONEYS.........................................91

Section 10.01    Satisfaction and Discharge of Indenture....................................91
Section 10.02    Obligations Deemed Paid.......................................................91
Section 10.03    Application of Trust Money......................................................92
Section 10.04    Payment of Related Bonds......................................................92

ARTICLE XI    MISCELLANEOUS PROVISIONS..........................................92

Section 11.01    No Personal Liability.............................................................92
Section 11.02    Texas Contract.....................................................................92
Section 11.03    Legal Holidays.....................................................................92
Section 11.04    Benefits of Provisions of Indenture and Obligations.....................93
Section 11.05    Execution in Counterparts; Electronic Transactions.....................93

Section 11.06    UCC Financing Statements.................................................................93

AMENDED AND RESTATED MASTER TRUST INDENTURE,
DEED OF TRUST AND SECURITY AGREEMENT

THIS AMENDED AND RESTATED MASTER TRUST INDENTURE, DEED OF TRUST AND SECURITY AGREEMENT, dated as of [November 1], 2019 (this "Indenture" or this "Master Indenture"), between TARRANT COUNTY SENIOR LIVING CENTER INC., a Texas nonprofit corporation, as the obligor and the initial Obligated Group Member (the "Obligor"), and UMB BANK, NATIONAL ASSOCIATION, as successor Master Trustee, amends and restates the Master Trust Indenture, Deed of Trust and Security Agreement dated as of October 1, 2009 (as previously amended, the "Original Master Indenture"), between the Obligor and The Bank of New York Mellon Trust Company, National Association as initial Master Trustee.

WITNESSETH:

WHEREAS, the Obligor was authorized and deemed it necessary and desirable to enter into the Original Master Indenture for the purpose of providing for the issuance from time to time by the Obligor or other Persons electing to become Obligated Group Members (as defined herein) of Obligations (as defined herein) to finance or refinance the acquisition or betterment of health care facilities or other facilities, or for other lawful and proper purposes; and

WHEREAS, UMB Bank, National Association is the successor to The Bank of New York Mellon Trust Company, National Association as Master Trustee under the Original Master Indenture; and

WHEREAS, the Obligor is authorized and deems it necessary and desirable to amend and restate the Original Master Indenture into this Indenture to reflect amendments thereto agree upon by the Obligor and the Master Trustee; and

WHEREAS, the Obligor has filed a voluntary plan of reorganization (the "Plan") under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"), which Plan was supported and approved by the holders of approximately ___ % of the Obligations Outstanding under the Original Master Indenture; and

WHEREAS, the Plan contemplates, among other matters, the amendment and restatement of the Original Master Indenture by this Amended and Restated Master Indenture as of the effective date (the "Effective Date") of the Plan, and the Bankruptcy Court has entered its order (the "Bankruptcy Court Order") approving the Plan and, among other things, approving the amendment and restatement of the Original Master Indenture by this Amended and Restated Master Trust Indenture, which Bankruptcy Court Order supersedes, with respect to the amendment effected by this Amended and Restated Master Trust Indenture, anything in Section 9.02 of the Original Master Indenture limiting in any respect the ability of the Holders of the Obligations to amend the Original Master Indenture; and

WHEREAS, all acts and things necessary to constitute this Indenture as amended and restated on and as of the Effective Date a valid indenture and agreement according to its terms have been done and performed, the Obligor has duly authorized the execution and delivery of this

amended and restated Indenture, and the Obligor, in the exercise of the legal right and power invested in it, executes this amended and restated Indenture and proposes to make, execute, issue and deliver Obligations hereunder; and

WHEREAS, the Master Trustee has agreed to, and agrees to, accept and administer the trusts created hereby,

## GRANTING CLAUSES

NOW, THEREFORE, THIS INDENTURE WITNESSETH, that, to secure the payment of the principal of (and premium, if any) and interest on the Outstanding Obligations (hereinafter defined) and the performance of the covenants therein and herein contained and to declare the terms and conditions on which the Outstanding Obligations are secured, and in consideration of the premises, of the purchase of the Obligations by the Holders thereof, and of the sum of One Dollar ($1.00) to the Obligated Group Members in hand paid by the Master Trustee at or before the execution and delivery hereof the receipt and sufficiency of which are hereby acknowledged, the Obligated Group Members in the Original Master Indenture have granted, bargained, sold, aliened, remised, released, conveyed, assigned, transferred, mortgaged, hypothecated, pledged, set over, and confirmed, and by these presents do hereby grant, bargain, sell, alien, remise, release, convey, assign, transfer, mortgage, hypothecate, pledge, set over, and confirm, to the Master Trustee, forever, all and singular the following described properties, and grant a security interest therein for the purposes herein expressed, to wit:

## GRANTING CLAUSE FIRST

All real and personal property of the Obligated Group, including without limitation all property of the Obligated Group Members described in the other granting clauses herein; and

## GRANTING CLAUSE SECOND

The land described on Exhibit "A" hereto (the "Premises") and incorporated herein for all purposes, including, without limitation, all buildings, structures, fixtures, additions, enlargements, extensions, improvements, modifications or repairs now or hereafter located thereon or therein and with the tenements, hereditaments, servitudes, appurtenances, rights, privileges and immunities thereunto belonging or appertaining which may from time to time be owned by the Obligated Group Members, and all claims or expectancy, of, in and to the Premises, it being the intention of the parties hereto that, so far as may be permitted by law, all property of the character hereinabove described, which is now owned or is hereafter acquired by the Obligated Group Members, and is affixed or attached or annexed to the Premises, shall be and remain or become and constitute a portion of the Premises, and the security covered by and subject to the lien of this Indenture; and

## GRANTING CLAUSE THIRD

All of the rights, titles, interests and estates, now owned or hereafter acquired by the Obligated Group Members in and to any and all accounts, chattel paper, goods, documents, instruments, general intangibles, deposit accounts, investment property, equipment, inventory, fixtures, and any and all other personal property of any kind or character defined in and subject to the provisions of the Texas Business and Commerce Code, including the supporting obligations

2

thereof, proceeds and products of and from any and all of such personal property used in connection with or arising out of the operation and use of the improvements located on the Premises and any substitutions or replacements therefor; including the following, all whether now owned or hereafter acquired or arising and wherever located; without limitation, such grant, pledge and assignment includes:    (i) accounts (including health-care-insurance receivables, credit card receivables and rights to receive payment from third-party payors such as Medicare and Medicaid) and Gross Revenues; (ii) securities entitlements, securities accounts, commodity accounts, commodity contracts and investment property; (iii) deposit accounts; (iv) instruments (including promissory notes); (v) documents (including warehouse receipts); (vi) chattel paper (including electronic chattel paper and tangible chattel paper); (vii) inventory, including raw materials, work in process, or materials used or consumed in the business of the Obligated Group Members, items held for sale or lease or furnished or to be furnished under contracts of service, sale or lease, goods that are returned, reclaimed or repossessed; (viii) goods of every nature, including stock-in-trade, goods on consignment, standing timber that is to be cut and removed under a conveyance or contract for sale, the unborn young of animals, crops grown, growing, or to be grown, manufactured homes, computer programs embedded in such goods and farm products; (ix) equipment, including machinery, vehicles and furniture; (x) fixtures; (xi) agricultural liens; (xii) as-extracted collateral; (xiii) letter of credit rights; (xiv) general intangibles, of every kind and description, including payment intangibles, software, computer information, source codes, object codes, records and data, all existing and future customer lists, choses in action, claims (including claims for indemnification or breach of warranty), books, records, patents and patent applications, copyrights, trademarks, tradenames, tradestyles, trademark applications, goodwill, blueprints, drawings, designs and plans, trade secrets, contracts, licenses, license agreements, formulae, tax and any other types of refunds, returned and unearned insurance premiums, rights and claims under insurance policies; (xv) all supporting obligations of all of the foregoing property; (xvi) all property of the Obligated Group Members now or hereafter in the Master Trustee's possession or in transit to or from, or under the custody or control of, the Master Trustee or any affiliate thereof; (xvii) all cash and cash equivalents thereof; and (xviii) all cash and noncash proceeds (including insurance proceeds) of all of the foregoing property, all products thereof and all additions and accessions thereto, substitutions therefor and replacements thereof; and

## GRANTING CLAUSE FOURTH

Any amounts on deposit from time to time in any fund or account created hereunder, subject to the provisions of this Master Indenture permitting the application thereof for the purposes and on the terms and conditions set forth herein; and

## GRANTING CLAUSE FIFTH

Any and all property that may, from time to time hereinafter, by delivery or by writing of any kind, be subjected to the lien and security interest hereof by the Obligated Group Members or by anyone in its behalf (and the Master Trustee is hereby authorized to receive the same at any time as additional security hereunder), which subject to the lien and security interest hereof of any such property as additional security may be made subject to any reservations, limitations, or conditions which shall be set forth in a written instrument executed by the grantor or the person so acting in its behalf or by the Master Trustee respecting the use and disposition of such property or the proceeds thereof;

TO HAVE AND TO HOLD, IN TRUST, WITH THE POWER OF SALE, all said property, rights, privileges, and franchises of every kind and description, real, personal, or mixed, hereby and hereafter (by supplemental instrument or otherwise) granted, bargained, sold, aliened, remised, released, conveyed, assigned, transferred, mortgaged, hypothecated, pledged, set over, or confirmed as aforesaid, or intended, agreed, or covenanted so to be, together with all the appurtenances thereto appertaining (said properties, rights, privileges, leasehold, and franchises including any cash and securities hereafter deposited or required to be deposited with the Master Trustee (other than any such cash which is specifically stated herein not to be deemed part of the Trust Estate) being herein collectively referred to as the "Trust Estate") unto the Master Trustee and its successors and assigns forever;

SUBJECT, HOWEVER, to the Liens (as defined herein) described in Exhibit B hereto and to any and all mortgages, liens, charges, encumbrances, pledges, and security interests granted, created, assumed, incurred, or existing pursuant to the provisions of Section 4.19 hereof;

BUT IN TRUST, NEVERTHELESS, for the equal and ,proportionate benefit and security of the Holders from time to time of all the Outstanding Obligations without any priority of any such Obligations over any other such Obligations except as herein otherwise expressly provided;

UPON CONDITION that, if the Obligated Group Members or their successors or assigns shall well and truly pay, or cause to be paid, the principal of (and premium, if any) and interest on the Outstanding Obligations according to the true intent and meaning thereof, or there shall be deposited with the Master Trustee such amounts in such form in order that none of the Obligations shall remain Outstanding as herein defined and provided, and shall pay or cause to be paid to the Master Trustee all sums of money due or to become due to it in accordance with the terms and provisions hereof, then upon the full and final payment of all such sums and amounts secured hereby or upon such deposit, the rights, titles, liens, security interests, and assignments herein granted shall cease, determine, and be void and this grant shall be released by the Master Trustee in due form at the expense of the Obligated Group Members, except only as herein provided; otherwise this grant to be and shall remain in full force and effect;

UPON FURTHER CONDITION as to any property included in the Trust Estate that, upon Request of the Obligated Group Representative accompanied by an Officer's Certificate and an Opinion of Counsel to the effect that the conditions precedent for the disposition of such property set forth in Section 4.18 hereof (other than the condition precedent set forth in Section 4.18(d) hereof) have been satisfied, the rights, title, liens, security interests and assignments herein granted shall cease, determine and be void as to such property only and this grant shall be released by the Master Trustee as to such property in due form at the expense of the Obligated Group Members;

ALL THINGS NECESSARY to make this Indenture a valid agreement and contract for the security of the Obligations in accordance with the terms of such Obligations and this Indenture have been done;

IT IS HEREBY COVENANTED AND DECLARED that the Trust Estate is to be held and applied by the Master Trustee, subject to the further covenants, conditions, and trusts hereinafter set forth, and the Obligated Group Members do hereby covenant and agree to and with the Master

Trustee, for the equal and proportionate benefit of all Holders of the Obligations except as herein otherwise expressly provided; and

THIS INDENTURE FURTHER WITNESSETH and it is expressly declared that all Obligations issued and secured hereunder are to be issued, authenticated and delivered and all said rights hereby pledged and assigned are to be dealt with and disposed of under, upon and subject to the terms, conditions, stipulations, covenants, agreements, trusts, uses and purposes as hereinafter expressed and the Obligated Group Members have agreed and covenanted, and do hereby agree and covenant, with the Master Trustee for the equal and proportionate benefit of the respective holders from time to time of the Obligations as follows:

## ARTICLE I
## DEFINITION OF TERMS, CONSTRUCTION AND CERTAIN GENERAL PROVISIONS

Section 1.01    Definition of Terms.  For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

(1)    "this Indenture" or "this Master Indenture" means this instrument as originally executed or as it may from time to time be supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof;

(2)    all references in this instrument designated "Articles," "Sections," and other subdivisions are to the designated Articles, Sections and other subdivisions of this instrument as originally executed. The words "herein," "hereof," and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section, or other subdivision;

(3)    the terms defined in this Article have the meanings assigned to them in this Article, and include the plural as well as the singular number; and

(4)    all accounting terms not otherwise defined herein have the meanings assigned to them, in accordance with generally accepted accounting principles applied in accordance with Section 1.02 of this Indenture.

"Act" when used with respect to any Holder of Obligations has the meaning specified in Section 1.04.

"Additional Indebtedness" means Indebtedness incurred by any Member subsequent to the issuance of the Series 2019 Note.

"Additional Obligation" means any evidence of Indebtedness or evidence of any repayment obligation under any Interest Rate Agreement issued after the issuance of the Series 2019 Note, which is authorized to be issued by a Member pursuant to this Master Indenture which has been authenticated by the Master Trustee pursuant to Section 2.03 hereof.

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.

5

For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the policies of such Person, directly or indirectly, whether through the power to appoint and remove its directors, the ownership of voting securities, by contract, or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Authorized Denomination" means $5,000 or any integral multiple thereof or such other denomination for a series of Obligations as may be set forth in a Supplemental Indenture.

"Authorized Representative" shall mean, with respect to the Obligated Group Representative and each Obligated Group Member, its respective chairman of the board, chief executive officer, president, chief financial officer, chief reorganization officer, any vice president, or any other person or persons designated an Authorized Representative thereof by an Officer's Certificate of the Obligated Group Representative or the Obligated Group Member, signed by an Authorized Representative and delivered to the Master Trustee.

"Balloon Indebtedness" means Funded Indebtedness, 25% or more of the original principal of which matures during any consecutive 12 month period, if such maturing principal amount is not required to be amortized below such percentage by mandatory redemption or prepayment prior to such 12 month period.  Balloon Indebtedness does not include Indebtedness which otherwise would be classified hereunder as Put Indebtedness.

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas.

"Bankruptcy Court Order" means the order of the Bankruptcy Court approving the Plan, including the amendment and restatement of the Original Master Indenture by this Amended and Restated Master Trust Indenture.

"Board Resolution" of any specified Person means a copy of a resolution certified by the Person responsible for maintaining the records of the Governing Body of such Person to have been duly adopted by the Governing Body of such Person and to be in full force and effect on the date of such certification, and delivered to the Master Trustee.

"Bond Indenture" means the Indenture of Trust dated as of [November 1], 2019, between the Issuer and the Series 2019 Bond Trustee relating to the Series 2019 Bonds.

"Book Value," when used with respect to Property of a Member, means the value of such Property, net of accumulated depreciation and amortization, as reflected in the most recent audited financial statements of such Member that have been prepared in accordance with generally accepted accounting principles, and when used with respect to Property of all Members, means the aggregate of the values of such Property, net of accumulated depreciation and amortization, as reflected in the most recent audited combined financial statements of the Obligated Group prepared in accordance with generally accepted accounting principles, provided that such aggregate shall be calculated in such a manner that no portion of the value of any Property of any Member is included more than once.

"Budget" means the Obligated Group's annual operating and capital budget for the applicable year, broken down by month and approved by a Consultant, as amended from time to time with the approval of a Consultant.

"Business Day" means any day other than (i) a Saturday, a Sunday or, in the City of New York, New York, or in Minneapolis, Minnesota (or, if different, in the city in which the designated corporate trust office of the Related Bond Trustee is located), a day on which banking institutions are authorized or required by law or executive order to close, or (ii) a day on which the New York Stock Exchange is closed.

"Capitalized Lease" means any lease of real or personal property which, in accordance with generally accepted accounting principles as in effect for the Obligated Group from time to time is treated as a "capital leases" or a "finance lease", but does not include operating leases.

"Capitalized Rentals" means, as of the date of determination, the amount at which the aggregate Net Rentals due and to become due under a Capitalized Lease under which a Person is a lessee would be reflected as a liability on a balance sheet of such Person.

"Cash and Investments" means (i) the sum of cash, cash equivalents, and the Current Value of marketable securities of the Obligated Group Members, including without limitation board-designated assets, including amounts, if any, on deposit in the Operating Account and the Liquidity Support Account, but excluding (a) trustee-held funds other than those described above in this definition, (b) donor-restricted funds not available to pay debt service on the Obligations, and (c) any funds pledged or otherwise subject to a Lien, other than a Lien solely in favor of the Master Trustee plus (ii) unless otherwise expressly stated, the undrawn amount available under the Liquidity Support Agreement (i.e. disregarding amounts funded into the Liquidity Support Account) as of the applicable calculation date. For the purposes of calculations hereunder, an Unrestricted Contribution from an Affiliate made after the applicable calculation date shall be treated as being made on the applicable calculation date so long as the Unrestricted Contribution is made prior to the date the applicable certificate is required to be delivered with respect to such calculation and is irrevocably designated by the Obligated Group as to be deemed for all purposes hereunder as made on the applicable calculation date.

"Code" means the Internal Revenue Code of 1986, as amended from time to time and the corresponding provisions, if any, of any successor internal revenue laws of the United States.

"Commitment Indebtedness" means the obligation of any Member to repay amounts disbursed pursuant to a commitment from a financial institution to refinance or purchase when due, when tendered or when required to be purchased (a) other Indebtedness of such Member, or (b) Indebtedness of a Person who is not a Member, which Indebtedness is guaranteed by a Guaranty of such Member or secured by or payable from amounts paid on Indebtedness of such Member, in either case which Indebtedness or Guaranty of such Member was incurred in accordance with the provisions of Section 4.16 hereof, and the obligation of any Member to pay interest payable on amounts disbursed for such purposes, plus any fees, costs or expenses payable to such financial institution for, under or in connection with such commitment, in the event of disbursement pursuant to such commitment or in connection with enforcement thereof, including without limitation any penalties payable in the event of such enforcement.

"Completion Funded Indebtedness" means any Funded Indebtedness for borrowed money: (a) incurred for the purpose of financing the completion of the acquisition, construction, remodeling, renovation or equipping of Facilities or marketing or other pre-opening expenses of Facilities with respect to which Funded Indebtedness has been incurred in accordance with the provisions hereof; and (b) with a principal amount not in excess of the amount which is required to provide completed and equipped Facilities of substantially the same type and scope contemplated at the time such prior Funded Indebtedness was originally incurred, to provide for Funded Interest during the period of construction, to provide any reserve fund relating to such Completion Funded Indebtedness and to pay the costs and expenses of issuing such Completion Funded Indebtedness.

"Consent," "Order," and "Request" of any specified Person mean, respectively, a written consent, order, or request signed in the name of an Authorized Representative of the Obligated Group Representative or in the name of any other Person by the Chairman of the Governing Body, the President, a Vice President, the Treasurer, an Assistant Treasurer or the Chief Financial Officer of such Person or any other person or persons designated by an Officers Certificate and delivered to the Master Trustee.

"Construction Index" means the most recent issue of the "Dodge Construction Index for U.S. and Canadian Cities" with reference to the city in which the subject property is located (or, if such Index is not available for such city, with reference to the city located closest geographically to the city in which the subject property is located), or, if such Index is no longer published or used by the federal government in measuring costs under Medicare or Medicaid programs, such other index which is certified to be comparable and appropriate by the Obligated Group Representative in an Officer's Certificate delivered to the Master Trustee and which other index is acceptable to the Master Trustee.

"Consultant" means a professional consulting, accounting, investment banking or commercial banking firm or individual selected by the Obligated Group Representative having the skill and experience necessary to render the particular report required and having a favorable reputation for such skill and experience, which firm or individual (i) does not control any Member of the Obligated Group or any Affiliate thereof and is not controlled by or under common control with any Member of the Obligated Group or an Affiliate thereof and (ii) if selected to perform the services required under Section 4.11, 4.20 or 4.22, has received Noteholder Consent, provided that for such purpose Noteholder Consent shall be deemed granted if (a) the Obligated Group has caused to be posted on the EMMA website for the CUSIP numbers of the Related Bonds a notice stating that the Obligated Group is required to retain a Consultant under the applicable Section of the Master Indenture, identifying the Consultant proposed to be retained by the Obligated Group and stating that, pursuant to this Master Indenture, Noteholder Consent to such Consultant is required but will be deemed granted unless the beneficial owners of at least one-third in principal amount of all Related Bonds have notified the Master Trustee of their objection to such Consultant on or before the date that is 30 days following the date of such posting of such notice on the EMMA website and (b) within 30 days following the date of such posting of such notice on the EMMA website, the Master Trustee shall not have received written communication from the beneficial owners of at least one-third in principal amount of all Related Bonds objecting to the retention of the applicable Consultant (for such purpose, the Master Trustee may conclusively rely upon a

8

certification by the Person submitting the applicable objection of the principal amount of Related Bonds beneficially owned by such Person).

"Contributions" means the aggregate amount of all contributions, grants, gifts, bequests and devises actually received in cash or marketable securities by any Person in the applicable fiscal year of such Person and any such contributions, grants, gifts, bequests and devises originally received in a form other than cash or marketable securities by any Person which are converted in such fiscal year to cash or marketable securities.

"Control Agreement" means an agreement among a depository institution, the Obligor and the Master Trustee with respect to a depository account established by the Obligor, which agreement, to the Master Trustee's satisfaction, confers "control", within the meaning of the Uniform Commercial Code, over the applicable account to the Master Trustee.

"Credit Facility" means any Liquidity Facility, letter of credit, bond insurance policy, standby purchase agreement, guaranty, line of credit, surety bond or similar credit or liquidity facility securing any Indebtedness of any Obligated Group Member.

"Current Value" means (i) with respect to Property, Plant and Equipment: (a) the aggregate fair market value of such Property, Plant and Equipment as reflected in the most recent written report of an appraiser selected by the Obligated Group Representative and, in the case of real property, who is a member of the American Institute of Real Estate Appraisers (MAI), delivered to the Master Trustee (which report shall be dated not more than 12 months prior to the date as of which Current Value is to be calculated) increased or decreased by a percentage equal to the aggregate percentage increase or decrease in the Construction Index from the date of such report to the date as of which Current Value is to be calculated, minus the fair market value (as reflected in such most recent appraiser's report) of any Property, Plant and. Equipment included in such report but disposed of since the last such report increased or decreased by a percentage equal to the aggregate percentage increase or decrease in the Construction Index from the date of such report to the date as of which Current Value is to be calculated; plus (b) the Book Value of any Property, Plant and Equipment acquired since the last such report increased or decreased by a percentage equal to the aggregate percentage increase or decrease in the Construction Index from the date of such acquisition to the date as of which Current Value is to be calculated, minus (c) the Book Value of any such Property, Plant and Equipment acquired since the last such report but disposed of; and (ii) with respect to any other Property, the fair market value of such Property.

"Days Cash on Hand" means, as of the date of calculation, the amount determined by dividing (a) the amount of Cash and Investments on such date by (b) the quotient obtained by dividing Expenses (including interest on Indebtedness but excluding provisions for bad debt amortization, depreciation or any other non-cash expenses) as shown on the most recent annual audited financial statements of the Obligated Group (or, with respect to any calculation of Days Cash on Hand as of any quarter end that is not the end of a Fiscal Year, as reflected in the unaudited trailing twelve month financial statements for the period ending on such quarter end, as derived from the quarterly financial statements delivered pursuant to Section 4.15(b)(ii) hereof), by 365.

"Debt Service Requirements" means, with respect to the period of time for which calculated, the aggregate of the payments required to be made during such period in respect of

9

principal (whether at maturity, as a result of mandatory sinking fund redemption, mandatory prepayment or otherwise) and interest on outstanding Funded Indebtedness of each Person or a group of Persons with respect to which calculated; provided that: (a) the amount of such payments for a future period shall be calculated in accordance with the assumptions contained in Sections 4.16 and 4.17 hereof; (b) interest shall be excluded from the determination of the Debt Service Requirements to the extent that Funded Interest is available to pay such interest; (c) principal of Indebtedness shall be excluded from the determination of Debt Service Requirements to the extent that amounts are on deposit in an irrevocable escrow for the applicable Indebtedness and such amounts (including, where appropriate, the earnings or other increment to accrue thereon) are required to be applied to pay such principal and such amounts so required to be applied are sufficient to pay such principal; (d) principal of Indebtedness due in its final year shall be excluded from the determination of Debt Service Requirements to the extent moneys were initially deposited and are on deposit as of the date of calculation in a debt service reserve fund which required that moneys on deposit in the debt service reserve fund be used to pay a principal payment in the final year of such Indebtedness, and except for the payment to be received from such debt service reserve fund, the Indebtedness would have had approximately level debt service.

"Defeasance Obligations" means:

(1)     Direct obligations of the United States of America or obligations to the full and prompt payment of which the full faith and credit of the United States of America is pledged or evidences of ownership of proportionate interests in future interest and principal payments on such obligations held by a bank or trust company as custodian, under which the owner of the investment is the real party in interest and has the right to proceed directly and individually against the obligor on such obligations, and which underlying obligations are not available to satisfy any claim of the custodian or any Person claiming through the custodian or to whom the custodian may be obligated, provided that in each case the obligations are not subject to prepayment; and

(2)     Obligations described in Section 103(a) of the Code rated AAA or Aaa by Moody's or S&P, provision for the payment of the principal of (and premium, if any) and interest on which shall have been made by the irrevocable deposit at least 123 days preceding the date of determination with a bank or trust company acting as a trustee or escrow agent for holders of such obligations of money, or obligations described in clause (1) or obligations described in clause (1) above, the maturing principal of and interest on which, when due and payable, without reinvestment will provide money, sufficient to pay when due the principal of (and premium, if any) and interest on such obligations, and which money, or obligations described in clause (1) above, are not available to satisfy any other claim, including any claim of the trustee or escrow agent or any claim of any Person claiming through the trustee or escrow agent or any claim of any Person to whom the Person on whose behalf such irrevocable deposit was made, the trustee, or the escrow agent may be obligated, whether arising out of the insolvency of the Person on whose

behalf such irrevocable deposit was made, the trustee or escrow agent or otherwise.

"Effective Date" means _____, 2019, the date set forth in the Bankruptcy Court Order for the effective date of the Plan.

"Entrance Fees" means fees, other than security deposits, monthly rentals or monthly service charges, paid to a Member by residents of Independent Living Units for the purpose of obtaining the right to reside in those units including any refundable resident deposits described in any lease or similar Residency Agreements with respect to those Independent Living Units, but shall not include any such amounts held in escrow or otherwise set aside pursuant to the requirements of any such agreement prior to the occupancy of the unit covered by such Residency Agreement or pursuant to Chapter 246, Texas Health and Safety Code (which amounts shall be included if and when occupancy occurs and such set-aside is no longer required).

"Event of Default" has the meaning set forth in Article VII hereof.

"Expenses" means, for any period, the aggregate of all expenses calculated under generally accepted accounting principles, including without limitation any accrual for taxes, assessments and insurance, incurred by the Person or group of Persons involved during such period, but excluding (a) interest expense on Funded Indebtedness, (b) depreciation and amortization, (c) extraordinary expenses, losses on the sale of assets other than in the ordinary course of business and losses on the extinguishment of debt or termination of pension plans or Interest Rate Agreements, (d) losses resulting from any reappraisal, revaluation or write down of assets or Interest Rate Agreements, other than bad debts, (e) other non-cash expenses or losses, other than write down of bad debts that have been included in Revenues, and (f) any development or marketing fees that constitute Subordinated Indebtedness. If such calculation of Expenses is being made with respect to the Obligated Group, any such expenses attributable to transactions between any Member and any other Member shall be excluded.

"Facilities" means all land, leasehold interests and buildings and all fixtures and equipment (as defined in the Uniform Commercial Code or equivalent statute in effect in the state where such fixtures or equipment are located) of a Person.

"Fiscal Year" means any 12 month period beginning on January 1 of any calendar year and ending on December 31 of such calendar year, or such other consecutive 12 month period selected by the Obligated Group Representative as the fiscal year for the Members for good faith reasons unrelated to circumvention of covenants and requirements of this Indenture.

"Fitch" means Fitch Inc., a corporation organized and existing under the laws of the State of Delaware, its successors and assigns, and if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "Fitch" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Obligated Group, with written notice to the Master Trustee.

"Funded Indebtedness" means, with respect to any Person, (a) all Indebtedness of such Person incurred or assumed for money borrowed or credit extended, which is not Short Term; (b) all Short Term Indebtedness incurred by the Person which is of the type described in Section

11

4.16(d) hereof; (c) the Person's Guaranties of Indebtedness which are not Short Term (but including Guaranties of Short Term Indebtedness described in Section 4.16(d) hereof); and (d) Capitalized Rentals under Capitalized Leases entered into by the Person; provided, however, that Indebtedness that could be described by more than one of the foregoing categories shall not in any case be considered more than once for the purpose of any calculation made pursuant to this Master Indenture.

"Funded Interest" means amounts irrevocably deposited in an escrow or other trust account (other than a debt service reserve fund held under a Related Bond Indenture or ordinary course debt service payments paid into a debt service fund held under a Related Bond Indenture) to pay interest on Funded Indebtedness or Related Bonds and interest earned on such amounts to the extent such interest earned is required to be applied to pay interest on Funded Indebtedness or Related Bonds.

"Governing Body" means, with respect to a Member, the board of directors, the board of trustees or similar group in which the right to exercise the powers of corporate directors or trustees is vested.

"Government Obligations" means direct obligations of the United States of America or obligations the full and timely payment of the principal of and interest on which is unconditionally guaranteed by the United States of America.

"Gross Revenues" means all receipts, revenues, rentals, income, insurance proceeds (including, without limitation, all Medicaid, Medicare and other third party payments), condemnation awards, Entrance Fees and other moneys received by or on behalf of any Obligated Group Member, including (without limitation) revenues derived from (a) the ownership, operation or leasing of any portion of the Facilities (including, without limitation, fees payable by or on behalf of residents of the Facilities) and all rights to receive the same (other than the right to directly receive Medicaid and Medicare payments, to the extent prohibited by law), whether in the form of accounts, general intangibles or other rights, and the proceeds of such accounts, general intangibles and other rights, whether now existing or hereafter coming into existence or whether now owned or held or hereafter acquired, and (b) gifts, grants, bequests, donations and contributions heretofore or hereafter made that are legally available to meet the obligations of the Obligated Group Member to pay Obligations issued under this Master Indenture; provided, however, that there shall be excluded from Gross Revenues (i) any amounts received by an Obligated Group Member as a billing agent for another entity, except for fees received for serving as billing agent, (ii) for the avoidance of doubt, gifts, grants, bequests, donations and contributions to an Obligated Group Member heretofore or hereafter made, and the income and gains derived therefrom, which are specifically restricted by the donor or grantor to a particular purpose which is inconsistent with their use to pay Obligations issued under this Master Indenture, (iii) any moneys received by any Obligated Group Member from prospective residents or commercial tenants in order to pay for customized improvements to those Independent Living Units, Rental Units or other areas of the Facilities to be occupied or leased to such residents or tenants, and (iv) all deposits made pursuant to Residency Agreements that pursuant to the terms of such Residency Agreements are required to be held in escrow until construction of particular Facilities is completed, a certificate of occupancy has been issued and appropriate licenses, if required, have been issued.

"Guaranty" means all obligations of a Person guaranteeing, or in effect guaranteeing, any Indebtedness, dividend or other obligation of any Primary Obligor in any manner, whether directly or indirectly, including but not limited to obligations incurred through an agreement, contingent or otherwise, by such Person: (a) to purchase such Indebtedness or obligation or any Property constituting security therefor; (b) to advance or supply funds: (i) for the purchase or payment of such Indebtedness or obligation, or (ii) to maintain working capital or a balance sheet condition; (c) to purchase securities or other Property or services primarily for the purpose of assuring the owner of such Indebtedness or obligation of the ability of the Primary Obligor to make payment of the Indebtedness or obligation; or (d) otherwise to assure the owner of such Indebtedness or obligation against loss in respect thereof.

"Historical Debt Service Coverage Ratio" means, for any period of time, the ratio consisting of a numerator equal to the amount determined by dividing Income Available for Debt Service for that period by the Debt Service Requirements for such period and a denominator of one; provided, however, that in calculating the Debt Service Requirements for such period, the principal amount of any Funded Indebtedness included in such calculation which is paid during such period shall be excluded to the extent such principal amount is paid from the proceeds of other Funded Indebtedness incurred in accordance with the provisions of this Master Indenture; and provided further, to the extent an Interest Rate Agreement has been entered into in connection with any particular Funded Indebtedness, the actual debt service paid after the effect of payments made to or received from the provider of the Interest Rate Agreement shall be used in the calculation.

"Historical Pro Forma Debt Service Coverage Ratio" means, for any period of time, the ratio consisting, of a numerator equal to the amount determined by dividing Income Available for Debt Service for that period by the Maximum Annual Debt Service Requirement for the Funded Indebtedness then outstanding (other than any Funded Indebtedness being refunded with the Funded Indebtedness then proposed to be issued) and any Funded Indebtedness then proposed to be issued and a denominator of one.

"Holder" means a bearer of any Obligation issued in bearer form, and the registered owner of any Obligation issued in registered form.

"Income Available for Debt Service" means for any period, the excess of Revenues over Expenses of the Person or group of Persons involved.

"Indebtedness" means all debt or obligations of any Member for the repayment of borrowed money (including Capitalized Leases and installment purchase contracts) shown as liabilities on the balance sheet of such Member or which are properly capitalized on the balance sheet of such Member in accordance with generally accepted accounting principles, and all Guaranties; provided that Indebtedness shall not include:

       (a)    obligations of any Member to another Member or Guaranties or assumptions by a Member, directly or indirectly, of Indebtedness of another Member;

       (b)    any portion of any Indebtedness or any portion of Related Bonds payable from such Indebtedness, for which cash or Government Obligations are irrevocably on deposit in

an escrow or trust account with the Master Trustee, the Related Bond Trustee or a third party escrow agent, which cash and Government Obligations (including, where appropriate, the earnings or other increments to accrue thereon) are irrevocably required to be used to pay, and are sufficient to pay, the applicable portion of such Indebtedness or the corresponding portion of Related Bonds payable from such Indebtedness;

        (c)     rentals payable under leases which are not Capitalized Leases;

        (d)     Indebtedness of any entity that is not a Member (even though such entity may be a subsidiary of or controlled by or under common control with a Member) except to the extent of any Guaranty by any Member of such Indebtedness or to the extent that Member is otherwise obligated with respect to that Indebtedness;

        (e)     any other obligations that do not constitute debt under generally accepted accounting principles;

        (f)     liabilities to residents of senior living or similar facilities to refund Entrance Fees or other fees paid by those residents;

        (g)     any Interest Rate Agreement or any Obligation issued to evidence or secure obligations thereunder; and

        (h)     Subordinated Indebtedness to an Affiliate.

"Independent Counsel" means an attorney, other than attorney who is an employee or officer of a Member or an Affiliate of a Member, duly admitted to practice law before the highest court of any state, or a firm with which such an attorney is affiliated, and, without limitation, may include independent legal counsel for any Member, the Master Trustee or any Related Bond Trustee.

"Independent Living Units" means the independent living units that are part of the Project and are offered for occupancy on an Entrance Fee basis, and does not include Rental Units.

"Insurance Consultant" means a person or firm who in the case of an individual is not an employee or officer of any Member or of an Affiliate of any Member and which, in the case of a firm, does not control any Member of the Obligated Group or any Affiliate thereof and is not controlled by or under common control with any Member of the Obligated Group or an Affiliate thereof, appointed by the Obligated Group Representative, qualified to survey risks and to recommend insurance coverage for nursing homes or health care facilities and services of the type involved, and having a favorable reputation for skill and experience in such surveys and such recommendations, and which may include a broker or agent with whom any Member transacts business, provided in all events that such person or firm is not unacceptable to the Master Trustee.

"Interest Payment Date" means the Stated Maturity of an installment of interest on the Obligations.

"Interest Rate Agreement" means an interest rate exchange, hedge or similar agreement, expressly identified in an Officer's Certificate of the Obligated Group Representative delivered to

the Master Trustee as being entered into in order to hedge the interest payable on all or a portion of any Indebtedness, which agreement may include, without limitation, an interest rate swap, a forward or futures contract or an option (e.g. a call, put, cap, floor or collar) and which agreement does not constitute an obligation to repay money borrowed, credit extended or the equivalent thereof.

"Investment Grade Condition" means that at least one Rating Agency shall have rated the Series 2019 Bonds BBB- or Baa3 or higher (or such other rating deemed to be "investment grade" by the applicable Rating Agency) and that each Rating Agency rating the Series 2019 Bonds shall have rated the Series 2019 Bonds BBB- or Baa3 or higher (or such other rating deemed to be "investment grade" by the applicable Rating Agency.)

"Lien" means any mortgage or pledge of, security interest in or lien on, charge or encumbrance on or lease of any Property of the Person involved in favor of or to, or which secures any obligation to, any Person other than any Member.

"Lifespace" means Lifespace Communities, Inc., an Iowa nonprofit corporation, and its successors and permitted assigns under the Lifespace Master Indenture.

"Lifespace Master Indenture" means the Master Trust Indenture dated as of November 1, 2010, as supplemented and amended from time to time in accordance with its terms, among Lifespace, such other Personas as hereafter become members of the obligated group in accordance with the Lifespace Master Indenture, and the Lifespace Master Trustee.

"Lifespace Master Trustee" means U.S. Bank National Association, as master trustee under the Lifespace Master Indenture, or any successor master trustee in accordance with the terms thereof.

"Lifespace Obligated Group" means the members from time to time of the obligated group under the Lifespace Master Indenture. As of the date hereof, Lifespace is the sole member of the obligated group under the Lifespace Master Indenture.

"Liquidity Facility" means a written commitment to provide money to purchase or retire any Indebtedness if (i) on the date of delivery of such Liquidity Facility, the unsecured Funded Indebtedness or claims paying ability of the provider of such Liquidity Facility or its parent holding company or other controlling entity is rated at least "A" by a least one of the Rating Agencies and (ii) as of any particular date of determination, no amount funded under such Liquidity Facility for the payment of the principal or the purchase or redemption price of such Indebtedness (exclusive of amounts realized for the payment of accrued interest on such Indebtedness) shall be required to be repaid by the obligor on such Funded Indebtedness for a period of at least one year.

"Liquidity Provider" means Lifespace.

"Liquidity Requirement" has the meaning given such term in Section 4.20 hereof

"Liquidity Support Account" means the account by that name established by the Liquidity Provider with the Master Trustee pursuant to the Liquidity Support Agreement and Section 3.03 of this Master Indenture.

"Liquidity Support Agreement" means the Liquidity Support Agreement dated as of [April __], 2019, among the Obligor, the Liquidity Provider, and the Master Trustee.

"Master Trustee" means UMB Bank, National Association, a national banking association with trust powers, as trustee hereunder, and any successor in trust appointed pursuant to Article VIII hereof.

"Maturity" when used with respect to any Indebtedness means the date on which the principal of such Indebtedness or any installment thereof becomes due and payable as therein provided, whether at the Stated Maturity thereof or by declaration of acceleration, call for redemption, or otherwise.

"Maximum Annual Debt Service Requirement" means the largest total Debt Service Requirements for the current or any succeeding Fiscal Year; provided, however, that with respect to any calculation of the Historical Pro Forma Debt Service Coverage Ratio for purposes of Section 4.11 with respect to a Testing Date for a trailing 12-month period that occurs before or includes [the first May 1 or November 1 that is 5 years after the Effective Date], "Maximum Annual Debt Service Requirement" means $[_____], representing as of the date hereof the largest total Debt Service Requirements for the current or any succeeding Fiscal Year in the period that ends with the Fiscal Year that includes [the first May 1 or November 1 that is 5 years after the Effective Date] .

"Moody's" means Moody's Investors Service, a corporation organized and existing under the laws of the State of Delaware, its successors and assigns, and, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "Moody's" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Obligated Group, with written notice to the Master Trustee.

"Mortgaged Property" means the real property and personal property of the Members which is subject to the Lien and security interest of this Master Indenture.

"Net Proceeds" means, when used with respect to any insurance (other than the proceeds of business interruption insurance) or condemnation award or sale consummated under threat of condemnation, the gross proceeds from the insurance or condemnation award or sale with respect to which that term is used, less all expenses (including attorney's fees, adjuster's fees and any expenses of the Obligated Group or the Master Trustee) incurred in the collection of such gross proceeds.

"Net Rentals" means all fixed rents (including as such all payments which the lessee is obligated to make to the lessor on termination of the lease or surrender of the Property other than upon termination of the lease for a default thereunder) payable under a lease or sublease of real or personal Property, excluding any amounts required to be paid by the lessee (whether or not designated as rents or additional rents) on account of maintenance, repairs, insurance, taxes and similar charges. Net Rentals for any future period under any so called "percentage lease" shall be computed on the basis of the amount reasonably estimated to be payable thereunder for such period, but in any event not less than the amount paid or payable thereunder during the immediately preceding period of the same duration as such future period; provided that the amount estimated

to be payable under any such percentage lease shall in all cases recognize any change in the applicable percentage called for by the terms of such lease.

"Non Recourse Indebtedness" means any Indebtedness the liability for which is effectively limited to the proceeds of rights exercised against the personal property financed by such Indebtedness, with no recourse, directly or indirectly, to any other Property of any Member.

"Noteholder Consent" means the written consent of the Holders of a majority in aggregate principal amount of the total amount of Obligations then Outstanding.

"Obligated Group" means, collectively, all of the Obligated Group Members.

"Obligated Group Member" or "Member" means the Obligor and any other Person who has satisfied the requirements set forth in this Indenture for becoming an Obligated Group Member and its successors until any such Person or a successor or transferee Person satisfies the requirements set forth in this Indenture for ceasing to be an Obligated Group Member.

"Obligated Group Representative" means the Obligor, or any successor Obligated Group Representative appointed pursuant to Section 6.04 hereof.

"Obligation" means any promissory note, guaranty, lease, contractual agreement to pay money or other obligation of any Obligated Group Member which is authenticated and delivered pursuant to this Indenture and which is entitled to the benefits of this Indenture.

"Obligation Register" means the register of ownership of the Obligations to be maintained pursuant to this Indenture.

"Obligor" means Tarrant County Senior Living Center Inc., a Texas nonprofit corporation, and any and all successors thereto in accordance with this Indenture.

"Occupied" means an Independent Living Unit for which a Residency Agreement has been executed, all related Entrance Fees have been paid in accordance with such Residency Agreement, and the occupant of such Independent Living Unit continues to permanently reside therein. For purposes of this definition, combined Independent Living Units are counted as the number of original units so combined.

"Officer's Certificate" means a certificate signed, in the case of a certificate delivered by a Member of the Obligated Group, by the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the President, any Vice President, Director of Finance or any other Authorized Representative of any Member of the Obligated Group or, in the case of a certificate delivered by any other corporation, by the President, any Vice President, Director of Finance or any other officer or agent authorized to sign by resolution of the Governing Body of such corporation or, in the case of a certificate delivered by any other Person, the chief executive or chief financial officer of such other Person, in either case whose authority to execute such certificate shall be evidenced to the satisfaction of the Master Trustee.

"Operating Account" shall mean the deposit account established by the Obligor at _____, or any successor deposit account established by the Obligor with a financial institution.

"Opinion of Counsel" means a written opinion of counsel who may (except as otherwise expressly provided herein) be counsel to any Obligated Group Member and shall be reasonably acceptable to the Master Trustee.

"Organizational Documents" of any corporation means the articles of incorporation, certificate of incorporation, corporate charter or other document pursuant to which such corporation was organized, and its bylaws, each as amended from time to time, and as to any other Person, means the instruments pursuant to which it was created and which govern its powers and the authority of its representatives to act on its behalf.

"Outstanding" when used with respect to Obligations means, as of the date of determination, all Obligations theretofore authenticated and delivered under this Indenture, except:

    (1)    Obligations theretofore cancelled and delivered to the Master Trustee or delivered to the Master Trustee for cancellation;

    (2)    Obligations for whose payment or redemption money (or Defeasance Obligations to the extent permitted by Section 10.02 of this Indenture) shall have theretofore been deposited with the Master Trustee or any Paying Agent for such Obligations in trust for the Holders of such Obligations pursuant to this Indenture; provided, that, if such Obligations are to be redeemed, notice of such redemption has been duly given or waived pursuant to this Indenture or irrevocable provision for the giving of such notice satisfactory to the Master Trustee has been made pursuant to this Indenture; and

    (3)    Obligations upon transfer of or in exchange for or in lieu of which other Obligations have been authenticated and delivered pursuant to this Indenture;

provided, however, that in determining whether the Holders of the requisite principal amount of Outstanding Obligations have given any request, demand, authorization, direction, notice, consent, or waiver hereunder, Obligations owned by any Obligated Group Member or any Affiliate of any Obligated Group Member shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Master Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent, or waiver, only Obligations that the Master Trustee knows to be so owned shall be so disregarded. Obligations so owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Master Trustee the pledgee's right so to act with respect to such Obligations and that the pledgee is not an Obligated Group Member or an Affiliate of any Obligated Group Member.

"Paying Agent" means any Person authorized by the Obligated Group Representative to pay the principal of (and premium, if any) or interest on any Obligations on behalf of the Obligated Group.

"Permitted Encumbrances" means, as of any particular date:

18

(a)     Liens arising by reason of good faith deposits with a Member in connection with leases of real estate, bids or contracts (other than contracts for the payment of money), deposits by any Member to secure public or statutory obligations, or to secure, or in lieu of, surety, stay or appeal bonds (other than in connection with proceedings or litigation relating to collection of Indebtedness), and deposits as security for the payment of taxes or assessments or other similar charges; any Lien arising by reason of deposits with, or the giving of any form of security to, any governmental agency or any body created or approved by law or governmental regulation for any purpose at any time as required by law or governmental regulation as a condition to the transaction of any business or the exercise of any privilege or license, or to enable any Member to maintain self-insurance or to participate in any funds established to cover any insurance risks or in connection with workers' compensation, unemployment insurance, pensions or profit sharing plans or other social security plans or programs, or to share in the privileges or benefits required for corporations participating in such arrangements;

(b)     any Lien described in Exhibit B which is existing on the date of execution of this Indenture provided that no such Lien may be extended, renewed or modified to apply to any Property of a Member of the Obligated Group not subject to such Lien on such date, unless such Lien as so extended, renewed or modified otherwise qualifies as a Permitted Encumbrance;

(c)     any Lien on the Property of any Member granted in favor of or securing Indebtedness to any other Member, with Noteholder Consent;

(d)     this Master Indenture, and any other Lien on Property if such Lien equally and ratably secures all of the Obligations and only the Obligations;

(e)     leases which relate to Property of the Obligated Group which is of a type that is customarily the subject of such leases, such as office space for physicians and educational institutions, food service facilities, gift shops, commercial, beauty shop, banking, radiology, other similar specialty services, pharmacy and similar departments or employee rental apartments; and any leases, licenses or similar rights to use Property whereunder a Member is lessee, licensee or the equivalent thereof upon fair and reasonable terms no less favorable to the lessee or licensee than would obtain in a comparable arm's length transaction;

(f)     Liens for taxes and special assessments which are not then delinquent, or if then delinquent are being contested in accordance with Section 4.05 hereof;

(g)     utility, access and other easements and rights of way, restrictions, encumbrances and exceptions which do not materially interfere with or materially impair the operation of the Property affected thereby (or, if such Property is not being then operated, the operation for which it was designed or last modified);

(h)     any mechanic's, laborer's, materialman's, broker's, appraiser's, supplier's or vendor's Lien or right in respect thereof if payment is not yet due under the contract in question or has been due for less than 30 days, or if such Lien is being contested in accordance with the provisions of the Master Indenture;

(i)     such Liens, defects, irregularities of title and encroachments on adjoining property as normally exist with respect to property similar in character to the Property involved

and which do not materially adversely affect the value of, or materially impair, the Property affected thereby for the purpose for which it was acquired or is held by the owner thereof;

(j)      zoning laws and similar restrictions which are not violated by the Property affected thereby;

(k)      statutory rights under Section 291, Title 42 of the United States Code, as a result of what are commonly known as Hill Burton grants, and similar rights under other federal statutes or statutes of the state in which the Property involved is located;

(l)      all right, title and interest of the state where the Property involved is located, municipalities and the public in and to tunnels, bridges and passageways over, under or upon a public way;

(m)      Liens on or in Property given, granted, bequeathed or devised by the owner thereof existing at the time of such gift, grant, bequest or devise, provided that such Liens consist solely of restrictions on the use thereof or the income therefrom;

(n)      Liens (other than Liens on cash or securities deposited with or subject to a control agreement for the benefit of a creditor or agent of a creditor or a surety for a creditor) resulting from any judgment or award, the time for the appeal or petition for rehearing of which shall not have expired, or in respect of which any Member shall at any time in good faith be prosecuting an appeal or proceeding for a review and in respect of which a stay of execution pending such appeal or proceeding for review shall be in existence, provided that such Liens are junior to the Lien of this Indenture;

(o)      Liens by the depositor on moneys deposited by patients or others with a Member as security for or as prepayment of the cost of patient care or any rights of residents of life care, elderly housing or similar facilities to endowment, prepayment or similar funds deposited by or on behalf of such residents;

(p)      Liens on Property due to rights of third party payors for recoupment of excess reimbursement paid;

(q)      any security interest in a rebate fund, conventionally sized debt service or interest reserve, debt service, construction fund or any similar fund established pursuant to the terms of any Supplement, Related Bond Indenture or Related Loan Agreement in favor of the Master Trustee, a Related Bond Trustee or the holder of the Indebtedness issued pursuant to such Supplement, Related Bond Indenture or Related Loan Agreement or the holder of any related Commitment Indebtedness;

(r)      any Lien on any Related Bond or any evidence of Indebtedness of any Member acquired by or on behalf of any Member which secures Commitment Indebtedness and only Commitment Indebtedness;

(s)      any Lien on tangible personal Property acquired by a Member which Lien secures a Capitalized Lease, Non-Recourse Indebtedness  or other Indebtedness issued, incurred or assumed by any Member in connection with and to effect such acquisition or existing

20

Indebtedness which will remain outstanding after such acquisition, if in any such case the aggregate principal amount of such Indebtedness does not exceed the fair market value subject to such Lien as determined in good faith by the Governing Body of the Member;

(t)     [reserved];

(u)     such Liens, covenants, conditions and restrictions, if any, on tangible property which do not secure Indebtedness and which are other than those of the type referred to above, and which (i) in the case of Property owned by the Obligated Group on the date of execution of the Master Indenture, do not and will not, so far as can reasonably be foreseen, materially adversely affect the value of the Property currently affected thereby or materially impair the same, and (ii) in the case of any other Property, do not materially impair or materially interfere with the operation or usefulness thereof for the purpose for which such Property was acquired or is held by a Member;

(v)     such Liens as are required to be granted by Section 246.111 of the Texas Health and Safety Code, as amended; and

(w)     any other Lien with Noteholder Consent.

"Permitted Investments" means:

(a)     Government Obligations;

(b)     debt obligations which are (i) issued by any state or political subdivision thereof or any agency or instrumentality of such state or political subdivision, and (ii) at the time of purchase, rated in one of the two highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by any Rating Agency;

(c)     any bond, debenture, note, participation certificate or other similar obligation issued by a government sponsored agency (such as the Federal National Mortgage Association, the Federal Home Loan Bank System, the Federal Home Loan Mortgage Corporation, the Federal Farm Credit Bank or the Student Loan Marketing Association) which is either (i) rated in the highest rating category by any Rating Agency, or (ii) backed by the full faith and credit of the United States of America;

(d)     U.S. denominated deposit account, certificates of deposit and banker's acceptances of any bank, trust company, or savings and loan association, including the Master Trustee or Bond Trustee or their affiliates, which have a rating on their short-term certificates of deposit on the date of purchase in one of the two highest short-term rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by any Rating Agency, and which mature not more than 360 days after the date of purchase;

(e)     commercial paper which is rated at the time of purchase in one of the two highest short-term rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by any Rating Agency, and which matures not more than 270 days after the date of purchase;

(f)     bonds, notes, debentures or other evidences of debt issued or guaranteed by a corporation which are, at the time of purchase, rated by any Rating Agency in any of the three highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise);

(g)     investment agreements with banks that at the time the agreement is executed are rated in one of the two highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by any Rating Agency or investment agreements with non-bank financial institutions, provided that (1) all of the unsecured, direct long-term debt of either the non-bank financial institution or the related guarantor of such non-bank financial institution is rated by any Rating Agency at the time the agreement is executed in one of the two highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) for obligations of that nature; or (2) if the non-bank financial institution and any related guarantor have no outstanding long-term debt that is rated, all of the short-term debt of either the non-bank financial institution or the related guarantor of the non-bank financial institution is rated by any Rating Agency in one of the two highest rating categories (without regard to any refinement or gradation of the rating category by numerical modifier or otherwise) assigned to short-term debt by any Rating Agency.  If such non-bank financial institution and any guarantor do not have any short-term or long-term debt, but do have a rating in one of the two highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise), then investment agreements with the non-bank financial institution will be permitted. Any investment agreement pursuant to this clause (g) shall provide that if at any time after purchase the provider of the investment agreement drops below the two highest rating categories assigned by the applicable Rating Agency, (a) within 30 days, the provider will either (1) cause its obligations under the agreement to be assumed by another provider rated in one of the two highest rating categories or (2) secure the agreement with Government Obligations which are represented to be free and clear of third-party claims, are required to be valued no less frequently than weekly, monthly, are required to maintain a fair market value in relation to the amount owed under the investment agreement, including principal and interest, equal to at least 103%, and are held in the custody of the Master Trustee or the Master Trustee's custodial agent, and (b) any failure of the provide to comply with clause (a)(1) or (2) shall constitute an event of default under the agreement;

(h)     repurchase agreements with respect to and secured by Government Obligations or by obligations described in clause (b) and (c) above, which agreements may be entered into with a bank (including the Master Trustee, the Bond Trustee or their affiliates), a trust company, financial services firm or a broker dealer which is a member of the Securities Investors Protection Corporation, provided that (i) the Bond Trustee or a custodial agent of the Bond Trustee has possession of the collateral and that the collateral is free and clear of third-party claims, (ii) a master repurchase agreement or specific written repurchase agreement governs the transaction, (iii) the collateral securities are valued no less frequently than monthly, and (iv) the fair market value of the collateral securities in relation to the amount of the repurchase obligation, including principal and interest, is equal to at least 103%, and (v) the collateral securities are held in the custody of the Bond Trustee or the Bond Trustee's agent;

22

(i)     investments in a money market fund, including funds of the Bond Trustee, the Master Trustee or their affiliates, rated (at the time of purchase) in the highest rating category for this type of investment by any Rating Agency; and

(j)     shares in any investment company, money market mutual fund, fixed income mutual fund, exchange-traded fund or other collective investment fund registered under the federal Investment Company Act of 1940, whose shares are registered under the Securities Act of 1933, and whose investments consist solely of Permitted Investments as defined in paragraphs (a) through (i) above, including money market mutual funds from which the Bond Trustee, the Master Trustee or their affiliates derive a fee for investment advisory or other services to the fund.

The Master Trustee shall be entitled to assume that any investment which at the time of purchase is a Permitted Investment remains a Permitted Investment thereafter, absent receipt of written notice or information to the contrary.  To the extent such investment is no longer a Permitted Investment, the Obligated Group Representative shall promptly provide the Master Trustee written notice of such status and the Master Trustee shall proceed to liquidate such investment.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof or any other entity.

"Place of Payment" for a series of Obligations means a city or political subdivision designated as such pursuant to this Indenture or a Supplement.

"Plan" means the plan of reorganization filed by the Obligor in the Bankruptcy Court on _____, 2019, as amended.

"Premises" means the real property described in Exhibit A hereto, as it may be amended from time to time.

"Primary Obligor" means the Person who is primarily obligated on an obligation which is guaranteed by another Person.

"Project" means The Stayton at Museum Way, a continuing care retirement community consisting of (a) the Premises, (b) Independent Living Units, Rental Units, assisted living units, a health center including nursing beds, and related common areas, (c) necessary or useful furnishings, equipment and machinery, and (d) such interests in land as may be necessary or suitable for the foregoing, including roads and rights of access, utilities and other necessary site preparation facilities.

"Projected Debt Service Coverage Ratio" means, for any future period, the ratio consisting of a numerator equal to the amount determined by dividing the projected Income Available for Debt Service for that period by the Maximum Annual Debt Service Requirement for the Funded Indebtedness expected to be outstanding during such period and a denominator of one.

"Projected Rate" means the projected yield at par of an obligation as set forth in the report of a Consultant, or if a contemporaneous Funded Indebtedness issue is offered by the Obligor that

is not subject to any credit enhancement, the yield on the Funded Indebtedness for a comparable term over which Put Indebtedness or Balloon Indebtedness is to be computed in accordance with Section 4.17. Such report shall state that in determining the Projected Rate such Consultant reviewed the yield evaluations at par of not less than three obligations (or such lesser number as the Consultant shall deem appropriate, but in no event less than one) selected by such Consultant, the interest on which is entitled to the exemption from federal income tax afforded by Section 103(a) of the Code or any successor thereto (or, if it is not expected that it will be reasonably possible to issue such tax exempt obligations, or if the interest on the Indebtedness for which the Projected Rate is being calculated is not entitled to such exemption, then obligations the interest on which is subject to federal income taxation) which obligations such Consultant states in its report are reasonable comparators for utilizing in developing such Projected Rate and which obligations: (i) were outstanding on a date selected by the Consultant which date so selected occurred during the 90 day period preceding the date of the calculation utilizing the Projected Rate in question, (ii) to the extent practicable, are obligations of Persons engaged in operations similar to those of the Obligated Group and having a credit rating similar to that of the Obligated Group, (iii) are not entitled to the benefits of any credit enhancement (including without limitation any letter or line of credit or insurance policy) if the obligation for which the Projected Rate is being determined is not benefited by any credit enhancement, and (iv) to the extent practicable, have a remaining term and amortization schedule substantially the same as the obligation with respect to which such Projected Rate is being developed.

"Property" means any and all rights, titles and interests in and to any and all property, whether real or personal, tangible (including cash) or intangible, wherever situated and whether now owned or hereafter acquired by a Person.

"Property, Plant and Equipment" means all Property of each Member which is classified as property, plant and equipment under generally accepted accounting principles.

"Put Date" means (a) any date on which an owner of Put Indebtedness may elect to have such Put-Indebtedness paid, purchased or redeemed by or on behalf of the underlying obligor prior to its stated maturity date or (b) any date on which Put Indebtedness is required to be paid, purchased or redeemed from the owner by or on behalf of the underlying obligor (other than at the option of the owner) prior to its stated maturity date, other than pursuant to any mandatory sinking fund or other similar fund or other than by reason of acceleration upon the occurrence of an event of default.

"Put Indebtedness" means Indebtedness which is (a) payable or required to be purchased or redeemed by or on behalf of the underlying obligor, at the option of the owner thereof, prior to its stated maturity date or (b) payable or required to be purchased or redeemed from the owner by or on behalf of the underlying obligor (other than at the option of the owner) prior to its stated maturity date, other than pursuant to any mandatory sinking fund or other similar fund or other than by reason of acceleration upon the occurrence of an event of default.

"Rating Agency" means Moody's, Standard & Poor's or Fitch.

24

"Related Bond Indenture" means any indenture, bond resolution or other comparable instrument pursuant to which a series of Related Bonds is issued, or, in the case of Related Bonds not issued by a governmental issuer, means the Related Loan Agreement.

"Related Bond Trustee" means the trustee and its successor in the trust created under any Related Bond Indenture, or, in the case of Related Bonds not issued by a governmental issuer, means the lender or, in the case of multiple lenders, lender agent or representative designated under the Related Loan Agreement.

"Related Bonds" means the revenue bonds or other obligations issued by any state, territory or possession of the United States or any municipal corporation or political subdivision formed under the laws thereof or any constituted authority or agency or instrumentality of any of the foregoing empowered to issue obligations on behalf thereof ("governmental issuer"), pursuant to a single Related Bond Indenture, the proceeds of which are loaned or otherwise made available to any Obligated Group Member in consideration of the execution, authentication and delivery of an Obligation to or for the order of such governmental issuer, or, in the case of a loan or other extension of credit made by a lender or group of lenders other than a governmental issuer and secured by an Obligation, means the applicable loan or credit facility.

"Related Loan Agreement" means any loan agreement, financing agreement, credit agreement or other comparable instrument entered into in connection with a series of Related Bonds.

"Rental Units" means units that are offered for occupancy on a rental basis with no Entrance Fee payable in connection with occupancy.

"Required Information Recipient" means the Master Trustee, each Related Bond Trustee, the Municipal Securities Rulemaking Board's EMMA information repository (in the form required for posting thereon), and all beneficial owners of Related Bonds who hold $500,000 or more of Related Bonds and request such reports in writing (which written request shall include a certification as to such ownership).

"Residency Agreement" means each and every contract, including without limitation any "Reservation Agreement" or "Residency Agreement", as amended from time to time, between an Obligated Group Member and a resident of the Project giving the resident rights of occupancy in the Project, including, without limitation, the Independent Living Units, Rental Units, assisted living units, skilled nursing beds or specialty care (dementia) beds and providing for services to such resident.

"Responsible Officer" when used with respect to the Master Trustee means the officer in the corporate trust department or comparable department of the Master Trustee having direct responsibility for administration of this Master Indenture.

"Revenue Fund" means the Revenue Fund created by Section 3.05 hereof.

"Revenues" means, for any period, (a) in the case of any Person providing health care services and/or senior living services, the sum of (i) net patient service revenues and resident service revenues plus (ii) other operating revenues, plus (iii) non operating revenues (other than

any revenues recognized from deferred revenues related to Entrance Fees, Contributions, income derived from the sale of assets not in the ordinary course of business, any gain from the extinguishment of debt or other extraordinary item, earnings which constitute Funded Interest or earnings on amounts which are irrevocably deposited in escrow to pay the principal of or interest on Indebtedness, but including investment income), plus (iv) Unrestricted Contributions, plus or minus, as applicable, (v) Entrance Fees received minus Entrance Fees refunded to residents, and (b) in the case of any other Person, gross revenues less sale discounts and sale returns and allowances, as determined in accordance with generally accepted accounting principles; but excluding in either case (i) any unrealized gain or loss resulting from changes in the valuation of investment securities or unrealized changes in the value of derivative investments, (ii) any gains on the sale or other disposition of fixed or capital assets not in the ordinary course, (iii) earnings resulting from any reappraisal, revaluation or write up of fixed or capital assets, and (iv) insurance (other than business interruption) and condemnation proceeds; provided, however, that if such calculation is being made with respect to the Obligated Group, such calculation shall be made in such a manner so as to exclude any revenues attributable to transactions between any Member and any other Member. For the avoidance of doubt, for purposes of this definition, the net cash amount of Entrance Fees received minus Entrance Fees refunded during the applicable calculation period is treated as an addition to Revenues (if positive) or subtraction from Revenues (if negative), and any deferred recognition of Entrance Fees in other periods for GAAP purposes is disregarded.

"Series 2019 Bond Trustee" means UMB Bank, National Association, as bond trustee under the Bond Indenture.

"Series 2019 Bonds" means the Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Series 2019.

"Series 2019 Note" means the Series 2019 Note issued by the Obligated Group Representative pursuant to and described in the Series 2019 Supplemental Indenture.

"Series 2019 Supplemental Indenture" means the Supplemental Master Trust Indenture No. 3 dated as of [November 1], 2019 between the Obligated Group Representative and the Master Trustee.

"Short Term," when used in connection with Indebtedness, means having an original maturity less than or equal to one year and not renewable at the option of the debtor for a term greater than one year beyond the date of original issuance or subject to a Put within one year of the incurrence of such Indebtedness (unless such Put is unconditionally payable from other Indebtedness in effect at the time of incurrence that is not Short Term.)

"Standard & Poor's" means Standard & Poor's, a division of The McGraw Hill Companies, Inc., a corporation organized and existing under the laws of the State of New York, its successors and assigns, and, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "Standard & Poor's" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Obligated Group Representative, with written notice to the Master Trustee.

"Stated Maturity" when used with respect to any Indebtedness or any installment of interest thereon means any date specified in the instrument evidencing such Indebtedness or such installment of interest as a fixed date on which the principal of such Indebtedness or any installment thereof (including any sinking fund installment) or the fixed date on which such installment of interest is due and payable.

"Subordinated Indebtedness" means any promissory note, guaranty, lease, contractual agreement to pay money or other obligation the terms of the documents providing for the issuance of which expressly provide that no payments shall be made on such Subordinated Indebtedness at any time that any Obligations, whether currently Outstanding or subsequently issued, are Outstanding, unless such payments are permitted under Section 3.09 of this Master Indenture and that the Master Trustee is an intended third party beneficiary of such subordination provision.

"Supplement" means an indenture supplemental to, and authorized and executed pursuant to the terms of, this Indenture.

"Target Coverage Ratio" means, for the first two Testing Dates, 1.10:1.00, and for each subsequent Testing Date, 1.20:1.00.

"Tax Exempt Organization" means a Person organized under the laws of the United States of America or any state thereof that is exempt from federal income taxes under Section 501(a) of the Code as an organization described in Section 501(c)(3) of the Code, or corresponding provisions of federal income tax laws from time to time in effect.

"Testing Date" means each June 30 and December 31, commencing with the first such date that is at least 12 months after the Effective Date.

"Threshold Amount" means $1,000,000.

"Trust Estate" has the meaning given such term in the Granting Clauses hereof.

"Unrestricted Contributions" means Contributions which are not restricted in any way that would prevent their application to the payment of debt service on Indebtedness of the Person receiving such Contributions.

Section 1.02    Compliance Certificates and Reports.  Whenever the amount or date of any of the following is a condition to the taking of any action permitted hereby,

(a)    Estimated Revenues, Expenses, Cash and Investments and Income Available for Debt Service of any Person for any future Fiscal Year shall be established by a certificate or report of a Consultant stating the amount of such estimated item based upon assumptions provided by such Person and stating that such assumptions are, in the opinion of the Consultant, reasonable.

(b)    any of:

(1)    Revenues, Expenses, Cash and Investments and Income Available for Debt Service of any Person for any prior Fiscal Year or period,

27

(2)      Maximum Annual Debt Service of any Person, and

(3)      principal of and interest on any Indebtedness shall be established by an Officer's Certificate of the Obligated Group Representative stating the amount of such item and that such amounts have been derived from either the most recent financial statements of the Obligated Group delivered to the Master Trustee pursuant to Section 4.15 hereof or, for any period other than a prior Fiscal Year, from the internally prepared financial statements of the Obligated Group for such period;

(c)      the anticipated date of completion of any construction project of any Person shall be established by an Officer's Certificate of the Obligated Group Representative; and

(d)      securities shall include any amounts invested in marketable securities, whether classified as short term or long term assets.

All calculations required to be made hereunder with respect to the Obligated Group shall be made after elimination of intercompany items on a combined basis. The character or amount of any asset, liability or item of income or expense required to be determined or any consolidation, combination or other accounting computation required to be made for the purposes hereof, shall be determined or made in accordance with generally accepted accounting principles in effect on the date hereof, or at the option of the Obligated Group Representative, at the time in effect (provided that such generally accepted accounting principles are applied consistently with the requirements existing either on the date hereof or at the time in effect) except that assets, liabilities, items of income and expenses of Affiliates which are not included in the Obligated Group shall not be taken into account, and except where such principles are inconsistent with the requirements of this Indenture; provided, however, that there shall not be included in any calculation of any item otherwise required to be included in such calculation with respect to any Person which has withdrawn or is withdrawing from the Obligated Group.

Section 1.03   <u>Form of Documents Delivered to Master Trustee</u>. In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents. Any certificate or opinion of any officer of a Person may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any such certificate or Opinion of Counsel may be based, in so far as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of a specified Person stating that the information with respect to such factual matters is in the possession of such Person, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

28

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Section 1.04 <u>Acts of Holders of Obligations</u>. (a) Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders of Obligations may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders of Obligations in person or by agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Master Trustee, and, where it is hereby expressly required, to the Obligated Group Representative. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Holders of Obligations signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent, or of the holding by any Person of unregistered Obligations, shall be sufficient for any purpose of this Indenture and conclusive in favor of the Master Trustee and the Obligated Group Members, if made in the manner provided in this Section.

(b) The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by the certificate of any notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof. Where such execution is by an officer of a corporation or a member of a partnership, on behalf of such corporation or partnership, such certificate or affidavit shall also constitute sufficient proof of his authority.

(c) The amount of Obligations held in bearer form held by any Person executing any such instrument or writing as a Holder of Obligations, the numbers of such Obligations, and the date of his holding the same, may be proved by the production of such Obligations or by a certificate executed, as depositary, by any trust company, bank, banker or member of a national securities exchange (wherever situated), if such certificate is in form satisfactory to the Master Trustee, showing that at the date therein mentioned such Person had on deposit with such depositary, or exhibited to it, the Obligations held in bearer form therein described; or such facts may be proved by the certificate or affidavit of the Person executing such instrument or writing as a Holder of Obligations, if such certificate or affidavit is in form satisfactory to the Master Trustee. The Master Trustee and the Obligated Group Members may assume that such ownership of any Obligation held in bearer form continues until (1) another certificate bearing a later date issued in respect of the same Obligation is produced, or (2) such Obligation is produced by some other Person, or (3) such Obligation is registered as to principal or is surrendered in exchange for an Obligation in registered form, or (4) such Obligation is no longer Outstanding.

(d) The fact and date of execution of any such instrument or writing and the amount and numbers of Obligations held in bearer form held by the Person so executing such instrument or writing may also be proved in any other manner which the Master Trustee deems sufficient; and the Master Trustee may in any instance require further proof with respect to any of the matters referred to in this Section.

(e) The ownership of Obligations in registered form shall be proved by the Obligation Register.

(f) Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Obligation shall bind every future Holder of the same Obligation and the Holder of every Obligation issued upon the transfer thereof or in exchange therefor or in lieu thereof, in respect of anything done or suffered to be done by the Master Trustee or the Obligated Group Members in reliance thereon, whether or not notation of such action is made upon such Obligation.

Section 1.05 Notices, etc., to Master Trustee and Obligated Group Members. Any request, demand, authorization, direction, notice, consent, waiver or Act of Holders of Obligations or other document provided or permitted by this Indenture to be made upon, given or furnished to, or filed with,

(1) the Master Trustee by any Holder of Obligations or by any specified Person shall be sufficient for every purpose hereunder if actually received by the Master Trustee at UMB Bank, National Association, 120 Sixth Street South, Suite 1400, Minneapolis, MN 55402, Attention: Corporate Trust Department;

(2) the Obligated Group Members by the Master Trustee or by any Holder of Obligations shall be sufficient for every purpose hereunder if in writing and mailed, first class postage prepaid, to the Obligated Group Representative addressed to it at Tarrant County Senior Living Center Inc., c/o Lifespace Communities, Inc., 4201 Corporate Drive, West Des Moines, Iowa 50266, Attention: Chief Financial Officer or at any other address previously furnished in writing to the Master Trustee by the Obligated Group Representative, with a copy to Lifespace Communities, Inc., 4201 Corporate Drive, West Des Moines, Iowa 50266, Attention: Jodi Hirsch, Senior Vice President and General Counsel; or

(3) any Obligated Group Member by the Master Trustee or by any Holder of Obligations shall be sufficient for every purpose hereunder if in writing and mailed, registered or certified first class postage prepaid, to the Obligated Group Member addressed to it at the address specified in the Supplement executed by such Obligated Group Member or at any other address previously furnished in writing to the Master Trustee by such Obligated Group Member.

Section 1.06 Notices to Holders of Obligations; Waiver. Where this Indenture provides for notice to Holders of Obligations of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, to each Holder of such Obligations, at his address as it appears on the Obligation Register, not later than the latest date, and not earlier than the earliest date, prescribed for the transmission of such notice. Where this Indenture provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be

the equivalent of such notice. Waivers of notice by Holders of Obligations shall be filed with the Master Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

Section 1.07    [Reserved.]

Section 1.08    Effect of Headings and Table of Contents. The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 1.09    Successors and Assigns. All covenants and agreements in this Indenture by the Obligated Group Members shall bind their respective successors and assigns, whether so expressed or not.

Section 1.10    Separability Clause. In case any provision in this Indenture or in the Obligations shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

<div align="center">

ARTICLE II
THE OBLIGATIONS
</div>

Section 2.01    Series and Amount of Obligations. (a) Obligations shall be issued under this Indenture in series created by Supplements permitted hereunder. No Obligations may be issued hereunder to evidence or secure Non Recourse Indebtedness or Subordinated Indebtedness. Each series shall be designated to differentiate the Obligations of such series from the Obligations of any other series. No Obligation issued hereunder shall be secured on a basis senior to other Obligations; provided, however, that the provision of an Interest Rate Agreement, letter or line of credit, standby bond purchase agreement, bond insurance policy or other similar instrument or obligation issued by a financial institution or municipal bond insurer or the establishment of a debt service reserve fund or account for the benefit of the Holders of certain Obligations, shall not be considered as the providing of security for such Obligations for purposes of the above preclusion on an Obligation being secured on a basis senior to other Obligations. The number of series of Obligations that may be created under this Indenture is not limited. The aggregate principal amount of Obligations of each series that may be created under this Indenture is not limited except as restricted by Supplement and the provisions of Article IV of this Indenture.

(b)    Any Obligated Group Member proposing to incur Indebtedness, other than the Series 2019 Note, whether evidenced by Obligations issued pursuant to a Supplement or by evidences of Indebtedness issued pursuant to documents other than this Master Indenture, shall give written notice of its intention to incur such Indebtedness, including in such notice the amount of Indebtedness to be incurred, to the Obligated Group Representative and the other Obligated Group Members. The Obligated Group Representative shall provide the Master Trustee with a copy of any such notice it receives prior to the date such Indebtedness is to be incurred. Any such Obligated Group Member, other than the Obligated Group Representative, proposing to incur such Indebtedness other than the Series 2019 Note, shall obtain the written consent of the Obligated Group Representative, which consent shall be evidenced by an Officer's Certificate of the Obligated Group Representative filed with the Master Trustee or an endorsement to such

<div align="center">31</div>

Indebtedness signed by the Obligated Group Representative. The Series 2019 Note is issued simultaneously with the execution and delivery hereof.

Section 2.02 <u>Appointment of Obligated Group Representative</u>. Each Obligated Group Member, by becoming an Obligated Group Member, irrevocably appoints the Obligated Group Representative as its agent and true and lawful attorney in fact and grants to the Obligated Group Representative (a) full and exclusive power to execute Supplements authorizing the issuance of Obligations or series of Obligations, (b) full and exclusive power to execute Obligations for and on behalf of the Obligated Group and each Obligated Group Member, (c) full and exclusive power to execute Supplements on behalf of the Obligated Group and each Obligated Group Member pursuant to Sections 9.01 and 9.02 hereof, and (d) full power to prepare, or authorize the preparation of, any and all documents, certificates or disclosure materials reasonably and ordinarily prepared in connection with the issuance of Obligations hereunder, or Related Bonds associated therewith, and to execute and deliver such items to the appropriate parties in connection therewith.

Section 2.03 <u>Execution and Authentication of Obligations</u>. All Obligations shall be executed for and on behalf of the Obligated Group and the Obligated Group Members by an Authorized Representative of the Obligated Group Representative. The signature of any such Authorized Representative may be manual or may be mechanically or photographically reproduced on the Obligation. If any Authorized Representative whose signature appears on any Obligation ceases to be such Authorized Representative before delivery thereof, such signature shall remain valid and sufficient for all purposes as if such Authorized Representative had remained in office until such delivery. Each Obligation shall be manually authenticated by an authorized officer of the Master Trustee, without which authentication no Obligation shall be entitled to the benefits hereof.

The Master Trustee's authentication certificate shall be substantially in the following form:

<p align="center">MASTER TRUSTEE'S AUTHENTICATION CERTIFICATE</p>

This [Obligation] is one of the Obligations referred to in the aforementioned Master Indenture.

Date of Authentication: _____        Master Trustee: _____

<p align="right">By: Authorized Signatory</p>

Section 2.04 <u>Supplement Creating Obligations</u>. The Obligated Group Representative (on behalf of the Obligated Group Members) and the Master Trustee may from time to time enter into a Supplement in order to create Obligations hereunder. Each Supplement authorizing the issuance of Obligations shall specify and determine the date of the Obligations, the principal amount thereof, the purposes for which such Obligations are being issued, the form, title, designation, and the manner of numbering or denominations, if applicable, of such Obligations, the date or dates of maturity of such Obligations, the rate or rates of interest (or method of determining the rate or rates of interest) and premium, if any, borne by such Obligations, the arrangement for place and medium of payment, and any other provisions deemed advisable or necessary. Each Obligation shall be issuable, shall be transferable and exchangeable and shall be subject to redemption as specified in

<p align="center">32</p>

this Master Indenture and in the Supplement. Any Obligation to be held by a Related Bond Trustee in connection with the issuance of Related Bonds shall be in the principal amount equal to the aggregate principal amount of such Related Bonds and shall be registered in the name of the Related Bond Trustee as assignee of the issuer of the Related Bonds. Unless an Obligation has been registered under the Securities Act of 1933, as amended (or similar legislation subsequently enacted), each such Obligation shall be endorsed with a legend which shall read substantially as follows: "This [describe Obligation] has not been registered under the Securities Act of 1933 or any state securities law (or any such similar subsequent legislation);" provided, however, such legend shall not be required if the Master Trustee is provided with an Opinion of Counsel to the effect that such legend is not required.

A Supplement and the Obligations issued thereunder may contain, as applicable, provisions relating to bond insurance or other forms of credit enhancement, as well as any and all compatible provisions necessary in order to make the Obligations meet the requirements of an issuer of any credit enhancement. Similarly, a Supplement may provide for Obligations to be issued in fixed or variable rate forms, as the case may be, with such tender and redemption provisions as may be deemed necessary for the issuance thereof and provide for the execution of required documents necessary for such purposes, and may specifically subordinate payment, remedies and any other provisions of the Obligations issued thereunder to the provisions of any other Obligations.

Section 2.05  Conditions to Issuance of Obligations Hereunder.  With respect to Obligations created hereunder, simultaneously with or prior to the execution, authentication and delivery of Obligations pursuant to this Master Indenture:

(a)  The Obligated Group Representative (on behalf of the Obligated Group Members) and the Master Trustee shall have entered into a Supplement as provided in Section 2.04 hereof, and all requirements and conditions to the issuance of such Obligations set forth in the Supplement and in this Master Indenture, including, without limitation, the provisions of Section 4.16 hereof (provided that such provisions shall not be applicable to the Series 2019 Note), shall have been complied with and satisfied, as provided in an Officer's Certificate of the Obligated Group Representative, a copy of which shall be delivered to the Master Trustee; and

(b)  The Obligated Group Representative shall have delivered to the Master Trustee an Opinion of Counsel to the effect that (1) registration of such Obligations under the Securities Act of 1933, as amended, and qualification of this Master Indenture or the Supplement under the Trust Indenture Act of 1939, as amended, is not required, or, if such registration or qualification is required, that all applicable registration and qualification provisions of said acts have been complied with, and (2) the Master Indenture and the Obligations are valid, binding and enforceable obligations of each of the Obligated Group Members in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance and other laws affecting creditors' rights generally, usual equity principles and other customary exclusions.

Section 2.06  List of Holders of Obligations.  The Master Trustee shall keep on file at its office the Obligation Register which shall consist of a list of the names and addresses of the Holders of all Obligations. At reasonable times and under reasonable regulations established by the Master Trustee, the Obligation Register may be inspected and copied by any Obligated Group

33

Member, the Holder of any Obligation or the authorized representative thereof, provided that the ownership by such Holder and the authority of any such designated representative shall be evidenced to the satisfaction of the Master Trustee.

Section 2.07    Optional and Mandatory Redemption.  Obligations of each series shall be subject to optional and mandatory redemption in whole or in part and may be redeemed prior to maturity, as provided in the Supplement creating such series, but not otherwise.

Section 2.08    Mutilated, Destroyed, Lost and Stolen Obligations.  If (i) any mutilated Obligation is surrendered to the Master Trustee, or the Master Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Obligation, and (ii) there is delivered to the Master Trustee such security or indemnity as may be required by the Master Trustee to save it and the Obligated Group Representative harmless, then, in the absence of notice to the Obligated Group Representative or the Master Trustee that such Obligation has been acquired by a bona fide purchaser, the Obligated Group Representative shall execute and upon its request the Master Trustee shall authenticate and deliver in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Obligation, a new Obligation of like tenor, series, interest rate and principal amount, bearing a number not contemporaneously outstanding.

In case any such mutilated, destroyed, lost or stolen Obligation has become or is about to become due and payable, the Obligated Group Representative in its discretion may, instead of issuing a new Obligation, pay such Obligation.

Upon the issuance of any new Obligation under this Section, the Obligated Group Representative and the Master Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Master Trustee) connected therewith.

Every new Obligation issued pursuant to this Section in lieu of any destroyed, lost or stolen Obligation shall constitute an original additional contractual obligation of the maker thereof, whether or not the destroyed, lost or stolen Obligation shall be at any time enforceable by anyone, and shall be entitled to all the benefits and security of this Indenture equally and proportionately with any and all other Obligations duly issued hereunder.

The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Obligations.

Section 2.09    Cancellation.  All Obligations surrendered for payment, redemption, transfer or exchange shall, if delivered to any Person other than the Master Trustee, be delivered to the Master Trustee and, if not already canceled or required to be otherwise delivered by the terms of the Supplement authorizing the series of Obligations of which such Obligation is a part, shall be promptly canceled by it.  The Obligated Group Representative may at any time deliver to the Master Trustee for cancellation any Obligations previously authenticated and delivered hereunder, which the Obligated Group Representative may have acquired in any manner whatsoever, and all Obligations so delivered shall be promptly canceled by the Master Trustee. No Obligations shall be authenticated in lieu of or in exchange for any Obligations canceled as

provided in this Section, except as expressly permitted by this Indenture. All canceled Obligations held by the Master Trustee shall be treated by the Master Trustee in accordance with its current document retention policies.

<div align="center">

ARTICLE III
FUNDS AND ACCOUNTS

</div>

Section 3.01    [Reserved.]

Section 3.02    [Reserved.]

Section 3.03    <u>Liquidity Support Account.</u>

*[note: we anticipate amendment of the existing MTI at the time the Liquidity Support Agreement is executed to provide substantially similar language with respect to the funded $3,000,000.]*

(a)    The Master Trustee has previously established the Liquidity Support Account under the Original Master Indenture. The Liquidity Support Account continues in effect under this Master Indenture. On the Effective Date, pursuant to the terms of the Liquidity Support Agreement, the Master Trustee shall receive from the Liquidity Provider, and upon receipt shall deposit to the Liquidity Support Account, the amount, if any, as together with other amounts then on deposit in the Liquidity Support Account shall equal $3,000,000. The money deposited in the Liquidity Support Account, together with all investments thereof and investment income therefrom, shall be held in trust and applied solely as provided in this Section and the Liquidity Support Agreement. Pending disbursements of the amounts on deposit in the Liquidity Support Account, the Master Trustee shall promptly invest and reinvest such amounts in accordance with the Liquidity Support Agreement.

(b)    The Bond Trustee or the Obligor may from time to time request the Master Trustee to request deposits by the Liquidity Provider from the Unfunded Liquidity Support (as defined in the Liquidity Support Agreement) to the Liquidity Support Account in accordance with and subject to the limits under the Liquidity Support Agreement. All amounts received by the Master Trustee from the Liquidity Provider following such a request shall be deposited in the Liquidity Support Account.

(c)    The Bond Trustee or the Obligor may from time to time direct the Master Trustee to withdraw moneys from the Liquidity Support Account (including without limitation moneys deposited therein pursuant to subsection (b)) for operating expenses of the Project in accordance with the Liquidity Support Agreement or, if no other funds are available therefor (other than funds in a debt service reserve fund), to pay amounts due but unpaid on any Obligations upon submission of a disbursement request in accordance with the Liquidity Support Agreement. The Master Trustee shall fund any such withdrawals from amounts deposited in the Liquidity Support Account pursuant to subsection (b) or, if no such moneys are available for deposit or such moneys are not deposited on a timely basis by the Liquidity Provider, from available amounts described in subsection (a).

<div align="center">35</div>

(d) If the conditions for such release under the terms of the Liquidity Support Agreement are satisfied, the Master Trustee shall transfer any remaining funds in the Liquidity Support Account to the Liquidity Provider in accordance with the Liquidity Support Agreement.

Section 3.04 [Reserved.]

Section 3.05 <u>Revenue Fund</u>. On the fifth Business Day preceding the end of each month following the occurrence of an Event of Default, the Master Trustee shall withdraw and pay or deposit from the amounts on deposit in the Revenue Fund the following amounts in the order indicated:

<u>First</u>: To the payment of all amounts due the Master Trustee under this Indenture;

<u>Second</u>: To the payment of the amounts then due and unpaid upon the Obligations, first, for interest, ratably, without preference or priority of any kind, according to the amounts due and payable on such Obligations for interest and second, for principal (and premium, if any) ratably, without preference or priority of any kind, according to the amounts due and payable on such Obligations for principal (and premium, if any), provided that if the Obligations shall have been accelerated pursuant to Section 7.02, payments shall; be made according to the amounts due and payable on such Obligations for interest and principal (and premium, if any) ratably, without preference or priority of any kind for interest, principal or premium, according to the amounts due and payable on such Obligations;

<u>Third</u>: To the Operating Account, on the first Business Day of each month, the amount certified by the Obligated Group Representative to be needed to pay operating expenses of the Project required to be paid in such month, which amount shall not exceed 110% of the amount set forth for such month in the Budget; and

<u>Fourth</u>: Such other amounts as the Obligated Group Representative may request for such purposes as shall be specified in a written request to the Master Trustee, but only if the Master Trustee has received Noteholder Consent to such payments or transfers.

If the Master Trustee has received Noteholder Consent to such reprioritization, all or any portion of amounts described in paragraphs Third or Fourth of this subsection (c), as specified in the applicable Noteholder Consent, may be paid out at a higher level of priority (e.g., ahead of Second), as so specified, during such period as is so specified.

The money deposited to the Revenue Fund, together with all investments thereof and investment income therefrom, shall be held in trust and applied solely as provided in this Section and in Section 7.09 hereof. Pending disbursements of the amounts on deposit in the Revenue Fund, the Master Trustee shall promptly invest and reinvest such amounts in accordance with Section 3.06 hereof.

Section 3.06 <u>Investment of Funds</u>. Any moneys held by the Master Trustee hereunder as part of any fund or account established under this Indenture shall be invested or reinvested by the Master Trustee in Permitted Investments upon the receipt of an Obligated Group Representative Request (upon which the Master Trustee is entitled to rely). Any such investments shall be held by or under the control of the Master Trustee and shall mature, or be redeemable at the option of the Master Trustee at such times as it is anticipated that moneys from the particular fund will be required for the purposes of this Indenture. For the purpose of any investment or reinvestment under this Section, investments shall be deemed to mature at the earliest date on which the obligor is, on demand, obligated to pay a fixed sum in discharge of the whole of such obligation. Any Permitted Investments may be purchased from or sold to the Master Trustee or any of its respective affiliates.

Section 3.07 <u>Allocation and Transfers of Investment Income</u>. Any investments in any fund or account shall be held by or under the control of the Master Trustee and shall be deemed at all times a part of the fund or account from which the investment was made. Any loss resulting from such investments shall be charged to such fund or account; provided that investment earnings on the Liquidity Support Account shall be paid to Lifespace in accordance with the terms of the Liquidity Support Agreement.

Section 3.08 <u>Master Trustee Relieved From Responsibility</u>. The Master Trustee shall be fully protected in relying upon any Obligated Group Representative Request relating to investments in any fund, and shall not be liable for any losses or prepayment penalties as a result of complying with any such Obligated Group Representative Request, and shall not be required to ascertain any facts with respect to such Request.

Section 3.09 <u>Payments on Subordinated Indebtedness</u>. A Member will not make payments on Subordinated Indebtedness unless the Obligated Group Representative delivers an Officer's Certificate to the Master Trustee prior to the applicable payment on Subordinated Indebtedness certifying that the following conditions are satisfied:

(a) If the proposed payment on the Subordinated Indebtedness is to be made to an Affiliate, had the payment occurred as of the last day of the most recent fiscal quarter for which financial statements have been delivered under Section 4.15, the Obligated Group would have had Days Cash on Hand of not less than 150 after that payment;

(b) If the proposed payment on the Subordinated Indebtedness is to be made to a Person that is not an Affiliate, (i) had the payment occurred as of the last day of the most recent fiscal quarter for which financial statements have been delivered under Section 4.15, the Obligated Group would have had Days Cash on Hand of not less than 120 after that payment, and (ii) had the payment occurred during the most recent Fiscal Year for which audited financial statements of the Obligated Group are available, the Historical Debt Service Coverage Ratio for that Fiscal Year, deducting the amount of the proposed payment from Income Available for Debt Service, would have been not less than 1.30; and

(c) Whether the payment is to an Affiliate or to a Person that is not an Affiliate, there is no event existing that constitutes, or with the giving of notice or the passing of time or both would constitute, and the proposed payment on Subordinated Indebtedness will not cause an

37

event that with the giving of notice or the passing of time or both would constitute, an Event of Default under this Master Indenture.

## ARTICLE IV
## REPRESENTATIONS AND COVENANTS OF THE OBLIGATED GROUP MEMBERS

Section 4.01    Title to Mortgaged Trust Estate and Lien of this Instrument.  The Obligor represents that it has good and indefeasible title to the Trust Estate, and any other Obligated Group Member will represent by its admission to the Obligated Group that it has good and indefeasible title to its portion of the Trust Estate, free and clear of any liens, charges, encumbrances, security interests and adverse claims whatsoever except the encumbrances permitted by Section 4.19 hereof.  The Obligor represents, and any other Obligated Group Member will represent by its admission to the Obligated Group, that it has the right to mortgage the Trust Estate (or in the case of an Obligated Group Member other than the Obligor, its portion of the Trust Estate) and will warrant and defend to Master Trustee, the title and the lien of this Indenture as a valid and enforceable mortgage thereon, subject to Permitted Encumbrances.  This Indenture constitutes a valid and subsisting lien on the Trust Estate, all in accordance with the terms hereof, subject to Permitted Encumbrances.

The Obligated Group Representative covenants that the Operating Account shall at all times be and remain subject to a Control Agreement.

Section 4.02    Further Assurances.  The Obligor, upon the request of Trustee, will execute, acknowledge, deliver and record and/or file such further instruments and do such further acts as may be necessary, desirable or proper to carry out more effectively the purpose of this Indenture and to subject the Trust Estate to the liens and security interests hereof.

Section 4.03    Recording and Filing.  The Obligor shall cause this Master Indenture and all amendments and supplements thereto and substitutions therefor to be recorded, filed, re-recorded and refiled in such manner and in such places as are necessary to protect the lien on the Trust Estate and will pay all such recording, filing, re-recording and refiling taxes, fees and other charges.  Additionally, the Obligor hereby authorizes the Master Trustee at any time and from time to time to file any initial financing statements, amendments thereto and continuation statements with or without the signature of the Obligor as authorized by applicable law, as applicable to all or part of the Property.  For purposes of such filings, the Obligor agrees to furnish any information requested by the Master Trustee promptly upon request by the Master Trustee.  The Obligor also ratifies its authorization for the Master Trustee to have filed any like initial financing statements, amendments thereto and continuation statements, if filed prior to the date of this Master Indenture.  The Obligor hereby irrevocably constitutes and appoints the Master Trustee and any officer or agent of the Master Trustee, with full power of substitution, as its true and lawful attorneys in fact with full irrevocable power and authority in the place and stead of the Obligor or in the Obligor's own name to execute in the Obligor's name any documents and otherwise to carry out the purposes of this Section 4.03, to the extent that the Obligor's authorization above is not sufficient.  To the extent permitted by law, the Obligor hereby ratifies all acts said attorneys in fact have lawfully done in the past or shall lawfully do or cause to be done in the future by virtue hereof.  This power of attorney is coupled with an interest and shall be irrevocable.  Furthermore, this Master Indenture shall also constitute a "fixture filing" for the purpose of Article 9 of the Texas Business and

Commerce Code against all of the Trust Estate which is or to become fixtures. Information concerning the security interest herein granted may be obtained at the addresses of the Obligor and the Master Trustee as set forth in Section 1.05 of this Master Indenture. The Obligor's identification number assigned by its state of incorporation is correctly set forth in Section 4.07 of this Master Indenture. The Obligor shall promptly notify the Master Trustee of any change in its organizational identification number.

Section 4.04  Payment of Principal, Premium and Interest. The Obligated Group Representative will duly and punctually pay the principal of (and premium, if any) and interest on the Obligations in accordance with the terms of the Obligations and this Indenture.

Each Obligated Group Member hereby jointly and severally unconditionally guarantees the full and timely payment of the principal of, and premium, if any, and interest on all Outstanding Obligations which such Person has not created or otherwise made (and on which such Person is not otherwise primarily liable) in accordance with the terms thereof, whether at Stated Maturity, declaration of acceleration, call for-redemption or otherwise. Such guaranty shall not be affected, modified or impaired upon the happening from time to time of any event, other than the payment of such Obligations (or provision therefor), including, without limitation, any of the following, whether or not with notice to, or the consent of, the guarantor:

(a)  the waiver, compromise, settlement, release or termination by any Person of the obligations evidenced by such Obligations or any covenant or security in support thereof;

(b)  the failure to give notice to the guarantor of the occurrence of an event of default under the terms and provisions of this Indenture or any agreement under which such Obligations are created, assumed, guaranteed or secured;

(c)  any failure, omission, or delay on the part of the Master Trustee or the Holder of such Obligations to enforce, assert or exercise any right, power or remedy conferred on the Master Trustee or such Holder in this Indenture or any other agreement under which such Obligations are created, assumed, guaranteed or secured;

(d)  the voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all the assets, marshaling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization or arrangement under bankruptcy or similar laws, composition with creditors or readjustment of, or other similar proceedings affecting any such guarantor or any other obligor on Obligations;

(e)  the invalidity, irregularity, illegality, unenforceability, or lack of value of, or any defect in any of the Obligations so guaranteed or any collateral security therefor; or

(f)  to the extent permitted by law, any event or action that would, in the absence of this Section, result in the release or discharge by operation of laws of such guarantor from the performance or observance of any obligation, covenant, or agreement contained in this Indenture.

Section 4.05  Payment of Taxes and Other Claims. Each Obligated Group Member will pay or discharge or cause to be paid or discharged before the same shall become delinquent, (1) all taxes, assessments, and other governmental charges lawfully levied or assessed or imposed

39

upon it or upon its income, profits, or property, and (2) all lawful claims for labor, materials, and supplies which, if unpaid, might by law become a lien upon its property; provided, however, that no such Person shall be required to pay and discharge or cause to be paid and discharged any such tax, assessment, governmental charge, or claim to the extent that the amount, applicability, or validity thereof shall currently be contested in good faith by appropriate proceedings and the property of the Obligated Group, or any portion thereof, shall not be subject to sale, foreclosure, transfer, loss or forfeiture as a result of or during the pendency of such contest. Each Obligated Group Member shall establish and shall maintain adequate reserves on its books for the payment of the contested amount plus any accruing interest and/or penalties thereon. Solely for purposes of Section 3.09 and 4.18(f) of this Master Indenture, following any initial administrative or judicial determination adverse to the Obligated Group Member, during the remaining period of any such contest, the contested amount plus any accruing interest and/or penalties thereon shall be treated as an Expense in calculation of Days Cash on Hand.

Section 4.06  Maintenance of Properties.  Each Obligated Group Member will cause all its properties used or useful in the conduct of its business to be maintained and kept in good condition, repair, and working order and supplied with all necessary equipment, ordinary wear and tear, casualty, condemnation, and acts of God excepted. Each Obligated Group Member will cause to be made all necessary repairs, renewals, replacements, betterments, and improvements thereof, all as in the reasonable judgment of the Obligated Group Representative may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times; provided, however, that nothing in this Section shall prevent any such Person from discontinuing the operation and maintenance of any of its properties if such discontinuance is, in the reasonable judgment of such Person (and in the opinion of the Governing Body of such Person if the property involved is any substantial part of the properties of such Person taken in the aggregate), desirable in the conduct of its business and not disadvantageous in any material respect to the Holders of the Obligations.

Section 4.07  Corporate Existence; Status of Obligor.  (a) Subject to Section 5.01, each Obligated Group Member will do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence, rights (charter and statutory), and franchises; provided, however, that no Person shall be required to preserve any right or franchise if the Governing Body of such Person shall reasonably determine that the preservation thereof is no longer desirable in the conduct of its business and that the loss thereof is not disadvantageous in any material respect to the Holders of the Obligations.

(b)  The Obligor's exact legal name is correctly set forth at the beginning of this Master Indenture, and the Obligor is an organization of the type specified in the first paragraph of this Master Indenture. The Obligor is formed or incorporated in or organized under the laws of the State of Texas, and has an organizational identification number of 800725819 assigned by the Secretary of State of the State of Texas. Neither the Obligor nor any other Obligated Group Member will cause or permit any change to be made in its name or identity unless the it shall have first notified the Master Trustee in writing of such change at least 30 days prior to the effective date of such change, and shall have first taken all action, including any action required by the Master Trustee, required for the purpose of perfecting or protecting the lien and security interest of the Master Trustee. The place where the Obligor keeps its books and records, including recorded data of any kind or nature, regardless of the medium or recording, including software,

40

writings, plans, specifications and schematics, has been for the preceding two months and will continue to be the address of the Obligor set forth in Section 1.05 hereof (unless the Obligor notifies the Master Trustee in writing at least 30 days prior to the date of such change). No other Obligated Group Member will change the place where it keeps its books and records, including recorded data of any kind or nature, regardless of the medium or recording, including software, writings, plans, specifications and schematics, unless it notifies the Master Trustee in writing at least 30 days prior to the date of such change.

(c)     The Obligor and any other Obligated Group Member that is an organization described in Section 501(c)(3) of the Code at the time it becomes and Obligated Group Member covenants and agrees to take all action necessary to preserve its status as an organization described in Section 501(c)(3) of the Code.

Section 4.08     Preservation of Qualifications.     Each Obligated Group Member will not allow any permit, right, license, franchise or privilege necessary for the ownership or operation of the Trust Estate as a continuing care retirement community to lapse or be forfeited. If an Obligated Group Member becomes a provider of services under and a participant in the Medicare program or any successor program thereto or any program by a federal, state or local government providing for payment or reimbursement for services rendered for health care, such Obligated Group Member shall use its commercially reasonable efforts to remain fully qualified as a provider of services and a participant in such program; provided, however, that no Obligated Group Member shall be required to maintain any such qualification if (i) the Governing Board of such Person shall determine that the maintenance of such qualification is not in the best economic interest of such Person and (ii) at least 30 days prior to the discontinuance of such qualification, such Person shall notify the Required Information Recipient of such proposed discontinuance and shall provide the Required Information Recipient with a written explanation of the basis for such determination.

Section 4.09     Additions to Facilities.     Any additions, improvements and extensions to the Facilities and repairs, renewals and replacements thereof, including (without limitation) any capital improvements, shall upon their acquisition become part of the Facilities. Each Obligated Group Member shall provide written notice to the Master Trustee at the time it acquires any real estate and shall add a legal description of such real estate to Exhibit A, record such revised version of Exhibit A and take sure other action as is required to subject such additional real estate to the Lien hereof.

Section 4.10     Insurance.

(a)     Required Coverage.     The Obligated Group shall maintain, or cause to be maintained, insurance under policies issued on an occurrence basis and otherwise of such type and in such amounts or in excess of such amounts as are customarily carried by, and insure against such risks as are customarily insured against by, businesses of like size and character to the Obligated Group Members; provided that in no case is such insurance coverage to be in an amount less than that specified below:

(i)     "All Risk" or "Special form" insurance against loss and/or damage to the Facilities under a policy or policies covering such risks as are ordinarily insured against with respect to similar facilities, including without limiting the generality of the foregoing, fire,

lightning, windstorm, hail, flood (if required under subparagraph (ix) below), earthquake, explosion, riot, riot attending a strike, civil commotion, damage from aircraft, vehicle, or smoke and uniform standard extended coverage and vandalism, malicious mischief, and ordinance law endorsements including boiler coverages and machinery coverage. Such insurance shall be in an amount not less than the full insurable replacement value of the Facilities, with a deductible amount of not more than $100,000. No policy of insurance shall be so written that the proceeds thereof will produce less than the minimum coverage required by the preceding sentence, by reason of co-insurance provisions or otherwise, without the prior written consent of the Master Trustee. The term "full insurable replacement value" means the actual replacement cost of the Facilities, including demolition that is required to rebuild and increased cost of construction endorsements. During construction, this coverage may be provided as part of the builder's all risk coverage required under subparagraph (viii) below.

(ii)     Use and occupancy (or business interruption) insurance, covering interruption of the Obligated Group's operations in whole or in part by reason of the total or partial suspension of, or interruption in, the operation of the Facilities, including its construction or rental of buildings, caused by the damage to or destruction of any part of the Facilities caused by any of the perils described in subparagraph (i) above, with such exceptions as are customarily imposed by insurers, in an amount sufficient to pay the interest component of debt service, taxes (or payments in lieu of taxes), and other fixed charges and other necessary continuing expenses for a period of at least twelve (12) months.

(iii)     Commercial general public liability insurance (excluding professional liability coverage as provided in subparagraph (viii) below), including blanket contractual liability and bodily injury liability and automobile liability insurance, in an occurrence form, protecting the Obligated Group against liability for injuries to persons and property with a combined single limit of liability coverage not less than $1,000,000 per occurrence and $1,500,000 annual aggregate with a deductible not to exceed $100,000.

(iv)     Automobile liability insurance, including hired and non-owned coverage, in an occurrence form, in the minimum amount of $1,000,000 bodily injury and property damage combined single limit and aggregate where applicable, with a deductible not to exceed $100,000.

(v)     Excess liability coverage in the amount of at least either straight excess or umbrella excess, covering excess of subparagraphs (iii), (iv), and (x) of this subsection to be maintained in force so that the total coverage available under each of the aforementioned subsections, including this subsection, is not less than $5,000,000 per occurrence and in the aggregate, where applicable, as excess of employer's liability, general liability, professional liability and automobile liability coverage, provided that the Obligated Group need not maintain such coverage if an Insurance Consultant states in writing that such coverage is not available, not available at reasonable rates, or is unfeasible for some other reason, but states that the insurance the Obligated Group is maintaining is customary in the case of corporations engaged in the same or similar activities and similarly situated and is adequate to protect the Obligated Group's Property and operations.

(vi)    Workers' compensation insurance or qualification as a self-insurer under applicable state law respecting all employees of the Obligated Group and all persons engaged in work on the Facilities, in such amount as is customarily carried by like organizations engaged in like activities of comparable size and liability exposure.

(vii)    [reserved]

(viii)    Commencing on the date of execution of a construction contract with respect to any additions to or restorations, replacements or modifications of the Facilities, until the completion date of such other construction, carry, or cause the contractor to carry, builder's all risk completed value insurance to the extent of the full replacement value of such portions of the Facilities, in non-reporting form for and with extended coverage endorsement then in use in the state in which the construction occurs, and covering all physical loss or damage, including by vandalism and malicious mischief for the following: soft costs, delayed completion, loss of earnings/rents and physical damage for "all risks of physical loss" affecting the building or structure; materials and supplies owned by the insured with a full installation floater; foundations; temporary structures (scaffolding, construction forms, etc.); fixtures, materials and equipment to service the building or intended to become a permanent part of the building.

(ix)    Either (A) flood insurance in the lesser amount of (1) the aggregate outstanding principal amount of the Obligations and (2) the maximum amount of flood insurance available, or (B) a certification from the Insurance Consultant that no portion of the Facilities is located in an area having "Special Flood Hazards" as that term is used in the Flood Disaster Protection Act of 1973, as amended.

(x)    Professional liability insurance with limits of liability not less than $1,000,000 annually per occurrence and $3,000,000 annual aggregate, and with a deductible not to exceed $100,000.

(b)    Carriers. All policies of insurance shall be issued by responsible insurance companies or associations selected by the Obligated Group rated at least "A-" by A.M. Best or a comparable rating agency.

(c)    Policies. All policies of insurance shall provide that they may not be canceled nor the coverages reduced, the deductibles increased or otherwise modified adversely to the interests of the Holders without at least thirty (30) days' prior written notice to the Master Trustee. The insurance required by subparagraphs (iii), (iv), and (v) of subsection (a) of this Section shall name the Master Trustee as an additional insured, as its interests may appear. The insurance required by subparagraphs (i), (ii), (vii), (viii), and (ix) of subsection (a) of this Section shall name the Master Trustee as an "additional insured" in accordance with the so-called "standard mortgagee subparagraph" and/or "loss payable clause" and require that all insurance proceeds resulting from any claim be paid to the Master Trustee for the benefit of the Holders. All policies of property insurance required hereunder, by naming the Master Trustee as mortgagee, shall contain an endorsement or agreement by the insurer that any loss will be payable in accordance with the terms of said policy, notwithstanding any act of the owner of the property that might otherwise result in forfeiture of said insurance.

43

(d)     Certificates. Originals or certified copies of the original policies, including all endorsements of all such policies, shall be deposited with the Master Trustee, provided that in lieu of such policies there may be deposited with the Master Trustee an original certificate or certificates of the respective insurers originally executed by the authorized agent(s) attesting the fact that the insurance required by this Section is in full force and effect and clearly reflecting all coverages, amounts and deductibles.   At least five (5) days prior to the expiration of any such policy, the Obligated Group shall furnish the Master Trustee evidence satisfactory to the Master Trustee that the policy has been renewed or replaced or is no longer required hereby.

(e)     Blanket Policies. In lieu of separate policies, the Obligated Group may maintain blanket or umbrella policies if such policies provide the same coverage required by this Section with protection against each risk and meeting all the other requirements stated herein and the Obligated Group deposits with the Master Trustee a certificate or certificates of the respective insurers evidencing such coverage and otherwise meeting the requirements stated herein.

(f)     Unexpired Policies. To the extent so provided in any unexpired insurance policy applicable to the Facilities, the Obligated Group's rights, if any, to all unexpired insurance policies, including any right to unearned premiums applicable to the Facilities and all proceeds thereof, shall inure to the benefit of, and pass to the purchaser of, the Facilities at any foreclosure or trustee's sale conducted pursuant to the terms of this Master Indenture.

(g)     Substitute Coverage. If any insurance required by this Section (other than insurance described in clause (a)(i) or (a)(ii)) shall be commercially unavailable at a reasonable cost, as evidenced by a certificate of the Insurance Consultant to the Master Trustee to the effect that (i) that such insurance is unavailable or that the cost of such insurance is in an amount or range specified in such certificate and that such cost is not reasonable for the scope of coverage, and (ii) due to the circumstances described in (i), similarly situated continuing care retirement communities are not at such time purchasing the applicable type of insurance or the applicable amount of insurance coverage, the Master Trustee shall accept such substitute coverage or other modification as shall be recommended by the Insurance Consultant. The failure to maintain any coverage required by this Section (other than insurance described in clause (a)(i) or (a)(ii)) with respect to any period for which such a certificate of an Insurance Consultant has been delivered to the Master Trustee shall not constitute a default hereunder provided that the Obligated Group complies with the recommended substitute coverage or other modification.

(h)     Insurance Consultant Review. The Obligated Group Representative shall annually review the insurance each Obligated Group Member maintains as to whether such insurance is customary and adequate. In addition, the Obligated Group Representative shall, at least once every two Fiscal Years (commencing with its Fiscal Year ending December 31, 2020), and, if any substitute coverage is in effect pursuant to subsection (g) above, at least once every Fiscal Year, cause a certificate of an Insurance Consultant or Insurance Consultants to be delivered to the Master Trustee within 120 days of the applicable Fiscal Year which indicates that the insurance then being maintained by the Members meets the standards described above. The Obligated Group Representative shall cause copies of its review, or the certificates of the Insurance Consultant or Insurance Consultants, as the case may be, to be delivered promptly to the Master Trustee.

44

(i)    Master Trustee as Insured.  Naming of the Master Trustee as an insured or additional insured under any insurance policy, or the furnishing to the Master Trustee of information relating thereto, shall not impose upon the Master Trustee any responsibility or duty to approve the form of such policy, the qualifications of the company issuing same or any other matters relating thereto.

Section 4.11    Rates and Charges.  (a) Each Member covenants and agrees to operate all of its Facilities on a revenue producing basis and to charge such fees and rates for its Facilities and services and to exercise such skill and diligence, including obtaining payment for services provided, as to provide income from its Property together with other available funds sufficient to pay promptly all payments of principal and interest on its Indebtedness, all expenses of operation, maintenance and repair of its Property and all other payments required to be made by it hereunder to the extent permitted by law.  Each Member further covenants and agrees that it will from time to time as often as necessary and to the extent permitted by law, revise its rates, fees and charges in such manner as may be necessary or proper to comply with the provisions of this Section.

(b)    The Members covenant and agree that the Obligated Group Representative will calculate the Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group for the 12 month period ending on each Testing Date, and will deliver a copy of such calculation to the Required Information Recipient no later than 45 days following the applicable Testing Date, provided that a copy of the calculation for the December 31 Testing Date shall be redelivered with the audited financial statements for the applicable Fiscal Year based on the data in such audited financial statements.

(c)    If the Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group is less than the Target Coverage Ratio for two consecutive Testing Dates, the Obligated Group Representative, shall, within 30 days following the delivery of the calculation described herein deliver to the Master Trustee an Officer's Certificate setting forth in reasonable detail the reasons for such failure to achieve the applicable Target Coverage Ratios and the measures undertaken by the Obligated Group in order to generate an Historical Pro Forma Debt Service Coverage Ratio of at least 1.20:1 as of the following Testing Date.

(d)    If the Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group is less than the Target Coverage Ratio for three consecutive Testing Dates, the Obligated Group Representative, at the Obligated Group's expense, shall select a Consultant within 30 days following the delivery of the calculation described herein to make recommendations with respect to the rates, fees and charges of the Obligated Group and the Obligated Group's methods of operation and other factors affecting its financial condition in order to increase such Historical Pro Forma Debt Service Coverage Ratio to at least 1.20:1 as of the following Testing Date.

(e)    Within 60 days of the engagement of any such Consultant, the Obligated Group Representative shall cause a summary of the Consultant's report and recommendations, if any, to be filed with each Member and each Required Information Recipient, and shall simultaneously cause a copy of the Consultant's report and recommendations, if any, to be filed in a password-protected data room (other than one provided by Intralinks or BOX) that may be accessed by beneficial owners of Related Bonds and potential purchasers of Related Bonds.  Each Member shall follow each recommendation of the Consultant applicable to it to the extent feasible

(as determined in the reasonable judgment of the Governing Body of the Obligated Group Representative) and permitted by law. This Section shall not be construed to prohibit any Member from serving indigent residents to the extent required for such Member to continue its qualification as a Tax Exempt Organization or from serving any other class or classes of residents without charge or at reduced rates so long as such service does not prevent the Obligated Group from satisfying the other requirements of this Section.

(f)     If the Obligated Group fails to achieve a Historical Pro Forma Debt Service Coverage Ratio at least equal to the Target Coverage Ratio for two or more Testing Dates, such failure shall not constitute an Event of Default under the Master Indenture if the Obligated Group takes all action necessary to comply with the procedures set forth above for preparing a report and adopting a plan and follows each recommendation contained in such report to the extent feasible (as determined in the reasonable judgment of the Governing Body of the Obligated Group Representative) and permitted by law. Notwithstanding the preceding sentence, if the Obligated Group fails to achieve a Historical Pro Forma Debt Service Coverage Ratio of at least 1.00:1 as of any Testing Date, such failure shall constitute an Event of Default under this Master Indenture.

Section 4.12   Damage or Destruction. Each Member agrees to notify the Master Trustee immediately in the case of the destruction of its Facilities or any portion thereof as a result of fire or other casualty, or any damage to such Facilities or portion thereof as a result of fire or other casualty, the Net Proceeds of which are estimated to exceed the Threshold Amount. If such Net Proceeds do not exceed the Threshold Amount, such Net Proceeds may be paid directly to the Member suffering such casualty or loss. The Members covenant that they will expend or contract to expend an amount not less than the amount of any such Net Proceeds within 24 months after receipt thereof to (i) repair, replace or restore the damaged or destroyed facilities, (ii) acquire or construct additional capital assets for any one or more Members, or (iii) repay, or irrevocably escrow the applicable Net Proceeds for the repayment of, the principal portion of any Indebtedness incurred by any one or more Members of the Obligated Group to acquire or construct capital assets or refinance Indebtedness incurred for such purpose.

In the event such Net Proceeds exceed the Threshold Amount, the Member suffering such casualty or loss shall deposit such Net Proceeds upon receipt with the Master Trustee (and thereupon the Master Trustee shall establish a Restoration Fund hereunder and deposit such Net Proceeds therein) and, within 12 months after the date on which the aggregate Net Proceeds are finally determined, elect by written notice to the Master Trustee one of the following three options:

(a)     Option A Repair and Restoration. Such Member may elect to replace, repair, reconstruct, restore or improve any of the Facilities of the Obligated Group or acquire additional Facilities for the Obligated Group or repay Indebtedness incurred for any such purpose pending the receipt of such Net Proceeds provided that the Obligated Group Representative notifies the Master Trustee of such election and provides to the Master Trustee, if the Net Proceeds deposited or expected to be deposited with the Master Trustee exceed $10,000,000 and unless expressly and specifically waived by the Master Trustee, prior to the application of any such Net Proceeds to such replacement, repair, reconstruction, restoration or improvement (1) a copy of a fully executed construction contract entered into by the Member with respect to such replacement, repair, reconstruction, restoration or improvement work, with a guaranteed maximum price, together with a collateral assignment of such contract to the Master Trustee exercisable by the

46

Master Trustee upon an Event of Default hereunder, (2) (2) evidence of the effectiveness of builders' risk insurance fully insuring the Obligated Group and the Master Trustee, as their interests may appear, for risks customarily covered by builders' risk insurance, (3) a disbursement agreement between such Member and the Master Trustee, in form and substance satisfactory to the Master Trustee (the "Disbursement Agreement"), containing disbursement procedures, including requisition approvals by a construction monitor or consultant retained by the Master Trustee at the Obligated Group's expense, forms of disbursement requisitions, certifications with each requisition as to sufficiency of funds to complete the contracted work at the remaining contract price, lien waiver requirements, retention requirements, and change order approvals by the applicable construction monitor or consultant, (4) evidence satisfactory to the Master Trustee that the Obligated Group will remain financially viable and debt service on the Obligations will be paid during the period of such replacement, repair, reconstruction, restoration or improvement and thereafter, and (5) the Net Proceeds and any other amounts as are required, in combination with such Net Proceeds, to pay (A) the guaranteed maximum price of the applicable construction contract and (B) any debt service coming due on Obligations during the period of expenditure of the Net Proceeds, to the extent such amount is in excess of amounts projected to be available from Revenues during such period. Provided that the Master Trustee has received the above-listed items, unless an Event of Default has occurred and is continuing hereunder, any Net Proceeds of insurance relating to such damage or destruction received by the Master Trustee shall be released from time to time by the Master Trustee to such Member upon:

(i)  the receipt by the Master Trustee of: a written requisition by the Member to the Master Trustee in the form set forth in the Disbursement Agreement, together with the approvals of such requisition required under the Disbursement Agreement; and

(ii)  satisfaction of such other disbursement conditions as may be set forth in the Disbursement Agreement.

It is further understood and agreed that in the event such Member shall elect this Option A, such Member shall complete the replacement, repair, reconstruction, restoration, improvement and acquisition of the Facilities, whether or not the Net Proceeds of insurance received for such purposes are sufficient to pay for the same.

(b)  Option B Prepayment of Obligations. Such Member may elect (and shall be deemed to have so elected if no other election has been made in accordance with this Section 4.12 within 12 months after the date on which the aggregate Net Proceeds are finally determined), to have all of the Net Proceeds payable as a result of such damage or destruction applied to the prepayment of the Obligations. In such event such Member shall, in its notice of election to the Master Trustee, direct the Master Trustee to apply such Net Proceeds, when and as received, to the prepayment of Obligations on a pro rata basis among all Obligations Outstanding. In the event any Related Bonds secured by an Obligation are not redeemable or prepayable at the time of such prepayment, the applicable pro rata portion of such Net Proceeds shall be irrevocably escrowed with the applicable Related Bond Trustee until the earlier of the date on which such Related Bonds are subject to redemption or prepayment or the date of acceleration of the Related Bonds.

(c)  Option C Partial Restoration and Partial Prepayment of Obligations. Such Member may elect to have a portion of such Net Proceeds applied to the replacement, repair,

reconstruction, restoration and improvement of the Facilities of the Obligated Group or the acquisition of additional Facilities for the Obligated Group or the repayment of Indebtedness incurred for any such purpose pending the receipt of such Net Proceeds with the remainder of such Net Proceeds to be applied to prepay Obligations on a pro rata basis among all Obligations Outstanding, in which event such Net Proceeds to be used for replacement, repair, reconstruction, restoration, improvement and acquisition shall be applied as set forth in subparagraph (a) of this Section 4.12 (subject to the conditions on such election) and such Net Proceeds to be used for prepayment of the Obligations shall be applied as set forth in subparagraph (b) of this Section.

Notwithstanding the foregoing, the proceeds of business interruption insurance are not subject to the above provisions of this Section.

At any time that an Event of Default shall have occurred and be continuing, (i) the Master Trustee shall be entitled to settle any insurance claim arising from the destruction of its Facilities or any portion thereof, and each Obligated Group Member hereby grants the Master Trustee power of attorney to effect such settlement on its behalf and (ii) notwithstanding the foregoing, any Net Proceeds obtained by the Master Trustee shall, unless otherwise directed by the Holders of a majority in principal amount of the Outstanding Obligations, apply such Net Proceeds as provided in Section 3.05 hereof.

Section 4.13 <u>Condemnation</u>. Each Member agrees to notify the Master Trustee immediately if it receives notice of any prospective or pending condemnation proceedings with respect to the Facilities or any part thereof. The Master Trustee and the Members shall cooperate fully with each other in the handling and conduct of any prospective or pending condemnation proceedings with respect to their Facilities or any part thereof. Each Member hereby irrevocably assigns to the Master Trustee, as its interests may appear, all right, title and interest of such Member in and to any Net Proceeds of any award, compensation or damages payable in connection with any such condemnation or taking, or payment received in a sale transaction consummated under threat of condemnation (any such award, compensation, damages or payment being hereinafter referred to as an "award"), which exceeds the Threshold Amount. Such Net Proceeds shall be initially paid to the Master Trustee for disbursement or use as hereinafter provided. If such Net Proceeds do not exceed the Threshold Amount, such Net Proceeds may be paid to the Member in question. The Members covenant that they will expend or contract to expend an amount not less than the amount of any such Net Proceeds within 24 months of the receipt thereof to (i) restore, replace or repair the condemned Facilities, (ii) acquire or construct additional capital assets, or (iii) repay the principal portion of Indebtedness incurred by one or more Members of the Obligated Group to acquire or construct capital assets or to refinance Indebtedness incurred for such purpose.

In the event such Net Proceeds exceed the Threshold Amount, the Member in question shall deposit such Net Proceeds upon receipt with the Master Trustee (and thereupon the Master Trustee shall establish a Restoration Fund hereunder and deposit such Net Proceeds therein). Thereupon, such Net Proceeds shall be subject in all respects to Section 4.12 as though such Net Proceeds were proceeds of insurance and such condemnation constituted damage to the applicable Facilities.

Section 4.14 <u>Other Provisions with Respect to Net Proceeds</u>. Amounts received by the Master Trustee in respect of any awards shall, at the Request of the Obligated Group

Representative, be invested or reinvested by the Master Trustee as directed in writing by the Obligated Group Representative in Permitted Investments.

Section 4.15 Financial Statements, Bondholder Calls, Etc. (a) The Members covenant that they will keep or cause to be kept proper books of records and accounts in which full, true and correct entries will be made of all dealings or transactions of or in relation to the business and affairs of the Obligated Group in accordance with generally accepted principles of accounting consistently applied except as may be disclosed in the notes to the audited financial statements referred to in subparagraph (b) below. To the extent that generally accepted accounting principles would require consolidation of certain financial information of entities which are not Members of the Obligated Group with financial information of one or more Members, consolidated financial statements prepared in accordance with generally accepted accounting principles which include information with respect to entities which are not Members of the Obligated Group may be delivered in satisfaction of the requirements of this Section 4.15 so long as: (i) supplemental information in sufficient detail to separately identify the information with respect to the Members of the Obligated Group is delivered to the Master Trustee with the audited financial statements; (ii) such supplemental information has been subjected to the auditing procedures applied in the audit of the consolidated financial statements delivered to the Master Trustee and, in the opinion of the accountant, is fairly stated in all material respects in relation to the consolidated financial statements taken as a whole; and (iii) such supplemental information is used for the purposes hereof or for any agreement, document or certificate executed and delivered in connection or pursuant to this Master Indenture.

(b) The Obligated Group Representative will furnish or cause to be furnished to each Required Information Recipient, the following:

(i) A monthly statement of the Obligated Group as soon as practicable after the information is available but in no event more than 45 days after the completion of such month, including (I) a calculation of the marketing levels for the Project as of the end of such month, including the number of Independent Living Units that have been sold or cancelled during that month and on an aggregate basis; (II) occupancy levels of the Project as of the end of such month including the number of Independent Living Units that were occupied and vacated during that month and on an aggregate basis; (III) an unaudited statement of revenues and expenses and statement of cash flows of the Obligated Group for such month compared to the approved budget for that month and an unaudited balance sheet of the Obligated Group as of the end of such month; and (IV) statements of the balances for each fund and account required to be established hereunder or under the Liquidity Support Agreement or under any Related Bond Indenture as of the end of such month (obtained from the applicable trustee), all in reasonable detail and certified by an officer of the Obligated Group Representative. The Obligated Group Representative does not need to deliver any monthly statement of the Obligated Group described in this subsection (i) at any time that the Historical Pro Forma Debt Service Coverage Ratio for the most recent Fiscal Year was at least 1.30:1.

(ii) Quarterly unaudited financial statements of the Obligated Group as soon as practicable after they are available but in no event more than 45 days after the completion of such fiscal quarter, including a combined or combining statement of revenues and expenses and statement of cash flows of the Obligated Group during such period, a combined or combining

49

balance sheet as of the end of each such fiscal quarter, and a calculation of the occupancy, Days Cash on Hand, and Historical Pro Forma Debt Service Coverage Ratio for such fiscal quarter if required to be calculated by Sections 4.11, 4.20, 4.21, 4.22 and 4.23 hereof, all prepared in reasonable detail and certified, subject to year-end adjustment, by an officer of the Obligated Group Representative. Such financial statements and calculations shall be accompanied by a comparison to the annual budget provided pursuant to subsection (iv) below.

(iii) Within 150 days of the end of each Fiscal Year, an annual audited financial report of the Obligated Group prepared by a firm of certified public accountants, including, if there is more than one Obligated Group Member, a combined and an unaudited combining balance sheet as of the end of such Fiscal Year and a combined and an unaudited combining statement of cash flows for such Fiscal Year and a combined and an unaudited combining statement of revenues and expenses for such Fiscal Year, showing in each case in comparative form the financial figures for the preceding Fiscal Year together with a separate written statement of the accountants preparing such report containing calculations of the Obligated Group's Historical Debt Service Coverage Ratio for said Fiscal Year and Days Cash on Hand as of the end of such Fiscal Year and a statement that such accountants have no knowledge of any default under this Master Indenture insofar as they related to accounting matters, or if such accountants shall have obtained knowledge of any such default or defaults, they shall disclose in such statement the default or defaults and the nature thereof.

(iv) On or before the date of delivery of the financial reports referred -to in subsection (iii) above, an Officer's Certificate of the Obligated Group Representative (A) stating that the Obligated Group is in compliance with all of the terms, provisions and conditions of this Master Indenture or, if not, specifying all such defaults and the nature thereof, (B) calculating and certifying the marketing, occupancy, Days Cash on Hand, and Historical Pro Forma Debt Service Coverage Ratio, if required to be calculated for such Fiscal Year by Sections 4.11, 4.20, 4.21, 4.22 and 4.23 hereof, as of the end of such month or Fiscal Year, as appropriate, and (C) attaching a summary and copy of the Obligated Group's annual operating and capital budget for the coming year.

(v) On or before the date of delivery of the financial reports referred to in subsections (ii) and (iii) above, a management's discussion and analysis of results for the applicable fiscal period.

(vi) Copies of (A) any board approved revisions to the summary of the annual budget provided pursuant to subsection (iv) above, or (B) any correspondence to or from the Internal Revenue Service concerning the status of the Obligor as an organization described in Section 501(c)(3) of the Code or with respect to the tax exempt status of the Series 2019 Bonds, promptly upon receipt.

(vii) Such additional information as the Master Trustee or any Related Bond Trustee may reasonably request concerning any Member in order to enable the Master Trustee or such Related Bond Trustee to determine whether the covenants, terms and provisions of this Master Indenture have been complied with by the Members and for that purpose all pertinent books, documents and vouchers relating to the business, affairs and Property (other than patient, donor and personnel records) of the Members shall, to the extent permitted by law, at all times

during regular business hours be open to the inspection of such accountant or other agent (who may make copies of all or any part thereof) as shall from time to time be designated by the Master Trustee or such Related Bond Trustee.

(c)     The Members also agree that, within 10 days after its receipt thereof, the Obligated Group Representative will file with the Required Information Recipient a copy of each Consultant's report (or summary thereof) or counsel's opinion required to be prepared under the terms of this Master Indenture.

(d)     The Obligated Group Representative shall give prompt written notice of a change of accountants by the Obligated Group to the Master Trustee and each Related Bond Trustee. The notice shall state (i) the effective date of such change; (ii) whether there were any unresolved disagreements with the former accountants on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which the accountants claimed would have caused them to refer to the disagreement in a report on the disputed matter, if it was not resolved to their satisfaction; and (iii) such additional information relating thereto as such Related Bond Trustee or the Master Trustee may reasonably request.

(e)     Within 15 days after the delivery of the monthly (if applicable), quarterly and annual information required under subsections (b)(i), (ii) and (iii) hereof, the Obligated Group shall host a telephone call with Holders and beneficial owners and prospective beneficial owners of Related Bonds, during which the chief financial officer and the chief operating officer of the Obligor and, if different, the Obligated Group Representative shall provide a presentation regarding such information and respond to questions from Holders and beneficial owners and prospective beneficial owners of Related Bonds.  The Obligated Group Representative shall provide, in writing, the date and time of each such call and details as to how to participate in such call to the Required Information Recipient at least 7 days prior to the applicable call.

(f)     Without limiting the foregoing, each Member will permit, upon reasonable notice, the Master Trustee or any such Related Bond Trustee (or such persons as they may designate) to visit and inspect, at the expense of such Person, its Property and to discuss the affairs, finances and accounts of the Obligated Group with its officers and independent accountants, all at such reasonable times and locations and as often as the Master Trustee or such Related Bond Trustee may reasonably request.

(g)     The Obligated Group Representative may designate a different Fiscal Year for the Members of the Obligated Group by delivering a notice to the Master Trustee designating the first and last day of such new Fiscal Year and whether or not there will be any interim fiscal period (the "Interim Period") of a duration of greater than or less than 12 months preceding such new Fiscal Year, provided that such redesignation shall not be permitted if the effect thereof is to avoid an Event of Default that would have occurred but for such redesignation or to permit a transaction that would not be permitted under this Master Indenture but for such redesignaqtion. The Members covenant that they will furnish to the Master Trustee and each Related Bond Trustee, as soon as practicable after they are available, but in no event more than 150 days after the last day of such Interim Period, a financial report for such Interim Period certified by a firm of nationally or regionally recognized independent certified public accountants selected by the Obligated Group Representative covering the operations of the Obligated Group for such Interim Period and

containing a combined balance sheet as of the end of such Interim Period and a combined statement of changes in fund balances and changes in financial position for such Interim Period and a combined statement of revenues and expenses for such Interim Period, showing in each case in comparative form the financial figures for the comparable period in the preceding Fiscal Year, together with a separate written statement of the accountants preparing such report containing a calculation of the Obligated Group's Historical Pro Forma Debt Service Coverage Ratio for the Interim Period and Days Cash on Hand as of the end of such Fiscal Year and a statement that such accountants have obtained no knowledge of any default by any Member in the fulfillment of any of the terms, covenants, provisions or conditions of this Master Indenture insofar as they relate to accounting matters, or if such accountants shall have obtained knowledge of any such default or defaults, they shall disclose in such statement the default or defaults and the nature thereof (but such accountants shall not be liable directly or indirectly to anyone for failure to obtain knowledge of any default).

(h)     Delivery of such reports, information and documents described in this Section 4.15 to the Master Trustee is for informational purposes only, and the Master Trustee's receipt thereof shall not constitute notice to it of any information contained therein or determinable from information contained therein, including compliance by the Obligated Group or the Members with any of its or their covenants hereunder, as to which the Master Trustee is entitled to rely exclusively on Officer's Certificates.

Section 4.16   Permitted Additional Indebtedness.   So long as any Obligations are outstanding, the Obligated Group will not incur any Additional Indebtedness (whether or not incurred through the issuance of Additional Obligations) other than:

(a)     Funded Indebtedness, if prior to incurrence thereof or, if such Funded Indebtedness was incurred in accordance with another subsection of this Section 4.16 and any Member wishes to have such Indebtedness classified as having been issued under this subsection (a), prior to such classification, there is delivered to the Master Trustee:

(i)     (A) an Officer's Certificate to the effect that for the most recent Fiscal Year for which audited financial statements have been filed with the Master Trustee as required by this Indenture, the Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group was not less than 1.20:1; or

(ii)     (A) an Officer's Certificate to the effect that for the most recent Fiscal Year for which audited financial statements have been filed with the Master Trustee as required by this Indenture, the Historical Debt Service Coverage Ratio of the Obligated Group was not less than 1.20:1; and (B) a written report of a Consultant (prepared in accordance with industry standards) to the effect that the estimated Projected Debt Service Coverage Ratio of the Obligated Group will be not less 1.25:1 for each of the first two full Fiscal Years following the later of (1) the estimated completion of the development, marketing, acquisition, construction, renovation or replacement being paid for with the proceeds of such additional Funded Indebtedness or (2) the first full Fiscal Year following the maximum level of occupancy in the case of construction, renovation or replacement of elderly housing facilities being financed with the proceeds of such additional Funded Indebtedness, provided that the maximum level of occupancy is projected to occur no later than during the fourth full Fiscal Year following the incurrence of such Funded

Indebtedness, or (3) following the incurrence of Funded Indebtedness for other purposes; provided that such report shall include forecast balance sheets, statements of revenues and expenses and statements of changes in financial position for such Fiscal Year and a statement of the relevant assumptions upon which such forecasted statements are based, which financial statements must indicate that sufficient revenues and cash flow could be generated to pay the operating expenses of the Obligated Group's proposed and existing facilities and the debt service on all of the Obligated Group's Indebtedness during each Fiscal Year, including the Fiscal Year in which such Indebtedness is incurred, until the applicable first two full Fiscal Years.

(b)     Subject to the proviso following subsection (j) below, Completion Funded Indebtedness in an amount of no more than 10% of the Funded Indebtedness originally incurred to finance the construction of the applicable Facilities, if there is delivered to the Master Trustee: (i) an Officer's Certificate of the Member for whose benefit such Indebtedness is being issued stating that at the time the original Funded Indebtedness for the Facilities to be completed was incurred, such Member had reason to believe that the proceeds of such Funded Indebtedness together with other moneys then expected to be available would provide sufficient moneys for the completion of such Facilities, (ii) a statement of an independent architect or an expert setting forth the amount estimated to be needed to complete the Facilities, and (iii) an Officer's Certificate of such Member stating that the proceeds of such Completion Funded Indebtedness to be applied to the completion of the Facilities, together with a reasonable estimate of investment income to be earned on such proceeds and available to pay such costs, the amount of moneys, if any, committed to such completion from available cash or marketable securities and reasonably estimated earnings thereon, enumerated loans from Affiliates or bank loans (including letters or lines of credit) and federal or state grants reasonably expected to be available, will be in an amount not less than the amount set forth in the statement of an independent architect or other expert, as the case may be, referred to in (ii).

(c)     Funded Indebtedness for the purpose of refunding any outstanding Funded Indebtedness if prior to the incurrence thereof an Officer's Certificate of a Member is delivered to the Master Trustee stating that, taking into account the issuance of the proposed Funded Indebtedness and the application of the proceeds thereof and any other funds available to be applied to such refunding, the Annual Debt Service Requirement of the Obligated Group will not be increased in any year during which Obligations Outstanding at the time such Funded Indebtedness is incurred (other than Obligations that will cease to be Outstanding upon the incurrence of such Funded Indebtedness) remain Outstanding.

(d)     Subject to the proviso following subsection (j) below, Short Term Indebtedness, in a total principal amount which at the time incurred does not, together with the principal amount of all other such Short Term Indebtedness of the Obligated Group then outstanding under this subsection (d) but excluding the principal payable on all Funded Indebtedness during the next succeeding 12 months, exceed 10% of the Revenues of the Obligated Group for the most recent Fiscal Year for which financial statements reported upon by independent certified public accountants are available; provided, however, that the Obligated Group covenants that for a period of 20 consecutive calendar days in each Fiscal Year the total amount of such Short Term Indebtedness of the Obligated Group outstanding under this subsection (d) shall be reduced to zero.

(e)     Balloon Indebtedness if:

(i)     Subject to the proviso following subsection (j) below, (A)   there is in effect at the time such Balloon Indebtedness is incurred a binding irrevocable commitment to provide financing sufficient to pay the principal amount of such Balloon Indebtedness coming due in each consecutive 12 month period in which 25% or more of the original principal amount of such Balloon Indebtedness comes due; and

(B)     the conditions set forth in subsection (a) are met if it is assumed that for any Fiscal Year in which 25% or more of the original principal amount of such Balloon Indebtedness comes due, (1) the portion of Balloon Indebtedness coming due in such Fiscal Year matures, bears interest and is payable in accordance with the terms of the financing described in clause (A); or

(ii)     (A) the aggregate principal amount of all Balloon Indebtedness issued and outstanding pursuant to this subsection (e)(ii), taking into account the Balloon Indebtedness to be incurred, does not exceed 25% of the Revenues of the Obligated Group for the most recent Fiscal Year for which financial statements reported upon by independent certified public accountants are available, and

(B)     the conditions set forth in subsection (a) are met if it is assumed that for any Fiscal Year in which 25% or more of the original principal amount of such Balloon Indebtedness comes due, it is assumed that the portion of Balloon Indebtedness coming due in such Fiscal Year matures over 25 years from the date of issuance of the Balloon Indebtedness, bears interest on the unpaid balance at the Projected Rate and is payable on a level annual debt service basis over a period of no more than 25 years;  ; or

(iii)     Subject to the proviso following subsection (j) below, the Balloon Indebtedness to be incurred has a remaining term of five years or greater beginning in such fiscal year, and

(1)     the Member incurring such Balloon Indebtedness establishes in an Officer's Certificate filed with the Master Trustee an amortization schedule for such Balloon Indebtedness, which amortization schedule shall provide for payments of principal and interest for each Fiscal Year that are not less than the amounts required to make any actual payments required to be made in such Fiscal Year by the terms of such Balloon Indebtedness;

(2)     such Member agrees in such Officer's Certificate to deposit each Fiscal Year with a bank or trust company (pursuant to an agreement between such Member and such bank or trust company) the amount of principal shown on such amortization schedule net of any amount of principal actually paid on such Balloon Indebtedness during such Fiscal Year (other than from amounts on deposit with such

54

bank or trust company) which deposit shall be made prior to any such required actual payment during such Fiscal Year if the amounts so on deposit are intended to be the source of such actual payments; and

(3)    the conditions described in subsection (a) above are met with respect to such Balloon Indebtedness when it is assumed that such Balloon Indebtedness is actually payable in accordance with such amortization schedule.

(f)    Subject to the proviso following subsection (j) below, Put Indebtedness if:

(i)    the amount of such Put Indebtedness does not exceed 10% of the Revenues of the Obligated Group for the most recent Fiscal Year for which financial statements reported upon by independent certified public accountants are available and the conditions set forth in subsection (a) above are met with respect to such Put Indebtedness when it is assumed that (A) such Put Indebtedness bears interest at the Projected Rate and is payable on a level annual debt service basis over a period of no more than 30 years commencing with the next succeeding Put Date, or (B) such Put Indebtedness bears interest at the Projected Rate and is payable according to its actual principal amortization schedule, but this subsection (i) shall only be used if the debt service of all Indebtedness of the Obligated Group outstanding, when the Put Indebtedness debt service being calculated is calculated according to this subsection (i), varies no more than 10% per year;

(ii)    (A)    there is in effect at any time such Put Indebtedness is incurred a binding commitment (including without limitation letters or lines of credit or insurance) which may be subject only to commercially reasonable contingencies by a financial institution or bond insurer or surety generally regarded as responsible, to provide financing sufficient to pay the principal amount of such Put Indebtedness on any Put Date, and (B) the conditions set forth in subsection (a) are met for any Fiscal Year in which 25% or more of the original principal amount of such Put Indebtedness may come due when it is assumed that (1) the portion of Put Indebtedness which may come due in such Fiscal Year matures over 30 years from the date of issuance of the Put Indebtedness, bears interest on the unpaid balance at the Projected Rate and is payable on a level annual debt service basis over a period of no more than 30 years or (2) the portion of Put Indebtedness which may come due in such Fiscal Year matures according to its actual principal amortization schedule, bears interest on the unpaid balance at the Projected Rate, but this subsection (ii) shall only be used if the amortization of all Indebtedness of the Obligated Group outstanding, when the Balloon Indebtedness debt service being calculated is calculated according to this subsection (ii), varies more than 10% per year; or

(iii)    the aggregate principal amount of all Put Indebtedness issued pursuant to this subsection (e) does not exceed 10% of the Revenues of the Obligated Group for the most recent Fiscal Year for which financial statements reported on by independent certified public accountants are available.

(g)    Non Recourse Indebtedness.

(h)     Subordinated Indebtedness.

(i)     Commitment Indebtedness.

(j)     Subject to the proviso below, Indebtedness the principal amount of which at the time incurred, together with the aggregate principal amount of all other Indebtedness then outstanding which was issued pursuant to the provisions of this subsection (n) and which has not been subsequently reclassified as having been issued under another subsection of this Section 4.16, does not exceed 10% of the Revenues of the Obligated Group for the latest preceding Fiscal Year for which financial statements reported upon by independent certified public accountants are available;

provided, however, that the total amount of all Indebtedness outstanding which was issued pursuant to the provisions of subsections (b), (d), (e)(i), (e)(iii), (f) and (j) shall not exceed 15% of the Revenues of the Obligated Group for the most recent Fiscal Year for which financial statements reported on by independent certified public accountants are available.

It is agreed and understood by the parties hereto that various types of Indebtedness may be incurred under any of the above referenced subsections with respect to which the tests set forth in such subsection are met and need not be incurred under only a subsection specifically referring to such type of Indebtedness (e.g., Balloon Indebtedness and Put Indebtedness may be incurred under subsection (a) above if the tests therein are satisfied).

Each Member covenants that prior to, or as soon as reasonably practicable after, the incurrence of Indebtedness by such Member for money borrowed or credit extended, or the equivalent thereof, after the date of issuance of the Series 2019 Note, it will deliver to the Master Trustee an Officer's Certificate which identifies the Indebtedness incurred, identifies the subsection of this Section 4.16 pursuant to which such Indebtedness was incurred, demonstrates compliance with the provisions of such subsection and attaches a copy of the instrument evidencing such Indebtedness.

Each Member agrees that, prior to incurring Additional Indebtedness for money borrowed from or credit extended by entities other than Related Issuers, sellers of real or personal property for purchase money debt, lessors of such property or banks or other institutional lenders, it will provide the Master Trustee with an opinion of Independent Counsel acceptable to the Master Trustee to the effect that, to such Counsel's knowledge, such Member has complied in all material respects with all applicable state and federal laws regarding the sale of securities in connection with the incurrence of such Additional Indebtedness (including the issuance of any securities or other evidences of indebtedness in connection therewith) and such Counsel has no reason to believe that a right of rescission under such laws exists on the part of the entities to which such Additional Indebtedness is to be incurred.

The provisions of this Master Indenture notwithstanding, the Members of the Obligated Group may not incur any Additional Indebtedness the proceeds of which will be used for the acquisition of real Property or the construction of any Facilities unless the right, title and interest in any assets to be financed or refinanced with the proceeds of such Additional Indebtedness and the real estate upon which such assets will be located have been mortgaged and assigned to the

Master Trustee pursuant to a mortgage in substantially the form of the Mortgage and such assets and real estate are not subject to any other Lien except for Permitted Encumbrances.

Section 4.17 <u>Calculation of Debt Service and Debt Service Coverage</u>. The various calculations of the amount of Indebtedness of a Person, the amortization schedule of such Indebtedness and the debt service payable with respect to such Indebtedness required under certain provisions of this Master Indenture shall be made in a manner consistent with that adopted in Section 4.16 and in this Section 4.17. In the case of Balloon or Put Indebtedness issued pursuant to subsection (e) or (f) of Section 4.16 hereof, unless such Indebtedness is reclassified pursuant to this Section 4.17 as having been issued pursuant to another subsection of Section 4.16, the amortization schedule of such Indebtedness and the debt service payable with respect to such Indebtedness for future periods shall be calculated on the assumption that such Indebtedness is being issued simultaneously with such calculation. With respect to Put Indebtedness, if the option of the holder to require that such Indebtedness be paid, purchased or redeemed prior to its stated maturity date, or if the requirement that such Indebtedness be paid, purchased or redeemed prior to its stated maturity date (other than at the option of such holder and other than pursuant to any mandatory sinking fund or any similar fund), has expired or lapsed as of the date of calculation, such Put Indebtedness shall be deemed payable in accordance with its terms.

In determining the amount of debt service payable on Indebtedness in the course of the various calculations required under certain provisions of this Master Indenture, if the terms of the Indebtedness being considered are such that interest thereon for any future period of time is expressed to be calculated at a varying rate per annum, a formula rate or a fixed rate per annum based on a varying index, then for the purpose of making such determination of debt service, interest on such Indebtedness for such period (the "Determination Period") shall be computed by assuming that the rate of interest applicable to the Determination Period is equal to the average of the rate of interest (calculated in the manner in which the rate of interest for the Determination Period is expressed to be calculated) which was in effect on the last date of each of the 12 full calendar months immediately preceding the month in which such calculation is made; provided that if the index or other basis for calculating such interest was not in existence for at least 12 full calendar months next preceding the date of calculation, the rate of interest for such period shall be deemed to be the average rate of interest that was in effect on the last day of each full calendar month next preceding the date of calculation; and if the average rate of interest borne by such Indebtedness for such shorter period cannot be calculated, the rate of interest for such period shall be deemed to be the Projected Rate.

Obligations issued to secure Indebtedness permitted to be incurred under Section 4.16 shall not be treated as Additional Indebtedness.

No debt service shall be deemed payable with respect to Commitment Indebtedness until such time as funding occurs under the commitment which gave rise to such Commitment Indebtedness. From and after such funding, the amount of such debt service shall be calculated in accordance with the actual amount required to be repaid on such Commitment Indebtedness and the actual interest rate and amortization schedule applicable thereto. No Additional Indebtedness shall be deemed to arise when any funding occurs under any such commitment or any such commitment is renewed upon terms which provide for substantially the same terms of repayment of amounts disbursed pursuant to such commitment as obtained prior to such renewal. In addition,

no Additional Indebtedness shall be deemed to arise when Indebtedness which bears interest at a variable rate of interest is converted to Indebtedness which bears interest at a fixed rate or the method of computing the variable rate on such Indebtedness is changed or the terms upon which Indebtedness, if Put Indebtedness, may be or is required to be tendered for purchase are changed, if such conversion or change is in accordance with the provisions applicable to such variable rate Indebtedness or Put Indebtedness in effect immediately prior to such conversion or change.

Balloon Indebtedness incurred as provided under subsection (e) of Section 4.16, unless reclassified pursuant to this Section 4.17, shall be deemed to be payable in accordance with the assumptions set forth in subsection (e) of Section 4.16. Put Indebtedness incurred as provided under subsection (f) of Section 4.16, unless reclassified pursuant to this Section 4.17, shall be deemed to be payable in accordance with the assumptions set forth in subsection (f) of Section 4.16.

For the purpose of determining whether any particular Guaranty may be incurred, it shall be assumed that 100% of the Indebtedness guaranteed is Funded Indebtedness of the guarantor under such Guaranty. For the purpose of calculating any historical Debt Service Requirements, the guarantor's Debt Service Requirements under a Guaranty shall be deemed to be the actual amount paid on such Guaranty by the guarantor. For any other purpose, a guarantor shall be considered liable for 100% of the annual debt service requirement on the Indebtedness guaranteed.

For purposes of the various calculations required under this Master Indenture for Capitalized Leases, the Capitalized Rentals under a Capitalized Lease at the time of such calculation shall be deemed to be the principal payable thereon.

Each Member may elect to have Indebtedness issued pursuant to one provision of Section 4.16 reclassified as having been incurred under another provision of Section 4.16, by demonstrating compliance with such other provision on the assumption that such Indebtedness is being reissued on the date of delivery of the materials required to be delivered under such other provision including the certification of any applicable Projected Rate. From and after such demonstration, such Indebtedness shall be deemed to have been incurred under the provision with respect to which such compliance has been demonstrated until any subsequent reclassification of such Indebtedness.

Anything herein to the contrary notwithstanding, any portion of any Indebtedness of any Member for which an Interest Rate Agreement has been obtained by such Member shall be deemed to bear interest for the period of time that such Interest Rate Agreement is in effect at a net rate which takes into account the interest payments made by such Member on such Indebtedness and the payments made or received by such Member on such Interest Rate Agreement; provided that the long term credit rating of the provider of such Interest Rate Agreement (or any guarantor thereof) is in one of the three highest rating categories of any Rating Agency (without regard to any refinements of gradation of rating category by numerical modifier or otherwise). In addition, so long as any Indebtedness is deemed to bear interest at a rate taking into account an Interest Rate Agreement, any payments made by a Member on such Interest Rate Agreement shall be excluded from Expenses and any payments received by a Member on such Interest Rate Agreement shall be excluded from Revenues, in each case, for all purposes of this Master Indenture.

Section 4.18 <u>Sale or Lease of Property</u>. Each Member agrees that it will not sell, lease, donate, transfer or otherwise dispose (including without limitation any involuntary disposition) of Property (either real or personal property, including Cash and Investments) unless the Obligated Group Representative determines that the Property has been sold, leased, donated, transferred or otherwise disposed of in one or more of the following transfers or other dispositions of Property:

(a)     Investments at fair market value in return for cash or other Investments;

(b)     Cash in the ordinary course of business in an arm's length transaction;

(c)     Tangible personal property to any Person, if prior to such sale, lease or other disposition there is delivered to the Master Trustee an Officer's Certificate of a Member stating that, in the judgment of the signer, such Property has, or within the next succeeding 24 calendar months is reasonably expected to, become inadequate, obsolete, worn out, unsuitable, unprofitable, undesirable or unnecessary and the sale, lease or other disposition thereof will not impair the structural soundness, efficiency or economic value of the remaining Property;

(d)     From a Member to another Member; provided that no portion of the Project financed with proceeds of the Series 2019 Bonds may be transferred by the Obligor to any other Member unless the Bond Trustee has received an opinion of nationally recognized bond counsel to the effect that such transfer will not adversely affect (i) the validity of the Series 2019 Bonds or any other Related Bonds or (ii) with respect to the Series 2019 Bonds or any Related Bonds the interest on which is tax-exempt, the exclusion of interest on the Series 2019 Bonds or such Related Bonds from the gross income of the owners thereof for federal income tax purposes;

(e)     Tangible personal property upon fair and reasonable terms no less favorable to the Member than would be obtained in a comparable arm's length transaction;

(f)     The Property sold, leased, donated, transferred or otherwise disposed of does not, for any consecutive 12 month period, exceed 3% of the total Book Value or, at the option of the Obligated Group Representative, the Current Value of all Property of the Obligated Group and (i) the Historical Pro Forma Debt Service Coverage Ratio was not less than 1.30:1 for the last Fiscal Year for which audited financial statements have been delivered to the Master Trustee; provided that if such transfer is of cash or investments, then in calculating the Historical Debt Service Coverage Ratio for purposes of such transfer, the Income Available for Debt Service will be reduced by one year's estimated interest earnings attributable the moneys to be used for such transfer using, at the option of the Obligated Group Representative, either (1) the current budgeted investment rate, as certified in an Officer's Certificate, or (2) the actual average investment rate on the transferred funds, as certified in a report of a Consultant , and (ii) as of the end of the last fiscal quarter for which financial statements have been delivered to the Master Trustee as required under Section 4.15 hereof, the Obligated Group had not less than 180 Days Cash on Hand after giving effect to the transaction. If the Historical Debt Service Coverage Ratio as calculated above is not less than 1.30:1, the foregoing percentage of the total Book Value or Current Value may be increased as follows under the following conditions:

(A)     to 5%, if Days Cash on Hand would not be less than 200 after the effect of such sale, lease or disposition of assets; or

(B) to 7.5%, if Days Cash on Hand would not be less than 300 after the effect of such sale, lease or disposition of assets; or

(C) to 10%, if Days Cash on Hand would not be less than 400 after the effect of such sale, lease or disposition of assets.

(g) To any Person if such Property consists solely of assets which are specifically restricted by the donor or grantor to a particular purpose which is inconsistent with their use for payment on the Obligations.

For avoidance of doubt, it is understood that this Section 4.18 does not prohibit any transfer of cash by a Member in payment of any of its obligations, indebtedness and liabilities, the incurrence of which obligation, indebtedness or liability did not or would not, either immediately or with the giving of notice, the passage of time or both, result in the occurrence of an Event of Default.

For purposes of this Section 4.18, payments by the Obligated Group of any development, marketing, operating, or other subordinated fees that have been deferred from the year in which they were originally due as a result of subordination will not be treated as a disposition of Property.

Each Member further agrees that it will not sell, lease, donate or otherwise dispose of Property (A) which could reasonably be expected at the time of such sale, lease, donation or disposition to result in a reduction of the Historical Pro Forma Debt Service Coverage Ratio for the Obligated Group such that the Master Trustee would be obligated to require the Obligated Group to retain a Consultant pursuant to Section 4.11 hereof, or (B) if a Consultant has been retained in the circumstances described in Section 4.11 hereof, such action, in the opinion of such Consultant, will have an adverse effect on the Income Available for Debt Service of the Obligated Group.

Upon Request of the Obligated Group Representative accompanied by an Officer's Certificate and an Opinion of Counsel to the effect that the conditions precedent for the disposition of such property set forth in this Section 4.18 (other than the condition precedent set forth in Section 4.18(d) above) have been satisfied, the rights, title, liens, security interests and assignments herein granted shall cease, determine and be void as to such property only and the lien of this Indenture shall be released by the Master Trustee as to such property in due form at the expense of the Obligated Group Members;

Section 4.19 **Liens on Property.** Each Member covenants that it will not create or permit to be created or remain and, at its cost and expense, will promptly discharge or terminate, any Liens on its Property or any part thereof which are not Permitted Encumbrances.

Section 4.20 **Liquidity Covenant.** (a) The Obligated Group covenants that it will calculate the Days Cash on Hand on each Testing Date, and will deliver a copy of such calculation to the Required Information Recipient no later than 45 days following the applicable Testing Date, provided that a copy of the calculation for the December 31 Testing Date shall be redelivered with the audited financial statements for the applicable Fiscal Year based on the data in such audited financial statements.

(b) If Days Cash on Hand of the Obligated Group is less than 120 for two consecutive Testing Dates, the Obligated Group Representative, shall, within 30 days following the delivery of the calculation described herein deliver to the Master Trustee an Officer's Certificate to the Master Trustee setting forth in reasonable detail the reasons for such failure to achieve 120 Days Cash on Hand (the "Liquidity Requirement") and adopting a specific plan setting forth steps to be taken in order to generate Days Cash on Hand at least equal to 120 as of the following Testing Date.

(c) If Days Cash on Hand of the Obligated Group is less than the Liquidity Requirement for three consecutive Testing Dates, the Obligated Group Representative, at the Obligated Group's expense, shall select a Consultant within 30 days following the delivery of the calculation described herein to make recommendations with respect to the rates, fees and charges of the Obligated Group and the Obligated Group's methods of operation and other factors affecting its financial condition in order to increase Days Cash on Hand to at least 120 as of the following Testing Date. The Obligated Group Representative shall file a copy or summary of the Consultant's report and recommendations, if any, with each Member and each Required Information Recipient within 60 days after the date such Consultant is actually engaged. and shall simultaneously cause a copy of the Consultant's report and recommendations, if any, to be filed in a password-protected data room (other than one provided by Intralinks or BOX) that may be accessed by beneficial owners of Related Bonds and potential purchasers of Related Bonds. Each Member of the Obligated Group shall follow each recommendation of the Consultant applicable to it to the extent feasible (as determined in the reasonable judgment of the Governing Body of the Member) and permitted by law.

(d) Failure of the Obligated Group to achieve the Liquidity Requirement for any Testing Date shall not constitute an Event of Default under this Master Indenture if the Obligated Group takes all action necessary to comply with the procedures set forth above for adopting a plan and follows each recommendation contained in such plan or Consultant's report to the extent feasible (as determined in the reasonable judgment of the Governing Body of the Obligated Group Representative) and permitted by law. Notwithstanding the preceding sentence, failure to achieve Days Cash on Hand of at least 60 as of any Testing Date shall constitute an Event of Default hereunder.

(e) Provided that the Obligated Group has implemented the recommendations of the most recent Consultant's report delivered under this Section, the Obligated Group shall not be required to retain more than one Consultant's report under this Section in any 12 month period.

Section 4.21    [Reserved.]

Section 4.22    Occupancy Covenant. The Obligated Group covenants that for each fiscal quarter commencing with the first fiscal quarter following the fiscal quarter in which the Effective Date occurs (each an "Occupancy Quarter"), the Obligated Group will use its best efforts to have Occupied the percentage of the total number of all Independent Living Units (the "Percentage of Units Occupied") at or above 88%, which level shall be measured as of the last day of the applicable Occupancy Quarter (the "Occupancy Requirement.") The Obligated Group Representative will deliver a copy of such calculation to the Required Information Recipient no later than 30 days following the end of each Occupancy Quarter.

61

If the Percentage of Units Occupied for any two consecutive Occupancy Quarters is less than the Occupancy Requirement, the Obligated Group Representative shall within 30 days thereafter submit an Officer's Certificate to the Master Trustee setting forth in detail the reasons therefor and the plan to increase the Percentage of Units Occupied to at least the Occupancy Requirement set forth above for future periods (a "Corrective Occupancy Action Plan").

If the Percentage of Units Occupied for any three consecutive Occupancy Quarters is less than the Occupancy Requirement, the Obligated Group Representative shall select a Consultant within 30 days thereafter to make recommendations regarding the actions to be taken to increase the Percentage of Units Occupied to at least the Occupancy Requirement set forth above for future periods.  Within 60 days after the engagement of any such Consultant, the Obligated Group Representative shall cause a summary or copy of the Consultant's report and recommendations to be filed with each Member and each Required Information Recipient, and shall simultaneously cause a copy of the Consultant's report and recommendations, if any, to be filed in a password-protected data room (other than one provided by Intralinks or BOX) that may be accessed by beneficial owners of Related Bonds and potential purchasers of Related Bonds..  Each Member shall follow each recommendation of the Consultant to the extent feasible (as determined in the reasonable judgment of the Governing Board of such Member) and permitted by law.

Notwithstanding any other provision of this Master Indenture, failure of the Obligated Group to achieve the Occupancy Requirement for any Occupancy Quarter shall not constitute an Event of Default under this Master Indenture if the Obligated Group takes all action necessary to comply with the procedures set forth above for preparing a Corrective Occupancy Action Plan and for obtaining a Consultant's report and adopting a plan and follows each recommendation contained in such Corrective Occupancy Action Plan or Consultant's report to the extent feasible (as determined in the reasonable judgment of the Governing Body of the Obligated Group Representative) and permitted by law.

Provided that the Obligated Group has implemented the recommendations of the most recent Consultant's report delivered under this Section, the Obligated Group shall not be required to obtain more than one Consultant's report under this Section in any two consecutive Fiscal Years.

Section 4.23   [Reserved]

Section 4.24   Deposits on Effective Date.  (a) On the Effective Date, the Obligor shall cause the bond trustee for the Series 2009 Bonds to transfer all cash and investments in the reserve fund for the Series 2009 Bonds to the Series 2019 Bond Trustee for deposit in the Reserve Fund established under Related Bond Indenture for the Series 2019 Bonds.

(b)   On the Effective Date the Obligor shall transfer, deposit or apply all unrestricted Cash and Investments (excluding amounts on deposit in the Liquidity Support Fund and amounts available under the Liquidity Support Agreement) of the Obligor as follows:

> First:   To pay refunds of Entrance Fees that as of the Effective Date are required to be paid by Residency Agreements, as set forth in a certificate of an Authorized Representative of the

Obligor delivered to the Master Trustee that includes the amount of such refunds.

Second: To the Master Trustee to pay all unpaid professional fees and expenses of the bond restructuring effected in the Obligor's bankruptcy proceeding, as set forth in a certificate of an Authorized Representative of the Obligor delivered to the Master Trustee;

Third: Retained by the Obligor for deposit in the Operating Account an amount equal to $_____, which the Obligor has certified to the Master Trustee equals (after deduction of the amounts in paragraphs First and Second above) 100% of the Cash and Investments (excluding amounts on deposit in the Liquidity Support Fund and amounts available under the Liquidity Support Agreement) as of the Effective Date up to 30 Days Cash on Hand plus 50% of the Cash and Investments (excluding amounts on deposit in the Liquidity Support Fund and amounts available under the Liquidity Support Agreement) as of the Effective Date in excess of 30 Days Cash on Hand up to 60 Days Cash on Hand;

Fourth: To the Series 2019 Bond Trustee for deposit to the Reserve Fund established under the Related Bond Indenture for the Series 2019 Bonds, $_____, which the Obligor has certified to the Master Trustee equals 100% of the Cash and Investments (excluding amounts on deposit in the Liquidity Support Fund and amounts available under the Liquidity Support Agreement) as of the Effective Date (after deduction of the amounts in paragraphs First, Second and Third above), but which amount, together with the amount transferred from the reserve fund for the Series 2009 Bonds pursuant to Section 4.24(a) is no greater than the Reserve Requirement for the Series 2019 Bonds;

Fifth: Any balance remaining after the transfers described in paragraphs First, Second, Third and Fourth above shall be transferred to the Operating Account.

(c)   Thereafter, each Obligated Group Member shall deposit into the Operating Account upon receipt all Gross Revenues of such Obligated Group Member, provided that upon the occurrence and during the continuance of an Event of Default, each Obligated Group Member shall upon receipt deposit with the Master Trustee all Gross Revenues of such Obligated Group Member for deposit to the Revenue Fund to be applied in accordance with Section 3.05.

Section 4.25    Reserve Fund for Series 2019 Bonds.  Until the amount on deposit in the Reserve Fund for the Series 2019 Bonds under the Related Bond Indenture equal the Reserve Requirement as defined in the Related Bond Indenture for the Series 2019 Bonds, the Obligated Group shall, on or before the 1st day of each month, commencing the month after the month in which the Effective Date occurs to and including the 24th month after the month in which the Effective Date occurs, pay to the Series 2019 Bond Trustee for deposit to the Reserve Fund established under the Related Bond Indenture for the Series 2019 Bonds an amount equal to the lesser of (a) the amount required for the amount on deposit in such Reserve Fund to equal the Reserve Fund Requirement under such Related Bond Indenture or (b)(i) 50% of Cash and Investments (excluding amounts on deposit in the Liquidity Support Fund and amounts available under the Liquidity Support Agreement) as of the last day of the preceding month in excess of 30 Days Cash on Hand but not in excess of 60 Days Cash on Hand, plus (ii) 100% of Cash and Investments (excluding amounts on deposit in the Liquidity Support Fund and amounts available under the Liquidity Support Agreement) in excess of 60 Days Cash on Hand. Together with each such deposit required by the first sentence of this Section, the Obligated Group Representative shall deliver to the Series 2019 Bond Trustee a certification of the Obligated Group Representative of its compliance with this requirement, which certification shall include the amount of such Cash and Investments as of the applicable month end and the amount corresponding to 30 and 60 Days Cash on Hand as of the most recent quarter for which Days Cash on Hand has been computed and reported in accordance with Section 415(b)(ii). The monthly deposits required by the first sentence of this Section shall be made on the 1st Business Day of the month following the month for which the calculation of Days Cash on Hand is made. From and after the date on which the amount on deposit in the Reserve Fund for the Series 2019 Bonds equals the Reserve Requirement therefor, the Obligated Group shall make such payments to the Series 2019 Bond Trustee for deposit in such Reserve Fund as are required by the Related Loan Agreement or the Related Bond Indenture for the Series 2019 Bonds.

Section 4.26    Rating Application.  The Obligated  Group Representative covenants that it will seek a rating of the Series 2019 Bonds from any Rating Agency each year after a determination is made by the Obligated Group Representative in consultation with a qualified investment banker or financial consultant that an investment grade rating is reasonably obtainable, until achievement of an investment grade rating, provided that if during any such year the Obligated Group Representative receives a preliminary indication from such Rating Agency that the Series 2019 Bonds will not be assigned an investment grade rating, the Obligated Group Representative shall withdraw its rating request for such year.  The Obligated Group Representative further covenants that, upon request by the holders of a majority in principal amount of the Obligations, it will consult with a qualified investment banker or financial consultant whether that an investment grade rating, provided that such request shall not be made more than once in any 24 month period.

Section 4.27    Management Agreements; Oversight Fees.  The  Obligor covenants that any agreement for management of the Facilities, or any portion or aspect thereof, will provide for payment by the Obligated Group of compensation for such services that does not, together with any home office or similar fee payable to any Affiliate, exceed 6% of Actual Monthly Revenues (as defined  under the Master Management Services Agreement dated September 7, 2017 between the Obligor and Seniority, Inc.) Any management agreement with an Affiliate shall provide that during the continuance of any failure of the Obligor to make monthly deposits (to the extent required) of debt service with any Related Bond Trustee or any payment default on any

Outstanding Obligations hereunder, 50% of the payment due to the Affiliate under such management agreement shall be deferred until all scheduled amounts due and payable to the Related Bond Trustee or on the Outstanding Obligations have been paid. Any management fees due and not paid by the Obligated Group to an Affiliate under the provisions described in the preceding sentence shall be deferred and become payable at such subsequent time when all scheduled amounts due and payable to the Related Bond Trustee or on the Outstanding Obligations have been paid.

Section 4.28    [Reserved.]

Section 4.29    Actuarial Study. During the Fiscal Year ending December 31, _____, and at least once every three Fiscal Years thereafter, the Obligated Group Representative, at the Obligated Group's expense, shall provide the actuarial study described below or a summary thereof to each Member and each Required Information Recipient. The actuarial study shall be prepared by a Consultant and include (i) the amount, if any, of the Obligated Group's obligations to provide services under the Residency Agreements anticipated to be in excess of those that could be satisfied using the rates, fees and charges for the Project then in effect, and (ii) recommendations, if any, with respect to the rates, fees and charges of the Members and the Obligated Group's methods of operation and other factors affecting its financial condition in order to enable the Obligated Group to satisfy such obligations. Each Member shall follow each recommendation of the Consultant applicable to it to the extent feasible (as determined in the reasonable judgment of the Governing Body of the Obligated Group Representative) and permitted by law.

## ARTICLE V
### CONSOLIDATION, MERGER, CONVEYANCE AND TRANSFER

Section 5.01    Merger, Consolidation, Sale or Conveyance. (a) Each Member agrees that it will not merge into, or consolidate with, one or more corporations which are not Members, or allow one or more of such corporations to merge into it, or sell or convey all or substantially all of its Property to any Person who is not a Member, unless:

(i)    Any successor corporation to such Member (including without limitation any purchaser of all or substantially all the Property of such Member) is a corporation organized and existing under the laws of the United States of America or a state thereof and shall execute and deliver to the Master Trustee an appropriate instrument, satisfactory to the Master Trustee, containing the agreement of such successor corporation to assume, jointly and severally, the due and punctual payment of the principal of, premium, if any, and interest on all Obligations according to their tenor and the due and punctual performance and observance of all the covenants and conditions of this Master Indenture to be kept and performed by such Member;

(ii)    Immediately after such merger or consolidation, or such sale or conveyance, no Member would be in default in the performance or observance of any covenant or condition of any Related Bond Indenture, Related Loan Agreement or this Master Indenture;

(iii)    The Investment Grade Condition is satisfied upon such merger, consolidation, sale or conveyance, or the Obligated Group Representative shall have obtained, and delivered to the Master Trustee, Noteholder Consent to such transaction;

(iv)     Assuming that any Indebtedness of any successor or acquiring corporation is Indebtedness of such Member and that the Revenues and Expenses of the Member for such most recent Fiscal Year include the Revenues and Expenses of such other corporation (A) immediately after such merger or consolidation, sale or conveyance, the Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group for the most recent Fiscal Year for which financial statements that have been reported upon by independent certified public accountants are available would be not less than 1.20:1 or that such Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group is greater than the Historical Debt Service Coverage Ratio of the Obligated Group was for such Fiscal Year prior to such merger or consolidation, sale or conveyance and (B) immediately after such merger or consolidation, sale or conveyance, the Obligated Group would have at least 120 Days Cash on Hand for the most recent quarter after adjustment for the change or that Days Cash on Hand of the Obligated Group would be greater than such calculation would be immediately prior to such merger or consolidation, sale or conveyance; and

(v)     If all amounts due or to become due on all Related Bonds have not been fully paid to the holders thereof or fully provided for, there shall be delivered to the Master Trustee an Opinion of Bond Counsel to the effect that under then existing law the consummation of such merger, consolidation, sale or conveyance would not adversely affect the validity of such Related Bonds or the exemption otherwise available from federal or state income taxation of interest payable on such Related Bonds.

(b)     In case of any such consolidation, merger, sale or conveyance and upon any such assumption by the successor corporation, such successor corporation shall succeed to and be substituted for its predecessor, with the same effect as if it had been named herein as such Member. Each successor, assignee, surviving, resulting or transferee corporation of a Member must agree to become, and satisfy the conditions described in Section 6.01 hereof to becoming, a Member of the Obligated Group prior to any such succession, assignment or other change in such Member's corporate status. Any successor corporation to such Member thereupon may cause to be signed and may issue in its own name Obligations hereunder and the predecessor corporation shall be released from its obligations hereunder and under any Obligations, if such predecessor corporation shall have conveyed all Property owned by it (or all such Property shall be deemed conveyed by operation of law) to such successor corporation. All Obligations so issued by such successor corporation hereunder shall in all respects have the same legal rank and benefit under this Master Indenture as Obligations theretofore or thereafter issued in accordance with the terms of this Master Indenture as though all of such Obligations had been issued hereunder by such prior Member without any such consolidation, merger, sale or conveyance having occurred.

(c)     In case of any such consolidation, merger, sale or conveyance such changes in phraseology and form (but not in substance) may be made in Obligations thereafter to be issued as may be appropriate.

(d)     The Master Trustee may rely upon an opinion of Independent Counsel as conclusive evidence that any such consolidation, merger, sale or conveyance, and any such assumption, complies with the provisions of the Master Indenture summarized under this caption and that it is proper for the Master Trustee under the provisions of the Master Indenture to join in the execution of any instrument required to be executed and delivered by the Master Trustee.

ARTICLE VI
MEMBERSHIP IN THE OBLIGATED GROUP

Section 6.01    Admission of Obligated Group Members.  Any other Person may become a Member of the Obligated Group if:

(a)    Such Person is a business entity;

(b)    Such Person shall execute and deliver to the Master Trustee a Supplement in a form acceptable to the Master Trustee which shall be executed by the Master Trustee and the Obligated Group Representative, containing the agreement of such Person (i) to become a Member of the Obligated Group and thereby to become subject to compliance with all provisions of this Master Indenture and (ii) unconditionally and irrevocably (subject to the right of such Person to cease its status as a Member of the Obligated Group pursuant to the terms and conditions of Section 6.03 hereof) to jointly and severally make payments upon each Obligation;

(c)    The Obligated Group Representative and each Member shall have approved the admission of such Person to the Obligated Group;

(d)    The Investment Grade Condition is satisfied upon such admission, or the Obligated Group Representative shall have obtained, and delivered to the Master Trustee, Noteholder Consent to such transaction;

(e)    The Master Trustee shall have received (i) an Officer's Certificate of the Obligated Group Representative which (A) demonstrates that (1) immediately upon such Person becoming a Member of the Obligated Group, the Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group for the most recent Fiscal Year for which financial statements that have been reported upon by independent certified public accountants are available, after adjustment for the addition of the new Member, would be not less than 1.20:1, or that such Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group with such Person is greater than the Historical Debt Service Coverage Ratio of the Obligated Group was for such Fiscal Year without such Person becoming a Member of the Obligated Group, and (2) immediately upon such Person becoming a Member of the Obligated Group, the Obligated Group would have at least 120 Days Cash on Hand based, with respect to pre-existing Members of the Obligated Group, on the most recent quarterly financial statements delivered to the Master Trustee pursuant to Section 4.15 hereof and, in the case of the incoming Obligated Group Member, its most recent quarterly financial statements, or that such calculation of the Days Cash on Hand of the Obligated Group is greater than such calculation would be without such Person becoming a Member of the Obligated Group; and (B) states that immediately after such Person becoming a Member of the Obligated Group, no event of default will exist hereunder and no event shall have occurred which with the passage of time or the giving of notice, or both, would become such an event of default; (ii) an opinion of Independent Counsel in form and substance acceptable to the Master Trustee to the effect that (x) the instrument described in Section 6.01(b) above has been duly authorized, executed and delivered and constitutes a legal, valid and binding agreement of such Person, enforceable in accordance with its terms, subject to customary exceptions for bankruptcy, insolvency and other laws generally affecting enforcement of creditors' rights and application of general principles of equity and (y) the addition of such Person to the Obligated Group will not adversely affect the

67

status as a Tax Exempt Organization of any Member which otherwise has such status; (iii) evidence from each Rating Agency then maintaining a rating on any series of Related Bonds to the effect that the admission of such Person to the Obligated Group will not result in a lower rating on such series of Related Bonds; (iv) if all amounts due or to become due on all Related Bonds have not been paid to the holders thereof and provision for such payment has not been made in such manner as to have resulted in the defeasance of all Related Bond Indentures, an Opinion of Bond Counsel to the effect that under then existing law the consummation of such transaction would not adversely affect the-validity of any Related Bonds or any exemption from federal or state income taxation of interest payable on such Bonds otherwise entitled to such exemption; provided that in making the calculation called for by subsection (e)(i) above, (x) there shall be excluded from Revenues any Revenues generated by Property of such Person transferred or otherwise disposed of by such Person since the beginning of the Fiscal Year during which such Person's entry into the Obligated Group occurs and (y) there shall be excluded from Expenses any Expenses related to Property of such Person transferred or otherwise disposed of by such Person since the beginning of the Fiscal Year during which such Person's entry into the Obligated Group Occurs.

Each successor, assignee, surviving, resulting or transferee corporation of a Member must agree to become, and satisfy the above described conditions to becoming, a Member of the Obligated Group prior to any such succession, assignment or other change in such Member's corporate status.

Section 6.02   Obligated Group Members.   Upon any Person's becoming an Obligated Group Member as provided in Section 6.01:

(a)   the Master Trustee may pursue any remedies consequent upon an Event of Default against any Obligated Group Member, or all of them, without notice to, demand upon or joinder of (and without in any way releasing) any of the others, or against any one or more or all of them at the same time or at different times;

(b)   any right of contribution or right acquired by subrogation by any Obligated Group Member against any other Obligated Group Member arising out of the payment of Debt shall be subordinated to the rights of the Master Trustee and the Holders of Obligations; and

(c)   each Obligated Group Member shall designate the Obligated Group Representative as its attorney in fact with full power of substitution to perform, satisfy, and discharge every obligation, covenant, duty or liability to be performed on the part of the Obligated Group Member hereunder.

Section 6.03   Withdrawal of Obligated Group Members.   Each Member covenants that it will not take any action, corporate or otherwise, which would cause it or any successor thereto into which it is merged or consolidated under the terms of the Master Indenture to cease to be a Member of the Obligated Group unless:

(a)   prior to cessation of such status, there is delivered to the Master Trustee an Opinion of Bond Counsel to the effect that, under then existing law, the cessation by the Member of its status as a Member will not adversely affect the validity of any Related Bond or any

exemption from federal or state income taxation of interest payable thereon to which such Bond would otherwise be entitled;

(b) The Investment Grade Condition is satisfied upon such cessation of status as a Member of the Obligated Group, or the Obligated Group Representative shall have obtained, and delivered to the Master Trustee, Noteholder Consent to such cessation;

(c) prior to the cessation of such status, there is delivered to the Master Trustee an Officer's Certificate of the Obligated Group Representative to the effect that: (i) (A) immediately after such cessation the Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group for the most recent Fiscal Year for which financial statements that have been reported upon by independent certified public accountants are available, after adjustment for the removal of the Member, would be not less than 1.20:1 or that such Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group is greater than the Historical Debt Service Coverage Ratio of the Obligated Group was for such Fiscal Year prior to such cessation and (B) immediately after such cessation, the Obligated Group would have at least 120 Days Cash on Hand requirements for the most recent quarter after adjustment for the removal of the Member, or that such calculation of the Days Cash on Hand of the Obligated Group is greater than such calculation would be immediately prior to such cessation; (ii) immediately after such cessation, no event of default exists hereunder and no event shall have occurred which with the passage of time or the giving of notice, or both, would become such an event of default; (iii) evidence from each Rating Agency then maintaining a rating on any series of Related Bonds to the effect that the withdrawal of such Person from the Obligated Group will not result in a lower rating on such series of Related Bonds.

(d) prior to such cessation there is delivered to the Master Trustee an opinion of Independent Counsel (which Counsel and opinion are acceptable to the Master Trustee) to the effect that the cessation by such Member of its status as a Member will not adversely affect the status as a Tax Exempt Organization of any Member which otherwise has such status;

(e) if any Related Bonds were rated by a Rating Agency prior to the Person withdrawing from the Obligated Group, the Master Trustee has received evidence from such Rating Agency, satisfactory to the Master Trustee, that the rating(s) on such Related Bonds will not be reduced or withdrawn as a result of such Person withdrawing from the Obligated Group; and

(f) prior to cessation of such status, the Obligated Group Representative and each Member, consents in writing to the withdrawal by such Member.

Section 6.04 <u>Successor Obligated Group Representative</u>. Tarrant County Senior Living Center Inc. shall serve as the Obligated Group Representative until such time as Tarrant County Senior Living Center Inc. either (i) withdraws from the Obligated Group in accordance with this Article VI or (ii) delivers to the Master Trustee its resignation as the Obligated Group Representative. Tarrant County Senior Living Center Inc. covenants to fulfill all of the duties of the Obligated Group Representative under this Indenture. Tarrant County Senior Living Center Inc. agrees that it shall not withdraw from the Obligated Group or resign as Obligated Group Representative until Tarrant County Senior Living Center Inc. has appointed another Obligated

Group Representative and such successor Obligated Group Representative has accepted its duties in writing. Each Obligated Group Member by becoming an Obligated Group Member acknowledges that the Obligated Group Representative has certain powers and duties under this Master Indenture and authorizes the Obligated Group Representative to exercise such powers and carry out such duties.

## ARTICLE VII
## REMEDIES OF THE MASTER TRUSTEE AND HOLDERS OF SECURED OBLIGATIONS IN EVENT OF DEFAULT

Section 7.01 <u>Events of Default</u>. Event of Default, as used herein, shall mean any of the following events, whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or come about or be effected by operation of law or pursuant to or in compliance with any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body:

(a) default in the payment of the principal of (or premium, if any) or interest on any Obligation when it becomes due and payable at its Maturity and the continuance of such default beyond the period of grace, if any, provided in the instrument creating such Obligation; or

(b) any Obligated Group Member shall fail duly to observe or perform any other covenant or agreement (other than a covenant or agreement whose performance or observance is elsewhere in this Section specifically dealt with) on the part of such Person contained in this Indenture for a period of 45 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Obligated Group Representative by the Master Trustee, or to the Obligated Group Representative and the Master Trustee by the Holders of at least 25% in aggregate principal amount of Obligations then Outstanding; provided that if any such default can be cured by such Obligated Group Member but cannot be cured within the 45 day curative period described above, the Master Trustee may upon request by the Obligated Group Representative extend the cure period by a number of days specified by the Master Trustee, and, if such an extension of the cure period is granted by the Master Trustee, it shall not constitute an Event of Default if (i) corrective action is instituted by such Obligated Group Member within such 45 day period and diligently pursued until the default is corrected and (ii) the default is corrected within such extended cure period; or

(c) a decree or order by a court having jurisdiction in the premises shall have been entered adjudging any Obligated Group Member a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization or arrangement of any Obligated Group Member under the Federal Bankruptcy Code or any other similar applicable Federal or state law, and such decree or order shall have continued undischarged and unstayed for a period of 60 days; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver or trustee or assignee in bankruptcy or insolvency of any Obligated Group Member or of its property, or for the winding up or liquidation of its affairs, shall have been entered, and such decree or order shall have remained in force undischarged and unstayed for a period of 60 days; or

(d) any Obligated Group Member shall institute proceedings to be adjudicated a voluntary bankrupt, or shall consent to the institution of a bankruptcy proceeding against it, or

shall file a petition or answer or consent seeking reorganization or arrangement under the Federal Bankruptcy Code or any other similar applicable Federal or state law, or shall consent to the filing of any such petition, or shall consent to the appointment of a receiver or trustee or assignee in bankruptcy or insolvency of it or of its Trust Estate, or shall make assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due, or action shall be taken by the Governing Body of any Obligated Group Member in furtherance of any of the aforesaid purposes; or

(e)     any Obligated Group Member shall fail to pay or make provision for payment of any recourse Indebtedness (other than Subordinated Indebtedness owed to an Affiliate of the Obligated Group Member) having a principal balance of not less than $100,000 and the continuance of such failure beyond the applicable grace period, if any; or

(f)     the Master Trustee has received written notice that an event of default, as therein defined, under any instrument under which Obligations may be incurred or secured, or under any Related Bond Indenture, has occurred and is continuing beyond the applicable period of grace, if any; or

(g)     an Event of Default described in Section 4.11 or 4.20 shall have occurred; or

(h)     an event of default shall have occurred under the Liquidity Support Agreement.

Section 7.02    Acceleration of Maturity; Rescission and Annulment.    If an Event of Default occurs and is continuing, then and in every such case the Master Trustee or the Holders of not less than 25% in principal amount of the Outstanding Obligations may declare the principal of all the Obligations to be due and payable immediately, by a notice in writing to the Obligated Group Representative and all of the Holders of Obligations (and to the Master Trustee if given by Holders of Obligations), and upon any such declaration such principal shall become immediately due and payable.

At any time after such a declaration of acceleration has been made and before a judgment or decree for payment of the money due has been obtained by the Master Trustee as hereinafter in this Article provided, the Holders of a majority in principal amount of the affected Outstanding Obligations or, if less than a majority, 100% of those Holders of Obligations that caused the applicable acceleration, by written notice to the Obligated Group Representative and the Master Trustee, may rescind and annul such declaration and its consequences.

No such rescission shall affect any subsequent default or impair any right consequent thereon.

Section 7.03    Entry.    As to all real property and fixtures included in the Trust Estate, the Obligor agrees that upon the occurrence of an Event of Default the Obligor, upon demand of the Master Trustee during the continuance thereof, shall forthwith surrender to the Master Trustee or its agent (or to a receiver appointed by a court) the actual possession of, and it shall be lawful for the Master Trustee by such officers or agents as it may appoint (or by receiver appointed by a court) to enter and take possession of, the Trust Estate (and the books, papers, and accounts of the

71

Obligated Group Members) and to hold, operate, and manage the Trust Estate (including the managing of all needful repairs, and such alterations, additions, and improvements as to the Master Trustee shall seem wise) and to receive the rents, issues, tolls, profits, revenues, and other income thereof, and, after deducting the costs and expenses of entering, taking possession, holding, operating, and managing the Trust Estate, as well as payments for taxes, insurance, and other proper charges upon the Trust Estate including without limitation, reasonable compensation to itself, its agents, and counsel, to apply the same as provided in Section 7.09.

Section 7.04    Powers of Sale, Transfer, Assignment, Lease, and Other Dispositions; Suits for Enforcement. In case an Event of Default shall occur and be continuing, the Master Trustee, in its discretion may, subject to the provisions of Section 7.18 (7.18???):

(a)    as to all of the real property and fixtures included in the Trust Estate, enforce this trust and sell such property as an entirety or in parcels, by one sale or by several sales, held at one time or at different times as the Master Trustee may elect (all rights to a marshalling of the assets of the Obligated Group Members, including the Trust Estate, or to a sale in inverse order of alienation, being for the Obligated Group Members and their respective successors and assigns, expressly and specifically hereby waived), at the County Courthouse in any County in which a part of the real properties included in the Trust Estate are situated in the area in such Courthouse designated for real property foreclosure sales in accordance with applicable law, each such sale to be made on the first Tuesday of some month between the hours of 10:00 o'clock a.m. and 4:00 o'clock p.m., prevailing local time, to the highest bidder for cash at public auction, after the Master Trustee (or a Person or Persons selected by the Master Trustee) shall have given notices of the proposed sale in the manner hereinafter set forth, and may make due conveyance to the purchaser or purchasers, with general warranty of title to such purchaser or purchasers binding upon the Obligated Group Members and their respective successors and assigns. The Master Trustee (or a Person or Persons selected by the Master Trustee) shall give notice of such proposed sale by posting written notice of the time, place, and terms of sale at the location designated by law and, by filing a copy of such written notice in the office of the County Clerk, of the County in which the sale is to be made for at least 21 consecutive days preceding the date of the sale. Where such real properties to be sold are situated in more than one County, one notice shall be posted at the location designated by law, and a copy of such notice shall be filed with the County Clerk, of each County in which a part of said real properties to be sold is situated, and such notices shall designate the county where such real properties will be sold, which may be any County in which a part of said real properties is situated. In addition to the foregoing notice or notices to be posted and filed by the Master Trustee (or by a Person or Persons selected by the Master Trustee), the Master Trustee shall, at least 21 days preceding the date of sale, serve written notice of the proposed sale by certified mail on each debtor obligated to pay the Obligations according to the records of the Master Trustee. The service of such shall be completed upon deposit of the notice, enclosed in a post paid wrapper, properly addressed to each such debtor at the most recent address as shown by the records of the Master Trustee, in a post office or an official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service. In this respect and to the full extent that it may legally do so, the Obligor also expressly covenants, stipulates, and agrees that (a) the address of the Obligor set out in Section 1.05 of this Indenture shall be deemed and considered conclusively to be and remain at all times the most recent address of such debtor obligated to pay the Master Trustee as shown by the records of the

Master Trustee, provided such address may be changed from time to time only by express written notice of change thereof signed by the Obligor and actually delivered to and received by the Master Trustee and setting forth a new address with such new address for such debtor and the most recent addresses for other debtors then held by the Master Trustee being deemed and considered conclusively to be and remain at all times thereafter, until changed in the manner herein provided, the most recent address of all debtors, including, without limitation, the Obligated Group Members, obligated to pay the Obligations as shown by the records of the Master Trustee, (b) the records of the Master Trustee shall not be deemed to reflect any change in the respective names or identities of the Obligated Group Members or others obligated or to become obligated to pay the Obligations (to whom notice of a proposed sale shall be required to be mailed as above provided) unless and until express written notice of such change signed by all such debtors obligated to pay the Obligations shall have been actually delivered to and received by the Master Trustee, and (c) no notice of such sale or sales other than the notices hereinabove provided and as hereinafter provided in this Subsection (a) shall be required to be given to the Obligor, or any other Person and any other notice is expressly waived. At any sale conducted under this instrument, credit upon all or any part of the Obligations shall be deemed cash paid for the purpose of this paragraph. The proceeds arising from such sale or sales shall be applied by the Master Trustee as provided in Section 7.09. The provision hereof with respect to posting and giving notices of sale are intended to comply with the provisions of the Texas Property Code, and in the event the requirement for any notice under the Texas Property Code shall be eliminated or the prescribed manner of giving same is modified by future amendment to the Texas Property Code, the requirement for such particular notice shall be stricken from or modified in this instrument in conformity with such amendment. The manner prescribed in this Subsection (a) for serving or giving any notice, other than notice to be posted or caused to be posted by the Master Trustee, shall not be deemed exclusive, but such notice or notices may be given in any manner which may be permitted by applicable law, or

(b)     protect and enforce its rights and the rights of the Master Trustee under this Indenture by sale pursuant to judicial proceedings or by a suit, action, or proceeding in equity or at law or otherwise, whether for the specific performance of any covenant or agreement contained in this Indenture or in aid of the execution of any power granted in this Indenture or for the foreclosure of this Indenture or for the enforcement of any other legal, equitable, or other remedy, as the Master Trustee, being advised by counsel, shall deem most effectual to protect and enforce any of the rights of the Master Trustee, or

(c)     as to all or part of the personal property (tangible or intangible) and fixtures included in the Trust Estate (such portion of the Trust Estate herein referred to as the "Collateral"),

(i)     proceed under the Texas Uniform Commercial Code and exercise with respect to the Collateral all the rights, remedies, and powers of a secured party under the Texas Uniform Commercial Code, including, without limitation, the right and power to sell, at public or private sale or sale, or otherwise dispose of, lease, or utilize, the Collateral and any part or parts thereof in any manner authorized or permitted under the Texas Uniform Commercial Code after default by a debtor, and, to the extent permitted by law, the Obligor expressly waives any notice of sale or other disposition of the Collateral and any other rights and remedies of a debtor or formalities prescribed by law relative to sale or disposition of the Collateral or exercise of any other right or remedy of the Master Trustee existing after default hereunder, and, to the extent any

such notice is required and cannot be waived, the Obligor agrees that if such notice is mailed, postage prepaid, to the Master Trustee at its address stated in the first paragraph hereof at least ten days before the time of the sale or disposition, such notice shall be deemed reasonable and shall fully satisfy any requirement for giving of said notice,

(ii)   take possession of the Collateral and enter upon any premises where the same may be situated for such purpose without being deemed guilty of trespass and without liability for damages thereby occasioned and take any action deemed necessary or appropriate or desirable by the Master Trustee, at its option and in its discretion, to repair, refurbish, or otherwise prepare the Collateral for sale, lease, or other use or disposition as herein authorized,

(iii)   transfer at any time to itself or to its nominee the Collateral, or any part thereof, and receive the money, income proceeds, or benefits attributable or accruing thereto and hold the same as security for the Outstanding Obligations or apply same as herein provided, and

(iv)   require the Members to assemble the Collateral and make it available to the Trustee at a place to be designated by the Trustee that is reasonably convenient to all parties.

The Master Trustee shall be fully subrogated to the rights of all vendor's lienholders and other lienholders whose indebtedness is paid in whole or in part from proceeds of Obligations.

The filing of a suit to foreclose any lien, mortgage, or security interest hereunder shall never be considered an election so as to preclude foreclosure under any power of sale herein contained after dismissal of such a suit.

Any such sale (including notice thereof) shall comply with the applicable requirements, at the time of the sale, of Section 51.002 of the Texas Property Code or, if and to the extent such statute is not then in force, with the applicable requirements, at the time of the sale, of the successor statute or statutes, if any, governing sales of Texas real property under powers of sale conferred by deeds of trust. If there is no statute in force at the time of the sale governing sales of Texas real property under powers of sale conferred by deeds of trust, such sale shall comply with applicable law, at the time of the sale, governing sales of Texas real property under powers of sale conferred by deeds of trust.

Section 7.05   Incidents of Sale.  Upon any sale of any of the Trust Estate, whether made under the power of sale hereby given or pursuant to judicial proceedings, to the extent permitted by law:

(a)   any Holder or Holders of Obligations or the Master Trustee may bid for and purchase the property offered for sale, and upon compliance with the terms of sale may hold, retain, and possess and dispose of such property, without further accountability, and may, in paying the purchase money therefor, deliver any Outstanding Obligations or claims for interest thereon in lieu of cash to the amount which shall, upon distribution of the net proceeds of such sale, be payable thereon, and such Obligations, in case the amounts so payable thereon shall be less than the amount due thereon, shall be returned to the Holders thereof after being appropriately stamped to show partial payment;

(b)    the Master Trustee may make and deliver to the purchaser or purchasers a good and sufficient deed, bill of sale, and instrument of assignment and transfer of the property sold;

(c)    the Master Trustee is hereby irrevocably appointed the true and lawful attorney of each Member, in its name and stead, to make all necessary deeds, bills of sale, and instruments of assignment and transfer of the property thus sold; and for that purpose it may execute all necessary deeds, bills of sale, and instruments of assignment and transfer, and may substitute one or more persons, firms, or corporation with like power, each Member hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof; but if so requested by the Master Trustee or by any purchaser, any Member shall ratify and confirm any such sale or transfer by executing and delivering the Master Trustee or to such purchaser or purchasers all proper deeds, bills of sale, instruments of assignment and transfer, and release as may be designated in any such request;

(d)    rights, titles, interests, claims, and demands whatsoever, either at law or in equity or otherwise, of the Members of, in, and to the property so sold shall be divested and such sale shall be a perpetual bar both at law and in equity against each of the Members and their respective successors and assigns, and against any and all persons claiming or who may claim the property sold or any part thereof by, through, or under the Members or their respective successors and assigns; and

(e)    receipt of the Master Trustee or of the officer making such sale shall be a sufficient discharge to the purchaser or purchasers at such sale for his or their purchaser money and such purchaser or purchasers and his or their assigns or personal representative shall not, after paying such purchase money and receiving such receipt, be obligated to see to the application of such purchase money, or be in any wise answerable for any loss, misapplication, or non-application thereof.

Upon a sale of substantially all the Trust Estate, whether made under the power of sale hereby granted or pursuant to judicial proceedings, the Obligated Group Representative will permit, to the extent permitted by law, the purchaser thereof and its successors and assigns to take and use the names of the Members and to carry on business under such name or any variant thereof and to use and employ any and all other trade names, brands, and trademarks of the Members; and in such event, upon written request of such purchaser, its successors, or its assigns, any Member will, at the expense of the purchaser, change its name in such manner as to eliminate any similarity.

Section 7.06   Collection of Indebtedness and Suits for Enforcement by Master Trustee. The Obligated Group Members covenant (subject to any notice and grace periods contained herein) that if

(a)    default is made in the payment of any installment of interest on any Obligation when such interest becomes due and payable, or

(b)    default is made in the payment of the principal of (or premium, if any, on), or any installment of principal (or premium, if any, on) any Obligation at the maturity (including acceleration) thereof, each Obligated Group Member will, upon demand of the Master Trustee,

pay to it, for the benefit of the Holders of such Obligations, the whole amount then due and payable on such Obligations for principal (and premium, if any) and interest, with interest at the rate borne by the Obligations upon the overdue principal (and premium, if any) and, to the extent not prohibited by applicable law, overdue interest; and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Master Trustee, its agents and counsel.

If the Obligated Group Members fail to pay any of the foregoing amounts forthwith upon demand, the Master Trustee, in its own name and as trustee of an express trust, may institute a judicial proceeding for the collection of the sums so due and unpaid, and may prosecute such proceeding to judgment or final decree, and may enforce the same against the Obligated Group Members or any other obligor upon the Obligations and collect the moneys adjudged or decreed to be payable in the manner provided by law out of the property of the Obligated Group Members or any other obligor upon the Obligations, wherever situated.

If an Event of Default occurs and is continuing, the Master Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Holders of Obligations by such appropriate judicial proceedings as the Master Trustee shall deem most effectual to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy.

Section 7.07    Master Trustee May File Proofs of Claim.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition, or other judicial proceeding relative to the Obligated Group Members or any other obligor upon the Obligations or the property of the Obligated Group Members or of such other obligor or their creditors, the Master Trustee (irrespective of whether the principal of the Obligations shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Master Trustee shall have made any demand on the Obligated Group Members for the payment of overdue principal, premium, or interest) shall be entitled and empowered, by intervention in such proceeding or otherwise, (i) to file and prove a claim for the whole amount of principal (and premium, if any) and interest owing and unpaid in respect of the Obligations and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Master Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Master Trustee, its agents and counsel which shall be deemed an administrative claim) and of the Holders of Obligations allowed in such judicial proceeding, and (ii) to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same; and any receiver, assignee, trustee, liquidator, sequestrator, custodian, or other similar official in any such judicial proceeding is hereby authorized by each Holder of Obligations to make such payments to the Master Trustee, and in the event that the Master Trustee shall consent to the making of such payments directly to the Holders of Obligations, to pay to the Master Trustee any amount due to it for the reasonable compensation, expenses, disbursements, and advances of the Master Trustee, its agents and counsel, and any other amounts due the Master Trustee under this Indenture which shall be deemed an administrative claim.

Nothing herein contained shall be deemed to authorize the Master Trustee to authorize or consent to or accept or adopt on behalf of any Holder of Obligations any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Holder thereof, or to authorize the Master Trustee to vote in respect of the claim of any Holder of Obligations in any such proceeding.

Section 7.08    Master Trustee May Enforce Claims Without Possession of Obligations. All rights of action and claims under this Indenture or the Obligations may be prosecuted and enforced by the Master Trustee without the possession of any of the Obligations or the production thereof in any proceeding relating thereto, and any such proceeding instituted by the Master Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements, and advances of the Master Trustee, its agents and counsel, be for the ratable benefit of the Holders of the Obligations in respect of which such judgment has been recovered.

Section 7.09    Application of Money Collected.   Any money collected by the Master Trustee pursuant to this Article and any proceeds of any sale (after deducting the costs and expenses of such sale, including a reasonable compensation to the Master Trustee, its agents and counsel, and any taxes, assessments, or liens prior to the lien of this Indenture, except any thereof subject to which such sale shall have been made), whether made under any power of sale herein granted or pursuant to judicial proceedings, together with, in the case of any entry or sale as otherwise provided herein, any other sums then held by the Master Trustee as part of the Trust Estate, shall be deposited in the Revenue Fund created by this Indenture, shall be applied in the order specified in Section 3.05, at the date or dates fixed by the Master Trustee and, in case of the distribution of such money on account of principal (or premium, if any), upon presentation of the Obligations and the notation thereon of the payment if only partially paid and upon surrender thereof if fully paid.

In the event the Master Trustee incurs expenses or renders services in any proceedings which result from the occurrence or continuance of an Event of Default under Section 7.01(c) or 7.01(d) hereof, or from the occurrence of any event which, by virtue of the passage of time, would become such Event of Default, the expenses so incurred and compensation for services so rendered are intended to constitute expenses of administration under the United States Bankruptcy Code or equivalent law.

Section 7.10    Limitation on Suits.  No Holder of any Obligation shall have any right to institute any proceeding, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless

(a)      such Holder has previously given written notice to the Master Trustee of a continuing Event of Default;

(b)      the Holders of not less than 25% in principal amount of the Outstanding Obligations shall have made written request to the Master Trustee to institute proceedings in respect of such Event of Default in its own name as Master Trustee hereunder;

(c)     such Holder or Holders have offered to the Master Trustee indemnity satisfactory to it against the costs, expenses and liabilities to be incurred in compliance with such request;

(d)     the Master Trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(e)     no direction inconsistent with such written request has been given to the Master Trustee during such 60 day period by the Holders of a majority in principal amount of the Outstanding Obligations; it being understood and intended that no one or more Holders of Obligations shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Obligations, or to obtain or to seek to obtain priority or preference over any other Holders or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Obligations.

Section 7.11     Unconditional Right of Holders of Obligations to Receive Principal, Premium and Interest. Notwithstanding any other provision in this Indenture, the Holder of any Obligation shall have the right which is absolute and unconditional to receive payment of the principal of (and premium, if any) and (subject to Section 2.07) interest on such Obligation on the respective Stated Maturities expressed in such Obligation (or, in the case of redemption, on the redemption date) and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder.

Section 7.12     Restoration of Rights and Remedies. If the Master Trustee or any Holder of Obligations has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Master Trustee or to such Holder of Obligations, then and in every such case the Obligated Group Members, the Master Trustee and the Holders of Obligations shall, subject to any determination in such proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Master Trustee and the Holders of Obligations shall continue as though no such proceeding had been instituted.

Section 7.13     Rights and Remedies Cumulative. No right or remedy herein conferred upon or reserved to the Master Trustee or to the Holders of Obligations is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 7.14     Delay or Omission Not Waiver. No delay or omission of the Master Trustee or of any Holder of any Obligation to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article or by law to the Master Trustee or to the Holders of Obligations may be exercised from time to time, and as often as may be deemed expedient, by the Master Trustee or by the Holders of Obligations, as the case may be.

Section 7.15   Control by Holders of Obligations.  The Holders of a majority in principal amount of the Outstanding Obligations shall have the right to direct the time, method, and place of conducting any proceeding for any remedy available to the Master Trustee or exercising any trust or power conferred on the Master Trustee, provided that:

(a)    such direction shall not be in conflict with any rule of law or with this Indenture,

(b)    the Master Trustee may take any other action deemed proper by the Master Trustee which is not inconsistent with such direction; and

(c)    the Master Trustee shall not be required to act on any direction given to it pursuant to this Section until indemnity as set forth in Section 8.03(e) hereof is provided to it by such Holders.

Section 7.16   Waiver of Past Defaults.  The Holders of not less than a majority in principal amount of the Outstanding Obligations may on behalf of the Holders of all the Obligations waive any past default hereunder and its consequences, except a default:

(a)    in the payment of the principal of (or premium, if any) or interest on any Obligation, or

(b)    in respect of a covenant or provision hereof which under Article IX cannot be modified or amended without the consent of the Holder of each Outstanding Obligation affected.

Upon any such waiver, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

Section 7.17   Undertaking for Costs.  All parties to this Indenture agree, and each Holder of any Obligation by his acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Master Trustee for any action taken or omitted by it as Master Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section shall not apply to any suit instituted by the Master Trustee, to any suit instituted by any Holder of Obligations, or group of Holders of Obligations, holding in the aggregate more than 10% in principal amount of the Outstanding Obligations, or to any suit instituted by any Holder of Obligations for the enforcement of the payment of the principal of (or premium, if any) or interest on any Obligation on or after the respective Stated Maturities expressed in such Obligation (or, in the case of redemption, on or after the redemption date).

Section 7.18   Waiver of Stay or Extension Laws.  Each Obligated Group Member covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law

wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and each Obligated Group Member (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay, or impede the execution of any power herein granted to the Master Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 7.19 <u>Inapplicability of Finance Code</u>. In no event shall the provisions of V.T.C.A., Finance Code, Ch. 346 of the Revised Civil Statutes of Texas (which regulates certain revolving credit loan accounts and revolving tri-party accounts) apply to the loan evidenced by the Obligations secured hereby.

ARTICLE VIII
CONCERNING THE MASTER TRUSTEE

Section 8.01 <u>Duties and Liabilities of Master Trustee</u>. (a) Except during the continuance of an Event of Default, the Master Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Master Trustee.

(b) In case any Event of Default has occurred and is continuing, the Master Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a reasonably prudent person would exercise or use under the circumstances in the conduct of his own affairs.

(c) No provision of this Indenture shall be construed to relieve the Master Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except, that:

(1) this Subsection shall not be construed to limit the effect of Subsection (a) of this Section;

(2) the Master Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proved that the Master Trustee was negligent in ascertaining the pertinent facts;

(3) the Master Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the holders of not less than a majority in aggregate principal amount of Obligations then Outstanding relating to the time, method, and place of conducting any proceeding for any remedy available to the Master Trustee, or exercising any trust or power conferred upon the Master Trustee, under this Indenture;

(4) no provision of this Indenture shall require the Master Trustee to expend or risk its funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have grounds for believing that

80

the repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it; and

(5) in the absence of bad faith on its part, the Master Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Master Trustee and conforming to the requirements of this Indenture; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Master Trustee, the Master Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture.

(d) Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Master Trustee shall be subject to the provisions of this Section.

Section 8.02 Notice of Defaults. Within 60 days after the occurrence of any default hereunder of which the Master Trustee is deemed to have knowledge as provided in Section 8.03(h) hereof, the Master Trustee shall transmit by mail to all Holders of Obligations, notice of such default, unless such default shall have been cured or waived; provided, however, that except in the case of a default in the payment of the principal of (or premium, if any) or interest on any Obligations or in the payment of any sinking or purchase fund installment, the Master Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee or a trust committee of directors and/or Responsible Officers of the Master Trustee in good faith determine that the withholding of such notice is in the interest of the Holders of Obligations. For the purpose of this Section, the term "default" means any event which is, or after notice or lapse of time or both would become, an Event of Default.

Section 8.03 Certain Rights of Master Trustee. Except as otherwise provided in Section 8.01:

(a) The Master Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, approval, bond, debenture, coupon, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties and shall not be required to verify the accuracy of any information or calculations required to be included therein or attached thereto;

(b) Any request or direction of any Person mentioned herein shall be sufficiently evidenced by a Request of such Person; and any resolution of the Governing Body of any Person may be evidenced to the Master Trustee by a Board Resolution of such Person;

(c) Whenever in the administration of this Indenture the Master Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering, or omitting any

action hereunder, the Master Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's Certificate;

(d)     The Master Trustee may consult with counsel and the written advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon;

(e)     The Master Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders of Obligations pursuant to the provisions of this Indenture, unless such Holders shall have provided to the Master Trustee security or indemnity satisfactory to it against the costs, expenses, and liabilities which might be incurred by it in connection with such request or direction;

(f)     The Master Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, approval, bond, debenture, coupon, or other paper or document but the Master Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Master Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records, and premises of the Obligated Group Members and each other obligor on the Obligations, personally or by agent or attorney;

(g)     The Master Trustee may execute any of the trusts or powers hereunder or perform any duties-hereunder either directly or by or through agents or attorneys and the Master Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care hereunder;

(h)     The Master Trustee shall not be deemed to have knowledge of any default (as defined in Section 8.02 hereof) hereunder, except an Event of Default under Section 7.01(a) hereof, unless a Responsible Officer has actually received notice of such default in writing from any Obligated Group Member or the Holder of any Obligation, referencing the Obligations and describing such default;

(i)     The permissive right of the Master Trustee to do things enumerated in this Indenture shall not be construed as a duty (except as otherwise herein provided). It shall not be the duty of the Master Trustee, except as herein provided, to see that any duties or obligations herein imposed upon any Obligated Group Member or any other Person are performed, and the Master Trustee shall not be liable or responsible for the failure of any Obligated Group Member or any other Person to perform any act required of it or them by this Indenture;

(j)     The Master Trustee is not required to give any bond or surety with respect to the performance of its duties or the exercise of its powers under this Indenture;

(k)     In the event the Master Trustee receives inconsistent or conflicting requests and indemnity from two or more groups of holders of Obligations, each representing less than a majority in aggregate principal amount of the Obligations Outstanding, the Master Trustee, in its sole discretion, may determine what action, if any, shall be taken;

82

(l)    The Master Trustee's immunities and protections from liability in connection with the performance of its duties under this Indenture shall extend to the Master Trustee's officers, directors, agents and employees. Such immunities and protections, together with the Master Trustee's right to compensation, shall survive the Master Trustee's resignation or removal and final payment of the Obligations; and

(m)    Except for information provided by the Master Trustee concerning the Master Trustee, the Master Trustee shall have no responsibility for any information in any offering memorandum or other disclosure material distributed with respect to the Obligations, and the Master Trustee shall have no responsibility for compliance with any state or federal securities laws in connection with the Obligations.

Section 8.04    Not Responsible For Recitals or Issuance of Obligations. The recitals contained herein and in the Obligations (other than the certificate of authentication on such Obligations) shall be taken as the statements of the Obligated Group Members, and the Master Trustee assumes no responsibility for their correctness. The Master Trustee makes no representations as to the validity or sufficiency of this Indenture or of the Obligations. The Master Trustee shall not be accountable for the use or application by the Obligated Group Members of any of the Obligations or of the proceeds of such Obligations. The Master Trustee is not a party to, and is not responsible for, and makes no representation with respect to matters set forth in any preliminary official statement, official statement, or similar document prepared and distributed in connection with the transactions contemplated in this Indenture.

Section 8.05    Master Trustee or Registrar May Own Obligations. The Master Trustee, any Paying Agent, registrar, or any other agent of the Obligated Group Members, in its individual or any other capacity, may become the owner or pledgee of Obligations and may otherwise deal with the Obligated Group Members with the same rights it would have if it were not Master Trustee, Paying Agent, Obligation registrar, or such other agent.

Section 8.06    Money to Be Held in Trust. All money received by the Master Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated from other funds except to the extent required by law. The Master Trustee shall be under no liability for interest on any money received by it hereunder other than such interest as it expressly agrees to pay.

Section 8.07    Compensation and Expenses of Master Trustee. The Obligated Group Members agree

(a)    to pay to the Master Trustee from time to time reasonable compensation for all services rendered by it hereunder, including such compensation as may be agreed to in any separate agreement of an Obligated Group Member with the Master Trustee;

(b)    to reimburse the Master Trustee upon its request for all expenses, disbursements and advances incurred or made by the Master Trustee in accordance with any provision of this Indenture (including the compensation and the expenses and disbursements, of its agents and counsel; and

(c)     each Obligated Group Member shall indemnify the Master Trustee for, and hold it harmless against any loss, liability or expense incurred by it (other than any portion thereof finally adjudicated to be attributable to negligence or bad faith by the Master Trustee), arising out of and in connection with the acceptance or administration of this trust, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder.

Section 8.08   Corporate Master Trustee Required; Eligibility.   There shall at all times be a Master Trustee hereunder which shall be a banking corporation, bank or trust company organized and doing business under the laws of the United States of America or of any state, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by Federal or State banking authority.  If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  If at any time the Master Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign promptly in the manner and with the effect hereinafter specified in this Article.

Section 8.09   Resignation and Removal; Appointment of Successor.  (a) No resignation or removal of the Master Trustee and no appointment of a successor Master Trustee pursuant to this Article shall become effective until the acceptance of appointment by the successor Master Trustee under Section 8.10.

(b)     The Master Trustee may resign at any time by giving written notice thereof to the Obligated Group Representative.  If an instrument of acceptance by a successor Master Trustee shall not have been delivered to the Master Trustee within 30 days after the giving of such notice of resignation, the resigning Master Trustee may petition any court of competent jurisdiction for the appointment of a successor Master-Trustee.

(c)     The Master Trustee may be removed at any time by act of the Holders of a majority in principal amount of the Outstanding Obligations delivered to the Master Trustee and to the Obligated Group Representative or by the Obligated Group Representative with the written consent of the Holders of a majority in principal amount of the Outstanding Obligations.

(d)     If at any time:

(1)     the Master Trustee shall cease to be eligible under Section 8.08 and shall fail to resign after written request therefor by the Obligated Group Representative or by any such Holder of Obligations, or

(2)     the Master Trustee shall become incapable of acting or shall be adjudged a bankrupt or insolvent or a receiver of the Master Trustee or of its property shall be appointed or any public officer shall take charge or control of the Master Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then, in any such case, (A) the Obligated Group Representative by written

84

request may remove the Master Trustee, or (B) subject to Section 7.17, any Holder of Obligations who has been a bona fide Holder of a Obligation for at least 6 months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Master Trustee and the appointment of successor Master Trustee.

(e)     If the Master Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of Master Trustee for any cause, the Obligated Group Representative, by an Obligated Group Representative Request, shall promptly appoint a successor Master Trustee, provided that if prior to such appointment or within one year after such resignation, removal or incapability, or the occurrence of such vacancy, a successor Master Trustee shall be appointed by Act of the Holders of a majority in principal amount of the Outstanding Obligations delivered to the Obligated Group Representative and the retiring Master Trustee, the successor Master Trustee so appointed shall, forthwith upon its acceptance of such appointment, become the successor Master Trustee and supersede the successor Master Trustee appointed by the Obligated Group Representative. If no successor Master Trustee shall have been so appointed by the Obligated Group Representative or the Holders of Obligations and accepted appointment in the manner hereinafter provided, any Holder of Obligations who has been a bona fide Holder of a Obligation for at least 6 months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Master Trustee.

The Obligated Group Representative shall give notice of each resignation and each removal of the Master Trustee and each appointment of a successor Master Trustee by mailing written notice of such event by first class mail, postage prepaid, to the registered Holders of Obligations at their addresses as shown in the Obligation Register. Each notice shall include the name and address of the designated corporate trust office of the successor Master Trustee.

Section 8.10   Acceptance of Appointment by Successor. Every successor Master Trustee appointed hereunder shall execute, acknowledge and deliver to the Obligated Group Representative and to the retiring Master Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Master Trustee shall become effective and such successor Master Trustee, without any further act, deed, or conveyance, shall become vested with all the rights, powers, trusts, and duties of the retiring Master Trustee; but, on request of the Obligated Group Representative or the successor Master Trustee, such retiring Master Trustee shall, upon payment of its charges and the amounts due to it hereunder, execute and deliver an instrument transferring to such successor Master Trustee all the rights, powers, and trusts of the retiring Trustee, and shall duly assign, transfer, and deliver to the successor Master Trustee all property and money held by such retiring Master Trustee hereunder. Upon request of any such successor Master Trustee, the Obligated Group Representative shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Master Trustee all such rights, powers, and trusts.

No successor Master Trustee shall accept its appointment unless at the time of such acceptance such successor Master Trustee shall be qualified and eligible under this Article. The indemnity provided for in Section 8.07(c) herein shall continue to be binding upon the Members of the Obligated Group for the benefit of the retiring or removed Master Trustee.

85

Section 8.11   Merger or Consolidation.  Any entity into which the Master Trustee may be merged or with which it may be consolidated, or any entity resulting from any merger or consolidation to which the Master Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Master Trustee, shall be the successor Master Trustee hereunder, provided such entity shall be otherwise qualified and eligible under this Article, without the execution or filing of any paper or any further act on the part of any of the parties hereto.  In case any Obligations shall have been authenticated, but not delivered, by the Master Trustee then in office, any successor by merger or consolidation to such authenticating Master Trustee may adopt such authentication and deliver the Obligations so authenticated with the same effect as if such successor Master Trustee had itself authenticated such Obligations.

Section 8.12   Master Trustee as Related Bond Trustee.  The Master Trustee may serve as Related Bond Trustee under any Related Bond Indenture.

ARTICLE IX
SUPPLEMENTS AND AMENDMENTS

Section 9.01   Supplements Without Consent of Holders of Obligations.  Without the consent of the Holders of any Obligations, each Obligated Group Member and the Master Trustee at any time may enter into one or more Supplements for any of the following purposes:

(a)   to evidence the succession of another Person to an Obligated Group Member, or successive successions, and the assumption by the successor Person of the covenants, agreements and obligations of an Obligated Group Member as permitted by this Indenture or to evidence additions to, or withdrawals from, membership in the Obligated Group in accordance with the provisions of Article VI hereof;

(b)   to add to the covenants of the Obligated Group Members for the benefit of the Holders of Obligations, or to surrender any right or power herein conferred upon the Obligated Group Members, or to add to the Events of Default enumerated in Section 7.01;

(c)   to cure any ambiguity or to correct or supplement any provision herein that may be inconsistent with any other provision herein, or to make any other provision with respect to matters or questions arising under this Indenture that shall not be inconsistent with this Indenture, provided such action shall not adversely affect the interests of the Holders of Obligations;

(d)   to modify or supplement this Indenture in such manner as may be necessary or appropriate to qualify this Indenture under the Trust Indenture Act of 1939 as then amended, or under any similar Federal or State statute or regulation, including provisions whereby the Master Trustee accepts such powers, duties, conditions and restrictions hereunder and the Obligated Group Members undertake such covenants, conditions or restrictions additional to those contained in this Indenture as would be necessary or appropriate so to qualify this Indenture; provided, however, that nothing herein contained shall be deemed to authorize inclusion in this Indenture or in any Supplements provisions referred to in Section 316(a)(2) of the said Trust Indenture Act or any corresponding provision provided for in any similar statute hereafter in effect;

(e)   to create and provide for the issuance of Obligations as permitted hereunder;

86

(f)    to increase or maintain any credit rating assigned to any Series of Related Bonds by a Rating Agency so long as no Obligation issued hereunder shall be secured on a basis senior to other Obligations; and

(g)    to make any amendment to any provision of this Indenture or to any Supplement which is only applicable to Obligations issued thereafter or which will not apply so long as any Obligation then Outstanding remains Outstanding.

Section 9.02   Supplements With Consent of Holders of Obligations. With the consent of the Holders of not less than a majority in principal amount of the Outstanding Obligations, by Act of said Holders delivered to the Obligated Group Representative and the Master Trustee, each Obligated Group Member and the Master Trustee may enter into Supplements for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or of modifying in any manner the rights of the Holders of the Obligations under this Indenture; provided, however, that no such Supplement shall, without the consent of the Holder of each Outstanding Obligations affected thereby,

(a)    change the Stated Maturity of the principal of, or any installment of interest on, any Obligations or any date for mandatory redemption thereof, or reduce the principal amount thereof or the interest thereon or any premium payable upon the redemption thereof, or change any Place of Payment where, or the coin or currency in which, any Obligations or the interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the Stated Maturity thereof (or, in the case of redemption, on or after the redemption date), or

(b)    reduce the percentage in principal amount of the Outstanding Obligations, the consent of whose Holders is required for any such Supplement, or the consent of whose Holders is required for any waiver (of compliance with certain provisions of this Indenture or certain defaults hereunder and their consequences) provided for in this Indenture, or

(c)    modify any of the provisions of this Section or Section 7.16, except to increase any such percentage or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Obligation affected thereby.

It shall not be necessary for any Act of Holders of Obligation under this Section to approve the particular form of any proposed Supplement, but it shall be sufficient if such Act shall approve the substance thereof.

Section 9.03   Execution of Supplements. In executing, or accepting the additional trusts created by, any Supplement permitted by this Article or the modifications thereby of the trusts created by this Indenture the Master Trustee shall be entitled to receive, and shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such Supplemental is authorized or permitted by this Indenture and that all conditions precedent thereto have been complied with. In connection with the execution and delivery of a Supplement pursuant to Section 9.01(c), the Master Trustee, in its discretion, may determine whether or not in accordance with such Section the Holders of the Bond Obligations would be affected by such Supplement, and any such determination shall be binding and conclusive on the Members of the Obligated Group, and the Holders of the Obligations. The Master Trustee may receive and be entitled to rely upon an

Opinion of Counsel as conclusive evidence as to whether the Holders of the Obligations would be so affected by any such Supplement. The Master Trustee may, but shall not (except to the extent required in the case of a Supplement entered into under Section 9.01(d)) be obligated to, enter into any such Supplement which affects the Master Trustee's own rights, duties or immunities under this Indenture or otherwise.

Section 9.04    Effect of Supplement.  Upon the execution of any Supplement under this Article, this Indenture shall, with respect to each series of Obligations to which such Supplement applies, be modified in accordance therewith, and such Supplement shall form a part of this Indenture for all purposes, and every Holder of Obligations thereafter or (except to the extent provided pursuant to Section 9.01(h)) theretofore authenticated and delivered hereunder shall be bound thereby.

Section 9.05    Obligations May Bear Notation of Changes.  Obligations authenticated and delivered after the execution of any Supplement pursuant to this Article may bear a notation in form approved by the Master Trustee as to any matter provided for in such Supplement. If the Obligated Group Representative or the Master Trustee shall so determine, new Obligations so modified as to conform, in the opinion of the Master Trustee and the Obligated Group Representative, to any such Supplement may be prepared and executed by the applicable Obligated Group Member and authenticated and delivered by the Master Trustee in exchange for Obligations then Outstanding.

Section 9.06    Substitution or Addition of Lifespace Master Notes.  The Obligated Group and the Master Trustee may, without the consent of or notice (except as set forth in paragraph (c)) to any Holders of Obligations, amend or supplement this Master Indenture to modify, amend, change or remove any covenant, agreement, term or provision of this Master Indenture (other than a modification of the type described in subparagraphs (a) through (c) in Section 902) in order to effect the substitution of Lifespace Master Indenture Notes (the "Lifespace Replacement Notes") for all Outstanding Obligations hereunder or, if the Members of the Obligated Group are not included in the Lifespace Obligated Group, the issuance of Lifespace Master Indenture Notes that guarantee payment by the Members of the Obligations (the "Lifespace Guaranty Notes" and, together with Lifespace Replacement Notes, the "New Lifespace Notes", and either transaction the "Obligated Group Transaction"), subject to the following requirements and conditions:

(a)    The modifications, amendments, changes and removals permitted by this Section shall include those necessary or appropriate to implement the Obligated Group Transaction and to effect (1) if applicable, the inclusion of each of the Members in the Lifespace Obligated Group, (2) the issuance of the New Lifespace Notes of the Lifespace Obligated Group under the Lifespace Master Indenture in substitution for or in addition to, as applicable, , and providing for identical payment obligations and payees as, any then Outstanding Obligations hereunder, which New Lifespace Note or Notes would constitute joint and several obligations of the members of the Lifespace Obligated Group, secured on a parity with all other obligations under the Lifespace Master Indenture, or, if there are obligations of differing seniority under the Lifespace Master Indenture, on a parity with the most senior liens and most senior obligations issued or issuable under the Lifespace Master Indenture, (3) the replacement of all or any portion of the. Obligated Group's financial and operating covenants and related definitions set forth in this Master Indenture with the Lifespace Obligated Group's financial and operating covenants and related definitions set

forth in the Lifespace Master Indenture, (4) if the Members hereunder are included in the Lifespace Obligated Group, the pledging of the Gross Revenues of the Members to the Lifespace Master Trustee to secure all Lifespace Master Indenture Notes, including the Lifespace Replacement Notes; (5) if the Members hereunder are included in the Lifespace Obligated Group, the mortgaging and pledging of the Mortgaged Property of the Members to the Lifespace Master Trustee to secure the Lifespace Replacement Notes and, if so elected by the Lifespace Obligated Group, any or all other obligations under the Lifespace Master Indenture on a parity or junior basis to the lien securing the Lifespace Replacement Notes; for the avoidance of doubt, if the Members hereunder are not included in the Lifespace Obligated Group, the Outstanding Obligations hereunder shall remain Outstanding hereunder and shall remain secured hereunder by the Gross Revenues of the Members and the Mortgaged Property, and neither the Gross Revenues of the Members nor the Mortgaged Property shall secure any obligations under the Lifespace Master Indenture.

(b)     The Obligated Group may implement the Obligated Group Transaction, and the Master Trustee upon the request of the Obligated Group Representative shall implement the Obligated Group Transaction, if and only if:

(1)     the Obligated Group Representative gives written notice of the substance of such proposed Obligated Group Transaction to each Rating Agency that has in effect a rating for any Obligations or Related Bonds then Outstanding prior to the date such Obligated Group Transaction is to take effect, and (i) each such Rating Agency (or, if no Rating Agency has in effect a rating for any Obligations or Related Bonds then Outstanding without taking into account any Credit Facility, at least one Rating Agency selected by the Obligated Group Representative) shall confirm in writing prior to the implementation of the Obligated Group Transaction that the ratings on any Related Bonds outstanding at the time of the Obligated Group Transaction shall be not less than "BBB-", and (ii) the Obligated Group Representative delivers an Officer's Certificate certifying that after giving effect to such New Lifespace Notes and assuming that the Lifespace Obligated Group constituted the Obligated Group under this Master Indenture, the Lifespace Obligated Group could demonstrate compliance with the provisions of Section 4.16(a), assuming the incurrence of $1.00 of additional Funded Indebtedness, (iii) the Lifespace Master Indenture contains a pledge of Gross Revenues of each member of the Lifespace Obligated Group substantially similar to the pledge of Gross Revenues as defined hereunder immediately prior to the Obligated Group Transaction, which pledge secures the New Lifespace Note or Notes, as applicable, on a parity with all other obligations under the Lifespace Master Indenture, or, if there are obligations of differing seniority under the Lifespace Master Indenture, on a parity with the most senior obligations issued or issuable under the Lifespace Master Indenture and (iv) the Mortgaged Property, as defined hereunder immediately prior to the Obligated Group Transaction, secures the Lifespace Replacement Note or Lifespace Replacement Notes, if and as applicable, on a first mortgage and first lien basis, subject only to Permitted Encumbrances as defined under the Lifespace Master Indenture; provided

that, , the first mortgage and first lien on the Mortgaged Property securing the Lifespace Replacement Note or Notes, if and as applicable, may also secure, on a parity or junior basis to the lien securing the Lifespace Replacement Note or Notes, other obligations issued under the Lifespace Master Indenture;

(2)    a copy of the Lifespace Master Indenture is delivered to the Master Trustee; and

(3)    original Lifespace Replacement Notes replacing, or original Lifespace Guaranty Notes guaranteeing, all Obligations Outstanding under this Master Indenture, which New Lifespace Notes are issued by or on behalf of the Lifespace Obligated Group under and pursuant to and secured by the Lifespace Master Indenture and shall have been duly authenticated by the Lifespace Master Trustee under the terms of the Lifespace Master Indenture; and

(4)    at or prior to the implementation of the Obligated Group Transaction, there shall also be delivered to the Master Trustee, each Related Bond Issuer and each Related Bond Trustee, (A) an Opinion of Bond Counsel to the effect that under then existing law the implementation of the Obligated Group Transaction and the execution of the amendments or supplements contemplated in this Section, in and of themselves, would not adversely affect the validity of any Outstanding Related Bonds or the exclusion from federal income taxation of interest payable on such Related Bonds, and (B) an Opinion of Counsel to the effect that (i) the New Lifespace Note or Notes to be delivered to secure any Indebtedness or Related Bonds constitute legal, valid and binding obligations of the members of the Lifespace Obligated Group enforceable in accordance with their terms subject to customary exceptions, (ii) the New Lifespace Note or Notes to be delivered to secure any Indebtedness or Related Bonds are secured by a perfected security interest in the Gross Revenues of each member of the Lifespace Obligated Group and in all other property of the Lifespace Obligated Group subject to the lien securing such New Lifespace Note or Notes that is capable of perfection under the Uniform Commercial Code by the filing of financing statements; (iii) the issuance of the New Lifespace Note or Notes will not cause such Related Bonds or such New Lifespace Note or Notes to become subject to the registration requirements pursuant to the Securities Act of 1933, as amended (or that such Related Bonds or Obligations have been so registered if registration is required) and will not subject the Lifespace Master Indenture to the qualification provisions of the Trust Indenture Act of 1939, as amended (or that the Lifespace Master Indenture has been so qualified if qualification is required) and (iv) the conditions of this Section 9.06 have been satisfied.

(c)    In addition, not less than 15 days prior to the implementation of the Obligated Group Transaction, the Obligated Group Representative shall give written notice thereof

to the Required Information Recipients, and prior to the implementation of the Obligated Group Transaction a copy of the Lifespace Master Indenture as amended in connection with the Obligated Group Transaction shall have been provided to the Required Information Recipients.

## ARTICLE X
## SATISFACTION AND DISCHARGE OF INDENTURE; UNCLAIMED MONEYS

Section 10.01 <u>Satisfaction and Discharge of Indenture</u>. If at any time the Obligated Group Members shall have paid or caused to be paid the principal of (and premium, if any) and interest on all the Obligations Outstanding hereunder, as and when the same shall have become due and payable, and if the Obligated Group Members shall also pay or provide for the payment of all other sums payable hereunder by each Obligated Group Member then this Indenture shall cease to be of further effect (except as to (1) rights of registration of transfer and exchange, (2) substitution of mutilated, defaced, or apparently destroyed, lost or stolen Obligations, (3) rights of Holders to receive payments of principal thereof (and premium, if any) and interest thereon, (4) the rights, remaining obligations, if any, and immunities of the Master Trustee hereunder and (5) the rights of the Holders as beneficiaries hereof with respect to the property so deposited with the Master Trustee payable to all or any of them) and the Master Trustee, on the Obligated Group Representative's Request accompanied by an Officer's Certificate and an Opinion of Counsel (both to the effect that all conditions precedent in this Indenture relating to the satisfaction and discharge of this Indenture have been satisfied) and at the cost and expense of the Obligated Group Representative, shall execute proper instruments acknowledging satisfaction of and discharging this Indenture.

Notwithstanding the satisfaction and discharge of this Indenture, the obligations of the Obligated Group Members to the Master Trustee under Section 8.07 and, if funds shall have been deposited with the Master Trustee pursuant to Section 10.02, the obligations of the Master Trustee under Section 10.03 shall survive.

Section 10.02 <u>Obligations Deemed Paid</u>. Obligations of any series shall be deemed to have been paid if (a) (1) in case such Obligations are to be redeemed on any date prior to their Stated Maturity, the Obligated Group Representative by Obligated Group Representative Request shall have given to the Master Trustee in form satisfactory to it irrevocable instructions to give notice of redemption of such Obligations on said redemption date, (2) there shall have been deposited with the Master Trustee either money sufficient, or Defeasance Obligations the principal of and the interest on which will provide money sufficient without reinvestment (as established by an Officer's Certificate delivered to the Master Trustee accompanied by a report of an Independent Accountant setting forth the calculations upon which such Officer's Certificate is based), to pay when due the principal of (and premium, if any) and interest due and to become due on said Obligations on and prior to the redemption date or Stated Maturity thereof, as the case may be, and (3) in the event said Obligations are not by their terms subject to redemption within the next 45 days, the Obligated Group Representative by Obligated Group Representative Request shall have given the Master Trustee in form satisfactory to it irrevocable instructions to give a notice to the Holders of such Obligations that the deposit required by (2) above has been made with the Master Trustee and that said Obligations are deemed to have been paid in accordance with this Section and stating such maturity or redemption date upon which money is to be available for the payment of the principal of (and premium, if any) and interest on said Obligations or (b) such Obligations

are delivered to the Master Trustee by the Related Bond Trustee together with instructions from the Obligated Group Representative directing the Master Trustee to retire and cancel such Obligations.

Section 10.03 <u>Application of Trust Money</u>. The Defeasance Obligations and money deposited with the Master Trustee pursuant to Section 10.02 and principal or interest payments on any such Defeasance Obligations shall be held in trust, shall not be sold or reinvested, and shall be applied by it, in accordance with the provisions of the Obligations and this Indenture, to the payment, either directly or through any Paying Agent (including the Obligated Group Representative acting as Paying Agent) as the Master Trustee-may determine, to the Persons entitled thereto, of the principal (and premium, if any) and interest for whose payment such money or Defeasance Obligations were deposited; provided that, upon delivery to the Master Trustee of an Officer's Certificate (accompanied by the report of an Independent Accountant setting forth the calculations upon which such Officer's Certificate is based) establishing that the money and Defeasance Obligations on deposit following the taking of the proposed action will be sufficient for the purposes described in clause (2) of Section 10.02, any money received from principal or interest payments on Defeasance Obligations deposited with the Master Trustee or the proceeds of any sale of such Defeasance Obligations, if not then needed for such purpose, shall, upon Obligated Group Representative Request be reinvested, to the extent practicable, in other Defeasance Obligations or disposed of as requested by the Obligated Group Representative. For purposes of any calculation required by this Article, any Defeasance Obligation which is subject to redemption at the option of its issuer, the redemption date for which has not been irrevocably established as of the date of such calculation, shall be assumed to cease to bear interest at the earliest date on which such obligation may be redeemed at the option of the issuer and the principal of such obligation shall be assumed to be received at its stated maturity.

Section 10.04 <u>Payment of Related Bonds</u>. Notwithstanding any other provision of this Article X, no Obligation will be considered paid or deemed to have been paid unless the Related Bonds, if any, have been paid or deemed paid pursuant to the Related Bond Indenture.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

Section 11.01 <u>No Personal Liability</u>. No recourse under this Indenture or any Obligations shall be had against any officer, director, agent or employee, as such, past, present, or future, of any Obligated Group Member, any Affiliate, the Master Trustee or of any successor corporation; it being expressly understood that this Indenture and the obligations incurred hereunder are solely obligations of the entities named herein as obligors, and that no personal liability whatever shall attach to such persons or any of them, under this Indenture or any Obligations.

Section 11.02 <u>Texas Contract</u>. This Indenture and the Obligations shall be deemed to be contracts made under the laws of the State of Texas, and for all purposes shall be construed in accordance with the laws of said State applicable to contracts made and to be performed in said State.

Section 11.03 <u>Legal Holidays</u>. If the date for making any payment or the last date for performance of any act or the exercising of any right, as provided in this Indenture, shall be a legal

holiday or a day on which banking institutions in Dallas, Texas or [Minneapolis, Minnesota] are authorized by law to remain closed, such payment may be made or act performed or right exercised on the next succeeding day not a legal holiday or a day on which such banking institutions are authorized by law to remain closed with the same force and effect as if done on the nominal date provided in this Indenture.

Section 11.04 <u>Benefits of Provisions of Indenture and Obligations</u>. Nothing in this Indenture or in the Obligations, expressed or implied, shall give or be construed to give any Person, other than the parties hereto, and the Holders of such Obligations, any legal or equitable right, remedy, or claim under or in respect of this Indenture, or under any covenant, condition, and provision herein contained; all its covenants, conditions, and provisions being for the sole benefit of the parties hereto and of the Holders of such Obligations.

Section 11.05 <u>Execution in Counterparts; Electronic Transactions</u>. This Indenture may be executed in any number of counterparts, each of which shall be an original; but such counterparts shall together constitute but one and the same instrument. The transaction described herein may be conducted and this Master Indenture and related documents may be stored by electronic means. Copies, telecopies, facsimiles, electronic files and other reproductions of original executed documents shall be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

Section 11.06 <u>UCC Financing Statements</u>. The Members of the Obligated Group hereby expressly grant to the Master Trustee the full right and authority to file any Uniform Commercial Code financing statement, continuation statement or amendment that may be required by law or is necessary to maintain any security interest granted by the Obligated Group to the Master Trustee pursuant to this Master Indenture. Notwithstanding anything to the contrary contained herein, the Master Trustee shall not be responsible for any initial filings of any financial statements or the information contained therein (including the exhibits thereto), the perfection of any such security interests by such initial filings, or the accuracy of sufficiency of any description of collateral or name or location of an Obligated Group Member in such filings, and unless the Master Trustee shall have been notified by the Obligated Group in writing that any such initial filing, description of collateral or name or location was or has become defective or inaccurate, the Master Trustee shall be fully protected in relying on such initial filing and descriptions in filing any financing or continuation statement(s) pursuant to this Section. Subject to the foregoing, the Master Trustee shall file continuation statements for any initial financing statement delivered to it on the Effective Date at such times as necessary to avoid a lapse in the effectiveness of such initial financing statements. The Obligated Group shall be responsible for and shall pay any reasonable expenses, including legal fees incurred by the Master Trustee under this section.

**ML Draft – 1/28/2019**
**FOR SETTLEMENT/**
**DISCUSSION PURPOSES ONLY**

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed by persons thereunto duly authorized, as of the day and year first above written.

TARRANT COUNTY SENIOR LIVING CENTER INC., as the initial Obligated Group Member

By: _____
      President

UMB BANK, NATIONAL ASSOCIATION, as Master Trustee

By: _____

Title:

**ML Draft – 1/28/2019**
**FOR SETTLEMENT/**
**DISCUSSION PURPOSES ONLY**

STATE OF TEXAS

COUNTY OF DALLAS

This instrument was acknowledged before me on _____2019, by Charles B. Brewer, who is President Tarrant County Senior Living Center Inc., a Texas nonprofit corporation, for and on behalf of said corporation.

_____

Notary Public, State of Texas

(Seal)

STATE OF _____

COUNTY OF _____

This instrument was acknowledged before me on _____, 2019, by _____, who is a _____ of UMB Bank, National Association, a national banking association, for and on behalf of said organization.

_____

Notary Public

(Seal)

Signature Page to Amended and Restated Master Trust Indenture,
Deed of Trust and Security Agreement

**ML Draft – 1/28/2019**
**FOR SETTLEMENT/**
**DISCUSSION PURPOSES ONLY**

EXHIBIT A

<u>Legal Description</u>

<u>(Stayton at Museum Way)</u>

Being Lot 1, Block 1 of GREYSTONE ADDITION, an Addition to the City of Fort Worth, Tarrant County, Texas, as recorded in Cabinet A, Slide 11920, Plat Records, Tarrant County, Texas.

**ML Draft – 1/28/2019**
**FOR SETTLEMENT/**
**DISCUSSION PURPOSES ONLY**

EXHIBIT B

EXISTING LIENS

[None]

87584900v.1

TARRANT COUNTY CULTURAL EDUCATION FACILITIES FINANCE CORPORATION

TO

UMB BANK,
NATIONAL ASSOCIATION, AS BOND TRUSTEE

INDENTURE OF TRUST

DATED AS OF [NOVEMBER 1], 2019

TARRANT COUNTY CULTURAL EDUCATION FACILITIES FINANCE CORPORATION
RETIREMENT FACILITY REVENUE BONDS
(THE STAYTON AT MUSEUM WAY PROJECT)
SERIES 2019

### TABLE OF CONTENTS

Page

ARTICLE I        ARTICLE I DEFINITIONS.................................................................................13

Section 1.01     Definitions...............................................................................................13
Section 1.02     Recital Incorporation...............................................................................13

ARTICLE II       AUTHORIZATION, TERMS, EXECUTION AND ISSUANCE OF
                 BONDS ......................................................................................................13

Section 2.01     Authorized Amount of Series 2019 Bonds ...............................................13
Section 2.02     All Bonds Equally and Ratably Secured; Bonds Not an Obligation of
                 Issuer........................................................................................................13
Section 2.03     Authorization of Series 2019 Bonds ........................................................13
Section 2.04     Execution of Bonds, Signatures ...............................................................14
Section 2.05     Registration and Exchange of Bonds; Persons Treated as Owners.............14
Section 2.06     Lost, Stolen, Destroyed, and Mutilated Bonds .........................................15
Section 2.07     Delivery of Series 2019 Bonds ................................................................16
Section 2.08     Bond Trustee's Authentication Certificate.................................................16
Section 2.09     Issuance of Additional Bonds ..................................................................17
Section 2.10     Requirements for Authentication and Delivery of Additional Bonds..........17
Section 2.11     Cancellation and Destruction of Bonds By the Bond Trustee .....................17
Section 2.12     Book Entry Only System ..........................................................................17
Section 2.13     Successor Securities Depository; Transfers Outside Book Entry Only
                 System ......................................................................................................18
Section 2.14     Payments to Cede & Co ...........................................................................18
Section 2.15     Beneficial Owner Register .......................................................................18

ARTICLE III      REVENUES AND FUNDS .........................................................................19

Section 3.01     Additional Bonds ....................................................................................19
Section 3.02     Creation of the Bond Fund.......................................................................19
Section 3.03     Payments into the Bond Fund ..................................................................19
Section 3.04     Use of Moneys in the Principal Account and the Interest Account .............19
Section 3.05     Custody of the Bond Fund .......................................................................20
Section 3.06     [Construction Fund ..................................................................................20
Section 3.07     Completion Certificate.............................................................................20
Section 3.08     Creation of the Reserve Fund...................................................................20
Section 3.09     Payments into the Reserve Fund ...............................................................20
Section 3.10     Use of Moneys in the Reserve Fund .........................................................20
Section 3.11     Custody of the Reserve Fund ...................................................................21
Section 3.12     Nonpresentment of Bonds........................................................................21
Section 3.13     Bond Trustee's and Paying Agents' Fees, Charges, and Expenses .............21
Section 3.14     Moneys to be Held in Trust......................................................................22
Section 3.15     Repayment to the Obligor from the Funds.................................................22
Section 3.16     Rebate Fund ............................................................................................22
Section 3.17     [Reserved] ...............................................................................................24
Section 3.18     Cost of Issuance Fund ..............................................................................24

ARTICLE IV COVENANTS OF THE ISSUER ................................................................24

Section 4.01 Performance of Covenants: Authority .............................................24
Section 4.02 Payments of Principal, Premium, If Any, and Interest ....................25
Section 4.03 Supplemental Indentures: Recordation of Bond Indenture and
Supplemental Indentures..................................................................25
Section 4.04 Lien of Bond Indenture ...................................................................25
Section 4.05 Rights Under the Agreement............................................................25
Section 4.06 Tax Covenants.................................................................................25
Section 4.07 Change in Law ................................................................................26
Section 4.08 Program Investment ..........................................**Error! Bookmark not defined.**

ARTICLE V REDEMPTION OF BONDS ...................................................................26

Section 5.01 Optional Redemption of Series 2019 Bonds....................................26
Section 5.02 Sinking Fund Redemption ...............................................................27
Section 5.03 Method of Selection of Bonds in Case of Partial Redemption;
Redemption Priority.........................................................................28
Section 5.04 Notice of Redemption .....................................................................28
Section 5.05 Bonds Due and Payable on Redemption Date; Interest Ceases to Accrue .......29
Section 5.06 Cancellation.....................................................................................30
Section 5.07 Partial Redemption of Fully Registered Bonds................................30
Section 5.08 Special Redemption .........................................................................30

ARTICLE VI INVESTMENTS ....................................................................................30

Section 6.01 Investment of Bond Fund, Construction Fund and Reserve Fund Moneys......30
Section 6.02 Allocation and Transfers of Investment Income ..............................30
Section 6.03 Valuation of Permitted Investments.................................................31

ARTICLE VII DISCHARGE OF BOND INDENTURE................................................31

Section 7.01 Discharge of the Bond Indenture .....................................................31

ARTICLE VIII DEFAULTS AND REMEDIES...............................................................33

Section 8.01 Events of Default.............................................................................33
Section 8.02 Remedies on Events of Default........................................................33
Section 8.03 Majority of Bondholders May Control Proceedings.........................34
Section 8.04 Rights and Remedies of Bondholders ..............................................35
Section 8.05 Application of Moneys.....................................................................35
Section 8.06 Bond Trustee May Enforce Rights Without Bonds ..........................37
Section 8.07 Bond Trustee to File Proofs of Claim in Receivership, Etc..............37
Section 8.08 Delay or Omission No Waiver .........................................................37
Section 8.09 Discontinuance of Proceedings on Default, Position of Parties Restored ........37
Section 8.10 Enforcement of Rights .....................................................................37
Section 8.11 Undertaking for Costs ......................................................................38
Section 8.12 Waiver of Events of Default .............................................................38

ARTICLE IX CONCERNING THE BOND TRUSTEE AND PAYING AGENTS .............38

Section 9.01 Duties of the Bond Trustee ..............................................................38
Section 9.02 Fees and Expenses of Bond Trustee and Paying Agent....................41

Section 9.03    Resignation or Replacement of Bond Trustee .................................................42
Section 9.04    Conversion, Consolidation or Merger of Bond Trustee....................................43
Section 9.05    Designation and Succession of Paying Agent...................................................43
Section 9.06    [Reserved.] .......................................................................................................43
Section 9.07    [Reserved.] .......................................................................................................43

ARTICLE X      SUPPLEMENTAL INDENTURES AND AMENDMENTS TO THE
               AGREEMENT ...................................................................................................44

Section 10.01   Supplemental Indentures Not Requiring Consent of Bondholders...................44
Section 10.02   Supplemental Indentures Requiring Consent of Bondholders..........................44
Section 10.03   Execution of Supplemental Indenture...............................................................45
Section 10.04   Consent of Obligor ...........................................................................................45
Section 10.05   Amendments, Etc., of the Agreement Not Requiring Consent of
               Bondholders ......................................................................................................46
Section 10.06   Amendments, Etc., of the Agreement or Master Indenture Requiring
               Consent of Bondholders....................................................................................46

ARTICLE XI     MISCELLANEOUS ..........................................................................................47

Section 11.01   Evidence of Signature of Bondholders and Ownership of Bonds ...................47
Section 11.02   No Personal Liability ........................................................................................47
Section 11.03   Limited Obligation............................................................................................47
Section 11.04   Parties Interested Herein ..................................................................................48
Section 11.05   Titles, Headings, Etc ........................................................................................48
Section 11.06   Severability .......................................................................................................48
Section 11.07   Governing Law..................................................................................................48
Section 11.08   Execution of Counterparts.................................................................................48
Section 11.09   Notices...............................................................................................................48
Section 11.10   Payments Due on Holidays ...............................................................................49

INDENTURE OF TRUST

THIS INDENTURE OF TRUST dated as of [November 1], 2019, between TARRANT COUNTY CULTURAL EDUCATION FACILITIES FINANCE CORPORATION, a nonstock nonprofit cultural educational facilities finance corporation duly organized and existing under the laws of the State of Texas (the "Issuer"), and UMB BANK, NATIONAL ASSOCIATION, a national banking association with trust powers having an office in Minneapolis, Minnesota, as Bond Trustee, being authorized to accept and execute trusts of the character herein set out,

WITNESSETH:

WHEREAS, the Issuer was created pursuant to the Cultural Education Facilities Finance Corporation Act, Article 1528m, V.A.T.C.S., as amended (the "Act"); and

WHEREAS, the Issuer is authorized by the Act to sell and deliver its bonds for the purpose of financing or refinancing the cost of a health facility, as defined in Chapter 221, Texas Health and Safety Code, as amended (the "Health Facility Act"); and

WHEREAS, the Issuer is further authorized by the Act to make a loan of the proceeds of its bonds in the amount of all or part of the cost of the health facility or health facilities for which such bonds have been authorized and, at the option of the Issuer, for the deposit to a reserve fund or reserve funds for the bonds; and

WHEREAS, the execution and delivery of this Indenture of Trust (hereinafter sometimes referred to as the "Bond Indenture"), and the issuance of the bonds hereinafter authorized under this Bond Indenture, pursuant to the provisions of the Act, have been in all respects duly and validly authorized by a resolution duly adopted and approved by the Board of Directors of the Issuer; and

WHEREAS, the Issuer is authorized by law and deems necessary, in accordance with its powers described above, and has duly authorized and directed that its bonds, to be known as "Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2019", be issued (all bonds from time to time outstanding under the terms of this Bond Indenture being hereinafter referred to as the "Series 2019 Bonds" or the "Bonds"); and

WHEREAS, the proceeds of the Series 2019 Bonds shall be loaned to Tarrant County Senior Living Center Inc. (the "Obligor") pursuant to a Loan Agreement dated as of [November 1], 2019 (the "Agreement") between the Issuer and the Obligor; and

WHEREAS, to secure the payment of the principal of the Series 2019 Bonds, premium, if any, and the interest thereon and the performance and observance of the covenants and conditions herein contained the Issuer has authorized the execution and delivery of this Bond Indenture; and

WHEREAS, the Issuer has previously authorized and issued its Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2009A in the original principal amount of $100,275,000 (the "Series 2009A Bonds") and its Tarrant County Cultural Education Facilities Finance Corporation

Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2009B, Accelerated Redemption Reset Option Securities (ARROS) in the original principal amount of $10,000,000 (the "Series 2009B Bonds" and together with the Series 2009A Bonds, the "Series 2009 Bonds"), which Series 2009 Bonds are outstanding in the principal amount of $[105,795,000]; and

WHEREAS, the Issuer has previously authorized and issued its Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2009C-1, Tax-Exempt Mandatory Paydown Securities in the original principal amount of $31,300,000 (the "Series 2009C-1 Bonds") and its Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2009C-2, Tax-Exempt Mandatory Paydown Securities in the original principal amount of $25,000,000 (the "Series 2009C-2 Bonds"), which Series 2009C-1 Bonds and Series 2009C-2 Bonds have been paid in accordance with their terms and are no longer outstanding; and

WHEREAS, the Obligor is in default of certain covenants relating to the Series 2009 Bonds, and the Obligor and a majority in principal amount of the Series 2009 Bonds have reached an agreement to restructure the Series 2009 bonds through the issuance and exchange of the Series 2019 Bonds for the outstanding Series 2009 Bonds (the "Exchange"); and

WHEREAS, the Obligator voluntarily filed for reorganization under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") and _____, 2019, and submitted to the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") a plan of reorganization (the "Plan"), which Plan provides for, among other matters, the Exchange of the Series 2019 Bonds for the outstanding Series 2009 Bonds; and

WHEREAS, on _____, 2019, the Bankruptcy Court issued its order (the "Bankruptcy Court Order") approving the Plan effective as of November ___, 2019, including approval of the Exchange of the Series 2019 Bonds for a like principal amount of the outstanding Series 2009 Bonds; and

WHEREAS, the Obligor has requested that the Issuer authorize and approve the issuance of the Series 2019 Bonds on the Exchange Date; and

WHEREAS, the Issuer has determined to issue the Series 2019 Bonds in the Aggregate Principal Amount of $[105,795,000] for the purpose of refinancing the outstanding Series 2009 Bonds and accrued and unpaid interest thereon, through the Exchange, which Series 2009 Bonds financed the cost of certain health facilities located in the City of Fort Worth, Tarrant County, Texas, funded a debt service reserve fund and paid a portion of the cost of issuance of the Series 2009 Bonds; and

WHEREAS, the Series 2019 Bonds, the Bond Trustee's Authentication Certificate, the Comptroller's Registration Certificate and the Assignment are to be substantially in the following forms, with such necessary or appropriate variations, omissions, and insertions as permitted or required by this Bond Indenture:

(FORM OF SERIES 2019 BOND)
(Face of Bond)

## TARRANT COUNTY CULTURAL EDUCATION FACILITIES FINANCE CORPORATION RETIREMENT FACILITY REVENUE BONDS (THE STAYTON AT MUSEUM WAY PROJECT) SERIES 2019

No. R-_____ $[105,795,000]

| Interest Rate | Maturity Date | Delivery Date | Dated | CUSIP |
|---|---|---|---|---|
| 5.75% | [November 1], 2054] | [November  ], 2019 | [November 1], 2019 | |

REGISTERED OWNER:    CEDE & CO.
PRINCIPAL AMOUNT:  [ONE HUNDRED FIVE MILLION SEVEN HUNDRED NINETY-FIVE THOUSAND] DOLLARS

TARRANT COUNTY CULTURAL EDUCATION FACILITIES FINANCE CORPORATION, a nonstock nonprofit cultural educational facilities finance corporation duly organized and existing under the laws of the State of Texas (the "Issuer"), created and acting on behalf of Tarrant County, Texas, for value received, promises to pay, from the sources described herein, to the registered owner specified above, or registered assigns, the principal amount specified above, on the maturity date specified above (unless this Bond shall have been called for prior redemption) and to pay, from such sources, interest on said sum on [May 1] and [November 1] of each year, commencing [May 1], 2020, at the interest rate specified above, until payment of the principal hereof has been made or provided for.  This Bond will bear interest from the most recent interest payment date to which interest has been paid or provided for, or, if no interest has been paid, from [November 1], 2019.

NEITHER THE STATE OF TEXAS NOR ANY POLITICAL SUBDIVISION OR AGENCY OF THE STATE OF TEXAS, INCLUDING TARRANT COUNTY, TEXAS, SHALL BE LIABLE OR OBLIGATED (GENERALLY, SPECIALLY, MORALLY OR OTHERWISE) TO PAY THE PRINCIPAL OF THIS BOND OR THE PREMIUM, IF ANY, OR INTEREST HEREON, AND NEITHER THE FAITH AND CREDIT NOR THE TAXING POWER OF THE STATE OF TEXAS, TARRANT COUNTY, TEXAS, OR ANY OTHER POLITICAL SUBDIVISION OR AGENCY THEREOF IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST ON THE BONDS. THE ISSUER HAS NO TAXING POWER.

This Bond and the series of Bonds of which it is a part have been issued under and pursuant to the provisions of the Cultural Education Facilities Finance Act, Article 1528m, V.A.T.C.S., as amended (the "Act").  This Bond is a limited obligation of the Issuer payable solely from the revenues, receipts and resources of the Issuer pledged to its payment and not from any other

revenues, funds or assets of the Issuer. No owner of any Bonds has the right to compel Tarrant County, Texas to pay the principal of, interest or redemption premium, if any, on the Bonds.

The principal of and premium, if any, on this Bond are payable upon the presentation and surrender hereof at the [Minneapolis, Minnesota] trust office of UMB Bank, National Association, as trustee, or at the designated corporate trust office of its successor in trust (the "Bond Trustee") under an Indenture of Trust dated as of [November 1], 2019 (the "Bond Indenture") by and between the Issuer and the Bond Trustee. Interest on this Bond will be paid on each interest payment date (or, if such interest payment date is not a business day, on the next succeeding business day), by check or draft mailed to the person in whose name this Bond is registered (the "registered owner") in the registration records of the Issuer maintained by the Bond Trustee at the address appearing thereon at the close of business on the last day of the calendar month next preceding such interest payment date (the "Regular Record Date") or by wire transfer of same day funds upon receipt by the Bond Trustee prior to the Regular Record Date of a written request by a registered owner of $1,000,000 or more in aggregate principal amount of Bonds. The CUSIP number and appropriate dollar amounts for each CUSIP number shall accompany all payments of principal of, redemption premium, if any, and interest on the Bonds. Any such interest not so timely paid or duly provided for shall cease to be payable to the person who is the registered owner hereof at the close of business on the Regular Record Date and shall be payable to the person who is the registered owner hereof at the close of business on a Special Record Date (as defined in the hereinafter defined Agreement), for the payment of any defaulted interest. Such Special Record Date shall be fixed by the Bond Trustee whenever moneys become available for payment of the defaulted interest, and notice of the Special Record Date shall be given to the registered owners of such Bonds not less than ten days prior to such Special Record Date. Alternative means of payment of interest may be used if mutually agreed upon between the owner of this Bond and the Bond Trustee, as provided in the Bond Indenture. All such payments shall be made in lawful money of the United States of America without deduction for the services of the Bond Trustee.

This Bond shall be issued pursuant to a book entry system administered by The Depository Trust Company (together with any successor thereto, "Securities Depository"). The book entry system will evidence beneficial ownership of the Bonds with transfers of ownership effected on the register held by the Securities Depository pursuant to rules and procedures established by the Securities Depository. So long as the book entry system is in effect, transfer of principal, interest and premium payments, and provisions of notices or other communications, to beneficial owners of the Bonds will be the responsibility of the Securities Depository as set forth in the Bond Indenture.

This Bond is one of a duly authorized issue of bonds of the Issuer known as "Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Series 2019" (the "Series 2019 Bonds") and issued in an Aggregate Principal Amount (as defined in the hereinafter defined Agreement) of $[105,795,000] for the purpose of refinancing the outstanding principal amount of the Issuer's Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Series 2009A and Series 2009B, the proceeds of which were used to finance and refinance the cost of certain health facilities owned and operated by Tarrant County Senior Living Center Inc., a Texas nonprofit corporation (the "Obligor"), located in the

4

City of Fort Worth, Tarrant County, Texas (the "Project"), to fund a debt service reserve fund for the Series 2009 Bonds and to pay a portion of the cost of issuance of the Series 2009 Bonds.

The refinancing of the Series 2009 Bonds is being effected through the exchange of the outstanding Series 2009 Bonds for the Series 2019 Bonds (the "Exchange") and the replacement of the loan agreement between the Issuer and the Obligor for the loan of the proceeds of the Series 2009 Bonds with a loan agreement between the Issuer and the Obligor for the repayment by the Obligor of a replacement loan by the Issuer in an amount equal to the principal amount of the Series 2019 Bonds, together with interest thereon. To provide for its loan repayment obligations, the Obligor has issued its Series 2019 Note (the "Series 2019 Note") under a Loan Agreement dated as of [November 1], 2019, between the Issuer and the Obligor (the "Agreement"). The Series 2019 Note is issued pursuant to an Amended and Restated Master Trust Indenture, Deed of Trust and Security Agreement dated as of [November 1], 2019, as supplemented (the "Master Indenture"), between the Obligor and UMB Bank, National Association, successor master trustee (in such capacity, the "Master Trustee") to The Bank of New York Mellon Trust Company, National Association, as original master trustee. Pursuant to the Master Indenture, the Obligor has pledged and granted a security interest in the Gross Revenues and the Mortgaged Property (as defined in the Master Indenture) to the Master Trustee to secure the Series 2019 Note.

Additional obligations on a parity with the Series 2019 Note may be issued pursuant to the Master Indenture subject to the conditions and terms contained therein, and the payments on such additional obligations will also be secured by a pledge of the Gross Revenues and Mortgaged Property.

This Bond and the claims for interest hereon are payable only out of the revenues derived by the Issuer pursuant to the Agreement. The Series 2019 Bonds are issued under and are equally and ratably secured and are entitled to the protection given by the Bond Indenture.

No recourse under or upon any obligation, covenant, or agreement contained in the Bond Indenture, or in any Bond, or under any judgment obtained against the Issuer or by the enforcement of any assessment or by any legal or equitable proceeding by virtue of any constitution or statute or otherwise or under any circumstances, under or independent of the Bond Indenture, shall be had against any director, incorporator, officer, agent, employee, or representative as such, past, present or future, of the Issuer, either directly or through the Issuer or otherwise, for the payment for or to the Issuer or for or to the registered owner of any Bond issued thereunder or otherwise, of any sum that may be due and unpaid by the Issuer upon any such Bond.

Neither the directors, incorporators, officers, agents, employees or representatives of the Issuer past, present or future, nor any person executing this Bond or the Bond Indenture, shall be personally liable hereon or thereon or be subject to any personal liability by reason of the issuance hereof and thereof, whether by virtue of any constitution, statute or rule of law or by the enforcement of any assessment or penalty, or otherwise, all such liability being expressly released and waived as a condition of and in consideration for the execution of the Bond Indenture and the issuance of this Bond.

Reference is hereby made to the Bond Indenture and all indentures supplemental thereto and the Master Indenture for a description of the revenues pledged, the nature and extent of the

security, the rights, duties, and obligations of the Issuer, the Bond Trustee and the owners of the Series 2019 Bonds, and the terms and conditions upon which the Bonds are secured.

The Series 2019 Bonds are subject to optional redemption prior to maturity by the Issuer at the direction of the Obligor in whole or in part on any date prior to [_____ __], 202[2] at a redemption price equal to 107% of the principal amount of Series 2019 Bonds to be redeemed, together with accrued interest to the redemption date, and thereafter at a redemption price that shall decline by 1% of the principal amount of Series 2019 Bonds to be redeemed on each [_____], beginning on [_____], 202[2] until [_____], 202[8], on and after which the redemption price shall be equal to 100% of the principal amount of Series 2019 Bonds to be redeemed, together with accrued interest to the redemption date.

The Series 2019 Bonds are subject to mandatory sinking fund redemption at a redemption price equal to the principal amount thereof plus accrued interest to the redemption date. As and for a sinking fund for the redemption of Series 2019 Bonds, the Issuer shall cause to be deposited into the Principal Account of the Bond Fund a sum which is sufficient to redeem on [_____] of each of the following years (after credit as provided below) the following principal amounts of Series 2019 Bonds, plus accrued interest to the redemption date:

| Year | Amount | Year | Amount |
|------|--------|------|--------|

[insert sinking fund schedule] –

*maturity

Unless an Event of Default shall have occurred and be continuing, at the option of the Obligor to be exercised by delivery of a written certificate to the Bond Trustee on or before the forty fifth day next preceding any sinking fund redemption date, it may (i) deliver to the Bond Trustee for cancellation Series 2019 Bonds or portions thereof of the same maturity, in an Aggregate Principal Amount desired by the Obligor or (ii) specify a principal amount of Series 2019 Bonds or portions thereof, which prior to said date have been redeemed (otherwise than through the operation of the sinking fund) and canceled by the Bond Trustee at the request of the Obligor and not theretofore applied as a credit against any sinking fund redemption obligation.

The Series 2019 Bonds shall be subject to special redemption by the Issuer at the direction of the Obligor prior to their scheduled maturities, in whole or in part at a redemption price equal to the principal amount thereof plus accrued interest from the most recent interest payment date to the redemption date on any date in case of damage or destruction to, or condemnation of, any property, plant, and equipment of any Obligated Group Member, to the extent that the net proceeds of insurance or condemnation award exceed the Threshold Amount (as defined in the Master Indenture) and the Obligor has determined not to use, or is unable to use, such net proceeds or award to repair, rebuild or replace such property, plant, and equipment.

If less than all Series 2019 Bonds are to be optionally redeemed, the selection of particular Series 2019 Bonds to be redeemed shall be made by the Securities Depository or by lot by the Bond Trustee. Notice of the call for any redemption shall be given by the Bond Trustee by sending a copy of the redemption notice by mail not more than 60 nor less than 30 days prior to the

redemption date to the registered owner of each Series 2019 Bond to be redeemed as shown on the registration records kept by the Bond Trustee, as provided in the Bond Indenture. Series 2019 Bonds or portions thereof called for redemption will cease to bear interest after the specified redemption date, provided funds for their payment are on deposit at the place of payment at that time.

The Series 2019 Bonds are issuable as fully registered Bonds in denominations of $5,000 and any integral multiple thereof and are exchangeable for an equal Aggregate Principal Amount of fully registered Series 2019 Bonds of the same maturity of other authorized denominations at the aforesaid office of the Bond Trustee but only in the manner and subject to the limitations and on payment of the charges provided in the Bond Indenture.

This Bond is fully transferable by the registered owner hereof in person or by his or her duly authorized attorney on the registration books kept at the principal office of the Bond Trustee upon surrender of this Bond together with a duly executed written instrument of transfer satisfactory to the Bond Trustee. Upon such transfer a new fully registered Series 2019 Bond of authorized denomination or denominations for the same Aggregate Principal Amount and maturity will be issued to the transferee in exchange therefor, all upon payment of the charges and subject to the terms and conditions set forth in the Bond Indenture.

The Bond Trustee will not be required to transfer or exchange any Series 2019 Bond after the mailing of notice calling such Series 2019 Bond or any portion thereof for redemption has been given as herein provided, nor during the period beginning at the opening of business 15 days before the day of mailing by the Bond Trustee of a notice of prior redemption and ending at the close of business on the day of such mailing.

The Issuer and the Bond Trustee may deem and treat the person in whose name this Bond is registered as the absolute owner hereof for the purpose of making payment (except to the extent otherwise provided hereinabove and in the Bond Indenture with respect to Regular and Special Record Dates for the payment of interest) and for all other purposes, and neither the Issuer nor the Bond Trustee shall be affected by any notice to the contrary. The principal of, premium, if any, and interest on this Bond shall be paid free from and without regard to any equities between the Obligor and the original or any intermediate owner hereof, or any setoffs or counterclaims.

The owner of this Bond shall have no right to enforce the provisions of the Bond Indenture or to institute action to enforce the covenants therein, or to take any action with respect to any event of default under the Bond Indenture, or to institute, appear in or defend any suit or other proceedings with respect thereto, except as provided in the Bond Indenture. In case an event of default under the Bond Indenture shall occur, the principal of all of the Bonds at any such time Outstanding under the Bond Indenture may be declared or may become due and payable, upon the conditions and in the manner and with the effect provided in the Bond Indenture. The Bond Indenture provides that such declaration may in certain events be waived by the Bond Trustee or the owners of a requisite principal amount of the Bonds Outstanding under the Bond Indenture.

To the extent permitted by, and as provided in, the Bond Indenture, modifications or amendments of the Bond Indenture, or of any indenture supplemental thereto, and of the rights and obligations of the Issuer and of the owners of the Bonds may be made with the consent of the

Issuer and the Bond Trustee and, in certain instances, of not less than a majority in Aggregate Principal Amount of the Bonds then Outstanding; and, in certain other instances, of not less than all of the Bonds affected thereby. Any such consent by the owner of this Bond shall be conclusive and binding upon such owner and upon all future owners of this Bond and of any Bond issued upon the transfer or exchange of this Bond whether or not notation of such consent is made upon this Bond.

IT IS HEREBY CERTIFIED, RECITED AND DECLARED that all acts, conditions and things required to exist, happen and be performed precedent to and in the execution and delivery of the Bond Indenture and issuance of this Bond do exist, have happened and have been performed in due time, form and manner as required by law.

THIS BOND shall not be entitled to any benefit under the Bond Indenture, or any indenture supplemental thereto, or become valid or obligatory for any purpose until (i) the Bond Trustee shall have manually signed the certificate of authentication hereon or (ii) a manually signed Comptroller's Registration Certificate is attached hereto.

IN WITNESS WHEREOF, Tarrant County Cultural Education Facilities Finance Corporation has caused this Bond to be executed with the manual or facsimile signatures of its President and Secretary, and a facsimile of its corporate seal to be hereto affixed or printed, all as of the date set forth above.

<div style="margin-left:40%">

TARRANT COUNTY CULTURAL EDUCATION FACILITIES FINANCE CORPORATION

By: _____
                    President

</div>

(SEAL)

Attest:

_____
Secretary

<div style="text-align:center">(FORM OF TRUSTEE'S CERTIFICATE OF AUTHENTICATION)</div>

This is one of the Series 2019 Bonds referred to in the within mentioned Bond Indenture.

Date of Authentication:

<div style="margin-left:40%">

UMB BANK, NATIONAL ASSOCIATION, as Bond Trustee

By: _____
Authorized Signatory

</div>

<div style="text-align:center">(END OF FORM OF TRUSTEE'S CERTIFICATE OF AUTHENTICATION)</div>

(FORM OF COMPTROLLER'S REGISTRATION CERTIFICATE)
(To be attached to initial Bonds only)

COMPTROLLER'S REGISTRATION CERTIFICATE: REGISTER NO.

I hereby certify that this Bond has been examined, certified as to validity, and approved by the Attorney General of the State of Texas, and that this Bond has been registered by the Comptroller of Public Accounts of the State of Texas.

Witness my signature and seal this _____

Comptroller of Public Accounts
of the State of Texas

[SEAL]

(END OF FORM OF COMPTROLLER'S REGISTRATION CERTIFICATE)

9

[FORM OF ASSIGNMENT]

ASSIGNMENT

For value received, the undersigned hereby sells, assigns and transfers unto _____ the within Bond, and does hereby irrevocably constitute and appoint _____ attorney to transfer such Bond on the books kept for registration and transfer of the within Bond, with full power of substitution in the premises.

Date: _____

NOTICE: The signature to this Assignment must correspond with the name as it appears upon the face of the within Bond in every particular, without enlargement or alteration or any change whatsoever.

Signature Guaranteed By:

_____
Authorized Signatory

NOTE: the signature to this Assignment must be guaranteed by a financial institution that is a member of the Securities Transfer Agents Medallion Program ("STAMP"), the Stock Exchange Medallion Program ("SEMP") or the New York Stock Exchange, Inc. Medallion Signature Program ("MSP").

\* \* \* [END OF SERIES 2009 BOND FORM] \* \* \*

WHEREAS, all things necessary to make the Series 2019 Bonds, when authenticated by the Bond Trustee and issued as in this Bond Indenture provided, the valid, binding, and legal obligations of the Issuer and to constitute this Bond Indenture a valid, binding, and legal instrument for the security of the Bonds in accordance with its terms, have been done and performed

NOW, THEREFORE, THIS INDENTURE OF TRUST WITNESSETH:

That the Issuer, in consideration of the premises and of the mutual covenants herein contained and of the purchase and acceptance of the Series 2019 Bonds by the owners thereof and of the sum of One Dollar to it duly paid by the Bond Trustee at or before the execution and delivery of these presents, and for other good and valuable consideration, the receipt of which is hereby acknowledged, in order to secure the payment of the principal of, premium, if any, and interest on all Bonds at any time Outstanding under this Bond Indenture, according to their tenor and effect, and to secure the performance and observance of all the covenants and conditions in the Bonds and herein contained, and to declare the terms and conditions upon and subject to which the Bonds are issued and secured, has executed and delivered this Bond Indenture and has granted, bargained, sold, warranted, alienated, remised, released, conveyed, assigned, pledged, set over, and confirmed, and by these presents does grant, bargain, sell, warrant, alien, remise, release, convey, assign, pledge, set over, and confirm unto UMB Bank, National Association, as trustee, and to its

successors and assigns forever, all and singular the following described property, franchises, and income:

A. All of the Issuer's right, title and interest in and to any Note delivered by the Obligor to the Issuer pursuant to the Agreement; and

B. All of the Issuer's right, title and interest in and to the Agreement (except for the rights of the Issuer to receive payments, if any, under Sections 5.7, 7.5, and 9.5 of the Agreement), together with all powers, privileges, options and other benefits of the Issuer contained in the Agreement; provided, however, that nothing in this clause shall impair, diminish or otherwise affect the Issuer's obligations under the Agreement or, except as otherwise provided in this Bond Indenture, impose any such obligations on the Bond Trustee; and

C. Amounts on deposit from time to time in the Bond Fund and Reserve Fund, but excluding the Rebate Fund (all as defined in the Agreement), subject to the provisions of this Bond Indenture permitting the application thereof for the purposes and on the terms and conditions set forth herein; and

D. Any and all property of every kind or description which may from time to time hereafter be sold, transferred, conveyed, assigned, hypothecated, endorsed, deposited, pledged, mortgaged, granted or delivered to, or deposited with the Bond Trustee as additional security by the Issuer or anyone on its part or with its written consent, or which pursuant to any of the provisions hereof or of the Agreement or any Note may come into the possession of or control of the Bond Trustee or a receiver appointed pursuant to Article VIII hereof, as such additional security; and the Bond Trustee is hereby authorized to receive any and all such property as and for additional security for the payment of the Bonds, and to hold and apply all such property subject to the terms hereof.

TO HAVE AND TO HOLD the same with all privileges and appurtenances hereby conveyed and assigned, or agreed or intended to be, to the Bond Trustee and its successors in said trust and assigns forever;

IN TRUST, NEVERTHELESS, upon the terms herein set forth for the equal and proportionate benefit, security, and protection of all owners of the Bonds issued under and secured by this Bond Indenture without privilege, priority, or distinction as to the lien or otherwise of any of the Bonds over any other of the Bonds;

PROVIDED, HOWEVER, that if the Issuer, its successors or assigns, shall pay, or cause to be paid, the principal of the Bonds and the premium, if any, and the interest due or to become due thereon, at the times and in the manner mentioned in the Bonds according to the true intent and meaning thereof, and shall cause the payments to be made into the Bond Fund as hereinafter required or shall provide, as permitted hereby, for the payment thereof by depositing with the Bond Trustee the entire amount due or to become due hereon, or certain securities as herein permitted and shall keep, perform, and observe all the covenants and conditions pursuant to the terms of this Bond Indenture to be kept, performed, and observed by it, and shall pay or cause to be paid to the Bond Trustee all sums of money due or to become due to it in accordance with the terms and provisions hereof, then upon such final payments this Bond Indenture and the rights hereby granted

shall cease, determine, and be void; otherwise this Bond Indenture to be and remain in full force and effect.

THIS BOND INDENTURE FURTHER WITNESSETH and it is expressly declared that all Bonds issued and secured hereunder are to be issued, authenticated, and delivered and all said rights hereby pledged and assigned are to be dealt with and disposed of under, upon, and subject to the terms, conditions, stipulations, covenants, agreements, trusts, uses, and purposes as hereinafter expressed, and the Issuer has agreed and covenanted, and does hereby agree and covenant, with the Bond Trustee and with the respective owners from time to time of the Bonds as follows:

[END OF PREAMBLE]

## ARTICLE I

### ARTICLE I DEFINITIONS

Section 1.01 <u>Definitions</u>. All defined words and phrases used in this Bond Indenture shall have the meaning given and ascribed to such words and phrases in Article I of the Agreement.

Section 1.02 <u>Recital Incorporation</u>. The recitals set forth in the beginning of this Indenture are hereby incorporated herein.

## ARTICLE II

### AUTHORIZATION, TERMS, EXECUTION AND ISSUANCE OF BONDS

Section 2.01 <u>Authorized Amount of Series 2019 Bonds</u>. No Series 2019 Bonds may be issued under this Bond Indenture except in accordance with this Article. The total original principal amount of Series 2019 Bonds that may be issued hereunder is hereby expressly limited to $[105,795,000], except as provided in Section 2.06 hereof.

Section 2.02 <u>All Bonds Equally and Ratably Secured; Bonds Not an Obligation of Issuer</u>. All Series 2019 Bonds issued under this Bond Indenture and at any time Outstanding shall in all respects be equally and ratably secured hereby, without preference, priority, or distinction, so that all Series 2019 Bonds at any time issued and Outstanding hereunder shall have the same right, lien, and preference under and by virtue of this Bond Indenture, and shall all be equally and ratably secured hereby. The Series 2019 Bonds shall be payable solely out of the revenues and other security pledged hereby and shall not constitute an indebtedness of the Issuer within the meaning of any state constitutional provision or statutory limitation and shall never constitute nor give rise to a pecuniary liability of the Issuer.

Section 2.03 <u>Authorization of Series 2019 Bonds</u>.

(a) There is hereby authorized to be issued hereunder and secured hereby an issue of bonds designated as the "Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Series 2019." The Series 2019 Bonds shall be numbered consecutively upward from R-1.

(b) The Series 2019 Bonds shall bear interest from the most recent interest payment date to which interest has been paid or provided for, or, if no interest has been paid, from [November 1], 20[19]. The Series 2019 Bonds shall bear interest on the basis of a 360 day year composed of twelve 30 day months payable each [May 1] and each [November 1] beginning [May 1], 2020, at the rate per annum of 5.75% and shall mature on [November 1], [2054.]

(c) The Series 2019 Bonds shall be issued in Authorized Denominations and shall be dated as of [November1, 2019]. The Series 2019 Bonds are subject to prior redemption as herein set forth and shall be substantially in the form and tenor hereinabove recited with appropriate variations, omissions, and insertions as are permitted or required by this Bond Indenture.

13

(d)     The principal of and premium, if any, on the Series 2019 Bonds shall be payable in lawful money of the United States of America at the Payment Office of the Bond Trustee, or at the designated corporate trust office of its successor, upon presentation and surrender of the Series 2019 Bonds. Payment of interest on any Series 2019 Bond shall be made to the person who is the registered owner thereof at the close of business on the Regular Record Date for such Interest Payment Date by check mailed by the Bond Trustee on such Interest Payment Date to such registered owner at his or her address as it appears on the registration records kept by the Bond Trustee or by wire transfer of same day funds upon receipt by the Bond Trustee prior to the Regular Record Date of a written request by a registered owner of $1,000,000 or more in aggregate principal amount of Bonds. The CUSIP number and appropriate dollar amounts for each CUSIP number shall accompany all payments of principal, premium, if any, and interest on the Series 2019 Bonds.

Any such interest not so timely paid or duly provided for shall cease to be payable to the person who is the registered owner of such Series 2019 Bond at the close of business on the Regular Record Date and shall be payable to the person who is the registered owner thereof at the close of business on a Special Record Date for the payment of any such defaulted interest. Such Special Record Date shall be fixed by the Bond Trustee whenever moneys become available for payment of the defaulted interest, and notice of the Special Record Date shall be given to the registered owners of the Series 2019 Bonds not less than ten days prior thereto by first class postage prepaid mail to each such registered owner as shown on the registration records, stating the date of the Special Record Date and the date fixed for the payment of such defaulted interest. Alternative means of payment of interest may be used if mutually agreed upon between the owners of any Series 2019 Bonds and the Bond Trustee. All such payments shall be made in lawful money of the United States of America.

Notwithstanding the foregoing, payments of the principal of and interest on any Bonds that are subject to the book entry system as provided in Article II of this Bond Indenture shall be made in accordance with the rules, regulations and procedures established by the securities depository in connection with the book entry system.

Section 2.04    Execution of Bonds, Signatures.  The Bonds shall be executed on behalf of the Issuer by its President and its corporate seal shall be thereunto affixed and attested by the Secretary. The signatures of such officers and the seal of the Issuer may be in facsimile. In case any officer who shall have signed any of the Bonds shall cease to hold such office and any of such Bonds shall have been authenticated by the Bond Trustee or delivered or sold, such Bonds with the signatures thereto affixed may, nevertheless, be authenticated by the Bond Trustee, and delivered, and may be sold by the Issuer, as though the person or persons who signed such Bonds had remained in office.

Section 2.05    Registration and Exchange of Bonds; Persons Treated as Owners.  The Issuer shall cause books for the registration and for the transfer of the Bonds as provided in this Bond Indenture to be kept by the Bond Trustee which is hereby appointed the bond registrar of the Issuer for the Series 2019 Bonds. Upon surrender for transfer of any fully registered Bond at the Payment Office of the Bond Trustee, duly endorsed for transfer or accomplished by an assignment duly executed by the registered owner or his attorney duly authorized in writing, the Issuer shall execute and the Bond Trustee shall authenticate and deliver in the name of the transferee or

transferees a new fully registered Bond or Bonds of a like Aggregate Principal Amount for a like principal amount and maturity.

The Issuer shall execute and the Bond Trustee shall authenticate and deliver Bonds which the Bondholder making the exchange is entitled to receive, bearing numbers not contemporaneously Outstanding. The execution by the Issuer of any fully registered Bond of any denomination shall constitute full and due authorization of such denomination and the Bond Trustee shall thereby be authorized to authenticate and deliver such Bond.

The Bond Trustee shall not be required to transfer or exchange any Bond after the mailing of notice calling such Bond or any portion thereof for redemption has been given as herein provided, nor during the period beginning at the opening of business fifteen days before the day of mailing by the Bond Trustee of a notice of prior redemption and ending at the close of business on the day of such mailing except for Bondholders of $1,000,000 or more in aggregate principal amount of the Series 2019 Bonds.

As to any Bond, the Person in whose name the same shall be registered shall be deemed and regarded as the absolute owner thereof for all purposes, and payment of principal of or interest on any Bond shall be made only to or upon the written order of the registered owner thereof or his legal representative, but such registration may be changed as hereinabove provided. All such payments shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums paid.

The Bond Trustee shall require the payment by any Bondholder requesting exchange or transfer of any tax or other governmental charge required to be paid with respect to such exchange or transfer.

Section 2.06  Lost, Stolen, Destroyed, and Mutilated Bonds. Upon receipt by the Bond Trustee of evidence satisfactory to it of the ownership of and the loss, theft, destruction, or mutilation of any Bond and, in the case of a lost, stolen, or destroyed Bond, of indemnity satisfactory to it, and upon surrender and cancellation of the Bond if mutilated, (i) the Issuer shall execute, and the Bond Trustee shall authenticate and deliver, a new Bond of the same series, date and maturity as the lost, stolen, destroyed or mutilated Bond in lieu of such lost, stolen, destroyed, or mutilated Bond or (ii) if such lost, stolen, destroyed, or mutilated Bond shall have matured or have been called for redemption, in lieu of executing and delivering a new Bond as aforesaid, the Issuer may pay such Bond. Any such new Bond shall bear a number not contemporaneously Outstanding. The applicant for any such new Bond may be required to pay all expenses and charges of the Issuer and of the Bond Trustee in connection with the issue of such new Bond. All Bonds shall be held and owned upon the express condition that, to the extent permitted by law, the foregoing conditions are exclusive with respect to the replacement and payment of mutilated, destroyed, lost, or stolen Bonds, negotiable instruments, or other securities. If, after the delivery of such new Bond, a bona fide purchaser of the original Bond in lieu of which such duplicate Bond was issued presents for payment such original Bond, the Obligor or the Bond Trustee shall be entitled to recover upon such new Bond from the person to whom it was delivered or any person taking therefrom, except a bona fide purchaser, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Obligor or the Bond Trustee in connection therewith.

Section 2.07   Delivery of Series 2019 Bonds.   Upon the execution and delivery of this Bond Indenture, the Issuer shall execute and deliver to the Bond Trustee and the Bond Trustee shall authenticate the Series 2019 Bonds and deliver them to the Securities Depository for crediting to the participant accounts of the beneficial owners of the Series 2009 Bonds in accordance with the provisions of the Plan as hereinafter in this Section provided.

Prior to the delivery by the Bond Trustee of any of the Series 2019 Bonds there shall be filed with and delivered to the Bond Trustee at least:

(a)   A Certified Resolution authorizing the execution and delivery of the Agreement and this Bond Indenture and the issuance of the Series 2019 Bonds.

(b)   Original executed counterparts of the Agreement, this Bond Indenture, the Supplemental Indenture and the Master Indenture.

(c)   The Series 2019 Note, duly executed and authenticated and duly assigned and payable to the Bond Trustee.

(d)   A request and authorization to the Bond Trustee on behalf of the Issuer and signed by its President to authenticate and deliver the Series 2019 Bonds to the Securities Depository for crediting to the participant accounts of the beneficial owners of the Series 2009 Bonds in accordance with the provisions of the Plan.

(e)   An Opinion of Bond Counsel to the effect that the Series 2019 Bonds have been duly and validly authorized, issued and delivered and constitute valid and binding obligations of the Issuer, enforceable against the Issuer in accordance with their terms, that the interest payable on the Series 2019 Bonds is excludable from gross income for federal income tax purposes and that each of the instruments to which the Issuer is a party has been duly and validly authorized, executed and delivered by the Issuer and constitutes the legal, valid and binding obligation of the Issuer, enforceable against the Issuer in accordance with its terms, subject to customary qualifications on enforceability.

(f)   The favorable opinion or opinions of the Attorney General of Texas with respect to the validity of the Series 2019 Bonds.

(g)   The deposit into the Reserve Fund of the amounts required by Section 4.23 of the Master Indenture from unrestricted cash of the Obligor and by Section 4.24 of the Master Indenture from monies held by the Bond Trustee in the reserve fund established under the bond indenture for the Series 2009 Bonds.

(h)   A copy of the Bankruptcy Court Order, in form and substance acceptable to counsel to the Issuer, approving the Plan and the Exchange of the Series 2019 Bonds for the outstanding Series 2009 Bonds.

Section 2.08   Bond Trustee's Authentication Certificate.   The Bond Trustee's authentication certificate upon the Bonds shall be substantially in the form and tenor hereinbefore provided.   No Bond shall be secured hereby or entitled to the benefit hereof, or shall be valid or obligatory for any purpose, unless (i) the certificate of authentication, substantially in such form,

has been duly executed by the Bond Trustee or (ii) a manually signed Comptroller's Registration Certificate has been attached thereto; and such certificate of the Bond Trustee upon any Bond shall be conclusive evidence and the only competent evidence that such Bond has been authenticated and delivered hereunder. The Bond Trustee's certificate of authentication shall be deemed to have been duly executed by it if manually signed by an authorized signatory of the Bond Trustee, but it shall not be necessary that the same person sign the certificate of authentication on all of the Bonds issued hereunder.

Section 2.09    [Reserved]

Section 2.10    [Reserved]

Section 2.11    Cancellation and Destruction of Bonds By the Bond Trustee. Whenever any Outstanding Bonds shall be delivered to the Bond Trustee for the cancellation thereof pursuant to this Bond Indenture, upon payment of the principal amount or interest represented thereby or for replacement pursuant to Section 2.06 hereof, such Bonds shall be promptly cancelled and treated in accordance with the Bond Trustee's standard retention policies. In the event of destruction of the Bonds by the Bond Trustee, a certificate of destruction evidencing such destruction shall be furnished by the Bond Trustee to the Issuer and the Obligor upon written request.

Section 2.12    Book Entry Only System. The Bonds shall be initially issued in the form of a single fully registered Bond registered in the name of Cede & Co., as nominee of DTC, and except as provided in Section 2.13 hereof, all of the outstanding Bonds shall be registered in the name of Cede & Co., as nominee of DTC.

With respect to Bonds registered in the name of Cede & Co., as nominee of DTC, the Issuer and the Bond Trustee shall have no responsibility or obligation to any participant in DTC (a "DTC Participant") or to any person on behalf of whom such a DTC Participant holds an interest in the Bonds, except as provided in this Indenture. Without limiting the immediately preceding sentence, the Issuer and the Bond Trustee shall have no responsibility or obligation with respect to (i) the accuracy of the records of DTC, Cede & Co. or any DTC Participant with respect to any ownership interest in the Bonds, (ii) the delivery to any DTC Participant or any other person, other than a Bondholder, as shown on the registration books, of any notice with respect to the Bonds, including any notice of redemption, or (iii) the payment to any DTC Participant or any other person, other than a Bondholder as shown in the registration books, of any amount with respect to principal of, premium, if any, or interest on, the Bonds. Notwithstanding any other provision of this Bond Indenture to the contrary, the Issuer and the Bond Trustee shall be entitled to treat and consider the person in whose name each Bond is registered in the registration books as the absolute owner of such Bond for the purpose of payment of principal, premium, if any, and interest with respect to such Bond, for the purpose of giving notices of redemption and other matters with respect to such Bond, for the purpose of registering transfers with respect to such Bond, and for all other purposes whatsoever. The Bond Trustee shall pay all principal of, premium, if any, and interest on the Bonds only to or upon the order of the respective owners, as shown in the registration books as provided in this Bond Indenture, or their respective attorneys duly authorized in writing, and all such payments shall be valid and effective to fully satisfy and discharge the Issuer's obligations with respect to payment of principal of, premium, if any, and interest on, the Bonds to the extent

of the sum or sums so paid. No person other than an owner, as shown in the registration books, shall receive a Bond certificate evidencing the obligation of the Issuer to make payments of principal, premium, if any, and interest, pursuant to this Bond Indenture. Upon delivery by DTC to the Bond Trustee of written notice to the effect that DTC has determined to substitute a new nominee in place of Cede & Co., and subject to the provisions in this Bond Indenture with respect to payment of interest to the registered owner at the close of business on the Record Date, the word "Cede & Co." in this Bond Indenture shall refer to such new nominee of DTC.

Section 2.13    Successor Securities Depository; Transfers Outside Book Entry Only System.

(a)    In the event that DTC advises the Bond Trustee that it is no longer capable of discharging its responsibilities described herein and in the representation letter of the Issuer to DTC (the "DTC Letter"), the Issuer, at the request of the Bond Trustee, shall (i) appoint a successor securities depository, qualified to act as such under Section 17(a) of the Securities Exchange Act of 1934, as amended, notify DTC and DTC Participants, identified by DTC, of the appointment of such successor securities depository and transfer one or more separate Bonds to such successor securities depository or (ii) notify DTC and DTC Participants, identified by DTC, of the availability through DTC of Bonds and transfer one or more separate Bonds to DTC Participants, identified by DTC, having Bonds credited to their DTC accounts. In such event, the Bonds shall no longer be restricted to being registered in the registration books in the name of Cede & Co., as nominee of DTC, but may be registered in the name of the successor securities depository, or its nominee, or in whatever name or names Bondholders transferring or exchanging Bonds shall designate, in accordance with the provisions of this Bond Indenture.

(b)    Upon the written consent of [100%] of the beneficial owners of the Bonds, the Bond Trustee, in accordance with the DTC Letter, shall withdraw the Bonds from DTC, and authenticate and deliver Bonds fully registered to the assignees of DTC or its nominee. If the request for such withdrawal is not the result of any Issuer or Obligor action or inaction, such withdrawal, authentication and delivery shall be at the cost and expense (including costs of printing, preparing and delivering such Bonds) of the Persons requesting such withdrawal, authentication and delivery.

Section 2.14    Payments to Cede & Co. Notwithstanding any other provision of this Bond Indenture to the contrary, so long as any Bond is registered in the name of Cede & Co., as nominee of DTC, all payments with respect to principal of, premium, if any, and interest on, such Bond and all notices, transfers and deliveries with respect to such Bond shall be made and given, respectively, in the manner provided in the DTC Letter.

Section 2.15    Beneficial Owner Register.

In its discretion, upon receipt of written certification from a beneficial owner of Bonds (a "Beneficial Owner"), in form satisfactory to the Bond Trustee, as to its beneficial ownership of a specified principal amount of Bonds, the Bond Trustee shall be permitted to deem such Beneficial Owner the Holder of the stated principal amount of the applicable Bonds for purposes of any consent, request, direction, approval, objection or other instrument or action required or permitted

by this Bond Indenture or the Agreement to be executed or taken by any Holder of the Bonds (other than the transfer of a Bond) to which such certification is attached, and any such consent, request, direction, approval, objection or other instrument or action taken by such Beneficial Owner shall be fully effective as if taken by a Holder of an equivalent principal amount of Bonds, provided that in the event of conflicting instruments executed by the actual Holder and a Beneficial Owner, the action of the Holder shall govern.

## ARTICLE III

## REVENUES AND FUNDS

Section 3.01    [Reserved]

Section 3.02    Creation of the Bond Fund.  There is hereby created by the Issuer and ordered established with the Bond Trustee a trust fund to be designated as the "Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Bond Fund" (the "Bond Fund"). There are hereby created by the Issuer and ordered established with the Bond Trustee two separate accounts within the Bond Fund to be designated as the Principal Account and the Interest Account, respectively. Moneys on deposit in the Principal Account shall be used to pay the principal of and premium, if any, on the Bonds, when due and payable. Moneys on deposit in the Interest Account shall be used to pay the interest on the Bonds.

Section 3.03    Payments into the Bond Fund.  There shall be deposited into the Interest Account any accrued interest received from the sale of Bonds to the initial purchasers thereof. In addition, there shall also be deposited into the Principal Account or the Interest Account, as and when received, (i) all payments on the Series 2019 Note, (ii) all moneys transferred to the Bond Fund from the Reserve Fund pursuant to Section 3.10 hereof, (iii) all other moneys required to be deposited therein pursuant to the Agreement, and (iv) all other moneys received by the Bond Trustee when accompanied by directions that such moneys are to be paid into the Principal Account or the Interest Account. There also shall be retained or deposited in the Principal Account or the Interest Account all interest and other income received on investments or moneys required to be transferred thereto, in accordance with Section 6.02 hereof. The Issuer hereby covenants and agrees that so long as any of the Bonds are Outstanding it will deposit, or cause to be deposited, into the Principal Account or the Interest Account for its account sufficient sums from revenues and receipts derived from the Agreement promptly to meet and pay the principal of, premium, if any, and interest on the Bonds as the same become due and payable.

Section 3.04    Use of Moneys in the Principal Account and the Interest Account.  The amounts deposited into the Interest Account pursuant to Section 3.01 hereof shall be used to pay accrued interest on the Bonds on the first Interest Payment Date. Except as provided in Sections 3.15 and 8.05 hereof, moneys in the Principal Account or the Interest Account shall be used solely for the payment of the principal of, premium, if any, and interest on the Bonds on a pro rata basis.

Section 3.05    Custody of the Bond Fund.  The Bond Fund shall be in the custody of the Bond Trustee but in the name of the Issuer, and the Issuer hereby authorizes and directs the Bond Trustee to withdraw sufficient funds from the Principal Account or the Interest Account of the Bond Fund to pay the principal of, premium, if any, and interest on the Bonds as the same come due and payable, which authorization and direction the Bond Trustee hereby accepts.

Section 3.06    [Reserved].

Section 3.07    [Reserved].

Section 3.08    Creation of the Reserve Fund.

(a)    There is hereby created and established with the Bond Trustee a trust fund designated as the "Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Debt Service Reserve Fund" (the "Reserve Fund").

(b)    Moneys on deposit in the Reserve Fund shall be used solely to provide a reserve for the payment of the principal of and interest on the Series 2019 Bonds.

Section 3.09    Payments into the Reserve Fund.  In addition to the deposits required by Section 2.07(g) hereof, there shall be deposited into the Reserve Fund any Reserve Fund Obligations delivered by the Obligor to the Bond Trustee pursuant to Section 5.6 of the Agreement. In addition, there shall be deposited into the Reserve Fund all moneys required to be transferred thereto pursuant to Section 6.02 hereof, all moneys required to be transferred thereto pursuant to Section 3.03 of the Master Indenture, and all other moneys received by the Bond Trustee when accompanied by directions that such moneys are to be paid into the Reserve Fund.  There shall also be retained in the Reserve Fund all interest and other income received on investments of Reserve Fund moneys to the extent provided in Section 6.02 hereof.

Section 3.10    Use of Moneys in the Reserve Fund.

(a)    Except as provided herein and in Section 3.15 hereof, moneys in the Reserve Fund shall be used solely for the payment of the principal of and interest on the Series 2019 Bonds in the event moneys in the Bond Fund are insufficient to make such payments when due, whether on an interest payment date, redemption date, maturity date, acceleration date or otherwise.

(b)    Upon the occurrence of an Event of Default of which the Bond Trustee is deemed to have notice hereunder and the election by the Bond Trustee of the remedy specified in Section 8.02(a) hereof, any Reserve Fund Obligations in the Reserve Fund shall, subject to the provisions of Section 3.16 hereof, be transferred by the Bond Trustee to the Principal Account and applied in accordance with Section 8.05 hereof.  On [May 1] and [November 1] in each year, any earnings on the Reserve Fund Obligations on deposit in the Reserve Fund that are in excess of the Reserve Fund Requirement shall be transferred into the Interest Account of the Bond Fund.

(c)     On the final maturity date of the Series 2019 Bonds, any Reserve Fund Obligations in the Reserve Fund may, upon the direction of the Obligor, be used to pay the principal of and interest on the Series 2019 Bonds on such final maturity date.

(d)     If at any time moneys in the Reserve Fund are sufficient to pay the principal or redemption price of all Bonds, the Bond Trustee may use the moneys on deposit in the Reserve Fund to pay such principal or redemption price of the Bonds.

Section 3.11   Custody of the Reserve Fund.   The Reserve Fund shall be in the custody of the Bond Trustee but in the name of the Issuer, and the Issuer hereby authorizes and directs the Bond Trustee to transfer sufficient moneys from the Reserve Fund to the Bond Trustee for deposit to the Bond Fund to pay the principal of and interest on the Bonds for the purposes herein described, which authorization and direction the Bond Trustee hereby accepts.  In the event there shall be a deficiency in the Principal Account or the Interest Account on any payment date for the Bonds, the Bond Trustee shall promptly make up such deficiency from the Reserve Fund.  No later than the Business Day following any such transfer that reduces the value of the Reserve Fund to an amount below the Reserve Fund Requirement, the Bond Trustee shall provide written notice to the Obligor of the amount of such transfer and the amount of such deficiency.

Section 3.12   Nonpresentment of Bonds.   In the event that any Bonds shall not be presented for payment when the principal thereof or interest thereon becomes due, either at maturity, the date fixed for redemption thereof, or otherwise, if funds sufficient for the payment thereof shall have been deposited into the Bond Fund or otherwise made available to the Bond Trustee for deposit therein as provided in Section 3.03 hereof, all liability of the Issuer to the owner or owners thereof for the payment of such Bonds shall forthwith cease, determine and be completely discharged, and thereupon it shall be the duty of the Bond Trustee to hold such fund or funds, without liability for interest thereon, for the benefit of the owner or owners of such Bonds, who shall thereafter be restricted exclusively to such fund or funds for any claim of whatever nature on his or their part under this Bond Indenture or on, or with respect to, said Bond, and all such funds shall remain uninvested.  If any Bond shall not be presented for payment within the period of two years following the date of final maturity of such Bond, the Bond Trustee shall, to the extent required by law, transfer such funds to the state treasury of the state in which the principal office of the Bond Trustee is located, in which case the owner of such Bonds shall look only to such state for payment, or, in the alternative, to the extent permitted by law, the Bond Trustee shall, upon request in writing by the Obligor, return such funds to the Obligor free of any trust or lien and such Bond shall, subject to the defense of any applicable statute of limitation, thereafter be an unsecured obligation of the Obligor.  In either event, the Bond Trustee shall have no further responsibility with respect to such moneys or payment of such Bonds.  Thereafter, the Bondholders shall be entitled to look only to the Obligor for payment, and then only to the extent of the amount so repaid by the Bond Trustee.  The Obligor shall not be liable for any interest on any sums paid to it.

Section 3.13   Bond Trustee's and Paying Agents' Fees, Charges, and Expenses.   Pursuant to the provisions of the Agreement, the Obligor has agreed to pay to the Bond Trustee and to each Paying Agent, commencing with the effective date of the Agreement and continuing until the principal of, premium, if any, and interest on the Bonds shall have been fully paid or provision for the payment thereof shall have been made in accordance with the provisions of this Bond

Indenture, the reasonable and necessary fees and expenses (including reasonable attorneys' fees) of the Bond Trustee and each Paying Agent, as and when the same become due, upon the submission by the Bond Trustee and each Paying Agent of a statement therefor.

Section 3.14   Moneys to be Held in Trust.   All moneys required to be deposited with or paid to the Bond Trustee under any provision of this Bond Indenture (except moneys in the Rebate Fund) shall be held by the Bond Trustee in trust for the purposes specified in this Bond Indenture, and except for moneys deposited with or paid to the Bond Trustee for the redemption of Bonds for which the notice of redemption has been duly given, shall, while held by the Bond Trustee, constitute part of the Trust Estate and be subject to the lien hereof.

Section 3.15   Repayment to the Obligor from the Funds.   Any amounts remaining in the Bond Fund or Reserve Fund after payment in full of the Bonds (or after making provision for such payment), the fees and expenses of the Bond Trustee and the Paying Agents (including attorneys' fees, if any), the Administration Expenses, and all other amounts required to be paid hereunder and under the Agreement shall be paid to the Obligor upon the termination of the Agreement.

Section 3.16   Rebate Fund.

(a)   A special Rebate Fund is hereby established by the Issuer. The Rebate Fund shall be for the sole benefit of the United States of America and shall not be subject to the claim of any other Person, including without limitation the Bondholders. The Rebate Fund is established for the purpose of complying with Section 148 of the Code and the Treasury Regulations promulgated pursuant thereto. The money deposited in the Rebate Fund, together with all investments thereof and investment income therefrom, shall be held in trust and applied solely as provided in this Section. The Rebate Fund is not a portion of the Trust Estate and is not subject to the lien of this Bond Indenture. Notwithstanding the foregoing, the Bond Trustee with respect to the Rebate Fund is afforded all the rights, protections and immunities otherwise accorded to it hereunder.

(b)   Within 60 days after the close of each fifth "Bond Year," the Bond Trustee shall receive from the Obligor a computation in the form of a certificate of an officer of the Obligor of the amount of "Excess Earnings," if any, for the period beginning on the date of delivery of the Bonds and ending at the close of such "Bond Year" and the Obligor shall pay to the Bond Trustee for deposit into the Rebate Fund an amount equal to the difference, if any, between the amount then in the Rebate Fund and the Excess Earnings so computed. The term "Bond Year" means with respect to the Bonds each one-year period ending on the anniversary of the date of delivery of the Bonds or such other period as may be elected by the Issuer in accordance with the Regulations and notice of which election has been given to the Bond Trustee. If, at the close of any Bond Year, the amount in the Rebate Fund exceeds the amount that would be required to be paid to the United States of America under paragraph (d) below if the Bonds had been paid in full, such excess may, at the request of the Obligor, be transferred from the Rebate Fund and paid to the Obligor.

(c)   In general, "Excess Earnings" for any period of time means the sum of

(i)   the excess of --

22

(A)    the aggregate amount earned during such period of time on all "Nonpurpose Investments" (including gains on the disposition of such Obligations) in which "Gross Proceeds" of the issue are invested (other than amounts attributable to an excess described in this subparagraph (c)(i)), over

(B)    the amount that would have been earned during such period of time if the "Yield" on such Nonpurpose Investments (other than amounts attributable to an excess described in this subparagraph (c)(i)) had been equal to the yield on the issue, plus

(ii)    any income during such period of time attributable to the excess described in subparagraph (c)(i) above.

The term Nonpurpose Investments, Gross Proceeds, Issue Date and Yield shall have the meanings given to such terms in section 148 of the Code and the Regulations promulgated pursuant to such section.

(d)    The Bond Trustee shall, as directed in writing by the Obligor, pay to the United States of America at least once every five years, to the extent that funds are available in the Rebate Fund or otherwise provided by the Obligor, an amount that ensures that at least 90 percent of the Excess Earnings from the date of delivery of the Bonds to the close of the period for which the payment is being made will have been paid. The Bond Trustee shall pay to the United States of America not later than 60 days after the Bonds have been paid in full as directed by the Obligor in writing, to the extent that funds are available in the Rebate Fund or otherwise provided by the Obligor, 100 percent of the amount then required to be paid under Section 148(f) of the Code as a result of Excess Earnings.

(e)    The amounts to be computed, paid, deposited or disbursed under this section shall be determined by the Obligor acting on behalf of the Issuer within thirty days after each Bond Year after the date of issuance of the Bonds. By such date, the Obligor shall also notify, in writing, the Bond Trustee and the Issuer of the determinations the Obligor has made and the payment to be made pursuant to the provisions of this section. Upon written request of any registered owner of Bonds, the Obligor shall furnish to such registered owner of Bonds a certificate (supported by reasonable documentation, which may include calculation by Bond Counsel or by some other service organization) showing compliance with this section and other applicable provisions of section 148 of the Code.

(f)    The Bond Trustee shall maintain a record of the periodic determinations by the Obligor of the Excess Earnings for a period beginning on the first anniversary date of the issuance of the Bonds and ending on the date six years after the final retirement of the Bonds. Such records shall state each such anniversary date and summarize the manner in which the Excess Earnings, if any, was determined.

(g)    If the Bond Trustee shall declare the principal of the Bonds and the interest accrued thereon immediately due and payable as the result of an Event of Default specified in this Bond Indenture, or if the Bonds are optionally or mandatorily prepaid or redeemed prior to

23

maturity as a whole in accordance with their terms, any amount remaining in any of the funds shall be transferred to the Rebate Fund to the extent that the amount therein is less than the Excess Earnings computed by the Obligor as of the date of such acceleration or redemption, and the balance of such amount shall be used immediately by the Bond Trustee for the purpose of paying principal of, redemption premium, if any, and interest on the Bonds when due. In furtherance of such intention, the Issuer hereby authorizes and directs its President to execute any documents, certificates or reports required by the Code and to make such elections, on behalf of the Issuer, which may be permitted by the Code as are consistent with the purpose for the issuance of the Bonds.

(h)     The requirements contained in this Section relating to the computation and payment of Excess Earnings shall not be applicable if all Gross Proceeds of the Bonds are expended in compliance with Treasury Regulations Section 1.148-7.

(i)     Notwithstanding any of the provisions of this Section, the Bond Trustee shall have no duty or responsibility with respect to the Rebate Fund except to follow the specific written instructions of the Obligor.

Section 3.17     [Reserved]

Section 3.18     [Reserved]

ARTICLE IV

COVENANTS OF THE ISSUER

Section 4.01     Performance of Covenants: Authority.     The Issuer covenants that it will faithfully perform at all times any and all covenants, undertakings, stipulations, and provisions contained in this Bond Indenture, in any and every Bond and in all proceedings of the Board of Directors pertaining hereto; provided, however, that except for the covenant of the Issuer set forth in Section 4.02 hereof relating to payment of the Bonds, the Issuer shall not be obligated to take any action or execute any instrument pursuant to any provision hereof until it shall have been requested to do so by the Obligor or by the Bond Trustee, or shall have received the instrument to be executed and at the option of the Issuer shall have received from the party requesting such execution assurance satisfactory to the Issuer that the Issuer shall be reimbursed for its reasonable expenses incurred or to be incurred in connection with taking such action or executing such instrument. The Issuer covenants that it is duly authorized under the laws of the State of Texas, including particularly and without limitation the Act, to issue the Series 2019 Bonds and to execute this Bond Indenture, and to pledge the revenues and receipts hereby pledged, and to assign its rights under and pursuant to the Agreement and the Series 2019 Note in the manner and to the extent herein set forth, that all action on its part and to the extent herein set forth, that all action on its part for the issuance of the Series 2019 Bonds and the execution and delivery of this Bond Indenture has been duly and effectively taken and will be duly taken as provided herein, and that the Series 2019 Bonds in the hands of the owners thereof are and will be valid and enforceable limited obligations of the Issuer according to the import hereof, except as enforcement thereof and hereof may be limited by bankruptcy, insolvency, moratorium, reorganization and other similar

laws affecting the rights of creditors and by the application of general principles of equity, if such remedies are pursued.

Section 4.02    Payments of Principal, Premium, If Any, and Interest.    The Issuer will promptly pay or cause to be paid the principal of, premium, if any, and interest on all Bonds issued hereunder according to the terms hereof. The principal, premium, if any, and interest payments are payable solely from revenues and other amounts derived from the Series 2019 Note, and from the other security pledged hereby, which revenues and security are hereby specifically pledged to the payment thereof in the manner and to the extent herein specified. Nothing in the Bonds or in this Bond Indenture shall be considered or construed as pledging any funds or assets of the Issuer other than those pledged hereby.

Section 4.03    Supplemental Indentures; Recordation of Bond Indenture and Supplemental Indentures.    The Issuer will execute and deliver all indentures supplemental hereto, and will cause this Bond Indenture, the Agreement, and all supplements hereto and thereto, as well as all security instruments and financing statements relating thereto, to be filed in each office required by law in order to publish notice of the liens created by this Bond Indenture and the Agreement. The Bond Trustee, at the Obligor's expense, will cause all continuation statements and all supplements to any financing statement or continuation statement and other instruments as may be required, at all times to be recorded, registered and filed in such manner and in such places as may be required by law in order fully to preserve and protect the security of the Bondholders and all rights of the Bond Trustee hereunder.

Section 4.04    Lien of Bond Indenture.    The Issuer hereby agrees not to create any lien having priority or preference over the lien of this Bond Indenture upon the Trust Estate or any part thereof, other than the security interest granted by it to the Bond Trustee, except as otherwise specifically provided in Article VIII hereof. The Issuer agrees that no obligations the payment of which is secured by payments or other moneys or amounts derived from the Agreement and the other sources provided herein will be issued by it except in accordance with Sections 2.09 and 2.10 of this Bond Indenture.

Section 4.05    Rights Under the Agreement.    The Issuer will observe all of the obligations, terms and conditions required on its part to be observed or performed under the Agreement. The Issuer agrees that wherever in the Agreement it is stated that the Issuer will notify the Bond Trustee, give the Bond Trustee some right or privilege, or in any way attempts to confer upon the Bond Trustee the ability for the Bond Trustee to protect the security for payment of the Bonds, that such part of the Agreement shall be as though it were set out in this Bond Indenture in full.

The Issuer agrees that the Bond Trustee as assignee of the Agreement may enforce, in its name or in the name of the Issuer, all rights of the Issuer (except those rights to indemnification and payment under Sections 5.7, 7.5 and 9.5 thereof) and all obligations of the Obligor under and pursuant to the Agreement for and on behalf of the Bondholders, whether or not the Issuer is in default hereunder.

Section 4.06    Tax Covenants.

The Issuer (to the extent within its power or direction) shall not use or permit the use of any proceeds of Series 2019 Bonds or any other funds of the Issuer, directly or indirectly, in any manner, and shall not take or permit to be taken any other action or actions, which would adversely affect the exclusion of the interest on any Series 2019 Bond from gross income for federal income tax purposes.

The Issuer (to the extent within its power or direction) agrees that so long as any of the Series 2019 Bonds remain Outstanding, it will comply with the provisions of the Tax Agreement applicable to the Issuer.

The Bond Trustee agrees to comply, at the direction of the Issuer or the Obligor, with any obligations expressly assumed by the Bond Trustee under the Tax Agreement, and upon receipt of the Tax Agreement and any Opinion of Bond Counsel which sets forth such requirements, to comply with any statute, regulation or ruling that may apply to it as Bond Trustee hereunder and relating to reporting requirements or other requirements necessary to preserve the exclusion from federal gross income of the interest on the Series 2019 Bonds, provided that nothing herein shall require the Bond Trustee to take any action that might result in personal liability for the Bond Trustee. The Bond Trustee from time to time may cause a firm of attorneys, consultants or independent accountants or an investment banking firm to supply the Bond Trustee, on behalf of the Issuer, with such information as the Bond Trustee, on behalf of the Issuer, may request in order to determine in a manner reasonably satisfactory to the Bond Trustee, on behalf of the Issuer, all matters relating to (a) the actuarial yields on the Series 2019 Bonds as the same may relate to any data or conclusions necessary to verify that the Series 2019 Bonds are not "arbitrage bonds" within the meaning of Section 148 of the Code, and (b) compliance with rebate requirements of Section 148(f) of the Code. Payment for costs and expenses incurred in connection with supplying the foregoing information shall be made by the Obligor.

The foregoing covenants of this Section shall remain in full force and effect notwithstanding the defeasance of the Series 2019 Bonds pursuant to **Article VII** or any other provision of this Bond Indenture, until the final maturity date of the Series 2019 Bonds and payment thereof.

Section 4.07    Change in Law. To the extent that published rulings of the Internal Revenue Service, or amendments to the Code or the Regulations modify the covenants of the Issuer that are set forth in this Bond Indenture or that are necessary for interest on any issue of the Bonds to be excludable from gross income for federal income tax purposes, the Issuer, upon receiving the written Opinion of Bond Counsel to such effect, will comply, at the expense of the Obligor, with such modifications and direct the Bond Trustee to take such action as may be required to comply with such modifications.

# ARTICLE V

## REDEMPTION OF BONDS

Section 5.01    Optional Redemption of Series 2019 Bonds.

(a)    The Series 2019 Bonds are subject to optional redemption prior to maturity by the Issuer at the direction of the Obligor in whole or in part on any date, at a redemption price equal to the percentage of the principal amount of Series 2019 Bonds to be redeemed set forth below, together with accrued interest to the redemption date.

| Redemption Date | Percentage of Principal Amount |
|---|---|
| Prior to _____, 202[2] | 107% |
| _____, 202[2] to _____, 202[3] | 106% |
| _____, 202[3] to _____, 202[4] | 105% |
| _____, 202[4] to _____, 202[5] | 104% |
| _____, 202[5] to _____, 202[6] | 103% |
| _____, 202[6] to _____, 202[7] | 102% |
| _____, 202[7] to _____, 202[8] | 101% |
| _____, 202[8] and thereafter | 100% |

Section 5.02   Sinking Fund Redemption.

(a)   The Series 2019 Bonds are subject to mandatory sinking fund redemption at a redemption price equal to the principal amount thereof plus accrued interest to the redemption date. As and for a sinking fund for the redemption of Series 2019 Bonds, the Issuer shall cause to be deposited into the Principal Account of the Bond Fund a sum which is sufficient to redeem on _____ of each of the following years (after credit as provided below) the following principal amounts of Series 2019 Bonds, plus accrued interest to the redemption date:

| Year | Amount | Year | Amount |
|---|---|---|---|
| [Insert Schedule] | | | |

*maturity

(b)   On or before the thirtieth day prior to each sinking fund payment date, the Bond Trustee shall proceed to select for redemption (by lot in such manner as the Bond Trustee may determine) from all Series 2019 Bonds Outstanding a principal amount of such Series 2019 Bonds equal to the Aggregate Principal Amount of such Series 2019 Bonds redeemable with the required sinking fund payment, and shall call such Series 2019 Bonds or portions thereof ($5,000 or any integral multiple thereof) for redemption from the sinking fund on the next _____, and give notice of such call. At the option of the Obligor to be exercised by delivery of a written certificate to the Bond Trustee on or before the forty fifth day next preceding any sinking fund redemption date, it may (i) provided no Event of Default has occurred and is continuing, deliver to the Bond Trustee for cancellation Series 2019 Bonds or portions thereof in an Aggregate Principal Amount desired by the Obligor or (ii) specify a principal amount of Series 2019 Bonds

or portions thereof which prior to said date have been redeemed (otherwise than through the operation of the sinking fund) and canceled by the Bond Trustee at the request of the Obligor and not theretofore applied as a credit against any sinking fund redemption obligation. Each such Series 2019 Bond or portion thereof so delivered or previously redeemed shall be credited by the Bond Trustee at 100% of the principal amount thereof against the obligation of the Issuer to redeem Series 2019 Bonds on such sinking fund redemption date. Any excess shall be credited against the next sinking fund redemption obligation to redeem Series 2019 Bonds. In the event that the Obligor shall avail itself of the provisions of clause (i) of the second sentence of this paragraph, the certificate required by the second sentence of this paragraph shall be accompanied by the Series 2019 Bonds or portions thereof to be canceled.

Section 5.03    Method of Selection of Bonds in Case of Partial Redemption; Redemption Priority.

(a)    In the event that less than all of the Outstanding Series 2019 Bonds are to be redeemed as provided in Sections 5.01, 5.08 or 5.11 hereof, the Series 2019 Bonds to be redeemed shall be selected by the Securities Depository or by lot in such manner as the Bond Trustee may determine.

(b)    If a Series 2019 Bond is of a denomination larger than the minimum Authorized Denomination, a portion of such Series 2019 Bond may be redeemed, but Series 2019 Bonds shall be redeemed only in the principal amount of an Authorized Denomination and no Series 2019 Bond may be redeemed in part if the principal amount to be Outstanding following such partial redemption is not an Authorized Denomination.

Section 5.04    Notice of Redemption.  Series 2019 Bonds shall be called for redemption by the Bond Trustee as herein provided upon receipt by the Bond Trustee at least 45 days prior to the redemption date (or such later date as shall be acceptable to the Bond Trustee) of a certificate of the Obligor specifying the principal amount of Series 2019 Bonds to be called for redemption, the applicable redemption price or prices and the provision or provisions of this Bond Indenture pursuant to which such Series 2019 Bonds are to be called for redemption. The provisions of the preceding sentence shall not apply to the redemption of Series 2019 Bonds pursuant to the sinking fund provided in Section 5.02 hereof, and such Series 2019 Bonds shall be called for redemption by the Bond Trustee without the necessity of any action by the Obligor or the Issuer. In case of every redemption, the Bond Trustee shall cause notice of such redemption to be given by mailing by first class mail, postage prepaid, a copy of the redemption notice to the owners of the Series 2019 Bonds designated for redemption in whole or in part, at their addresses as the same shall last appear upon the registration books, in each case not more than 60 nor less than 30 days prior to the redemption date. In addition, notice of redemption shall be sent by first class or registered mail, return receipt requested, or by overnight delivery service (1) contemporaneously with such mailing: (A) to any owner of $1,000,000 or more in principal amount of Series 2009 Bonds and (B) to at least two or more information services of national recognition that disseminate redemption information with respect to municipal bonds; and (2) to any securities depository registered as such pursuant to the Securities Exchange Act of 1934, as amended, that is an owner of Series 2019 Bonds to be redeemed so that such notice is received at least two days prior to such mailing date. An additional notice of redemption shall be given by certified mail, postage prepaid, mailed not less than 60 nor more than 90 days after the redemption date to any owner of Series

2019 Bonds selected for redemption that has not surrendered the Series 2019 Bonds called for redemption, at the address as the same shall last appear upon the registration books.

All notices of redemption shall state:

      (1)     the redemption date,

      (2)     the redemption price,

      (3)     the identification, including complete designation (including series) and issue date of the Series 2019 Bonds and the CUSIP number (and in the case of partial redemption, certificate number and the respective principal amounts, interest rates and maturity dates) of the Series 2019 Bonds to be redeemed,

      (4)     that on the redemption date the redemption price will become due and payable upon each such Series 2019 Bonds, and that interest thereon shall cease to accrue from and after said date,

      (5)     the name and address of the Bond Trustee and any paying agent for such Series 2019 Bonds, including the place where such Series 2019 Bonds are to be surrendered for payment of the redemption price and the name and phone number of a contact person at such address.

Provided, however, that failure to give any such notice, or any defect therein, shall not affect the validity of any proceedings for the redemption of any Series 2019 Bonds for which the notice required hereunder was given.

Section 5.05   <u>Bonds Due and Payable on Redemption Date; Interest Ceases to Accrue</u>. On or before the business day prior to the redemption date specified in the notice of redemption, an amount of money sufficient to redeem all Series 2019 Bonds called for redemption at the appropriate redemption price, including accrued interest to the date fixed for redemption, shall be deposited with the Bond Trustee. If at the time of mailing of notice of any optional redemption in connection with a refunding of all or a portion of the Series 2019 Bonds the Obligor shall not have deposited with the Bond Trustee moneys sufficient to redeem all of the Series 2019 Bonds called for redemption, such notice may state that it is conditional in that it is subject to the deposit of the proceeds of refunding bonds with the Bond Trustee not later than the redemption date, and such notice shall be of no effect unless such moneys are so deposited; provided that such conditional notice shall not be given more than twice within any six month period. On the redemption date the principal amount of each Series 2019 Bond to be redeemed, together with the accrued interest thereon to such date and redemption premium, if any, shall become due and payable; and from and after such date, notice having been given and deposit having been made in accordance with the provisions of this Article V, then, notwithstanding that any Series 2019 Bonds called for redemption shall not have been surrendered, no further interest shall accrue on any such Series 2019 Bonds. From and after such date of redemption (such notice having been given and such deposit having been made), the Series 2019 Bonds to be redeemed shall not be deemed to be Outstanding hereunder, and the Issuer shall be under no further liability in respect thereof.

Section 5.06 Cancellation. All Bonds which have been redeemed shall be cancelled by the Bond Trustee and treated as provided in Section 2.11 hereof.

Section 5.07 Partial Redemption of Fully Registered Bonds. Upon surrender of any fully registered Bond for redemption in part only, the Issuer shall execute and the Bond Trustee shall authenticate and deliver to the owner thereof, at the expense of the Obligor, a new Bond or Bonds of the same series and of the same maturity of Authorized Denominations in an Aggregate Principal Amount equal to the unredeemed portion of the Bond surrendered.

Section 5.08 Special Redemption. The Bonds shall be subject to special redemption by the Issuer at the direction of the Obligor prior to their scheduled maturities, in whole or in part at a redemption price equal to the principal amount thereof plus accrued interest from the most recent interest payment date to the redemption date on any date in case of damage or destruction to, or condemnation of, any property, plant, and equipment of any Obligated Group Member, to the extent that the net proceeds of insurance or condemnation award exceed the Threshold Amount (as defined in the Master Indenture) and the Obligor has determined not to use or is unable to use such net proceeds or award to repair, rebuild or replace such property, plant, and equipment.

ARTICLE VI

INVESTMENTS

Section 6.01 Investment of Bond Fund and Reserve Fund Moneys. Any moneys held as part of the Bond Fund or Reserve Fund shall be invested or reinvested by the Bond Trustee at the written request and direction of the Obligor (upon which the Bond Trustee is entitled to rely) in Permitted Investments. All Permitted Investments shall be either subject to redemption at any time at a fixed value at the option of the owner thereof or shall mature or be marketable not later than the business day prior to the date on which the proceeds are expected to be expended. For the purpose of any investment or replacement under this Section, the Permitted Investments shall be deemed to mature at the earliest date on which the Obligor is, on demand, obligated to pay a fixed sum in discharge of the whole of such obligation. The Bond Trustee may make any and all investments permitted by the provisions of this Section through its trust department. In order to comply with the directions of the Obligor, the Bond Trustee may sell, at the best price obtainable, or present for redemption, or may otherwise cause liquidation prior to their maturities, any of the obligations in which funds have been invested, and the Bond Trustee shall not be liable for any loss or penalty of any nature resulting therefrom. In order to avoid loss in the event of any need for funds, the Obligor may instruct the Bond Trustee, in lieu of a liquidation or redemption of investments in the fund or account needing funds, to exchange such investment for investments in another fund or account that may be liquidated at no, or at reduced, loss. The Bond Trustee shall be under no liability for interest on any moneys received hereunder unless specifically agreed to in writing.

Section 6.02 Allocation and Transfers of Investment Income. Any investments in any Fund shall be held by or under the control of the Bond Trustee and shall be deemed at all times a part of the Fund from which the investment was made. Any loss resulting from such investments shall be charged to such Fund. The Bond Trustee shall not be liable for any loss or penalty resulting from any such investment made in accordance with any permitted direction by a Obligor or for the

Bonds becoming "arbitrage bonds" by reason of any such investment. Any interest or other gain from any fund from any investment or reinvestment pursuant to Section 6.01 hereof shall be allocated and transferred as follows:

(a) Any interest or other gain realized as a result of any investments or reinvestments of moneys in the Principal Account and the Interest Account of the Bond Fund shall be credited at least semiannually to the Interest Account unless a deficiency exists in the Reserve Fund, in which case such interest or other gain shall be paid into the Reserve Fund forthwith.

(b) Any interest or other gain realized as a result of any investments or reinvestments of moneys in the Reserve Fund shall be credited to a the Reserve Fund if a deficiency exists therein at that time. If a deficiency does not exist in the Reserve Fund at that time, such interest or other gain on other amounts paid into the Reserve Fund shall be paid for deposit into the Interest Account of the Bond Fund, at least semiannually.

The Bond Trustee shall sell and reduce to cash a sufficient portion of such investments whenever the cash balance in any fund is insufficient for the purposes of such fund.

Section 6.03    Valuation of Permitted Investments. Accounting and valuation of Permitted Investments in any Fund or Account will be performed as follows:

On a monthly basis the Bond Trustee shall furnish to the Obligor a full and complete statement of all receipts and disbursements of Permitted Investments in any Fund and Account covering such period, including a statement of the assets contained in each Fund and Account. Assets will be valued at market value in accordance with the normal valuation procedures of the Bond Trustee. Valuation of Permitted Investments shall include accrued interest thereof through the valuation date.

ARTICLE VII

DISCHARGE OF BOND INDENTURE

Section 7.01    Discharge of the Bond Indenture. If, when the Bonds secured hereby shall become due and payable in accordance with their terms or otherwise as provided in this Bond Indenture and the whole amount of the principal of, premium, if any, and interest due and payable upon all of the Bonds shall be paid, or provision shall have been made for the payment of the same, together with all other sums payable hereunder (including but not limited to the fees and expenses of the Bond Trustee and any Paying Agent, in accordance with Section 3.13 hereof), then the right, title and interest of the Bond Trustee in and to the Trust Estate and all covenants, agreements and other obligations of the Issuer to the Bondholders shall thereupon cease, terminate and become void and be discharged and satisfied. In such event, upon the written request of the Issuer or of the Obligor, and upon receipt of an Opinion of Counsel to the effect that all conditions precedent herein provided relating to the satisfaction and discharge of this Bond Indenture have been complied with, the Bond Trustee shall execute such documents as may be reasonably required by the Issuer and shall turn over to the Obligor any surplus in the Bond Fund and Reserve Fund.

All Outstanding Bonds shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in this Section if (i) in case said Bonds are to be redeemed on any date prior to their maturity, the Obligor shall have given to the Bond Trustee in form satisfactory to it irrevocable written instructions to give on a date in accordance with the provisions of Section 5.04 hereof notice of redemption of such Bonds on said redemption date, such notice to be given in accordance with the provisions of Section 5.04 hereof, (ii) there shall have been deposited with the Bond Trustee (or another Paying Agent) either moneys in an amount which shall be sufficient, or Government Obligations which shall not contain provisions permitting the redemption thereof at the option of the issuer, or any other Person other than the holder thereof, the principal of and the interest on which when due, and without any reinvestment thereof, will provide moneys which, together with the moneys, if any, deposited with or held by the Bond Trustee or any Paying Agent at the same time (including the Bond Fund and the Reserve Fund), shall be sufficient, in the opinion of an independent certified public accountant, to pay when due the principal of, premium, if any, and interest due and to become due on said Bonds on or prior to the redemption date or maturity date thereof, as the case may be, and (iii) in the event that said Bonds are not by their terms subject to redemption within the next 45 days, the Obligor shall have given the Bond Trustee in form satisfactory to it irrevocable written instructions to give, as soon as practicable in the same manner as the notice of redemption is given pursuant to Section 5.04 hereof, a notice to the owners of such Bonds that the deposit required by subclause (ii) above has been made with the Bond Trustee (or another depository) and that said Bonds are deemed to have been paid in accordance with this Section and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal of, premium, if any, and interest on said Bonds. Neither the Government Obligations nor moneys deposited with the Bond Trustee pursuant to this Section nor principal or interest payments on any such Government Obligations shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal of, premium, if any, and interest on said Bonds; provided any such cash received from such principal or interest payments on such Government Obligations deposited with the Bond Trustee, if not then needed for such purpose, shall, at the written direction of the Obligor, either (1) be reinvested, to the extent practicable, in Government Obligations of the type described in clause (ii) of this paragraph maturing at the times and in amounts sufficient to pay when due the principal of, premium, if any, and interest to become due on said Bonds on or prior to such redemption date or maturity date thereof, as the case may be or (2) be used to pay principal and/or interest on the Bonds. At such time as any Bond shall be deemed paid as aforesaid, it shall no longer be secured by or entitled to the benefits of this Bond Indenture, except for the purpose of any payment from such moneys or Government Obligations deposited with the Bond Trustee and the purpose of transfer and exchange pursuant to Section 2.05 hereof.

The release of the obligations of the Issuer under this Section shall be without prejudice to the rights of the Bond Trustee to be paid reasonable compensation for all services rendered by it hereunder and all its reasonable and necessary expenses, charges and other disbursements incurred on or about the administration of the trust hereby created and the performance of its powers and duties hereunder.

ARTICLE VIII

DEFAULTS AND REMEDIES

Section 8.01    Events of Default.  If any of the following events occur, it is hereby defined as and shall be deemed an "Event of Default":

(a)    Default in the payment of the principal of or premium, if any, on any Bond when the same shall become due and payable, whether at the stated maturity thereof, or upon proceedings for redemption or as required by the sinking fund provisions hereof or otherwise.

(b)    Default in the payment of any installment of interest on any Bond when the same shall become due and payable.

(c)    An event of default under the Master Indenture or the Agreement.

(d)    Failure by the Issuer in the performance or observance of any other of the covenants, agreements or conditions in its part in this Bond Indenture or in the Bonds contained, which failure shall continue for a period of 60 days after written notice specifying such failure and requesting that it be remedied, is given to the Issuer and the Obligor by the Bond Trustee or to the Issuer, the Obligor and to the Bond Trustee by the owners of not less than 25% in principal amount of the Bonds Outstanding.

(e)    A transfer therefrom to the Bond Fund reduces the value of the cash and Permitted Investments in the Reserve Fund to an amount below the Reserve Fund Requirement, unless the Obligor has provided to the Bond Trustee funds sufficient to replenish the Reserve Fund to the Reserve Fund Requirement within 10 Business Days after transmittal of the notice required under Section 3.11 hereof.

Section 8.02    Remedies on Events of Default.  Upon the occurrence of an Event of Default, the Bond Trustee shall have the following rights and remedies:

(a)    The Bond Trustee may, if so directed by the Bondholders of at least 25% in Aggregate Principal Amount of the Bonds Outstanding or in the event that the payment of the principal of and accrued interest on any Note has been declared due and payable immediately by the Master Trustee, by notice in writing given to the Issuer and the Obligor, declare the principal amount of all Bonds then Outstanding and the interest accrued thereon to be immediately due and payable and said principal and interest shall thereupon become immediately due and payable. Upon any declaration of acceleration hereunder, the Bond Trustee shall give notice thereof to the Bondholders by the same means as a notice of redemption under Article V hereof, stating the date upon which such acceleration occurred.

The provisions of the preceding paragraph, however, are subject to the condition that if, after the payment of the principal of, and accrued interest on, the Bonds has been declared due and payable immediately, the Bondholders of a majority in Aggregate Principal Amount of the Bonds Outstanding or, if less, 100% of the Bondholders that directed the applicable acceleration of the Bonds direct the Bond Trustee to annul such acceleration, the declaration of the acceleration of the Bonds shall be annulled, and the Bond Trustee shall promptly give written notice of such

33

annulment to the Issuer and the Obligor and notice to Bondholders by the same means as a notice of redemption under Article V hereof; but no such annulment shall extend to or affect any subsequent Event of Default or impair any right or remedy consequent thereon;

(b)     The Bond Trustee may, by mandamus, or other suit, action or proceeding at law or in equity, enforce the rights of the Bondholders, and require the Issuer or the Obligor or both of them to carry out the agreements with or for the benefit of the Bondholders and to perform its or their duties under the Act, the Agreement and this Bond Indenture.

(c)     The Bond Trustee may, by action or suit in equity, require the Issuer to account as if it were the trustee of an express trust for the Bondholders but any such judgment against the Issuer shall be enforceable only against the funds and accounts hereunder in the hands of the Bond Trustee.

(d)     The Bond Trustee may, by action or suit in equity, enjoin any acts or things which may be unlawful or in violation of the rights of the Bondholders.

(e)     The Bond Trustee may, upon the filing of a suit or other commencement of judicial proceedings to enforce the rights of the Bond Trustee and the Bondholders, have appointed a receiver or receivers of the Trust Estate upon a showing of good cause with such powers as the court making such appointment may confer.

(f)     The Bond Trustee may exercise its rights under the Master Indenture as a Holder of the Series 2019 Note and any other Note held by the Bond Trustee.

No right or remedy is intended to be exclusive of any other right or remedy, but each and every such right or remedy shall be cumulative and in addition to any other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

If any Event of Default shall have occurred and if requested by the owners of at least 25% in Aggregate Principal Amount of Bonds then Outstanding and indemnified as provided in Section 9.01(m) hereof (except the remedy under Section 8.02(a) above, for which no indemnity may be required), the Bond Trustee shall be obligated to exercise such one or more of the rights and powers conferred by this Section as it, being advised by counsel, shall deem most expedient in the interests of such Bondholders. In the event the Bond Trustee shall receive inconsistent or conflicting requests and indemnity from two or more groups of owners of Outstanding Bonds, each representing less than a majority of the aggregate principal amount of the Outstanding Bonds, the Bond Trustee, in its sole discretion, may determine what action, if any, shall be taken.

Section 8.03     Majority of Bondholders May Control Proceedings. Anything in this Bond Indenture to the contrary notwithstanding the owners of at least a majority in Aggregate Principal Amount of the Bonds then Outstanding shall have the right, at any time, to the extent permitted by law, by an instrument or instruments in writing executed and delivered to the Bond Trustee, to direct the time, method, and place of conducting all proceedings, to be taken in connection with the enforcement of the terms and conditions of this Bond Indenture, or for the appointment of a receiver, and any other proceedings hereunder; provided that such direction shall not be otherwise than in accordance with the provisions hereof and provided, further, that notwithstanding anything to the contrary in this Bond Indenture, the Issuer shall have the sole ability to direct the method

and place of conducting all proceedings to be taken in connection with the enforcement of Section 4.10 of the Agreement. The Bond Trustee shall not be required to act on any direction given to it pursuant to this Section until indemnity as set forth in Section 9.01(m) hereof is provided to it by such Bondholders.

Section 8.04 <u>Rights and Remedies of Bondholders</u>. No owner of any Bond shall have any right to institute any suit, action, or proceeding in equity or at law for the enforcement of this Bond Indenture or for the execution of any trust hereof or for the appointment of a receiver or any other applicable remedy hereunder, unless a default has occurred of which the Bond Trustee has been notified as provided in Section 9.01 hereof, or of which by said Section it is deemed to have notice, nor unless such default shall have become an Event of Default and the owners of at least a majority in Aggregate Principal Amount of Bonds then Outstanding shall have made written request to the Bond Trustee and shall have offered reasonable opportunity either to proceed to exercise the powers hereinbefore granted or to institute such action, suit, or proceeding in their own names, nor unless they have also offered to the Bond Trustee indemnity as provided in Section 9.01(m) hereof, nor unless the Bond Trustee shall thereafter fail or refuse to exercise the powers hereinbefore granted, or to institute such action, suit, or proceeding in its own name; and such notification, request, and offer of indemnity are hereby declared in every case at the option of the Bond Trustee to be conditions precedent to the execution of the powers and trusts of this Bond Indenture, and to any action or cause of action for the enforcement of this Bond Indenture, or for the appointment of a receiver or for any other remedy hereunder; it being understood and intended that no one or more owners of the Bonds shall have the right in any manner whatsoever to affect, disturb, or prejudice the lien of this Bond Indenture by his, her, its, or their action or to enforce any right hereunder except in the manner herein provided and that all proceedings at law or in equity shall be instituted, had, and maintained in the manner herein provided and for the equal benefit of the owners of all Bonds then Outstanding. Nothing in this Bond Indenture contained shall, however, affect or impair the right of any owner of Bonds to enforce the payment of the principal of, premium, if any, or interest on any Bond at and after the maturity thereof, or the obligation of the Issuer to pay the principal of, premium, if any, and interest on each of the Bonds to the respective owners of the Bonds at the time and place, from the source and in the manner herein, and in the Bonds expressed.

Section 8.05 <u>Application of Moneys</u>.

(a) Subject to the provisions of subparagraph (c) hereof, all moneys received by the Bond Trustee pursuant to any right given or action taken under the provisions of this Article shall, after payment of the costs and expenses of the proceedings resulting in the collection of such moneys and the expenses, liabilities, and advances incurred or made by the Bond Trustee, be deposited into the Bond Fund, and all moneys so deposited into the Bond Fund and all moneys held in or deposited into the Bond Fund during the continuance of an Event of Default and available for payment of the Bonds under the provisions of Section 3.04 hereof shall (after payment of the fees and expenses of the Bond Trustee) be applied as follows:

(i) Unless the principal of all of the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied:

35

<u>First</u>:  To the payment to the Persons entitled thereto of all installments of interest then due on the Bonds in the order of the maturity of the installments of such interest and, if the amount available shall not be sufficient to pay in full any particular installment, then to the payment ratably, according to the amounts due on such installment, to the Persons entitled thereto, without any discrimination or privilege; and

<u>Second</u>:  To the payment to the Persons entitled thereto of the unpaid principal of any of the Bonds which shall have become due (other than Bonds called for redemption for the payment of which moneys are held pursuant to the provisions of this Bond Indenture), in the order of their due dates, with interest on such Bonds from the respective dates upon which they become due at the rate of interest borne by such Bonds and, if the amount available shall not be sufficient to pay in full Bonds due on any particular date, together with such interest, then to the payment ratably, according to the amount of principal due on such date, to the persons entitled thereto, without any discrimination or privilege.

(ii)     If the principal of all the Bonds shall have become due or shall have been declared due and payable, all such moneys shall be applied to the payment of the principal and interest then due and unpaid upon all of the Bonds (together with interest on overdue installments of principal at the rate of interest borne by each Bond), without preference or priority of principal over interest, any other installment of interest, or of any Bond over any other Bond, ratably, according to the amounts due respectively for principal and interest, to the Persons entitled thereto without any discrimination or privilege.

(iii)    If the principal of all the Bonds shall have been declared due and payable, and if such declaration shall thereafter have been rescinded and annulled under the provisions of this Article then, subject to the provisions of paragraph (ii) of this Section in the event that the principal of all the Bonds shall later become due or be declared due and payable, the moneys shall be applied in accordance with the provisions of the foregoing paragraph (i) of this Section.

(b)     Whenever moneys are to be applied pursuant to the provisions of this Section, such moneys shall be applied at such times, and from time to time, as the Bond Trustee shall determine, having due regard to the amount of such moneys available for application and the likelihood of additional moneys becoming available for such application in the future.  Whenever the Bond Trustee shall apply such moneys, it shall fix the date (which shall be an Interest Payment Date unless it shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue.  The Bond Trustee shall give such notice as it may deem appropriate of the deposit of any such moneys and of the fixing of any such date, and shall not be required to make payment to the owner of any unpaid Bond until such unpaid Bond shall be presented to the Bond Trustee for appropriate endorsement or for cancellation if fully paid.

(c)     Whenever all of the Bonds and interest thereon have been paid under the provisions of this Section and all expenses and fees of the Bond Trustee and the Paying Agents and all Administration Expenses have been paid, any balance remaining in any funds shall be paid to the Obligor as provided in Section 3.15 hereof.

Section 8.06    Bond Trustee May Enforce Rights Without Bonds.   All rights of action and claims under this Bond Indenture or any of the Bonds Outstanding hereunder may be enforced by the Bond Trustee without the possession of any of the Bonds or the production thereof in any trial or proceedings relative thereto; and any suit or proceeding instituted by the Bond Trustee shall be brought in its name as Bond Trustee, without the necessity of joining as plaintiffs or defendants any owners of the Bonds and any recovery of judgment shall be for the ratable benefit of the owners of the Bonds, subject to the provisions of this Bond Indenture.

Section 8.07    Bond Trustee to File Proofs of Claim in Receivership, Etc.   In the case of any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition, or other judicial proceedings affecting the Obligor, the Bond Trustee shall, to the extent permitted by law, be entitled to file such proofs of claims and other documents as may be necessary or advisable in order to have claims of the Bond Trustee and of the Bondholders allowed in such proceedings for the entire amount due and payable by the Issuer under the Bond Indenture or by the Obligor at the date of the institution of such proceedings and for any additional amounts which may become due and payable by it after such date, without prejudice, however, to the right of any Bondholder to file a claim in his, her or its own behalf.

No provision of this Bond Indenture empowers the Bond Trustee to authorize, consent to, accept or adopt on behalf of any Bondholder any plan or reorganization, arrangement, adjustment or composition affecting any of the rights of any Bondholders, or authorizes the Bond Trustee to vote in respect of the claim in any proceeding described in this Section.

In the event the Bond Trustee incurs expenses or renders services in any proceedings affecting the Obligor and described in this Section, the expenses so incurred and compensation for services so rendered are intended to constitute expenses of administration under the United States Bankruptcy Code or equivalent law.

Section 8.08    Delay or Omission No Waiver.   No delay or omission of the Bond Trustee or of any Bondholder to exercise any right or power accruing upon any default or Event of Default shall exhaust or impair any such right or power or shall be construed to be a waiver of any such default or Event of Default, or acquiescence therein; and every power and remedy given by this Bond Indenture may be exercised from time to time and as often as may be deemed expedient.

Section 8.09    Discontinuance of Proceedings on Default, Position of Parties Restored.   In case the Bond Trustee shall have proceeded to enforce any right under this Bond Indenture, and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Bond Trustee, then and in every such case the Issuer and the Bond Trustee shall be restored to their former positions and rights hereunder with respect to the Trust Estate, and all rights, remedies, and powers of the Bond Trustee shall continue as if no such proceedings had been taken.

Section 8.10    Enforcement of Rights.   The Bond Trustee, as pledgee and assignee for security purposes of all the right, title, and interest of the Issuer in and to the Agreement (except those rights under Section 5.7, 7.5, and 9.5 thereof) and the Notes shall, upon compliance with applicable requirements of law and except as otherwise set forth in this Article VIII, shall have standing to enforce each and every right granted to the Issuer under the Agreement and under the

Notes. The Issuer and the Bond Trustee hereby agree, without in any way limiting the effect and scope thereof, that the pledge and assignment hereunder to the Bond Trustee of any and all rights of the Issuer in and to the Note and the Agreement shall constitute an agency appointment coupled with an interest on the part of the Bond Trustee which, for all purposes of this Bond Indenture, shall be irrevocable and shall survive and continue in full force and effect notwithstanding the bankruptcy or insolvency of the Issuer or its default hereunder or on the Bonds. Subject to Section 9.01 hereof, in exercising such right and the rights given the Bond Trustee under this Article VIII, the Bond Trustee shall take such action as, in the judgment of the Bond Trustee, would best serve the interests of the Bondholders, taking into account the provisions of the Master Indenture, together with the security and remedies afforded to owners of the Note.

Section 8.11   Undertaking for Costs. All parties to this Indenture agree, and each Holder of any Bond by his acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Bond Indenture, or in any suit against the Bond Trustee for any action taken or omitted by it as Bond Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion access reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section shall not apply to any suit instituted by the Bond Trustee, to any suit instituted by any Bondholder, or group of Bondholders, holding in aggregate more than 10% in principal amount of the Outstanding Bonds, or to any suit instituted by a Bondholder for the enforcement of the payment of the principal of (or premium, if any) or interest on any Bond on or after the respective maturities thereof expressed in such Bond (or, in the case of redemption, on or after the redemption date).

Section 8.12   Waiver of Events of Default. The Bond Trustee, upon the written request of the Owners of a majority in aggregate principal amount of the Bonds then Outstanding shall waive any Event of Default hereunder; provided, however, that the Bond Trustee may not waive an Event of Default described in subparagraph (a) of Section 8.01 hereof without the written consent of the registered owners of all Bonds then Outstanding; and provided, further, that notwithstanding anything to the contrary in this Bond Indenture, the Issuer shall have the sole ability to waive any Event of Default in connection with the covenants and obligations of the Obligor under Section 4.10 of the Agreement.

ARTICLE IX

CONCERNING THE BOND TRUSTEE AND PAYING AGENTS

Section 9.01   Duties of the Bond Trustee. The Bond Trustee hereby accepts the trust imposed upon it by this Bond Indenture and agrees to perform said trusts, but only upon and subject to the following express terms and conditions, and no implied covenants or obligations shall be read into this Bond Indenture against the Bond Trustee:

(a)   The Bond Trustee, prior to the occurrence of an Event of Default and after the curing of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Bond Indenture. In case an Event of Default has occurred (which has not been cured) the Bond Trustee shall exercise such of the rights and

38

powers vested in it by this Bond Indenture and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs.

(b)     The Bond Trustee may execute any of the trusts or powers hereof and perform any of its duties hereunder, either directly or by or through attorneys, agents, receivers, or employees, and the Bond Trustee shall not be responsible for any misconduct or negligence on the part of any receiver, agent or attorney appointed with due care by it hereunder, and shall be entitled to act upon an Opinion of Counsel concerning all matters of trust hereof and the duties hereunder, and may in all cases pay such reasonable compensation to all such attorneys, agents, receivers, and employees as may reasonably be employed in connection with the trust hereof. The Bond Trustee may act upon an Opinion of Counsel and shall not be responsible for any loss or damage resulting from any action or nonaction taken by or omitted to be taken in good faith in reliance upon such Opinion of Counsel.

(c)     The Bond Trustee shall not be responsible for any recital herein or in the Bonds (except in respect to the certificate of authentication by the Bond Trustee endorsed on the Bonds and the acceptance of the trusts hereunder).

(d)     The Bond Trustee shall not be accountable for the use of any Bonds authenticated or delivered hereunder or the proceeds thereof, or for any moneys disbursed by the Bond Trustee in accordance with this Bond Indenture. The Bond Trustee makes no representations as to the validity or sufficiency of this Bond Indenture or the Bonds. The Bond Trustee is not a party to, is not responsible for, and makes no representations with respect to matters set forth in any preliminary official statement, or similar document prepared and distributed in connection with the sale of the Bonds. The Bond Trustee may become the owner of the Bonds with the same rights which it would have if not Bond Trustee.

(e)     The Bond Trustee shall be protected in acting upon any notice, request, consent, certificate, order, affidavit, letter, telegram, teletransmission or other paper or document reasonably believed to be genuine and correct and to have been signed or sent by the proper person or persons. Any request or direction of the Issuer or the Obligor mentioned herein shall be sufficiently evidenced by a written request, order, or consent signed in the name of the Issuer or Obligor, by the Issuer Representative, or Obligor, as the case may be. Any action taken by the Bond Trustee pursuant to this Bond Indenture upon the request or authority or consent of any person who at the time of making such request or giving such authority or consent is the owner of any Bonds shall be conclusive and binding upon all future owners of the same Bond and upon Bonds issued in place thereof.

(f)     As to the existence or nonexistence of any fact or matter or as to the sufficiency or validity of any instrument, paper, or proceeding, the Bond Trustee shall be entitled to rely and shall be protected in acting or refraining to act upon a certificate signed on behalf of the Issuer or the Obligor by the Issuer Representative or Obligor or such other person as may be designated for such purpose by Certified Resolution as sufficient evidence of the facts therein contained, and prior to the occurrence of a default of which the Bond Trustee has been notified as provided in subsection (h) of this Section, or of which by said subsection it is deemed to have notice, shall also be at liberty to accept a similar certificate to the effect that any particular dealing,

transaction, or action is necessary or expedient, but may at its discretion secure such further evidence deemed necessary or advisable, but shall in no case be bound to secure the same.

(g)     The permissive right of the Bond Trustee to do things enumerated in this Bond Indenture shall not be construed as a duty (except as otherwise herein provided) and the Bond Trustee shall not be answerable for other than its own negligence or willful misconduct, except that:

(1)     the Bond Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proved that the Bond Trustee was negligent in ascertaining the pertinent facts;

(2)     the Bond Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Bondholders of at least a majority in Aggregate Principal Amount of the Outstanding Bonds relating to the time, method, and place of conducting any proceeding for any remedy available to the Bond Trustee, or exercising any trust or power conferred upon the Bond Trustee, under this Bond Indenture; and

(3)     the Bond Trustee shall not be liable if the Bond Trustee reasonably relies in good faith upon an Officer's Certificate delivered pursuant to this Bond Indenture or an Opinion of Counsel.

(h)     The Bond Trustee shall not be required to take notice or be deemed to have notice of any default hereunder except failure by the Issuer to cause to be made any of the payments to the Bond Trustee required to be made by Article III hereof unless the Bond Trustee shall be specifically notified in writing of such default by the Issuer or by the owners of at least a majority in Aggregate Principal Amount of Bonds then Outstanding and all notices or other instruments required by this Bond Indenture to be delivered to the Bond Trustee, must, in order to be effective, be delivered to a Responsible Officer at the designated corporate trust office of the Bond Trustee, and in the absence of such notice so delivered, the Bond Trustee may conclusively assume there is no default except as aforesaid.

(i)     All moneys received by the Bond Trustee shall, until used or applied or invested as herein provided, be held in trust in the manner and for the purposes for which they were received, but need not be segregated from other funds except to the extent required by this Bond Indenture or law.

(j)     At any and all reasonable times the Bond Trustee and its duly authorized agents, attorneys, experts, engineers, accountants, and representatives shall have the right, but shall not be required, to inspect the Project, including all books, papers, and records of the Issuer and the Obligor pertaining to the Project and the Bonds.

(k)     The Bond Trustee shall not be required to give any bond or surety in respect of the execution of the said trusts and powers or otherwise in respect of the premises, and no provision of this Bond Indenture shall require the Bond Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the

exercise of any of its rights or powers, if it shall have grounds for believing that repayment of such funds or indemnity satisfactory against such risk or liability is not assured to it.

(l)     Notwithstanding anything in this Bond Indenture contained, the Bond Trustee shall have the right, but shall not be required, to demand in respect of the authentication of any Bonds, the withdrawal of any cash, or any action whatsoever within the purview of this Bond Indenture, any showings, certificates, opinion, appraisals, or other information, or corporate action or evidence thereof, in addition to that by the terms hereof required, as a condition of such action by the Bond Trustee deemed desirable for the purpose of establishing the right of the Issuer to the authentication of any Bonds, the withdrawal of any cash, or the taking of any other action by the Bond Trustee.

(m)     Before taking any action under this Section or Article VIII hereof, the Bond Trustee may require that indemnity reasonably satisfactory to it be furnished to it for the reimbursement of its fees, costs, liabilities and all expenses (including attorneys fees) which it may incur and to protect it against all liability, except liability which may result from its negligence or willful misconduct, by reason of any action so taken.

(n)     Except as provided in Section 9.01(a) above, it shall not be the duty of the Bond Trustee, except as expressly provided herein, to see that any duties or obligations imposed herein or in the Agreement upon the Issuer, the Obligor, or other Persons are performed, and the Bond Trustee shall not be liable or responsible because of the failure of the Issuer, the Obligor, or other Persons to perform any act required of them pursuant to the terms of this Bond Indenture.

(o)     In acting or omitting to act pursuant to the provisions of the Agreement, the Bond Trustee shall be entitled to and be protected by the rights and immunities accorded to it by the terms of this Bond Indenture.

(p)     In the event the Bond Trustee receives inconsistent or conflicting requests and indemnity from two or more groups of holders of Bonds, each representing less than a majority in aggregate principal amount of the Bonds Outstanding, the Bond Trustee, in its sole discretion, may determine what action, if any, shall be taken.

(q)     The Bond Trustee's immunities and protections from liability in connection with the performance of its duties under this Bond Indenture shall extend to the Bond Trustee's officers, directors, agents and employees. Such immunities and protections, together with the Bond Trustee's right to compensation, shall survive the Bond Trustee's resignation or removal and final payment of the Bonds.

Section 9.02   Fees and Expenses of Bond Trustee and Paying Agent. The Issuer agrees, but solely from any funds received from the Obligor pursuant to the Agreement,

(a)     to pay to the Bond Trustee, each Paying Agent and all other agents their reasonable and necessary fees for services rendered hereunder as and when the same become due and all expenses (including attorneys' fees) reasonably and necessarily made or incurred by the Bond Trustee, such Paying Agent or such other agent in connection with such services as and when the same become due as provided in Section 3.13 hereof; and

(b)     to reimburse the Bond Trustee upon its request for all reasonable expenses, disbursements, and advances incurred or made by the Bond Trustee in accordance with any provisions of this Bond Indenture (including the reasonable compensation, expenses, and disbursements of its agents and counsel), except any such expense, disbursement, or advance as may be attributable to the negligence or bad faith of the Bond Trustee.

As security for the performance of the obligations of the Issuer under this Section, the Bond Trustee shall be secured under this Bond Indenture by a lien prior to the Bonds for the payment of the expenses and reimbursements due hereunder, and shall have the right to use and apply any trust funds held by it hereunder for such purpose.

Section 9.03   Resignation or Replacement of Bond Trustee.   The present or any future Bond Trustee may resign by giving to the Issuer, the Obligor and each Bondholder thirty days' notice of such resignation. Such resignation shall not be effective until such time as a successor Bond Trustee shall have accepted its appointment. The present or any future Bond Trustee may be removed at any time by an instrument in writing executed by the owners of at least a majority in Aggregate Principal Amount of Bonds Outstanding or by the Obligor with the written consent of the owners of at least a majority in Aggregate Principal Amount of Bonds Outstanding, or, upon a substitution for the Series 2019 Note of a master note or notes issued under the master indenture for the Lifespace Obligated Group (as defined in the Master Indenture) in accordance with Section 9.06 of the Master Indenture, by the Obligor without the written consent of any owners of Bonds.

In case the present or any future Bond Trustee shall at any time resign or be removed or otherwise become incapable of acting, a successor may be appointed by the owners of at least a majority in Aggregate Principal Amount of the Bonds Outstanding by an instrument or concurrent instruments signed by such Bondholders, or their attorneys in fact duly appointed; provided that the Issuer may, by an instrument executed by order of the Board of Directors, appoint a successor until a new successor shall be appointed by the Bondholders as herein authorized. The Issuer upon making such appointment shall forthwith give notice thereof to each Bondholder and to the Obligor, which notice may be given concurrently with the notice of resignation given by any resigning Bond Trustee. Any successor so appointed by the Issuer shall immediately and without further act be superceded by a successor appointed in the manner above provided by the owners of at least a majority in Aggregate Principal Amount of the Bonds Outstanding. In the event that the Issuer does not so act within thirty days after notice of resignation, the Bond Trustee shall have the right to petition a court of competent jurisdiction to appoint a successor Bond Trustee.

Every successor Bond Trustee shall always be a bank, banking corporation or trust company duly organized under the laws of the United States of America or any state or territory thereof, with trust powers in good standing, qualified to act hereunder, and having a combined capital and surplus of not less than $50,000,000. Any successor appointed hereunder shall execute, acknowledge, and deliver to the Issuer and the predecessor Bond Trustee an instrument accepting such appointment hereunder and thereupon such successor shall, without any further act, deed, or conveyance, become vested with all the estates, properties, rights, powers, and trusts of its predecessor in the trust hereunder with like effect as if originally named as Bond Trustee herein; but the Bond Trustee retiring shall, nevertheless, on the written demand of its successor, execute and deliver an instrument conveying and transferring to such successor, upon the trusts herein expressed, all the estates, properties, rights, powers, and trusts of the predecessor, who shall, upon

42

payment of the expenses, charges and other disbursements which are due and owing to it pursuant to Sections 3.13 and 9.02 hereof, duly assign, transfer and deliver to the successor all properties and moneys held by it under this Bond Indenture. Should any instrument in writing from the Issuer be required by any successor for more fully and certainly vesting in and confirming to it all of such estates, properties, rights, powers, and trusts, the Issuer shall, on request of such successor, make, execute, acknowledge, and deliver the deeds, conveyances, and necessary instruments in writing.

The notices herein provided for shall be given by mailing a copy thereof to the Obligor and the registered owners of the Bonds at their addresses as the same shall last appear on the registration books. The instruments evidencing the resignation or removal of the Bond Trustee and the appointment of a successor hereunder, together with all other instruments provided for in this Section shall be filed and/or recorded by the successor Bond Trustee in each recording office where this Bond Indenture shall have been filed and/or recorded.

Section 9.04   Conversion, Consolidation or Merger of Bond Trustee. Any bank, banking corporation or trust company into which the Bond Trustee merges or is consolidated, or to which it (or a receiver on its behalf) may sell or transfer its corporate trust business as a whole, or substantially as a whole, shall be the successor of the Bond Trustee under this Bond Indenture with the same rights, powers, duties, and obligations and subject to the same restrictions, limitations, and liabilities as its predecessor, all without the execution or filing of any papers or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding. In case any of the Bonds to be issued hereunder shall have authenticated, but not delivered, any successor Bond Trustee may adopt the certificate of any predecessor Bond Trustee, and deliver the same as authenticated; and, in case any of such Bonds shall not have been authenticated, any successor Bond Trustee may authenticate such Bonds in the name of such successor Bond Trustee.

Section 9.05   Designation and Succession of Paying Agent. The Bond Trustee shall be the Paying Agent or Paying Agents for the Bonds.

Any bank or trust company with or into which any Paying Agent may be merged or consolidated, or to which the assets and business of such Paying Agent may be sold, shall be deemed the successor of such Paying Agent for the purposes of this Bond Indenture. If the position of Paying Agent shall become vacant for any reason, the Issuer shall, within thirty days thereafter, appoint such bank or trust company as shall be specified by the Obligor and located in the same city as such Paying Agent to fill such vacancy; provided, however, that if the Issuer shall fail to appoint such Paying Agent within said period, the Bond Trustee shall make such appointment.

The Paying Agents, if any, shall enjoy the same protective provisions in the performance of their duties hereunder as are specified in Section 9.01 hereof with respect to the Bond Trustee insofar as such provisions may be applicable.

Section 9.06   [Reserved.]

Section 9.07   [Reserved.]

ARTICLE X

SUPPLEMENTAL INDENTURES AND AMENDMENTS TO THE AGREEMENT

Section 10.01 Supplemental Indentures Not Requiring Consent of Bondholders. The Issuer and the Bond Trustee may, without the consent of, but with notice thereof to the Bondholders as provided in Section 10.02, enter into such indentures or agreements supplemental hereto (which supplemental indentures or agreements shall thereafter form a part hereof) for any one or more or all of the following purposes:

(a) To add to the covenants and agreements in this Bond Indenture contained other covenants and agreements thereafter to be observed for the protection or benefit of the Bondholders.

(b) To cure any ambiguity, or to cure, correct, or supplement any defect or inconsistent provision contained in this Bond Indenture, or to make any provisions with respect to matters arising under this Bond Indenture or for any other purpose if such provisions are necessary or desirable and do not, in the judgment of the Bond Trustee, adversely affect the interests of the owners of Bonds.

(c) To subject to this Bond Indenture additional revenues, properties, or collateral.

(d) To qualify this Bond Indenture under the Trust Indenture Act of 1939, if such be hereafter required in the Opinion of Counsel.

(e) To satisfy any requirements imposed by a rating agency if necessary to maintain the then current rating on the Bonds.

(f) To maintain the extent to which the interest on the Bonds is not includable in the gross income of the recipients thereof, if in the opinion of Bond Counsel such supplemental indenture or agreement is necessary.

(g) To modify or amend this Bond Indenture to provide for a substitution of master note or notes issued under the master indenture for the Lifespace Obligated Group (as defined under the Master Indenture) for the Series 2019 Note in accordance with Section 9.06 of the Master Indenture, subject, however, to the limitations set forth Section 10.02 (a) through (c).

Section 10.02 Supplemental Indentures Requiring Consent of Bondholders. The owners of not less than a majority in Aggregate Principal Amount of the Bonds then Outstanding shall have the right, from time to time, to consent to and approve the execution by the Issuer and the Bond Trustee of such indenture or indentures supplemental hereto (exclusive of supplemental indentures entered into pursuant to Section 10.01 hereof), as shall be deemed necessary or desirable by the Issuer for the purpose of modifying, altering, amending, adding to, or rescinding, in any particular, any of the terms or provisions contained in this Bond Indenture; provided, however, that without the consent of the owners of all the Bonds at the time Outstanding nothing herein contained shall permit, or be construed as permitting any of the following:

(a)     An extension of the maturity of, or a reduction of the principal amount of, or a reduction of the rate of, or extension of the time of payment of interest on, or a reduction of a premium payable upon any redemption of, any Bond.

(b)     A privilege or priority of any Bond or Bonds over any other Bond.

(c)     A reduction in the Aggregate Principal Amount of the Bonds required for consent to any supplemental indenture.

Upon the execution of any supplemental indenture pursuant to the provisions of this Section, this Bond Indenture shall be deemed to be modified and amended in accordance therewith, and the respective rights, duties, and obligations under this Bond Indenture of the Issuer, the Bond Trustee and all owners of Bonds then Outstanding shall thereafter be determined, exercised, and enforced hereunder, subject in all respects to such modifications and amendments.

If at any time the Issuer shall request the Bond Trustee to enter into such supplemental indenture for any of the purposes of this Section, the Bond Trustee shall, upon being satisfactorily indemnified with respect to costs, fees and expenses (including attorneys' fees), cause notice of the proposed execution of such supplemental indenture to be mailed to the registered owners of the Bonds at their addresses as the same last appear on the registration books. Such notice shall briefly set forth the nature of the proposed supplemental indenture and shall state that copies thereof are on file at the designated office of the Bond Trustee for inspection by all Bondholders.

Section 10.03  Execution of Supplemental Indenture. The Bond Trustee is authorized to join with the Issuer in the execution of any such supplemental indenture and to make further agreements and stipulations which may be contained therein, but the Bond Trustee shall not be obligated to enter into any such supplemental indenture which affects its rights, duties, or immunities under this Bond Indenture. The Bond Trustee shall be entitled to receive, and shall be fully protected in relying upon, an Opinion of Counsel stating that the execution and delivery of a supplemental indenture is authorized or permitted by this Bond Indenture and has been effected in compliance with the provisions hereof. In connection with a supplemental indenture entered into pursuant to Section 10.01(b) hereof, the Bond Trustee may in its discretion receive an Opinion of Counsel as conclusive evidence as to whether the Bondholders would be so affected by any such modification or amendment to this Bond Indenture.

Any supplemental indenture executed in accordance with the provisions of this Article shall thereafter form a part of this Bond Indenture; and all the terms and conditions contained in any such supplemental indenture as to any provision authorized to be contained therein shall be deemed to be part of this Bond Indenture for any and all purposes. In case of the execution and delivery of any supplemental indenture, express reference may be made thereto in the text of the Bonds issued thereafter, if any, if deemed necessary or desirable by the Bond Trustee.

Section 10.04  Consent of Obligor. Anything herein to the contrary notwithstanding, a supplemental indenture under this Article shall not become effective unless and until the Obligor shall have consented in writing to the execution and delivery of such supplemental indenture unless an Event of Default has occurred and is continuing under this Bond Indenture, in which case no consent of the Obligor shall be required. The Bond Trustee shall cause notice of the proposed

execution of any supplemental indenture together with a copy of the proposed supplemental indenture to be mailed to the Obligor at least fifteen days prior to the proposed date of execution of such supplemental indenture.

Section 10.05 <u>Amendments, Etc., of the Agreement Not Requiring Consent of Bondholders</u>. The Issuer and the Bond Trustee shall, without the consent of or notice to the Bondholders, consent to any amendment, change, or modification of the Agreement as may be required (i) by the provisions of the Agreement and this Bond Indenture, (ii) for the purpose of curing any ambiguity or formal defect or omission, (iii) to satisfy any requirements imposed by a rating agency if necessary to maintain the then current rating on the Bonds, (iv) to maintain the extent to which the interest on the Bonds is not includable in the gross income of the recipients thereof, if in the opinion of Bond Counsel such amendment is necessary, (v) to modify or amend the Agreement to provide for a substitution of master note or notes issued under the master indenture for the Lifespace Obligated Group (as defined in the Master Indenture) for the Series 2019 Note in accordance with Section 9.06 of the Master Indenture, subject, however, to the limitations set forth Section 10.02 (a) through (c), and (vi) in connection with any other change therein which does not adversely affect the Bond Trustee or the owners of the Bonds.

Section 10.06 <u>Amendments, Etc., of the Agreement or Master Indenture Requiring Consent of Bondholders</u>. Except for the amendments, changes, or modifications as provided in Section 10.05 hereof, neither the Issuer nor the Bond Trustee shall consent to any other amendment, change, or modification of the Agreement, and the Bond Trustee shall not consent as Holder of the Series 2019 Note to any amendment, change, or modification of the Master Indenture, without the giving of notice to and the written approval or consent of the owners of not less than a majority in Aggregate Principal Amount of the Bonds at the time Outstanding given and procured as provided in Section 10.02 hereof. If at any time the Issuer and the Obligor shall request the consent of the Bond Trustee to any such proposed amendment, change, or modification of the Agreement or the Obligor shall request the consent of the Bond Trustee to any such proposed amendment, change, or modification of the Master Indenture, the Bond Trustee shall, upon being satisfactorily indemnified with respect to expenses, cause notice of such proposed amendment, change, or modification to be given in the same manner as provided in Section 10.02 hereof. Such notice shall briefly set forth the nature of such proposed amendment, change, or modification and shall state that copies of the instrument embodying the same are on file at the designated office of the Bond Trustee for inspection by all Bondholders.

In executing or consenting to any amendment, change or modification of the Agreement or the Master Indenture, the Bond Trustee shall be entitled to receive, and shall be fully protected in relying upon, an Opinion of Counsel stating that the execution and delivery of or consent to such amendment, change, modification of the Agreement or Master Indenture is authorized or permitted by this Bond Indenture and the Agreement and has been effected in compliance with the provisions of this Bond Indenture and the Agreement. The Bond Trustee may, but shall not be obligated to, enter into or consent to any such amendment, change, or modification which affects the Bond Trustee's own rights, duties or immunities. In connection with any amendment, change or modification in connection with Section 10.05(vi), the Bond Trustee may receive an Opinion of Counsel as conclusive evidence as to whether the Bondholders would be prejudiced by any such amendment, change, or modification of the Agreement.

ARTICLE XI

MISCELLANEOUS

Section 11.01 <u>Evidence of Signature of Bondholders and Ownership of Bonds</u>. Any request, consent, or other instrument which the Bond Indenture may require or permit to be signed and executed by the Bondholders may be in one or more instruments of similar tenor, and shall be signed or executed by such Bondholders in person or by their attorneys appointed in writing. Proof of the execution of any such instrument or of an instrument appointing any such attorney, or of the ownership of Bonds shall be sufficient (except as otherwise herein expressly provided) if made in the following manner, but the Bond Trustee may, nevertheless, in its discretion, require further or other proof in cases where it deems the same desirable:

(a)     The fact and date of the execution by any Bondholder or his attorney of such instrument may be proved by the certificate of any officer authorized to take acknowledgments in the jurisdiction in which he purports to act that the person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before a notary public.

(b)     The ownership of any fully registered Bond and the amount and numbers of such Bonds and the date of holding the same shall be proved by the registration books of the Issuer kept by the Bond Trustee. Any request or consent of the owner of any Bond shall bind all future owners of such Bond in respect of anything done or suffered to be done by the Issuer or the Bond Trustee in accordance therewith.

Section 11.02 <u>No Personal Liability</u>. No recourse under or upon any obligation, covenant or agreement contained in this Bond Indenture, or in any Bond hereby secured, or under any judgment obtained against the Issuer, or by the enforcement of any assessment or by any legal or equitable preceding by virtue of any constitution or statute or otherwise or under any circumstances, under or independent of this Bond Indenture, shall be had against any officer, director, agent or employee, as such, past, present or future, of any of the Issuer, the Bond Trustee or Tarrant County, Texas, either directly or through the Issuer, or otherwise, for the payment for or to the Issuer or any receiver thereof, or for or to the holder of any Bond issued hereunder or otherwise of any sum that may be due and unpaid by the Issuer upon any such Bond. Any and all personal liability of every nature, whether at common law or in equity, or by statute or by constitution or otherwise, of any such person to respond by reason of any act or omission on his part or otherwise, for the payment for or to the Issuer or any receiver thereof or for or to the holder of any Bond issued hereunder or otherwise, of any sum that may remain due and unpaid upon the Bonds hereby secured or any of them, is hereby expressly waived and released as a condition of and consideration for the execution of this Bond Indenture and the issue of such Bonds.

Section 11.03 <u>Limited Obligation</u>. Neither the State of Texas, nor Tarrant County, Texas, shall in any event be liable for the payment of the principal of, premium, if any, or interest on any of the Bonds issued hereunder. The Bonds are limited obligations of the Issuer payable solely from the revenues, receipts and resources of the Issuer pledged to their payment and not from any other revenues, funds or assets of the Issuer. None of the Bonds of the Issuer issued hereunder shall be construed or constitute an indebtedness of the Issuer or an indebtedness or obligation

47

(special, moral or general) of the State of Texas or Tarrant County, Texas within the meaning of any constitutional or statutory provision whatsoever.

Section 11.04 <u>Parties Interested Herein</u>. With the exception of rights herein expressly conferred on the Obligor, nothing in this Bond Indenture expressed or implied is intended or shall be construed to confer upon, or to give to, any person other than the Issuer, the Bond Trustee, the Paying Agents, and the owners of the Bonds, any right, remedy, or claim under or by reason of this Bond Indenture, and any covenants, stipulations, promises, and agreements in this Bond Indenture contained by and on behalf of the Issuer shall be for the sole and exclusive benefit of the Issuer, the Bond Trustee and the owners of the Bonds.

Section 11.05 <u>Titles, Headings, Etc</u>. The titles and headings of the articles, sections, and subdivisions of this Bond Indenture have been inserted for convenience of reference only and shall in no way modify or restrict any of the terms or provisions hereof.

Section 11.06 <u>Severability</u>. In the event any provision of this Bond Indenture shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof.

Section 11.07 <u>Governing Law</u>. This Bond Indenture shall be governed and construed in accordance with the laws of the State of Texas.

Section 11.08 <u>Execution of Counterparts; Electronic Transactions</u>. This Bond Indenture may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument. The transaction described herein may be conducted and this Bond Indenture and related documents may be stored by electronic means. Copies, telecopies, facsimiles, electronic files and other reproductions of original executed documents shall be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

Section 11.09 <u>Notices</u>. Any notice, request or other communication under this Agreement shall be given in writing and shall be deemed to have been given by either party to the other party at the addresses shown below upon any of the following dates:

      (a)    The date of notice by telefax, telecopy, or similar telecommunications, which is confirmed promptly in writing;

      (b)    Three Business Days after the date of the mailing thereof, as shown by the post office receipt if mailed to the other party hereto by registered or certified mail;

      (c)    The date of the receipt thereof by such other party if not given pursuant to (a) or (b) above. The address for notice for each of the parties shall be as follows:

      Tarrant County Cultural Education Facilities Finance Corporation
      c/o Brown Pruitt Wambsganss Ferrill & Dean, P.C.
      201 Main Street
      Suite 801
      Fort Worth, Texas 76102

Attention: Secretary, Randal L. Dean
Telephone: (817) 338-4888
Telecopier No.: (817) 338-0700

81

Obligor:

Tarrant County Senior Living Center Inc.
c/o Lifespace Communities, Inc.
4201 Corporate Drive
West Des Moines, Iowa 50266
Telephone: (515) 309-4456
Telecopier: _____
Attention: Chief Financial Officer

with a copy to:

Lifespace Communities, Inc.
4201 Corporate Drive
West Des Moines, Iowa 50266
Telephone: (515) 309-4456
Telecopier: _____
Attention: Jodi Hirsch, Senior Vice President and General Counsel

Bond Trustee:

UMB Bank, National Association
[insert]

Notwithstanding the foregoing, notices to the Bond Trustee shall be effective only upon receipt.

Section 11.10 <u>Payments Due on Holidays</u>. If the date for making any payment or the last day for performance of any act or the exercising of any right, as provided in this Bond Indenture, shall be a legal holiday or a day on which banking institutions in Dallas, Texas or Minneapolis, Minnesota, are authorized by law to remain closed, such payment may be made or act performed or right exercised on the next succeeding day not a legal holiday or a day on which such banking institutions are authorized by law to remain closed with the same force and effect as if done on the nominal date provided in this Bond Indenture.

IN WITNESS WHEREOF, TARRANT COUNTY CULTURAL EDUCATION FACILITIES FINANCE CORPORATION has caused this Bond Indenture to be executed on its behalf by its President, and UMB BANK, NATIONAL ASSOCIATION has caused this Bond Indenture to be executed on its behalf by its duly authorized officer to evidence its acceptance of the trusts hereby created, all as of the date first above written.

TARRANT COUNTY CULTURAL EDUCATION
FACILITIES FINANCE CORPORATION

By: _____
President

UMB BANK, NATIONAL ASSOCIATION,
as Bond Trustee

By: _____
Authorized Signatory

Indenture of Trust Signature Page
Series 2019

TARRANT COUNTY CULTURAL EDUCATION FACILITIES FINANCE CORPORATION

and

TARRANT COUNTY SENIOR LIVING CENTER INC.

LOAN AGREEMENT

DATED AS OF [NOVEMBER 1], 2019

TARRANT COUNTY CULTURAL EDUCATION FACILITIES FINANCE CORPORATION
RETIREMENT FACILITY REVENUE BONDS
(THE STAYTON AT MUSEUM WAY PROJECT)
SERIES 2019

TABLE OF CONTENTS
[to be updated]

(This Table of Contents is not a part of this
Loan Agreement and is only for convenience of reference)

PAGE

ARTICLE I

Definitions

Section 1.1    Definitions...................................................**Error! Bookmark not defined.**

ARTICLE II

Representations

Section 2.1    Representations by the Issuer......................**Error! Bookmark not defined.**

Section 2.2    Representations by the Obligor....................**Error! Bookmark not defined.**

ARTICLE III

Term of Agreement

Section 3.1    Term of this Agreement ...............................**Error! Bookmark not defined.**

ARTICLE IV

Issuance of the Bonds

Section 4.1    Agreement to Issue Bonds ...........................**Error! Bookmark not defined.**

Section 4.2    Modifications of the Projects ......................**Error! Bookmark not defined.**

Section 4.3    Covenants Regarding Tax Exemption ..........**Error! Bookmark not defined.**

Section 4.4    [Reserved] ...................................................**Error! Bookmark not defined.**

Section 4.5    Representations and Warranties as to Tax Exempt Status of Obligor .. **Error! Bookmark not defined.**

Section 4.6    Disposition of the Project.............................**Error! Bookmark not defined.**

ARTICLE V

Loan of Bond Proceeds; Note; Provision for Payment

Section 5.1    Loan of Bond Proceeds ...............................**Error! Bookmark not defined.**

Section 5.2    Repayment of Loan ......................................**Error! Bookmark not defined.**

Section 5.3    Credits ........................................................**Error! Bookmark not defined.**

Section 5.4    Note ............................................................**Error! Bookmark not defined.**

Section 5.5    Payment of Bond Trustee's and Paying Agent's Fees and Expenses ... **Error! Bookmark not defined.**

i

Section 5.6    Reserve Fund.................................................**Error! Bookmark not defined.**

Section 5.7    Payment of Administration Expenses...........**Error! Bookmark not defined.**

Section 5.8    Payees of Payments.......................................**Error! Bookmark not defined.**

Section 5.9    Obligations of Obligor Hereunder Unconditional....... **Error! Bookmark not defined.**

## ARTICLE VI

### Maintenance and Insurance

Section 6.1    Maintenance and Modifications of Projects by Obligor .... **Error! Bookmark not defined.**

Section 6.2    Insurance ......................................................**Error! Bookmark not defined.**

## ARTICLE VII

### Special Covenants

Section 7.1    No Warranty of Merchantability, Condition or Suitability by the Issuer .............................................................**Error! Bookmark not defined.**

Section 7.2    Right of Access to the Project......................**Error! Bookmark not defined.**

Section 7.3    Nonsectarian Use .........................................**Error! Bookmark not defined.**

Section 7.4    Further Assurances........................................**Error! Bookmark not defined.**

Section 7.5    INDEMNIFICATION ...................................**Error! Bookmark not defined.**

Section 7.6    Authority of Obligor ....................................**Error! Bookmark not defined.**

Section 7.7    Authority of Issuer Representative................**Error! Bookmark not defined.**

Section 7.8    No Personal Liability ...................................**Error! Bookmark not defined.**

Section 7.9    Fees and Expenses........................................**Error! Bookmark not defined.**

## ARTICLE VIII

### Assignment and Leasing

Section 8.1    Assignment and Leasing by Obligor............**Error! Bookmark not defined.**

Section 8.2    Assignment and Pledge by Issuer ................**Error! Bookmark not defined.**

## ARTICLE IX

### Failure to Perform Covenants and Remedies Therefor

Section 9.1    Event of Default ...........................................**Error! Bookmark not defined.**

Section 9.2    Remedies......................................................**Error! Bookmark not defined.**

Section 9.3    Discontinuance of Proceedings....................**Error! Bookmark not defined.**

Section 9.4    No Remedy Exclusive..................................**Error! Bookmark not defined.**

Section 9.5       Agreement to Pay Attorneys' Fees and Expenses....... **Error! Bookmark not defined.**

Section 9.6       Waivers ........................................................**Error! Bookmark not defined.**

### ARTICLE X

#### Prepayment of Note

Section 10.1      General Option to Prepay Note .....................**Error! Bookmark not defined.**

Section 10.2      Conditions to Exercise of Option ................**Error! Bookmark not defined.**

### ARTICLE XI

#### Miscellaneous

Section 11.1      Notices..........................................................**Error! Bookmark not defined.**

Section 11.2      Binding Effect ................................................**Error! Bookmark not defined.**

Section 11.3      Severability ...................................................**Error! Bookmark not defined.**

Section 11.4      Amounts Remaining in Funds.......................**Error! Bookmark not defined.**

Section 11.5      Amendments, Changes, and Modifications ..**Error! Bookmark not defined.**

Section 11.6      Execution in Counterparts; Electronic Transactions... **Error! Bookmark not defined.**

Section 11.7      Payment.........................................................**Error! Bookmark not defined.**

Section 11.8      Governing Law...............................................**Error! Bookmark not defined.**

Section 11.9      No Pecuniary Liability of Issuer ..................**Error! Bookmark not defined.**

Section 11.10     Payments Due on Holidays ...........................**Error! Bookmark not defined.**

Section 11.11     No Individual Liability...................................**Error! Bookmark not defined.**

Section 11.12     Survival of Covenants ...................................**Error! Bookmark not defined.**

Exhibit A         Project Description ................................................................ A-1

LOAN AGREEMENT

THIS LOAN AGREEMENT dated as of [November 1], 2019, between TARRANT COUNTY CULTURAL EDUCATION FACILITIES FINANCE CORPORATION, a nonprofit cultural educational facilities finance corporation duly organized and existing under the laws of the State of Texas (the "Issuer"), and TARRANT COUNTY SENIOR LIVING CENTER INC., a nonprofit corporation duly organized and existing under the laws of the State of Texas (the "Obligor"),

WITNESSETH:

WHEREAS, the Issuer is a nonstock nonprofit cultural educational facilities finance corporation organized and existing under the laws of the State of Texas, created and acting on behalf of Tarrant County, Texas; and

WHEREAS, the Issuer is authorized under the Cultural Education Facilities Finance Corporation Act, Article 1528m, V.A.T.C.S., as amended (the "Act"), to enter into loan agreements and to issue its bonds and loan the proceeds thereof to provide for the financing and refinancing of the acquisition, construction or installation of health facilities; and

WHEREAS, the Obligor has requested the Issuer to issue its bonds in an amount sufficient to provide for the refinancing of a portion of the cost of acquiring, constructing, and equipping certain health facilities for the Obligor through the exchange of such bonds for bonds previously issued by the Issuer for such purpose; and

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants hereinafter contained, the parties hereto formally covenant, agree and bind themselves as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.  Except as otherwise provided herein, the terms used in this Agreement shall have the meanings given such terms in the Master Indenture.  In addition to such terms defined in the Master Indenture, the following terms, except where the context indicates otherwise, shall have the respective meanings set forth below.

"Account" means any account established within a Fund.

"Act" means the Cultural Education Facilities Finance Corporation Act, Article 1528m, V.A.T.C.S., as amended from time to time.

"Administration Expenses" means the reasonable and necessary fees and expenses incurred by the Issuer pursuant to this Agreement and the Bond Indenture.

"Affiliate" means, with respect to any Person, any Person that directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such first Person.  A Person shall be deemed to control another Person for the purposes of this definition if

such Person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of the second Person, whether through the ownership of voting securities, common directors, trustees or officers, by contract or otherwise.

"Aggregate Principal Amount" means the outstanding principal amount including, in the case of a security sold at a discount to the purchaser thereof the accreted value of such discount calculated in accordance with the documents authorizing such security, or if not so defined, generally accepted accounting principles.

"Agreement" or "Loan Agreement" means this Loan Agreement and any amendments and supplements hereto made in conformity herewith and with the Bond Indenture.

"Authorized Denominations" means the denomination of $5,000 or any integral multiple thereof.

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas.

"Bankruptcy Court Order" means the order of the Bankruptcy Court approving the Plan, including the Exchange of the Series 2019 Bonds for the outstanding Series 2009 Bonds.

"Board" or "Board of Directors" means the governing body of the Issuer.

"Bond Counsel" means Gilmore & Bell, P.C., and its successors or such other nationally recognized bond counsel as may be selected by the Obligor with the approval of the Issuer and the Bond Trustee, which approval may not be unreasonably withheld.

"Bond Fund" means the Bond Fund created in Section 3.02 of the Bond Indenture.

"Bond Indenture" means the Indenture of Trust of even date herewith relating to the Bonds between the Issuer and the Bond Trustee, including any indentures supplemental thereto made in conformity therewith.

"Bondholder" or "owner" of the Bonds mean the registered owner of any fully registered Bond.

"Bonds" means the Series 2019 Bonds.

"Bond Trustee" means UMB Bank, National Association, being the registrar, a paying agent and the trustee under the Bond Indenture, or any successor corporate trustee.

"Business Day" means any day other than (i) a Saturday, a Sunday or, in the City of New York, New York, or in Minneapolis, Minnesota (or, if different, in the city in which the designated corporate trust office of the Bond Trustee is located), a day on which banking institutions are authorized or required by law or executive order to close, or (ii) a day on which the New York Stock Exchange is closed.

"Certified Resolution" means a resolution duly adopted by the Board of Directors, certified by the Secretary.

"Code" means the Internal Revenue Code of 1986, as amended.

"Delivery Date" means the date the Bonds are delivered to the Securities Depository for crediting to the beneficial owners of the Series 2009 Bonds in accordance with the Plan in Exchange for the cancellation of the Series 2009 Bonds.

"Effective Date" means the date set forth in the Bankruptcy Court Order for the effective date of the Plan, including the Exchange of the Series 2019 Bonds for the outstanding Series 2009 Bonds

"Event of Default" means those defaults specified in Section 8.01 of the Bond Indenture.

"Funds" means the Bond Fund and the Reserve Fund]

"Government Obligations" means direct obligations of, or obligations the principal of and interest on which are guaranteed by, the United States of America, including (in the case of direct obligations of the United States of America) evidences of direct ownership of proportionate interests in future interest or principal payments of such obligations.  Investments in such proportionate interests must be limited to circumstances wherein (a) a bank or trust company acts as custodian and holds the underlying Government Obligations; (b) the owner of the investment is the real party in interest and has the right to proceed directly and individually against the Obligor of the underlying Government Obligations; and (c) the underlying Government Obligations are held in a special account, segregated from the custodian's general assets, and are not available to satisfy any claim of the custodian, any person claiming through the custodian, or any person to whom the custodian may be obligated.

"Health Facility Act" means the Health Facilities Development Act, Chapter 221, Texas Health and Safety Code, as amended from time to time.

"Immediate Notice" shall mean notice by telephone, telegram, telex, telecopier or other telecommunication device, receipt of which has been confirmed by the recipient, to such phone numbers or addresses as are specified in Section 11.09 of the Bond Indenture or such other phone number or address as the addressee shall have directed in writing, promptly followed by written notice by overnight carrier or delivery service, expenses prepaid, to such addresses.

"Interest Account" means the account of such name in the Bond Fund created in Section 3.02 of the Bond Indenture.

"Interest Payment Date" means, each [May 1] and [November 1], commencing [May 1], 2020, or, if such day is not a business day, the immediately succeeding business day in the years during which the Series 2019 Bonds are Outstanding under the provisions of the Bond Indenture.

"Issuer" means Tarrant County Cultural Education Facilities Finance Corporation, or any public corporation succeeding to its rights and obligations under this Agreement.

3

"Issuer Representative" means the President of the Issuer or such other person at the time, and from time to time, designated by written certificate of the Issuer furnished to the Obligor and the Bond Trustee containing the specimen signature of such person and signed on behalf of the Issuer by its President. Such certificate shall designate an alternate or alternates, any of whom may act at any time as Issuer Representative.

"Master Indenture" means the Amended and Restated Master Trust Indenture, Deed of Trust and Security Agreement dated as of [November 1], 2019, between the Obligor and the Master Trustee, including any supplements or amendments thereto and modifications thereof.

"Master Trustee" means UMB Bank, National Association, as successor master trustee under the Master Indenture, and its successors as master trustee thereunder.

"Note" means the Series 2019 Note.

"Obligated Group Members" has the meaning given such term in the Master Indenture.

"Obligated Group Representative" means (i) Tarrant County Senior Living Center Inc., a nonprofit corporation incorporated under the laws of the State of Texas, and (ii) any surviving, resulting or transferee corporation.

"Obligor" means Tarrant County Senior Living Center Inc., a Texas nonprofit corporation, and any and all successors thereto in accordance with the Master Indenture.

"Opinion of Bond Counsel" shall mean an opinion in writing signed by legal counsel selected by the Obligor and reasonably acceptable to the Issuer and the Bond Trustee who shall be nationally recognized in matters pertaining to the validity of obligations of governmental issuers and the exemption from federal income taxation of interest on such obligations.

"Opinion of Counsel" means an opinion in writing signed by an attorney or firm of attorneys, acceptable to the Bond Trustee, who may be counsel to the Obligor or other counsel.

"Outstanding" means, as of any particular time, all Bonds which have been duly authenticated and delivered by the Bond Trustee under the Bond Indenture, except:

(a)     Bonds theretofore cancelled by the Bond Trustee or delivered to the Bond Trustee for cancellation after purchase in the open market or because of payment at or redemption prior to maturity;

(b)     Bonds for the payment or redemption of which cash funds (or Government Obligations to the extent permitted in Section 7.01 of the Bond Indenture) shall have been theretofore irrevocably deposited with the Bond Trustee (whether upon or prior to the maturity or redemption date of any such Bonds); provided that if such Bonds are to be redeemed prior to the maturity thereof, notice of such redemption shall have been given or arrangements satisfactory to the Bond Trustee shall have been made therefor, or waiver of such notice satisfactory in form to the Bond Trustee, shall have been filed with the Bond Trustee and provided further that prior to such payment or redemption, the Bonds to be paid or redeemed shall be deemed to be Outstanding for the purpose of transfers and exchanges under Section 2.05 of the Bond Indenture; and

(c)     Bonds in lieu of which other Bonds have been authenticated under Section 2.06 of the Bond Indenture.

"Paying Agent" means any bank or trust company, including the Bond Trustee, designated pursuant to the Bond Indenture to serve as a paying agency or place of payment for the Bonds, and any successor designated pursuant to the Bond Indenture.

"Payment Office" with respect to the Bond Trustee or other Paying Agent means the office maintained by the Bond Trustee or any affiliate of the Bond Trustee or of another Paying Agent for the payment of interest and principal on the Bonds.

"Permitted Investments" has the meaning assigned to such term in the Master Indenture.

"Person" means an individual, association, unincorporated organization, corporation, limited liability company, partnership, joint venture, business trust or a government or an agency or a political subdivision thereof, or any other entity.

"Plan" means the plan of reorganization filed by the Obligor in the Bankruptcy Court on _____, 2019, as amended.

"Principal Account" means the account of such name in the Bond Fund created in Section 3.02 of the Bond Indenture.

"Project" means the Project described in Exhibit A hereto.

"Rebate Fund" means that special fund established in the name of the Issuer with the Bond Trustee pursuant to Section 3.16 of the Bond Indenture.

"Registered Owner" or "Owners" means the person or persons in whose name or names a Bond shall be registered on books of the Issuer kept by the Bond Trustee for that purpose in accordance with the terms of the Bond Indenture.

"Regular Record Date" means the  [1st day of the month of][15th day of the month preceding] each regularly scheduled Interest Payment Date.

"Regulations" means the applicable proposed, temporary or final Income Tax Regulations promulgated under the Code or, to the extent applicable to the Code, under the Internal Revenue Code of 1986, as such regulations may be amended or supplemented from time to time.

"Reserve Fund" means the Reserve Fund created in Section 3.08 of the Bond Indenture. "Reserve Fund Obligations" means cash and Permitted Investments.

"Reserve Fund Requirement" means an amount equal to $_____ [maximum annual debt service on the Series 2019 Bonds].

"Responsible Officer" when used with respect to the Bond Trustee means an officer in the corporate trust department of the Bond Trustee having direct responsibility for administration of the Bond Indenture.

"Securities Depository" means The Depository Trust Company, New York, New York, and any successor thereto as permitted by the Bond Indenture.

"Series 2009 Bonds" means the Series 2009A Bonds and the Series 2009B Bonds.

"Series 2009 Debt Service Reserve Fund" means the "Reserve Fund" established under the bond indenture for the Series 2009 Bonds.

"Series 2009A Bonds" means Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Series 2009A in the original principal amount of $100,275,000.

"Series 2009B Bonds" means Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Series 2009B, Accelerated Redemption Reset Option Securities (ARROS) in the original principal amount of $10,000,000.

"Series 2019 Bonds" means the Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Series 2019.

"Series 2019 Note" means the Note issued by the Obligor pursuant to the Supplemental Indenture relating to the Series 2019 Bonds.

"Special Record Date" means a special date fixed to determine the names and addresses of owners of Series 2019 Bonds for purposes of paying interest on a special interest payment date for the payment of defaulted interest, all as further provided in Section 2.03 of the Bond Indenture.

"Supplemental Indenture" means the Supplemental Indenture Number 2, dated as of [November 1], 2019, by the Obligor executed and delivered to the Master Trustee, supplemental to the Master Indenture, providing for the issuance of the Series 2019 Note.

"Tax Agreement" means the Tax Compliance Agreement dated as of [November 1], 2019, among the Issuer, the Obligor and the Bond Trustee, as from time to time amended in accordance with the provisions thereof.

"Trust Estate" means the property pledged and assigned to the Bond Trustee pursuant to the granting clauses of the Bond Indenture.

Certain additional terms are defined in Section 7.5 hereof.

## ARTICLE II

## REPRESENTATIONS

Section 2.1    <u>Representations by the Issuer</u>. The Issuer represents that:

(a)     The Issuer is a nonstock nonprofit cultural education facilities finance corporation duly organized and validly existing under and pursuant to the laws of the State of Texas and has full power and authority under the laws of the State of Texas (including, in particular, the Act) to enter into the transactions contemplated by this Agreement and to carry out its obligations hereunder. By proper corporate action the Issuer has duly authorized the execution and delivery of this Agreement and the Bond Indenture and the performance of its obligations under this Agreement and the Bond Indenture.

(b)     To the best of the Issuer's knowledge, neither the execution and delivery of the Series 2019 Bonds, the Bond Indenture or this Agreement, the consummation of the transactions contemplated thereby and hereby nor the fulfillment of or compliance with the terms and conditions or provisions of the Series 2019 Bonds, the Bond Indenture or this Agreement conflict with or result in the breach of any of the terms, conditions or provisions of any constitutional provision or statute of the State of Texas or the articles of incorporation or bylaws of the Issuer or of any agreement or instrument or judgment, order or decree of which the Issuer has notice that it is a party or constitute a default under any of the foregoing or result in the creation or imposition of any prohibited lien, charge or encumbrance of any nature upon any property or assets of the Issuer under the terms of any instrument or agreement.

(c)     To refinance the Series 2009 Bonds through the Exchange in accordance with the Plan and the Bankruptcy Court Order, which Series 2009 Bonds financed a portion of the costs of the Project, funded a debt service reserve fund for the Series 2009 Bonds, and paid a portion of the costs of issuance of the Series 2009 Bonds,, the Issuer proposes to issue the Series 2019 Bonds. The Series 2019 Bonds shall be in the principal amount, mature, bear interest, be subject to redemption prior to maturity, be secured, and have such other terms and conditions as are set forth in the Bond Indenture.

(d)     The Series 2019 Bonds are to be issued under and secured by the Bond Indenture pursuant to which the Issuer's interest in this Agreement and in the Series 2019 Note, and the revenues and receipts derived by the Issuer from the Series 2019 Note, will be pledged and assigned to the Bond Trustee as security for payment of the principal of, premium, if any, and interest on the Series 2019 Bonds.

(e)     The Obligor has represented to the Issuer that the Project constitutes a "health facility" within the meaning of the Health Facility Act. The Project will promote the health and general welfare of the residents of the City of Fort Worth, Tarrant County, Texas by improving the adequacy and accessibility of health care within the State of Texas.

(f)     The issuance of the Series 2019 Bonds and the execution of this Agreement and the Bond Indenture have been approved by the Issuer at a duly constituted meeting.

(g)     Except as otherwise permitted by this Agreement, the Issuer covenants that it has not and will not pledge the income and revenues derived from this Agreement other than to secure the Bonds.

Section 2.2     Representations by the Obligor. The Obligor represents that:

7

     (a)    The Obligor is a nonprofit corporation duly incorporated and in good standing under the laws of the State of Texas, has power to enter into this Agreement, the Master Indenture, the Supplemental Indenture and the Series 2019 Note, and by proper corporate action has duly authorized the execution and delivery of this Agreement, the Master Indenture, the Supplemental Indenture and the Series 2019 Note.

     (b)    Neither the execution and delivery of this Agreement, the Master Indenture, the Supplemental Indenture and the Series 2019 Note, the consummation of the transactions contemplated hereby and thereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement, the Master Indenture, the Supplemental Indenture or the Series 2019 Note, conflict with or result in a breach of any of the terms, conditions or provisions of any corporate restriction or any agreement or instrument to which the Obligor is now a party or by which it is bound or constitute a default under any of the foregoing.

     (c)    The Obligor intends to operate or to cause the Project to be operated as a "health facility" within the meaning of the Health Facility Act to the expiration or sooner termination of this Agreement as provided herein for the purpose of providing health care services as provided in the Health Facility Act.

     (d)    No event of default or any event which, with the giving of notice or the lapse of time, or both, would constitute an event of default under the Master Indenture, has occurred and is continuing as of the Effective Date.

     (e)    Taking into account the issue price (as defined in Section 1273 of the Code) of the stated maturity of the Bonds, the average term of the Bonds of such issue does not and will not exceed 120% of the average reasonably expected economic life of the Project to be refinanced by the Bonds, weighted in proportion to the respective cost of each item comprising the property the cost of which has been or will be financed, directly or indirectly, with the Net Proceeds of the Bonds. For purposes of the preceding sentence, the reasonably expected economic life of property shall be determined as of the later of (A) the date of delivery for the Bonds, or (B) the date on which such property was or is placed in service (or expected to be placed in service). In addition, land shall not be taken into account in determining the reasonably expected economic life of property, except that, in the event 25% or more of the collective Net Proceeds of the Bonds, directly or indirectly, have been expended for land, such land shall be treated as having an economic life of 30 years and shall be taken into account for purposes of determining the reasonably expected economic life of such property.

     (f)    To the best of the Obligor's knowledge, information and belief, all of the documents, instruments and written information supplied by or on behalf of the Obligor, which have been reasonably relied upon by Bond Counsel in rendering their opinion with respect to the exclusion from gross income of the interest on the Bonds for federal income tax purposes or counsel to the Obligor in rendering its opinion with respect to the status of the Obligor under Section 501(c)(3) of the Code, are true and correct in all material respects, do not contain any untrue statement of a material fact and do not omit to state any material fact necessary to be stated therein to make the information provided therein, in light of the circumstances under which such information was provided, not misleading.

## ARTICLE III

## TERM OF AGREEMENT

Section 3.1 <u>Term of this Agreement</u>. Subject to Section 11.12 herein, this Agreement shall remain in full force and effect from the date of delivery hereof until such time as all of the Bonds shall have been fully paid or provision made for such payment pursuant to the Bond Indenture and all reasonable and necessary fees and expenses of the Bond Trustee and the Issuer accrued and to accrue through final payment of the Bonds and all liabilities of the Obligor with respect to the Bonds accrued and to accrue through final payment of the Bonds have been paid.

## ARTICLE IV

## ISSUANCE OF THE BONDS

Section 4.1 <u>Agreement to Issue Bonds</u>. On the Effective Date the Issuer will issue and cause to be delivered as provided herein the Series 2019 Bonds and cooperate with the Obligor in directing the bond trustee for the Series 2009 Bonds to transfer any monies in the reserve fund for the Series 2009 Bonds to the Reserve Fund for the Series 2019 Bonds, as required by Section 4.24 of the Master Indenture.

Section 4.2 <u>Modifications of the Projects</u>. The Obligor hereby covenants and agrees that no changes or modifications, or substitutions, deletions, or additions shall be made with respect to the Project if such change disqualifies such Project under the Act.

Section 4.3 <u>Covenants Regarding Tax Exemption</u>. Concurrently with the execution and delivery of this Loan Agreement, the Obligor, the Issuer, and the Bond Trustee are executing and delivering a Tax Agreement relating to the exclusion of interest on the Series 2019 Bonds for federal income tax purposes. The Obligor covenants and agrees that it will not take any action or permit any action to be taken that would adversely affect the exclusion from gross income for federal income tax purposes of the interest on the Series 2019 Bonds and will take whatever action, or refrain from whatever action, necessary to comply with the requirements of the Code to maintain the exclusion from gross income for federal income tax purposes of the interest on the Series 2019 Bonds, and the Obligor shall comply with the Tax Agreement and will pay or provide for payment to the United States Government or the Bond Trustee, all rebate payments required under Section 148(f) of the Code and the Tax Agreement, to the extent such amounts are not available to the Bond Trustee in the Rebate Fund held under the Bond Indenture. This covenant shall survive payment in full or defeasance of the Series 2019 Bonds.

Section 4.4 [Reserved]

Section 4.5 <u>Representations and Warranties as to Tax Exempt Status of Obligor</u>. The Obligor hereby represents and warrants as follows:

      (a) the Obligor is an organization exempt from federal income taxation under Section 501(a) of the Code by virtue of being described in Section 501(c)(3) of the Code;

(b) the purposes, character, activities and methods of operation of the Obligor have not changed materially since its organization and are not materially different from the purposes, character, activities and methods of operation at the time of its receipt of a determination by the Internal Revenue Service that it is an organization described in Section 501(c)(3) of the Code (the "Determination");

(c) the Obligor has not diverted a substantial part of its corpus or income for a purpose or purposes other than the purpose or purposes for which it is organized or disclosed to the Internal Revenue Service in connection with its Determination;

(d) the Obligor has not operated since its organization in a manner that would result in it being classified as an "action" organization within the meaning of section 1.501(c)(3)-1(c)(3) of the Regulations including, but not limited to, promoting or attempting to influence legislation by propaganda or otherwise as a substantial part of its activities;

(e) with the exception of the payment of compensation (and the payment or reimbursement of expenses) which is not excessive and is for personal services which are reasonable and necessary to carrying out the purposes of the Obligor, no person controlled by any such individual or individuals nor any person having a personal or private interest in the activities of the Obligor has acquired or received, directly or indirectly, any income or assets, regardless of form, of the Obligor during the current Fiscal Year and the period, if any, preceding the current Fiscal Year, other than as reported to the Internal Revenue Service by the Obligor;

(f) the Obligor is not a "private foundation" within the meaning of Section 509(a) of the Code;

(g) the Obligor has not received any indication or notice whatsoever to the effect that its exemption under Section 501(a) of the Code as an organization described in Section 501(c)(3) of the Code has been revoked or modified, or that the Internal Revenue Service is considering revoking or modifying such exemption, and such exemption is still in full force and effect;

(h) the Obligor has filed with the Internal Revenue Service all requests for determination, reports and returns required to be filed by it and such requests for determination, reports and returns have not omitted or misstated any material fact and has notified the Internal Revenue Service of any changes in its organization and operation since the date of its Determination;

(i) the Obligor has not devoted more than an insubstantial part of its activities in furtherance of a purpose other than an exempt purpose within the meaning of Section 501(c)(3) of the Code;

(j) the Obligor has not taken any action, nor does it know of any action that any other person has taken, nor does it know of the existence of any condition, which would cause the Obligor to lose its exemption from taxation under Section 501(a) of the Code or cause the interest on the Bonds to become taxable to the recipient thereof because such interest is not excludable from the gross income of such recipient for federal income tax purposes under Section 103(a) of the Code; and

(k)     the Obligor shall direct the bond trustee for the Series 2009 Bonds to transfer any monies in the reserve fund for the Series 2009 Bonds to the Reserve Fund for the Series 2019 Bonds and to make the other transfers of cash and investments, if any, required by Section 4.24 of the Master Indenture

Section 4.6     Disposition of the Project.     The Obligor covenants that the property constituting the Project will not be sold or otherwise disposed in a transaction resulting in the receipt by the Obligor of cash or other compensation, unless the Obligor obtains an Opinion of Bond Counsel that such sale or other disposition will not adversely affect the tax-exempt status of the Bonds.

<div align="center">

**ARTICLE V**

**LOAN OF BOND PROCEEDS; NOTE; PROVISION FOR PAYMENT**

</div>

Section 5.1     Loan of Bond Proceeds.     The Obligor hereby agrees that the issuance of the Series 2019 Bonds shall be deemed to be a loan from the Issuer of an amount equal to the principal amount of the Series 2019 Bonds to refinance the Series 2009 Bonds.  The Obligor agrees to repay the loan pursuant to the provisions set forth in Section 5.2 hereof.

Section 5.2     Repayment of Loan.     The Obligor shall make the following payments in repayment of the loan of the proceeds of the Series 2019 Bonds by the Issuer to the Obligor and to provide for payment of the principal of, redemption premium, if any, and interest on the Series 2019 Bonds, directly to the Bond Trustee, in immediately available funds, for deposit in the Bond Fund, on the following dates, and otherwise as set out below:

(a)     *Bond Fund-Interest:* On or before 11:00 a.m., central time, on the 15th day of each month, commencing [_____ 15, 2020] an amount equal to one-sixth of the amount of interest to become due on the Series 2019 Bonds on the next Interest Payment Date (or, if less, the amount which, together with other funds then available for such purpose in the Bond Fund, shall equal the interest to become due on the Series 2019 Bonds on the next Interest Payment Date), and on or before 11:00 a.m., central time, on the Business Day prior to any date that any payment of interest is required to be made in respect of the Series 2019 Bonds pursuant to the Bond Indenture, an amount which, together with any other moneys available for such purpose in the Bond Fund, is not less than the interest is due.

(b)     *Bond Fund-Principal:* On or before 11:00 a.m., central time, on the 15th day of each month, commencing [_____ 15, 2024] an amount equal to one-twelfth of the amount of principal to become due on the Series 2019 Bonds on the next principal payment date, whether at maturity or upon mandatory sinking fund redemption (or, if less, the amount which, together with other funds then available for such purpose in the Bond Fund, shall equal the principal to become due on the Series 2019 Bonds on such next principal payment date), and on or before 11:00 a.m., central time, on the Business Day prior to the date on which principal on the Series 2019 Bonds is due (including without limitation, as a result of acceleration), an amount which, together with any other moneys available for such purpose in the Bond Fund, is not less than the principal due on the Series 2019 Bonds on such principal payment date.

(c) *Bond Fund-Redemption:* On or before the date required by this Loan Agreement or the Bond Indenture, the amount required to redeem Series 2019 Bonds then Outstanding if the Obligor exercises its right to redeem Series 2019 Bonds under any provision of the Bond Indenture or if any Series 2019 Bonds are required to be redeemed (other than pursuant to mandatory sinking fund redemption provisions) under any provision of the Bond Indenture.

If the Obligor fails to make any of the payments required in this Section, the item or installment so in default shall continue as an obligation of the Obligor until the amount in default shall have been fully paid, and the Obligor agrees to pay the same with interest thereon from the date when such payment was due until paid in full, at the rate of interest borne by the Series 2019 Bonds.

In the event that the Obligor, following payment of the applicable month's operating expenses, lacks funds (other than amounts in the Liquidity Support Account or available under the Liquidity Support Agreement) for the payment of any monthly payment described under subsection (a) or (b) above, the Obligor shall not be deemed in default of its obligation to make the applicable monthly loan payment to the Bond Fund if the applicable amount (the "Monthly Deficit"), together with any prior Monthly Deficit that remains unfunded in the Bond Fund, is less than amounts available for transfer to the Bond Fund in the Liquidity Support Account held by the Master Trustee plus the then remaining Unfunded Liquidity Support obligation under the Liquidity Support Agreement, provided that the existence of any Monthly Deficit shall constitute a default if the amount of all Monthly Deficits occurring prior to the fourth Business Day preceding an Interest Payment Date is not funded to the Bond Fund from sources other than the Debt Service Reserve Fund on the fourth Business Day preceding the applicable Interest Payment Date or, if earlier, if amounts available for transfer to the Bond Fund in the Liquidity Support Account held by the Master Trustee plus the then remaining Unfunded Liquidity Support obligation under the Liquidity Support Agreement are reduced to an aggregate amount that is less than such unfunded Monthly Deficits. The amount of any unfunded Monthly Deficits shall be deducted from amounts available in the Liquidity Support Account or under the Liquidity Support Agreement for purposes of any Days Cash on Hand calculation made as of a date such Monthly Deficits are in existence.

Section 5.3    Credits. Any amount in either account of the Bond Fund at the close of business of the Bond Trustee on the day immediately preceding any payment date on the Series 2019 Note in excess of the aggregate amount then required to be contained in such account of the Bond Fund pursuant to Section 5.2 hereof shall be credited pro rata against the payments due by the Obligor on such next succeeding principal or interest payment date on the Series 2019 Note.

In the event that all of the Bonds then Outstanding are called for redemption, any amounts contained in the Reserve Fund and the Bond Fund at the close of business of the Bond Trustee on the day immediately preceding such redemption date shall be credited against the payments due by the Obligor on the Series 2019 Note, as provided below.

The principal amount of any Series 2019 Bonds to be applied by the Bond Trustee as a credit against any sinking fund payment pursuant to Section 5.02 of the Bond Indenture shall be credited against the obligation of the Obligor with respect to payment of installments of principal of the Series 2019 Note as described in the Supplemental Indenture.

The cancellation by the Bond Trustee of any Series 2019 Bonds purchased by the Obligor or of any Series 2019 Bonds redeemed or purchased by the Issuer through funds other than funds received on the Series 2019 Note shall constitute payment of a principal amount of the Series 2019

Note equal to the principal amount of the Series 2019 Bonds so cancelled. Upon receipt of written notice from the Bond Trustee of such cancellation, the Master Trustee shall at the request of the Obligor endorse on the Series 2019 Note such payment of such principal amount thereof.

Section 5.4     Note. Concurrently with the sale and delivery by the Issuer of the Series 2019 Bonds, the Obligor shall execute and deliver the Series 2019 Note substantially in the form set forth in the Supplemental Indenture.

Section 5.5     Payment of Bond Trustee's and Paying Agent's Fees and Expenses. The Obligor agrees to pay the reasonable and necessary fees and expenses (including attorney's fees) of the Bond Trustee and any Paying Agents as and when the same become due, upon submission by the Bond Trustee or any Paying Agent of a statement therefor.

Section 5.6     Reserve Fund. (a) In the event any moneys in the Reserve Fund are transferred to the Bond Trustee for deposit to the Bond Fund pursuant to Section 3.10 or 3.11 of the Bond Indenture, except if such moneys are transferred due to the redemption of all Bonds, the Obligor agrees to deposit within ten Business Days after notice from the Bond Trustee of such withdrawal additional Reserve Fund Obligations in an amount sufficient to satisfy the Reserve Fund Requirement.

(a)     In the event the value of the Reserve Fund Obligations (as determined pursuant to the statement of the Bond Trustee furnished in accordance with Section 6.03 of the Bond Indenture) on deposit in the Reserve Fund is less than the 95% of the Reserve Fund Requirement as a result of a reduction in the value of the Reserve Fund Obligations, the Obligor agrees to deposit additional Reserve Fund Obligations in an amount sufficient to satisfy the Reserve Fund Requirement or, if less, the amount in the reduction in value of the Reserve Fund Obligations, such amount to be deposited in no more than three equal consecutive monthly installments, the first installment to be made within 30 days of such receipt of written notice from the Bond Trustee of a deficiency.

Section 5.7     Payment of Administration Expenses. In consideration of the agreement of the Issuer to issue the Bonds and loan the proceeds thereof to provide financing for the Project, the Obligor hereby agrees to pay any and all costs paid or incurred by the Issuer in connection with the financing or refinancing of the Project, whenever incurred, including out of pocket expenses and compensation in connection with the issuance of Bonds, including, without limitation, reasonable sums for reimbursement of the fees and expenses incurred by the Issuer's financial advisors, consultants and legal counsel in connection with such Project and the issuance of the Bonds.

Section 5.8     Payees of Payments. The payments on the Series 2019 Note pursuant to Section 5.2 hereof shall be paid in funds immediately available at the Payment Office of the Bond Trustee, directly to the Bond Trustee for the account of the Issuer and shall be deposited into the appropriate account of the Bond Fund. The amounts provided for in Section 5.6 hereof shall be paid to the Bond Trustee for the account of the Issuer and shall be deposited into the Reserve Fund. The payments to be made to the Bond Trustee and the Paying Agent under Section 5.5 hereof shall be paid directly to the Bond Trustee and the Paying Agent for their own use. The payments for

Administration Expenses under Section 5.7 hereof shall be paid directly to the Issuer for its own use.

Section 5.9 Obligations of Obligor Hereunder Unconditional. The obligations of the Obligor to make the payments required in Section 5.2 hereof shall be absolute and unconditional. The Obligor will not suspend or discontinue, or permit the suspension or discontinuance of, any payments provided for in Section 5.2 hereof for any cause including, without limiting the generality of the foregoing, any acts or circumstances that may constitute failure of consideration, eviction or constructive eviction, destruction of or damage to the Project, commercial frustration of purpose, any change in the tax or other laws or administrative rulings of or administrative actions by the United States of America or the State of Texas or any political subdivision of either, or any failure of the Issuer to perform and observe any agreement, whether express or implied, or any duty, liability, or obligation arising out of or connected with this Agreement, whether express or implied. Nothing contained in this Section shall be construed to release the Issuer from the performance of any agreements on its part herein contained; and in the event the Issuer shall fail to perform any such agreement, the Obligor may institute such action against the Issuer as the Obligor may deem necessary to compel performance, provided that no such action shall violate the agreements on the part of the Obligor contained herein and the Issuer shall not be required to pay any costs, expenses, damages or any amounts of whatever nature except for amounts received pursuant to this Agreement. Nothing herein shall be construed to impair the Obligor's right to institute an independent action for any claim that it may have against the Issuer, the Bond Trustee, any Bondholder or any other third party. The Obligor may, however, at its own cost and expense and in its own name or in the name of the Issuer, prosecute or defend any action or proceedings or take any other action involving third persons which the Obligor deems reasonably necessary in order to secure or protect this right of possession, occupancy, and use hereunder, and in such event the Issuer hereby agrees to cooperate fully with the Obligor.

## ARTICLE VI

## MAINTENANCE AND INSURANCE

Section 6.1 Maintenance and Modifications of Projects by Obligor. The Obligor may, at its own expense, cause to be made from time to time any additions, modifications or improvements to the Project provided such additions, modifications or improvements do not impair the character of the Project as a "health facility" within the meaning of the Health Facility Act or impair the extent of the exemption of interest on the Bonds from Federal income taxation.

Section 6.2 Insurance. Throughout the term of this Agreement, the Obligor will, at its own expense, provide or cause to be provided insurance against loss or damage to the Project in accordance with the terms of the Master Indenture.

## ARTICLE VII

## SPECIAL COVENANTS

Section 7.1 No Warranty of Merchantability, Condition or Suitability by the Issuer. The Issuer makes no warranty, either express or implied, as to the condition of the Project or that the

Project will be suitable for the Obligor's purposes or needs. Without limiting the effect of the preceding sentence, it is expressly agreed that in connection with each sale or conveyance pursuant to this Agreement (i) the Issuer makes NO WARRANTY OF MERCHANTABILITY and (ii) THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION CONTAINED HEREIN.

Section 7.2   Right of Access to the Project. The Obligor agrees that the Issuer, the Bond Trustee, and any of their duly authorized agents shall have the right at all reasonable times upon reasonable notice to the Obligor to examine and inspect the Project to determine that the Obligor is in compliance with the terms and conditions of this Agreement; provided that any such inspection will be conducted in a manner that will minimize any intrusion on the operations of the Project.

Section 7.3   Nonsectarian Use. The Obligor agrees that no proceeds of the Bonds will be used to construct, acquire or install any portion of the Project which is intended to be used or which are being used for sectarian purposes.

Section 7.4   Further Assurances. The Issuer and the Obligor agree that they will, from time to time, execute, acknowledge, and deliver, or cause to be executed, acknowledged, and delivered, such supplements hereto and such further instruments as may reasonably be required for carrying out the intention of or facilitating the performance of this Agreement.

Section 7.5   INDEMNIFICATION. (a) THE OBLIGOR AGREES THAT IT WILL AT ALL TIMES INDEMNIFY AND HOLD HARMLESS EACH OF THE INDEMNIFIED PARTIES AGAINST ANY AND ALL LOSSES OR CLAIMS, INCLUDING LOSSES AS A RESULT OF THE NEGLIGENT ACTS OR OMISSIONS OF ANY INDEMNIFIED PARTY, OTHER THAN LOSSES RESULTING FROM FRAUD, WILLFUL MISCONDUCT OR THEFT ON THE PART OF THE INDEMNIFIED PARTY CLAIMING INDEMNIFICATION. THE OBLIGOR ALSO SHALL INDEMNIFY THE BOND TRUSTEE FOR, AND DEFEND AND HOLD IT HARMLESS AGAINST, ANY LOSS, LIABILITY, CLAIMS OR DEMANDS OR EXPENSES (INCLUDING ATTORNEYS FEES) INCURRED WITHOUT NEGLIGENCE OR BAD FAITH ON ITS PART, ARISING OUT OF OR IN CONNECTION WITH THE ACCEPTANCE OR ADMINISTRATION OF THE TRUST CREATED UNDER THE BOND INDENTURE OR THE PERFORMANCE OF ITS DUTIES UNDER

THE BOND INDENTURE, INCLUDING THE COSTS AND EXPENSES OF DEFENDING ITSELF AGAINST ANY CLAIM OR LIABILITY IN CONNECTION WITH THE EXERCISE OR PERFORMANCE OF ANY OF ITS POWERS OR DUTIES UNDER THE BOND INDENTURE. THE BOND TRUSTEE MAY ENFORCE ITS RIGHTS UNDER THE PRECEDING SENTENCE AS A THIRD PARTY BENEFICIARY OF THIS AGREEMENT.

(a)   NONE OF THE INDEMNIFIED PARTIES SHALL BE LIABLE TO THE OBLIGOR FOR, AND THE OBLIGOR HEREBY RELEASES EACH OF THEM FROM, ALL LIABILITY TO THE OBLIGOR FOR, ALL INJURIES, DAMAGES OR DESTRUCTION TO ALL OR ANY PART OF ANY PROPERTY OWNED OR CLAIMED BY THE OBLIGOR THAT DIRECTLY OR INDIRECTLY RESULT FROM, ARISE OUT OF OR RELATE TO THE DESIGN, CONSTRUCTION, OPERATION, USE, OCCUPANCY, MAINTENANCE OR

OWNERSHIP OF THE PROJECT OR ANY PART THEREOF, EVEN IF SUCH INJURIES, DAMAGES OR DESTRUCTION DIRECTLY OR INDIRECTLY RESULT FROM, ARISE OUT OF OR RELATE TO, IN WHOLE OR IN PART, ONE OR MORE ACTS OR OMISSIONS, INCLUDING ACTS OR OMISSIONS CONSTITUTING NEGLIGENCE ON THE PART OF ANY INDEMNIFIED PARTY (BUT NOT INCLUDING ACTS OR OMISSIONS CONSTITUTING FRAUD, WILLFUL MISCONDUCT OR THEFT ON THE PART OF THE INDEMNIFIED PARTY CLAIMING RELEASE) IN CONNECTION WITH THE ISSUANCE OF ANY SERIES OF THE BONDS OR IN CONNECTION WITH THE PROJECT.

(b)     Each Indemnified Person, as appropriate, shall reimburse the Obligor for payments made by the Obligor pursuant to this Section to the extent of any proceeds, net of all expenses of collection, actually received by it from any other source (but not from the proceeds of any claim against any other Indemnified Person) with respect to any Loss to the extent necessary to prevent a recovery of more than the Loss by such Indemnified Person with respect to such Loss. At the request and expense of the Obligor, each Indemnified Person shall claim or prosecute any such rights of recovery from other sources (other than any claim against another Indemnified Person) and such Indemnified Person shall assign its rights to such rights of recovery from other sources (other than any claim against another Indemnified Person), to the extent of such required reimbursement, to the Obligor.

(c)     In case any Claim shall be brought or, to the knowledge of any Indemnified Person, threatened against any Indemnified Person in respect of which indemnity may be sought against the Obligor, such Indemnified Person promptly shall notify the Obligor in writing; provided, however, that any failure so to notify shall not relieve the Obligor of its obligations under this Section.

(d)     The Obligor shall have the right to assume the investigation and defense of all Claims, including the employment of counsel and the payment of all expenses. Each Indemnified Person shall have the right to employ separate counsel in any such action and participate in the investigation and defense thereof, but the fees and expenses of such counsel shall be paid by such Indemnified Person unless (i) the employment of such counsel has been specifically authorized by the Obligor, in writing, (ii) the Obligor has failed after receipt of notice of such Claim to assume the defense and to employ counsel, or (iii) the named parties to any such action (including any impleaded parties) include both an Indemnified Person and the Obligor, and the Indemnified Person shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or additional to those available to the Obligor (in which case, if such Indemnified Person notifies the Obligor in writing that it elects to employ separate counsel at the Obligor's expense, the Obligor shall not have the right to assume the defense of the action on behalf of such Indemnified Person; provided, however, that the Obligor shall not, in connection with any one action or separate but substantially similar or related actions in the same jurisdiction arising out of the same general allegation or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys for the Indemnified Parties, which firm shall be designated in writing by the Indemnified Parties).

(e)     Each Indemnified Person shall cooperate with the Obligor, and the Obligor shall cooperate with each Indemnified Person, in the defense of any action or Claim. The Obligor shall not be liable for any settlement of any action or Claim without the Obligor's consent but, if

any such action or Claim is settled with the consent of the Obligor or there be final judgment for the plaintiff in any such action or with respect to any such Claim, the Obligor shall indemnify and hold harmless the Indemnified Parties from and against any Loss by reason of such settlement or judgment to the extent provided in Subsection (a).

(f)     The provisions of this Section shall survive the termination of this Agreement, and the obligations of the Obligor hereunder shall apply to Losses or Claims under Subsection (a) whether asserted prior to or after the termination of this Agreement. In the event of failure by the Obligor to observe the covenants, conditions and agreements contained in this Section, any Indemnified Person may take any action at law or in equity to collect amounts then due and thereafter to become due, or to enforce performance and observance of any obligation, agreement or covenant of the Obligor under this Section. The obligations of the Obligor under this Section shall not be affected by any assignment or other transfer by the Issuer of its rights, titles or interests under this Agreement to the Bond Trustee pursuant to the Bond Indenture and will continue to inure to the benefit of the Indemnified Parties after any such transfer. The provisions of this Section shall be cumulative with and in addition to any other agreement by the Obligor to indemnify any Indemnified Person.

(g)     The following terms have the meanings assigned to them below whenever they are used in this Agreement:

"Claims" shall mean all claims, lawsuits, causes of action and other legal actions and proceedings of whatever nature brought against (whether by way of direct action, counter claim, cross action or impleader) any Indemnified Party, even if groundless, false, or fraudulent, so long as the claim, lawsuit, cause of action or other legal action or proceeding is alleged or determined, directly or indirectly, to arise out of, to result from, to relate to or to be based upon, in whole or in part: (a) the issuance of the Bonds, (b) the duties, activities, acts or omissions (EVEN IF NEGLIGENT) of any Person in connection with the issuance of the Bonds, or the obligations of the various parties arising under the Bond Indenture, this Agreement or the Master Indenture, or (c) the duties, activities, acts or omissions (EVEN IF NEGLIGENT) of any Person in connection with the design, construction, installation, operation, use, occupancy, maintenance or ownership of the Projects or any part thereof.

"Indemnified Party" shall mean one or more of the Issuer, Tarrant County, Texas, and any of their respective officers, directors, councilpersons, officials, consultants, agents, servants, and employees, and any successor to any of such Persons. [*County has to approve this bond issue and is not likely to do so if its standard indemnification language is different from its prior bond issues.*]

"Indemnified Persons" means the Indemnified Parties and the Bond Trustee.

"Losses" means losses, costs, damages, expenses, judgments, and liabilities of whatever nature (including, but not limited to, reasonable attorney's, accountant's and other professional's fees, litigation and court costs and expenses, amounts paid in settlement and amounts paid to discharge judgments and amounts payable by an Indemnified Persons to any other Person under any arrangement providing for indemnification of that Person) directly or indirectly resulting from arising out of or relating to one or more Claims.

Section 7.6    Authority of Obligor.    Whenever under the provisions of this Agreement the approval of the Obligor is required, or the Issuer or the Bond Trustee are required to take some action at the request of the Obligor, such approval or such request shall be made by the Obligor unless otherwise specified in this Agreement and the Issuer or the Bond Trustee shall be authorized to act on any such approval or request and the Obligor shall have no complaint against the Issuer or the Bond Trustee as a result of any action taken.

Section 7.7    Authority of Issuer Representative.    Whenever under the provisions of this Agreement the approval of the Issuer or the Bond Trustee are required, or the Obligor is required to take some action at the request of the Issuer, such approval or such request shall be made by the Issuer Representative unless otherwise specified in this Agreement and the Obligor or the Bond Trustee shall be authorized to act on any such approval or request and the Issuer shall have no complaint against the Obligor or the Bond Trustee as a result of any such action taken.

Section 7.8    No Personal Liability.    No obligations contained in the Bonds, the Bond Indenture or this Agreement shall be deemed to be the obligations of any officer, director, council member, trustee, agent or employee of the Issuer, the Bond Trustee, the Obligor or Tarrant County, Texas, in his or her individual capacity, and neither the Board of Directors, the governing body of the Obligor, the Bond Trustee or Tarrant County, Texas, any official of the Issuer or Tarrant County, Texas nor any official of the Issuer executing the Bonds, the Bond Indenture or this Agreement shall be liable personally thereon or be subject to any personal liability or accountability with respect thereto.

Section 7.9    Fees and Expenses.    The Obligor agrees to pay promptly upon demand therefor all costs paid, incurred or charged by the Issuer in connection with the Bonds, including without limitation, (i) all fees required to be paid to the Issuer with respect to the Bonds, (ii) all out of pocket expenses and costs of issuance of the Bonds and effecting the Plan and the Exchange (including reasonable fees and expenses of attorneys employed by the Issuer) reasonably incurred by the Issuer in connection with the issuance of the Bonds and (iii) all out of pocket expenses (including reasonable fees and expenses of attorneys employed by the Issuer) reasonably incurred by the Issuer in connection with the enforcement of any of its rights or remedies or the performance of its duties under the Bond Indenture or this Agreement.

## ARTICLE VIII

## ASSIGNMENT AND LEASING

Section 8.1 <u>Assignment and Leasing by Obligor</u>. This Agreement may be assigned, and all or any portion of the Project may, subject to the terms of the Master Indenture, be leased by the Obligor without the consent of either the Issuer or the Bond Trustee, provided that each of the following conditions is complied with:

(a) No assignment or leasing shall relieve the Obligor from primary liability for any of its obligations hereunder, and in the event of any such assignment or leasing the Obligor shall continue to remain primarily liable for payment of the loan payments and other payments specified in Article V hereof and for performance and observance of the other covenants and agreements contained herein; provided that if (i) the Obligor withdraws from the Obligated Group (as defined in the Master Indenture) and is released from its obligations on the Series 2019 Note by the Master Trustee pursuant to the Master Indenture and (ii) this Agreement has been assigned to a remaining member of such Obligated Group in accordance with this Section 8.1, the Obligor shall also be released from its liability for its obligations hereunder, including payment of the loan payments and other payments specified in Article V hereof and the performance and observance of the other covenants and agreements contained herein.

(b) The assignee or lessee shall assume in writing the obligations of the Obligor hereunder to the extent of the interest assigned or leased, provided that the provisions of this subsection shall not apply to a lease of a portion of the Project or an operating contract for the performance by others of Obligor or medical services on or in connection with the Project, or any part thereof.

(c) The Obligor shall, within 30 days after the delivery thereof, furnish or cause to be furnished to the Issuer and the Bond Trustee a true and complete copy of each such assumption of obligations and assignment or lease of the Project, as the case may be.

Section 8.2 <u>Assignment and Pledge by Issuer</u>. Solely pursuant to the Bond Indenture, the Issuer may assign its interest in and pledge any moneys receivable under the Series 2019 Note and this Agreement (except in respect of certain rights to indemnification and for Administration Expenses, indemnification and payment of attorneys' fees and expenses pursuant to Sections 5.7, 7.5 and 9.5 hereof) to the Bond Trustee as security for payment of the principal of, premium, if any, and interest on the Bonds. The Obligor consents to such assignment and pledge.

## ARTICLE IX

## FAILURE TO PERFORM COVENANTS AND REMEDIES THEREFOR

Section 9.1 <u>Event of Default</u>. Failure of the Obligor to pay when due any payment (other than failure to make any payment on the Series 2019 Note, which default shall have no grace period) required to be made under this Agreement or to observe and perform any covenant, condition or agreement on its part to be observed or performed hereunder, and continuation of such failure for a period of 60 days after written notice, specifying such failure and requesting that it be

remedied, is given to the Obligor by the Issuer or the Bond Trustee, the Issuer or the Bond Trustee shall constitute an Event of Default hereunder and thereupon the Issuer and the Bond Trustee shall have the remedies provided in Section 9.2 hereof.

Section 9.2    Remedies.  Upon the occurrence of an Event of Default under Section 9.1 hereof, the Issuer or the Bond Trustee, as assignee or successor of the Issuer, upon compliance with all applicable law, in its discretion may take any one or more of the following steps:

(a)    by mandamus, or other suit, action or proceeding at law or in equity, enforce all rights of the Issuer, and require the Obligor to carry out any agreements with or for the benefit of the Bondholders and to enforce performance and observance of any duty, obligation, agreement or covenant of the Obligor under the Act or this Agreement; or

(b)    by action or suit in equity require the Obligor to account as if it were the trustee of an express trust for the Issuer; or

(c)    by action or suit in equity enjoin any acts or things which may be unlawful or in violation of the rights of the Issuer; or

(d)    upon the filing of a suit or other commencement of judicial proceedings to enforce the rights of the Bond Trustee and the Bondholders, have appointed a receiver or receivers of the Trust Estate upon a showing of good cause with such powers as the court making such appointment may confer.

Section 9.3    Discontinuance of Proceedings.  In case any proceeding taken by the Issuer or the Bond Trustee on account of any Event of Default under Section 9.1 shall have been discontinued or abandoned for any reason, or shall have been determined adversely to the Issuer or the Bond Trustee, then and in every case the Issuer and the Bond Trustee shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies and powers of the Issuer and the Bond Trustee shall continue as though no such proceeding had been taken.

Section 9.4    No Remedy Exclusive.  No remedy herein conferred upon or reserved to the Issuer or the Bond Trustee is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement or now or hereafter existing at law or in equity or by statute.  No delay or omission to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right or power may be exercised from time to time and as often as may be deemed expedient.  In order to entitle the Issuer or the Bond Trustee to exercise any remedy reserved to it in this Article, it shall not be necessary to give any notice, other than notice required in Section 9.1 hereof.  Such rights and remedies given the Issuer hereunder shall also extend to the Bond Trustee and the holders of the Bonds, subject to the Bond Indenture.

Section 9.5    Agreement to Pay Attorneys' Fees and Expenses.  In the event the Issuer or the Bond Trustee should employ attorneys or incur other expenses for the enforcement of performance or observance of any obligation or agreement on the part of the Obligor herein or in the Bond Indenture contained, the Obligor agrees that it will on demand therefor pay to the Issuer

or the Bond Trustee, as the case may be, the reasonable fee of such attorneys and such other reasonable expenses incurred by the Issuer or the Bond Trustee.

Section 9.6    Waivers.  In the event any agreement contained in this Agreement should be breached by either party and thereafter waived by the other party, such waiver shall be limited to the particular breach waived and shall not be deemed to waive any other breach hereunder.  In view of the assignment of the Issuer's rights in and under this Agreement to the Bond Trustee under the Bond Indenture, the Issuer shall have no power to waive any failure to perform under Section 9.1 hereunder without the consent of the Bond Trustee (other than a failure to observe the covenants contained in Section 4.10 hereof, which may be waived by the Issuer without the consent of the Bond Trustee).

## ARTICLE X

## PREPAYMENT OF NOTE

Section 10.1    General Option to Prepay Note.  The Obligor shall have and is hereby granted the option exercisable at any time to prepay all or any portion of its payments due or to become due on the Series 2019 Note by depositing with the Bond Trustee for payment into the Bond Fund an amount of money or Government Obligations the principal and interest on which when due, will be equal to an amount sufficient to pay the principal of, premium, if any, and interest on any portion of the Bonds then Outstanding under the Bond Indenture, without penalty. The exercise of the option granted by this Section shall not be cause for redemption of Bonds unless such redemption is permitted at that time under the provisions of the Bond Indenture and the Obligor specifies the date for such redemption.  In the event the Obligor prepays all of its payments due and to become due on the Series 2019 Note by exercising the option granted by this Section and upon payment of all reasonable and necessary fees and expenses of the Bond Trustee, the Issuer and any Paying Agent accrued and to accrue through final payment of the Bonds called for redemption as a result of such prepayment and of all Administration Expenses through final payment of the Bonds called for redemption as a result of such prepayment, this Agreement shall terminate; provided that no such termination shall occur unless all of the Bonds are no longer Outstanding.

Section 10.2    Conditions to Exercise of Option.  To exercise the option granted in Section 10.1 hereof, the Obligor shall give written notice to the Issuer and the Bond Trustee which shall specify therein the date of such redemption, which date shall be not less than 45 days from the date the notice is mailed.

## ARTICLE XI

## MISCELLANEOUS

Section 11.1    Notices.  Any notice, request or other communication under this Agreement shall be given in writing and shall be deemed to have been given by either party to the other party at the addresses shown below upon any of the following dates:

     (a)     The date of notice by telefax, telecopy, or similar telecommunications, which is confirmed promptly in writing;

     (b)     Three Business Days after the date of the mailing thereof, as shown by the post office receipt if mailed to the other party hereto by registered or certified mail;

     (c)     The date of the receipt thereof by such other party if not given pursuant to (a) or (b) above.

The address for notice for each of the parties shall be as follows:

> Tarrant County Cultural Education Facilities Finance Corporation
> c/o Brown Pruitt Wambsganss Ferrill & Dean, P.C.
> 201 Main Street
> Suite 801
> Fort Worth, Texas 76102
> Attention: Secretary, Randal L. Dean
> Telephone: (817) 338-4888
> Telecopier No.: (817) 338-0700

Obligor:

> Tarrant County Senior Living Center Inc.
> c/o Lifespace Communities, Inc.
> 4201 Corporate Drive
> West Des Moines, Iowa 50266
> Telephone: (515) 309-4456
> Telecopier: _____
> Attention: Chief Financial Officer

with a copy to:

> Lifespace Communities, Inc.
> 4201 Corporate Drive
> West Des Moines, Iowa 50266
> Telephone: (515) 309-4456
> Telecopier: _____
> Attention: Jodi Hirsch, Senior Vice President and General Counsel

Bond Trustee:

> UMB Bank,
> National Association
> [address]
> Attention:
> Telephone:
> Telecopy:

Notwithstanding the foregoing, notices to the Bond Trustee shall be effective only upon receipt.

Section 11.2 <u>Binding Effect</u>. This Agreement shall inure to the benefit of and shall be binding upon the Issuer, the Obligor, and their respective successors and assigns, subject, however, to the limitations contained in Sections 8.1, 8.2 and 11.9 hereof.

Section 11.3 <u>Severability</u>. In the event any provision of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof.

Section 11.4 <u>Amounts Remaining in Funds</u>. It is agreed by the parties hereto that any amounts remaining in the Bond Fund or the Reserve Fund upon expiration or sooner termination of this Agreement, after payment in full of the Bonds (or provision for payment thereof having been made in accordance with the provisions of the Bond Indenture), the fees, charges, and expenses of the Bond Trustee, the Issuer and the Paying Agent in accordance with the Bond Indenture, the Administration Expenses and all other amounts required to be paid under this Agreement and the Bond Indenture, shall belong to and be paid to the Obligor by the Bond Trustee or the Issuer.

Section 11.5 <u>Amendments, Changes, and Modifications</u>. Except as otherwise provided in this Agreement or in the Bond Indenture, subsequent to the initial issuance of Bonds and prior to their payment in full (or provision for the payment thereof having been made in accordance with the provisions of the Bond Indenture), this Agreement may not be effectively amended, changed, modified, altered, or terminated without the written consent of the Bond Trustee.

Section 11.6 <u>Execution in Counterparts; Electronic Transactions</u>. This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument. The transaction described herein may be conducted and this Agreement and related documents may be stored by electronic means. Copies, telecopies, facsimiles, electronic files and other reproductions of original executed documents shall be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

Section 11.7 <u>Payment</u>. At such time as the principal of, premium, if any, and interest on all Bonds Outstanding under the Bond Indenture shall have been paid, or shall be deemed to be paid, in accordance with the Bond Indenture, and all other sums payable by the Obligor under this Agreement shall have been paid, the Series 2019 Note shall be deemed to be fully paid and shall be delivered by the Bond Trustee to the Obligor.

Section 11.8 <u>Governing Law</u>. This Agreement shall be governed and construed in accordance with the law of the State of Texas.

Section 11.9 <u>No Pecuniary Liability of Issuer</u>. No provision, covenant, or agreement contained in this Agreement, or any obligations herein imposed upon the Issuer, or the breach thereof, shall constitute an indebtedness of the Issuer within the meaning of any Texas constitutional provision or statutory limitation or shall constitute or give rise to a pecuniary liability of the Issuer or a charge against its general credit. In making the agreements, provisions, and

covenants set forth in this Agreement, the Issuer has not obligated itself except with respect to the application of the revenues, income, and all other property therefrom, as hereinabove provided.

Section 11.10 <u>Payments Due on Holidays</u>. If the date for making any payment or the last date for performance of any act or the exercising of any right, as provided in this Agreement, shall be a legal holiday or a day on which banking institutions in Dallas, Texas or Minneapolis, Minnesota are authorized by law to remain closed, such payment may be made or act performed or right exercised on the next succeeding day not a legal holiday or a day on which such banking institutions are authorized by law to remain closed with the same force and effect as if done on the nominal date provided in this Agreement.

Section 11.11 <u>No Individual Liability</u>. No covenant or agreement contained in this Agreement or the Bond Indenture shall be deemed to be the covenant or agreement of any member of the Board of Directors or the governing body of the Obligor or the Bond Trustee or of any officer, director, trustee, agent or employee of the Issuer, the Bond Trustee or the Obligor or the governing body of Tarrant County, Texas, in his or her individual capacity, and none of such persons shall be subject to any personal liability or accountability by reason of the execution hereof, whether by virtue of any constitution, statute or rule of law, or by the enforcement or any assessment or penalty, or otherwise.

Section 11.12 <u>Survival of Covenants</u>. All covenants, agreements, representations and warranties made by the Obligor in this Agreement, the Bond Indenture, the Series 2019 Note and the Bonds, and in any certificates or other documents or instruments delivered pursuant to this Agreement or the Bond Indenture, shall survive the execution and delivery of this Agreement, and the Bond Indenture and the Series 2019 Note and shall continue in full force and effect until the Bonds and the Series 2019 Note are paid in full and all of the Obligor's other payment obligations (including without limitation the indemnification obligation under Section 7.5 and the obligations under Sections 5.5, 5.7 and 9.5 hereof) under this Agreement, the Bond Indenture, the Series 2019 Note and the Bonds are satisfied. All such covenants, agreements, representations and warranties shall be binding upon any successor and assigns of the Obligor.

IN WITNESS WHEREOF, the Issuer and the Obligor have caused this Agreement to be executed in their respective corporate names, all as of the date first above written.

TARRANT COUNTY CULTURAL EDUCATION FACILITIES FINANCE CORPORATION

By: _____
      President

TARRANT COUNTY SENIOR LIVING CENTER INC.

By: _____
      President

EXHIBIT A

PROJECT DESCRIPTION

The Project consists of a continuing care retirement community with approximately 188 independent living units, 42 assisted living units, 20 memory support units and 46 nursing beds, together with common areas and parking areas, to be known as The Stayton at Museum Way located on approximately 2.5 acres at 2501 Museum Way, Fort Worth, Texas.

87584929v.1

**Final Draft: May 3, 2019**

---

**TARRANT COUNTY SENIOR LIVING CENTER INC.**
as the Obligated Group Representative

and

**UMB BANK, NATIONAL ASSOCIATION**
as successor Master Trustee

---

**SUPPLEMENTAL MASTER TRUST INDENTURE NO. 2**

---

**DATED AS OF [MAY __], 2019**

---

**RELATING TO
MASTER TRUST INDENTURE,
DEED OF TRUST AND SECURITY AGREEMENT
DATED AS OF OCTOBER 1, 2009**

---

## SUPPLEMENTAL MASTER TRUST INDENTURE NO. 2

## TABLE OF CONTENTS

Page

Parties ..................................................................................................................... 1
Recitals ................................................................................................................... 1

### ARTICLE I

### DEFINITIONS

Section 1.01.    Definitions of Terms ........................................................................... 2

### ARTICLE II

### AMENDMENT AND SUPPLEMENT OF MASTER INDENTURE

Section 2.01.    Amendment and Supplement of Section 3.03 Liquidity Support Account ......................... 2

### ARTICLE III

### REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 3.01.    Representations and Warranties ............................................................... 3
Section 3.02.    Covenants under the Master Indenture and Related Documents .......................... 3
Section 3.03.    Further Action ................................................................................... 3

### ARTICLE IV

### MISCELLANEOUS PROVISIONS

Section 4.01.    Ratification of Master Indenture .............................................................. 3
Section 4.02.    Limitation of Rights ............................................................................ 4
Section 4.03.    Electronic Transactions ........................................................................ 4
Section 4.04.    Binding Effect ................................................................................... 4
Section 4.05.    Severability ....................................................................................... 4
Section 4.06.    Execution in Counterparts ..................................................................... 4
Section 4.07.    Governing Law ................................................................................... 4

Signatures .............................................................................................................. S-1

\*    \*    \*

## SUPPLEMENTAL MASTER TRUST INDENTURE NO. 2

**THIS SUPPLEMENTAL MASTER TRUST INDENTURE NO. 2**, dated as of [May ___], 2019, (this "Supplemental Master Indenture No. 2") between Tarrant County Senior Living Center Inc., as the obligor and the Obligated Group Representative acting on behalf of itself and all other Obligated Group Members under the hereinafter referred to Indenture (the "Obligor") and UMB Bank, National Association, as successor master trustee (the "Master Trustee"),

### WITNESSETH:

**WHEREAS**, this Supplemental Master Indenture No. 2 amends and supplements the Master Trust Indenture, Deed of Trust and Security Agreement dated as of October 1, 2009, (the "Original Master Indenture" and as amended and supplemented from time to time, including by Supplemental Indenture Number 1, dated as of October 1, 2009, and by this Supplemental Master Indenture No. 2, collectively referred to herein as the "Master Indenture") between the Obligor and the Master Trustee; and

**WHEREAS**, the Obligor and the Master Trustee are authorized under **Section 9.01(b)** of the Original Master Indenture, without the consent of the holders of the Obligations, to amend or supplement the Master Indenture for certain purposes therein, including to add to the covenants of the Obligated Group Members for the benefit of the Holders of Obligations, subject to the terms and provisions contained in the Master Indenture; and

**WHEREAS**, the Original Master Indenture provided for a Liquidity Support Agreement which has been fully drawn and no longer provides benefits to the Holders, and the Obligor has negotiated to obtain a new Liquidity Support Agreement for the benefit of the Holders and desires to supplement and amend **Section 3.03** of the Original Master Indenture to provide for the disbursement of funds and other matters relating to such new Liquidity Support Agreement; and

**WHEREAS**, all acts and things necessary to make this Supplemental Master Indenture No. 2, when executed by the Obligor, as Obligated Group Representative, the valid, binding and legal obligation of the Obligated Group Members, and to constitute these presents, together with the Master Indenture, a valid indenture and agreement according to its terms, have been done and performed, and the execution of this Supplemental Master Indenture No. 2 has in all respects been duly authorized, and the Obligor, in the exercise of the legal right and power vested in it, executes this Supplemental Master Indenture No. 2;

### NOW, THEREFORE, THIS INDENTURE WITNESSETH:

That in consideration of the mutual covenants, conditions and agreements which follow, the Obligor, on behalf of the Obligated Group Members, covenants and agrees with the Master Trustee as follows:

# ARTICLE I

## DEFINITION OF TERMS

**Section 1.01. Definition of Terms.**

(a)     The terms used in this Supplemental Master Indenture No. 2 shall, except as set forth below or as otherwise stated herein, have the meanings assigned to them in the **Section 1.01** of the Original Master Indenture or Supplemental Indenture Number 1 dated as of October 1, 2009 authorizing the Series 2009A Note, the Series 2009B Note and the Series 2009C Note, which Series 2009B Note and Series 2009C Note are no longer Outstanding under the Master Indenture.

(b)     From and after the date of execution and delivery of this Supplemental Master Indenture No. 2, the following terms in **Section 1.01** of the Original Master Indenture are amended to read in their entirety as follows:

"Liquidity Provider" means Lifespace Communities, Inc., an Iowa nonprofit corporation.

"Liquidity Support Agreement" means the Liquidity Support Agreement dated as of [_____ ], 2019, among the Obligor, the Liquidity Provider, and the Master Trustee.

(c)     For all purposes of the Master Indenture, the following words and terms have the following meanings:

"PSA Breach" has the meaning given that term in the Liquidity Support Agreement.

"Series 2009 Bond Indenture" has the meaning given that term in the Liquidity Support Agreement.

"Series 2009 Bond Trustee" has the meaning given that term in the Liquidity Support Agreement.

# ARTICLE II

## AMENDMENT AND SUPPLEMENT OF MASTER INDENTURE

**Section 2.01.     Amendment of Section 3.03 Liquidity Support Account.**  Section 3.03 of the Original Master Indenture is amended to read in its entirety as follows:

**Section 3.03.     Liquidity Support Account.**

(a)     The Master Trustee has previously established the Liquidity Support Account under the Original Master Indenture.  The Liquidity Support Account held by the Master Trustee continues in effect under this Supplemental Master Indenture No. 2.  Pursuant to the Liquidity Support Agreement, upon the execution and delivery hereof, the Liquidity Provider has deposited

2

$3,000,000 with the Master Trustee for credit to the Liquidity Support Account.

(b)     Upon receipt of a Series 2009 Bond Trustee Funded LSA Request in the form attached and delivered in accordance with **Section 3.1(c)** of the Liquidity Support Agreement, the Master Trustee shall deliver to the Series 2009 Bond Trustee from moneys in the Liquidity Support Account the amount so requested to be applied by the Series 2009 Bond Trustee to pay debt service on the Series 2009 Bonds.

(c)     Upon receipt of a Borrower Funded LSA Request in the form attached and delivered in accordance with **Section 3.1(d)** of the Liquidity Support Agreement, the Master Trustee shall deliver to the Obligor from moneys in the Liquidity Support Account the amount so requested to be by applied by Obligor to pay operating expenses of the Project.

(d)     Upon written notice to the Master Trustee from the Liquidity Provider that a PSA Breach has occurred, all remaining moneys in the Liquidity Support Account shall be paid to the Liquidity Support Provider, and the Liquidity Support Account shall be closed.


# ARTICLE III

## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 3.01.    Representations and Warranties.**    The Obligor, as the Obligated Group Representative acting on behalf of the Obligated Group Members, represents and warrants that (a) it is duly authorized under the laws of the State of Texas and all other applicable provisions of law to execute this Supplemental Master Indenture No. 2, and (b) all corporate action on the part of the Obligated Group Representative required by its governing documents and the Master Indenture to establish this Supplemental Master Indenture No. 2 as the binding obligation of the Obligated Group has been duly and effectively taken.

**Section 3.02.    Covenants under the Master Indenture and Related Documents.**    The Obligor, as the Obligated Group Representative acting on behalf of the Obligated Group Members, covenants and agrees that it will faithfully perform or cause to be performed at all times any and all covenants, agreements and undertakings, required on the part of the Obligated Group contained in the Master Indenture.

**Section 3.03.    Further Action.**    The Obligor, on its own behalf and as Obligated Group Representative, and the Master Trustee shall take such further actions as may be necessary or required to further effectuate the purposes of this Supplemental Master Indenture No. 2.


# ARTICLE IV

## MISCELLANEOUS PROVISIONS

**Section 4.01.    Ratification of Master Indenture.**    The Master Indenture, as amended and supplemented by this Supplemental Master Indenture No. 2 and as otherwise amended and supplemented, is in all respects ratified and confirmed and the Master Indenture as so amended and supplemented shall

be read, taken and construed as one and the same instrument. Except as herein otherwise expressly provided, all the provisions, definitions, terms and conditions of the Master Indenture, as amended and supplemented by this Supplemental Master Indenture No. 2 and as otherwise amended and supplemented, shall be deemed to be incorporated in, and made a part of, this Supplemental Master Indenture No. 2. All references to "this Master Indenture" or "this Indenture" in the Master Indenture shall be to the Master Indenture as amended and supplemented by this Supplemental Master Indenture No. 2 and as otherwise amended and supplemented from time to time.

**Section 4.02. Limitation of Rights.** Nothing in this Supplemental Master Indenture No. 2 or in the Obligations, express or implied, shall give or be construed to give any person, firm or corporation, other than the Obligor, the other Obligated Group Members, the Master Trustee, and the registered holders of the Obligations or their registered assigns, any legal or equitable right, remedy or claim under or in respect of this Supplemental Master Indenture No. 2, or under any covenant, condition and provision herein contained; all its covenants, conditions and provisions being for the sole benefit of the Obligor, the other Obligated Group Members, the Master Trustee, and of the registered holders of the Obligations or their registered assigns.

**Section 4.03. Electronic Transactions** The transactions described herein may be conducted and related documents may be stored by electronic means. Copies, telecopies, facsimiles, electronic files and other reproductions of original executed documents shall be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

**Section 4.04. Binding Effect.** All the covenants, stipulations, promises and agreements in this Supplemental Master Indenture No. 2 by or on behalf of the Obligated Group Representative, the Obligor, the other Obligated Group Members or the Master Trustee shall inure to the benefit of and shall bind their respective successors and assigns, whether so expressed or not.

**Section 4.05. Severability.** If any provision in this Supplemental Master Indenture No. 2 or in the Obligations shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

**Section 4.06. Execution in Counterparts.** This Supplemental Master Indenture No. 2 may be executed in any number of counterparts, each of which shall be an original; and all of which shall together constitute but one and the same instrument.

**Section 4.07. Governing Law.** This Supplemental Master Indenture No. 2 shall be deemed to be a contract made under the laws of the State of Texas, and for all purposes shall be construed in accordance with the laws of said State.

**IN WITNESS WHEREOF,** the parties hereto have caused this Supplemental Master Indenture No. 2 to be duly executed and attested by the persons thereunto duly authorized, as of the day and year first above written.

**TARRANT COUNTY SENIOR LNING CENTER INC.,**
as an Obligated Group Member and as Obligated Group Representative

By:_____
Authorized Signatory

**UMB BANK NATIONAL ASSOCIATION**, as Master Trustee

By:_____
Authorized Signatory

**Final Draft: May 3, 2019**

---

**TARRANT COUNTY SENIOR LIVING CENTER INC.**
as the Obligated Group Representative

and

**UMB BANK, NATIONAL ASSOCIATION**
as successor Master Trustee

---

**SUPPLEMENTAL MASTER TRUST INDENTURE NO. 3**

---

**DATED AS OF [NOVEMBER 1], 2019**

---

**RELATING TO**
**TARRANT COUNTY CULTURAL EDUCATION**
**FACILITIES FINANCE CORPORATION**
**RETIREMENT FACILITIY REVENUE BONDS**
**(THE STAYTON AT MUSEUM WAY PROJECT)**
**SERIES 2019**

---

## SUPPLEMENTAL MASTER TRUST INDENTURE NO. 3

## TABLE OF CONTENTS

**Page**

**Parties**.................................................................................................................................1
**Recitals**...............................................................................................................................1

## ARTICLE I

## DEFINITIONS

**Section 1.01.** Definitions.......................................................................................................2

## ARTICLE II

## AUTHORIZATION OF SERIES 2019 NOTE

**Section 2.01.** Authorization of Series 2019 Note......................................................................2
**Section 2.02.** Form of Series 2019 Note...................................................................................2
**Section 2.03.** Conditions to Issuance and Delivery of Series 2019 Note...................................3
**Section 2.04.** Payments on Series 2019 Note............................................................................3
**Section 2.05.** Prepayment and Redemption of Series 2019 Note...............................................3

## ARTICLE III

## SECURITY FOR SERIES 2019 NOTE

**Section 3.01** Security for Series 2019 Note ..............................................................................3

## ARTICLE IV

## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 4.01.** Representations and Warranties ...........................................................................3
**Section 4.02.** Covenants under the Master Indenture and Related Documents ..........................3
**Section 4.03.** Further Action ....................................................................................................4

## ARTICLE V

## MISCELLANEOUS PROVISIONS

**Section 5.01.** Notices...............................................................................................................4
**Section 5.02.** Ratification of Master Indenture .........................................................................5
**Section 5.03.** Limitation of Rights ...........................................................................................5
**Section 5.04.** Electronic Transactions ......................................................................................5
**Section 5.05.** Binding Effect ....................................................................................................5
**Section 5.06.** Severability .........................................................................................................5

**Section 5.07.**  Execution in Counterparts ........................................................................... 6
**Section 5.08.**  Governing Law ......................................................................................... 6

**Signatures** ........................................................................................................... S-1

\*    \*    \*

## SUPPLEMENTAL MASTER TRUST INDENTURE NO. 3

**THIS SUPPLEMENTAL MASTER TRUST INDENTURE NO. 3**, dated as of [November 1], 2019, (this "Supplemental Master Indenture No. 3") between Tarrant County Senior Living Center Inc., a Texas nonprofit corporation, as the sole Obligated Group Member and as Obligated Group Representative (the "Obligated Group Representative") and UMB Bank, National Association, as master trustee (the "Master Trustee"),

## WITNESSETH:

**WHEREAS**, this Supplemental Master Indenture No. 3 supplements the Amended and Restated Master Trust Indenture, Deed of Trust and Security Agreement dated as of [November 1], 2019 (the "Existing Master Indenture" and as amended and supplemented from time to time, including by this Supplemental Master Indenture No. 3, the "Master Indenture") between the Obligated Group Representative and the Master Trustee; and

**WHEREAS**, concurrently with the execution and delivery of this Supplemental Master Indenture No. 3, the Tarrant County Cultural Education Facilities Finance Corporation ("*Issuer*") and UMB Bank National Association, as trustee ("*Related Bond Trustee*"), are entering into an Indenture of Trust of even date herewith ("*Related Bond Indenture*"), under which the Issuer will issue the $[_____] principal amount of Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2019, which will constitute Series 2019 Bonds and Related Bonds under the Master Indenture ("*Series 2019 Bonds*"), which Related Bonds are being issued in exchange for all outstanding Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2009A (the "*Series 2009 Bonds*") of the Issuer and accrued and unpaid interest thereon pursuant to the Bankruptcy Court Order (as defined in the Related Loan Agreement described below);

**WHEREAS**, the Issuer and the Obligated Group Representative are entering into a Loan Agreement of even date herewith ("*Related Loan Agreement*"), under which the Issuer will be deemed to have loaned the proceeds of the Series 2019 Bonds to the Obligated Group Representative to provide funds for the purpose of effecting the Exchange (as defined in the Related Loan Agreement) of the Series 2019 Bonds for the Series 2009 Bonds.

**WHEREAS,** pursuant to the Related Loan Agreement, the Obligated Group Representative has agreed to issue the Obligation (the "*Series 2019 Note*") created by this Supplemental Master Indenture No. 3 to evidence and secure the obligation of the Obligated Group Representative to make the payments required under the Related Loan Agreement; and

**WHEREAS**, the Obligated Group Representative is authorized under **Section 9.01(e)** of the Existing Master Indenture to issue and deliver of a new Obligation in the form of the Series 2019 Note to evidence and secure the obligations of the Obligated Group Representative under the Related Loan Agreement.

**WHEREAS**, all acts and things necessary to make the Series 2019 Note authorized by this Supplemental Master Indenture No. 3, when executed by the Obligated Group Representative, and authenticated and delivered by the Master Trustee as provided in the Existing Master Indenture and this Supplemental Master Indenture No. 3, the valid, binding and legal obligations of the Members of the Obligated Group, and to constitute these presents, together with the Existing Master Indenture, a valid

indenture and agreement according to its terms, have been done and performed, and the execution of this Supplemental Master Indenture No. 3 and the issuance hereunder and under the Existing Master Indenture of the Series 2019 Note authorized by this Supplemental Master Indenture No. 3 have in all respects been duly authorized, and the Obligated Group Representative, in the exercise of the legal right and power vested in it on behalf of the Obligated Group, executes this Supplemental Master Indenture No. 3 and proposes to make, execute, issue and deliver the Series 2019 Note authorized hereunder.

**NOW, THEREFORE,** in order to declare the terms and conditions upon which the Series 2019 Note authorized by this Supplemental Master Indenture No. 3 is authenticated, issued and delivered, and in consideration of the premises and the acquisition and acceptance of such Series 2019 Note by the Holder thereof, and in consideration of the mutual covenants, conditions and agreements which follow, the Obligated Group Representative acting on behalf of the Obligated Group, covenants and agrees with the Master Trustee as follows:

## ARTICLE I

## DEFINITION OF TERMS

*Section 1.01. Definitions.* The terms used in this Supplemental Master Indenture No. 3 shall, except as set forth below or as otherwise stated herein, have the meanings assigned to them in the Master Indenture.

## ARTICLE II

## AUTHORIZATION OF SERIES 2019 NOTE

*Section 2.01.    Authorization of Series 2019 Note.* There is hereby created as an Obligation under the Master Indenture a promissory note to be known and entitled Tarrant County Senior Living Center Inc. Series 2019 Note (the *"Series 2019 Note"*). The Series 2019 Note, in the principal amount of $_____, shall be executed, authenticated and delivered in accordance with **Article II** of the Master Indenture.

*Section 2.02.    Form of Series 2019 Note.* The Series 2019 Note created hereby shall be in the form of a fully registered Obligation without coupons, shall be dated [November 1], 2019, shall bear interest from its date on the principal balance thereof in the amount set forth in such Series 2019 Note, payable on the each [May 1] and [November 1], commencing [May 1], 2020, and shall be substantially in the form set forth in **Exhibit A** attached hereto, but with such changes as may be necessary to reflect the terms of such Series 2019 Note.

*Section 2.03.    Conditions to Issuance and Delivery of Series 2019 Note.* The Series 2019 Note shall be issued on the Effective Date of the Bankruptcy Court Order (each as defined in the Related Bond Indenture), simultaneously with the delivery to the Master Trustee of the Opinion of Counsel to the Obligated Group required by **Section 2.05(b)** of the Existing Master Indenture.

*Section 2.04.    Payments on Series 2019 Note.* The Series 2019 Note authorized hereunder shall be payable in installments in the amounts and on the dates, shall bear interest from the date of said Series 2019 Note at the respective rates, and shall have such other terms and provisions as are set forth in

or incorporated by reference into the form of Series 2019 Note attached hereto. Payments on the Series 2019 Note shall be made in the manner and in accordance with the provisions of the Master Indenture except to the extent that any contrary provision is made in this Supplemental Master Indenture or such Series 2019 Note.

**Section 2.05.** **Prepayment and Redemption of Series 2019 Note.** The Series 2019 Note is subject to prepayment and redemption prior to maturity as provided in the Existing Master Indenture and, to the extent and with respect to the corresponding redemption or prepayment provisions of the Related Bond Indenture and the Related Loan Agreement, by paying the amount necessary to provide for the payment, prepayment, redemption, refunding or advance defeasance of the Series 2019 Bonds or any portion of the Series 2019 Bonds in the manner provided in and in accordance with the terms of the Related Bond Indenture and the Related Loan Agreement.

## ARTICLE III

## SECURITY FOR SERIES 2019 NOTE

**Section 3.01.** **Security for Series 2019 Note.** The Series 2019 Note authorized hereunder stands on a parity with all Obligations issued and Outstanding under the Master Indenture and are equally and ratably secured by the Master Indenture, including the pledge and assignment of a security interest in the Trust Estate pursuant to the Granting Clauses of the Existing Master Indenture, including a pledge and assignment of all real property and all personal property, including Gross Revenues, of the Obligated Group.

## ARTICLE IV

## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 4.01.** **Representations and Warranties.** The Obligated Group Representative, acting on behalf of the Obligated Group Members, represents and warrants that:

(a)     it is duly authorized under the laws of the State of Texas and all other applicable provisions of law to execute this Supplemental Master Indenture No. 3 and to issue the Series 2019 Note hereunder;

(b)     all corporate action on the part of the Obligated Group Representative required by its governing documents and the Master Indenture to establish this Supplemental Master Indenture No. 3 as the binding obligation of the Obligated Group has been duly and effectively taken; and

(c)     all such action so required for the authorization and issuance of the Series 2019 Note has been duly and effectively taken.

**Section 4.02.** **Covenants under the Master Indenture.** The Obligated Group Representative acting on behalf of the Obligated Group Members, covenants and agrees that it will faithfully perform or cause to be performed at all times any and all covenants, agreements and undertakings, required on the part of the Obligated Group contained in the Master Indenture.

**Section 4.03.** **Further Action.** The Obligated Group Representative and the Master Trustee shall take such further actions as may be necessary or required to further effectuate the purposes of this Supplemental Master Indenture No. 3.

## ARTICLE V

## MISCELLANEOUS PROVISIONS

**Section 5.01.** **Notices.** It shall be sufficient service of any notice, request, complaint, demand or other paper required by this Supplemental Master Indenture No. 3 to be given to or filed with the following parties if the same shall be given in the manner provided in the Existing Master Indenture addressed as follows:

(a)    To the Obligated Group Representative or any other Member of the Obligated Group at:

    Tarrant County Senior Living Center Inc.
    c/o Lifespace Communities, Inc
    4201 Corporate Drive
    West Des Moines, Iowa 50266
    Attention: (515) 309-4456
    Telecopy: _____
    Attention: Chief Financial Officer

with a copy to:

    Lifespace Communities, Inc.
    4201 Corporate Drive
    West Des Moines, Iowa 50266
    Telephone: (515) 309-4456
    Telecopier: _____
    Attention: Jodi Hirsch, Senior Vice President and General Counsel

(b)    To the Master Trustee at:

    UMB Bank, National Association

    _____
    [City, State of Master Trustee] _____
    Attention: Corporate Trust Department
    Telecopy: _____

(c)    To the Issuer and the Related Bond Trustee:

    At the address of such party and in the manner set forth in the Related Bond Indenture.

    (d)    To all other parties:

    At the addresses specified in **Section 1.05** of the Master Indenture.

If, because of the temporary or permanent suspension of mail service or for any other reason, it is impossible or impractical to mail any notice in the manner herein provided, then such delivery of notice in lieu thereof as shall be made with the approval of the Master Trustee shall constitute a sufficient notice.

If notice to holder of the Series 2019 Note or owners of Series 2019 Bonds is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular holder or owner shall affect the sufficiency of such notice with respect to other holders or owners. Where the Master Indenture provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by holders or owners shall be filed with the Master Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

**Section 5.02. Ratification of Master Indenture.** The Existing Master Indenture, as supplemented by this Supplemental Master Indenture No. 3 and as otherwise amended and supplemented, is in all respects ratified and confirmed and the Existing Master Indenture as so amended and supplemented shall be read, taken and construed as one and the same instrument. Except as herein otherwise expressly provided, all the provisions, definitions, terms and conditions of the Existing Master Indenture, as amended and supplemented by this Supplemental Master Indenture No. 3 and as otherwise amended and supplemented, shall be deemed to be incorporated in, and made a part of, this Supplemental Master Indenture No. 3. All references to "this Master Indenture" in the Existing Master Indenture shall be to the Existing Master Indenture as supplemented by this Supplemental Master Indenture No. 3 and as otherwise amended and supplemented from time to time.

**Section 5.03. Limitation of Rights.** Nothing in this Supplemental Master Indenture No. 3 or in the Series 2019 Note, express or implied, shall give or be construed to give any person, firm or corporation, other than the Obligated Group Representative, the other Obligated Group Members, the Master Trustee, and the Holder of the Series 2019 Note or its registered assigns, any legal or equitable right, remedy or claim under or in respect of this Supplemental Master Indenture No. 3, or under any covenant, condition and provision herein contained; all its covenants, conditions and provisions being for the sole benefit of the Obligated Group Representative, the other Obligated Group Members, the Master Trustee, and of the Holder of the Series 2019 Note or its registered assigns.

**Section 5.04. Electronic Transactions** The transactions described herein may be conducted and related documents may be stored by electronic means. Copies, telecopies, facsimiles, electronic files and other reproductions of original executed documents shall be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

**Section 5.05. Binding Effect.** All the covenants, stipulations, promises and agreements in this Supplemental Master Indenture No. 3 by or on behalf of the Obligated Group Representative, the other Obligated Group Members or the Master Trustee shall inure to the benefit of and shall bind their respective successors and assigns, whether so expressed or not.

**Section 5.06. Severability.** If any provision in this Supplemental Master Indenture No. 3 or in the Series 2019 Note shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

***Section 5.07.*** ***Execution in Counterparts.*** This Supplemental Master Indenture No. 3 may be executed in any number of counterparts, each of which shall be an original; and all of which shall together constitute but one and the same instrument.

***Section 5.08.*** ***Governing Law.*** This Supplemental Master Indenture No. 3 and the Series 2019 Note shall be deemed to be a contract made under the laws of the State of Texas, and for all purposes shall be construed in accordance with the laws of said State.

*[Remainder of page intentionally left blank.]*

**IN WITNESS WHEREOF,** the parties hereto have caused this Supplemental Master Indenture No. 3 to be duly executed and attested by the persons thereunto duly authorized, as of the day and year first above written.

**TARRANT COUNTY SENIOR LNING CENTER INC.,**
as the sole Obligated Group Member and as Obligated Group Representative

By:_____
Authorized Signatory

**UMB BANK NATIONAL ASSOCIATION,** as Master Trustee

By:_____
Authorized Signatory

**EXHIBIT A**
**TO SUPPLEMENTAL MASTER TRUST INDENTURE NO. 3**


**(FORM OF SERIES 2019 NOTE)**


**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT**
**OF 1933, AS AMENDED OR ANY STATE SECURITIES LAW**

**No. R-1**

$_____

**TARRANT COUNTY SENIOR LIVING CENTER INC.**
**SERIES 2019 NOTE**

| Date of Note | Final Maturity Date |
|---|---|
| [November 1], 2019 | [November 1], [2054] |

TARRANT COUNTY SENIOR LIVNG CENTER Inc., as an obligated group member and the obligated group representative (the "Obligated Group Representative") under the hereinafter defined Master Indenture, for value received, hereby promises to pay to TARRANT COUNTY CULTURAL EDUCATION FACILITIES FNANCE CORPORATION, or registered assigns, at the [St. Louis], Missouri, corporate trust office of UMB Bank, National Association, as bond trustee (with its successors and assigns, the "Bond Trustee") or at such other location as the Bond Trustee may from time to time by notice to the Obligated Group Representative require, the principal amount shown above on or prior to the final maturity date shown above, and earlier upon redemption in whole or in part of the Series 2019 Bonds described herein, in the amounts and on the dates as set forth in the hereinafter referred to Related Bond Indenture and in the hereinafter referred to Related Loan Agreement, and to pay to the Holder interest on the unpaid principal balance hereof from the date of this Note to the final maturity date or the redemption date at the rates of interest on the hereinafter described Series 2019 Bonds, until this Note is paid.

This Note is issued in the principal amount specified above of is dated as of [November 1], 2019 and is designated as the "Tarrant County Senior Living Center Inc. Series 2019 Note" (the "Note", and together with all other Obligations issued under the Master Indenture hereinafter defined, the "Obligations") issued under and pursuant to Supplemental Master Trust Indenture No. 3 dated as of [November 1], 2019 ("Supplemental Master Indenture No. 3"), supplementing the Amended and Restated Master Trust Indenture, Deed of Trust and Security Agreement, dated as of [November 1], 2019 (as supplemented and amended, the "Master Indenture"), between the Obligated Group Representative and UMB Bank, National Association, as master trustee (the "Master Trustee"), and delivered pursuant to a Loan Agreement dated as of [November 1], 2019 (the "Related Loan Agreement") between Tarrant County Cultural Education Facilities Finance Corporation (the "Issuer") and the Obligated Group Representative.

Pursuant to the terms of the Master Indenture, each of the Obligated Group Members described therein will be jointly and severally liable for the payment of this Note and all other Obligations.

This Note is issued for the purpose of securing the payment of the principal of, premium, if any, and interest on Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Series 2019 (the "Series 2019 Bonds") and the payment of the loan of the proceeds of the Series 2019 Bonds to the Obligated Group pursuant to the Related Loan Agreement. The Series 2019 Bonds were issued under the laws of the State of Texas, including particularly Article 1528m, V.A.T.C.S., as amended, and an Indenture of Trust dated as of [November 1], 2019 (the "Bond Indenture"), between the Issuer and the Bond Trustee, which Series 2019 Bonds are being issued in exchange for all outstanding Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2009A (the "Series 2009 Bonds") of the Issuer and accrued and unpaid interest thereon pursuant to the Bankruptcy Court Order (as defined in the Loan Agreement).

The amounts due on this Note shall be payable at the times and in the amounts as provided in the Related Bond Indenture and the Related Loan Agreement. The last such installment shall be in an amount sufficient to discharge all unpaid amounts due on this Note in full. The payments on this Note shall be made in lawful currency of the United States of America by depositing the same with the Bond Trustee, by check, draft or wire transfer in immediately available funds, at its office, at or prior to the opening of business on the date the same shall become due and payable, and by giving notice of payments to the hereinafter referred to Master Trustee as provided in the Master Indenture. The Obligated Group shall receive certain credits against its required payments on this Note equal to the corresponding amounts paid as or credited against payments of the principal, interest or other amounts on the Series 2019 Bonds, as specified in the Related Loan Agreement. The obligation evidenced by this Note shall terminate only when payment in full of all amounts due hereunder has been made or duly provided for in accordance with the Master Indenture and the Related Bond Indenture and Related Loan Agreement. The Master Trustee shall maintain, in accordance with its usual practice, an account or accounts evidencing the principal and interest and other amounts due hereunder. In any legal action or proceeding, such accounts shall, in the absence of manifest error, be conclusive and binding as to the existence and amounts of the obligations to the Holder therein recorded. Notwithstanding the foregoing, the failure to maintain such account or accounts or any error therein shall not affect the obligations of the Obligated Group hereunder.

All Obligations issued and Outstanding under the Master Indenture including this Note are equally and ratably secured by the Master Indenture. The Members of the Obligated Group jointly and severally agree under the Master Indenture to be liable on all Obligations, including this Note, issued under the Master Indenture. All Members of the Obligated Group are jointly and severally liable under the Master Indenture for the payment of all Obligations, including this Note, issued under the Master Indenture. Under the Master Indenture, the Obligated Group Representative may issue additional Obligations from time to time, and if issued, such additional Obligations will rank pari passu with this Note and all other Obligations issued under the Master Indenture, except as otherwise provided in the Master Indenture. Copies of the Master Indenture, the Related Bond Indenture and the Related Loan Agreement are on file with the Master Trustee and reference is made to the Master Indenture, the Related Bond Indenture and the Related Loan Agreement for the provisions with respect to the nature and extent of the security for and the rights of the Holder of this Note, the terms and conditions on which this Note is issued and the rights, duties and obligations of the Obligated Group Representative and the Master Trustee under the Master Indenture, to all of which the Holder hereof, by acceptance of this Note, assents. The Master Indenture may be modified, amended or supplemented to the extent and under the circumstances permitted by, and subject to the terms and conditions of, the Master Indenture.

To the extent permitted by and as provided in the Master Indenture, modifications or changes of the Master Indenture, or of any indenture supplemental thereto, and of the rights and obligations of the Obligated Group Members (as defined in the Master Indenture) and of the holders of the Obligations in any particular may be made with the consent of the Master Trustee and the Obligated Group Members and, in certain circumstances, with the consent of the holders of not less than a majority in aggregate

principal amount of the Obligations then Outstanding under the Master Indenture. No such modification or change shall be made which will reduce the percentage of the Obligations, the consent of the holders of which is required to consent to such supplemental indenture, or permit a preference or priority of any Obligation or Obligations over any other Obligation or Obligations, or which will effect a change in the times, amount and currency of payment of the principal of, and premium, if any, or interest on this Note or a reduction in the principal amount or redemption price of any Obligation or the rate of interest thereon, without the consent of the holder of such Obligation. Any such consent by the holder of this Note shall be conclusive and binding upon such holder and all future holders and owners hereof irrespective of whether or not any notation of such consent is made upon this Note.

This Note is subject to prepayment in the manner, under the circumstances, upon such notice and at the prices set forth in the Master Indenture and the Related Bond Indenture and the Related Loan Agreement. This Note may also be prepaid in whole or in part by paying the amount necessary to provide for the payment, prepayment, redemption, refunding or advance defeasance of the Series 2019 Bonds or any portion of the Series 2019 Bonds and the payment of the amounts due under the Related Bond Indenture and is subject to mandatory prepayment in the event of mandatory redemption of the Series 2019 Bonds in the amount necessary to provide for the payment of such mandatory redemption in the manner provided in the Related Bond Indenture.

Upon the occurrence of certain "Events of Default", as defined in the Master Indenture, the principal of all outstanding Obligations may be declared due and payable, and thereupon shall become due and payable as provided in the Master Indenture.

The holder of this Note shall have no right to enforce the provisions of the Master Indenture, or to institute any action to enforce the covenants therein, or to take any action with respect to any default under the Master Indenture, or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Master Indenture.

This Note shall be registered on the register to be maintained by the Master Trustee and this Note shall be transferable only upon said register at said office by the registered owner or by his duly authorized attorney. Such transfer shall be without charge to the holder hereof, but any taxes or other governmental charges required to be paid with respect to the same shall be paid by the holder requesting such transfer as a condition precedent to the exercise of such privilege. Upon any such transfer, the Obligated Group Representative shall execute and the Master Trustee shall authenticate and deliver in exchange for this Note a new registered Note without coupons, registered in the name of the transferee.

The Obligated Group Representative and other Obligated Group Members, the Master Trustee and any paying agent may deem and treat the person in whose name this Note is registered as the absolute owner hereof for all purposes; and neither the Obligated Group Representative and the other Obligated Group Members, any paying agent, the Master Trustee nor any Obligation registrar shall be affected by any notice to the contrary. All payments made to the registered owner hereof shall be valid and, to the extent of the sum or sums so paid, effectual to satisfy and discharge the liability for moneys payable on this Note.

No covenant or agreement contained in this Note or the Master Indenture shall be deemed to be a covenant or agreement of any officer, agent or employee of any of the Obligated Group Members in his individual capacity, and neither the Board of Directors of any of the Obligated Group Members nor any officer executing this Note shall be liable personally on this Note or be subject to any personal liability or accountability by reason of the issuance of this Note.

This Note shall not be entitled to any benefit under the Master Indenture, or be valid or become obligatory for any purpose, until this Note shall have been authenticated by execution by the Master Trustee, or its successor as Master Trustee, of the Certificate of Authentication inscribed hereon.

**IT IS HEREBY CERTIFIED** that all conditions, acts and things required to exist, happen and be performed under the Master Indenture precedent to and in the issuance of this Note, exist, have happened and have been performed, and that the issuance, authentication and delivery of this Note have been duly authorized by resolutions of the Obligated Group Representative duly adopted.

**IN WITNESS WHEREOF, Tarrant County Senior Living Inc.** has caused this Note to be executed in its name and on its behalf by the manual or facsimile signature of its [President or Vice President], and attested by the manual or facsimile signature of its Secretary or Assistant Secretary, and this Note to be dated as of the Dated Date shown above.

<div style="margin-left:50%">

**TARRANT COUNTY SENIOR LIVING CENTER INC.,** as Obligated Group Representative

By: _____
Title: _____

</div>

ATTEST:

By: _____
Title: _____

<div align="center">

**MASTER TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

</div>

This Note is one of the Obligations described in the within-mentioned Master Indenture.

<div style="margin-left:50%">

**UMB BANK, NATIONAL ASSOCIATION,** as Master Trustee

By: _____
Title:   Authorized Officer

</div>

## ENDORSEMENT

Pay to the order of UMB Bank, National Association, Bond Trustee, pursuant to the Indenture of Trust described in this Note authorizing $_____ principal amount of Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2019, without recourse or warranty of any nature or description.

**TARRANT COUNTY CULTURAL EDUCATIONAL FACILITIES FINANCE CORPORATION**

By: _____

Title:

# **EXHIBIT D**

Financial Projections

| Stayton Projected Cash Flow | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| Operating Revenue | $ 21,375 | $ 22,003 | $ 22,682 | $ 23,398 | $ 24,139 |
| (-) Operating Expense | (15,793) | (16,227) | (16,691) | (17,176) | (17,681) |
| **Adjusted Net Operating Income** | **5,582** | **5,776** | **5,991** | **6,222** | **6,458** |
| *Adjusted Net Operating Income Margin (%)* | *26.1%* | *26.3%* | *26.4%* | *26.6%* | *26.8%* |
| (-) Management Fees | (1,740) | (1,800) | (1,865) | (1,930) | (1,994) |
| **Net Operating Income** | **3,842** | **3,976** | **4,126** | **4,292** | **4,464** |
| *Net Operating Income Margin (%)* | *18.0%* | *18.1%* | *18.2%* | *18.3%* | *18.5%* |
| (-) Restructuring Fees | (1,116) | - | - | - | - |
| (+) Entrance Fee Turnover, net | 3,747 | 5,442 | 5,770 | 6,033 | 6,287 |
| (+) Changes in Net Working Capital | (119) | 137 | 136 | 136 | 139 |
| (-) Settlement of General Unsecured Claims | (363) | - | - | - | - |
| (+) Cash (to) / from Restricted Funds | (4,956) | (137) | - | - | - |
| (+) Interest Income | 233 | 233 | 233 | 233 | 233 |
| (-) Capital Expenditures | (1,138) | (786) | (670) | (815) | (569) |
| **Unlevered Free Cash Flow** | **130** | **8,865** | **9,594** | **9,879** | **10,555** |
| *Unlevered Free Cash Flow Margin (%)* | *0.6%* | *40.3%* | *42.3%* | *42.2%* | *43.7%* |
| (-) Cash Interest - Subordinated Loan | - | - | - | - | - |
| (-) Cash Interest - Bond Debt | (5,678) | (6,489) | (6,489) | (6,489) | (6,489) |
| (-) Principal Payments of Subordinated Loan | - | - | - | - | - |
| (-) Principal Payments of Bond Debt | - | - | - | - | - |
| **Levered Free Cash Flow** | **(5,548)** | **2,375** | **3,105** | **3,390** | **4,065** |
| (+) Beginning Cash[2] | 8,422 | 2,874 | 5,250 | 8,354 | 11,744 |
| **Ending Cash** | **$ 2,874** | **$ 5,250** | **$ 8,354** | **$ 11,744** | **$ 15,809** |

**Memo: Liquidity & Leverage Metrics**

*Restricted Funds & Financial Leverage / Coverage Metrics*

| | | | | | |
|---|---|---|---|---|---|
| Liquidity Support Agreement[3] | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Debt Service Reserve | 7,359 | 7,359 | 7,359 | 7,359 | 7,359 |
| Principal & Interest Reserve | 270 | 270 | 270 | 270 | 270 |
| Total Restricted Funds | $ 10,629 | $ 10,629 | $ 10,629 | $ 10,629 | $ 10,629 |
| Long Term Debt (Series 2020 Obligations) | $ 112,861 | $ 112,861 | $ 112,861 | $ 112,861 | $ 112,861 |
| Debt Service Coverage | 1.3x | 1.5x | 1.5x | 1.6x | 1.7x |
| Debt Service to Revenue (%) | 27% | 29% | 29% | 28% | 27% |
| Days Cash on Hand | 45 | 78 | 122 | 167 | 221 |
| Cash to Debt (%) | 3% | 5% | 7% | 10% | 14% |
| Net Operating Margin, Adjusted (%)[4] | 30% | 34% | 35% | 35% | 35% |

Footnote

(1) Projections assume a Plan Effective Date of January 31, 2020

(2) Beginning cash in 2020 is based on the Stayton Forbearance / Cash Collateral Budget.

(3) Amount represents Lifespace funded Liquidity Support Agreement ("LSA"). Total LSA commitment is $6 million, with $3 million funded upon execution of the membership substitution. Assumes liquidity support during the projection period is not required. The funded LSA may be released to Lifespace upon the achievement of certain financial criteria. Release of the LSA to Lifespace may occur during the projection period, however, for purposes of presentation the release of restricted funds is not provided in the projection.

(4) Calculated as: [resident revenue + net entrance fees received - (resident expenses - non-cash expense)] / (resident revenue + net entrance fees received).

# **EXHIBIT E**

Liquidation Analysis

## Exhibit E[1]
Liquidation Analysis

**Background**

Section 1129(a)(7) of the Bankruptcy Code, which is often referred to as the "best interests of creditors" test, requires that as a condition to confirmation of the Plan, each holder of a Claim or Interest in each Impaired Class must either (i) accept the Plan or (ii) receive or retain under the Plan property of value that is not less than the amount the Holder of an Impaired Class Claim would receive or retain in a hypothetical liquidation under chapter 7 of the Bankruptcy Code (the "***Liquidation Analysis***").

The Debtor prepared the Liquidation Analysis to include: (i) estimated cash proceeds that a chapter 7 trustee would generate if the Debtor's Chapter 11 Case were converted to a chapter 7 case on or about thirty days after the Petition Date and the Assets of the Debtor's Estate were liquidated; (ii) estimated distribution that each Holder of a Claim or Interest would receive from the liquidation proceeds; and (iii) compared each Holder's estimated distribution and recovery under a chapter 7 liquidation to the distribution and recovery under the Plan.

The Liquidation Analysis is based upon certain assumptions, and as such certain aspects may be different from those represented in the Plan. The Liquidation Analysis should be read in conjunction with the Disclosure Statement.

THE DEBTOR MAKES NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THESE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN, OR A CHAPTER 7 TRUSTEE'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. IN THE EVENT THAT THE CHAPTER 11 CASE IS CONVERTED TO A CHAPTER 7 LIQUIDATION, ACTUAL RESULTS MAY VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THIS LIQUIDATION ANALYSIS.

**Presentation**

The Liquidation Analysis has been prepared assuming the Debtor converted its Chapter 11 Case to chapter 7 of the Bankruptcy Code on or about December 1, 2019 (the "***Liquidation Date***"). The Liquidation Date represents approximately thirty days after the Petition Date.

Unless otherwise identified herein, the Liquidation Analysis is based on the Debtor's unaudited financial statements as of July 31, 2019. The values presented herein are assumed to be representative of the Debtor's assets and liabilities as of the Liquidation Date.

On the Liquidation Date, it is assumed the Bankruptcy Court would appoint a chapter 7 trustee to conduct the liquidation of the Debtor's Estate. The liquidation of the Debtor's Estate is assumed to occur through the cash sale of substantially all of the Debtor's Assets. The proceeds of such sale are assumed to be applied in the following order: (i) payment of Chapter 7 administrative costs, including trustee fees, professional fees, wind-down expenses, and real estate broker fees; (ii) Bond Claims; and (iii) General Unsecured Claims, including  claims by residents for outstanding

---

[1] Capitalized terms not otherwise defined herein shall have the meanings described to them in the *Debtor's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*.

obligations due and payable under Continuing Care Contracts, and any applicable Deficiency Claims.

The Liquidation Analysis assumes that upon conversion of the case to chapter 7, the Assets would be sold and residents would be transitioned from the community over a four-month process under the direction of the chapter 7 trustee. Given the uncertainty around the transition process and the marketability of the Assets, there can be no assurances given that a four-month liquidation process or that estimated recoveries outlined in this Liquidation Analysis may be achieved. An extension of the liquidation process may result in an increase to wind-down costs which may negatively impact creditor recoveries.

## Conclusion

The Liquidation Analysis demonstrates that Holders of Claims in certain Unimpaired Classes that would receive a full recovery under the Plan would receive less than a full recovery in a hypothetical liquidation. Further, Holders of Claims in Impaired Classes would receive a lower recovery in a hypothetical liquidation than they would under the Plan.

| Liquidation Analysis | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Recovery (%) | | | Proceeds | |
| | | Book Value | | Low | High | | Low | High |
| Cash | [A] | $ | 6,201,000 | 100.0% | 100.0% | $ | 6,201,000 | $ 6,201,000 |
| Accounts Receivable, net | [B] | | 647,508 | 55.0% | 75.0% | | 356,129 | 485,631 |
| Other Receivables | [C] | | 915,523 | 0.0% | 0.0% | | - | - |
| Inventory | [D] | | 19,683 | 5.0% | 10.0% | | 984 | 1,968 |
| Prepaid Expenses | [E] | | 466,788 | 35.0% | 55.0% | | 163,376 | 256,733 |
| Fixed Assets, net | [F] | | 106,295,427 | 50.0% | 70.0% | | 53,147,714 | 74,406,799 |
| Intangible Assets, net | [G] | | 167,566 | 0.0% | 0.0% | | - | - |
| Restricted Assets | [H] | | 4,830,420 | 100.0% | 100.0% | | 4,830,420 | 4,830,420 |
| **Gross Proceeds from Liquidation** | | $ | **119,543,915** | | | $ | **64,699,623** | $ **86,182,552** |
| | | | | | | | | |
| Amts. Not Sub. to the Ch. 7 Dist. Process | [H] | | | | | | (4,830,420) | (4,830,420) |
| **Funds Available Ch. 7** | | | | | | $ | **59,869,203** | $ **81,352,132** |
| | | | | | | | | |
| **Chapter 7 Administrative Costs** | [I] | | | | | | | |
| Trustee Fees | | | | | | | (1,819,326) | (2,463,814) |
| Trustee Professional Fees | | | | | | | (275,000) | (350,000) |
| Trustee Operational Wind-Down Expense | | | | | | | (4,469,416) | (4,469,416) |
| Trustee Real Estate Broker Fees | | | | | | | (797,216) | (1,116,102) |
| **Net Liquidation Proceeds Avail. to Secured Bond Claim** | | | | | | $ | **52,508,245** | $ **72,952,800** |
| Plus: Trustee Held Amounts | | | | | | | 4,830,420 | 4,830,420 |
| **Total Available to Secured Bond Claim** | | | | | | $ | **57,338,665** | $ **77,783,220** |
| | | | | | | | | |
| Secured Bond Claim | [J] | | 109,709,738 | 52% | 71% | | (57,338,665) | (77,783,220) |
| **Funds Available for Priority Claims** | | $ | **109,709,738** | | | $ | **-** | $ **-** |
| | | | | | | | | |
| Administrative Claims (503b9) | | | 50,000 | 0% | 0% | | - | - |
| **Funds Avail. for N/P Un. Sec. Claims** | | $ | **50,000** | | | $ | **-** | $ **-** |
| | | | | | | | | |
| **Non-Priority Unsecured Claims** | | | | | | | | |
| Resident Claims | [K] | | 103,941,230 | 0% | 0% | | - | - |
| General Unsecured and Intercompany Claims | | | 7,598,287 | 0% | 0% | | - | - |
| Secured Bond Claims - Deficiency | [L] | | 42,148,796 | 0% | 0% | | - | - |
| **Total Non-Priority Unsecured Claims** | | $ | **153,688,313** | | | $ | **-** | $ **-** |
| | | | | | | | | |
| **Total Distributions** | | | | | | $ | **(64,699,623)** | $ **(86,182,552)** |

**Notes to the Liquidation Analysis**

[A]: The cash balances are projected as of December 1, 2019, consistent with the Liquidation Date. The Liquidation Analysis assumes that operations during the liquidation period would not generate additional cash available for distribution except for net proceeds from the disposition of non-cash Assets. The Liquidation Analysis further assumes that any donor restricted funds held by an affiliate of the Debtor are not property of the Debtor and that the entrance fee escrow account balance is zero at the Liquidation Date.

[B]: Accounts receivable recovery of 55% to 75% has been estimated based on payor type and account aging.

[C]: Other receivables are comprised of miscellaneous resident entrance fee receivables and intercompany receivables, which are not expected to be recoverable.

[D]: Inventory is comprised of various perishable goods, which are expected to recover 5% to 10% of net book value.

[E]: Unused portion of insurance premiums are expected to be recoverable at 35% to 55%.

[F]: Estimated recovery for fixed assets, which include land, building, and land improvements range from 50% to 70%. Recovery amount represents a high-level estimate by the Debtor. No third-party liquidation appraisals or estimates are available. Significant uncertainty exists around the ability to economically repurpose the facility for alternative uses given the market saturation of senior living facilities (non-CCRC) in Fort Worth, Texas and the surrounding area. Additionally, the liquidation value of the Debtor's property after closure, which under a chapter 7 liquidation would include resident impairment, is highly speculative due to the reputational damage associated with such a process.

[G]: Intangible assets are comprised of capitalized marketing costs which are expected to recover 0% of net book value.

[H]: Restricted assets are $4,830,420 as of July 31, 2019. Restricted assets are comprised of reserve funds held by the Trustee. Restricted assets are expected to be 100% recoverable; however, funds are assumed to be applied in full against the Bond Claims.

[I]: Chapter 7 Administrative Costs assume the following: (i) chapter 7 trustee fees associated with the appointment of a chapter 7 trustee are calculated in accordance with Section 326 of the Bankruptcy Code; (ii) trustee professional fees include legal and accounting fees incurred during the four-month liquidation period; (iii) trustee operational wind-down expense including wind-down costs consistent with historical monthly operating expense run-rates at 100% for month one and two, 50% for month three and four, and medical records preservation costs and other healthcare specific required costs of $100,000; and (iv) a 1.5% real estate brokerage fee associated with the sale of the real property.

[J]: The Bond Claims recovery includes 100% of the restricted asset liquidation proceeds.

[K]: Resident claims include the net current and non-current resident refundable entrance fee liability under each Continuing Care Contract as of July 31, 2019. Balance is net of non-refundable accumulated entrance fee amortization.

[L]: Amount represents estimated Deficiency Claims of the Holders of The Bonds.

## **EXHIBIT F**

Form of Opinion of Bond Counsel

[FORM OF OPINION OF BOND COUNSEL]

_____, 2019

Tarrant County Cultural Education Facilities       UMB Bank, N.A.
 Finance Corporation                               St. Louis, Missouri,
Fort Worth, Texas                                   as Bond and Master Trustee

Tarrant County Senior Living Center, Inc.
Fort Worth, Texas

      Re:    $_____ Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2019
           _____

Ladies and Gentlemen:

We have acted as bond counsel in connection with the issuance of the above-captioned bonds (the "*Bonds*") by the Tarrant County Cultural Education Facilities Finance Corporation, a nonstock nonprofit cultural educational facilities finance corporation duly organized and existing under the laws of the State of Texas (the *"Issuer"*). In this capacity, we have examined the law and the certified proceedings, certifications and other documents that we deem necessary to render this opinion.

The Bonds are issued under the Cultural Education Facilities Finance Corporation Act, Article 1528m, V.A.T.C.S., as from time to time amended (the "*Act*"), and an Indenture of Trust dated as of _____ 1, 2019 (the "*Bond Indenture*"), between the Issuer and UMB Bank, National Association, as bond trustee (the "*Bond Trustee*"). Capitalized terms used and not otherwise defined in this opinion have the meanings assigned in the Bond Indenture.

Regarding questions of fact material to our opinion, we have relied on representations of the Issuer and Tarrant County Senior Living Center, Inc. d/b/a Stayton at Museum Way, a Texas nonprofit corporation (the "*Corporation*") contained in the Loan Agreement and the Tax Compliance Agreement and certified proceedings and other certifications of the Issuer, the Corporation and others furnished to us, without undertaking to verify them by independent investigation. We have also relied upon the Confirmation Order of the United States Bankruptcy Court for the Northern District of Texas dated _____, 2019 (the "Confirmation Order") authorizing and directing, among other matters, the exchange of the Issuer's outstanding Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2009A and Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2009B (collectively, the "*Series 2009 Bonds*") for the Bonds effective as of the date of this opinion.

Based on and subject to the foregoing, we are of the opinion, under existing law, as follows:

1.      The Issuer has lawful power and authority under the laws of the State of Texas, including the Act, to issue the Bonds and to enter into and perform its obligations under the Bond Indenture, the Loan Agreement and the Tax Compliance Agreement.

2.      The Bonds have been duly authorized, executed and delivered by the Issuer and are valid and legally binding limited obligations of the Issuer.

3.      The Bonds are payable solely from the loan payments made by the Corporation under the Loan Agreement and the Series 2019A Master Note and other funds held by the Bond Trustee and pledged under the Bond Indenture as security for the Bonds.  The Bonds are limited obligations of the Issuer payable solely from the revenues, receipts and resources of the Issuer pledged to its payment under the Bond Indenture and not from any other revenues, funds or assets of the Issuer. No owner of any Bonds has the right to compel Tarrant County, Texas to pay the principal of, interest or redemption premium, if any, on the Bonds

4.      The Bond Indenture, the Loan Agreement and the Tax Compliance Agreement have been duly authorized, executed and delivered by the Issuer and are valid and legally binding agreements of the Issuer enforceable against the Issuer.  The Bond Indenture creates a valid lien on the Trust Estate pledged and assigned by the Issuer to the Bond Trustee under the Bond Indenture for the benefit and security of the owners of the Bonds.

5.      The interest on the Bonds (i) is excludable from gross income for federal income tax purposes, and (iii) is not an item of tax preference for purposes of computing the federal alternative minimum tax.  The opinions set forth in this paragraph are subject to the condition that the Issuer and the Corporation comply with all requirements of the Internal Revenue Code of 1986, as amended (the *"Code"*) that must be satisfied subsequent to the issuance of the Bonds in order that interest thereon be, or continue to be, excludable from gross income for federal income tax purposes.  The Issuer and the Corporation have covenanted to comply with all of these requirements.  Failure to comply with certain of these requirements may cause the interest on the Bonds to be included in gross income for federal income tax purposes retroactive to the date of issuance of the Bonds.  The Bonds have not been designated as "qualified tax-exempt obligations" for purposes of Section 265(b)(3) of the Code.

We express no opinion regarding (a) the accuracy, completeness or sufficiency of the Disclosure Statement dated _____, 2019 relating to the solicitation of consents for a plan of reorganization of the Corporation or other offering material relating to the Bonds (except to the extent, if any, stated in the Disclosure Statement), (b) the perfection or priority of the lien on the Trust Estate pledged under the Bond Indenture, or (c) any federal or state tax consequences arising with respect to the Bonds, other than as expressly set forth in this opinion.

The rights of the owners of the Bonds and the enforceability of the Bonds, the Bond Indenture, the Loan Agreement and the Tax Compliance Agreement may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights generally and by equitable principles, whether considered at law or in equity.

This opinion is given as of its date, and we assume no obligation to revise or supplement this opinion to reflect any facts or circumstances that may come to our attention or any changes in law that may occur after the date of this opinion.

Very truly yours,